UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| D.J.C.V., minor child, and G.C., his father | } | No. 1:20-cv-5747 |
| | } | |
| Plaintiffs, | } | |
| | } | |
| v. | } | |
| | } | |
| United States of America, | } | |
| | } | |
| Defendant. | } | **COMPLAINT** |

## INTRODUCTION

1.      This matter concerns a cruel and inhumane policy crafted, issued, and carried out by the Trump Administration's Department of Homeland Security ("DHS"), Health and Human Services ("HHS") and subsidiary agencies to forcibly separate asylum-seeking parents from their children as part of the Administration's efforts to systemically terrorize and punish those vulnerable migrants and thereby deter future migration to the United States. The implementation of the policy and its corresponding long-term separation and isolation had the intended effect of causing extraordinary and profound trauma to thousands of families, including Plaintiffs, G C. and his then-19-month-old son, D.J.C.V., in a manner that meets the U.S. statutory and international law definitions of torture, *i.e.*, the intentional infliction of severe physical or mental pain or suffering.[1]

---

[1]      *See, e.g.*, OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY (Sept. 2019), *available at* https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

2.      Moreover, consistent with the Trump Administration's well-documented animus directed toward non-white migrants, the policy was geared at punishing asylum seekers from Central America, as approximately 90% of the children separated arrived from just three countries: Guatemala, El Salvador and Honduras (the originating country of Plaintiffs Mr. C. and D.J.C.V.).[2]  Moreover, the majority of migrants targeted by this policy are Indigenous peoples, Afro-descendants, or belong to ethnic and racial groups that are often categorized as non-white in the United States.  As such, the policy was intended to deny and did deny fundamental constitutional and international law rights, including the right to family integrity, on a discriminatory basis in such a widespread and systematic scale so as to constitute the crime against humanity of persecution.

3.      The Administration made quite clear that they intended to exploit the trauma resulting from family separations, and media reporting about that trauma, to deter future asylum seekers at the United States' ("U.S.") southern border with Mexico, and thus fundamentally undermine this country's 70-year-old asylum system, which implements the U.S.' international and domestic legal obligations to asylum-seekers.  Despite widespread condemnation and a federal court injunction in *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 1133, 1137 (S.D. Cal. 2018), which required Immigration and Customs Enforcement (ICE) to reunite separated families and stop further separations, as well as an abundance of scientific and medical evidence documenting the trauma associated with forced family separation, the Trump Administration continuously contended that separating parents from children at the U.S.-Mexico

---

[2]      U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-20-245, SOUTHWEST BORDER: ACTIONS NEEDED TO IMPROVE DHS PROCESSING OF FAMILIES AND COORDINATION BETWEEN DHS AND HHS (Feb. 2020) at 20, 92-93, *available at* https://www.gao.gov/assets/710/704683.pdf; *See also* ACLU, *Family Separation by the Numbers*, https://www.aclu.org/issues/immigrants-rights/immigrants-rights-and-detention/family-separation (last visited July 23, 2020).

border was somehow necessary to protect national security.  The Trump Administration thus deliberately subjected thousands of vulnerable people, including thousands of children, to a brutal and traumatizing campaign of physical and psychological harm to achieve narrow—and unlawful—policy goals.

4.      Officially, the federal government has admitted to separating at least 4,368 children from their parents or guardians after they crossed the U.S. southern border.[3]  However, the number of families separated is likely thousands higher, in part due to lax, if not intentionally deceptive, record-keeping failures of several government agencies. [4]

---

[3]      Kristina Davis, *U.S. officials say they are highly confident to have reached tally on separated children: 4,368*, L.A. TIMES (Jan. 18, 2020), https://www.latimes.com/world-nation/story/2020-01-18/u-s-officials-say-they-are-highly-confident-to-have-reached-tally-on-separated-children-4-368. *See also*, Joint Status Report at *1, *10, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18cv00428 DMS (MDD) (S.D. Cal. Sept. 9, 2019), ECF No. 465 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 986 children as part of the expanded class); *see also* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-Bl-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE (Jan. 17, 2019) at 11, *available at* https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf [hereinafter HHS OIG REPORT I]; S. Poverty L. Ctr., *Family separation under the Trump administration – a timeline*, (June 17, 2020), https://www.splcenter.org/news/2020/06/17/family-separation-under-trump-administration-timeline#2020.

[4]      *See,* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC. OIG-20-35, CBP SEPARATED MORE ASYLUM-SEEKING FAMILIES AT PORTS OF ENTRY THAN REPORTS AND FOR REASONS OTHER THAN THOSE OUTLINED IN PUBLIC STATEMENTS (May 29, 2020) at 11, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf ("[W]e encountered data reliability issues calling into question DHS' ability to accurately identify and address all family separations prior to June 2018.  Before then, OFO's system for tracking aliens at the ports of entry included a data field that could be used to indicate a child was held separately from his or her parent.  However, OFO officials said staff did not use the data field consistently, and as a result, OFO could not provide a reliable number of families separated before June 2018."). *See also,* HHS OIG REPORT I, *supra* note 3, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

5.      After tearing children away from their parents, DHS agents inflicted further terror and trauma on families by delaying and failing to provide information regarding the children's whereabouts and well-being to distraught parents and family members. Defying the consensus of expert opinion[5], not to mention basic human decency, DHS also systemically refused to facilitate adequate communication between the parents and children during their separation. DHS along with the Department of Health and Human Services' Office of Refugee Resettlement (ORR), the agency charged with taking custody of the separated children, likewise failed to implement any system for tracking the children to ensure that the families could be reunited.  All this was done without any semblance of an assessment as to whether the parent posed a danger to the child.

6.      In an emergency habeas action filed in this Court Mr. C. alleged that the continued separation from his young son violated substantive and procedural due process protections and rose to the level of torture. Honorable Judge Alvin Hellerstein agreed that Mr. C. and D.J.C.V.'s continued separation was unconstitutional and joined a broad consensus of district courts in recognizing that enforced separation violated the families' due process right to family integrity. Judge Hellerstein ordered their immediate reunification on October 10, 2018.[6] At the hearing in which he issued his decision, Judge Hellerstein called the policy of baselessly separating families the "most cruel of all cruelties."

---

[5]      *See* report by Physicians for Human Rights, *"You Will Never See Your Child Again" The Persistent Psychological Effects of Family Separation* (Feb 2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf; APA's May 30, 2018 statement, Am. Psychiatric Assoc., *APA Statement Opposing Separation of Children from Parents at the Border* (May 30, 2018), https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-children-from-parents-at-the-border.
[6]      Summary Order, D.J.C.V. v. U.S. Immigration & Customs Enf't, No. 18 CIV. 9115 (AKH), 2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018), ECF No. 21.

7.      The intentional infliction of such severe mental and physical trauma is at the crux of the government's family separation policy.  As the Special Rapporteur on Torture has explained, its implementation constitutes torture because the harm was inflicted, in this case and in others, "for the purpose of deterring, intimidating or punishing migrants or their families [or] coercing them into withdrawing their requests for asylum."[7]

8.      Mr. C. and his son fell victim to the Administration's policy on or about May 2, 2018 when U.S. government officials forcibly seized then-19-month-old D.J.C.V. from his father's custody and thereafter separated them for five and a half months, until the October 10, Court-ordered reunification. D.J.C.V. was held in ORR custody at various foster homes in the Bronx, New York, while Mr. C. was in various DHS detention facilities, including the Orange County Correctional Facility in Goshen, New York.  ICE officials threatened to deport Mr. C. without his son, and coercively conditioned the possibility of reuniting with his son on Mr. C.'s agreement to waive his and his son's bona fide asylum claims. Throughout this forced separation, the government provided only limited information to Mr. C. about his child's whereabouts and well-being, and afforded Mr. C. no opportunity to directly communicate with his son.

9.      The separation caused Mr. C. unbearable anguish and grief as well as fear for his son's mental, emotional, and physical well-being, which continues today.  By the time they were finally reunited D.J.C.V. had been separated from his father for nearly a quarter of his young life. All the while Mr. C. despaired that his young son would not remember or recognize him, a harsh

---

[7]      U.N. HUMAN RIGHTS COUNCIL, *Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment* ¶ 20, U.N. Doc. A/HRC/37/50, (Feb. 26, 2018), https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf. *See also* NYU amicus brief, arguing family separation, is torture in habeas proceeding https://chrgj.org/wp-content/uploads/2019/02/Redacted-GJC-et-al-Brief-Amici-Curiae-Feb-2019.pdf.

reality that materialized once they were finally reunited.  As a result of ICE's actions, Mr. C. and his son suffered and continue to suffer substantial and ongoing mental, emotional, and physical trauma.

10.     ICE and ORR's forced seizure, continued separation, and isolation of a parent and his young child, as well as ICE's conditioning of Mr. C.'s reunification with his son on a waiver of his asylum rights was cruel and unusual. It was also unlawful. The United States is liable in damages for the conduct which harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA"). The conduct against these noncitizens also violated the law of nations, conferring jurisdiction on the court under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, as individual agents acting for the United States (1) inflicted severe physical or mental pain or suffering and did so in order to coerce Mr. C. to forfeit his right to seek asylum and in a coordinated effort to limit or forestall migration and asylum from Central America, which meets the customary international law definition of torture;  and (2) did so motivated by a discriminatory animus against individuals of Latin American origin, targeting parents and children for separation on national, ethnic or racial grounds, thereby constituting the crime against humanity of persecution as defined under customary international law.

