UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

D.J.C.V., a minor child, and G.C., his father,

                              Plaintiffs,                    20 Civ. 5747 (PAE)

              v.

UNITED STATES OF AMERICA,


                              Defendant.


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2614/2799
Fax: (212) 637-2686
E-mail: rebecca.friedman@usdoj.gov
          alexander.hogan@usdoj.gov

REBECCA R. FRIEDMAN
ALEXANDER J. HOGAN
Assistant United States Attorneys
– Of Counsel –

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ............................................................................................................2

I.      Factual Background ..........................................................................................2

II.     G.C.'s Immigration History ...............................................................................5

III.    Legal Framework ..............................................................................................6

        A.  Relevant Immigration Statutory and Regulatory Framework............................6

        B.  Legal Framework for the Immigration Custody and Release
            Of Minor Aliens..............................................................................................9

            i.      The Homeland Security Act and the Trafficking
                    Victims Protection Reauthorization Act .........................................9

            ii.     The Flores Settlement Agreement .................................................10

        C.  Executive Branch Directives Regarding Immigration
            Enforcement.................................................................................................12

ARGUMENT ..............................................................................................................14

I.      The Court Lacks Subject Matter Jurisdiction As To Plaintiffs'
        FTCA Claims ....................................................................................................14

        A.  Plaintiffs Bear the Burden of Proving Subject Matter Jurisdiction ................15

        B.  The Discretionary Function and Due Care Exceptions Bar Plaintiffs'
            Claims ........................................................................................................15

            i.      The Discretionary Function Exception Bars Plaintiffs' Claims ....19

            ii.     The Due Care Exception Bars Plaintiffs' Claim Stemming from
                    Their Separation..........................................................................23

        C.  The Misrepresentation Exception Bars Claims Relating to the
            Alleged Waiver of Plaintiffs' Rights to Protection from Removal.................27

        D.  No Private Person Analog Exists for Determining Where to Plaice
            Detainees or the Enforcement of Federal Immigration Laws........................28

i

E.  Claims Related to Plaintiffs Separation ...........................................................32

II.    Plaintiffs Fail to State a Claim Under New York Law ..........................................35

A.  Plaintiffs' Claims Are Barred by New York Public Policy ............................35

B.  Plaintiffs Fail to State a Claim for Intentional or Negligent Infliction
Of Emotional Distress .........................................................................................37

i.        Extreme and Outrageous Conduct ...................................................37

ii.       Plaintiffs Fail to State a Negligent Infliction of Emotional
Distress or Negligence Claim .........................................................41

III.    Alien Tort Statute .......................................................................................................44

CONCLUSION ......................................................................................................................46

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Accardi v. United States,*
    435 F.2d 1239 (3d Cir. 1970) ............................................................................ 17

*Akutowicz v. United States,*
    859 F.2d 1122 (2d Cir. 1988) ............................................................................ 31

*Al Janko v. Gates,*
    831 F. Supp. 2d 272 (D.D.C. 2011) .......................................................... 44, 45

*Albence v. Guzman Chavez,*
    207 L. Ed. 2d 1050 (June 15, 2020) ................................................................... 9

*Antonelli v. Crow,*
    No. 08–261, 2012 WL 4215024 (E.D. Ky. Sept. 19, 2012) ............................. 33

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................................... 35

*Bailor v. Salvation Army,*
    51 F.3d 678 (7th Cir. 1995) .............................................................................. 21

*Baker v. Dorfman,*
    239 F.3d 415 (2d Cir. 2000) ............................................................................. 42

*Barker v. Kallash,*
    63 N.Y.2d 19 (1984) ................................................................................... 35, 36

*Bartlett v. Honeywell Int'l Inc.,*
    737 Fed. App'x 543 (2d Cir .2018) ................................................................... 39

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................................... 35

*Bell v. Wolfish,*
    441 U.S. 520 (1979) .......................................................................................... 33

*Berkovitz v. United States,*
    486 U.S. 531 (1988) .......................................................................................... 18

*Borquez v. United States,*
    773 F.2d 1050 (9th Cir. 1985) .................................................................... 23, 24

*Brown v. City of New York,*
    306 F. Supp. 473 (S.D.N.Y. 2004) ................................................................... 38

*Bunikyte, ex rel. Bunikiene v. Chertoff,* No. A-07-CA-164-SS,
    2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) ..................................... 11, 26, 27

*C.P. Chem. Co., Inc. v. United States,*
    810 F.2d 34 (2d Cir. 1987) ............................................................................... 17

*Caban v. United States,*
    671 F.2d 1230 (2d Cir. 1982) ........................................................................... 17

*Callahan v. City of New York,*
    90 F. Supp. 3d 60 (E.D.N.Y. 2015) ................................................................. 38

*Callahan v. United States,*
    329 F. Supp. 2d 404 (S.D.N.Y. 2004) ............................................................. 19

*Campos v. United States*,
  888 F.3d 724 (5th Cir. 2018) ............................................................................. 34

*Canosa v. Ziff*,
  No. 18-cv-4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ........................ 41

*Chapman v. Best Buy, Inc.*,
  No. 06-cv-824 (GLS), 2007 WL 3532696 (N.D.N.Y. Nov. 13, 2007) ...................... 43

*Chen v. United States*,
  854 F.2d 622 (2d Cir. 1988) .......................................................................... 29, 31

*Clark v. Suarez Martinez*,
  543 U.S. 371 (2005) ........................................................................................... 7

*Cruz v. United States*,
  684 F. Supp. 2d 217 (D.P.R. 2010) .................................................................... 34

*Czetwertynski v. United States*,
  514 F. Supp. 2d 592 (S.D.N.Y. 2007) ................................................................ 44

*D.B. v. Cardall*,
  826 F.3d 721 (4th Cir. 2016) ............................................................................ 26

*Dalehite v. United States*,
  346 U.S. 15 (1953) .......................................................................................... 16

*Denson v. United States*,
  574 F.3d 1318 (11th Cir. 2009) ............................................................... 39, 40, 41

*Doe v. DiGenova*,
  779 F.2d 74 (D.C. Cir. 1985) ............................................................................ 24

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) ......................................................................... 26

*Dupree v. United States*,
  247 F.2d 819 (3d Cir. 1957) ................................................................... 16, 17, 25

*Enigwe v. Zenk*,
  No. 03-cv-854 (CBA), 2007 WL 2713849 (E.D.N.Y. Sept. 14, 2007) ..................... 33

*Esrey v. United States*,
  707 Fed App'x 749 (2d Cir. 2018) .................................................................. 27, 28

*Farley v. Greyhound Canada Trans. Corp.*,
  No. 03-cv-0344 (SR), 2009 WL 1851037 (W.D.N.Y. June 26, 2009) ..................... 36

*Farley v. United States*,
  No. 11-cv-298S (WMS), 2017 WL 3503727 (W.D.N.Y. Aug. 16, 2017) ................. 22

*FDIC v. Citizens Bank & Trust Co. of Park Ridge, Ill.*,
  592 F.2d 364 (7th Cir. 1979) ............................................................................ 24

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ........................................................................................ 45

*Fernandini v. United States*,
  No. 15-cv-3843 (GHW), 2019 WL 1033797 (S.D.N.Y. Mar. 5, 2019) .................... 33

*Figueroa v. United States*,
  739 F. Supp. 2d 138 (E.D.N.Y. 2010) ................................................................ 31

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ............................................................................... 35

*Flores v. Lynch*,
  828 F.3d 898 (9th Cir. 2016) ....................................................................... 11, 26

*Flores v. Sessions*,
    862 F.3d 863 (9th Cir. 2017) .......................................................................... 9,11
*Francis v. United States*, 10-cv-1474,
    2011 WL 3563146 (D. Conn. Aug. 12, 2011) ...................................................... 33
*Fung-Schwartz v. Cerner Corp.*,
    No. 17-cv-233 (VSB), 2019 WL 4393022 (S.D.N.Y. Sept. 13, 2019) ................... 43
*Goldstar (Panama) S.A. v. United States*,
    967 F.2d 965 (4th Cir. 1992) .............................................................................. 44
*Gonzalez v. United States*,
    No. 16-cv-1494 (KAM), 2018 WL 1597384 (E.D.N.Y. Mar. 31, 2018)................. 43
*Green v. City of Mt. Vernon*,
    96 F. Supp. 3d 263 (S.D.N.Y. 2015)................................................................... 37
*Guerra v. Shanahan*,
    831 F.3d 59 (2d Cir. 2016)......................................................................... 6, 8, 9
*Guerrero-Sanchez v. Warden York Cty. Prison*,
    905 F.3d 208 (3d Cir. 2018)............................................................................ 6, 9
*Guzman Chavez v. Hott*,
    940 F.3d 867 (4th Cir. 2019) ............................................................................... 9
*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1951)........................................................................................... 21
*Harrison v. Fed. Bureau of Prisons*,
    464 F. Supp. 2d 552 (E.D. Va. 2006) ................................................................. 33
*Hines v. Davidowitz*,
    312 U.S. 52 (1941).............................................................................................. 40
*Holmes v. Watts*,
    No. 15-cv-155, 2016 WL 205401 (S.D. Ga. Jan. 15, 2016) ................................. 33
*In re Joint Eastern and Southern Dists. Asbestos Litig.*,
    891 F.2d 31 (2d Cir. 1989)........................................................................... 17, 18
*In re United States*,
    945 F.3d 616 (2d Cir. 2019)............................................................................... 21
*In re World Trade Center Disaster Site Litig.*,
    521 F.3d 169 (2d Cir. 2008).......................................................................... 17, 18
*Johnson v. U.S. Dep't of Interior*,
    949 F.2d 332 (10th Cir. 1991) ............................................................................ 32
*Jones v. Beth Israel Hosp.*,
    No. 17-cv-3445 (GHW), 2018 WL 1779344 (S.D.N.Y. Apr. 12, 2018) ................. 36
*Koohi v. United States*,
    976 F.2d 1328 (9th Cir. 1992) ............................................................................ 44
*Kraft v. City of New York*,
    696 F.Supp.2d 403 (S.D.N.Y. 2010)................................................................... 38
*Lane v. Pena*,
    518 U.S. 187 (1996)............................................................................................ 15
*Lipsey v. United States*,
    879 F.3d 249 (7th Cir. 2018) ............................................................................. 21
*Liranzo v. United States*,
    690 F.3d 78 (2d Cir. 2012)............................................................... 29, 30, 31, 32

*Luckett v. Bure*,
  290 F.3d 493 (2d Cir. 2002)...................................................................... 5, 6, 15, 19
*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000)................................................................................. 15
*Martin v. Citibank, N.A.*,
  762 F.2d 212 (2d Cir. 1985)................................................................................. 37
*Martinez v. Larose*,
  968 F.3d 555 (6th Cir. 2020) ................................................................................. 9
*McGowan v. United States*,
  825 F.3d 118 (2d Cir. 2016).......................................................................... 28, 29
*Medcalf v. Walsh*,
  938 F. Supp. 2d 478 (S.D.N.Y. 2013)................................................................. 37
*Millares Guiraldes de Tineo v. United States*,
  137 F.3d 715 (2d Cir. 1998)................................................................................. 15
*Miller Harness Co. v. United States*,
  241 F.2d 781 (2d Cir. 1957)................................................................................. 27
*Molchatsky v. United States*,
  778 F. Supp. 2d 421 (S.D.N.Y. 2011)................................................................. 34
*Molzof v. United States*,
  502 U.S. 301 (1992).............................................................................................. 16
*Ms. L. v. U.S. Immigration & Customs Enforcement*,
  310 F. Supp. 3d 1133 (S.D. Cal. 2018)..................................................... *passim*
*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
  612 F.3d 97 (2d Cir. 2010).............................................................................. 39, 41
*Nielsen v. Preap*,
  139 S. Ct. 954 (2019)............................................................................................ 20
*Nwozuzu v. United States*,
  712 Fed. App'x 31 (2d Cir. 2017)................................................................... 16, 25
*Of Cent. Am. Refugees v. I.N.S.*,
  795 F.2d 1434 (9th Cir. 1986).............................................................................. 21
*Ojo v. United States*,
  No. 16-cv-4112 (MKB) (LB), 2019 WL 3852391 (E.D.N.Y. Aug. 15, 2019).................. 22, 30
*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers v. Austin*,
  418 U.S. 264 (1974).............................................................................................. 39
*Omoniyi v. Dep't of Homeland Sec.*,
  No. 10-cv-1344 (DF), 2012 WL 892197 (S.D.N.Y. Mar. 13, 2012) ...................... 32
*Ostera v. United States*,
  769 F.2d 716 (11th Cir. 1985).............................................................................. 32
*Pena Arita v. United States*,
  2020 WL 3542256 (S.D. Tex. June 30, 2020) ............................................... 20, 21
*Portillo v. United States*,
  No. 17-cv-394 (JAD), 2018 WL 523363 (D.N.V. Jan. 22, 2018) ......................... 30
*Powell v. United States*,
  233 F.2d 851 (10th Cir. 1956) .............................................................................. 24
*Ramirez v. Bible*,
  882 F.3d 826 (9th Cir. 2017) ................................................................................. 9

