**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

D.J.C.V., minor child, and G.C., his father          :

              Plaintiffs,          :

     -v-          :          Index No. 1:20-cv-5747

United States of America,          :

              Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

---

Kathryn Ball
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
+1.212.309.6000
+1.212.309.6001
kathryn.ball@morganlewis.com

Lily G. Becker (*Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
+1.215.963.5000
+1.215.963.5001
lily.becker@morganlewis.com

Baher Azmy
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
+1.212.614.6464
+1.212.614.6499
bazmy@ccrjustice.org
gschwarz@ccrjustice.org
*Attorneys for Plaintiffs D.J.C.V., minor child,*
*and G. C*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

**A.**   **Flight from Persecution and the Terror of Father and Infant Son's Initial Separation.** ................................................................................................................ 3

**B.**   **The Family Separation Policy's Goal to Intentionally Inflict Pain and Deter Future Asylum Seekers.** ........................................................................................ 3

**C.**   **Mr. C.'s Continued Incommunicado Separation from His Son.** ............................. 5

**D.**   **The Illegality and Torment of Continued Separation.** ............................................ 5

**E.**   **Judicial Decisions Ordering Release and Reunification.** ....................................... 7

**F.**   **The Predictable, Traumatic Effects of this Family's Prolonged Separation.** ......... 8

ARGUMENT ...................................................................................................................... 9

**I.**   **THE COURT MUST TAKE ALL OF PLAINTIFFS' FACTUAL ALLEGATIONS AS TRUE, CONSTRUE INFERENCES IN FAVOR OF PLAINTIFFS AND INQUIRE MERELY IF PLAINTIFFS' CLAIMS ARE PLAUSIBLE.** ............................................................................................................... 9

**II.**   **PLAINTIFFS' ALLEGATIONS SHOW THE COURT HAS SUBJECT MATTER OVER THE FTCA CLAIMS.** ........................................................... 10

    **A.**   **Because Plaintiffs Sufficiently Allege That The Government's Separation of Plaintiffs Was Unconstitutional And Constituted Torture, The Discretionary Function Exception Does Not Shield It From Liability.** ........................................................................................ 11

    **B.**   **The FTCA's Due Care Exception Does Not Shield The Government's Conduct From Liability.** ........................................................................... 19

    **C.**   **The Misrepresentation Exception Does Not Bar Plaintiffs' FTCA Claims.** ................................................................................................. 23

    **D.**   **Because There Are Like Circumstances In Which Private Parties Could Intentionally And Negligently Inflict Emotional Distress, Plaintiffs' Tort Claims Satisfy The Broad Private Analog Inquiry.** ............. 24

**III.**   **PLAINTIFFS STATE CLAIMS FOR RELIEF UNDER NEW YORK LAW.** ....... 29

    **A.**   **Plaintiffs' Claims Are Not Barred By New York Public Policy.** .................. 29

    **B.**   **Plaintiffs State A Claim For Intentional And Negligent Infliction Of Emotional Distress And For Negligence.** ........................................................ 32

**IV.**   **THE UNITED STATES DOES NOT ENJOY SOVEREIGN IMMUNITY UNDER THE ATS FOR THE *JUS COGENS* VIOLATIONS ALLEGED HERE.** ........................................................................................................... 39

## TABLE OF CONTENTS
(continued)

**Page**

**A.**    **Because The ATS Is A Jurisdictional Statute Whose Content Derives From Common Law, The Common Law Principle That *Jus Cogens* Norms Displace Domestic Sovereign Immunity Applies.** ............................... 42

**B.**    **The United States Has Impliedly Waived Sovereign Immunity For *Jus Cogens Violations.*** ............................................................................ 48

CONCLUSION ........................................................................................................... 49

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.P.F. et al v. United States of America*,
   Docket No. 2:20-cv-00065 (D. Ariz. Jan 10, 2020)....................17 BA_Cite_D43EE8_000095

*Akutowicz v. United States*,
   859 F.2d 1122 (2d Cir. 1988)...............................................................................27

*Al Shimari v. CACI Premier Tech., Inc.*,
   368 F. Supp. 3d 935 (E.D. Va. 2019) ............................................................. *passim*

*Alami v. Volkswagen of Am., Inc.*,
   97 N.Y.2d 281 (2002) ...........................................................................................30

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989)...............................................................................................43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................9

*Avalos-Palma v. United States*,
   No. Civ. A. 13-5481 FLW, 2014 WL 3524758 (D.N.J. July 16, 2014) ................................26

*Barker v. Kallash*,
   63 N.Y.2d 19 (1984) ..........................................................................................30, 31

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................9

*Bialik v. E.I. Dupont de NeMours & Co.*,
   142 Misc. 2d 926 (Sup. Ct. Niagara Cty. 1988) ..................................................32

*Birnbaum v. United States*,
   588 F.2d 318 (2d Cir. 1978)....................................................................................12

*Bunikyte v. Chertoff*,
   Nos. A-07-CA-164-166, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) ................................22

*Bunker v. Testa*,
   234 A.D.2d 1004 (4th Dep't 1996).........................................................................7

*C.M. v. United States*,
   No. CV-19-05217-PHX-SRB, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020).............17, 18, 20

*Carranza v. United States*,
   No. 3:12-CV-02255-AC, 2013 WL 3333104 (D. Ore. July 1, 2013) .........................28, 35, 36

*Chen v. United States*,
   854 F.2d 622 (2d Cir. 1988)...........................................................................................26

*Committee of Central American Refugees v. INS*,
   795 F.2d 1434 (9th Cir. 1986) .....................................................................................16

*Crumpton v. Stone*,
   59 F.3d 1400 (D.C. Cir. 1995) .....................................................................................19

*Cruz Paz v. Lloyd et al.*,
   No. 18 Civ. 8993, ECF No. 11 (S.D.N.Y. Oct. 5, 2018) (Crotty, J.)......................34

*D.B. v. Cardall*,
   826 F.3d 721 (4th Cir. 2016).  .....................................................................................22

*D.J.C.V. v. U.S.C.I.S.*,
   No. 18 Civ. 9115, 2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018) ................................. *passim*

*de Nolasco v. United States Immigration & Customs Enf't*,
   319 F. Supp. 3d 491 (D.D.C. 2018) .............................................................................15

*Decter v. Second Nature Therapeutic Program, LLC*,
   42 F. Supp. 3d 450 (E.D.N.Y. 2014) ...........................................................................27

*Denson v. United States*,
   574 F.3d 1318 (11th Cir. 2009) ...................................................................................36

*Diaz-Bernal v. Myers*,
   758 F. Supp. 2d 106 (D. Conn. 2010) .........................................................................12

*Duchesne v. Sugarman*,
   566 F.2d 817 (2d Cir. 1977)..........................................................................................12

*Esrey v. United States*,
   707 Fed. App'x 749 (2d Cir. 2018)...............................................................................23

*Farley v. Greyhound Canada Trans. Corp.*,
   2009 U.S. Dist. LEXIS 54156 (W.D.N.Y. June 25, 2009) ........................................31

*FDIC v. Meyer*,
   510 U.S. 471, 475 (1994)................................................................................................9

*Filártiga v. Peña-Irala S.A.*,
   630 F.3d 876 (2d Cir. 1980)..........................................................................................39

*Firebaugh Canal Water Dist. v. United States*,
   712 F.3d 1296 (9th Cir. 2013) ......................................................................24

*Gaither v. City of New York*,
   300 A.D.2d 255  (1st Dep't 2002) ................................................................31

*Glusband v. Fittin Cunningham Lauzon, Inc.*,
   582 F. Supp. 145 (S.D.N.Y. 1984) ..............................................................38

*Goldstar (Panama) S.A. v. United States*,
   967 F.2d 965 (4th Cir. 1992) ........................................................................42

*Gottlieb v. County of Orange*,
   84 F.3d 511 (2d Cir. 1996)............................................................................13

*Guaranty Trust Co. v. United States*,
   304 U.S. 126 (1938)......................................................................................46

*Matter of Guerra*,
   24 I. & N. Dec. 37 (BIA 2006) ....................................................................34

*Indian Towing Co. v. United States*,
   350 U.S. 61 (1955)..................................................................................24, 25

*J.S.R. v. Sessions*,
   330 F. Supp. 3d 731, 741 (D. Conn. 2018)..................................................15

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018) (Kennedy, J., plurality)......................................40, 47

*Jones v. Beth Israel Hosp.*,
   No. 17-cv-3445, 2018 WL 1779344 (S.D.N.Y. Apr. 12, 2018) ...............31

*Kadić v. Karadžić*,
   70 F.3d 232 (2d Cir. 1995)......................................................................40, 43

*Kaminski v. United Parcel Serv.*,
   120 A.D.2d 409 (1st Dep't 1986) ................................................................32

*Kashef v. BNP Paribas*,
   925 F.3d 53 (2d Cir. 2019)......................................................................39, 44

*Kawananakoa v. Polyblank*,
   205 U.S. 349 (1907)......................................................................................44

*Kennedy v. McKesson Co.*,
   462 N.Y.S.2d 421 (1983)........................................................................37, 40

*Khulumani v. Barclay Nat. Bank, Ltd.*,
    504 F.3d 254 (2d. Cir. 2007) .............................................................................40

*Kia P. v. McIntyre*,
    235 F.3d 749 (2d Cir. 2000)..............................................................................13

*King v. Otasco, Inc.*,
    861 F.2d 438 (5th Cir. 1988) ............................................................................38

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375 (1994)............................................................................................9

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993)............................................................................................9

*Liranzo v. United States*,
    690 F.3d 78 (2d Cir. 2012)...............................................................24, 26, 27

*Loumiet v. United States*,
    828 F.3d 935 (D.C. Cir. 2016) ..........................................................................12

*M.D.C.G. v. United States*,
    No. 7:15-CV-552, 2016 WL 6638845 (S. D. Tex. Sept. 13, 2016) ............................29, 34, 37

*Maldonado v. Lloyd*,
    18 Civ. 3089, 2018 WL 2089348 (S.D.N.Y. May 4, 2018).................................22, 34

*Martinez v. United States*,
    No. CV 1300955TUCCJLAB, 2018 WL 3359562 (D. Ariz. July 10, 2018) .................. 28, 36

*Matar v. Dichter*,
    563 F.3d 9 (2009)............................................................................................. 45

*McGowan v. United States*,
    825 F.3d 118 (2d Cir. 2016)..........................................................................27, 28

*Medina v. United States*,
    259 F.3d 220 (4th Cir. 2001) ............................................................................12

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)..........................................................................................13

*Miller Harness Co. v. United States*,
    241 F.2d 781 (2d Cir. 1957)..............................................................................23

*Molchatsky v. United States*,
    778 F. Supp. 2d 421 (S.D.N.Y. 2011), *aff'd*, 713 F.3d 159 (2d Cir. 2013) ..............................9

*Moore v. County of Suffolk,*
    11 A.D.3d 591 (2d Dep't 2004) .................................................................................31

*Mortise v. United States,*
    102 F.3d 693 (2d Cir. 1996).......................................................................................37

*Ms. L. v. U.S. Dep't of Homeland Security,*
    310 F. Supp. 3d 1133 (S.D. Cal. 2018)..............................................................*passim*

*Ms. L. v. U.S Immigration & Customs Enf't,*
    302 F. Supp. 3d 1149 (S.D. Cal. 2018).....................................................................15

*Myers & Myers, Inc. v. United States Postal Serv.,*
    527 F.2d 1252 (2d Cir. 1975).....................................................................................11

*Nash v. MRC Recovery Inc.,*
    2016 N.Y. Misc. LEXIS 167 (Sup. Ct. Suffolk Cty. Jan. 12, 2016).......................31

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
    709 F.3d 109 (2d Cir. 2013).........................................................................................9

*Nurse v. United States,*
    226 F.3d 996 (9th Cir. 2000) .....................................................................................11

*Nwozuzu v. United States,*
    No. 14 CIV. 8589 LGS, 2015 WL 4865772 (S.D.N.Y. Aug. 12, 2015), *aff'd,*
    712 F. App'x 31 (2d Cir. 2017) ................................................................................20

*Orzechowski v. Perales,*
    153 Misc. 2d 464 (Sup. Ct. N.Y. Cty.1992) ...........................................................29

*Paixao v. Sessions et al.,*
    No. 18 Civ. 4591, ECF No. 16 (N.D. Ill. July 5, 2018) ..........................................34

*The Paquete Habana,*
    175 U.S. 677 (1900).............................................................................................43, 44

*Paul v. Avril,*
    812 F. Supp. 207 (S.D. Fla. 1993) ...........................................................................44

*People v. Leonard,*
    19 N.Y.3d 323(2012) ................................................................................................29

*Phifer v. State of New York,*
    204 A.D.2d 612, 612 N.Y.S.2d 225 (2d Dep't 1994)..............................................31

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    374 F. Supp. 2d 331 (S.D.N.Y. 2005).......................................................................40

*Prince v. Massachusetts,*
  321 U.S. 158 (1944)............................................................................................13

*Princz v. Fed. Rep. of Germany,*
  26 F.3d 1166 (D.C. Cir. 1994)......................................................................40, 45

*Pullman Constr. Indus. v. United States,*
  23 F.3d 1166 (7th Cir. 1994) .................................................................................46

*Raz v. United States,*
  343 F.3d 945 (8th Cir. 2003) .................................................................................12

*Ruiz v. United States,*
  No. 13-CV-1241, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) ...............18, 19, 37

*Santosky v. Kramer,*
  455 U.S. 745 (1982)............................................................................................13