11.     Plaintiffs bring this action under the FTCA and ATS seeking compensation for the extraordinary harms they suffered at the hands of ICE and ORR officials.

### JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b), and 1350.

13.     On July 26, 2019, Plaintiffs submitted an administrative claim to DHS and the Department of Health and Human Services (HHS). Neither agency has made a final disposition

on Plaintiffs' administrative claims and, as six months have passed since Plaintiffs' submission

of the claims, they are deemed constructively denied. 28 U.S.C. § 2675(a). Accordingly,

Plaintiffs have exhausted all potential administrative remedies.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1402(b) as a

substantial portion of the acts and omissions which are the subject of this Complaint occurred in

this District. Plaintiff, Mr. C. was detained in Orange County Correctional Facility located in

Goshen, New York. Plaintiff's son, D.J.C.V. was also detained in this District by ORR through

Lutheran Social Services of New York ("LSSNY") in the Bronx, New York.

## PARTIES

15.     Plaintiff G.C.[8] is an adult man from Honduras and the father of D.J.V.C. Together

with D.J.C.V., Mr. C. fled Honduras seeking protection from persecution, including threats to his

life and that of his son. Now 39 years old, Mr. C. was 37 years old at the time DHS and ORR

officials forcibly took and kept his son away from him.

16.     Plaintiff, D.J.C.V. is three years old. He was only 19 months old when he entered

the United States with his father on or about April 30, 2018, and turned two while he was in the

custody of ORR and separated from his father. This action is brought on his behalf, under the

authority of his father, Plaintiff Mr. C.

17.     Defendant United States of America is the appropriate defendant under the FTCA,

28 U.S.C. §§ 1346(b), 2671, *et seq*. and under the Alien Tort Statute, 28 U.S.C. § 1350, as the

---

[8] G.C. uses his initials in order to protect the identity of his minor son, D.J.C.V., who proceeds under initials pursuant to Fed. R. Civ. P. 5.2. In addition, Mr. C. further wishes to protect his identity because his immigration proceedings are pending and because he fears consequences from those who threatened him in Honduras. Mr. C. intends to file a motion to proceed under initials pursuant to *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185 (2d Cir. 2008).

United States has no sovereign immunity for violations of *jus cogens* violations such as torture and the crime against humanity of persecution.

18.     All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, its subsidiaries, ICE and Customs and Border Protection (CBP), and HHS and its subsidiary, ORR.

19.     DHS agents were responsible for separating Mr. C. from D.J.C.V. DHS employees also are responsible for supervising and managing detained individuals at CBP and ICE facilities and were the ones responsible for attempting to coercively condition Mr. C.'s reunification with his son on a waiver of his right to asylum.

20.     HHS agents are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities in New York.

21.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.[9]

## STATEMENT OF FACTS

**A.      The Trump Administration's Family Separation Policy**

**1.      The Development of the Separation Policy and Its Intent to Deter Future Central American Asylum Seekers**

22.     Trump Administration officials have pursued a range of immigration policies that collectively aim to dramatically decrease the number of individuals—primarily Central

---

[9]     28 U.S.C. § 2680(h).

Americans, Africans, and other immigrants of color—from seeking asylum in the United

States.[10]

23.     In an effort to limit the number of individuals seeking asylum, in July 2017, the

Trump Administration established a family separation pilot program in CBP's El Paso sector,

which covers regions in Western Texas and New Mexico.[11] This pilot program targeted for

criminal prosecution parents who crossed the border with children.[12]

24.     Through this program, DHS and subsidiary agency officials detained parents and

children, forcibly took children away from their parents' custody, and referred the parents to the

---

[10]     U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-19-163, UNACCOMPANIED CHILDREN:
AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER (Oct.
2018), *available at* https://www.gao.gov/assets/700/694963.pdf [hereinafter GAO REPORT].
*See also, e.g.*, Kevin Lemarque, *U.S. Judge Bars Trump Administration From Enforcing Asylum
Ban*, CNBC (Nov. 20, 2018), https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-
us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump
Administration Is Illegally Turning Away Asylum Seekers*, ACLU (Oct. 30, 2018),
https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-
asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration
Policy*, WASH. POST (Aug. 17, 2019),
https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump- immigration/;
Emma Platoff, et al., *While Migrant Families Seek Shelter From Violence, Trump Administration
Narrows Path to Asylum*, TEXAS TRIBUNE (July 10, 2018),
https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-
seekers-donald-trump/; Maria Sacchetti, et al., *Trump Tightens Asylum Rules, Will Make
Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. Post (Apr. 30, 2019),
https://www.washingtonpost.com/politics/trump- issues-memo-calling-for-changes-to-handling-
of-asylum-cases/2019/04/29/df41b5f2- 6adb-11e9-be3a-
33217240a539_story.html?noredirect=on&utm_term=.5e3bcec9eead; Glenn Thrush, *U.S. to
Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES (Jan. 24,
2019), https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html;
Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum
Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-
asylum/trump-administration-moves-to-curb-migrants-asylum-claims- idUSKCN1ND35K.
[11]     GAO REPORT, *supra* note 10, at 15-16. *See also* HHS OIG REPORT I, *supra* note 3, at
3.
[12]     GAO REPORT, *supra* note 10, at 15-16. *See also* HHS OIG REPORT I, *supra* note 3, at
3.

Department of Justice (DOJ) for criminal prosecution.[13] Children, some as young as four months old,[14] were separated from their parents, designated as unaccompanied minors, and placed in the custody of ORR.[15] The vast majority of separated families were not informed by immigration officials when or how they would be reunited; nor were parents assured that they would not be deported without their children in the event their asylum claim failed.[16]

25.     During the span of only five months, from July to November 2017, the government separated at least 281 individuals in families through this pilot initiative.[17]

26.     In December 2017, one month after the end of the pilot program, the Trump Administration circulated a memorandum entitled, "Policy Options to Respond to Border Surge of Illegal Immigration." [18] Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units."[19] This

---

[13]     HHS OIG REPORT I, *supra* note 3, at 4.

[14]     Todd Heisler & Caitlin Dickerson*, The Youngest Child Separated From His Family at the Border Was 4 Months Old*, N.Y. TIMES (Jun. 18, 2019)**,** https://www.nytimes.com/2019/06/16/us/baby-constantine-romania-migrants.html.

[15]     HHS OIG REPORT I, *supra* note 3, at 4.

[16]     *See* Miriam Jordan, *I Can't Go Without My Son,' A Mother Pleaded as She Was Deported to Guatemala,* N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html; Christianna Silva, *What we know about the immigrant kids separated from their* families, VICE NEWS (June 22, 2018), https://www.vice.com/en_us/article/evkwq4/what-we-know-about-the-immigrant-kids-separated-from-their-families.

[17]     HHS OIG REPORT I, *supra* note 3, at 3.

[18]     *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), *available at* https://www.documentcloud.org/documents/5688664-Merkleydocs2.html [hereinafter *Policy Options*].  *See also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting- migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

[19]     *Policy Options*, *supra* note 18.

memorandum evinced the Administration's deterrent intent and was reviewed by senior officials at the Department of Justice and DHS.[20]

27.     Under the "Prosecution" policy, the memorandum states that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]."[21] Similarly, under the "Separate Family Units," policy, the memorandum called for an announcement that adults would be placed in adult immigration detention (primarily county jails and privately-contracted detention centers), while children would be placed in ORR custody.[22] The memorandum specifically asserted that the "increase in prosecutions would be reported by media and it would have substantial deterrent effect."[23] Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate.

28.     Ultimately, this December 2017 memorandum outlining the prosecution and separation polices is consistent with directives announced, approximately five months later, on April 6, 2018, by then-Attorney General Jeff Sessions.

29.     On April 6, 2018, just prior to Mr. C. and D.J.C.V.'s arrival to the border, then-Attorney General Jeff Sessions announced the government's new "Zero Tolerance" policy, directed specifically and exclusively at the Southwest Border, which mandated the prosecution of all persons who crossed the United States border between ports of entry.[24] This policy

---

[20]     *Id*.

[21]     *Id*.

[22]     *See id.*

[23]     *Id*.