*Richards v. United States*,
    369 U.S. 1 (1962)..................................................................................... 16, 20
*Rivera v. City of New York*,
    392 F. Supp. 2d 644 (S.D.N.Y. 2005)........................................................ 37
*Ross v. United States*,
    No. 13-cv-573-A, 2013 WL 5290498 (N.D. Tex. Sept. 18, 2013) ........................ 33
*Saleh v. United States*,
    No. 12-cv-4598 (KBF), 2013 WL 5439140 (S.D.N.Y. Sept. 27 2013) .................. 31
*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) ................................................................... 44
*Sanderson v. Leg Apparel LLC*,
    No. 19-cv-8423 (GHW), 2020 WL 3100256 (S.D.N.Y. June 11, 2020) ................ 42
*Santana-Rosa v. United States*,
    335 F.3d 39 (1st Cir. 2003)........................................................................ 21
*Sea Air Shuttle Corp. v. United States*,
    112 F.3d 532 (1st Cir.1997)....................................................................... 31
*Sloan v. H.U.D.*,
    236 F.3d 756 (D.C. Cir. 2001).................................................................... 32
*Smith v. United States*,
    No. 11-cv-00616, 2014 WL 4638918 (S.D. Ohio Sept. 16, 2014) .................. 34, 36
*Sobitan v. Glud*,
    589 F.3d 379 (7th Cir. 2009) ..................................................................... 45
*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)................................................................................. 44
*Starr Int'l Co. v. Fed. Res. Bank of N.Y.*,
    906 F. Supp. 2d 202 (S.D.N.Y. 2012)...................................................... 39, 40
*United States v. Gaubert*,
    499 U.S. 315 (1991)................................................................... 18, 19, 23, 34
*United States v. Jennings*,
    652 F.3d 290 (2d Cir. 2011)....................................................................... 21
*United States v. McMillan*,
    741 Fed. App'x 856 (2d Cir. 2018)............................................................. 21
*United States v. Mitchell*,
    445 U.S. 535 (1980)................................................................................. 15
*United States v. Mitchell*,
    463 U.S. 206 (1983)................................................................................. 15
*United States v. Olson*,
    546 U.S. 43 (2005)............................................................................... 28, 29
*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984)............................................................................. 17, 18
*United States v. Sherwood*,
    312 U.S. 584 (1941)................................................................................. 15
*Williams v. United States*,
    947 F.2d 37 (2d Cir. 1991)........................................................................ 15
*Wolfish v. Levi*,
    573 F.2d 118 (2d Cir. 1978)....................................................................... 33

*Wood v. United States*,
   175 Fed App'x 419 (2d Cir. 2006)............................................................................. 22

**Statutes**

6 U.S.C. § 279............................................................................................... 9, 10, 26
8 U.S.C. § 1226(a) ........................................................................................ 6, 8, 9, 24
8 U.S.C. § 1231 ...................................................................................... 5, 6, 7, 8, 21, 24
8 U.S.C. § 1232............................................................................................ 9, 10, 25
8 U.S.C. § 1252(a)(1)............................................................................................. 8
8 U.S.C. § 1324.................................................................................................. 12
8 U.S.C. § 1325.................................................................................................. 13
8 U.S.C. § 1326.................................................................................................. 13
12 U.S.C. § 1823(e) ............................................................................................ 24
28 U.S.C. § 2674................................................................................................ 28
28 U.S.C. § 2680............................................................................... 2, 16, 23, 27
28 U.S.C. § 1346(b)(1) ................................................................................ 1, 16, 28

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ..................................................................... 1
Rederal Rule of Civil Procedure 12(b)(6)................................................................... 35

**Regulations**

8 C.F.R. § 208.31(e)..................................................................................... 3, 6, 7, 8
8 C.F.R. § 241.5.................................................................................................. 8
8 C.F.R. § 1208.16............................................................................................. 3, 8
8 C.F.R. § 208.16-18........................................................................................... 7
8 C.F.R. § 208.31(a)........................................................................................... 7

**Other Sources**

Executive Order 13767 § 1, 82 Fed. Reg. 8793 (Jan. 30, 2017)...................................... 12, 13, 14

U.S. Department of Justice, *Memorandum on Renewed Commitment to Criminal Immigration Enforcement* (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download 13

U.S. Department of Justice, *News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (April 6, 2018), DOJ 18-417, 2018 WL 1666622.........................13

Defendant the United States of America submits this memorandum of law in support of its motion to dismiss the Complaint of D.J.C.V., a minor child, and his father, G.C. (collectively, "Plaintiffs"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

Through this action, Plaintiffs seek to hold Defendant liable in tort pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.*, ("FTCA"), for enforcing federal immigration laws.  For the many reasons described below, the Government is not liable in tort for enforcing federal law.

The fundamental harm alleged by Plaintiffs is that, upon their illegal entry to the United States, they were separated from each other.  According to Plaintiffs, Defendant should have either released G.C. from custody so he could be with his son, or housed him with D.J.C.V. at a family residential center.  However, it was both consistent with law and within Defendant's discretion (1) to detain G.C. pending removal and pending completion of his withholding-only proceedings, (2) not to house G.C. in a family center with other women and children in light of his criminal history, specifically G.C.'s guilty plea to aggravated assault arising from swinging a machete at his wife, and (3) to place D.J.C.V. in the least restrictive setting possible (*i.e.*, not a detention center) consistent with the requirements of a federal statute and consent decree.

The lawfulness and reasonableness of Defendant's actions are evident given the facts and also supported by a district court decision in the Southern District of California involving a class action seeking the reunification of parents and children separated at the southern border.  *See infra* at 14 (discussing *Ms. L. v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018)).  While the *Ms. L.* court granted the class's request for an injunction and required reunification of parents and children, *id.* at 1149, the court specifically excepted parents with

criminal histories from the class, *id*. at 1139 n.5.  Because G.C. was not part of that class due to his criminal history, he had to individually move the court for reunification.  *See Ms. L.*, No. 18-cv-428 (DMS) (S.D. Cal. 2018) (Dkt. No. 221); *see also* Declaration of Alexander J. Hogan ("Hogan Decl."), Ex. 1 (attaching docket entry 221 from *Ms. L.*).  The *Ms. L.* court rejected G.C.'s application finding that defendants acted well within their discretion in determining that G.C.'s criminal history precluded either releasing him into the community or detaining him in a family residential center, and that defendants' decision was entitled to deference.  *See Ms. L.*, Dkt. No. 236 at 2; *see also* Hogan Decl., Ex. 2 (attaching docket entry 236 from *Ms. L.*).  Such a discretionary decision is not subject to challenge under the FTCA even if the "discretion involved be abused."  28 U.S.C. § 2680(a).  In any event, as properly noted by the *Ms. L.* court, the Government's decision to not house G.C. in a family center did not constitute an abuse of discretion, but was reasonable based on G.C.'s criminal history.  Discretionary government conduct cannot simultaneously be tortious conduct, thus requiring dismissal of Plaintiffs' claims.

## BACKGROUND

### I.    Factual Background

Plaintiffs state that they came to the United States from Honduras on or about April 30, 2018.  Cmpl. at ¶¶ 16, 83.  On that date, Plaintiffs encountered United States border patrol agents near Hidalgo, Texas, where Plaintiffs were apprehend and taken into custody.  *Id*. at ¶ 84.  While G.C. is not D.J.C.V.'s biological father, he is listed as D.J.C.V.'s legal father on his birth certificate.  *Id*. at ¶ 82.  Plaintiffs spent three days together in a secure facility.  *Id*. at ¶ 85.  On May 2, 2018, immigration officials separated D.J.C.V. and G.C.  At the time of their separation, G.C. was 37 years old and D.J.C.V. was 19 months old.  *Id*. at ¶¶ 15, 16.  Over the course of the next several months, G.C. was housed at several detention facilities, including one in Texas,

another in New Jersey, and the Orange County Correctional Center, which is located in Goshen, New York. *Id*. at ¶¶ 8, 93, 99. During G.C.'s detention, D.J.C.V. was placed with Lutheran Social Services of New York in the Bronx. *Id*. at ¶ 14. Plaintiffs further claim that, during their separation period, Defendant did not provide for adequate communication between them and did not provide G.C. with information relating to his son's whereabouts for several weeks. *Id*. at ¶¶ 62, 98.

G.C. alleges that, at some point during his detention, he was presented with a piece of paper and asked to sign it in exchange for seeing his son. G.C. claims that "upon information and belief, the paper he signed was some sort of withdrawal of his application for asylum." *Id*. at ¶ 101.[1] In other words, Plaintiffs claim that Defendant conditioned "any reunification with his son upon his agreement for both to be removed to Honduras." *Id*. at ¶ 101. However, shortly after this alleged meeting wherein G.C. signed this paper, after consultation with counsel, he informed ICE that he sought to continue his request for asylum or other protection, and he received letters dated June 16 and 22, 2018, regarding his request for protection. *Id*. at ¶ 102. Later in August of 2018, G.C. claims that, again, the Department of Homeland Security ("DHS") attempted to condition reunification on G.C. and D.J.C.V. waiving their ability to seek asylum or related protection, which G.C. refused to do. *Id*. at ¶ 116.

In July of 2018, G.C. was transferred to a detention center in New Jersey. *Id*. at ¶ 103. There, as part of the process of reunification, G.C. provided a DNA sample. *Id*. On July 19, 2018, he was informed that his DNA did not match D.J.C.V.'s DNA, and that, therefore, officials

---

[1] Though the Complaint discusses asylum, because G.C. was subject to reinstatement of a removal order, he would not be eligible for asylum. *See infra* p. 7, n.4. Instead, his request for asylum or protection would be limited to screening and possible adjudication of withholding of removal or deferral of removal. 8 C.F.R. § 1208.16; 8 C.F.R. § 208.31(e).

questioned whether G.C. was D.J.C.V.'s father. *Id*. at ¶ 106. On July 27, 2018, officials reversed their position when presented with additional information as to G.C.'s parentage. *Id*. at ¶ 107.

Thereafter, DHS evaluated whether to reunify G.C. and D.J.C.V. in light of G.C.'s criminal history. *Id*. at ¶ 110, 113. DHS informed G.C. that G.C. and D.J.C.V. could not be reunited with G.C. in custody because G.C. could not be held in a family center in light of his criminal history. *Id*. at ¶ 113.