*The Schooner Exchange v. McFaddon,*
  11 U.S. (7 Cranch) 116 (1812)............................................................................46

*Scollar v. City of New York,*
  160 A.D.3d 140, 74 N.Y.S.3d 173 (1st Dep't 2018) ............................................27

*Sea Air Shuttle Corp. v. United States,*
  112 F.3d 532 (1st Cir. 1997) .................................................................................26

*Sheehan v. United States,*
  896 F.2d 1168 (9th Cir. 1990) ..............................................................................28

*Siderman de Blake v. Republic of Argentina,*
  965 F.2d 699 (9th Cir.1992) ..........................................................................40, 44

*Skinner v. Oklahoma,*
  316 U.S. 535 (1942)............................................................................................13

*Socialist Workers Party v. Attorney Gen. of United States,*
  642 F. Supp. 1357 (S.D.N.Y. 1986).......................................................................12

*Sosa v. Alvarez-Machain,*
  542 U.S. 692 (2004)............................................................................................41

*Sosa v. Alvarez-Machain,*
  542 U.S. 724-25 (2004) .......................................................................................40

*Souza v. Sessions et al.,*
  No. 18 Civ. 4412, ECF No. 23 (N.D. Ill. Jun. 26, 2018) .......................................34

*Stanley v. Illinois*,
  405 U.S. 645 (1972)..................................................................................................14

*Sutton v. United States*,
  819 F.2d 1289 (5th Cir. 1987) ...............................................................................12

*Tekle v. United States*,
  511 F.3d 839 (9th Cir. 2007) ..................................................................................25

*Tel-Oren v. Libyan Arab Republic*,
  726 F.2d 774 (D.C. Cir. 1984)................................................................................40

*Thames Shipyard & Repair Co. v. United States*,
  350 F.3d 247 (1st Cir. 2003) ..................................................................................12

*Troxel v. Granville*,
  530 U.S. 57 (2000).............................................................................................13, 37

*Trustees of the New York City Dist. Council of Carpenters Pension Fund v. Lee*,
  No. 15-CV-8081 (KBF), 2016 WL 1064616 (S.D.N.Y. Mar. 14, 2016)................10

*U.S. v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)................................................................................40, 46

*United States Fid. & Guar. Co. v. United States*,
  837 F.2d 116 (3d Cir. 1988)...................................................................................12

*United States v. Loy*,
  237 F.3d 251 (3d Cir. 2001)....................................................................................14

*United States v. Muniz*,
  374 U.S. 150 (1963).................................................................................................25

*United States v. Nordic. Vill. Inc.*,
  503 U.S. 30 (1992) ..................................................................................................41

*United States v. Olson*,
  546 U.S. 43 (2005).............................................................................................24, 29

*Valdez v. City of New York*,
  21 Misc. 3d 1107 (A) (Sup. Ct. Bronx Cty 2008).............................................29, 37

*W.S.R. v. Sessions*,
  318 F. Supp. 3d 1116 (N.D. Ill. 2018) ........................................................13, 15, 17

*Watson v. United States*,
  179 F. Supp. 3d 251, 270-71, *aff'd in part, rev'd in part on other grounds*, 865
  F.3d 123 (2d Cir. 2017)...........................................................................................20

*Welch v. United States*,
   409 F.3d 646 (4th Cir. 2005) ...................................................................................19, 20

*Williams v. United States*,
   242 F.3d 169 (4th Cir. 2001) ........................................................................................43

*Wiwa v. Royal Dutch Petroleum Co.*,
   626 F. Supp. 2d 377 (S.D.N.Y. 2009)............................................................................40

*Wolfe v Hatch*,
   95 A.D.3d 1394 (3d Dep't 2012) ...................................................................................31

*Yousuf v. Samantar*,
   699 F.3d 763,776 (4th Cir. 2012) .............................................................................43, 44

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)........................................................................................................13

**Statutes**

6 U.S.C. 279(g)(2) ...............................................................................................................21

8 U.S.C. 1232(b)(3) .............................................................................................................21

28 U.S.C. § 1346(b)(1) ........................................................................................................24

28 U.S.C. § 2674 .................................................................................................................24

28 U.S.C. § 2680(a) .............................................................................................................19

28 U.S.C. § 2680(h) ........................................................................................................... 23

Foreign Sovereign Immunities Act.......................................................................................42

*FSIA* .............................................................................................................................44, 49

FSIA or the Westfall Act ......................................................................................................42

FTCA ............................................................................................................................ *passim*

Homeland Security Act....................................................................................................20, 21

Immigration and Nationality Act ...........................................................................................1

McKinney's Penal Law § 135.15...........................................................................................29

McKinney's Penal Law, §145................................................................................................29

Misc. 3d 1107(A) ................................................................................................................37

## Other Authorities

Akhil R. Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425, 1466 (1987) .....................40

Fifth Amendment ............................................................................................................11

Eleventh Amendment.........................................................................................................45

11th Amendment................................................................................................................45

Fourteenth Amendment ................................................................................................10

Clark Byse, *Proposed Reforms in Federal Non-statutory Judicial Review:
    Sovereign Immunity, Indispensable Parties, Mandamus*, 75 HARV. L. REV.
    1479, 1484 (1962)................................................................................................40

Erwin Chemerinsky, *Against Sovereign Immunity*, 53 STAN. L. REV. 1201, 1223
    (2001).....................................................................................................................40

James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First
    Amendment Right to Pursue Judicial Claims Against the Government*, 91 NW.
    U. L. REV. 899, 981 (1997) ................................................................................40

Kenneth C. Davis, *Sovereign Immunity Must Go*, 22 ADMIN. L. REV. 383, 383
    (1970).....................................................................................................................40

*Norms of International Law,* 77 Cal.L.Rev. 365, 401 (1989)........................................44

Report to the Committee Against Torture, ¶¶ 51, 61-63, 277-280 ...............................46

report of the United States, ¶ 185...................................................................................46

Rule 12(b)(1)......................................................................................................................7

Rule 12(b)(6)......................................................................................................................8

Rule 23 .............................................................................................................................17

U.N. Doc. CAT/C/28/Add.5 (Feb. 9, 2000), available at
    http://www.state.gov/documents/organization/100296.pdf......................................46

Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and
    Judicial Independence*, 35 GEO. WASH. INT'L L. REV. 521, 523 (2003) ..............40

## INTRODUCTION

Plaintiffs' detailed allegations – which must be taken as true – recount a horrifying story of cruelty and illegality undertaken by officials of Defendant the United States government ("Government").  The Government decided as a matter of policy to take children – already traumatized from what would have been a harrowing journey to seek refuge here from persecution in their home country – from the arms of their parents, disappearing them for months into an alien bureaucracy where parent and child alike feared they would never see each other again.  As the allegations show, this policy was enacted not for any valid administrative purpose, but specifically in order to inflict the primal cruelty, pain and paralyzing uncertainty these families in fact endured so that other nonwhite asylum seekers fleeing to the Southern border would be deterred from accessing their international and domestic right to seek asylum.

Like others, Mr. C. could not have imagined the intense physical and mental torment that would be inflicted upon him and his son when they sought refuge in this country.  D.J.C.V., then nineteen months old, was taken from his father's arms in May of 2018, at the height of the Trump Administration's implementation of its family separation policy. For the ensuing 5 months, they were held separately and without communication or hope of reunification until Judge Hellerstein granted their emergency petition for habeas, and ordered immediate reunification.  Mindful of the pain Mr. C. was suffering, U.S. officials offered to alleviate it – only by conditioning any reunification on his forfeiting his right to seek asylum and on his return to face persecution with his son.  This is torture.

The Government does not and could not dispute what Judge Hellerstein and numerous other courts have already found, that these actions violated Plaintiffs' due process right to family integrity.  Nothing about the Government's post-hoc reference to an eight-year old misdemeanor could deprive Mr. C. of his fundamental right to care for and love his son.  Instead, ignoring the

gravamen of Plaintiffs' complaint again and again, the Government references its discretionary entitlement to detain immigrants who entered the country unlawfully and thereafter denominate their children as "unaccompanied." This has nothing to do with the actual allegations in the complaint, which plausibly show that Mr. C.'s detention separate from his son was undertaken pursuant to high-level policy to separate asylum seekers from children.

The Government's failure to engage with Plaintiffs' actual allegations is fatal to its motion to dismiss. Because the Government has no discretion to violate the Constitution or international law prohibitions on torture and crimes against humanity, and because there was no statutory or regulatory authority mandating Plaintiffs' separation, the Discretionary Function and Due Care exceptions to the Federal Tort Claims Act's ("FTCA") waiver of sovereign immunity do not apply. Because there is a private law analog to the Government's imposition of intentional and negligent infliction of emotional distress by threatening harm to a child, and because the conduct is sufficiently outrageous and negligent, Plaintiffs state a claim under the FTCA for intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), and negligence. And, the Government does not dispute that Plaintiffs state a claim for torture and crimes against humanity under the Alien Tort Statute. As detailed below, the United States does not enjoy sovereign immunity in domestic courts for violations of *jus cogens* norms.

## STATEMENT OF FACTS

Pursuant to an official policy to separate family units and detain asylum-seeking parents at the border apart from their children, Plaintiffs Mr. C. and his 19-month-old son, D.J.C.V., were separated by agents of the United States ("U.S.") Customs and Border Protection ("CBP") and kept separated by agents of Immigration and Customs Enforcement ("ICE") and the Department of Health and Human Services ("HHS") over a period of five-and-a-half months. At

2

no point during this forced separation were Plaintiffs provided with due process to justify their

separation or even direct communication to maintain ties.  Instead, they were reunited only after

a federal district court ordered D.J.C.V.'s release to his father, holding their separation a grave

violation of the Due Process Clause. *See D.J.C.V. v. U.S.C.I.S.*, No. 18 Civ. 9115, 2018 WL

10436675 (S.D.N.Y. Oct. 15, 2018).

### A.    Flight from Persecution and the Terror of Father and Infant Son's Initial Separation.

In early 2018 in Honduras, Mr. C. was held at gunpoint and threatened with death by

members of the transnational crime syndicate MS-13.  Complaint, *D.J.C.V. and G.C. v. United

States,* No. 1:20-cv-5747 at ECF 1 ("Compl.") ¶81.  Shortly after crossing the U.S. border with

Mexico, Mr. C. and D.J.C.V. sought humanitarian protection from the U.S. government, as was

their right under the Immigration and Nationality Act.  Compl. ¶82.  Soon after, CBP agents

began advising Mr. C. that as a result of an eight-year-old misdemeanor, the U.S. planned to

deport him and take custody of his son; within approximately three days, CBP agents entered the

cold, crowded and unsanitary cell in which the family was held and forcibly removed D.J.C.V.

from his father's arms.  Compl. ¶¶83-92.  At this time and at no point thereafter did an agent or

agency of the U.S. provide the Plaintiffs with any notice or process to justify the separation

based on Mr. C.'s unfitness as a parent, his danger to the child, the child's best interest, or any

other grounds.  *Id*.

### B.    The Family Separation Policy's Goal to Intentionally Inflict Pain and Deter Future Asylum Seekers.

This separation was undertaken as part of an explicit policy of family separation, first

piloted by the U.S. Department of Homeland Security ("DHS") and HHS in October 2017 and

then broadened in the spring of 2018.  Compl. ¶¶23-31. The policy was planned, adopted, and

executed by cabinet members and other officials at the highest levels of the Trump

Administration in a deliberate attempt to punish nonwhite migrants for seeking asylum at the Southern border and to deter others from migrating.  Compl. ¶¶2-3, 31-35.  Officials adopted and ordered implementation of this policy despite direct knowledge of the significant harm and trauma, including permanent emotional distress and brain damage, that separated children were likely to suffer.  Compl. ¶36.  Pursuant to a Department of Justice ("DOJ") policy of "Zero Tolerance" ordered in April 2018 by then-Attorney General Jefferson Sessions, some parents separated from their children were prosecuted for entering the country illegally before requesting asylum.  Compl. ¶¶26-29.  But pursuant to this broad family separation policy, many others, including Mr. C., were not prosecuted at all, but simply separated from their children and detained for lengthy periods of time in adult detention centers while their children were delivered to the custody of the Office of Refugee Resettlement ("ORR"), the branch of HHS responsible for the care of unaccompanied migrant children.  Compl. ¶¶26-27.

High-ranking officials within the U.S. government made deliberate decisions to adopt and execute the family separation policy.  As predicted by officials within ORR as well as outside clinicians and experts, who warned DHS and DOJ as early as February 2017 that implementation of the policy would cause grave harm, Compl. ¶¶34-36, thousands of families suffered profound trauma.

Because the punitive family separation policy was in fact divorced from any stated interest in criminal prosecution or bona fide concern with a child's best interest, the government took children from their parents regardless of whether parents were taken into criminal custody or prosecuted at all and denominated children as "unaccompanied," even though they were accompanied by parents up until the point the government took the children away from them. Compl. ¶¶44-50.  Federal agencies separated thousands of families pursuant to these policies

without adequately preparing for its consequences or the care of children; it developed no formalized or consistent method of keeping track of where children were located or how to keep them in contact with their parents, Compl. ¶¶4-5, 60-61, a recklessness federal District Judge Sabraw called "startling," because "under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*." *Id*. at 61 (quoting *Ms. L. v. U.S. Dep't of Homeland Security*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018) (emphasis in original).[1]  This failure exacerbated the trauma of separated families, including Mr. C. and his son, D.J.C.V.