[24]     Memorandum from The Attorney General to Federal Prosecutors Along the Southwest Border (Apr. 6, 2018) (*available at* https://www.justice.gov/opa/pr/attorney-general- announces-zero-tolerance-policy-criminal-illegal-entry).

effectively endorsed the practices of criminal prosecution and family separation previously tested in the El Paso pilot program.[25]

30.     The Trump Administration's zero tolerance policy, in turn, triggered the family separation policies.[26]

31.     The Trump Administration enacted these policies to deter individuals from seeking asylum or otherwise coming to the United States by forcibly separating parents from their children.[27] A statement released by the White House entitled, "What You Need To Know About President Donald J. Trump's Efforts To End Catch And Release,"[28] shows that ending "catch and release" was intended to "empower Federal authorities . . . with the legal authority and resources [needed]," to address the issue of "more than 107,000 [unaccompanied children being] released into the United States since fiscal year 2016."[29]

---

[25]     *Id.*

[26]     Nila Bala & Arthur Rizer, *Trump's family separation policy never really ended. This is why.*, NBC News (Jul. 1, 2019), https://www.nbcnews.com/think/opinion/trump-s-family-separation-policy-never-really-ended-why-ncna1025376 ("[T]he zero tolerance and family separation policies are distinct from each other. Family separation refers to the policy of automatically breaking up family units because children cannot be detained in adult detention centers, while 'zero tolerance' is an approach to border crossings in which all undocumented immigrants who enter our country through the border with Mexico are automatically referred for criminal prosecution and sent to pretrial jail. Child separation, though, is a direct result of zero tolerance, and cannot be ended without truly ending zero tolerance.").

[27]     *See 60 Minutes, Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird*, CBS Television Broadcast,  Nov. 25, 2018 (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *see also  Policy Options*, *supra* note 18.

[28]     "Catch and Release" is a simplified, misleading term referring to a federal practice implemented by various administrations allowing asylum-seekers, among other groups of immigrants, to live in the community, rather than be held in government custody, while awaiting their immigration hearings. This practice is fully in accord with U.S. immigration law.

[29]     *What You Need To Know About President Donald J. Trump's Efforts To End Catch And Release*, The White House, Statements & Releases, April 9, 2018, *available at* https://www.whitehouse.gov/briefings-statements/need-know-president-donald-j-trumps-efforts-end-catch-release/.

32.     Former Attorney General Sessions attacked asylum as "an easy ticket to illegal

entry into the United States," swamped with "vague, insubstantial, and subjective claims."[30]

Secretary Nielsen signed off on the policy after receiving a memo observing that such a policy

would "have the greatest impact on current flows."[31]  The National Security Council and Stephen

Miller have laid out a persistent strategy to deny asylum seekers even when processed: in July

2019 a National Security Council official told CBP officials that "My mantra has persistently

been presenting aliens with *multiple unsolvable dilemmas* to impact their calculus for choosing

to make the arduous journey to begin with."[32]

33.     With knowledge that the policy of forcibly separating children from their families

would cause severe harm to those affected—and specifically intending to cause such harm—

---

[30]     Jeffrey B. Sessions III, *Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017) (transcript available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review).

[31]     Cora Currier, *Prosecuting Parents–and Separating Families–Was Meant to Deter Migration, Signed Memo Confirms*, INTERCEPT (Sept. 25, 2018), https://theintercept.com/2018/09/25/family-separation-border-crossings-zero-tolerance/ (containing excerpts of the Department of Homeland Security memo). *See, also,* Memorandum to the Secretary of Dep't of Homeland Security, Kirstjen Nielson, from Kevin K. McAleen, *Increasing Prosecutions of Immigration Violations* (Apr. 23, 2018) (*available at* https://www.documentcloud.org/documents/4936850-Part3-From-CBP-2018-070727-Redacted.html#document/p14/a456180).

[32]     Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC NEWS (July 29, 2019), https://www.nbcnews.com/politics/immigration/stephen-miller-wants-use-border-agents-screen-migrants-cut-down-n1035831 (emphasis added).

Jud Murdock, CBP's Acting Assistant Commissioner stated in December 2018 that actually considering asylum seekers' applications would only encourage more asylum seekers to come, emphasizing what the administration wished to avoid: "[t]he more we process, the more will come." Hamed Aleaziz, *The Trump Administration is Slowing the Asylum Process to Discourage Applicants, An Official Told Congress*, BUZZFEED (Dec. 17, 2018), https://www.buzzfeednews.com/article/hamedaleaziz/the-trump-administration-is-slowing-the-asylum-process-to.

Administration officials at the highest levels created a legally sanctioned procedure to incite fear, trauma, and pain.[33]

34.    Administration officials did this despite, and indeed in part because of, repeated warnings about the catastrophic, traumatic injuries forced and prolonged separation of families would produce.  For example:

a.    In September 2016,more than a year before the family separation pilot program officially began in El Paso, the DHS Advisory Committee on Family Residential Centers issued a report concluding that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS."[34] This report explicitly warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[35]

b.    Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, as early as February 2017, he repeatedly cautioned Administration officials that a policy of separating children from their parents had "significant potential for traumatic psychological injury to the child."[36] Administration officials ignored Commander White's warnings for over a year and

---

[33]    *Policy Options*, *supra* note 18; *see also*, Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/?utm_term=.6fce092b57af.

[34]    U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REPORT OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS (2016) at 2, *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc- 16093.pdf.

[35]    *Id.*

[36]    *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), *available at* https://youtu.be/OPPncPb50QE?t=73. *See also* Jeremy Stahl, *The Trump Administration Was*

up through the day he left ORR on March 15, 2018, mere weeks before the policy was

launched across the entire southern border, and continued to disregard his warnings

thereafter.

  c. In March 2017, several DHS officials told the press that the department was

considering a policy of separating mothers and children who cross the border illegally in

order to deter families from migrating to the United States. The very next day, the American

Academy of Pediatrics responded with a statement opposing DHS's proposed family

separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and
> physical stress children experience as they seek refuge in the United States is
> not exacerbated by the additional trauma of being separated from their siblings,
> parents or other relatives and caregivers. Proposals to separate children from
> their families as a tool of law enforcement to deter immigration are harsh and
> counterproductive. We urge policymakers to always be mindful that these are
> vulnerable, scared children"[37]

  35. The Trump Administration, including DHS officials, not only disregarded

warnings from several of their own Administration members, they also ignored a plethora of

scientific and medical evidence demonstrating that separating children from their parents likely

causes extraordinary trauma and long-lasting effects on children's development.[38] The

Administration acted intentionally, and/or recklessly and unreasonably by implementing these

---

*Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018),
https://slate.com/news- and-politics/2018/07/the-trump-administration-was-warned-separation-
would-be- horrific-for-children.html.

[37] Press Release, Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP
Statement Opposing Separation of Mothers and Children at the Border,* (Mar. 4, 2017), available
at, https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-
children-from-parents-at-the-border.

[38] *See infra* ¶ 79.

policies, which have been proven to cause permanent emotional and behavioral problems and brain damage in children.[39]

36.     In the weeks following implementation of the family separation policy, in May 2018, widespread media coverage sparked public outrage and condemnation across the nation. In response to the public outrage, Administration officials denied all claims that they implemented the "Zero Tolerance" policy to deter immigration.[40] Remarkably, the Administration also publicly denied the existence of any policy of family separation as they were meting out its brutal conditions.[41]

37.     These statements, however, were contradicted by the admissions of numerous high-level officials, including Secretary Nielsen, Attorney General Sessions, and then-White House Chief of Staff John Kelly,  made statements confirming that family separation was the express policy and that its intended purpose was to terrorize and deter parents from seeking asylum through the use of forced family separation.

38.     Accordingly, from 2017 through the time period at issue in this Complaint, government officials in the Trump Administration intentionally caused parents and children pain and suffering in order to deter them from seeking asylum, which is a universal human right dating to the 1951 United Nations Refugee Convention enacted to prevent a repeat of the horrors visited upon refugees who could not find sanctuary from persecution and slaughter during World War II.

---

[39]     *Id.*

[40]     *See* Christina Wilkie, *White House Denies Separating Families Is "Policy," but Insists It Is Needed "to Protect Children,"* CNBC (Jun. 18, 2018), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-47, 48 (2019) (statement of Sec. Kristjen Nielsen, Dep. of Homeland Sec.).

[41]     Wilkie, *supra* note 40.

## 2. The Implementation of the Separation Policy and the Failure and Refusal to Reunify

39.     During this period, CBP officers separated parents and children under the family separation policy at several immigration detention sites near the U.S.-Mexico border.

40.     Immigration officials frequently detained arriving parents and children in inhumane conditions. Immigration officials used cells which are commonly and infamously known as *hieleras* or "ice-boxes" due to the cold temperature inside, in short-term detention centers to house parents and children.

41.     Shortly after arrival, immigration officials would inform parents that immigration officials would take their children.

42.     Having received limited information and not knowing when immigration officials would come for their children, many parents waited in terror.

43.     Often, parents' terror and anxiety compounded as they were effectively forced to watch immigration officials take other parents' children away.

44.     If the parents did not willingly hand their children over to immigration officials, or when children clung to their parents, the officials often forcibly ripped the children out of their parents' arms.

45.     Immigration officials separated children as young as four months old and as old as 17 years old from their parents, without regard for the children's, health, age or language ability.

46.     After forcibly separating family units, CBP transferred many parents into ICE custody.[42]

---

[42]     OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE

47.     In many cases, parents begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's distress.

48.     Parents often endured immigration officials physically seizing their terrified children from their side and forcibly carrying them out of the cells and out of their sight.