On August 23, 2018, G.C. received his reasonable fear interview in relation to his claim for protection, and U.S. Citizenship and Immigration Services ("USCIS") determined that G.C. established a reasonable fear of torture in returning to Honduras. *Id*. at ¶ 115. On October 10, 2018, G.C was released from custody. *Id*. The following day, G.C. visited his son, and, on October 15, 2018, he was permanently reunited with his son. *Id*. at ¶ 131.

Plaintiffs claim that these actions to separate them were taken as part of the Government's "efforts to systemically terrorize and punish those vulnerable migrants and thereby deter future migration to the United States." *Id*. at ¶ 1. Plaintiffs insist that "[t]he intentional infliction of such severe mental and physical trauma is at the crux of the government's family separation policy." *Id*. at ¶ 7. Plaintiffs also claim that these measures were taken "in a coordinated effort to limit or forestall migration and asylum from Central America." *Id*. at ¶ 10; *see also id*. at ¶ 27 ("[T]he Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate."); *id*. at ¶ 139 ("[G.C.'s] forced separation from his young son was directed as part of a broader policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States.").

Based on these allegations, Plaintiffs bring six claims under the FTCA and the Alien Tort Statute ("ATS"): (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; (3) negligence; (4) torture; (5) crime against humanity: persecution; and (6) crime against humanity: inhumane acts. The first three are brought pursuant to the FTCA and the last three are brought pursuant to the ATS.

## II.    G.C.'s Immigration History

G.C. initially entered the United States at an unknown place and unknown time.  *See* Declaration of Deputy Field Operations Director Darius Reeves ("Reeves Decl.") ¶ 3.  On October 28, 2010, G.C. pleaded guilty to one charge of aggravated assault in LaFourche Parish, Louisiana, arising from swinging a machete at his wife.  *See* Declaration of James De La Cruz ("De La Cruz Decl.") (attaching arrest report and minute entry of G.C.'s guilty plea); Reeves Decl. ¶¶ 4-5.  He was sentenced to 48 days in jail.  Reeves Decl. ¶ 6.[2]  Thereafter, on December 9, 2010, an immigration judge in Oakdale, Louisiana, ordered G.C. removed from the United States, and G.C. was removed on January 14, 2011.  *Id*. ¶ 7.   G.C. later unlawfully returned to the United States, and immigration officials reinstated his removal order on October 5, 2013.  *Id.* ¶ 8.  G.C. was again removed from the United States on October 9, 2013.  *Id.*

Plaintiff G.C., along with D.J.C.V., most recently illegally entered the United States on or around April 30, 2018, and D.J.C.V. was subject to removal pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).  Cmpl. at ¶¶ 81, 83; Reeves Decl. ¶¶ 9-10.  On May 1, 2018, Plaintiff G.C. was given a Notice of Intent/Decision to Reinstate Prior Order, which explained that DHS intended to reinstate G.C.'s prior order of removal under 8 U.S.C. § 1231(a)(5).  Reeves Decl. ¶ 11.  A warrant

---

[2] Because these facts bear on the issue of jurisdiction as discussed herein, *see infra* at 19-23, the Court may rely on them.  *See Luckett v. Bure*, 290 F.3d 493, 496-497 (2d Cir. 2002) ("In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings.").

of removal was issued that same day.  *Id.*  After being served with the Notice of Intent, G.C. was detained under § 1231(a)(2) for the 90 day removal period.  *See* 8 U.S.C. § 1231(a)(2); Reeves Decl. ¶ 12.  After that 90-day period, and while Plaintiff G.C. was detained in New Jersey, he was subject to detention under § 1231(a)(6).  Reeves Decl. ¶ 13; *see Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 211 (3d Cir. 2018).

Plaintiff G.C. claimed fear of persecution during his detention, and on August 23, while G.C. was detained in New York, USCIS conducted Plaintiff G.C.'s reasonable fear interview, and determined that G.C. presented a reasonable fear of torture in Honduras.  Cmpl. at ¶ 115; Reeves Decl. ¶ 14.  Plaintiff was served a Notice of Referral to an Immigration Judge on the same day, Reeves Decl. ¶ 15, which placed him in proceedings to consider his application for withholding of removal based on either 8 U.S.C. § 1231(b)(3) or the regulations implementing the Convention Against Torture.  8 C.F.R. § 208.31(e).  As a result of his detention in New York and the fact that he was in withholding-only proceedings, Plaintiff G.C. was subject to detention under 8 U.S.C. § 1226(a) and was eligible for a bond hearing.  Cmpl. at ¶ 115; Reeves Decl. ¶ 16; *Guerra v. Shanahan*, 831 F.3d 59, 64 (2d Cir. 2016).

## III.    Legal Framework

### A.    Relevant Immigration Statutory and Regulatory Framework

Under the Immigration and Nationality Act ("INA"), any alien present in the United States without being admitted or paroled is inadmissible and subject to removal.  *See* 8 U.S.C. § 1182(a)(6)(A)(i).  Likewise, an alien who illegally reentered the United States after having been previously removed is subject to removal.  *See* 8 U.S.C. § 1231(a)(5).

The detention of aliens is authorized by 8 U.S.C. § 1226(a), which provides that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the

United States."  The federal government possesses the express statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *See* 8 U.S.C. § 1231(g)(1).

The INA provides that, when DHS finds that an alien has illegally reentered the United States after having been removed, "the prior order of removal is reinstated from its original date." 8 U.S.C. § 1231(a)(5).  The reinstated order "is not subject to being reopened or reviewed"; the alien "is not eligible and may not apply for any relief" from the order.  *Id.*

However, the Secretary[3] may not remove an alien to a country where the alien would face persecution or torture.  8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16-18.  Therefore, notwithstanding § 1231(a)(5), when an alien subject to a reinstated removal order expresses a fear of return to his country of origin (*i.e.*, the country to which he would ordinarily be removed), ICE refers the alien to USCIS for an interview with an asylum officer, who is charged with determining whether the alien possesses a "reasonable fear" of persecution or torture.  *See* 8 C.F.R. §§ 208.31(a), 241.8(e). USCIS has exclusive jurisdiction to make a reasonable fear determination.  8 C.F.R. § 208.31(a). If the asylum officer determines that the alien has established a reasonable fear of persecution or torture, 8 C.F.R. § 208.31(e) requires referral to an immigration judge for an administrative hearing to determine whether the noncitizen can meet the burden of establishing eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3) and related regulations.  8 C.F.R. § 208.31(e). At this point, the alien enters withholding-only proceedings.[4]  The alien may appeal the immigration

---

[3] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary.  *Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

[4] Even aliens who are found to have a reasonable fear of persecution or torture are ineligible for asylum.  Their relief from removal is limited to consideration of their application for withholding

judge's determination in withholding-only proceedings to the Board of Immigration Appeals ("BIA"), and the BIA's decision is subject to judicial review.  8 U.S.C. § 1252(a)(1), (a)(4).

Aliens with reinstated orders of removal are initially subject to detention under 8 U.S.C. § 1231(a)(2).  Section 1231 authorizes the detention of an alien who "is ordered removed," 8 U.S.C. § 1231(a)(1)(A), and provides that, "[d]uring the removal period, the [Secretary] shall detain the alien," *id.* § 1231(a)(2).  The "removal period" is defined as "a period of 90 days." *Id.* § 1231(a)(1)(A).

After the 90-day removal period, an alien who has not been removed may be released subject to supervised release.  *Id.* § 1231(a)(3); *see also* 8 C.F.R. § 241.5 (governing release on an order of supervision after expiration of removal period).  Detention beyond the 90-day removal period is governed by § 1231(a)(6), which allows for the extension of detention in certain cases, including those in which the Government determines that a noncitizen is a "risk to the community or unlikely to comply with the order of removal."  8 U.S.C. § 1231(a)(6) (certain aliens "*may* be detained beyond the removal period and, if released, shall be subject to [supervised release]") (emphasis added).

If an alien is subject to a reinstated removal order, but has pending withholding-only proceedings (which would result if it is determined that the alien has a reasonable fear of torture or persecution if returned to his home country and the matter was referred to an immigration judge), the courts of appeals are divided over whether the alien is detained under 8 U.S.C. § 1226(a) or 8 U.S.C. § 1231.  *Compare Guerra v. Shanahan*, 831 F.3d 59 (2d Cir. 2016) (holding that § 1226 applies) *with Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208 (3d Cir.

---

of removal based on either 8 U.S.C. § 1231(b)(3) or the regulations implementing the Convention Against Torture.  8 C.F.R. § 1208.16; 8 C.F.R. § 208.31(e).

2018) (§ 1231 applies).[5]  If an alien in withholding-only proceedings was detained in New Jersey, then after the initial 90-day removal period, he would be subject to permissive detention under § 1231(a)(6), but would not necessarily be entitled to a bond hearing.  *See Guerrero-Sanchez*, 905 F.3d at 211.[6]  If the alien in withholding-only proceedings was detained in New York, his detention during the pendency of those proceedings is pursuant to 8 U.S.C. § 1226(a), and the alien would be entitled to a bond hearing.  *Guerra*, 831 F.3d at 64.

     **B.**     **Legal Framework for the Immigration Custody and Release of Minor Aliens**

     The immigration custody and release of unaccompanied alien children is governed by two statutory provisions, 6 U.S.C. § 279 and 8 U.S.C. § 1232, and the *Flores* Settlement Agreement.[7]

     **i.**     **The Homeland Security Act and the Trafficking Victims Protection Reauthorization Act**

     In 2002, Congress enacted the Homeland Security Act ("HSA"), which created DHS.  The HSA transferred to DHS the responsibility for immigration enforcement, and transferred to the Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") the responsibility for "the care and placement of unaccompanied alien children who are in [f]ederal custody by reason of their immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1).  The HSA defined an unaccompanied alien child ("UAC") as a child who:

     (A) has no lawful immigration status in the United States;

---

[5] The Sixth Circuit and the Ninth Circuit hold that § 1231 governs detention in this situation, while the Fourth Circuit holds that § 1226 governs.  *See Martinez v. Larose*, 968 F.3d 555, 564 (6th Cir. 2020); *Ramirez v. Bible*, 882 F.3d 826, 832 (9th Cir. 2017); *Guzman Chavez v. Hott*, 940 F.3d 867, 878 (4th Cir. 2019).  The Supreme Court granted *cert* of the Fourth Circuit's decision in *Guzman Chavez*.  *Albence v. Guzman Chavez*, 207 L. Ed. 2d 1050 (June 15, 2020).

[6] Section 1231(a)(6) does not "explicitly authorize a bond hearing," although the Third Circuit concluded that aliens detained under § 1231(a)(6) are entitled to a bond hearing after *prolonged* detention or six months of custody.  *Guerrero-Sanchez*, 905 F.3d at 214, 226.

[7] The *Flores* Settlement Agreement may be found at *Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101).

(B) has not attained 18 years of age; and
(C) with respect to whom
      (i) there is no parent or legal guardian in the United States; or
      (ii) no parent or legal guardian in the United States is available to provide
      care and physical custody.

6 U.S.C. § 279(g)(2).

The Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2008, which was signed into law on December 23, 2008, built on the HSA, and required that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). It also required that:

> Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.

*Id.* § 1232(b)(3). ORR, a component of HHS, must place UACs "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). However, ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(2)(B). ORR may place children in a secure facility only if it determines that the child poses a danger to herself or others, or has been charged with a criminal offense. 8 U.S.C. § 1232(c)(2)(A).

### ii. The *Flores* Settlement Agreement

In 1997, the United States entered into a consent decree (the "*Flores* Settlement Agreement") enforced in the U.S. District Court for the Central District of California that established a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." *Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). The settlement set minimum standards for the detention, housing, and release of alien minors detained by the Government and obliged the Government to pursue a "general policy favoring release" of such minors. *Id.* The

Ninth Circuit has described the *Flores* Settlement Agreement as "a binding agreement incorporated into a [federal] judicial decree." *Id.* at 875. As Plaintiffs note, D.J.C.V. is "undisputedly a class member subject to the provisions" of the *Flores* Settlement Agreement. Cmpl. at ¶ 76 n.75.