### C.    Mr. C.'s Continued Incommunicado Separation from His Son.

Mr. C. was placed in an adult detention center in Texas.  Provided with no information about the whereabouts of his child, he discussed his fears with other detained parents, among whom spread rumors—often true—of parents being deported without their children.  Compl. ¶¶ 91-99, 58.  Mr. C. attempted to seek medical and mental health assistance for his intense physical and psychological distress and repeatedly sought information from ICE about the whereabouts of his son, learning finally that his son was in New York.  Compl. ¶98.

D.J.C.V. had indeed been placed in ORR custody in New York, but not in a stable placement.  D.J.C.V., who did not yet speak and had no capacity to understand what was happening or why he had been separated from his father, was moved at least three times from one setting to the next–once because of an allegation of abuse against a foster parent in whose home he was detained.  Compl. ¶¶122-124.

### D.    The Illegality and Torment of Continued Separation.

---

[1]    *See also id*. at 1136-37 (observing that "the Government was not prepared to accommodate the mass influx of separated children.  Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children."), quoted at Compl. ¶62, n. 59.

The separation of Mr. C. and D.J.C.V., along with thousands of other migrant families, triggered a flurry of legal action, government investigation, and public outcry.  Compl. ¶¶ 52-60.  On June 26, 2018, a federal court in *Ms. L.* found that implementation of the family separation policy had violated parents' due process rights in a manner "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Ms. L.*, 310 F. Supp. 3d at 1145 (internal citation omitted).  The district court certified a class of parents for relief, ordering reunification of children under five by July 10, 2018.  *Id.*; Compl. ¶¶61-62, 67.

In early July 2018, Mr. C. was transferred to Hudson County Correctional Facility, a detention center in New Jersey, and falsely advised that he would soon be reunified with his son.  Compl. ¶¶103-105.  But then ORR, which had been holding D.J.C.V. in a series of foster homes, decided that Mr. C. would not be reunified because, despite being D.J.C.V.'s legal and true father, he was not biologically related to D.J.C.V.  Compl. ¶106.  While ORR eventually changed its position when presented with the fact of Mr. C.'s legal parentage, ICE maintained that the family was not eligible for reunification and advised Mr. C. that he would be transferred back to Texas in preparation for deportation.  Compl. ¶¶108-115.  Even worse, U.S. officials attempted to coerce Mr. C. twice, in August 2018, to give up his fundamental rights by instructing that he could be reunified with his son upon the condition that he waive his rights to asylum in immigration court and accept deportation.  Compl. ¶116.

Presented with the court order in *Ms. L.* finding family separations unconstitutional and ordering reunifications *en masse*, ICE ***again*** changed its justification for the separation, informing Mr. C.'s counsel on August 17, 2018 that his eight-year-old misdemeanor conviction rendered him outside the Ms. L. class, which was limited to parents who had no "criminal history or communicable disease."  Compl. ¶75, quoting *Ms. L.*, 310 F. Supp. 3d at 1139 n.5.  The court

did not define "criminal history" in any way, and on September 19, 2018, the same court

declined to include Mr. C. in the class entitled to reunification as a form group relief.  However,

the district court's exclusion of Mr. C. in the class for injunctive relief under governing class

action procedural rules did not in any way opine upon or foreclose application of due process

principles protecting Mr. C.'s or D.J.C.V.'s rights to family integrity.

By this time, Mr. C., who had been deprived of any communication with his son, had

been transferred to the Orange County Correctional Facility in Goshen, N.Y., and D.J.C.V. was

in his third placement in an ORR shelter home since being taken from his father.  Throughout the

agonizing months of separation, Mr. C. experienced intense physical and emotional pain,

including depression, suicidal thoughts, anxiety, and chest and body pain.  Compl. ¶¶96-97.

D.J.C.V.'s guardian *ad litem* repeatedly advised authorities that the prolonged separation from

his father had taken a toll on D.J.C.V.'s "health, safety and well-being."  Compl. ¶124.  She

advised that D.J.C.V.'s separation from his father "has been traumatic," and he "is very confused

about why he is separated from his father," and that "so long as the separation keeps him from

living and developing under his father's care, his health, safety and well-being will continue to

suffer and will likely worsen."  Compl. ¶124.  Indeed, substantiating his father's worst fears,

when the family was finally reunited, D.J.C.V. did not immediately recognize his father.  Compl.

¶¶125-128.

### E. Judicial Decisions Ordering Release and Reunification.

Mr. C. was released from a detention center in New York on bond after a bond hearing

on October 10, 2020 and shortly after filing a habeas petition in the Southern District of New

York for himself and his son.  Compl. ¶120.  Yet even after Mr. C.'s release, ORR refused to

release D.J.C.V. to his father's custody, permitting only a short visit during which it was

apparent that his now-two-year-old son did not immediately recognize him.  Compl. ¶¶121-128.

ORR insisted on undertaking a lengthy vetting process before releasing D.J.C.V., even though it had no regulatory or constitutional authority to continue to deny Mr. C. custody of his son. Compl. ¶129.

On October 15, 2020, Judge Hellerstein held an emergency hearing on Mr. C.'s habeas petition, which argued that the separation was unconstitutional and constituted torture under U.S. and international law.  At the hearing, Judge Hellerstein characterized the forced separation of Mr. C. from his son: "It seems the most cruel thing you can imagine.  Separating a child from a parent ready, willing and able to care for him.  I don't understand the rationale for this.  The humanity."  Compl. ¶131.

The Court concluded that the separation violated due process, having found that the government had not alleged that Mr. C. was unfit or unwilling to care for his child, that the government had failed to provide "any other adequate reason why [father and son] should not be reunited," and that Mr. C's "single misdemeanor conviction from eight years ago does not provide a sufficient basis to distinguish this case" from others like *Ms. L.*, which found separation was unconstitutional.  Compl. ¶132; *D.J.C.V*, 2018 WL 10436675.  Indeed, at no point in the 166 days of separation did CBP, ICE, DHS, or HHS offer any hearing or process to explain their position and justify the initial, let alone the prolonged, separation of this father and his infant son.

### F.   The Predictable, Traumatic Effects of this Family's Prolonged Separation.

As the consensus of medical professionals have explained, D.J.C.V. and Mr. C. continue to suffer emotional distress as a direct result of the trauma caused by the U.S. when it initially separated them, kept them separated while in a series of detention centers and unstable placements, threatened the father with deportation and permanent separation, refused to enable communication between father and son, and failed to release D.J.C.V. to his father immediately

upon the Mr. C.'s release.  Compl. ¶¶133-137.  Mr. C. continues to suffer from episodes of

severe chest pain and heart palpitations, as well as serious sleeplessness and nightmares, Compl.

¶135, while D.J.C.V. has experienced sleeplessness, and episodes of aggression, anxiety and

moodiness, Compl. ¶136.

## ARGUMENT

### I.   THE COURT MUST TAKE ALL OF PLAINTIFFS' FACTUAL ALLEGATIONS AS TRUE, CONSTRUE INFERENCES IN FAVOR OF PLAINTIFFS AND INQUIRE MERELY IF PLAINTIFFS' CLAIMS ARE PLAUSIBLE.

Where a defendant makes a facial attack on jurisdiction the court must accept as true all

factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor.

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164

(1993).  Plaintiffs bear the burden of establishing subject-matter jurisdiction.  *See Kokkonen v.*

*Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  The doctrine of sovereign immunity is

jurisdictional in nature, *see FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  In the FTCA context, a

plaintiff bears the burden of showing that the discretionary function exception does not apply to

his claim and that it falls within an applicable waiver of the FTCA's sovereign immunity.

*Molchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), *aff'd*, 713 F.3d 159 (2d

Cir. 2013).

On a Rule 12(b)(6) motion, nonconclusory allegations must also be taken as true and

Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when plaintiffs

plead factual content that allows the court to "draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court is not

permitted to weigh competing inferences or to accept the moving party's allegations as true.

See. *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d

Cir. 2013).  Further, the "existence of other, competing inferences does not prevent the

plaintiff[s'] desired inference from qualifying as reasonable."  *Trustees of the New York City*

*Dist. Council of Carpenters Pension Fund v. Lee*, No. 15-CV-8081 (KBF), 2016 WL 1064616, at

*8 (S.D.N.Y. Mar. 14, 2016).

## II.     PLAINTIFFS' ALLEGATIONS SHOW THE COURT HAS SUBJECT MATTER OVER THE FTCA CLAIMS.

The highest officials in DHS adopted an unprecedented policy of punishing asylum

seekers and deterring migration by forcibly separating asylum-seeking parents from their

children, including toddlers like D.J.C.V., as they sought refuge in accordance with U.S. law.

Plaintiffs offer detailed factual allegations, showing that this was the policy's aim, and that as

such, it violated Plaintiffs' constitutional rights.  The Government continues to wish these well-

pled allegations away, including by erecting a straw man and repeatedly asserting its authority to

do something Plaintiffs do not challenge and that was not the reason the Government *actually*

separated this family.  By arguing that its actions fall under both the discretionary function

exception ("DFE") and due care exception ("DCE") to the FTCA and that there is no private

analog to its conduct, the Government focuses on its asserted authority to detain individuals

during removal proceedings, and thereafter keep a minor in ORR custody – a grant of authority

the Government says is not amenable to challenge.

This is beside the point factually and wrong legally.  Plaintiffs do not challenge the

Government's detention authority in the abstract, in part because, as Plaintiffs allegations show,

the Government was not acting pursuant to that normal process.  Rather, Plaintiffs challenge the

Government's decision, pursuant to a policy driven by punitive and deterrent ends, to initiate and

prolong the separation of a family without any individualized process or hearing.  Because that

conduct violates the constitutional right to family integrity, as courts across the country and in

this District relating to these very Plaintiffs have found, the Government cannot claim they were acting pursuant to the limited discretion or with due care afforded it by the FTCA.  And, because there is a plain private law analog to the IIED and NIED torts Plaintiffs allege, namely, private interference in parental or custodial rights that is either outrageous or negligent (and not, as the Government asserts, the exclusive governmental authority to detain immigrants), the FTCA claims can proceed.  At bottom, federal agencies have no discretion to violate the Constitution no matter how they clothe their actions or authority.

   **A.   Because Plaintiffs Sufficiently Allege That The Government's Separation of Plaintiffs Was Unconstitutional And Constituted Torture, The Discretionary Function Exception Does Not Shield It From Liability**.

   The Government claims it has unfettered discretion to detain someone "amenable to prosecution" for unlawfully entering the United States and thereafter detaining their child as an "unaccompanied" minor.  These post-hoc rationalizations were not, as Plaintiffs' well-pled allegations show, the reason for the initial or continued separation of Mr. C. from his young son. The allegations show it was done pursuant to a fully constructed family separation policy intended to torment, punish, and deter asylum seekers.  As alleged, and as Judge Hellerstein already determined, the separation of Plaintiffs, made without any procedural due process protections, violated their Constitutional rights to family integrity.  And, as alleged, the policy violates federal obligations not to commit torture or crimes against humanity.

          1.    The Discretionary Function Exception Does Not Protect Unlawful Acts.

    "[A] federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority."  *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975).  Numerous circuits have held that the FTCA's discretionary function exception does not shield the Government from liability for actions taken in violation of the detained person's constitutional rights.  *See Nurse v. United States*, 226 F.3d 996, 1002 n.3 (9th

Cir. 2000) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply."); *Raz v. United States,* 343 F.3d 945, 948 (8th Cir. 2003) (holding that the government's alleged surveillance activities "fall outside the FTCA's discretionary-function exception" where plaintiff had "alleged they were conducted in violation of his First and Fourteenth Amendment rights."); *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) ("conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable regulation. Federal officials do not possess discretion to violate constitutional rights or federal statutes."); *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) (same); *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003) (same) *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) (same); *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987) (same).  As demonstrated below, not only does the Government's conduct here violate the Constitution, it constitutes a *jus cogens* violation, which a government never has authority to undertake.  *See infra* Section IV.

District courts in the Second Circuit have adopted this principle.  *See, e.g.*, *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 120 (D. Conn. 2010) ("The plaintiffs are correct that the government does not have discretion to violate the Constitution"); *Birnbaum v. United States*, 588 F.2d 318, 329-33 (2d Cir. 1978) ("A discretionary function can derive only from properly delegated authority."); *Socialist Workers Party v. Attorney Gen. of United States*, 642 F. Supp. 1357, 1417 (S.D.N.Y. 1986) ("[T]he violations of the Constitution in the present case rendered the acts in question non-discretionary . . . [and] the discretionary function exception does not apply.")

The DFE does not extend to actions not authorized by statute and taken in direct violation of the Constitution and international law.

12

2.  As Alleged, the Separation of a Child from His Parent Without Due Process Violates the Constitution and Constitutes Torture and Crimes Against Humanity.

The Due Process Clause of the Fifth Amendment applies to all "persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent" and thus applies to the Plaintiffs. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The substantive protections of the Due Process Clause protect the fundamental right to family integrity. *See*, *e.g. Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality op.) (surveying 80 years of precedent to conclude that "the interest of parents in the care, custody, and control of their children [is] perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is a "fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Prince v. Massachusetts*,  321 U.S. 158 (1944) ("cardinal" constitutional principle of parental rights in "care and nurture of  the child" which the "state can neither supply nor hinder"); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state."). Likewise, children have a "constitutionally protected liberty interest in 'not being dislocated from the emotional attachments that derive from the intimacy of daily [family] association.'" *Kia P. v. McIntyre,* 235 F.3d 749, 759 (2d Cir. 2000).