49.     In many cases, immigration officials flew children thousands of miles away from their parents under the pretense that the separation was the necessary result of the criminal prosecution of the parents. In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

50.     Following family separation, the government then classified the children as "unaccompanied," even though they were accompanied by their parents when they arrived in the United States and remained accompanied until the government separated them from their parents and transferred the children to ORR custody. ORR is responsible for the long-term custodial care and placement of "unaccompanied alien children."[43] *See* 6 U.S.C. § 279(a).

51.     As predicted by then-White House Chief of Staff John Kelly, ORR staff then placed the children in "foster care or whatever."[44] The "whatever" included placement of many children in ORR facilities throughout the United States. At times, these facilities range from for-profit and non-profit warehouses with cages and prison-like beds, to temporary tent cities in the

---

ZERO TOLERANCE POLICY (Sept. 27, 2018) at 2-3, 13, 15, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter DHS OIG REPORT].

[43]     *Id.* at 3.

[44]     *Transcript: White House Chief of Staff John Kelly's Interview with NPR* (May 11, 2018) (transcript available at https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr).

South Texas desert, to renovated Walmarts, to foster care services run by religious organizations, to "tender-age" centers for babies and toddlers.[45]

52.     Various news agencies described these facilities as "unspeakable environments, characterized by a complete loss of human dignity."[46] For instance, many "facilities lacked basic hygiene products like toothbrushes and soap in many cases, and are often covered in lice."[47] In a Texas facility, when lawyers visited they reported that various instances of "kids taking care of kids."[48] On one occasion, a few girls as young as 10 were trying to take care of "[a] 2-year-old boy [who] want[ed] to be held all the time."[49]  Lawyers reported that there were some children who had wet their pants, but had no diapers and were wearing soiled clothing unable to bathe or change for weeks.[50]

53.     The parents and children were not provided information as to each other's whereabouts or dates when they would be able to see or speak to each other again. Many parents, including Mr. C., had to wait months before speaking to their children. In some cases, when parents finally obtained contact information for their children, they were told they had to pay to make phone calls, a significant obstacle for detained parents who had no resources.

---

[45]     Silva, *supra* note 16.

[46]     Nila & Rizer, *supra* note 26.

[47]     *Id.*; *see also* Clara Long and Nicole Austin-Hillery, *We went to a border detention center for children. What we saw was awful*, CNN OPINION (Jun. 25, 2019), **Error! Hyperlink reference not valid.**https://www.cnn.com/2019/06/24/opinions/children-migrant-centers-at-border-long-austin-hillery/index.html; Gaby Del Valle, *Lice, and Open Toilets: What Attorneys Saw at Migrant Processing Centers*, VICE NEWS (Jun. 22, 2019), https://www.vice.com/en_us/article/43jpjp/flu-lice-and-open-toilets-what-attorneys-saw-at-migrant-child-processing-centers.

[48]     *Hundreds of migrant children held in unsafe conditions at Texas facility, lawyers warn*, GUARDIAN (Jun. 21 2019), https://www.theguardian.com/us-news/2019/jun/21/child-migrant-facilities-shocking-conditions-revealed.

[49]     Cedar Attanasio, Garance Burke & Martha Mendoza, *Attorneys: Texas Border Facility Is Neglecting Migrant Kids*, ASSOCIATED PRESS (Jun. 21, 2019), https://apnews.com/46da2dbe04f54adbb875cfbc06bbc615.

[50]     *Id.*

54.     Families already traumatized by the threat of harm or death that motivated their arduous journey, which was invariably compounded by an exhausting and perilous journey to the U.S., thereafter suffered physically, mentally, and/or emotionally during the separation from their children.

55.     Likewise, children separated from their parents suffered physically, mentally, and/or emotionally. The trauma of children like D.J.C.V. was aggravated by the fact that, often times, many of them did not understand or were too young to understand why they had been separated.[51] Unfortunately, reports indicate that some children believed their parents had abandoned them.[52]  Others, like D.J.C.V., could no longer even remember their parents, compounding the stress and confusion on each, and the trauma upon reunification.

56.     The government further exacerbated the children and parents' trauma by failing to take even the simplest and most reasonable steps to record which children belonged to which parents and further demonstrated the sheer disregard for the well-being of the families

57.     The government's failure to ensure appropriate record-keeping manifested itself in many ways. For example, ICE's computer system "did not display data from CBP's systems that would have indicated whether a detainee had been separated from a child."[53]

---

[51]     OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 10 (Sept. 18, 2019), *available at* https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf) [hereinafter "HHS OIG REPORT II"] ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress. For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").
[52]     *Id.*
[53]     DHS OIG REPORT, *supra* note 42, at 9-10.

58.     As a result, when ICE processed detained parents for removal, "no additional effort [was made] to identify and reunite families prior to removal."[54]  In 2018, immigration agencies identified 471 parents "who were removed from the United States without their children, and without being given the opportunity to elect or waive reunification in accordance with the [June 26, 2018 preliminary injunction granted in favor of the *Ms. L* class.]."[55]

59.     The government's failures prolonged delays in parents' ability to locate and communicate with their children, and ultimately to be reunited, causing even more distress for separated families. These failures "also contributed to children's anxiety and fear for their parents' well-being."[56]

60.     When the DHS Office of Inspector General ("OIG") pressed ICE for information that should have been available to ICE (e.g., information on the current location of separated children), ICE could not provide the information, and had to request it from HHS. DHS later "acknowledged to the OIG that there is no 'direct electronic interface' between the DHS and HHS tracking systems."[57]

61.     As emphasized by the Honorable Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

---

[54]     *Id.* at 10.
[55]     Order Granting In Part And Denying In Part Plaintiffs' Motion To Allow Parents Deported Without Their Children To Travel To The United States at *2**, *Ms. L. v. U.S. Immigration and Customs Enforcement et al*., No. 18cv00428 DMS (MDD) (S.D. Cal. July 27, 2018), ECF No. 456 (*citing* ECF No. 382 at 7) ("But during the chaotic and unprecedented practice of separating these migrant families, 471 of the parents were deported without their children.").
[56]     HHS OIG REPORT II*, supra* note 51, at 10-11.
[57]     DHS OIG REPORT, *supra* note 42, at 11.

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process.[58]

62.     The government compounded the harm it caused by failing to provide parents and children, including Plaintiffs, with any information regarding each other's whereabouts or well-being for weeks and, in many cases, months, and by failing to facilitate adequate communication between parents and children.[59] The torture of not knowing where their family members were, whether they were healthy and safe, and when or whether they would see each other again further exacerbated the trauma parents and children suffered as a result of being torn apart.[60]

---

[58]     *Ms. L.*, 310 F. Supp. 3d at 1144 (emphasis in original).

[59]     *See, e.g.*, *id.* at 1136-37 ("[T]here is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children. Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children."); Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*, WASH. POST (June 21, 2018), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html (reporting that "government authorities have often been unwilling to arrange phone calls between [separated parents and children], or provide details about where the child is held").

[60]     *See, e.g.*, HHS OIG REPORT II, *supra* note 51, at 11 ("Adding to the challenge of addressing mental health needs of separated children was the uncertainty that came with a hectic reunification process for children covered by the *Ms. L v. ICE* lawsuit. . . . Changing guidance resulted in uncertainty around how or when reunification would happen. For example, case managers in facilities were not always able to let children know when, or even if, they would be reunified with their parents, or whether that reunification would happen in the United States. This type of uncertainty added to the distress and mental health needs of separated children. . . . [F]acilities reported that logistical issues introduced further uncertainty that could lead to emotional distress. Facilities reported that some reunifications were scheduled with little advance notice, or suddenly canceled or delayed, which increased the levels of uncertainty and anxiety in separated children . . . .")

63.     Although President Trump signed an executive order ("EO") purporting to end the policy of family separation on June 20, 2018 after provoking widespread condemnation, families continued to be torn apart.[61]

64.     The EO stated that it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."[62]

65.     At the time the order had been signed, more than 700 families had been separated.[63]

66.     The EO, however, did not explain whether or how the federal government would reunify children whom the government had forcibly separated from their parents. In fact, on June 22, 2018, the government admitted that it had no reunification procedure in place.[64]

---

[61]     *Affording Congress an Opportunity to Address Family Separation*, Exec. Order No. 13841, 83 Fed. Reg. 29435 (June 25, 2018) [hereinafter E.O. 13841].

[62]     *Id*.

[63]     Nila & Rizer, *supra* note 26. ("In many cases, the separations since then have continued under the guise of fitting into a narrow exception to the order — that the parent poses a danger to the child, or has a serious criminal record or gang affiliation.").

[64]     *See Ms. L*., 310 F. Supp. 3d at 1140–41 (citing Transcript of Status Conference at *29-30, *Ms. L*., No. 18cv00428 DMS (MDD) (S.D. Cal. June 22, 2018), ECF No. 77); *see also,* GAO REPORT, *supra* note 10, at 21 ("HHS officials told [the GAO] that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order."). The only procedure in place capable of reuniting children with their parents was the procedure developed to place unaccompanied children with sponsors in compliance with the Trafficking Victims Protection Reauthorization Act. *Id*. Under this procedure, however, a parent could only be reunited with his or her child if the government deemed them eligible to be a sponsor. *Id*. Judge Sabraw noted that this procedure was inadequate because it was created to address "a different situation, namely what to do with alien children who were apprehended *without their parents* at the border or otherwise," and further, that the procedure was not developed to address situations such as this one where family units were separated by government officials after they crossed the border together. *Id*. at 27 (quoting Order Following Status Conference at *2, *Ms. L*., No. 18cv00428 DMS (MDD) (S.D. Cal. July 10, 2018), ECF No. 101).