The *Flores* Settlement Agreement applies to both unaccompanied and accompanied minors. *Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016). Pursuant to the *Flores* Settlement Agreement, "[w]ithin five days of arrest, [DHS] must transfer the minor to a non-secure, licensed facility[.]" *Id.* at 902-03. The *Flores* Settlement Agreement "does not address . . . the housing of family units and the scope of parental rights for adults apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Id.* at 906.

Moreover, the *Flores* Settlement Agreement does not provide any rights to adult detainees, including rights of release. *Id.* at 908-09 (the Ninth Circuit, in enforcing the *Flores* Settlement Agreement, has specifically held that the consent decree does not require the Government to release parents from custody in order to allow them to be with their children); *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007). The preferential release to a parent "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908; *Bunikyte*, 2007 WL 1074070 at *16 (no preference for releasing parents who have violated immigration laws).

## C.   Executive Branch Directives Regarding Immigration Enforcement

Individuals in the custody of DHS subject to immigration proceedings under the INA also may be amenable to criminal prosecution, either for criminal immigration violations – *e.g.*, 8

U.S.C. § 1324 (alien smuggling), § 1325 (unlawful entry), and § 1326 (unlawful reentry after removal) – or for other criminal violations.  Those immigration statutes authorize DHS to refer individuals to the Department of Justice ("DOJ") for prosecution.

During the time period relevant to this action, the Executive Branch issued several directives regarding enforcement of federal immigration laws in response to a "surge of illegal immigration at the southern border with Mexico" and the operation of "sophisticated drug- and human-trafficking networks" – events the Executive Branch determined were a "significant threat to national security and public safety."  Executive Order 13767 § 1, 82 Fed. Reg. 8793 (Jan. 30, 2017).

In January 2017, the President issued Executive Order No. 13767 ("EO 13767") stating that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]"  *Id.* § 2(b).  EO 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law[,]" *id*. § 6, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole."  *Id*. § 11(d).

On April 11, 2017, DOJ issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement, and directed that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325 and illegal reentry of removed aliens under 8 U.S.C. § 1326, noting that "[c]onsistent and vigorous enforcement of key laws will disrupt organizations and deter unlawful conduct."  *See*

12

U.S. Department of Justice, *Memorandum on Renewed Commitment to Criminal Immigration Enforcement* (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

On April 6, 2018, the White House issued a Presidential Memorandum entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement," which required the Secretary of Homeland Security to report on progress implementing EO 13767's directive "to issue new policy guidance regarding the appropriate and consistent use of detention authority under the INA, including the termination of the practice known as 'catch and release,' whereby aliens are released in the United States shortly after their apprehension for violations of our immigration laws." 83 Fed. Reg. 16179 (Apr. 13, 2018).

That same day, the Attorney General issued a "Memorandum for Federal Prosecutors along the Southwest Border." U.S. Department of Justice, *News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (April 6, 2018), DOJ 18-417, 2018 WL 1666622 (hereinafter the "Zero Tolerance Memorandum"). Citing "a 203 percent increase in illegal border crossings" in the prior year and "the largest month-to-month increase since 2011," the memorandum directed federal prosecutors along the southwest border to immediately accept for prosecution, to the extent practicable, all § 1325(a) offenses referred for prosecution. *Id*. As the Attorney General explained, "a crisis has erupted at our Southwest Border that necessitates an escalated effort to prosecute those who choose to illegally cross our border." *Id*.

Consistent with EO 13767, the April 2018 Presidential Memorandum, and the Zero Tolerance Memorandum, DHS referred for prosecution adult aliens – including those traveling with children – who unlawfully entered the United States on the southwest border in violation of

§ 1325 or other statutory provisions authorizing criminal prosecution.  Alien minor children of those adults were transferred to ORR custody as UACs.

In response to these immigration policies and their resulting effects, a class action was filed in California seeking the reunification of parents and children separated at the southern border. *See Ms. L. v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). In June 2018, the court ordered the Government to reunify families and prohibited the Government from separating parents from their minor children in the future absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the Government to reunify parents separated from children under the age of five within fourteen days and with children aged five and older within thirty days. *Ms. L.,* 310 F. Supp. 3d at 1149-50.  Exempted from the *Ms. L.* class were people with criminal histories.  *Id.* at 1139 n.5.  Plaintiff G.C. individually moved the *Ms. L.* court for reunification, but the court rejected his motion due to his criminal history.  *See Ms. L.*, Dkt. No. 236 at 2; Hogan Decl. Ex. 2.

## ARGUMENT

## I.      The Court Lacks Subject Matter Jurisdiction As To Plaintiffs' FTCA Claims

The Court should dismiss the FTCA claims against the United States under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction for several reasons. First, Plaintiffs' claims are barred by the discretionary function exception to the FTCA.  Second, they are barred by the due care exception to the FTCA.  Third, some of Plaintiffs' claims are barred by the misrepresentation exception to the FTCA.  Fourth, because there is no private person analog to Plaintiffs' claims, they are not cognizable under the FTCA.

A.      **Plaintiffs Bear the Burden of Proving Subject Matter Jurisdiction**

"'A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the [Court] lacks the statutory or constitutional power to adjudicate it.'" *Luckett*, 290 F.3d at 496 (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id*. at 496-97.

It is well settled that "the United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (internal quotation and citation omitted). In other words, the Government cannot be sued without its consent, and "the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Although Congress can waive the United States' sovereign immunity through clear and unequivocal statutory language, waivers of sovereign immunity and their conditions must be strictly applied against the claimant. *See Lane v. Pena*, 518 U.S. 187, 192 (1996); *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998). Accordingly, if the United States has not waived its sovereign immunity, or if the conditions under which the United States has agreed to waive that immunity have not been met, federal subject matter jurisdiction does not exist over Plaintiffs' claims. *See United States v. Sherwood*, 312 U.S. 584, 590-91 (1941); *Williams v. United States*, 947 F.2d 37, 39 (2d Cir. 1991).

B.      **The Discretionary Function and Due Care Exceptions Bar Plaintiffs' Claims**

The FTCA's waiver of sovereign immunity is subject to several exceptions set forth in 28 U.S.C. § 2680. These exceptions "are designed to protect certain important governmental

functions and prerogatives from disruption." *Molzof v. United States*, 502 U.S. 301, 311 (1992);

*see also Richards v. United States*, 369 U.S. 1, 13 n.28 (1962).

Foremost among these exceptions are those in section 2680(a), which provides that the

waiver of sovereign immunity set forth at 28 U.S.C. § 1346(b)(1) shall not apply to:

> Any claim [1] based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not such
> statute or regulation be valid, or [2] based upon the exercise or performance or the
> failure to exercise or perform a discretionary function or duty on the part of a federal
> agency or an employee of the Government, whether or not the discretion involved
> be abused.

28 U.S.C. § 2680(a) (bracketed numerals added).

The first part of section 2680(a) sometimes is referred to as the FTCA's "due care

exception," and the second part often is referred to as the "discretionary function exception" or

"DFE."  As the legislative history of section 2680(a) states:

> The bill is not intended to authorize a suit for damages to test the validity of or
> provide a remedy on account of such discretionary acts even though negligently
> performed and involving an abuse of discretion.  Nor is it desirable or intended that
> the constitutionality of legislation, or the legality of a rule or regulation should be
> tested through the medium of a damage suit for tort.

H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

The due care exception "bars tests by tort action of the legality of statutes and regulations."

*Dalehite v. United States*, 346 U.S. 15, 33 (1953).  "Where government employees act pursuant to

and in furtherance of regulations, resulting harm is not compensable under the act[.]"  *Dupree v.*

*United States*, 247 F.2d 819, 824 (3d Cir. 1957) (citations omitted); *Nwozuzu v. United States*, 712

Fed. App'x 31, 33 (2d Cir. 2017) (summary order) (due care applies to government's interpretation

of a statute where there is legal uncertainty on the issue and no controlling legal authority clearly

precludes that particular interpretation); *Accardi v. United States*, 435 F.2d 1239, 1241 (3d Cir.

1970) (claim arising out of "the enforcement of 'rules and regulations'" barred by due care

exception). The due care exception was created because the "Tort Claims Act did not contemplate that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort. Nor did it contemplate a remedy for damages sustained by reason of the application of invalid laws or regulations." *Dupree*, 247 F.2d at 824 (citation and internal quotation marks omitted); *see also C.P. Chem. Co., Inc. v. United States*, 810 F.2d 34, 38 (2d Cir. 1987) ("It is clear that § 2680(a) was intended to protect the validity of governmental regulations from challenge in a tort action for damages.") (internal citation and quotation omitted). Thus, the FTCA precludes a claim based upon the actions of employees carrying out a statutory or regulatory scheme.

As to the discretionary function exception, by so limiting the FTCA, this exception "'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). As the Second Circuit has explained, "[t]he wellspring of the discretionary function exception is the doctrine of separation of powers. Simply stated, principles of separation of powers mandate that the judiciary refrain from deciding questions consigned to the concurrent branches of the government." *In re Joint Eastern and Southern Dists. Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir. 1989) (citing *Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir. 1982)).

The Supreme Court has enunciated a two-prong test for determining whether a claim is barred by the discretionary function exception. First, courts must determine whether the act "involv[es] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Pursuant to this first prong, courts look to whether "a federal statute, regulation or policy

specifically prescribes a course of action for an employee to follow[.]" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  To avoid the discretionary function exception, the plaintiff must identify a statute, regulation or policy that is both specific and mandatory, as well as conduct that violates said statute, regulation, or policy.  *See In re World Trade Ctr.*, 521 F.3d at 195.

Second, if the conduct does involve judgment or choice, courts then look to "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536).  "The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).  Thus, the exception protects "governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (internal citation and quotation omitted).  It is immaterial whether various policy considerations actually were considered, because "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325; *see also In re Joint East. & South. Dists. Asbestos Litig.*, 891 F.2d 31, 37 (2d Cir. 1989) ("We believe that it is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision . . . The discretionary function exception applies where there is room for policy judgment . . . Thus, the relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis.") (internal quotations and citations omitted).   Furthermore, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows

a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.  Also, the discretionary function exception applies even if the Government's conduct was negligent or an abuse of discretion.  *See id*. at 323; *Hekmat v. United States Trans. Sec. Admin*., 247 F. Supp. 3d 427, 437 (S.D.N.Y. 2017) ("Thus, [the discretionary function exception] applies even in the abuse of discretion."); *Callahan v. United States*, 329 F. Supp. 2d 404, 409 (S.D.N.Y. 2004) ("An abuse of discretion is expressly covered by the FTCA's discretionary function example.").

### i.    The Discretionary Function Exception Bars Plaintiffs' Claims

The alleged harm here was the separation of G.C. and D.J.C.V.  There were only two ways to avoid that harm—release G.C. and his son from custody or keep G.C. in custody, but house him with D.J.C.V.

Because this issue relates to jurisdiction, the Court may take notice of facts outside of the Complaint.  *See Luckett*, 290 F.3d at 496.  Particularly, here, a significant and relevant fact that Plaintiffs neglect to mention in the Complaint is the nature of Plaintiff G.C.'s prior criminal conviction.  *See* Cmpl. at ¶ 88.  Specifically, on October 28, 2010, G.C. pleaded guilty to one charge of aggravated assault for swinging a machete at his wife in LaFourche Parish, Louisiana. *See* De La Cruz Decl. (attaching arrest report and minute entry of G.C.'s guilty plea).