This is not to say the state *never* has the power to separate a child from their parent; the state may do so if there is an "objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety . . . at least pending investigation." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *W.S.R. v. Sessions,* 318 F. Supp. 3d 1116, 1125 (N.D. Ill. 2018) (fundamental right to family integrity in immigration detention applies to

both parent and child "absent parental unfitness or danger to the child").  But the parallel

requirements of procedural due process prohibit the state from presuming unfitness absent an

individualized determination, including notice and opportunity to be heard.  *See Stanley v.*

*Illinois*, 405 U.S. 645, 658 (1972) (although it is "more convenient to presume than to prove" a

parent's unfitness, "refusing a father a hearing when the issue at stake is the dismemberment of

his family" violates due process).  *See also United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir.

2001) ("[W]here there is insufficient evidence to support a finding that children are potentially in

danger from their parents, the state's interest cannot be said to be 'compelling,' and thus

interference in the family relationship is unconstitutional.").

     Plaintiffs allege not only that the Government made no such individualized determination

of Mr. C.'s unfitness, but that the separation was designed to achieve punitive and deterrence

policy goals totally divorced from the particular circumstances of Mr. C.'s relationship with his

son or the best interests of the child; the very purpose of the family separation policy was

intentionally designed to—***and did***—inflict maximal harms on the children.  Compl. ¶¶49, 139.

As described in Section IV, infra, the intentional infliction of such severe physical or mental pain

or suffering constitutes torture and the policy constitutes a widespread and systematic attack

designed to persecute and inflict inhumane acts, so as to constitute crimes against humanity.

Moreover, Plaintiffs allege that the Government was on notice from relevant government

officials that the separation was harmful to father and son, Compl. ¶¶34-36, and that they

continued the separation of Mr. C. —and maximized the pain to him and his child—specifically

in order to coerce him to forfeit their rights.  Compl. ¶¶108, 166.  Accordingly, as Judge

Hellerstein found:

     Except in the most dreadful circumstances, a court should not countenance the
     cruelty of the separation of a parent and child by the government.  Here, the

14

> government does not allege that Petitioner Mr. C. is unwilling or unfit to care
> for Petitioner D.J.C.V., his child, or any other adequate reason why petitioners
> should not be reunited.

*D.J.C.V*, 2018 WL 10436675, at *1.

Numerous courts have agreed with Judge Hellerstein and held that that the Government infringed the right to family integrity in carrying out the Trump Administration's policy to separate migrant parents from their children. In *Ms. L. v. United States Immigration & Customs Enf't,* 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018), the court found the Government's conduct in separating parents from their minor children upon entry to the U.S. in an effort to deter others "violates Plaintiffs' constitutional right to family integrity," particularly when undertaken without any "showing the parent is unfit or presents a danger to the child"; and, by enjoining the practice and ordering reunification, the court demonstrated that the rights are not immune from judicial review even at an international border. Similarly, in *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018), the court found that DHS violated children's due process right to family integrity when agents separated two migrant children from their parents without a case-specific determination (including notice and an opportunity to be heard) that separation was best for the child. *See also de Nolasco v. U.S.C.I.S,* 319 F. Supp. 3d 491, 501 (D.D.C. 2018) (separation of plaintiff from her sons in separate facilities for weeks with only periodic phone calls "directly and substantially" burdens right to family integrity"); *W.S.R.,* 318 F. Supp. 3d at 1125 (finding separation of two father-son pairs shortly after crossing the U.S.-Mexico border, constitutes a violation of "the fundamental right to reunify with a fit parent in immigration custody").

Finally, the Government's suggestion that policies involving detention or imprisonment of immigrants are "immune" from judicial review for claims of constitutional violations cannot

be taken seriously.  Memorandum of Law in Support of the Defendant's Motion to Dismiss the Complaint, *D.J.C.V. and G.C. v. United States,* No. 1:20-cv-5747 at ECF 22 ("Gov't Br.") at 21. While some decision-making regarding detention placement may be entrusted to the political branches, any Government discretion immunized from "judicial inquiry or interference" is appropriate only *absent* "any evidence of a violation of due process."  *Committee of Central American Refugees v. INS,* 795 F.2d 1434, 1441 (9th Cir. 1986).

3.    Post-Hoc Rationalizations of the Government's Actions Do Not Cure DHS's Unconstitutional Acts.

The Government proffers a number of post-hoc rationalizations in an attempt to bypass its *ex ante* obligation to justify any separation based on an *individualized* finding (subject to notice and opportunity to be heard) *prior* to the separation.

First, the Government appears to claim it had categorical power to undertake prolonged separation of Mr. C. from his son because it was authorized to detain Mr. C. in a particular detention center for adults, necessitating the categorization of D.J.C.V. as "unaccompanied." Gov't Br. at 19-20.  This framing ignores the well-pled allegations in this case, which show that these rationales were mere pretext to cover a more intentionally punitive goal.  The allegations show Plaintiffs' separation was not some individualized necessity; it happened as part of a program that separated thousands of other parents and children seeking humanitarian protection at the border in 2018, in order to punish asylum seekers and to deter migration.  Compl. ¶¶2, 7, 139.  While the DFE may protect the Government for discretionary decisions regarding "placement" of a detained person in a particular detention center if that decision does not violate statutory or regulatory authority, Gov't Br. at 20, the decisions made by DHS were undertaken as part of an intentional policy that was unconstitutional broadly and as applied to Plaintiffs.

The Government also seeks to justify the detention and separation on the grounds that Mr. C. was "amenable to prosecution," because he did not first present himself at a port of entry. Gov't Br. at 29.  That is, again, factually irrelevant and legally incorrect.  The U.S. did not, in fact, prosecute Mr. C.; the allegations show it removed his son from his custody for reasons independent of an asserted "amenab[ility] to prosecution" —*i.e.* to deter nonwhite asylum seekers arriving at the Southern border. And, as a matter of law, as the district court in the District of Arizona explained, the mere prospect of detention power does not justify prolonged separation: this position "rests on the false premise that by taking custody of children whose parents are 'amenable to prosecution,' the United States is simply enforcing federal law;" any such argument "ignores the crucial fact that the government never charged any Plaintiff with a crime." *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020); *see also A.P.F. v. United States of America,* Docket No. 2:20-cv-00065, at*7 (D. Ariz. Jan 10, 2020) ("the discretionary function exception cannot shield conduct related to the government's likely unconstitutional separation of plaintiffs").  Indeed, DHS's own regulations call to "presumptively place[] detained minors with their parents."  *W.S.R.,* 318 F. Supp. 3d at 1125.  In this case, in violation of its own regulations, the Government flipped the constitutional presumption.

Finally, the Government repeatedly emphasizes that Mr. C's eight-year-old misdemeanor conviction, dating back **years** before D.J.C.V. was born, justified the initial separation and the continued refusal to reunite father and child.  According to the Government, because Mr. C. was excluded from the class of parents in *Ms. L*., he and his son somehow forfeited their constitutional rights, freeing the Government to seize D.J.C.V. from Mr. C.'s arms and maintain an excruciating, torturous five-month incommunicado separation.  The Government tried and

17

lost this argument already.   Judge Hellerstein, understanding that the family separation was undertaken without due process or any individualized determination, emphasized that "Mr. C.'s single misdemeanor conviction from eight years ago does not provide a sufficient basis to distinguish this case" from other cases finding enforced separation violates due process. *D.J.C.V.*, 2018 WL 10436675; Compl. ¶6 (quoting Judge Hellerstein calling family separation the "most cruel of all cruelties").

The Government also reads much into the *Ms. L.* court's decision to exclude Plaintiffs from the class action definition.  But by excluding Plaintiffs for procedural reasons related to Rule 23 class-action factors, the *Ms. L.* court in no way suggested that the broader constitutional principles requiring family separation exclude those with past convictions.  *See Ms. L*, 310 F. Supp. 3d at 1144 ("under the present system migrant children are not accounted for with the same efficiency and accuracy as property" and "the government's conduct in separating parents from their minor children upon entry to the United States in an effort to deter others is conduct that is "brutal, offensive, and fails to comport with traditional notions of fair play and decency... and violates Plaintiffs' constitutional right to family integrity.").

In short, the Government's actions in the forced incommunicado separation of a 19-month-old from his father, for purposes of advancing a broader policy goal of punishing and deterring nonwhite asylum seekers, and to continue their separation subject to waiving their fundamental rights, do not involve the type of discretionary decision-making Congress intended to shield by the DFE.  *C.M. v. United States*, 2020 WL 1698191, at *5.  Indeed, far shorter acts of separation by immigration authorities have been found to be outside the DFE.  In *Ruiz v. United States*, No. 13-CV-1241, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014), the court rejected the government's DFE defense to a claim of negligence under the FTCA arising from CBP's

waiting 14 hours to contact a child's parents, reasoning that CBP officers' "treatment of" the

child during her detention "cannot be said to be susceptible to policy analysis." *Id.* at *8. As in

*Ruiz*, the Government's treatment of Mr. C. and his son—keeping them separated for almost a

quarter of D.J.C.V.'s young life and exposing them to unnecessary trauma—cannot be said to

"constitute a considered judgment grounded in social, economic, or political policies." *Id.*

> **B.     The FTCA's Due Care Exception Does Not Shield The Government's
>          Conduct From Liability.**

The Government contends that Plaintiffs' claims are also barred by the DCE set forth in

28 U.S.C. § 2680(a) because Plaintiffs' harms arose from conduct that was authorized or even

required by statute or regulation. Gov't Br. at 23-27. The argument merely recasts the

Government's DFE argument and fails for parallel reasons. There is no statute or regulation

mandating family separation by border authorities, much less one mandating it in the absence of

any due process. And, again, Plaintiffs do not challenge the theoretical power to enforce

immigration and criminal laws, including detention; instead, as Plaintiffs allegations show, the

Government initiated and prolonged the separation pursuant to an unlawful family separation

policy seeking to inflict maximal punishment and torment on a family seeking refuge in the U.S.,

which it in fact did here.

> 1.     <u>The Due Care Exception Applies Only Where A Statute or Regulation
>        Mandated An Official Course Of Conduct And The Official Exercised
>        "Due Care."</u>

The DCE bars claims that are "based upon an act or omission of an employee of the

Government, exercising due care, in the execution of a statue or regulation, whether or not such

statue or regulation be valid." 28 U.S.C. § 2680(a). In the absence of a Second Circuit test to

determine whether the DCE applies, district courts in the Second Circuit have applied the two-

part analysis articulated by the D.C. Circuit in *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995) and adopted by the Fourth Circuit in *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005):

> [C]ourts first ask whether a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Crumpton,* 59 F.3d at 1403 (quoting *United States v. Gaubert,* 499 U.S. 315, 322 (1991)). "Second, if a specific action is mandated," courts "inquire as to whether the officer exercised due care in following the dictates of that statute or regulation. If due care was exercised, sovereign immunity has not been waived."

*Welch,* 409 F.3d at 652 (internal citations omitted). *Nwozuzu v. United States*, No. 14 CIV. 8589 LGS, 2015 WL 4865772, at *5 (S.D.N.Y. Aug. 12, 2015), *aff'd,* 712 F. App'x 31 (2d Cir. 2017).

The Government's DCE argument fails at the first step. There is no statute or regulation mandating that parent and child be separated and held for prolonged periods of time in separate detention facilities. The failure to identify any lawful authority "specifically prescribing" the removal of D.J.C.V. from Mr. C.'s custody is fatal to the Government's defense. *See Watson v. United States*, 179 F. Supp. 3d 251, 270-71 (concluding that the DCE, which "applies to situations where a statute or regulation requires an action to be taken," was inapplicable because the statutes did not mandate the conduct at issue), *aff'd in part, rev'd in part on other grounds*, 865 F.3d 123 (2d Cir. 2017). In addition, the Government makes no argument, nor could it, that it acted with "due care" and thus complied with the second step.

### 2. No Statute or Regulation Mandated Separation of D.J.C.V. From His Father.

The only court to have opined on the DCE in this precise context—where a separated parent and child sought damages under the FTCA for harms suffered due to the Trump Administration's family separation policy—has found that the exception does not protect the Government's conduct. *C.M*, 2020 WL 1698191, at *3 ("[F]amily separation was established by

executive policy—not by a statute or regulation—which is not covered by the due care

exception").  The Government's actions were not only not authorized by statute, they were also

prohibited by the Constitution and international law.

According to the Government's distorted account, the separation of father and child arose

simply because Mr. C. was detained and his 19-month-old child was rendered an

"unaccompanied minor," thus requiring federal authorities to place him in the custody of ORR in

accordance with regulations governing the care of children who actually migrate alone.  Gov't

Br. at 23-24.  But the Government did not determine that it had the authority to detain Mr. C.

alone in a vacuum, a determination that happened to render D.J.C.V. without adult care,

necessitating ORR placement pursuant to 8 U.S.C. §1232(b)(3).  To the contrary, as Plaintiffs

allege, these actions were taken pursuant to an explicit policy to separate parents from children at

the border that not only had no basis in statute or regulation, but also violated the due process

right to family integrity.  Plaintiffs' allegations show that federal authorities deliberately

determined to remove D.J.C.V. from his father's custody in order to detain Mr. C. separately and

transform a toddler dependent on his parent for care and sustenance into an autonomous

"unaccompanied minor," all in order to achieve an independent policy aim of punishing and

deterring asylum seekers.

The Government is wrong to characterize the law as unclear.  *See* Gov't Br. at 25 ("there

existed no controlling legal authority clearly precluding" the government's interpretation of

immigration regulations governing the definition of unaccompanied minors).  In fact, the

Homeland Security Act, codified in 2002, defines an unaccompanied minor as a person who:

"(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age;

*and* (C) with respect to whom—(i) *there is no parent or legal guardian in the United States; or*

*(ii) no parent or legal guardian in the United States is available to provide care and physical custody.*" 6 U.S.C. §279(g)(2) (emphasis supplied).