67.     On June 26, 2018, in *Ms. L.*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.[65]

68.     Only after Judge Sabraw issued the injunction did the government begin taking steps to reunify families who were members of the *Ms. L.* class.[66] These efforts were defined by chaos.

69.     The government claimed that DHS and HHS had created a centralized database containing all relevant information regarding parents separated from their children. But there was "no evidence that such a database exists."[67] Any data the government collected was incomplete, contradictory, and unreliable.[68]

70.     Accordingly, the agencies resorted to a variety of inefficient and ineffective methods to determine which children were subject to Judge Sabraw's injunction,[69] including hand-sifting through agency data looking for any indication that a child in HHS custody had been separated from his or her parent,[70] and calling in the officer of the Assistant Secretary for

---

[65]     *Ms. L.*, 310 F. Supp. 3d at 1149-50.
[66]     *See id.* at 1140-41.
[67]     DHS OIG REPORT, *supra* note 42, at 10.
[68]     *Id.* at 11-12.
[69]     GAO REPORT, *supra* note 10, at 23-25.
[70]     *Id.* at 24.

Preparedness and Response, an HHS agency whose normal prerogative involves responding to

hurricanes and other public health disasters, to review data provided by HHS, DHS, and ORR.[71]

71.     The method for determining which family units required reunification changed

frequently, sometimes more than once a day, with staff at one ORR shelter reporting that "there

were times when [they] would be following one process in the morning but a different one in the

afternoon.[72]

72.     Judge Sabraw criticized the agencies for their callous treatment of families:

"[W]hat was lost in the process was the family. The parents didn't know where the children

were, and the children didn't know where the parents were. And the government didn't know,

either."[73]

73.     Consistent with Judge Sabraw's rulings, the government's policy of separating

children from their parents absent a determination that the parents were unfit or presented a

danger to their children and its failure to track the children and promptly reunite the families

once they were separated violated the constitutional right to family integrity of the persons

subject to the policy.[74]

---

[71]     *Id.* at 23.
[72]     *Id*. at 27.
[73]     Transcript of Status Conference at *58, *Ms. L.*, No. 18cv0428 DMS (MDD) (S.D. Cal. July 27, 2018), ECF No. 164.
[74]     *See Ms. L. v. U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018) (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); *see also Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

74.     The government reunification efforts were even more chaotic and careless for parents like Mr. C. who were not members of the class in *Ms. L* as they could not rely on the *Ms. L.* court order to assist them in finding their children and reunifying with them.

75.     Due to an eight-year-old misdemeanor conviction from years prior to D.J.C.V.'s birth, Mr. C. was not included in the class of parents covered by the injunction issued *in Ms. L.,* because the class definition did not include parents with a "criminal history or communicable disease." *Ms. L.,* 310 F. Supp. 3d at 1139 n.5.

76.     The U.S. Department of Homeland Security ("DHS") failed to disclose any process for reunification of families prior to removal, including during the pendency of asylum and withholding of removal claims, which may last for months, for parents who are exempt from the *Ms. L.* class like Mr. C.[75]

77.     As evidenced by Administration officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do

---

[75]     In opposition to a petition for writ of habeas corpus concerning D.J.C.V. and his father, the government gave no indication whatsoever that Mr. C. presents a danger to his child, is otherwise unfit, or unwilling to parent and care for D.J.C.V. In fact, on October 15, 2018, Judge Alvin K. Hellerstein ordered the government to release D.J.C.V. and reunify him with his father, as the government had not alleged that Mr. C. was unwilling or unfit to care for D.J.C.V. Summary Order, D.J.C.V. v. U.S. Immigration & Customs Enf't, No. 18 CIV. 9115 (AKH), 2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018), ECF No. 21. It's also important to note that D.J.C.V. is undisputedly a class member subject to the provisions of a settlement agreement reached in *Flores v. Reno*, No. CV 85-4544-RJK(PX) (C.D. Cal. Jan. 28, 1997), *available at* https://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf, which offers special protections to minors held in immigration custody and by the Agreement's own terms is separately enforceable in this Court.

so, the government instituted and implemented this policy to intentionally and negligently inflict emotional distress on the parents and children whom it separated.

78.     It succeeded, with devastating consequences for Mr. C. and his young son.

**B.      The Well-Known Physical and Mental Health Trauma Associated Resulting from Family Separation**

79.     Separating a young child from a parent–particularly when the child has no information about the parent's whereabouts or the possibility of reunification–is a traumatic event in the child's life. "Decades of research have concluded that children," like D.J.C.V, who have been forcibly and "traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma."[76] Recent studies indicate that "separation can impair memory and normal production of cortisol, a hormone produced in response to stress."[77] The American Academy of Pediatrics has explained the real life harm suffered when a child is ripped away from his parent: "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."[78]  "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong

---

[76]     Miriam Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.

[77]     *Id.*

[78]     Letter from Colleen A. Kraft, MD, FAAP, President of the American Academy of Pediatrics, to DHS Secretary Nielsen (Mar. 1, 2018), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf.

consequences for children."[79] It is clear that the trauma caused by the government's inhumane actions will likely have a devastating and lasting impact on D.J.C.V's psychological well-being.

### C.   The Five-Month Forced Separation of Mr. C. and D.J.C.V. and Related Trauma

#### 1.   Mr. C.'s Traumatic Separation from His Son

80.    A few days after their arrival in the United States, on or about May 2, 2018, federal DHS agents forcibly separated Mr. C. from his 19-month-old son, D.J.C.V.

81.    Mr. C. and his son had fled Honduras after receiving explicit death threats from gang members who had already murdered several family members. The threats of violence came to a head when MS-13 gang members kidnapped and held Mr. C. at gun point—threatening both his and his toddler's life.

82.    Although Mr. C. is not D.J.C.V.'s biological father, he is his legal father and is listed as such on D.J.C.V.'s birth certificate. Under Honduran law, this confers all parental rights to Mr. C. In every sense, Mr. C. is D.J.C.V.'s true father. From the day D.J.C.V. was brought home from the hospital after his birth, Mr. C. was there changing D.J.C.V.'s diapers, feeding him, playing with him, protecting him, and financially supporting all of his son's needs.

83.    Arriving tired and wet from their journey to the United States, on or about April 30, 2018, Mr. C. and D.J.C.V encountered U.S. border officials near Hidalgo, Texas. Immediately, Mr. C. expressed his fear of return to Honduras and provided the border officials a

---

[79]    Colleen A. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border, Am. Acad. of Pediatrics* (May 5, 2018), https://docs.house.gov/meetings/IF/IF14/20180719/108572/HHRG-115-IF14-20180719-SD004.pdf.

certified copy of his son's birth certificate and a letter, sworn under oath in a Honduran court, from D.J.C.V.'s mother permitting D.J.C.V. to travel with his father.

84.     Border officials apprehended Mr. C. and his son and took them to a short-term detention center notoriously known as "iceboxes" due to their freezing, unwavering temperatures. Sometimes the lights are left on all night in the iceboxes, a known form of torture.[80]

85.     Mr. C. and D.J.C.V. spent three days in the "icebox" without the necessary nutrition and essentials, like milk and diapers, that D.J.C.V. needed.

86.     On the first night, immigration officials inspected Plaintiffs' bodies for bruises and lice, while D.J.C.V., still in wet clothes, cried and shivered uncontrollably from the cold. In wet clothes himself, Mr. C. was unable to keep D.J.C.V. warm. Immigration officials provided one thin, ineffective, and foil-colored plastic blanket. Concerned for his son, Mr. C. asked for another blanket, but immigration officials refused his request, and Mr. C. and D.J.C.V. were forced to sleep on a cement floor.

87.     On the second day of their detention, Mr. C. and D.J.C.V. were corralled into a crowded cell with dozens of other men, women, and children. They had no privacy and used porta potties to relieve themselves. The only food that immigration officials provided was cold sandwiches and burritos which Mr. C. and D.J.C.V. had to eat on the floor.

88.     On the third day of their detention, immigration officials questioned Mr. C. and accused him of being a criminal due to an eight-year-old misdemeanor conviction. This

---

[80]     Serena Marshall, Lana Zak & Jennifer Metz, *Doctor compares conditions for children at immigrant holding centers to 'torture facilities,'* ABC News (*last updated* June 24, 2019), https://www.abcactionnews.com/news/national/doctor-compares-conditions-for-children-at-immigrant-holding-centers-to-torture-facilities.

conviction did not trigger mandatory detention under the Immigration and Naturalization Act ("INA") and Mr. C. had not shown any indication that he presented a danger to his son or was otherwise unfit to parent.