As a result of this conviction, G.C. was excluded from the class of plaintiffs in *Ms. L. Ms. L.*, 310 F. Supp. 3d at 1139 n.5 ("The class does not include parents with criminal history . . . ."). In light of his exclusion from the class, G.C. individually moved the *Ms. L.* court to be reunited with his son.  *See Ms. L.*, Dkt. No. 221; Hogan Decl. Ex. 1.  However, the Court denied this motion and noted that "[G.]C. has a misdemeanor domestic violence conviction for swinging a machete at his wife."  *Id*. at Dkt. No. 236 at 2; Hogan Decl., Ex. 2.  The court then concluded:

> Defendants' determination that . . . Mr. [G.]C. ha[s] disqualifying criminal history
> that precludes reunification with their children and either release into the
> community or detention in a family residential center is entitled to deference. The
> record indicates Defendants have vetted these parents in good faith and made
> principled decisions in light of their criminal history and overarching concerns
> regarding safety of their children and the public. These determinations certainly
> can be debated, but the Court is persuaded that Defendants have exercised their
> statutorily prescribed discretion in a reasonable manner. The Court has
> consistently held that matters of detention and parole are peculiarly within the
> province of the executive branch, and for prudential and other reasons that exercise
> of discretion ought not to be disturbed under these circumstances.

*Id*. at 3.[8]

Here, as *Ms. L.* properly noted, it was within the Government's discretion to release or

detain G.C., and the decision whether to release someone from custody clearly involves judgment

or choice and considerations of public policy—considerations that are indeed within the province

of the executive branch. *See Nielsen v. Preap*, 139 S. Ct. 954, 959 (2019) ("The second sentence

[of 8 U.S.C. § 1226(a)] generally gives the Secretary the *discretion* either to detain the alien or to

release him on bond or parole.") (emphasis added).[9] The fact that such prosecutorial decisions are

embedded with discretion is routinely recognized and clearly established. For example, in *Pena*

*Arita v. United States*, 2020 WL 3542256, at *7 (S.D. Tex. June 30, 2020), plaintiff brought an

FTCA action arising from his separation from his family after his illegal entry into the United

States. There, "the [c]ourt agree[d] with the United States" when it asserted that "the decision to

prosecute rests in the absolute discretion of the United States Attorney General, and once the

---

[8] The discretionary nature of this decision is reinforced by the conclusion in *Ms. L.* that, in determining whether to separate a parent and child, the Government's consideration of "criminal involvement in matters other than improper entry . . . would allow for the proper exercise of discretion by government officials." *Ms. L.*, 310 F. Supp. 3d at 1149 n.11.

[9] In the *Ms. L.* litigation, G.C. acknowledged that releasing him from custody was a discretionary determination. *See Ms. L.,* Dkt. No. 221 at 7; Hogan Decl., Ex. 1 ("The government could address this issue by simply exercising its discretion to release both families from custody.").

discretionary decision to prosecute is made, the separation of prisoners from their families is plainly legal." *Id.*; s*ee, e.g.*, *In re United States*, 945 F.3d 616, 627 (2d Cir. 2019) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.") (internal citation and quotation omitted); *United States v. Jennings*, 652 F.3d 290, 300 (2d Cir. 2011).

A corollary of this prosecutorial discretion is that law enforcement authorities have discretionary decision-making authority regarding detention and location of confinement. Thus, for example, "Congress has placed the responsibility of determining where aliens are detained within the discretion of the Attorney General." *Cmtte. Of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986); *see also* 8 U.S.C. § 1231(g) ("The [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). Indeed, decisions relating to aliens, including placement and detention, are so "vitally and intricately interwoven with contemporaneous policies [and] so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Cmtte. Of Cen. Am. Refugees*, 795 F.2d at 1440 (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580 (1951)).[10]

---

[10] *See also Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (decisions regarding whether to detain or release are policy-based decisions protected by the discretionary function exception); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement decisions are susceptible to policy analysis); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) ("assignment to particular institutions or units. . . must be viewed as falling within the discretionary function exception to the FTCA"); *c.f. United States v. McMillan*, 741 Fed. App'x 856 (2d Cir. 2018) (affirming ruling that "BOP had complete discretion to choose [inmate's] place of imprisonment"); *Wood v. United States*, 175 Fed App'x 419 (2d Cir. 2006) ("[T]he Attorney General, in the exercise of his statutory discretion in light of the available facilities, determined to hold [petitioner] in an Arizona detention center.").

Therefore, any claim based on the theory that G.C. should have been released in order to reunify him with his son is barred by the discretionary function exception because it was well within Defendant's discretion to detain G.C. rather than release him from custody. Exercising this discretion in such a way is particularly warranted (and should not be second guessed) when the person at issue has a violent criminal history, thus providing a basis not to release him into the public.

Similarly, to the extent Plaintiffs claim that G.C. should have been held in a family facility during his detention, *see* Cmpl. at ¶ 113, such that he could be housed with D.J.C.V., Plaintiffs are incorrect. Defendant must consider whether housing G.C. and D.J.C.V. together in a family center would have been consistent with law enforcement and child welfare considerations. Such decisions are precisely the type of discretionary decisions that the discretionary function exception was designed to protect. Here, Defendant's decision not to house a person with a violent criminal history—particularly one involving the use of a weapon in a domestic violence dispute—in a family center with women and children is certainly a discretionary determination that implicates public policy concerns, including security of the facility. *See, e.g.*, *Ojo v. United States*, No. 16-cv-4112 (MKB) (LB), 2019 WL 3852391, at *9 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted by*, 2020 WL 828076 (E.D.N.Y. Feb. 20, 2020) (concluding discretionary function exception barred plaintiff's claim and stating that "[n]umerous courts have found decisions regarding prison management, inmate security, and the security of officers are policy considerations"); *Farley v. United States*, No. 11-cv-298S (WMS), 2017 WL 3503727, at *6 (W.D.N.Y. Aug. 16, 2017) ("Decisions regarding the housing of prisoners or detainees, as well as their handling and placement, necessarily implicate safety and security and are therefore the sort of decisions that generally fall under the discretionary-function exception.").

It is immaterial whether various policy considerations actually were considered because "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. While it is not the province of the courts to second guess these discretionary determinations and the exception applies "whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), in this case it was certainly a reasonable exercise of discretion for Defendant to decide not to house an individual with a violent criminal history in a family center. Indeed, the *Ms. L.* court (the same court that issued a nation-wide injunction requiring the reunification of families) noted that Defendant "exercised [its] statutorily prescribed discretion in a reasonable manner" when it chose not to order G.C.'s release or house him in a family center. *See Ms. L.*, Dkt. No. 236 at 3; Hogan Decl., Ex. 2.

Accordingly, Defendant's two discretionary decisions resulting in Plaintiffs' separation— the decision to detain G.C. and the decision to not detain G.C. in a family residential center— cannot form the basis of a claim pursuant to the FTCA.

### ii.   The Due Care Exception Bars Plaintiffs' Claim Stemming from Their Separation

Pursuant to the due care exception, if the Government is authorized by statute or regulation to take the course of action that caused the harm, then it is not amenable to suit under the FTCA. This principle was clearly articulated in *Borquez v. United States*, 773 F.2d 1050 (9th Cir. 1985), where two plaintiffs drowned and one was injured as they attempted to walk across a diversion dam. The plaintiffs alleged that the Government was negligent in its maintenance of the dam. However, responsibility for the care and maintenance of the dam was transferred to a water-users' association pursuant to a federal statute, which provided in relevant part that the Secretary of the Interior was "*authorized, in his discretion*, to transfer . . . the care, operation, and maintenance of

23

all or any part of the project works, subject to such rules and regulations as he may prescribe." *Id.*

at 1052 (citing 43 U.S.C. § 499 (emphasis added)).  The Ninth Circuit held the due care exception

barred any claim based on the Government's decision to transfer such maintenance responsibility,

because such decision was authorized by Federal statute.  *Id.* at 1053.[11]

The two relevant actions here were both authorized by statute or regulation, and, thus,

cannot form the basis of an FTCA claim: (1) G.C.'s detention; and (2) the transfer of D.J.C.V. to

ORR custody.  The Government plainly had the statutory authority to detain G.C. after he entered

the country illegally and to determine the facility in which he was to be detained.  The Government

had the statutory authority to detain G.C. pending removal, and to detain him pending completion

of withholding-only proceedings once he claimed fear of persecution or torture, an asylum officer

found that fear reasonable, and he was referred to an immigration judge.  *See* 8 U.S.C. §§ 1226(a),

1231(a)(2), (6).  It also had the statutory authority to determine where to detain him.  *See* 8 U.S.C.

§ 1231(g) ("The [Secretary] shall arrange for appropriate places of detention for aliens detained

pending removal or a decision on removal.").  Strict enforcement of immigration laws in a way

authorized by statute cannot form the basis of an FTCA claim.

As a result of G.C.'s detention in a secure facility, the Government determined that

D.J.C.V. was a UAC and, pursuant to the TVPRA, transferred him to ORR custody.  The TVPRA

requires that "any department or agency of the Federal Government that has an unaccompanied

---

[11] *Accord Doe v. DiGenova*, 779 F.2d 74, 88 n.26 (D.C. Cir. 1985) (actions authorized by regulations protected by due care exception); *FDIC v. Citizens Bank & Trust Co. of Park Ridge, Ill.*, 592 F.2d 364, 366 (7th Cir. 1979) (applying the due care exception to claim based on the FDIC's execution of 12 U.S.C. § 1823(e), pursuant to which the "FDIC was authorized to enter into purchase and assumption agreements with respect to the assets of failing or closed banks"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (actions taken pursuant to and in furtherance of regulations protected by the due care exception).

alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).  ORR must place UACs "in the least restrictive setting that is in the best interest of the child."  8 U.S.C. § 1232(c)(2)(A).  Thus, not only was the Government authorized by statute to transfer D.J.C.V. to ORR custody, it was required to do so.  And no statute or regulation limits the time of a resulting separation, making that fact immaterial with respect to Defendants' execution of the federal statutes it is tasked to enforce.  *Dupree*, 247 F.2d at 824 ("Where government employees act pursuant to and in furtherance of regulations, *resulting harm* is not compensable under the act[.]") (emphasis added).  Accordingly, the due care exception bars Plaintiffs' separation claims

Plaintiffs cannot avoid the due care exception by arguing that the Government erred in interpreting federal law to determine D.J.C.V. to be a "UAC" because he, like other UACs, was "accompanied by their parents when they arrived in the United States and remained accompanied until the government separated them from their parents and transferred the children to ORR custody."  Cmpl. at ¶ 50.  Where courts permit an inquiry into whether an agency exercised "due care" in its interpretation of the statute or regulation at issue, the due care exception still applies when at the time of such interpretation there existed no controlling legal authority clearly precluding that particular interpretation.  *See Nwozuzu*, 712 Fed. App'x at 33 (because of "legal uncertainty" at the time, the Government's interpretation of the derivative citizenship statute at section 321(a) of the INA as requiring lawful permanent resident ("LPR") status is protected by the due care exception); *Doe v. Stephens*, 851 F.2d 1457, 1462 (D.C. Cir. 1988) (decision by VA to follow regulations that were invalidated by statute is protected by due care exception, because the agency could not be faulted for its "failure to predict the precise statutory interpretation that

25

led [a court] to reject the agency's" understanding of that statute). At the time of the challenged separation in this action, there was no authority clearly contrary to alien minors whose parents were detained pending removal being classified as UACs. Rather, precedent in this context permits a broad interpretation of what it means for a parent to be unavailable to "provide care and physical custody." 6 U.S.C. § 279(g)(2); *see D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) (court of appeals upheld determination that minor was "unaccompanied alien child" and transferred to ORR custody notwithstanding that minor actually lived with mother in their family home because mother's lack of fitness precluded her from being able to "provide what is necessary for the child's health, welfare, maintenance, and protection" and thus was not "available").[12] If a court of appeals has determined that a child can be deemed unaccompanied despite living in a home with her mother, the Government's interpretation that a child is unaccompanied when a parent is in a detention facility was certainly a reasonable one.