Mr. C., of course, was both present in the U.S. and was providing care and custody when CBP agents physically removed D.J.C.V. from his arms.  As Judge Keenan held in *Maldonado v. Lloyd*, 18 Civ. 3089, 2018 WL 2089348 (S.D.N.Y. May 4, 2018), "'in drafting the statute [governing the definition of unaccompanied minors], Congress was concerned with whether a child was accompanied in the sense of having a parent in the territory of the United States' … Accordingly, a child is not 'unaccompanied'—and, therefore, neither a UAC nor properly within ORR's regulatory ambit—if a parent is physically present in the United States and, as a practical matter, is available to provide care and physical custody." 2018 WL 2089348, at *5, (internal quotations and citations omitted).  Congress specifically rejected the definition the Government proposes when it passed the Homeland Security Act.  "Children who are apprehended by DHS while in the company of their parents are not in fact 'unaccompanied,' and if their welfare is not at issue, they should not be placed in ORR custody." *Bunikyte v. Chertoff*, Nos. A-07-CA-164-166, 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9, 2007), citing H.Rep. 109-79 at 38 (2006).

Moreover, as described *supra* Section I(A), the Government's actions violated both the father and child's unequivocally established due process rights to family integrity.  *See Maldonado*, 2018 WL 2089348, at *6-8.  The Government points to a single case authorizing the categorization of a child as "unaccompanied" despite the mother's presence, but did so precisely for a reason not present here: that mother was alleged to be "unfit."  Gov't Br. at 26, citing *D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016).  *D.B.* is distinguishable.  In precisely for a reason not present here: that mother was alleged to be "unfit."  *See D.B.*, 826 F.3d at 741.

Even if the Government were correct that D.J.C.V. was unaccompanied at the time he was separated from his father, which it is not, it does not even attempt to argue that the DCE applied after Mr. C. was released from detention on October 10, 2018 and was seeking the release of his son from ORR.  In order to do so, the Government would have to concede there was no statute or regulation mandating or authorizing keeping D.J.C.V. apart from his father once Mr. C. was out of DHS custody.

Finally, the Government does not even address this second prong of the DCE test.  U.S. officials did not exercise "due care" in carrying out the separations, keeping father and son apart and incommunicado, and refusing to release D.J.C.V. to his father's custody and conditioning any reunification upon a forfeiture of their fundamental rights.  This was intentional cruelty, not due care.

### C.     The Misrepresentation Exception Does Not Bar Plaintiffs' FTCA Claims.

The "misrepresentation" exception to the FTCA's waiver of sovereign immunity, 28 U.S.C. § 2680(h), does not apply here.  Plaintiffs do not assert a cause of action for the tort of misrepresentation, and indeed the word "misrepresent" appears nowhere in the Complaint. Rather, Mr. C. alleges that as part of its implementation of the family separation policy, DHS officials inflicted psychological harm by attempting to coerce him to waive his rights to asylum and withholding of removal as a condition of reunifying with his child.  This is not a claim that DHS "induced him to act" based on misrepresented facts as in *Miller Harness Co. v. United States,* 241 F.2d 781 (2d Cir. 1957) or concealed facts as in *Esrey v. United States*, 707 Fed. App'x 749 (2d Cir. 2018), Gov't Br. at 27.  Rather, DHS attempted to ***coerce*** Mr. C. into abandoning hope of protection in the U.S., thereby inflicting intentional and/or negligent infliction of emotional distress.  The facts therefore support existing claims of IIED, NIED, Negligence, and torture.  The misrepresentation exception otherwise has no bearing here.

23

Similarly, Plaintiffs' claims that the Government impeded communication between father and son are not independent tort claims, but rather facts that demonstrate aspects of the cruel nature of the Government's policy to punish Plaintiffs for seeking refuge.  The Government is correct that these facts are "inextricably linked" to the separation of father and child. Gov't Br. at 32.  But as set forth above, because this separation was part of a deliberate, systematic, and unconstitutional policy, it was not shielded by the DFE.  And because it occurred as part of an executive policy rather than a statute or a regulation, it is not covered by the DCE.

**D.      Because There Are Like Circumstances In Which Private Parties Could Intentionally And Negligently Inflict Emotional Distress, Plaintiffs' Tort Claims Satisfy The Broad Private Analog Inquiry.**

FTCA jurisdiction exists if a plaintiff alleges "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674 (FTCA allows for tort recovery against the United States "in the same manner and to the same extent as a private individual under like circumstances").  The provision is known as the "private analog" requirement.  Contrary to the Government's demand for an exact analog akin to a qualified immunity inquiry, the FTCA's requirement that a claim address "like circumstances" does not mean "***under the same circumstances***."  *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955) (emphasis added).  Courts must look "further afield" to find analogous torts relating to the government activity at issue.  *United States v. Olson*, 546 U.S. 43, 46 (2005); *accord Liranzo v. United States*, 690 F.3d 78, 87 (2d Cir. 2012) (explaining that the "[Supreme] Court adopted a broader view of the private analog requirement"); *Firebaugh Canal Water Dist. v. United States*, 712 F.3d 1296, 1303 (9th Cir. 2013) (private analog need not be "exactly on point;" it need only be "appropriate").

The Government's argument that there no "like circumstances" governing private persons rests on a formalistic distortion of the legal standards governing the private analog, and a fundamental mischaracterization—which infects the Government's entire brief—of Plaintiffs' actual claims for relief.

          1.    <u>Exclusive Governmental Functions Do Not Preclude Finding a Private Analog.</u>

The Government repeatedly emphasizes there can be no private analog because it is "only the federal government that has the authority to enforce immigration laws . . . [which] a private individual could not make."  Gov't Br. at 28; *see also id*. at 30 ("claims arise from the Government's enforcement of federal immigration laws"); *id*. ("harms stem from the Government's decision to strictly enforce federal immigration statutes"); *id*. ("faithful execution of federal statutes").

This red herring willfully ignores the Supreme Court's repeated admonition that an exclusive government authority over a claimant does not foreclose the possibility of identifying a private analog, and that the private analog should be viewed broadly.  Thus, in *Indian Towing Co.*, 350 U.S. at 64, where a claimant brought a negligence suit against the Coast Guard for its failure to maintain a functioning Coast Guard lighthouse, the Court emphatically rejected a reading of the private analog requirement "as excluding liability in the performance of activities which private persons do not perform[,] ... [*i.e.,*] 'uniquely governmental functions.'"  *see id* at 67 (noting that even though "all Government activity is inescapably 'uniquely governmental,'" private analogs still exist).  The Court located a private analog in a general duty of private citizens to be "good Samaritans" requiring due care toward others.  *Id*. at 64-65.  *See also United States v. Muniz*, 374 U.S. 150, 153 (1963) (even though federal confinement of inmates was "uniquely federal in character" negligence actions allowed to proceed); *Olson,* 546 U.S. at 45

(rejecting court of appeals finding that there is "no private-sector analogue for mine inspections" specifically, because of a broader private analogy to liability of "private persons who conduct safety inspections"); *see also Tekle v. United States*, 511 F.3d 839, 852 (9th Cir. 2007) ("Even if the conduct entails uniquely governmental functions, the court is to examine the liability of private persons in analogous situations"); *Liranzo*, 690 F.3d at 94-95 (false arrest and imprisonment claims for immigration detention, finding state tort law allowing claims against private individuals for detention without "legal privilege to do so"); *Avalos-Palma v. United States*, No. Civ. A. 13-5481 FLW, 2014 WL 3524758, at *12 (D.N.J. July 16, 2014) (private analog doctrine did not bar tort claims arising from wrongful deportation).[2]

2.   There are Private Analogs in IIED and NIED for the Outrageous Conduct of Threatening and Separating Families or, in the Alternative, Kidnapping.

Switching gears, the Government also suggests that Plaintiffs' claims rest on a challenge to their being "lawfully detained and housed in an appropriate detention center," Gov't Br. at 30; *see also id*. at 29 (suggesting Plaintiff objects to the "degree of lawful confinement to which he was subjected"). Here again, the Government wildly misses the thrust of Plaintiffs' claims. Plaintiffs do not challenge their confinement *qua* confinement. What Plaintiffs allege are claims for Intentional and Negligent Infliction of Emotional Distress, because the Government chose to forcibly separate a father and infant child, absent the required due process pertaining to family separation, for the intentional and successful purpose of inflicting maximal emotional and

---

[2]   The Government cites cases that stand for the uncontroversial proposition that the FTCA's immunity waiver does not extend to causes of action based solely on the Government's violation of federal regulations. *See Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537-38 (1st Cir. 1997) (conduct at issue "wholly concern[ed] the [Federal Aviation Administration's] alleged failure to perform its regulatory functions" under federal statutes); *Chen v. United States*, 854 F.2d 622, 626-27 (2d Cir. 1988) (dismissing FTCA claim predicated on government's failure to abide by its own procurement regulations). Plaintiffs' claims are not based on an alleged failure to follow federal regulations.

physical torment on Plaintiffs, all while denying Plaintiffs even an opportunity to communicate with one another and conditioning family reunification on a coercive act (here, a waiver of rights). *See, e.g.*, Compl. ¶¶1, 58, 387-88, 391-92. As described in Section III, *infra*, the relevant allegations state a claim for IIED, NIED and Negligence.

Because private individuals could intentionally inflict emotional distress on a parent by harming their child, there is an "appropriate" private analog based on "like" if not identical factual circumstances. For example, in *Scollar v. City of New York*, 160 A.D.3d 140, 74 N.Y.S.3d 173, 177 (1st Dep't 2018), the Court recognized a claim of IIED where a noncustodial parent falsely reported child abuse to Child Services and the Family Court in order to instill fear in her ex-partner about losing the child. If a private party's mere attempt to instill fear of child separation constitutes sufficiently outrageous conduct so as to plead IIED, surely the Government cannot contend that ***actually removing*** a child from its parent's care in order to instill fear does not give rise to tort liability. Other courts have set an even lower bar for a finding of IIED. *See Bunker v. Testa*, 234 A.D.2d 1004 (4th Dep't 1996) (threatening Plaintiff that he knew where children went to school and following them home). Likewise, a ***child*** can suffer IIED from the forced separation from their parent. *Decter v. Second Nature Therapeutic Program, LLC*, 42 F. Supp. 3d 450, 462 (E.D.N.Y. 2014) ("minor child's allegations that he was forcibly abducted from his home by strangers, placed in fear for his life, transported across country . . . and denied right to speak to his father or his attorney were sufficient to state plausible IIED claim under NY law.").[3]

---

[3]     The Government relies heavily on *Akutowicz v. United States*, 859 F.2d 1122 (2d Cir. 1988), where the tort related to altering the plaintiff's citizenship. In *Liranzo*, the Second Circuit subsequently recognized that the application of *Akutowicz* is limited to conduct where there could *never* be a private analogy, unlike the false arrest claim at issue in *Liranzo*: "A private individual cannot . . . cause injury to another's citizenship. But a private person is of course

Even more specifically, courts across the country have not hesitated to find that "the tort of intentional infliction of emotional distress is not excluded as a matter of law from [the] FTCA by § 2680(h)." *Sheehan v. United States,* 896 F.2d 1168, 1172 (9th Cir. 1990).  In *Martinez*, Plaintiffs stated a claim that agents caused emotional distress by "separating the family, questioning and threatening incarceration, verbal abuse, offering to release the children if Mr. Martinez confessed […], threaten[ing] to separate his family […], ensur[ing] that Mr. Martinez watched the agents transport his family to another location; and isolat[ing] him in a windowless cell." *Martinez v. United States*, No. CV 1300955TUCCJLAB, 2018 WL 3359562, at \*11 (D. Ariz. July 10, 2018); *see also Carranza v. United States*, No. 3:12-CV-02255-AC, 2013 WL 3333104, at \*8 (D. Ore. July 1, 2013) (government intended to inflict severe emotional distress threatening to send plaintiff to Mexico and place her girls in a foster home where they would not know who their family was and where she would not see them again); *M.D.C.G. v. United States*, No. 7:15-CV-552, 2016 WL 6638845, at \*11-12 (S. D. Tex. Sept. 13, 2016) (allowing an IIED claim to proceed where Plaintiffs alleged their trauma continued as plaintiff and her minor daughter were separated for three days and the minor was not permitted to be with her family *for a month*).  Courts have thus consistently found that mere threats of losing their

---

capable of falsely arresting another," *Liranzo*, 690 F.3d at 94-95; it found a local analog because a private person can make a "citizen's arrest." *Id.* at 95.  The Government's additional reliance on *McGowan v. United States*, 825 F.3d 118 (2d Cir. 2016), for the proposition that there is no private analog here because only governments can establish detention facilities, likewise carries no weight.  Unlike this case, *McGowan* involved "wrongful confinement," and held that there was no private analog to such a claim because only the government can administer administrative segregation.  *Id*. at 126.  Yet as *McGowan* itself affirms, the private analog inquiry asks whether "[p]rivate individuals ... may create a relationship with third parties that is similar to the relationship between" a governmental actor and a citizen.  *McGowan*, 825 F.3d at 127 (quoting *Olson*, 546 U.S. at 47).  Here because a private individual can create a relationship similar to the federal government's relationship with Plaintiffs, it can cause analogous harm.

children can result in the infliction of severe emotional distress. *Carranza*, 2013 WL 3333104, at *8. Here, the Government did not only threaten separation, but actually abducted Mr. C.'s infant son and held him in a separate facility for months.