89.     After Mr. C. was questioned, an immigration official informed Mr. C. that they were going to deport him and take D.J.C.V. Mr. C. began to feel pain in his chest and stomach upon receiving this information. He was extremely concerned about D.J.C.V.'s safety. Mr. C. felt depressed and could not eat. Mr. C. felt so badly that he asked to be examined by a doctor. During his examination, Mr. C. told the doctor that knowing that immigration officials were going to take his son made him feel like fainting and caused pains in his stomach and chest. Instead of providing medicine, the doctor instructed Mr. C. to drink lots of water and told him that they had no medicine to treat any of Mr. C.'s symptoms.

90.     On or about May 2, 2018, immigration officials arrived at the cell where Mr. C. and D.J.C.V. were housed to separate D.J.C.V. from the only father that he had ever known. When officials told Mr. C. to say goodbye to his son Mr. C. started to cry as he held D.J.C.V in his arms.  Immigrations officers then forcibly pulled D.J.C.V from his father's arms.  D.J.C.V. was too young to understand what was going on or why he was being separated from his father.

91.     At the time of their forced separation, Mr. C. was afraid and confused. He had no idea what was happening to his son or how long D.J.C.V. would be away from him. Immigration officers did not tell him where they were taking D.J.C.V. or who would care for him. Mr. C. had no idea who would be responsible for feeding D.J.C.V., playing with him or changing D.J.C.V.'s diapers.

92.     Although Mr. C. hoped that his son would only be away for a few days, immigration agents forcibly separated him from his son for 166 excruciating days.

93.     After being separated from his son, Mr. C. was transferred to a different detention center in Texas where he was detained with other mothers and fathers whose children had been taken. All Mr. C. could do was worry about his son. He and the other parents would talk about their forced separations and their fear of terrible things happening to their children. Rumors about parents being deported without their children spread and caused Mr. C. severe anxiety, hopelessness, and depression.

94.     It was so painful for Mr. C. to be without his son, that he thought of ending his life. One other father with whom Mr. C. was detained attempted to hang himself with a sheet.

95.     Officials in this detention center exasperated Mr. C.'s worst fears. Immigration officials threatened to deport Mr. C. without his son on several occasions. As detailed, *infra* agents  coerced Mr. C. into waiving his right to seek immigration relief in the U.S. by conditioning any chance he had of seeing his son again on the withdrawal of his application for withholding of removal.[81,]

96.     The use of threats and coercive tactics by immigration officials, as well as the continual failure to provide Mr. C. with information about his son's whereabouts, well-being, or the opportunity to communicate with him exacerbated Mr. C.'s trauma. In addition to frequently having feelings of depression, thoughts of suicide, anxiety, and chest and body pain, Mr. C. felt helpless, deeply anxious, and constantly concerned for his son's wellbeing. He had no idea who or what information to trust or whether he would ever see his son again.

97.     Mr. C. frequently sought medical and mental health care due to the severity of his symptoms of trauma. Though he did not always get effective treatment, Mr. C. was allowed to

---

[81]     *See infra* ¶ 98.

see a clinician who provided him with anti-depressant and anti-anxiety medication, which he had

never taken before.

98.    After numerous requests, over the course of several weeks, for information about

D.C.J.V., as well as permission to communicate with his son, immigration officials informed Mr.

C. that his son was somewhere in New York. Mr. C. knew almost nothing about New York and

had no way of verifying the information he received from immigration officials.

99.    Despite promises from officials that Mr. C. would be reunited with D.J.C.V., Mr.

C. was sent to a detention center in New Jersey where he spent two more months without seeing

or speaking to his son. Notwithstanding numerous additional attempts to seek information about

his son, Mr. C. continued to exist in state of confusion and obscurity about his son's welfare and

location. He continued to experience severe chest pains, depression, suicidal thoughts, and

anxiety throughout his five-month separation from his son.

### 2.    The Shifting and Inconsistent Rationales for Mr. C.'s Forced Separation

100.    Throughout Mr. C.'s separation from D.J.C.V., federal officials' rationales for

denying Mr. C. access to his toddler son not only shifted but also were pretextual.

101.    In the early days of separation from his son, Mr. C. met with unknown officials

and began speaking further about his fear of returning to Honduras. He was not permitted to

finish providing the information. He was extremely concerned about his son, and asked the

officials about him. At that time, he was presented with a piece of paper and told that he could

see his son again if he signed the paper. In a moment of desperation and fear, Mr. C. agreed.

Upon information and belief, the paper he signed was some sort of withdrawal of his application

for asylum. Thus, U.S. officials attempted to coerce Mr. C. to abandon his rightful claims to

protections under asylum law and the Convention Against Torture by conditioning any

reunification with his son upon his agreement for both to be removed to Honduras. Effectively U.S. officials sought to force Mr. C. to choose between indefinite detention without any access to his toddler son on the one hand and, on the other, reunification with his son under very serious risk to their lives in Honduras. This coercion and conditioning are central features of torture.

102.    Shortly after that meeting, following a brief consultation with local pro-bono counsel, Mr. C. wrote to ICE officials requesting that he continue his asylum/withholding application. He received letters on or about June 16 and 22, 2018 stating that he would be provided with an interview regarding his asylum application.

103.    In early July 2018, Mr. C. was told that he was being transferred to Hudson County Correctional Center ("HCCC") to be reunited with his son. Shortly after arriving at HCCC, officials met with him and requested a cheek swab. Mr. C. explained to them that his DNA would not match D.J.C.V.'s, but the officials insisted on doing the DNA test regardless.

104.    In the ensuing weeks, officials from DHS and ORR took a series of alternative positions with regard to the relationship between Mr. C. and his son, whether they would be reunited, and the status of their applications for asylum under the Convention Against Torture or withholding of removal.

105.    On July 13, 2018, Mr. C. engaged counsel. On July 17, 2018, counsel was informed by Mr. C.'s assigned Deportation Officer ("DO") that Mr. C. had claimed fear of persecution if returned to Honduras and that he would submit Mr. C. for an interview with the U.S. Citizenship and Immigration Service (USCIS) once counsel and ICE were able to resolve ICE's questions about Mr. C.'s relationship to D.J.C.V. The DO also stated that, if Mr. C.'s immigration file did not arrive in New York in time for the reunification of father and son, Mr.

C. would be released and told to return for his interview. The DO also represented that Mr. C.
was brought to HCCC to be reunited with his son.

106.    To Mr. C.'s shock and horror, on July 19, 2018, an ORR representative stated that
Mr. C. and D.J.C.V. were not family because their DNA did not match. ORR also questioned
Mr. C.'s credibility because, they alleged, he was untruthful in calling himself D.J.C.V.'s father.
Mr. C. was never anything but truthful in stating that he is, both legally and in fact, D.J.C.V.'s
father, even if he is not his biological father. ORR represented that it was in possession of
D.J.C.V.'s birth certificate, in which Mr. C. is listed as D.J.C.V.'s father, and had confirmed its
authenticity.

107.    ORR reversed its position on July 27, 2018 after being presented with additional
evidence of Mr. C.'s legal and factual parentage. At that time, ORR agreed to permit D.J.C.V. to
visit his father in custody at HCCC.

108.    When Lutheran Social Services of New York, the foster agency with whom ORR
had contracted D.J.C.V.'s custody, and counsel attempted to arrange the visits, DHS officials
initially stated that visitation required a court order. When pressed, DHS officials changed their
story, once more claiming that they did not consider Mr. C. and D.J.C.V. to be a family and
therefore could not visit with each other, regardless of what ORR believed.

109.    On August 7, 2018, the DO informed Mr. C.'s immigration counsel that, because
DHS did not consider Mr. C. and D.J.C.V to be family (despite receiving evidence proving
otherwise), Mr. C. was in the process of being transferred back to Texas. Upon information and
belief, DHS planned to process Mr. C. for removal from the United States. A supervising DO
later confirmed Mr. C. was in the process of being transferred.

110.    Similarly, when confronted with the prospect that a court order in *Ms. L.* would require reunification, federal officials again shifted their justification for denying reunification. For the very first time, they argued that the injunction in *Ms. L.*, which required migrant parents who had been separated from children under the age of five to be reunified by July 10, 2018, did not cover Mr. C. because of his "criminal history." On August 9, after Mr. C.'s counsel contacted the DOJ attorneys litigating the *Ms. L.* class action, DOJ informed counsel that "DHS does not have plans to move [Mr. C.]" and that DHS is not denying reunification "based on lack of parent/child relationship but rather is still evaluating the individual's criminal history in assessing whether he is a class member."

111.    On August 14, 2018, a supervising DO informed counsel that Mr. C. was "supposed to be transferred" that day, but "something" was "on hold." She said she did not know what would happen the following day. She reiterated that Mr. C. was brought to the Northeast "for reunification," and that ICE "would like to send him home" to Honduras but that the reason he was still being held was due to "reunification" and that "they were trying to reunify." Mr. C. was eventually transferred to the OCCF in August 2018.

112.    On an August 16, 2018 call, ORR officials informed counsel that "if reunification with Dad is possible, we'll do that." However, they said, it was ICE's position that Mr. C. was not eligible for reunification due to his criminal conviction. As a result, an ORR official encouraged the idea of sending D.J.C.V. back to Honduras, and indicated that counsel should speak to Mr. C. about that possibility; maybe, she commented, it would "open Mr. [C]'s eyes."