Therefore, for all the above reasons, the due care exception bars Plaintiffs' claims because the United States had the authority to detain Plaintiff G.C. after he reentered the country illegally, as well as the authority to, and in fact statutory requirement to, place Plaintiff D.J.C.V, his minor son, in the custody and care of ORR while Plaintiff G.C. was detained.

---

[12] Defendant also notes that, as described above, it was a discretionary decision to house G.C. in a secure detention facility. So long as G.C. was detained in a secure, adult detention facility, regardless of whether Plaintiff D.J.C.V. was a UAC pursuant to the TVPRA, the *Flores* Settlement Agreement precludes detention of alien minors in secure facilities. Pursuant to the *Flores* Settlement Agreement, "[DHS] must transfer the minor to a non-secure, licensed facility[.]" *Flores*, 828 F.3d at 902-03. As the court in *Bunikyte* observed, to comply with the *Flores* Settlement Agreement, ICE must "releas[e] the children to adult relatives not in custody, adult friends designated by their parents, or even state-operated foster care[.]" *Bunikyte*, 2007 WL 1074070 at *16. In other words, even if D.J.C.V. was not a UAC, under the *Flores* Settlement Agreement, the separation was necessary once the Government exercised its discretion to detain G.C. in a secure detention facility.

**C.  The Misrepresentation Exception Bars Claims Relating to the Alleged Waiver of Plaintiffs' Rights to Protection from Removal**

Plaintiff G.C. contends that the Government attempted to "coerce [him] to abandon his rightful claims to protections under asylum law and the Convention Against Torture by conditioning any reunification with his son upon his agreement for both to be removed to Honduras." Cmpl. at ¶ 101; *see also id.* (government officials allegedly presented him with a piece of paper and told him that he could see his son again if he signed the paper withdrawing his claim for asylum or related protection).  These alleged misrepresentations form part of the grounds for Plaintiffs' intentional infliction of emotional distress and negligence claims.  Cmpl. at ¶¶ 139, 145, 150.

As an initial matter, Plaintiffs do not allege any actual harm for the alleged misrepresentations as Plaintiff G.C. ultimately did not waive these rights and received a reasonable fear screening interview.  Cmpl. at ¶ 102.

In any event, to the extent that Plaintiff G.C. is attempting to argue that the Government interfered with his pursuit of asylum or related protection, those claims are barred by the misrepresentation exception of the FTCA, which bars "[a]ny claim arising out of . . . misrepresentation [or] deceit[.]"  28 U.S.C. § 2680(h).  The exception covers both "negligent misrepresentation as well as one for wilful [sic] misrepresentation or deceit." *Miller Harness Co. v. United States*, 241 F.2d 781, 783 (2d Cir. 1957); *see also Esrey v. United States*, 707 Fed App'x 749, 750 (2d Cir. 2018) (claim barred by misrepresentation exception where IRS allegedly concealed information from plaintiff).  In *Miller Harness Co.*, the appellant's president purchased certain government surplus property after having been told over the phone that the "sets" of parts to be purchased included stirrup irons and stirrup straps.  *Id.*  When the shipment arrived, it did not contain those parts.  The Court explained that the "case is solidly set upon a charge of innocent or

27

wilful [sic] misrepresentation," which is barred under the FTCA. *Id.* Here, like in *Miller Harness*, Plaintiff G.C. alleges that he was induced to act based on Government misrepresentations, and accordingly Plaintiffs' claims of interference with the ability to seek asylum or withholding of removal are therefore barred by Section 2680(h).

### D. No Private Person Analog Exists for Determining Where to Place Detainees or the Enforcement of Federal Immigration Laws

FTCA jurisdiction exists only if a plaintiff alleges "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674 (FTCA allows for tort recovery against United States only "in the same manner and to the same extent as a private individual under like circumstances"). The provision is known as the "private analog" requirement and where there is no private analog to the claim at issue, the court lacks jurisdiction to hear the claim. A private analog does not exist here because private individuals do not have the power to lawfully detain people and, in the course of that detention, determine the location at which the individual should be detained. Additionally, it is only the federal government that has the authority to enforce immigration laws and the alleged harm at issue here arose directly from enforcement decisions made by the Government that a private individual could not make.

In evaluating whether a private analog exists, the FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA." *United States v. Olson*, 546 U.S. 43, 46 (2005) (internal quotation marks omitted); *see also McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) ("[T]he Supreme Court has made clear that the relevant inquiry is the liability of a 'private person' under State law, not that of a 'state or municipal entity.'") (quoting *Olson*, 546 U.S. at 45-46). The FTCA does not waive sovereign immunity for claims against the United States based on governmental

"action of the type that private persons could not engage in and hence could not be liable for under local law." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotation marks omitted); *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) (same).

Here, G.C. was detained as a result of his undisputed criminal conduct—illegally crossing the border between ports of entry after having been removed previously. *See supra* at 5. Plaintiffs do not bring claims for false arrest or false imprisonment. Rather, the claim arises from the fact that, after G.C.'s arrest and detention, he was separated from his son and housed in an adult detention center. *See* Cmpl. at ¶ 93.

As the Second Circuit clearly stated in *McGowan*, "[p]rivate persons cannot establish facilities to detain other persons—only the government can, either on its own or through a governmental contractor. In short, there is no circumstance in state tort law that is analogous to the situation here." *McGowan*, 825 F.3d at 127. The plaintiff in *McGowan* argued that the court had jurisdiction to entertain his claim of wrongful confinement—specifically that he was imprisoned in an overly restrictive facility—under New York law because some New York courts had recognized a claim by a prisoner for wrongful confinement when that prisoner was improperly kept in solitary confinement or keeplock. *Id*. at 126. The *McGowan* court held that such a claim was not cognizable under the FTCA because private persons could not "establish facilities to detain other persons." *Id*. at 127. In other words, the court found that the type of harm plaintiff complained of—the degree of lawful confinement to which he was subjected—is not a harm a private person is capable of imposing given private persons cannot establish facilities to detain other people.

29

The same reasoning applies here.  G.C. was lawfully detained and housed in an appropriate detention center.  This power is one unique to the Government that private persons are incapable of performing and, therefore, there is no private analog in this case.

This case is distinct from *Liranzo v. United States*, 690 F.3d 78, 94-95 (2d Cir. 2012), where the Second Circuit held that claims for false arrest and false imprisonment do have private analogs—specifically, that a private person can make a "citizen's arrest."  There, the court held that a private person was susceptible to such a claim if they effectuated a citizen's arrest that was not privileged.  There is no false arrest or false imprisonment claim here.  Rather, Plaintiffs claim that they should have been detained together (or that the Government should have released G.C.).  In other words, Plaintiffs challenge where and with whom they were detained.  There can be no private person analog for claims challenging where or with whom one's immigration detention occurs because such decisions regarding the location and terms of detention cannot be performed by private persons.  Accordingly, the Court lacks subject matter jurisdiction under the FTCA.  *See Ojo*, 2019 WL 3852391, at *5-6 (no private analog where plaintiff's FTCA claim arose from the manner of his detention, specifically in the special housing unit); *Portillo v. United States*, No. 17-cv-394 (JAD), 2018 WL 523363, at *3 (D.N.V. Jan. 22, 2018) (no private analog to BOP's alleged negligence in applying good time credit to prisoner's sentence).

Moreover, Plaintiffs' claims arise from the Government's enforcement of federal immigration laws—something for which there is clearly no private analog.  Plaintiffs' alleged harms stem from the Government's decision to strictly enforce federal immigration statutes, including its decision to detain G.C. pending removal and/or during the pendency of his withholding-only proceedings.  The Government's faithful execution of federal statutes resulted in G.C.'s detention, rendering his child subject to separation—either pursuant to the TVPRA, the

*Flores* Settlement Agreement, or the exercise of the Government's discretion (as articulated above).  The United States has not waived its sovereign immunity because decisions regarding whether to enforce federal law have no private person counterpart.[13]  *See Chen*, 854 F.2d at 626 (2d Cir. 1988) (private analog requirement bars suits against government for actions arising from failure to enforce government regulations); *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir.1997) (decision regarding whether to take enforcement action under federal law is not conduct for which a private individual could be held liable and, thus, did not give rise to a FTCA action); *Figueroa v. United States*, 739 F. Supp. 2d 138, 141 (E.D.N.Y. 2010) ("On the other hand, no private analog is necessarily stated, for example, where the FTCA claim is based only upon an alleged failure to enforce a Federal statute or government regulation.").

Similarly, in addition to being barred by the misrepresentation exception, any claim premised on Defendant's alleged "threat[] to deport Mr. C. without his son, and coercively condition[] the possibility of reuniting with his son on Mr. C.'s agreement to waive his and his son's bona fide asylum claims" also lacks a private analog.  Cmpl. at ¶ 8.  The ability to adjudicate claims for protection from removal and deport people are actions that only the Government can take and, therefore, no private analog exists.  *See, e.g.*, *Akutowicz v. United States*, 859 F.2d 1122, 1125-26 (2d Cir. 1988) ("We think it clear, however, that the withdrawal of a person's citizenship constitutes a quasi-adjudicative action for which no private analog exists."); *Saleh v. United States*, No. 12-cv-4598 (KBF), 2013 WL 5439140, at *9 (S.D.N.Y. Sept. 27 2013) ("The denial of a green

---

[13] This argument is consistent with the Second Circuit's holding in *Liranzo*.  There, the court held that a private analog can exist even where "the challenged action is one that only the federal government does in fact perform."  *Liranzo*, 690 F.3d at 94.  As stated above, *see supra* at 30, the *Liranzo* court held that a proper comparison could be drawn to a false arrest claim arising from a citizen's arrest.  By contrast, here, the decision to detain an alien pending removal or pending completion of withholding-only proceedings (and the resulting separation of parent and child) does not have a private analog.

card is an immigration-related action that "has no private analog and thus cannot be redressed under the FTCA."); *Omoniyi v. Dep't of Homeland Sec.*, No. 10-cv-1344 (DF), 2012 WL 892197, at \*9 (S.D.N.Y. Mar. 13, 2012) ("[T]he alleged misconduct of CIS in initially denying Plaintiffs [sic] naturalization application has no private analog and thus cannot be redressed under the FTCA."); *Liranzo*, 690 F.3d at 96 ("Citizenship is a legal status, which only the federal government is capable of altering. A private individual cannot, without subsequent government action, cause injury to another's citizenship.").

### E.     Claims Related to Plaintiffs' Separation

In addition to the separation itself, Plaintiffs also appear to bring claims for actions related to this separation, including the frequency of communication between D.J.C.V. and G.C. as well as Defendant's system of tracking children.  These claims are barred pursuant to the doctrines discussed above.

First, any such claims would be barred by the due care exception because they are inextricably intertwined with their separation.  *See Sloan v. H.U.D.*, 236 F.3d 756, 762 (D.C. Cir. 2001) (claims that are "inextricably tied" or "inextricably linked" to the conduct protected by section 2680(a) are also barred).  This is so because the harms from the allegedly lacking communications or tracking are a direct consequence of the physical separations.  *See Johnson v. U.S. Dep't of Interior*, 949 F.2d 332, 339-40 (10th Cir. 1991) (claims that cannot be considered apart from each other are both barred); *Ostera v. United States*, 769 F.2d 716, 718 (11th Cir. 1985) (same).