The same is true for NIED and Negligence. *See Valdez v. City of New York*, 21 Misc. 3d 1107 (A) (Sup. Ct. Bronx Cty 2008) (NIED claim stated for children who observed "their immediate family member's injury caused by defendants' negligence that exposed the children as well as their family member to an unreasonable risk of bodily harm"); *Orzechowski v. Perales*, 153 Misc. 2d 464, 475–76 (Sup. Ct. N.Y. Cty.1992) (permitting a claim for emotional harm where a hospital sent a false telegram stating that plaintiff's mother had died and that her relatives should make burial arrangements).

Even though there are clear analogs already, should the Court wish to look "further afield," as it is authorized to do, *Olson*, 546 U.S. at 47, a private analog also exists for kidnapping a child. *See* McKinney's Penal Law § 135.15 ("Kidnapping in the First Degree") ("abduct[ing]" another person to coerce payment of money or goods or to "terrorize him or a third person"); *People v. Leonard*, 19 N.Y.3d 323 (2012) (holding "six-week old daughter hostage" constitutes "restraint under the kidnapping statute" even though infant was not capable of going anywhere voluntarily"). As Plaintiffs allege, D.J.C.V. was abducted from his father at the border, for purposes of deterring Plaintiffs and others from seeking asylum, to coerce waiver of his human rights and to "terrorize" the family. Or, the Court could look to the state law analog of "Custodial Interference." *See* McKinney's Penal Law, §145 (where relative with intent to hold child for protracted period, "takes or entices . . . child from his lawful custodian" without lawful authority).

## III.   PLAINTIFFS STATE CLAIMS FOR RELIEF UNDER NEW YORK LAW.

### A.   Plaintiffs' Claims Are Not Barred By New York Public Policy.

In a case challenging outrageous government conduct rightly condemned by the international community, medical professionals, and federal courts (including the federal court concluding that Plaintiffs' separation represented the "most cruel of the cruelties"), and which has caused incalculable physical and mental torment to Plaintiffs and thousands of vulnerable families, the Government nevertheless argues, without apparent irony or self-awareness, that Plaintiffs' claims are barred by New York public policy. Seeking blanket impunity, it contends that Plaintiffs have no recourse for *any* conduct committed by the Government following their entry into the U.S. because Mr. C. "crossed into the United States in violation of criminal immigration law." Gov't Br. at 36. Under the Government's retributivist view, it is free to inflict any torment, torture, or harm on any human it believes has violated the law. None of the Government's authority supports such an absolutist—and heartless—contention. Mr. C's family came here seeking asylum from lethal persecution at home, and unlike the cases the Government relies upon, could not have foreseen or be responsible for the independent—and unlawful—harm the Government chose to inflict upon him after his entry.

The Government principally relies on *Barker v. Kallash*, 63 N.Y.2d 19 (1984). In *Barker*, the minor plaintiff, who was injured while constructing a pipe bomb, an illegal activity, attempted to maintain a tort action against the nine-year-old defendant who unlawfully sold him the bomb materials. The Court of Appeals, in precluding the action, stated that "when the plaintiff's injury is a ***direct result*** of his knowing and intentional participation in a criminal act he cannot seek compensation for the loss, ***if the criminal act is judged to be so serious an offense*** as to warrant denial of recovery." *Id*. at 25-26 (emphases added). *Barker* has been described as a "narrow application of public policy imperatives under limited circumstances." *Alami v. Volkswagen of Am., Inc*., 97 N.Y.2d 281, 288 (2002). The *Barker* rule applies only to

"sufficiently serious" conduct so as to impose such a harsh result, *Wolfe v Hatch*, 95 A.D.3d 1394, 1396 (3d Dep't 2012), such as in situations involving a plaintiff injured while resisting arrest, *Moore v. County of Suffolk*, 11 A.D.3d 591 (2d Dep't 2004), a decedent killed while engaging in the hazardous and illegal activity of "elevator surfing," *Gaither v. City of New York*, 300 A.D.2d 255 (1st Dep't 2002), and a decedent killed while crashing a stolen vehicle, *Phifer v. State of New York*, 204 A.D.2d 612 (2d Dep't 1994).

This case is not close.  Unlike the plaintiffs in *Barker*, whose injuries were incurred "in the course of committing a serious criminal act," the injuries sustained by Plaintiffs, namely, the forcible separation of Mr. C. from his son, the withholding of information about the status of his son from Mr. C., the emotional distress caused by making inconsistent and pretextual excuses to prevent reunification and by conditioning reunification on a waiver of Mr. C.'s fundamental rights, and the profound mental harm caused by the separation of father from toddler, were not a necessary or direct result of Mr. C. ***lawfully seeking asylum*** in this country.  They were part of a wholly independent policy and unlawful decision to separate them and intentionally impose injury.  *See Nash v. MRC Recovery Inc.*, 2016 N.Y. Misc. LEXIS 167 (Sup. Ct. Suffolk Cty. Jan. 12, 2016) (*Barker* did not foreclose tort where the court could not conclude that plaintiff's injuries were the product of his own illegal conduct).

This case is also obviously unlike *Jones v. Beth Israel Hosp.,* No. 17-cv-3445, 2018 WL 1779344 (S.D.N.Y. Apr. 12, 2018), which foreclosed a tort remedy because the plaintiff's alleged injuries from police officers were the ***direct result*** of plaintiff's unlawful assault on the same police officers. And, *Farley v. Greyhound Canada Trans. Corp.*, 2009 U.S. Dist. LEXIS 54156 (W.D.N.Y. June 25, 2009), the only immigration-related case cited by the Government,

31

only supports Plaintiffs' claims.  *Farley* did not involve a claim of asylum, as here, and the injuries in *Farley* were sustained during the course of the illegal conduct.

> **B.      Plaintiffs State A Claim For Intentional And Negligent Infliction Of Emotional Distress And For Negligence.**

The Government's arguments that Plaintiffs fail to state a claim for IIED, NIED and Negligence read as if it is responding to a different complaint, with different allegations.  Once again, Plaintiffs do not claim that any act of authorized immigration detention triggers a state law tort.  Plaintiffs' claim is that the horror of enforced separation of a parent from their child, pursuant to a policy that is designed to punish and deter asylum seekers and that is undertaken without any individualized consideration and under coercion to forfeit constitutional rights is outrageous and thus states a claim for IIED.  And, perhaps because any human being knows all of this to be true, the Government seeks to defend a practice not at issue in this case.  In addition, the Government's documented failure to keep records of the whereabouts of separated children and to permit Mr. C. to communicate with his child, among other neglected duties of care, states a claim for NIED and negligence.

> 1.      Because the Government's Conduct was Extreme and Outrageous, Plaintiffs State an IIED Claim.

New York law recognizes a claim for intentional infliction of emotional distress ("IIED") "'for conduct exceeding all bounds usually tolerated by decent society.'"  *Fischer v. Maloney*, 43 NY.2d 553, 557 (1978), *quoting* Prosser, Torts § 12, at 56 [4th ed].  An IIED claim allows a plaintiff to recover for damage resulting from conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Kaminski v. United Parcel Serv.*, 120 A.D.2d 409, 412 (1st Dep't 1986) (internal citations and quotations omitted).  Outrageousness is a subjective standard.  *Bialik v. E.I. Dupont de NeMours & Co.*, 142 Misc. 2d

926, 929 (Sup. Ct. Niagara Cty. 1988) ("'Outrageous' might well be in the minds of the parties. For example, it's 'outrageous' to require a person terrified of heights to climb a high ladder, but this same requirement might be considered playful exercise by a young athlete"). A claim for IIED will survive a motion to dismiss if "assuming the truth of the facts pleaded, the acts complained of could be found by a trier of fact to amount to extreme and outrageous conduct which cannot be tolerated in a civilized community." *Kaminski*, 120 A.D.2d at 412.

Family separation, as directed by an unconstitutional separation policy, is extreme and outrageous conduct. In fact, the Zero Tolerance Policy was so extreme and outrageous that a preliminary injunction was issued, protests were held across the United States, Congress held numerous oversight hearings, and, eventually, President Trump issued an Executive Order vowing to end the practice. Here, the separation of Mr. C. from his infant son D.J.C.V. was particularly outrageous and extreme. On or about May 2, 2018, U.S. government officials forcibly seized then-19-month-old D.J.C.V. from his father's custody and thereafter separated them for five and a half months, until this Court ordered reunification in October 2018. Compl. ¶8. Throughout this forced separation, ICE officials threatened to deport Mr. C. without his son, and coercively conditioned the possibility of reuniting with his son on Mr. C.'s agreement to waive his and his son's bona fide asylum claims. *Id*. The Government exacerbated the dire situation by only providing limited information to Mr. C. about his child's whereabouts and well-being and denying Mr. C. any opportunity to directly communicate with his son. *Id*. Plaintiffs clearly meet the standard for an IIED claim.

When the Government states that its extreme and outrageous conduct should be excused because, "the *Ms. L.* court has already determined that the separation was justified and reasonable," Gov't Br. at 37, the Government ignores the procedural history of this case and the

fact that this Court has held otherwise, even taking Mr. C's eight-year-old misdemeanor into account, which excluded him from the *Ms. L.* class (*see supra* at 5-7).  On October 10, 2018, Mr. C. successfully obtained bond from an immigration judge and was released from immigration custody, Compl. ¶¶115, 120, because, despite the court's knowledge of Mr. C.'s eight-year-old misdemeanor conviction, he still met his burden of showing "that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight."  *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006).

Soon after, Mr. C. and D.J.C.V. simultaneously filed an emergency habeas motion in this Court, asking this Court to order Mr. C. and D.J.C.V. reunited.  At the October 15, 2018 hearing on their motion, Judge Hellerstein ordered Mr. C. and D.J.C.V.'s immediate reunification.  *See D.J.C.V. v. U.S. Immigration & Customs Enf't,* 2018 WL 10436675, at *1.  The short order specifically held that Mr. C.'s "single misdemeanor conviction from eight years ago," was not enough to distinguish Mr. C.'s case from similar cases where the reunification of parents and their children was ordered.  *Id.*[4]  At the hearing, Judge Hellerstein called the policy of baselessly separating families the "***most cruel of all cruelties***."  Compl. ¶¶6, 131 (emphasis added).  Given the immigration court's bond determination, the findings of gratuitous cruelty by Judge Hellerstein, and the order requiring reunification despite an old misdemeanor plea, the Government's claim that "[a] judicial statement that a given course of conduct was reasonable

---

[4]    Judge Hellerstein's order joined a broad consensus of district courts in recognizing that the enforced separation violated the families' due process right to family integrity.  *See, e.g., Cruz Paz v. Lloyd,* No. 18 Civ. 8993, ECF No. 11 (S.D.N.Y. Oct. 5, 2018) (Crotty, J.); *Paixao v. Session.*, No. 18 Civ. 4591, ECF No. 16 (N.D. Ill. July 5, 2018) (Shah, J.); *Souza v. Sessions et al.*, No. 18 Civ. 4412, ECF No. 23 (N.D. Ill. Jun. 26, 2018) (Shah, J.); *Maldonado v. Lloyd et al.*, No. 18 Civ. 3089, ECF No. 28 (S.D.N.Y. May 4, 2018) (Keenan, J.).

precludes any claim that the action at issue is extreme and outrageous," Gov't Br. at 37-38, rings hollow.

Multiple federal courts have found that the mere threat of family separation by immigration officers may be sufficient for an IIED claim.  *See Martine*, 2018 WL 3359562, at *11 (holding that CBP officer's use of improperly coercive tactics, including threatening to separate a family, could be sufficiently extreme and outrageous to support an IIED claim); *M.D.C.G*, 2016 WL 6638845, at *11-12 (a federal court permitted an IIED claim against federal agents who, after a family had endured torture, decided to separate that family in detention); *Carranza*, 2013 WL 3333104, at *10 (stating that an IIED claim was sufficiently pled based on ICE officials' allegedly extreme and outrageous behavior in threatening to permanently take a woman's daughters away from her).

Misinterpreting precedent and Plaintiffs' claims, the Government also argues that because separation was "the result of federal officers acting in a way authorized by federal law," the conduct could not be extreme and outrageous.  Gov't Br. at 37.  Again, Plaintiffs do not challenge the fact of their confinement as such— they challenge the intentional separation, without due process, in a manner intentionally designed to inflict harm.  As to this actual claim, Judge Hellerstein found that the Government's actions were unlawful, in violation of these very Plaintiffs' due process rights.  And, despite arguing that the United States enjoys sovereign immunity from Plaintiffs' ATS claims, the Government otherwise nowhere disputes that Plaintiffs sufficiently allege torture and crimes against humanity—violations of customary international law and therefore federal common law.[5]

---

[5]     And as explained in Section IV, *infra*, the *jus cogens* violations alleged here can never constitute a sovereign act, so the Government cannot claim they are acting under lawful federal authority.

The Government argues that the IIED claims are preempted by the Supremacy Clause and an asserted plenary authority to police the border.  *See* Gov't Br. at 38-39.  The platitude— "dating to *McCulloch v. Maryland*" —that state law is preempted by the "operations of federal instrumentalities," Gov't Br. at 39, obviously proves too much, as it would negate the congressional command in the FTCA to look to state law duties in ascribing liability against the United States.  Under the Government's view, the FTCA could never apply to government officials claiming to act pursuant to a federal executive order.  Not surprisingly, all but one of the cases the Government cites are general preemption cases, having nothing to do with the FTCA. *See* Gov't Br. at 38-40.  In any event, as outlined above, this Court and other federal courts have allowed for claims of IIED against government officials without finding that those claims run afoul of the Supremacy Clause.[6]

Moreover, the assertion that Plaintiffs' claims are preempted because the federal conduct was "necessary to the execution of a duty under the laws of the United States," Gov't Br. at 39, *again* ignores the gravamen of Plaintiffs' complaint: the IIED the Government inflicted was far from "necessary"; in fact, it was in violation of a superior duty to obey the Constitution.[7]  As Judge Hellerstein and other courts recognized, the claim of "necessity" undergirding Defendants violated Mr. C.'s and D.J.C.V.'s constitutional rights to family integrity and due process.