113.    On August 17, 2018, DOJ informed counsel for Mr. C. that DHS did not believe that Mr. C. is part of the *Ms. L.* class due to his criminal history of a single misdemeanor in 2010. Nevertheless, divining a new rationale for the continued separation, DOJ stated that Mr. C. could

not be reunified with D.J.C.V. in custody because he is not permitted to be held in a family

detention facility due to his criminal history. DOJ also stated that it was "willing to reunify and

remove" Mr. C. and his son to Honduras if Mr. C. elected that option. Counsel questioned why

Mr. C. had not yet received his reasonable fear interview, which was the first step in pursuing

Mr. C.'s immigration relief, and DOJ agreed to look into the issue.

114. On August 21, 2018, Mr. C.'s counsel was informed that Mr. C. would receive his

reasonable fear interview with USCIS on August 23. The same day, without notifying counsel,

Respondent DHS transferred Mr. C. approximately two hours away to OCCF in upstate New

York.

115. On August 23, 2018, USCIS conducted Mr. C.'s reasonable fear interview, and

determined that Mr. C. presented a reasonable fear of returning to Honduras. As a result of that

finding, Mr. C. was eligible to be released from detention pursuant to 8 U.S.C. § 1226(a). *Guerra

v. Shanahan*, 831 F.3d 59, 64 (2d Cir. 2016) (finding 8 U.S.C. § 1226(a) to be the controlling

statute regarding the detention or release of an individual who has passed his reasonable fear

interview and is continuing to seek withholding of removal). Nevertheless, the government

continued to detain Mr. C, until he successfully obtained bond from an immigration judge on

October 10, 2018.

### 3. The Government's Conditioning Reunification on Forfeiture of Mr. C.'s Rights

116. Despite the contradictory and pretextual reasons government officials proffered

for Mr. C.'s forced separation from his son, what government officials made abundantly clear–

and wholly consistent with the broader policy goals to use family separation to deter and deny

asylum seekers–is that any reunification would be conditioned on Mr. C.'s forfeiture of his and

his son's rights to seek asylum or related relief, namely withholding under the Convention

Against Torture and U.S. immigration laws. [82]- Specifically, during a call with Mr. C.'s lawyer, , on August 17, 2018, a DOJ lawyer stated that DHS was "willing to reunify and remove," on the condition that Mr. C. waive his asylum and CAT rights.[83]  Less than a week later, on August 23, 2018, DOJ committed this coercive condition to writing, stating that DHS will reunify for the purposes of removal."[84]  Despite the severe anguish of being separated from his son, Mr. C. refused to give up his and his son's claims for asylum.

117.    The Convention Against Torture, upon which the U.S. statutory definition of torture is based, *see* 18 U.S.C. § 2340, defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes" as "intimidating or coercing him or a third person."[85]

118.    In 2018, officials of the United States government subjected Mr. C. and his young son to intense mental and physical anguish and refused to relieve them of such anguish unless Mr. C. effectively confessed that he would not exercise his U.S. and international law rights. This is torture.

---

[82]    The practice of coercing asylum applicants to sign waivers has been well-documented. *See* B. Shaw Drake et al., *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers, Human Rights First*, 16 (2017), https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf. *See also* Compl., ¶¶19, 20 21, *Al Otro Lado v. Duke*, No. 2:17-cv-05111 (C.D. Cal. July 12, 2017), ECF. No. 1 (documenting well-plead instances where asylum seekers were coerced to sign waivers of their right to asylum, often based on a threat of family separation); see also Order Granting in Part and Denying in Part Defendants' Motion to Dismiss at *5-6, *Al Otro Lado v. Nielsen*, No. 3:17--cv-2366 (S.D. Cal. Aug. 20, 2018), ECF. No. 166 (describing well- plead allegations of coerced asylum withdrawals).

[83]    Silane TRO Decl. ¶4, *D.J.C.V. v. U.S. Immigration & Customs Enf't*, No. 18 CIV. 9115 (AKH) (S.D.N.Y. Oct. 15, 2018), ECF No. 19.

[84]    Id. ¶5, Ex. B.

[85]    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

119.    After several months in detention, Mr. C. was finally informed that his son was

being cared for by a foster family after he procured the contact information of D.J.C.V.'s social

worker. Even though Mr. C. received this information from the social worker, at no time was he

permitted to speak to his son directly. The idea that his son was staying with a foster family

made Mr. C. terrified that he would lose custody of his son and never see him again.  And,

despite recommendations from D.J.C.V.'s guardian ad litem that it was essential for the child's

short and long-term emotional health to have contact and be reunited with his father, ICE

officials defied this common sense recommendation.

120.    A New York immigration court judge granted Mr. C.'s petition for bond and he

was released on October 10, 2018.

121.    Desperate for the opportunity to see his son, Mr. C. worked with his attorney to

secure a visit with D.J.C.V the next day.

### 4.    D.J.C.V.'s Experience of Separation From His Father

122.    While his father was suffering in detention, D.J.C.V. was suffering all on his own.

After being ripped from his father's arms at only 19-months-old, immigration officials put

D.J.C.V. on a plane to New York, thousands of miles away from his father.

123.    After experiencing a traumatic separation from his father at the detention center

along the border, D.J.C.V.'s life and sense of stability was continually uprooted while he was

detained by ORR. During the five and a half months that D.J.C.V. was separated from his father,

he was transferred to new foster homes and caregivers no less than three times for various

reasons, including allegations of corporal punishment against his foster parent by another child

with whom D.J.C.V. lived. Though he was non-verbal given his "tender age", D.J.C.V.'s

exhibited the harmful effects the family separation and these transfers had on him, including

sadness, anger, irritability, and being withdrawn.  D.J.C.V.'s assigned ORR clinician further documented the impact, noting that D.J.C.V. likely felt abandoned by his parents *and previous foster parent.*

124.    The guardian ad litem representing him throughout D.J.C.V.'s detention wrote that "continued separation poses unacceptable risks to [D.J.C.V.'s] health and well-being. [D.J.C.V.'s] separation from his father for the last five months has been traumatic and has taken a significant toll on [D.J.C.V.'s] health. [D.J.C.V.] is very confused about why he is separated from his father, who he has had no contact with in months. He continues to struggle to make sense of life in an ORR shelter without either of his parents." She further stated that "[D.J.C.V.] needs his father's daily attention, care, and love. So long as this separation keeps [D.J.C.V.] from living and developing under his father's care, [D.J.C.V.'s] health, safety, and well-being will continue to suffer and will likely worsen."

125.    The trauma is particularly acute and lasting in the case of D.J.C.V., who was pre-verbal when separated and turned two years old in detention, far too young to be able to understand what was happening. He spent five months with strangers and without the father he knew and loved. When D.J.C.V. was reunified with his father, it was not clear that he recognized him.

### 5.    Mr. C. and D.J.C.V.'s Reunification Following a Federal Court Determination that Continued Separation Was Unlawful.

126.    On October 11, 2018, the federal government allowed Mr. C. to have a brief, one-and-a-half-hour supervised visit with D.J.C.V. at a church, supervised by an agency that contracted with ORR.

127.    The visit was both a joyous and painful for Mr. C. and D.J.C.V. At the start of the visit, D.J.C.V. cried when Mr. C. tried to hold him. D.J.C.V., being so young, did not recognize

his father. Mr. C. worried that since D.J.C.V. had struggled to recognize him during their visit, immigration officials would never reunify him with his son.

128.   D.J.C.V. eventually calmed down and became comfortable with Mr. C.'s presence during their short first visit. Mr. C. asked the foster care agency to let him see D.J.C.V. again as soon as possible, but his request was denied.

129.   Though Mr. C. was free from detention, officials refused to immediately return D.J.C.V. to him. The officials took the position that Mr. C. had to go through a lengthy vetting process in order to regain custody of his son.

130.   Seeking his son's release from ORR custody and reunification, Mr. C. filed a habeas corpus petition in the United States Court for the Southern District of New York and moved for a temporary restraining order on the ground that, among other things, the forced separation of father and child violated their substantive due process rights to family unification, as dozens of courts had recently confirmed in ordering reunification.

131.   On October 15, 2018, Judge Hellerstein recognized the illegality and senselessness of any continued separation and granted Plaintiffs' petition.[86] The court ordered Mr. C. and D.J.C.V.'s immediate reunification, which the parties effectuated that day. At the hearing Judge Hellerstein characterized the forced separation of Mr. C. from his son in plain

---

[86]   In his order, Judge Hellerstein relied on the persuasiveness of other cases where petitioners had established a likelihood of success on the merits of their claims for relief under the Due Process Clause. These cases included: *Cruz Paz v. Lloyd et al.*, No. 18 Civ. 8993 (S.D.N.Y. Oct. 5, 2018) (Crotty, J.), ECF No. 11; *Paixao v. Sessions et al.*, No. 18 Civ. 4591 (N.D. Ill. July 5, 2018) (Shah, J.), ECF No. 16; *Souza v. Sessions et al.*, No. 18 Civ. 4412 (N.D. Ill. Jun. 26, 2018) (Shah, J.), ECF No. 23; and *Maldonado v. Lloyd et al.*, No. 18 Civ. 3089 (S.D.N.Y. May 4, 2018) (Keenan, J.), ECF No. 28.

terms: "It seems the most cruel thing you can imagine. Separating a child from a parent ready, willing able to care for him. I don't understand the rationale for this. The humanity."[87]

132.    And, in the its summary order, the court rejected any purported government rationale for continued separation: "Except in the most dreadful circumstances, a court should not countenance the cruelty of the separation of a parent and child by the government. Here, the government does not allege that Petitioner Mr. C. is unwilling or unfit to care for Petitioner D.J.V.C., his child, or any other adequate reason why petitioners should not be reunited."