Second, any challenge to the frequency of communications between and about separated family members is barred by the discretionary function exception.  Plaintiffs have identified no mandatory directives prescribing in specific terms the regularity with which detained alien adults

must be permitted to communicate with their children. *See* Cmpl. at ¶¶ 5, 8, 59, 62. Further, claims relating to the conditions of one's detention in a secure facility, including communication with people outside of the facility, are a challenge to discretionary, policy-based decision-making regarding conditions of confinement that courts routinely find to be shielded by the discretionary function exception.[14] Here, government decision-making regarding when, with what frequency, and the means to afford communication between adult aliens in secure immigration detention and their separated children necessarily involves balancing various policy considerations, including accessibility and cost of communications, staffing and resource allocation at the secured detention facilities in order to facilitate such calls, the children's placement sites, and parents and children's respective responses to communications. *See Wolfish v. Levi*, 573 F.2d 118, 126 (2d Cir. 1978) ("[T]o require the [prison] to return to court whenever it seeks to make any change, however minor, in its telephone service, would place great strains on overburdened federal judges and would, in essence, preempt the role of prison officials."), *rev'd on other grounds*, *Bell v. Wolfish*, 441 U.S. 520 (1979); *Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) ("[T]he BOP's provision of telephone services is a matter committed to its discretion that will not be

---

[14] *See, e.g.*, *Fernandini v. United States*, No. 15-cv-3843 (GHW), 2019 WL 1033797, at *4-5 (S.D.N.Y. Mar. 5, 2019) (inmate housing and implementation of pest control procedures is a discretionary function); *Holmes v. Watts*, No. 15-cv-155, 2016 WL 205401, at *7 (S.D. Ga. Jan. 15, 2016) ("Several other courts have found the [BOP] decisions regarding where to house inmates . . . fall within the [DFE]."), *report and recommendation adopted*, 2016 WL 1064581 (Mar. 14, 2016); *Ross v. United States*, No. 13-cv-573-A, 2013 WL 5290498, at *4 (N.D. Tex. Sept. 18, 2013) ("FTCA complaints of overcrowding, understaffing, and similar issues pertaining to a prisoner's living quarters are routinely found to be excluded from the FTCA by the [DFE]."); *Antonelli v. Crow*, No. 08–261, 2012 WL 4215024, *3 (E.D. Ky. Sept. 19, 2012) (rejecting a litany of conditions of confinement claims under the discretionary function exception); *Francis v. United States*, 10-cv-1474, 2011 WL 3563146, at *6 (D. Conn. Aug. 12, 2011) (decision not to equip cell bunk beds with ladders barred by the DFE because "deciding what steps should be taken to provide for prisoners' safety involves judgment and discretion"); *Enigwe v. Zenk*, No. 03-cv-854 (CBA), 2007 WL 2713849, at *8-9 (E.D.N.Y. Sept. 14, 2007) (implementing smoking regulations within the discretionary function exception).

second-guessed through an FTCA claim.").  In applying the DFE, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Gaubert*, 499 U.S. at 324. Additionally, for reasons similar to those discussed above, there is no private analog to such a claim as a private individual does not have the ability to detain someone and restrict their ability to communicate with others.

Plaintiffs also allege that the Government failed to adequately track alien minors who were separated from their parents because the computer tracking systems within DHS were inadequately designed or did not sufficiently interface with other systems.  *See* Cmpl. ¶¶ 5, 60, 61, 77.  Because Plaintiffs do not allege that these alleged deficiencies caused their separation or hindered their reunification, such alleged tracking failures cannot form the basis of any valid claim for relief.[15] In any event, an agency's decisions regarding the design and maintenance of its computer systems and databases is a policy-based discretionary function involving, among other things, considerations of how to "allocate resources among various objectives."  *Cruz v. United States*, 684 F. Supp. 2d 217, 224 (D.P.R. 2010) (dismissing claim that VA negligently designed and maintained inadequate computer systems and safeguards).  As such, any challenge by Plaintiffs to the Government's allegedly deficient tracking systems is barred by the discretionary function exception.  *See also Molchatsky v. United States*, 778 F. Supp. 2d 421, 433 (S.D.N.Y. 2011) (holding as barred by DFE plaintiff's claims relating to the SEC's "case-management system" and "administrative protocols"), *aff'd* 713 F.3d 159 (2d Cir. 2013); *Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (deficiencies in computer database system that failed to reveal immigration status is protected by discretionary function exception); *Smith v. United States*, No.

---

[15] In fact, G.C. was released from custody on October 10, 2018, and he saw his son the very next day, thus barring any claim that any tracking failure delayed Plaintiffs' reunification.  *See* Cmpl. at ¶¶ 120, 126.

11-cv-00616, 2014 WL 4638918, *4 (S.D. Ohio Sept. 16, 2014) (design of computer system involved balancing user needs with limited resources and thus was shielded by exception).

## II.     Plaintiffs Fail to State a Claim Under New York Law

Putting aside the FTCA jurisdictional defects, which independently require dismissal, Plaintiffs also fail to state a claim under New York law.  On a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in favor of Plaintiffs.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true.  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (internal citation and quotation omitted).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failure to state a claim.  *Id.* at 679.

### A.     Plaintiffs' Claims Are Barred by New York Public Policy

In New York, when a plaintiff's injuries are the result of his own illegal conduct, he is not entitled to recover for those injuries.  In *Barker v. Kallash*, the New York Court of Appeals found that "when the plaintiff has engaged in activities prohibited, as opposed to merely regulated, by law, the courts will not entertain the suit if the plaintiff's conduct constituted a serious violation of the law and the injuries for which he seeks recovery were the direct result of that violation."  *Barker v. Kallash*, 63 N.Y.2d 19, 24 (1984).  The court made clear that that recovery is denied in such

circumstances "because the public policy of the State generally denies judicial relief to those injured in the course of committing a serious criminal act."  *Id.*

This *Barker* rule was applied by a New York federal court in the context of a person illegally attempting to cross the border.  In *Farley v. Greyhound Canada Trans. Corp.*, No. 03-cv-0344 (SR), 2009 WL 1851037 (W.D.N.Y. June 26, 2009), the decedent plaintiff was hiding in a compartment of a bus while trying to illegally cross the border from Canada to the United States.  When the bus stopped at the border, plaintiff left the compartment and hid under the bus.  When the bus moved forward, it ran over and killed plaintiff.  *Id.* at *1.  In finding that the claim was precluded by *Barker*, the court concluded that "there can be no dispute, the decedent's conduct at the time of his death, attempting to illegally enter the United States by eluding examination or inspection by immigration officers, is a serious criminal act for which federal prosecution would have likely ensued had the decedent survived."  *Id.* at *3; *see also id.* n.4 (collecting cases where claim barred by *Barker*).[16]

The same result is warranted here.  Plaintiffs engaged in conduct that constituted a serious violation of the law and the damages they seek to recover are the direct result of that violation.  Plaintiff G.C. crossed into the United States in violation of criminal immigration law, and, consequently, was amenable to criminal prosecution and immigration detention.  The resulting

---

[16] A similar result was reached in *Jones v. Beth Israel Hosp.*, No. 17-cv-3445 (GHW), 2018 WL 1779344, at *10 n.6 (S.D.N.Y. Apr. 12, 2018).  There, plaintiff claimed that he received inadequate mental healthcare from a hospital, which caused him to assault police officers (and caused the police officers to defend themselves).  Plaintiff then brought suit against the hospital.  The court concluded that "to the extent that Plaintiff's medical malpractice and negligence claims are premised on physical injuries that Plaintiff received during the alleged assault by the police officers, those claims contravene public policy and, therefore, necessarily fail."  *Id.*  In other words, even if plaintiff's inadequate medical care did cause him to assault these police officers, he was "precluded from pursuing compensation for any damages" resulting therefrom.  *Id.*

separation was not an attenuated harm arising from G.C.'s criminal behavior, but rather a direct consequence thereof.

**B.     Plaintiffs Fail to State a Claim for Intentional or Negligent Infliction of Emotional Distress**

**i.     Extreme and Outrageous Conduct**

Under New York law, a claim of intentional infliction of emotional distress ("IIED") requires "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Green v. City of Mt. Vernon*, 96 F. Supp. 3d 263, 297-298 (S.D.N.Y. 2015) (internal quotation and citation omitted).  A claim of negligent infliction of emotional distress ("NIED") "requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." *Id.*  For either claim, "the conduct forming the basis of the claim must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 298 (internal citation and quotation omitted).  As this Court has concluded, "in New York, the tort of intentional infliction of emotional distress is extremely disfavored . . . The element of outrageous conduct is rigorous and difficult to satisfy." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (internal quotation and citation omitted).  Moreover, the Second Circuit imposes the additional requirement with respect to an IIED claim that the conduct at issue "lack any reasonable justification." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985); *see also Rivera v. City of New York*, 392 F. Supp. 2d 644, 658 (S.D.N.Y. 2005).

Here, not only was Plaintiffs' separation the result of federal officers acting in a way authorized by federal law, but the *Ms. L.* court has already determined that the separation was justified and reasonable. *See supra* at 20.  A judicial statement that a given course of conduct was

reasonable precludes any claim that the action at issue is extreme and outrageous.  In any event, federal officers performing their duties as permitted by law cannot constitute extreme and outrageous conduct.  *See, e.g.*, *Callahan v. City of New York*, 90 F. Supp. 3d 60, 76 (E.D.N.Y. 2015) (denying emotional distress claim where "Plaintiff allege[d] that the Defendants committed the tort of intentional infliction of emotional distress merely by doing their jobs to report and investigate allegations of suspected child neglect, file neglect petitions with the Queens and Kings County Family Courts, and pursue the allegations of child neglect in those courts until a disposition was reached."); *Kraft v. City of New York*, 696 F.Supp.2d 403, 424 (S.D.N.Y. 2010) (D.J., Chin) (denying emotional distress claim arising from arrest because there was probable cause for that arrest); *Brown v. City of New York*, 306 F. Supp. 473, 481 (S.D.N.Y. 2004) (same).  This is especially true where the only way to cure the alleged harm was either by releasing G.C. from detention or housing him in a family center with other children and families.  It was not extreme and outrageous for the Government to reject those options in light of G.C.'s violent criminal history.[17]

To hold otherwise—that federal actors can be held liable pursuant to state tort law for enforcing federal law—would be contrary to the Supremacy Clause.  Under the Supremacy Clause,

---

[17] Moreover, any claim premised on the frequency of communications between G.C. and D.J.C.V., also fails to establish extreme and outrageous conduct.  The Complaint provides few details as to this claim.  Rather, it only states that it took "several weeks" for G.C. to be informed that his son was being held in foster care.  *See* Cmpl. at ¶ 98.  However, limitations on personal communications is a natural consequence of being in custody, especially in its early stages when both G.C. and D.J.C.V. were being transferred between facilities.  In addition, lack of communication for only "several weeks" is insufficient to meet the necessary threshold.  The same reasoning applies to any emotional distress claim premised on Defendant's alleged failure in tracking detainees or alleged attempt to have G.C. waive his ability to seek asylum or other protection.  Neither of these actions amount to extreme and outrageous conduct as contemplated by New York law to sustain an emotional distress claim—especially in light of G.C. receiving his reasonable fear interview and the tracking system not delaying his reunification with his son.

"state and local laws that conflict with federal laws are without effect." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010). One such form of preemption is conflict preemption whereby a state or local law "conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives."[18] *Id.* at 104.[19] As this Court has stated, "[i]n order for conflict preemption to apply, the activity that is forbidden by state law need not be required by federal law; it is sufficient that the activity that state law prohibits is federally authorized." *Starr Int'l Co. v. Fed. Res. Bank of N.Y.*, 906 F. Supp. 2d 202, 242 (S.D.N.Y. 2012) (internal citation and quotation omitted), *aff'd*, 742 F.3d 37, 41 (2d Cir. 2014) (preemption is warranted "when a significant conflict exists between an identifiable federal policy or interest and the operation of state law.") (internal citation and quotation omitted). Indeed, "case law—dating to *McCulloch v. Maryland*—has long held that state regulation is preempted where it would retard, impede, burden, or in any manner control the operations of federal instrumentalities." *Starr Int'l*, 906 F. Supp. 2d at 235 (internal citation and quotation omitted); *see also Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009) (rejecting FTCA liability arising from "policing international borders" where "federal interest rises to a zenith" and stating that "an officer of the United States cannot be held in violation of state law while simultaneously executing his duties as prescribed by federal law. An act cannot simultaneously be necessary to the execution of a duty under the laws of the United States and an

---

[18] State law includes state tort law. *See Bartlett v. Honeywell Int'l Inc.*, 737 Fed. App'x 543, 551 (2d Cir .2018) ("[W]e conclude that subjecting [defendant] to potential state tort law liability for this alleged conduct would pose an obstacle to the accomplishment and execution of Congress's full purposes and objectives.").