---

[6]     S*ee, e.g., Roe*, 2019 WL 1227940, at *6; *Martinez,* 2018 WL 3359562, at *11; *M.D.C.G.,* 2016 WL 6638845, at *11-12; *Ruiz v. United States,* 2014 WL 4662241; *Carranza,* 2013 WL 3333104, at *10; *El Badrawi*, 579 F. Supp. 2d at 252; *DeRafelo*, 2012 WL 2459396, at *6.

[7]     The only FTCA case that the Government cites, *Denson v. United States*, 574 F.3d 1318, 1348 (11th Cir. 2009), only proves Plaintiffs' point, because there, unlike here, the court found that the federal officers "complied with the full spectrum of federal statutory, regulatory, ***and constitutional law*** and did no more than was essential to carrying out their duties."  *Id.* (emphasis added).

*D.J.C.V.*, 2018 WL 10436675; *see also Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 501;

*Ms. L.*, 310 F. Supp. 3d at 1145-46.[8]

> 2.      Plaintiffs State a Claim for Negligent Infliction of Emotional Distress.

"Under New York law, a plaintiff may establish [a claim for negligent infliction of

emotional distress] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty

theory.'" *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).  Under the "direct duty"

theory, which applies here, a plaintiff suffers emotional distress caused by "defendant's breach of

a duty which unreasonably endangered [plaintiff's] own physical safety." *Id.*; *see Kennedy v.

McKesson Co.*, 462 N.Y.S.2d 421, 423–24 (1983).  Plaintiffs who are children state a claim of

negligent infliction of emotion distress "upon a showing that they suffered emotional injury from

observing their immediate family member's injury caused by defendants' negligence that

exposed the children as well as their family member to an unreasonable risk of bodily harm."

*Valdez*, 21 Misc. 3d 1107(A), at *4 (Sup. Ct., Bronx Cty. 2008)

Here, Plaintiffs allege that the Government inflicted emotional distress and acted

negligently by failing to record which children belonged with which parents and providing only

limited communication between and information about family members, failing to develop a

plan to reunite parents and children, and conditioning Mr. C.'s reunification with his son on a

waiver of his asylum rights.  Compl. ¶¶4, 8, 10, 56, 59, 66.  Even if, as the Government asserts,

Plaintiffs are required to allege fear for their physical safety to plead NIED under the direct duty

theory, Gov't Br. at 42, the Complaint clearly contains sufficient allegations of such fear.

---

[8]      Additionally, the *Ms. L.* court has already weighted the importance of the Government's interest in protecting the border against the constitutional right to family integrity and rejected the Defendant's argument.  *See Ms. L.,* 310 F. Supp. 3d at 1143 ("The context of the family separation practice at issue here, namely an international border, does not render the practice constitutional, nor does it shield the practice from judicial review.")

Indeed, the Complaint alleges *specific instances* of physical harm and fear for physical safety: "the separation caused Mr. C. unbearable anguish and grief as well as fear for his son's mental, emotional, and *physical* well-being," Compl. ¶9 (emphasis added); "[C]hildren separated from their parents suffered *physically*, mentally and/or emotionally, Compl. ¶55 (emphasis added); After "an immigration official informed Mr. C. that they were doing to deport him and take D.J.C.V. Mr. C. began to feel pain in his chest and stomach" Compl. ¶89; "[Mr. C] had no idea who would be responsible for feeding D.J.C.V., playing with him or changing D.J.C.V.'s diapers," Compl. ¶91; and "[t]he guardian ad litem representing him throughout D.J.C.V.'s detention wrote that "… [s]o long as this separation keeps [D.J.C.V] from living and developing under his father's care, [D.J.C.V.]'s health, safety and well-being will continue to suffer and will likely worsen." Compl. ¶124.

These allegations of fear of physical harm state an NIED claim.  *See Valdez,* 21 Misc. 3d 1107(A), (finding that children who witnessed their mother get shot and suffered emotional injury related to being placed in foster care as she recovered had stated a claim for negligent infliction of emotional distress); *see also King v. Otasco, Inc.*, 861 F.2d 438, 443 (5th Cir. 1988) (denying a motion to dismiss a NIED claim brought by children who were negligently left unsupervised in a mobile home after their father's arrest).

### 3.    Plaintiffs State a Claim for Negligence.

Under New York law, a plaintiff states a negligence claim by pleading "'the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by' plaintiff."  *Glusband v. Fittin Cunningham Lauzon, Inc.*, 582 F. Supp. 145, 152 (S.D.N.Y. 1984) *quoting Becker v. Schwartz*, 410, 413 N.Y.S.2d 895, 899 (1978).  The Complaint alleges that the Government acted negligently by failing to record which children belonged with which parents and providing only limited communication between and information about family members,

among other alleged acts.  *See* Compl. ¶¶4, 8, 10, 56, 59, 66.  The Complaint also alleges that the

federal officers and officials had a duty to Plaintiffs to act with ordinary care and prudence, and

the federal officers breached that duty by separating Mr. C. and D.J.C.V., failing to record which

children belong to witch parents, failing to provide adequate communication between Mr. C. and

D.J.C.V., failing to develop a reunification plan for parents and their children, and other acts

alleged in the Complaint.  *See* Compl. ¶¶4, 8, 10, 56, 59, 66, 144, 145.  As Plaintiffs sufficiently

allege a claim for negligence, the Government's motion to dismiss should be denied.

## IV.   THE UNITED STATES DOES NOT ENJOY SOVEREIGN IMMUNITY UNDER THE ATS FOR THE *JUS COGENS* VIOLATIONS ALLEGED HERE.

The Government nowhere contends that Plaintiffs have failed to state a claim under the

ATS for torture (Count IV) or for crimes against humanity (Count V – Persecution; Count VI –

Inhumane Acts).  Thus, it is undisputed that: (1) Plaintiffs' allegations show that the Government

intended to inflict "severe physical or mental pain or suffering" on Plaintiffs, so as to punish and

deter asylum seekers and so as to coerce Mr. C. to waive his immigration claims, *see* Compl.

¶¶116-119; 122-25; 133-37; all of which states a claim for torture, *see* Compl. ¶¶153-56; (2)

Plaintiffs' allegations that the Government's family separation policy represents a widespread

and systematic attack (*i.e.*, a cognizable course of conduct or policy), that targeted victims based

on nationality, ethnicity and/or national origin  *see* Compl. ¶¶1-5, 8-9, 22-38, is sufficient to state

a claim for the crime against humanity of persecution, Compl. ¶¶157-164; and (3) Plaintiffs'

allegations state a claim for the crime against humanity of inhumane acts, *see id*., *see also id*. at

¶¶39-59, 165-172.  It is also undisputed that these norms have achieved *jus cogens* status[9] and

---

[9]      A *jus cogens* norm is one "accepted and recognized by the international community of
states . . . from which no derogation is permitted," and which, because it does "not depend solely
on the consent of states for [its] binding force . . . enjoy[s] the highest status within international
law."  *Kashef v. BNP Paribas*, 925 F.3d 53, 61 (2d Cir. 2019).  Torture violates *jus cogens*
norms, *Filártiga v. Peña-Irala S.A.*, 630 F.3d 876, 878 (2d Cir. 1980), as do crimes against

are otherwise sufficiently "specific, universal and obligatory" so as to properly confer jurisdiction on the court to hear such claims under the ATS.[10]  *See Sosa v. Alvarez-Machain*, 542 U.S. 724-25, 732 (2004).[11]

The Government invokes the defense of sovereign immunity, which it argues bars any and all claims against the U.S. absent an express statutory waiver.  The Government's categorical assertion of sovereign immunity misses the nuance and weight of Plaintiffs' claims. While scholars have rightly questioned the importation of the English monarchical notion that the "King can do no wrong" into an American constitutional republic,[12] Plaintiffs' assertion is far

---

humanity, *see* Charter of the International Military Tribunal at Nuremberg, Rome Statute of the International Criminal Court art. 7(1)(h), 7(2)(g), A/CONF.183/9, July 17, 1998, 2187 U.N.T.S. 90; *U.S. v. Yousef,* 327 F.3d 56, 106 (2d Cir. 2003) (crimes against humanity "now have fairly precise definitions and [have] achieved universal condemnation" so as to give rise to universal jurisdiction under customary international law). *See also Khulumani v. Barclay Nat. Bank, Ltd.,* 504 F.3d 254, 271 (2d. Cir. 2007) (Katzmann, J.) ("The universal and fundamental rights of human beings identified by Nuremberg . . . are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*") citing *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715 (9th Cir.1992).

[10]    The Government is therefore foreclosed from raising arguments to the contrary in its reply brief. See, e.g., *Landau v. New Horizon Partners, Inc.*, 2003 WL 22097989, at *10 (S.D.N.Y. Sept. 8, 2003) (rejecting argument "raised for the first time in ... reply papers ... because the plaintiff had no opportunity to respond to such arguments, and in any event, full consideration and development of this issue requires that the argument be raised in the original moving papers.").

[11]    Cases recognizing that torture satisfies the *Sosa* norm so as to confer ATS jurisdiction are numerous.  *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401 (2018) (Kennedy, J., plurality) (explaining that "international human-rights norms" include "crimes like genocide, torture, and slavery . . . ."); *Kadić v. Karadžić*, 70 F.3d 232, 243 (2d Cir. 1995) (same); *Princz v. Fed. Rep. of Germany*, 26 F.3d 1166, 1173 (D.C. Cir. 1994) (same); *Siderman de Blake*, 965 F.2d at 717 (same); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (same); *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 385 (S.D.N.Y. 2009) (same); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 334 n. 2 (S.D.N.Y. 2005) (same); *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va. 2019) (same).

[12]    Numerous scholars recognize that sovereign immunity has no place in a constitutional republic committed to popular sovereignty and consent of the governed.  *See* James E. Pfander,

narrower and claim-specific: as the Eastern District of Virginia held in reviewing whether the U.S. could be held liable for ATS torture claims, there is no federal sovereign immunity for *jus cogens* violations.  *See Al Shimari v. CACI Premier Technology, Inc.*, 368 F. Supp. 3d 935 (E.D. Va. 2019).  First, because (as the Government observes), the ATS is a jurisdictional statute, courts must look to the common law for substantive content. At common law, the federal sovereign enjoys no immunity in domestic courts for *jus cogens* violations.[13]  Second, even if it did theoretically enjoy such immunity, the United States has implicitly waived it in actions in U.S. courts raising *jus cogens* violations, by acceding through treaties, membership in the community of nations, and its international enforcement structure, all of which require remediation of *jus cogens* violations.

Elementary principles of popular sovereignty, and its corollary, government accountability—as well as elementary principles of international law—compel a judicial remedy for the systematic, egregious human rights violations at issue in this case.  We have no King

---

*Sovereign Immunity and the Right to Petition:  Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 NW. U. L. REV. 899, 981 (1997); Erwin Chemerinsky, *Against Sovereign Immunity*, 53 STAN. L. REV. 1201, 1223 (2001); *see also* Vicki C. Jackson, *Suing the Federal Government:  Sovereignty, Immunity, and Judicial Independence*, 35 GEO. WASH. INT'L L. REV. 521, 523 (2003); Akhil R. Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425, 1466 (1987).  Others see it as illogical and impermissible barrier to substantive justice.  *See* Kenneth C. Davis, *Sovereign Immunity Must Go*, 22 ADMIN. L. REV. 383, 383 (1970); *see also* Clark Byse, *Proposed Reforms in Federal Non-statutory Judicial Review:  Sovereign Immunity, Indispensable Parties, Mandamus*, 75 HARV. L. REV. 1479, 1484 (1962). Justice Stevens, himself a skeptic, has observed that the absence of theoretical coherence to the principle, makes it "nothing but a judge-made rule that is sometimes favored and sometimes disfavored."  *United States v. Nordic. Vill. Inc.*, 503 U.S. 30, 42 (1992) (Stevens, J., dissenting).

[13]    Whether any such immunity may be available to the U.S. in *foreign* courts or for *foreign* sovereigns and *foreign* officials—with implicates wholly distinct jurisprudential and policy considerations – is not before the court.

41

here; this case amply demonstrates that United States government can—and does—do grave

wrong.  And when it does so, it should be held to accountable.

A.   **Because The ATS Is A Jurisdictional Statute Whose Content Derives From Common Law, The Common Law Principle That *Jus Cogens* Norms Displace Domestic Sovereign Immunity Applies.**

The Government is correct that, because the ATS is a jurisdictional statute, which itself

has no substantive content, the statute contains no waiver of sovereign immunity.  Gov't Br. at

53.  The Government is also correct, as its citation to *Goldstar (Panama) S.A. v. United States*,

967 F.2d 965, 968 (4th Cir. 1992) reveals, that ATS jurisdiction over any presumptively

sovereign entity must be "establish[ed] ***independent*** of that statute."  Gov't Br. at 53 (emphasis

added).[14]  The ATS instructs federal courts to look to international law (including *jus cogens*

norms) as incorporated into federal common law in order to establish substantive duties and

liability*.  Sosa v. Alvarez-Machain,* 542 U.S. 692, 732 (2004).  At the same time, federal

sovereign immunity is a creature—albeit antiquated and ill-fitted—of federal common law.  *See

Al Shimari*, 368 F. Supp. 3d at 944 n. 4 ("the immunity of the American government from suit is

a common law doctrine, and the question whether the United States has waived sovereign

immunity for *jus cogens* violations does not turn on the interpretation of any one statute.").