### 6.    Mr. C. and D.J.C.V.'s Harms and Losses

133.    Mr. C. and D.J.C.V. continue to endure the emotional and psychological scars of their forced separation.

134.    Mr. C. continues to suffer from episodes of severe chest pain and heart palpitations, as well as depression and anxiety. On one occasion, Mr. C. had to seek medical care for these symptoms and missed several days of work.

135.    Mr. C. also suffers from significant sleep-related issues. He experiences sleeplessness and nightmares related to the forced and prolonged separation from D.J.C.V. Mr. C. also experiences disruption in his sleep when D.J.C.V. struggles with his own sleeplessness and nightmares.

136.    D.J.C.V. also continues to be affected by the forced separation. In addition to sleep-related issues, D.J.C.V. has experienced episodes of aggression, anxiety, and moodiness.

137.    Neither Mr. C. nor D.J.C.V. has been able to access appropriate counseling to help them cope with the predictable trauma from their forced separation.

---

[87]    Stephen Rex Brown, *Honduran father to be reunited with 2-year-old son after being separated at border*, NY DAILY NEWS (Oct. 15, 2018, 6:50 PM), https://www.nydailynews.com/new-york/ny-metro-immigrant-reunion-20181015-story.html.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

138.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

139.    By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress. Namely, Mr. C.'s forced separation from his young son was directed as part of a broader policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States.  In addition, U.S. officials specifically refused to alleviate the family's known and obvious emotional distress by making inconsistent and pretextual excuses to prevent reunification and by conditioning reunification on a waiver of Mr. C.'s and his son's fundamental rights.

140.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

141.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for intentional infliction of emotional distress.

142.    The conduct of federal officers and officials was so outrageous and harmful, Plaintiffs are entitled to punitive damages.

## COUNT II
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

143.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

144.    The federal officers and officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.  The risks of harm from the government's conduct was known to federal officers and officials or should have been known.

145.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

146.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered severe emotional distress.

147.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for negligence.

## COUNT III
## NEGLIGENCE

148.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

149.    The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

150.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

151.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

152.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for its negligence.

## COUNT IV
## TORTURE

43

153.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

154.    The acts committed by U.S. officers and officials against Plaintiffs constitute torture, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. §1350. "[T]orture means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). This includes "act[s] specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation, coercion, or any reason based on discrimination of any kind." 18 U.S.C. § 2441(d)(1)(A) (War Crimes Act). "[S]evere mental pain or suffering" means "prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering," or "threatened" harm to the victims or third persons. 18 U.S.C. § 2340(2) (definitions applicable to 18 U.S.C. § 2340A (Anti-Torture Statute)); 18 U.S.C. § 2441(d)(2)(D) (incorporating definition from 18 U.S.C. § 2340(2)).[88]

155.    The norm against torture is well settled under U.S. and international law, including customary international law, and has reached *jus cogens* status.  The norm presents a non-derogable duty, that no sovereign can avoid.

---

[88]    *See also* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, ¶ 1, GA Res. 39/46, (Dec. 10 1984) (CAT), reprinted in 23 ILM 1027 (1984), as modified, 24 ILM 535 (1985) (defining torture as including causing "severe pain or suffering, whether physical or mental," without the requirement to show prolonged mental harm.

156.    Federal officials intentionally inflicted severe physical or mental pain or suffering on Mr. C. and his young son and did so in order to coerce and intimidate them to forfeit their fundamental rights.

## COUNT V
## CRIME AGAINST HUMANITY: PERSECUTION

157.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

158.    The acts committed by U.S. officials against Plaintiffs constitute under customary international law, the crime against humanity of persecution, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. § 1350. Crimes against humanity are universally proscribed and clearly defined under international law. Crimes against humanity are the commission of certain prohibited acts as part of a widespread or systematic attack against a civilian population. "Attack" means a course of conduct involving the commission of acts against a civilian population, pursuant to or in furtherance of a State or organizational policy; it does not equate to a military attack nor require the existence of an armed conflict.

159.    Persecution, as a crime against humanity, is universally proscribed and clearly defined as the intentional and severe deprivation of fundamental rights contrary to international law, based on the identity of the group, including on the basis of national, ethnic or racial grounds.[89]

160.    The crime against humanity of persecution, which was first codified in the Charter of the International Military Tribunal established at Nuremberg, has attained *jus cogens* status.

---

[89]    *See, e.g.,* Rome Statute of the International Criminal Court art. 7(1)(h), 7(2)(g), July 17, 1998, 2187 U.N.T.S. 90.

161.     The forcible separation of Mr. C. from his son, the withholding of information about the status of his son from Mr. C., the emotional distress inflicted on Mr. C. by making inconsistent and pretextual excuses to prevent reunification and by conditioning reunification on a waiver of Mr. C.'s fundamental rights, and the profound mental harm caused by the separation of father from son on the basis of national, ethnic or racial status constitutes persecution.

162.     The federal officials' acts and omissions were knowing, deliberate and/or purposeful.

163.     The federal officials' acts and omissions were part of a widespread or systematic attack against migrants and asylum seekers at the Southwest border, the vast majority of whom came from Central America. This attack, and broader animus towards those nationalities, were knowingly effectuated through the "Zero Tolerance" Policy.

164.     Through their acts and omissions, federal officials caused Mr. C. and his young son D.J.C.V. to suffer the severe deprivation of their fundamental rights to family unity; to be free from torture and cruel, inhuman and degrading treatment; their right to a life with dignity; and to equality and non-discrimination in pursuing their right to asylum.

**COUNT VI**
**CRIME AGAINST HUMANITY: INHUMANE ACTS**

165.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

166.     The acts committed by U.S. officials against Plaintiffs also constitute, under international law inhumane acts, a category of crimes against humanity, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. § 1350. Crimes against humanity are universally proscribed and clearly defined under international law. Crimes against humanity are the commission of certain prohibited acts as part of a widespread or

systematic attack against a civilian population. "Attack" means a course of conduct involving the commission of acts against a civilian population, pursuant to or in furtherance of a State or organizational policy; it does not equate to a military attack nor require the existence of an armed conflict.

167.    Inhumane acts, as a category of crimes against humanity, are acts that cause "great suffering, or serious injury to body or to mental or physical health."[90] Inhumane acts are similar in nature and gravity to other crimes against humanity such as torture, persecution, enforced disappearance, deportation or forcible transfer of a population, rape and other forms of sexual and gender-based violence, imprisonment in violation of fundamental rules of international law, murder, enslavement, and extermination.[91]

168.    The crime against humanity of inhumane acts was first codified in the Charter of the International Military Tribunal established at Nuremberg, and has attained *jus cogens* status.

169.    The forcible separation of Mr. C. from his son, the withholding of information about the status of his son from Mr. C, the emotional distress by making inconsistent and pretextual excuses to prevent reunification and by conditioning reunification on a waiver of Mr. C.'s fundamental rights, and the profound mental harm caused by the separation of father from son constitute inhumane acts.

170.    The federal officials' acts and omissions were knowing, deliberate and/or purposeful.

171.    The federal officials' acts and omissions were part of a widespread or systematic attack against migrants and asylum seekers at the Southwest border, the vast majority of whom

---

[90] *See, e.g.*, Rome Statute of the International Criminal Court, A/CONF. 183/9 (July 17, 1998), art. 7(1)(k) and 7(2)(g).
[91] *Id.*, art. 7.

came from Central America effectuated through the "Zero Tolerance Policy", and broader

animus towards those nationalities, and were committed with knowledge of that attack.

172.     Through their acts and omissions, federal officials have intentionally caused Mr.

C. and his young son D.J.C.V. great suffering, and serious injury to body and to their mental and

physical health.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request:

A.  Compensatory and punitive damages;

B.  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access

to Justice Act, 28 U.S.C. § 2412; and

C.  Such other and further relief as the Court deems just and appropriate.

Dated: July 23, 2020

/s/ Kathryn Ball
Kathryn Ball
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
+1.212.309.6000
+1.212.309.6001
kathryn.ball@morganlewis.com

Lily G. Becker*
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
+1.215.963.5000
+1.215.963.5001
lily.becker@morganlewis.com
*Pro hac vice application forthcoming

Baher Azmy
J. Wells Dixon
Ghita Schwarz
Guadalupe Aguirre
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
+1.212.614.6464
+1.212.614.6499
bazmy@ccrjustice.org
wdixon@ccrjustice.org
gschwarz@ccrjustice.org
laguirre@ccrjustice.org

Attorneys for Plaintiffs D.J.C.V., minor child, and G. C.