[19] Further, the Supreme Court has explicitly held that executive orders are encompassed by the Supremacy Clause and are protected against inconsistent state laws. *See Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974).

offense to the laws of a state. On the contrary, the obligations imposed by federal law are supreme, and where any supposed right or claim under state law would impede an officer from performing his duties, it must relent.").

As discussed previously, *see supra* at 6-14, all of the actions at issue were federally authorized by the INA, executive order, the TVPRA, and the *Flores* Settlement Agreement. Accordingly, given that G.C. was detained in a secure facility (something authorized by federal statute and soundly within the Executive branch's discretion), federal law, either by virtue of the TVPRA or the *Flores* Settlement Agreement (or both), required D.J.C.V. to be transferred elsewhere.

Accordingly, if state tort law prevents the separation of parent and child, then it would be impossible for Defendant to comply with both the state and federal law, and the state law would "prohibit[ what] is federally authorized." *Starr Int'l Co.*, 906 F. Supp. 2d at 242. Moreover, complying with the state law would certainly pose an obstacle to achieving federal objectives— objectives enunciated by the President of the United States in the area of immigration, a field widely recognized as within the ambit of federal, rather than state power. *See, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("That the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution was pointed out by authors of The Federalist in 1787, and has since been given continuous recognition by this Court."); *Denson*, 574 F.3d at 1345 ("[W]e are ever mindful that this case involves the actions of federal officers charged with safeguarding the United States border—a locus where the federal interest rises to its zenith . . . To be sure, the U.S. Constitution strictly allocates the responsibility for policing international borders to the federal government, and officers of the United States are solely charged with carrying out that mandate."). When such

a conflict exists such that complying with federal law would violate state tort law, then the state law is without effect.  *See New York SMSA Ltd. P'ship*, 612 F.3d at 103; *Denson*, 574 F.3d at 1347. Holding otherwise would allow any state to nullify federal law by simply passing a statute declaring that the given federal conduct was extreme, outrageous, and, therefore, amounted to intentional/negligent infliction of emotional distress.  Such an outcome would be at odds with the federal system.

ii.     **Plaintiffs Fail to State a Negligent Infliction of Emotional Distress or Negligence Claim**

The Complaint makes plain that Plaintiffs believe that the Government's separation of families was motivated by a desire to inflict emotional distress in order to deter immigration.  *See* Cmpl. at ¶¶ 7, 35, 38, 77, 117, 156, 159, 172.  As this Court has held, "[t]hough litigants may allege alternate, or inconsistent, claims in a pleading, when the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence may be dismissed."  *Canosa v. Ziff*, No. 18-cv-4115 (PAE), 2019 WL 498865, at *8 (S.D.N.Y. Jan. 28, 2019).  In *Canosa*, because plaintiff pleaded intentional acts, the court dismissed plaintiff's claim for negligent infliction of emotional distress.  The same outcome is warranted here because Plaintiffs' claim is that the Government intentionally separated families in order to inflict emotional distress.[20]

---

[20] By contrast, to the extent Plaintiffs claim that Defendant was negligent in its tracking of separated parents and children, that may sound in negligence.  However, for the reasons stated above, this claim falls squarely within the DFE and due care exceptions and, once more, Plaintiffs do not claim to have been harmed by any such failure in the tracking system.  Moreover, they fail to identify what duty Defendant owed Plaintiffs in this respect.  Similarly, to the extent Plaintiffs premise a negligence or emotional distress claim on the frequency of communication between parents and children or Defendant's alleged attempt to have G.C. waive his claim for protection from removal, Plaintiffs do not identify what duty Defendant breached in this regard.  And, again, as to the alleged waiver of the ability to seek asylum or other protection, Plaintiffs assert such actions were intentional, not negligent.

Additionally, under New York law, a plaintiff may only recover for NIED on one of two theories—the bystander theory or the direct duty theory.[21]   The bystander theory "requires the plaintiff to allege that she has witnessed the death or serious bodily injury of a member of her immediate family." *Sanderson v. Leg Apparel LLC*, No. 19-cv-8423 (GHW), 2020 WL 3100256, at *12 (S.D.N.Y. June 11, 2020).   The direct duty theory requires a plaintiff to allege that he "suffered an emotional injury from a defendant's breach of a duty which unreasonably endangered her own physical safety or caused her to fear for her physical safety.   The duty alleged must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Id*. (internal citations and quotations omitted).   Here, the bystander theory plainly does not apply.   As to the direct duty theory, Plaintiffs claim that they suffered emotional distress as a result of their separation.   However, their allegations do not indicate that they feared for their physical safety. Simply being in Government custody cannot satisfy the direct duty theory as there should not be a presumption that the Government will physically harm a prisoner or detainee such that they should fear for their safety.   Otherwise, any person in custody could claim that the mere fact of being in custody amounted to that person fearing for his safety.[22]

---

[21] Extreme and outrageous conduct is also an element of an NIED claim and, for the reasons stated above, the conduct at issue here was not extreme and outrageous.

[22] Apart from the bystander and direct duty theories, "New York also recognizes a cause of action in cases where there is an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious." *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (internal citation and quotation omitted).   For example, a hospital negligently informing a person that her mother had died or negligently misdiagnosing HIV have been found to satisfy this theory.   *Id*.   This theory is reserved for mistakes that are so grave one cannot question that someone would suffer emotional distress.   Here, Plaintiffs do not allege Defendant made a mistake.   Rather, Plaintiffs allege Defendant knowingly and intentionally separated them.

Similarly, Plaintiffs' unadorned claim for "negligence" should be dismissed. *See* Cmpl. at ¶¶ 148-52. Again, the allegations are incompatible with a theory of negligence. It is undisputed that the Government took action intending to separate Plaintiffs, and Plaintiffs claim that the Government did so in order to intentionally inflict emotional distress and deter migration to the United States. Plaintiffs have not stated a claim of negligence, but rather intentional conduct. Moreover, the claim is deficient because "[t]he complaint fails to specify which of defendants' acts plaintiff contends were negligent—it instead merely repeats and realleges every allegation set forth previously in the complaint, and, in substance, asserts that negligence can be found somewhere in those allegations." *Gonzalez v. United States*, No. 16-cv-1494 (KAM), 2018 WL 1597384, at *6 (E.D.N.Y. Mar. 31, 2018). "In order to prove negligence, a plaintiff must demonstrate (1) the existence of a legal duty owed to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff actually and proximately resulting from such breach."[23] *Chapman v. Best Buy, Inc.*, No. 06-cv-824 (GLS), 2007 WL 3532696, at *2 (N.D.N.Y. Nov. 13, 2007). Plaintiffs do not claim what duty Defendant owed to them or how that duty was breached. *See Fung-Schwartz v. Cerner Corp.*, No. 17-cv-233 (VSB), 2019 WL 4393022, at *10-11 (S.D.N.Y. Sept. 13, 2019) ("Count 19 does not identify the source of the alleged duty violated by Defendants, nor does the Second Amended Complaint mention a specific statute or regulation . . . This allegation

---

[23] Defendant, again, reiterates that it could not breach any duty to G.C. by lawfully detaining him for his illegal re-entry into the United States. It also did not breach a duty owed to Plaintiffs when, as a result of this detention and the application of the TVPRA and the *Flores* Settlement Agreement, Plaintiffs were separated. Rather, as the *Ms. L.* court concluded, Defendant acted in a reasonable manner.

43

is clearly insufficient, since without knowledge of the text that allegedly creates the standard of care, it is impossible to determine if Plaintiffs have stated a claim for violation of that standard.").[24]

## III.    Alien Tort Statute

The Supreme Court has made clear that the ATS is a jurisdictional statute that does not create a new cause of action. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) ("[W]e think the [ATS] was intended as jurisdictional in the sense of addressing the power of the courts to entertain cases."). The ATS also does not operate as an independent waiver of the Government's sovereign immunity. *See Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 968 (4th Cir. 1992) ("[A]ny party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit."); *Koohi v. United States,* 976 F.2d 1328, 1332 n.4 (9th Cir. 1992) (noting that the ATS does not constitute a waiver of sovereign immunity); *Sanchez-Espinoza v. Reagan,* 770 F.2d 202, 207 (D.C. Cir. 1985) (same); *Czetwertynski v. United States*, 514 F. Supp. 2d 592, 596 (S.D.N.Y. 2007) ("[T]he text of the ATS does not include a waiver of sovereign immunity."); *Al Janko v. Gates*, 831 F. Supp. 2d 272, 282-283 (D.D.C. 2011).

Therefore, it is clear that the ATS does not provide the necessary waiver of sovereign immunity, and Plaintiffs point to no other source of law that has waived Defendant's immunity as to these claims. The FTCA cannot provide this waiver because the same jurisdictional defenses articulated above would equally apply to these claims. In other words, these claims would still be

---

[24] Putting aside Plaintiffs' failure to articulate the basis of their negligence claim, the claim would be barred in any event for the same reasons discussed above relating to the FTCA's jurisdictional requirements—the due care exception, the discretionary function exception, the lack of a private analog, and the misrepresentation exception. Additionally, the Supremacy Clause concerns are equally applicable to this claim.

limited by the due care exception, the discretionary function exception, the misrepresentation exception, and the lack of a private analog.

Moreover, there is yet another, independent reason these claims could not come within the FTCA's waiver of immunity. For a claim to be covered under the FTCA's waiver of sovereign immunity, "[the] claim must allege, *inter alia*, that the United States would be liable to the claimant as a private person in accordance with the *law of the place* where the act or omission occurred." *FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (emphasis added). In *Meyer*, the Supreme Court held that:

> A constitutional tort claim such as [plaintiff's] could not contain such an allegation. Indeed, we have consistently held that § 1346(b)'s reference to the "law of the place" means law of the State—the source of substantive liability under the FTCA. By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right . . . the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims.

*Id*. at 477-78 (internal citations and quotations omitted). By interpreting "law of the place" to mean "law of the State," claims premised on federal law are not cognizable under the FTCA. For this reason, courts have held that FTCA claims based upon violations of treaties are not cognizable under the FTCA—just as claims premised on violations of federal statutory law or the constitution are not cognizable under the FTCA. *See, e.g.*, *Sobitan v. Glud*, 589 F.3d 379, 389 (7th Cir. 2009) ("The Court's reasoning in *Meyer* applies with equal force to claims brought pursuant to international treaty. An international treaty is no more the law of the place than the federal Constitution, and, therefore . . . the United States simply has not rendered itself liable for these types of claims.") (internal citation and quotation omitted); *Al Janko*, 831 F. Supp. 2d 272, 283 ("[C]ustomary international law is not state law and therefore . . . [is] not covered under the FTCA's limited waiver."). Accordingly, because the FTCA does not waive sovereign immunity with respect to claims based upon international law, the Court lacks jurisdiction.

## CONCLUSION

For the reasons discussed herein, this case should be dismissed for lack of subject matter jurisdiction and for failure to state a claim.

Dated:     October 16, 2020
           New York, New York

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By:        /s/ Rebecca R. Friedman
           REBECCA R. FRIEDMAN
           ALEXANDER J. HOGAN
           Assistant United States Attorneys
           86 Chambers Street, Third Floor
           New York, New York 10007
           Tel.: (212) 637-2614/2799
           Fax:  (212) 637-2686
           E-mail: rebecca.friedman@usdoj.gov
                   alexander.hogan@usdoj.gov

46