For this reason, the Government's reliance on cases conditioning waiver on a "clear and

unequivocal statutory language," *see* Gov't Br. at 15 (citing *Lane v. Pena*, 518 U.S. 187, 192

(1996), is inapposite to the ATS context.  A clear statement of *statutory* waiver merely reflects

---

[14]     *Goldstar,* which involved claims for property damage and not *jus cogens* violations, itself
did not apply a common law analysis, instead examining whether the U.S. waived sovereign
immunity for ATS claims arising from the breach of a specific treaty (1907 Hague Convention).
*Goldstar*, 967 F.2d at 968- 71.

the elementary principle that for any statute to abrogate the presumptive common-law federal sovereign immunity under domestic law, it must state the fact and scope of the waiver clearly. *See Williams v. United States*, 242 F.3d 169, 173 (4th Cir. 2001) (where U.S. waives "immunity against liability for violation of its own statutes," the waiver must be expressed in "specific language in the substantive federal statute allegedly giving rise to the duty"); *see also Al Shimari*, 368 F. Supp. 3d at 959, n. 11 (the rights created by domestic law "are enacted by Congress against the backdrop of sovereign immunity, [and] may be limited so as not to create a substantive right enforceable against the federal government").[15]

The ATS, by contrast, neither gives rise to a federal duty, expressly waiving sovereign immunity like substantive federal statutes cited by the government, nor affirmatively grants immunity, like the FSIA or the Westfall Act.  With no statute creating a rule of decision, the court should look to common law to determine the existence and scope of domestic sovereign immunity for violations of the law of nations informed as it must be by international law. *Samantar v. Yousuf*, 510 U.S. 305, 311 (2010) (finding that the "doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted"); *see also The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained . . . as often as questions of right depending upon it are duly presented for their determination."); *Kadić*, 70 F.3d at 246 (that "federal common law incorporates international law" has become a "settled proposition").

---

[15]     Similarly, in the context of statutorily authorized immunity under the Foreign Sovereign Immunities Act (FSIA), because the statute affirmatively grants immunity to foreign sovereigns and serves as the "sole basis for obtaining jurisdiction over a foreign state in our courts," claims that do not fit FSIA's express categories of waiver must be dismissed. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

The question of the right "duly presented" to this court, *The Paquette Habana*, 175 U.S. at 700, means that the common law principle of federal sovereign immunity must yield to the hierarchically superior *jus cogens* norm.  Sovereign immunity has been said to derive from the "ground that there can be no legal right as against the authority that makes the law on which the right depends." *Kawananakoa v. Polyblank*, 205 U.S. 349, 353 (1907).  So, by contrast, the substantive right to be free from *jus cogens* violations comes not from the font of federal sovereign authority, it is created by international law and incorporated into federal common law. Accordingly, "the right is not so limited and is enforceable against the federal government." *Al Shimari*, 368 F. Supp. 3d at 959 n. 11.

*Jus cogens* norms "enjoy the highest status within international law," *Kashef*, 925 F.3d at 61, and these norms "prevail over and invalidate . . . rules of international law in conflict with them." *Siderman de Black*, 965 F.2d 699 at 715-716.  It follows that, to the extent claims of claims of immunity from suit derives from international law, the *jus cogens* status of a norm should, and indeed must, supersede any claim to sovereign immunity derived from common law. *Id*. at 718; *see also Al Shimari*, 368 F. Supp. 3d at 963 (observing that prohibition on *jus cogens* violations "necessarily" imposes a rule requiring effective means to redress that violation," lest the "prohibitory norm itself would be toothless" and holding that *jus cogens* "prevail over and invalidate" an assertion of sovereign immunity").  Put another way, "as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign." *Yousuf v. Samantar*, 699 F.3d 763,776 (4th Cir. 2012); *Siderman de Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates *jus cogens* as a sovereign act"); *Paul v. Avril*, 812 F. Supp. 207, 212 (S.D. Fla. 1993). *See also Regina v. Bow Street Metro. Stipendiary Magistrate, Ex parte Pinochet* (No. 3), [1999] 2 All E.R. 97, 179

44

[2000] 1 A.C. 147 (H.L.), Opinion of Lord Millett ("International law cannot be supposed to have established a crime having the character of a *jus cogens* and at the same time to have provided an *immunity* which is coextensive with the obligation it seeks to impose.")[16]

The Second Circuit has not expressly held that the federal government does not enjoy sovereign immunity for *jus cogens* violations, but it has in no way disavowed this fundamental principle.  In the context of *foreign* sovereign immunity—which unlike the common law immunity here, is statutorily mandated by FSIA—the Second Circuit has recognized that "the contention that a foreign state ***should*** be deemed to have forfeited its sovereign immunity whenever it engages in conduct that violates fundamental humanitarian standards is an appealing one." *f v. Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242 (2d Cir. 1996) (emphasis added).  The court nevertheless could not take this otherwise logically appealing course because it did not fall within the narrow, express category of permissible waivers set forth under domestic law by the FSIA statute conferring immunity from suit in U.S. courts to foreign states.  *Id*. at 243.

The Second Circuit's decision in *Matar v. Dichter*, 563 F.3d 9 (2009), presents no bar to denying federal sovereign immunity here.  *Dichter* held that common-law foreign official immunity can survive claims of *jus cogens* violations, *id.*, at 13, 15 (deferring to concerns raised

---

[16]    *See also Al Shimari*, 368 F. Supp. 3d at 966 (when a state agent commits a *jus cogens* violation, "they are not acting as a state must, and the violative acts do not have the sovereign character necessary to confer immunity."); *Princz*, 26 F.3d at 1182 (Wald, J., dissenting) (observing that because *jus cogens* norms are by definition non-derogable, they "limit[] state sovereignty in the sense that the general will of the international community of states, and other actors, will take precedence over the individual wills of states to order their relations."); Adam Belsky, *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law,* 77 Cal.L.Rev. 365, 401 (1989) ("Because a state act in violation of a rule of *jus cogens* is not recognized as a sovereign act, the violating state has no legal right to claim immunity.")

45

by the Executive Branch and attendant foreign policy considerations), creating a split with the Fourth Circuit's subsequent, thorough analysis in *Yousef*, *see* 699 F.3d at 777 ("officials from other countries are not entitled to foreign sovereign for *jus cogens* violations").  Yet, critically, the claim of foreign official immunity at issue in both cases is fundamentally distinguishable from – and stronger than – a claim of domestic sovereign immunity, as a matter of positive law and policy.  First, unlike the peculiar and archaic rationale for *domestic* federal sovereign immunity, *see supra* n. 13, the principle of a *foreign* sovereign's immunity from suit is deeply established in customary international law.  *See The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812).  And this grounded customary international principle that a sovereign should not face the indignity of suit in a *foreign* court is itself braided with respect for principles of comity.  *See Guaranty Trust Co. v. United States*, 304 U.S. 126, 134-35 (1938) ("[U]pon the principle of comity foreign sovereigns and their public property are held not to be amenable to suit in our courts without their consent.").

That driving concern for comity and the impact on foreign relations for passing judgment on a foreign sovereign is wholly absent here.  As Judge Posner explained in distinguishing Eleventh Amendment and foreign sovereign immunity on the one hand, from federal sovereign immunity on the other (for purposes of evaluating whether the respective immunities were subject to immediate appeal under the collateral order doctrine): unlike "a governmental body's right to avoid litigation in another sovereign's courts," inherent in foreign sovereign and 11th Amendment immunity, the United States "is no stranger to litigation in its own courts," and the "United States Code is riddled with statutes authorizing relief against the United States and its agencies."  *Pullman Constr. Indus. v. United States*, 23 F.3d 1166, 1168 (7th Cir. 1994).

Adding to the distinction between foreign and federal sovereign immunity, *Dichter* rested its decision on the grounds that the United States "filed a Statement of Interest in the district court specifically recognizing Dichter's entitlement to immunity," which followed an assertion of immunity over the alleged conduct by Israel's Ambassador to the United State, and urged dismissal.  563 F.3d at 11, 15.  Despite the current Executive's interest in self-dealing, there is no lawful mechanism for a sovereign to recommend its own immunity. Moreover, ensuring a remedy for such *jus cogens* violations is necessary to effectuate Congress' intent undergirding the ATS itself: "to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1406 (2018).  The U.S. is bound ***and has bound itself***, under international law, to provide a remedy for grave human rights violations, lest it abandon its place in the community of nations.  *See* Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, art. 2(1), Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"), art. 14(1) ("Each State Party shall ensure in its legal system that the victim...obtains redress and has an enforceable right to fair and adequate compensation").[17]

---

[17]	In reporting to the various bodies of the United Nations charged with overseeing States parties' compliance with their treaty obligations, the United States has consistently cited the Alien Tort Statute as one mechanism by which it upholds its obligations to punish these acts and provide a remedy for these offenses. *See, e.g.*, U.S. Dep't of State, United States Report to the Committee Against Torture, ¶¶ 51, 61-63, 277-280 (reporting on "measures giving effect to its undertakings under [CAT]", cites ATS cases for torture that occurred in territory of foreign sovereigns), U.N. Doc. CAT/C/28/Add.5 (Feb. 9, 2000), available at http://www.state.gov/documents/organization/100296.pdf. See also U.N. Human Rights Committee, 4th Periodic report of the United States, ¶ 185, U.N. Doc. CCPR/C/USA/4 (May 22, 2012).

The egregious family separation policy shocked the world for its cruelty and terrifying

historical analogs.  Judicial remediation via the ATS is necessary to promote the values driving

the creation of the ATS and the U.S. membership in a global community.

### B.  The United States Has Impliedly Waived Sovereign Immunity For *Jus Cogens Violations.*

Even if the United States retained sovereign immunity in domestic courts for jus cogens,

a related reason that the United States does not enjoy sovereign immunity in this case is that it

has impliedly waived it for *jus cogens* violations.  To determine whether there has been an

implied waiver of a foreign sovereign's immunity under the relevant provision of the FSIA, the

Second Circuit asks whether "the law deems an actor to have surrendered a protection, regardless

of the actor's . . . intent."  *Smith*, 101 F.3d at 243.[18]

As the Court in *Al Shimari* explained, the entire architecture of international law, which

situates *jus cogens* norms at the top of the rights hierarchy and which depends on state

enforcement of universal norms, necessitates a finding that the United States has "surrendered"

any protection for its commission of *jus cogens* violations.  368 F. Supp. 3d at 959 ("by joining

the community of nations and accepting the law of nations, the federal government has impliedly

waived any right to claim sovereign immunity with respect to *jus cogens* violations when sued

for such violations in an American court.").

The law mandates a waiver of domestic sovereign immunity for several, summarized

reasons: (1) binding international law not only proscribes *jus cogens* violations, but requires a

---

[18]     Again, because the ATS does not create a specific federal statutory duty, it is not
appropriate to ask if there has been a clear and express statutory waiver of the federal
government's implied sovereign immunity.  As described, the ATS is not a source of
congressional mandated duties; it is a jurisdictional statute that looks to customary international
law, incorporated into federal common law for the relevant claims and defenses. Therefore, in
this context, examining whether at common law there is an implied waiver is appropriate.

remedy for such violations *Al Shimari*, 368 F. Supp. 3d at 958 (*jus cogens* norms "confer an unquestionable right on each individual to be free from states violating those norms"); (2) the United States ascrib[ed] to multinational agreements such as the Convention Against Torture, "and assur[ed] the Committee Against Torture that an adequate civil remedy exists" for *jus cogens* violations, *id*. at 960-61; (3) the United States "participated in the Nuremberg trials and the parallel development of peremptory norms of international law and . . . continu[ed] to recognize the existence of such peremptory norms," *id*. at 962-964; (4) the United States "h[eld] itself out as a member of the international community because the respect and enforcement of jus cogens norms are fundamental to . . . an international legal order," *id*. at 964-965; and (5) the federal government is limited by delegation of power by the "People as sovereign," who in turn "may not legitimately delegate to the government the power to engage in *jus cogens* violations." *Id*. at 968.

This case presents a quintessential example that the King can and *does* do wrong. Because the United States is not a kingdom, but a republic—and one that has joined a covenant among nations that have pledged to eradicate and remediate grave human rights violations—the Government cannot claim immunity from Plaintiffs' claims of torture and crimes against humanity. This Court is the forum to hear and adjudge the Government's grievous conduct.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Government's motion to dismiss in its entirety.

Respectfully submitted,

Dated: December 8, 2020

/s/ Kathryn Ball

Kathryn Ball
**MORGAN, LEWIS & BOCKIUS, LLP**
101 Park Avenue
New York, NY 10178-0060
+1.212.309.6000
+1.212.309.6001
kathryn.ball@morganlewis.com

Lily G. Becker (*Pro Hac Vice*)
**MORGAN, LEWIS & BOCKIUS, LLP**
1701 Market Street
Philadelphia, PA 19103
+1.215.963.5000
+1.215.963.5001
lily.becker@morganlewis.com

Baher Azmy
Ghita Schwarz
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
+1.212.614.6464
+1.212.614.6499
bazmy@ccrjustice.org
gschwarz@ccrjustice.org

*Attorneys for Plaintiffs D.J.C.V., minor child, and G. C.*