UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                :

D.J.C.V., minor child, and G.C., his Father,    :     Case No. 1:20-cv-5747-PAE
                                :
          Plaintiffs,         :
                                :     Hon. Paul A. Engelmayer
          v.                  :
                                :

UNITED STATES OF AMERICA,         :
                                :
          Defendant.        :
---------------------------------------------------------------x

---

**BRIEF OF DOCTORS BETH VAN SCHAACK (J.D., PH.D.), DARYN REICHERTER (M.D.), AND RYAN MATLOW (PH.D.) AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

---

Brian J. Fischer
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-39008
(212) 891-1600 (phone)
(212) 891-1699 (fax)

Corinne M. Smith (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000 (phone)
(202) 639-6066 (fax)

Debbie L. Berman (*pro hac vice*)
Andrew W. Vail (*pro hac vice*)
Brandon J. Polcik (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350 (phone)
(312) 527-0484 (fax)

*Counsel for* Amici Curiae

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF *AMICI CURIAE* ..................................................................................1

ARGUMENT ...................................................................................................................2

I.      FREEDOM FROM TORTURE IS A FUNDAMENTAL HUMAN RIGHT PROTECTED AS A *JUS COGENS* NORM OF INTERNATIONAL LAW....................2

II.     THE FORCED SEPARATION OF ASYLUM-SEEKING PARENTS FROM THEIR CHILDREN, FOR THE PRIMARY PURPOSE OF DETERRING IMMIGRATION CONSTITUTES TORTURE IN VIOLATION OF INTERNATIONAL LAW. ...............................................................................................4

       A.     Separation Inflicts Severe Pain And Suffering In The Separated Children.............5

       B.     Separation Inflicts Severe Pain And Suffering In The Separated Parents. ...........12

       C.     Federal Courts Recognize That Family Separation Causes Severe Mental And Physical Harm To Both Child And Parent.......................................................14

       D.     The Government Has Intentionally Separated Families For Impermissible Purposes. ...............................................................................................................16

       E.     Torture Must Be Assessed Based On Cumulative Effect. ....................................24

CONCLUSION...............................................................................................................24

# TABLE OF AUTHORITIES

**CASES**

*Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) ...................................................24

*Al-Saher v. INS*, 268 F.3d 1143 (9th Cir. 2001) ..........................................................24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................5

*Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980) ..................................................4

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) ...................................................2, 4

*Kadić v. Karadžić*, 70 F.3d 232 (2d Cir. 1995)............................................................4

*Leatherman v. Tarrant County Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993)...................................................................................................................5

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ..................................................15

*M.G.U. v. Nielsen*, 325 F. Supp. 3d 111 (D.D.C. 2018) .............................................15

*Ms. L. v. U.S. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018)............................14, 15, 16

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331 (S.D.N.Y. 2005)....................................................................................................4

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)............................................................4

*United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010) ............................................3, 4

*Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377 (S.D.N.Y. 2009) ...............4

**STATUTES**

18 U.S.C. § 2340...........................................................................................................3, 4

18 U.S.C. § 2340A..............................................................................................................3

28 U.S.C. § 1350........................................................................................................1, 3, 4

28 U.S.C. § 1350, note....................................................................................................3, 4

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) .......3

**LEGISLATIVE MATERIALS**

Senate Treaty Doc. No. 100-20 (Oct. 27, 1990) (Resolution of Advice and Consent to Ratification of the Convention against Torture) .................................................3

Maj. Staff of H. Comm. On the Judiciary, 116th Cong., *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos* (Oct. 2020), https://judiciary.house.gov/uploadedfiles/the_trump_administra tion_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_cam paign=4526-519 .................................................................................................23

OTHER AUTHORITIES

*Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, U.S. Dep't of Justice (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-deliv ers-remarks-discussing-immigration-enforcement-actions...................................17, 18, 19, 20

Jonathan Blitzer, *The Activist Effort to Find the Children the Government Took From Their Parents*, New Yorker (July 13, 2018), https://www.newyorker. com/news/news-desk/the-activist-effort-to-find-the-children-that-the-govern ment-took-from-their-parents ................................................................................12

Jonathan Blitzer, *A New Report on Family Separations Shows the Depths of Trump's Negligence*, New Yorker (Dec. 6, 2019), https://www.newyorker.com/ news/news-desk/a-new-report-on-family-separations-shows-the-depths-of-tru mps-negligence ......................................................................................................12

Pauline E. Boss, *Family stress management: A contextual approach* (2d ed. 2002) ...................13

John Bowlby, *Attachment and Loss: Retrospect and Prospect*, 52 Am. J. Orthopsychiatry 664 (1982)................................................................................7, 13

John Bowlby, *The Influence of Early Environment in the Development of Neurosis and Neurotic Character*, 21 Int'l J. Psycho-Analysis 1-25 (1940)..........................13

John Bowlby, *Maternal Care and Mental Health: A Report Prepared on Behalf of the World Health Organization as a Contribution to the United Nations Programme for the Welfare of Homeless Children* (2d ed. 1952).......................7, 12

Kalina Brabeck & Qingwen Xu, *The Impact of Detention and Deportation on Latino Immigrant Children and Families*, 32 Hispanic J. Behav. Sci. 341 (2010)........................................................................................................................9

Kalina M. Brabeck et al., *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. Orthopsychiatry 496, 500 (2014)........................................................................................................................6

John Briere & Catherine Scott, *Complex Trauma in Adolescents and Adults*, 38 Psychiatric Clinics of N. Am. 515 (2015)..........................................................7, 13

Chevelle Brudey et al., *Autonomic and Inflammatory Consequences of Posttraumatic Stress Disorder and the Link to Cardiovascular Disease*, 309 Am. J. Physiology Regul., Integrative & Comparative Physiology R315 (2015) ................................................................................................................14

Marylene Cloitre et al., *A Developmental Approach to Complex PTSD*, 22 J. Traumatic Stress 399 (2009). ..............................................................................9, 14

Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Dec. 10, 1984) ...............................................................2, 3, 4, 16, 17

Convention on the Rights of the Child (Sept. 2, 1990) ...............................................10

Cordula Droege, *In Truth the Leitmotiv: The Prohibition of Torture and Other Forms of Ill-Treatment in International Humanitarian Law*, 867 Int'l Rev. of the Red Cross 515 (2007 ..............................................................................................24

Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 20, 2018) ...................................17

*Fact Sheet: Zero Tolerance Immigration Prosecutions – Families*, U.S. Dep't of Homeland Security (last updated June 15, 2018), https://www.dhs.gov/news/ 2018/06/15/fact-sheet-zero-tolerance-immigration-prosecutions-families ............21

*Fact Sheet: Zero Tolerance Prosecution and Family Reunification*, Dep't of Homeland Security (last updated Nov. 19, 2020), https://www.dhs.gov/news/ 2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification ........21

Julian D. Ford et al., *Etiology of PTSD, in Posstraumatic Stress Disorder: Scientific and Professional Dimensions* 81-132 (2d ed. 2015) .................................................9

Julian D. Ford et al., *Toward an Empirically-Based Developmental Trauma Disorder Diagnosis for Children: Factor Structure, Item Characteristics, Reliability, and Validity of the Developmental Trauma Disorder Semi-Structured Interview*, 79 J. Clin. Psychiatry (2018) ...................................................8

*Full Text: Donald Trump Announces a Presidential Bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/ full-text-donald-trump-announces-a-presidential-bid/?arc404=true ......................20

Godfrey F. Glasgow & Janice Gouse-Sheese, *Theme of Rejection and Abandonment in Group Work with Caribbean Adolescents*, 17 Soc. Work with Grps. 3 (1995) ...........................................................................................................13

C. Heim & C.B. Nemeroff, *The Role of Childhood Trauma in the Neurobiology of Mood and Anxiety Disorders: Preclinical and Clinical Studies*, 49 Biol. Psych. 1023 (2001) .............................................................................................................6

International Covenant on Civil and Political Rights (Dec. 16, 1996) ...........................2

*Kirstjen Nielsen Addresses Family Separation at Border: Full Transcript*, N.Y. Times (June 18, 2018), https://www.nytimes.com/2018/06/18/us/politics/dhs-kirstjen-nielsen-families-separated-border-transcript.html ................................21

Tal Kopan, *DHS: 2,000 Children Separated from Parents at Border*, CNN (June 16, 2018, 2:44 AM), https://www.cnn.com/2018/06/15/politics/dhs-family-separation-numbers/index.html ................................................................23

Heidemarie K. Laurent et al., *Child Anxiety Symptoms Related to Longitudinal Cortisol Trajectories and Acute Stress Responses: Evidence of Developmental Stress Sensitization*, 124 J. Abnorm. Psychol. 68 (2015) ...........................8

Letter from Am. Immigration Counsel & Am. Immigration Lawyers Ass'n to Cameron Quinn, Officer of Civil Rights and Civil Liberties, Dep't of Homeland Security, and John V. Kelly, Acting Inspector General, Dep't of Homeland Security (Aug. 23, 2018), https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/the_use_of_coercion_by_u.s._department_of_homeland_security_officials_against_parents_who_were_forcibly_separated_from_their_children_public_fin_0.pdf ..................................22

Letter from U.S. Commission on Civil Rights to Jeff Sessions and Kirstjen Nielsen (June 15, 2018), https://www.usccr.gov/press/2018/06-15-18-letter.pdf .........................21, 22

Julie M. Linton et al., *Detention of Immigrant Children*, 139 Pediatrics e20170483 (2017) .........................................................................................9

Colleen Long & Ricardo Alonso-Zaldivar, *Watchdog: Thousands More Children May Have Been Separated*, Associated Press (Jan. 18, 2019), https://apnews.com/article/c648954057594364b01a38b8d16701ac ...............................12

Roy Lubit, et al., *Impact of Trauma on Children*, 9 J. Psychiatr. Prac. 128 (Mar. 2003) .........................................................................................7

Ryan Matlow & Daryn Reicherter, *Reducing Protections for Noncitizen Children— Exacerbating Harm and Trauma*, New England J. Med. (Nov. 21, 2018)............................11

Maite P. Mena et al., *Extended Parent-child Separations: Impact on Adolescent Functioning and Possible Gender Differences*, 13 J. Specialists in Pediatric Nursing 50 (2008) ...........................................................................13

Nat'l Sci. Council on the Developing Child, *Excessive Stress Disrupts the Architecture of the Developing Brain* (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 3, Jan. 2014)..................................................5

Nat'l Sci. Council on the Developing Child, *The Science of Neglect: The Persistent Absence of Responsive Care Disrupts the Developing Brain* (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 12, Dec. 2012) ...............................6

Charles Oberg et al., *Treatment of Migrant Children on the US Southern Border is Torture*, Pediatrics (Oct. 27, 2020), https://pediatrics.aappublications.org/content/pediatrics/early/2020/10/23/peds.2020-012930.full.pdf ..............................................12

*Remarks by President Trump Before Marine One Departure*, White House (Oct. 13, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-16/ ..................................................................................19

Report of the Special Rapporteur on the Question of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ¶ 3, 8, U.N. Doc. A/56/156 (July 3, 2001) ............................................................................................................5, 24

*Restatement of Foreign Relations* § 702 (1987) ...........................................................2

Sara Robinson, *Submission to the United Nations Special Rapporteur on the Human Rights of Migrants: U.S. Immigration Detention of Children and Their Families in the Time of Coronavirus and Family Separation, Global Justice Clinic*, N.Y.U. School of Law (May 15, 2020), https://chrgj.org/wp-content/uploads/2020/05/Submission-to-SR-on-Migrants_NYU-Global-Justice-Clinic_May-2020_Final.pdf ...............................................................................19, 20

Jay Root & Shannon Najmabadi, *Kids in Exchange for Deportation: Detained Migrants Say They Were Told They Could Get Kids Back on Way Out of U.S.*, Tex. Trib. (June 24, 2018, 10:00 AM), https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/ .............................................................................................................................22

Dana Rusch & Karina Reyes, *Examining the Effects of Mexican Serial Migration and Family Separations on Acculturative Stress, Depression, and Family Functioning* 35 Hispanic J. Behav. Sci. 139 (2013) ..............................................9

Mary D. Salter Ainsworth et al., *Patterns of Attachment: A Psychological Study of the Strange Situation* (1978) ...............................................................................7

*Sessions Admits Policy Is a Deterrent*, CNN (June 19, 2018), https://edition.cnn.com/videos/politics/2018/06/19/sessions-defends-controversial-immigration-policy-deterrent-sot.cnn/video/playlists/top-news-videos/ .....................................19

Michael D. Shear et al., *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. Times (Oct. 6, 2020, updated Oct. 21, 2020), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html .........................................................18

Joseph Spinazzola et al., *When Nowhere is Safe: Interpersonal Trauma and Attachment Adversity as Antecedents of Posttraumatic Stress Disorder and Developmental Trauma Disorder*, 31 J. Trauma Stress 631 (2018) ..........................................8

Stanford Hum. Rights in Trauma Mental Health Prog., *Ending Immigration Detention of Children & Ensuring Adequate Reception & Care for Them: Submission to the United Nations' Special Rapporteur Mr. Felipe Gonzalez Morales* (Apr. 2020) .......................................................................................8

Stanford Medicine, *Statement on the Impact of Parent-Child Separation on Parents' Ability to Effectively Participate in Asylum Proceedings*, Just Security, https://www.justsecurity.org/wp-content/uploads/2018/10/separation-impact-on-parents_statement-final-version.pdf ...............................................7, 10, 12, 13

Carola Suárez-Orozco et al., *I Felt Like My Heart Was Staying Behind*, 26 J. Adolescent Rsch. 222 (2011).........................................................................9, 10, 13

Hiroshi Takeuchi et al., *Childhood Parental Separation Experiences and Depressive Symptomatology in Acute Major Depression*, 57 Psychiatry & Clinical Neurosciences 215 (Apr. 2003)...................................................................8

*Transcript: Homeland Security Secretary Kirstjen Nielsen's Full Interview with NPR*, NPR (May 10, 2018), https://www.npr.org/2018/05/10/610113364/transcript-homeland-security-secretary-kirstjen-nielsens-full-interview-with-npr ........................19

*Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2020, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr...............................................17, 20

U.S. Gov't Accountability Office, GAO-20-245, *Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS* (Feb. 2020), https://www.gao.gov/assets/710/704683.pdf............................20

Yvonne M. Ulrich-Lai & James P. Herman, *Neural Regulation of Endocrine and Autonomic Stress Responses*, 10 Nature Rev. Neuroscience 397 (2009) ...............................10

Universal Declaration of Human Rights (Dec. 10, 1948).................................................2

*USA: "You Don't Have Any Rights Here"*, Amnesty Int'l, 4 (2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF...........................21, 22

*User Clip: Separation of Families*, CSPAN (Jan. 18, 2018), https://www.c-span.org/video/?c4709347/user-clip-separation-families ........................................................17, 19

Bessel A. van der Kolk, *Developmental Trauma Disorder: Toward a Rational Diagnosis for Children with Complex Trauma Histories*, 35 Psychiatr. Ann. 401 (2005).........................................................................................................................8

Beth Van Schaack, *New Proof Surfaces that Family Separation was About Deterrence and Punishment*, Just Security (Nov. 27, 2018), https://www.justsecurity.org/61621/proof-surfaces-family-separation-deterrence-punishment/.........................5

Beth Van Schaack, *The Torture of Forcibly Separating Children from their Parents*, Just Security (Oct. 18, 2018), https://www.justsecurity.org/61138/torture-forcibly-separating-children-parents/ ..............................................................5, 6

Vienna Convention on the Law of Treaties (May 23, 1969) ............................................................2

*Amici curiae* write in support of Plaintiffs' claims that the harms they endured, which were intentionally inflicted by the Trump Administration's family separation policy, constitute "severe physical pain or suffering," so as to meet the definition of torture under United States and international law. Specifically, *amici curiae* write to: (1) demonstrate that the United States is bound by prohibitions against torture, which constitutes a *jus cogens* norm of international law, and are thus cognizable under the Alien Tort Statute (28 U.S.C. § 1350) (*see infra* pp. 2-4); (2) detail the scientifically proven intense physical and mental anguish forced family separation causes—anguish that the Plaintiffs, a toddler and his father, have undoubtedly suffered (*see infra* pp. 4-16); and (3) show that, at the highest levels of government, the very intention of the family separation policy was to inflict such pain, as Plaintiffs experienced first-hand during the months they were kept from one another, satisfying the intent requirement of the relevant anti-torture law (*see infra* pp. 16-24).

## INTEREST OF *AMICI CURIAE*

As detailed in the Motion for Leave to File Brief as *Amici Curiae* in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss, *amici curiae* are professors and doctors with expertise in international human rights and the science of the physical and psychological changes and mental health pathology caused by trauma. *Amici curiae* have extensive experience researching and working to prevent and redress violations of international human rights law, including in the immigration and asylum context. Since the inception of the Trump Administration's family separation policy, *amici curiae* have gained important experience evaluating the mental and physical suffering endured by separated families. *Amici curiae*, therefore, have a significant interest in Plaintiffs' allegations that the separation of D.J.C.V. from G.C., his asylum-seeking parent, constituted torture in violation of international human rights law.

## ARGUMENT

**I.      FREEDOM FROM TORTURE IS A FUNDAMENTAL HUMAN RIGHT PROTECTED AS A *JUS COGENS* NORM OF INTERNATIONAL LAW.**

The right to be free from torture is a fundamental human right protected as a *jus cogens* norm of international law. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401 (2018) (Kennedy, J., plurality) ("International human-rights norms prohibit acts repugnant to all civilized peoples— crimes like genocide, torture, and slavery . . . ."); *Restatement (Third) of Foreign Relations* § 702 cmt. n (1987) (describing the prohibition against torture as a fundamental human right and *jus cogens* norm of international law); Vienna Convention on the Law of Treaties art. 53 (May 23, 1969) (stating that treaties may not conflict with *jus cogens* norms); Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. I (Dec. 10, 1984); International Covenant on Civil and Political Rights, art. 7 (Dec. 16, 1996); *see also* Universal Declaration of Human Rights, art. 5 (Dec. 10, 1948).

The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"), to which the United States is bound after having ratified and implemented it as domestic law, prohibits torture under all circumstances. Under Article 1(1) of the CAT, "torture" is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

CAT art. I (Dec. 10, 1984). The CAT further requires the United States to enact "effective legislation, administrative, judicial or other measures to prevent acts of torture in any territory

under its jurisdiction" and provide remedies when torture occurs. CAT arts. II, IV (Dec. 10, 1984).

The United States ratified the CAT in 1994 subject to certain declarations, reservations, and understandings. *See* Senate Treaty Doc. No. 100-20 (Oct. 27, 1990) (Resolution of Advice and Consent to Ratification of the Convention against Torture). These obligations and alterations to the terms of the CAT are codified as a Note to 28 U.S.C. § 1350, which sets forth the text of the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), and at 18 U.S.C. § 2340, which criminalizes torture—both of which include definitions of torture that are very similar to the CAT.[1] Indeed, the Eleventh Circuit has concluded that "the Torture Act [18 U.S.C. § 2340-2340A] tracks the provisions of the CAT in all material respects," and is "arguably more expansive" than the definition in the CAT, making it "that much more faithful to the CAT's purpose of enhancing global efforts to combat torture." *United States v. Belfast*, 611 F.3d 783, 806, 808-09 (11th Cir. 2010).

Federal courts repeatedly have recognized that the prohibition against torture finds

---

[1] *See also* 18 U.S.C. § 2340A(b) (providing for federal jurisdiction over torture committed by a U.S. national or by an offender present in the United States); 28 U.S.C. § 1350 (providing for federal jurisdiction over any civil action brought by an alien for a tort committed in violation of a treaty of the United States).

The Note to 28 U.S.C. § 1350's definition of torture mirrors the CAT's definition (severe pain or suffering; intentionally inflicted; for purposes of obtaining a confession, intimidating or coercing, or discriminating; except for pain and suffering arising only from lawful sanctions), except it replaces the CAT's "consent or acquiescence of a public official or other person acting in an official capacity" with a requirement that the act inflicting severe pain and suffering be "directed against an individual in the offender's custody or physical control." 28 U.S.C. § 1350, note, sec. 3(b)(1).

The definition of torture in 18 U.S.C. § 2340 requires both that the act at issue be committed by a person "acting under the color of law" as well as that it be inflicted "upon another person within [that person's] custody or physical control." 18 U.S.C. § 2340(1). Its language also differs slightly from the CAT's definition—for example, by requiring the "specific[]" intent to inflict severe physical or mental pain or suffering, and by not including a list of "purposes." *Id.* But, as noted above, the Eleventh Circuit has rejected a challenge to § 2340 on the ground that its torture definition differed from that of the CAT. *See United States v. Belfast*, 611 F.3d 783, 806-09 (11th Cir. 2010).

expression in binding customary international law because it is a norm that is "specific, universal, and obligatory." *See, e.g.*, *Jesner*, 138 S. Ct. at 1401 (explaining that "international human-rights norms" actionable under the Alien Tort Statute include "crimes like genocide, torture, and slavery . . . ."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 762 (2004) (Breyer, J., concurring) (stating that "universally condemned behavior" includes "torture"); *Filártiga v. Peña-Irala*, 630 F.2d 876, 880, 890 (2d Cir. 1980) (same); *Kadić v. Karadžić*, 70 F.3d 232, 243 (2d Cir. 1995) (same); *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 385 (S.D.N.Y. 2009) (same); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 333 n.2 (S.D.N.Y. 2005) (same). Like this case, many of these cases have proceeded under the Alien Tort Statute, 28 U.S.C. § 1350, which grants federal jurisdiction over torts committed in violation of the law of nations upon a showing that the prohibition is well established in international law. *See Sosa*, 542 U.S. at 729-34.

II.     **THE FORCED SEPARATION OF ASYLUM-SEEKING PARENTS FROM THEIR CHILDREN, FOR THE PRIMARY PURPOSE OF DETERRING IMMIGRATION CONSTITUTES TORTURE IN VIOLATION OF INTERNATIONAL LAW.**

There are four elements to proving torture under CAT: (1) severe pain or suffering (2) intentionally inflicted (3) for one of the enumerated impermissible purposes (4) by someone acting on behalf of a state. *See* CAT art. I (Dec. 10, 1984). These four elements also establish unlawful torture pursuant to the United States's ratification and codification of CAT. *See* 28 U.S.C. § 1350, note (containing the Torture Victim Protect Act, Pub. L. No. 102-256, 106 Stat. 73 (1992)); 18 U.S.C. § 2340; *Belfast*, 611 F.3d at 809. The U.S. government's intentional separation of families

seeking asylum readily meets all elements of this definition.[2]

### A. Separation Inflicts Severe Pain And Suffering In The Separated Children.

Family separation causes severe pain and suffering in children separated from their parents in the form of immediate and enduring mental and physical harm. What amount of pain and suffering constitutes torture is subjective and depends on the victim's age, other physical and mental attributes, the duration of the suffering, and individual effects of the mistreatment.[3] Harm from separation is particularly but unsurprisingly pronounced in early childhood development and may adversely affect a child's psychological health and neurological functioning in both the short- and long-term.[4] Here, D.J.C.V. was 19-months-old when he was forcibly seized and separated from his father for five and a half months. Compl. ¶ 8.[5] D.J.C.V.'s young age at the time of his separation is a crucial component in determining the severity of his suffering, as studies have

---

[2] Beth Van Schaack, *The Torture of Forcibly Separating Children from their Parents*, Just Security (Oct. 18, 2018), https://www.justsecurity.org/61138/torture-forcibly-separating-children-parents/ [hereinafter Schaack, *Torture*]; Beth Van Schaack, *New Proof Surfaces that Family Separation was About Deterrence and Punishment*, Just Security (Nov. 27, 2018), https://www.justsecurity.org/61621/proof-surfaces-family-separation-deterrence-punishment/.

[3] *See* Report of the Special Rapporteur on the Question of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ¶ 14 n.12, U.N. Doc. A/56/156 (July 3, 2001) [hereinafter Report of the Special Rapporteur]; *see also id.* ¶ 6 (stating severe pain or suffering can stem from acts such as intimidation and other threats, especially when the victim is "in the hands of law enforcement officials").

[4] "Studies indicate that toxic stress can have an adverse impact on brain architecture. In the extreme, such as in cases of severe, chronic abuse, especially during early, sensitive periods of brain development, the regions of the brain involved in fear, anxiety, and impulsive responses may overproduce neural connections while those regions dedicated to reasoning, planning, and behavioral control may produce fewer neural connections." Nat'l Sci. Council on the Developing Child, *Excessive Stress Disrupts the Architecture of the Developing Brain* 2 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 3, Jan. 2014).

[5] This brief assumes the accuracy of the facts alleged, as it is submitted in conjunction with motion to dismiss briefing, in which the facts alleged are treated by the Court as accurate. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

shown that "the psychiatric and neurological effects of being detached from their parents appear to be the most pronounced in children who are separated after infancy and before the age of five," and can include actual "physical[] change" to "children's brains."[6]

Early childhood trauma has been shown to have negative impacts on the psychological health and neurological functioning of a developing child.[7] Studies have shown that children experiencing stress rely on their supportive relationships with adults in order to develop healthy response systems.[8] Interruption of these relationships can result in "toxic stress," the experience of which leads to damaged bodily systems and brain architecture, which may have lifelong repercussions.[9] Disruption of a young child's relationship with a parent can cause more harm to the child's development than overt physical abuse, "including subsequent cognitive delays, impairments in executive functioning, and disruptions of the body's stress response."[10] Psychiatric studies have shown that the "detrimental effects of forced and unexpected parent-child separation" occur "even when children are well cared for in a safe environment."[11] This means that a child suffers harm from the trauma of separation from their parent even if placed in an adequate foster care environment during the period of family separation.

---

[6] Schaack, *Torture*, *supra* note 2.

[7] *See* C. Heim & C.B. Nemeroff, *The Role of Childhood Trauma in the Neurobiology of Mood and Anxiety Disorders: Preclinical and Clinical Studies*, 49 Biol. Psych. 1023 (2001).

[8] *See id.*

[9] *Id.* at 1.

[10] Disruption of parent-child relationships falls under the definition of "severe neglect," which researchers also refer to as "deprivation." Broadly, the definition of such deprivation is "the ongoing disruption or significant absence of caregiver responsiveness." *See* Nat'l Sci. Council on the Developing Child, *The Science of Neglect: The Persistent Absence of Responsive Care Disrupts the Developing Brain* 2 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 12, Dec. 2012).

[11] Kalina M. Brabeck et al., *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. Orthopsychiatry 496, 500 (2014) (citing Anna Freud & Dorothy T. Burlingham, *War and Children* (1943)).

Further, parent-child separation disrupts the critical milestone for child development known as "attachment."[12] Attachment ensures the psychological and physical well-being of the attached child and, as discussed in the next section, the parent/caregiver.[13] A secure attachment, in which caregivers are available and receptive to their child's needs, provides safety and enables the healthy development of self-esteem, eagerness to learn, trust, and self-reliance, among other domains. Attachment is thus crucial to a child's psychological, cognitive, and neurobiological development.[14]

The developmental interruptions caused by childhood trauma are shown to increase the risk of enduring mental health difficulties, such as emotional and behavioral problems, mood disorders, anxiety disorders, learning disorders, personality disorders, and posttraumatic stress disorder ("PTSD").[15] PTSD symptoms include unwanted and involuntary thoughts and feelings that are usually disturbing in nature, avoidance of trauma reminders, negative mood and cognition, and hyperarousal.[16] Furthermore, it is widely recognized that exposure to traumatic events and threats to a loved-one's well-being results in a wide array of psychological injuries beyond PTSD, such as depression, anxiety, dissociation, mood instability, and psychosis.[17] Indeed, early

---

[12] John Bowlby, *Attachment and Loss: Retrospect and Prospect*, 52 Am. J. Orthopsychiatry 664 (1982) [hereinafter Bowlby, *Attachment and Loss*].

[13] *Id.*

[14] John Bowlby, *Maternal Care and Mental Health: A Report Prepared on Behalf of the World Health Organization as a Contribution to the United Nations Programme for the Welfare of Homeless Children* (2d ed. 1952) [hereinafter Bowlby, *Maternal Care*]; Mary D. Salter Ainsworth et al., *Patterns of Attachment: A Psychological Study of the Strange Situation* (1978).

[15] *See* Roy Lubit et al., *Impact of Trauma on Children*, 9 J. Psychiatr. Prac. 128 (Mar. 2003).

[16] Stanford Medicine, *Statement on the Impact of Parent-Child Separation on Parents' Ability to Effectively Participate in Asylum Proceedings*, Just Security, https://www.justsecurity.org/wp-content/uploads/2018/10/separation-impact-on-parents_statement-final-version.pdf (signed by *amici* Professors Matlow and Reicherter).

[17] John Briere & Catherine Scott, *Complex Trauma in Adolescents and Adults*, 38 Psychiatric Clinics of N. Am. 515 (2015).

separation from parents is associated with a spectrum of psychiatric and physiological symptoms that can persist into adulthood.[18] The combination of threat, danger, and/or trauma in childhood within the context of disrupted attachment—known as developmental trauma—has been associated with particular long-term negative outcomes that are more pervasive than specific mood, anxiety, or posttraumatic stress disorders, including broad deficits and difficulties in emotion and somatic regulation, attention and behavioral regulation, identity development, and interpersonal functioning.[19] Scientific literature confirms that outcomes specific to family separation include the above-mentioned psychiatric disorders, as well as chronic diseases such as obesity, type II diabetes, and cardiovascular disease, all of which contribute to a reduced life expectancy.[20] Disruption of childhood development due to early experiences of toxic stress can lead to long-term impairment of the central nervous system's ability to respond and recover from stress.[21]

---

[18] Hiroshi Takeuchi et al., *Childhood Parental Separation Experiences and Depressive Symptomatology in Acute Major Depression*, 57 Psychiatry & Clinical Neurosciences 215 (Apr. 2003).

[19] Bessel A. van der Kolk, *Developmental Trauma Disorder: Toward a Rational Diagnosis for Children with Complex Trauma Histories*, 35 Psychiatr. Ann. 401 (2005); Joseph Spinazzola et al., *When Nowhere is Safe: Interpersonal Trauma and Attachment Adversity as Antecedents of Posttraumatic Stress Disorder and Developmental Trauma Disorder*, 31 J. Trauma Stress 631 (2018); Julian D. Ford et al., *Toward an Empirically-Based Developmental Trauma Disorder Diagnosis for Children: Factor Structure, Item Characteristics, Reliability, and Validity of the Developmental Trauma Disorder Semi-Structured Interview*, 79 J. Clin. Psychiatry (2018).

[20] Stanford Hum. Rights in Trauma Mental Health Prog., *Ending Immigration Detention of Children & Ensuring Adequate Reception & Care for Them: Submission to the United Nations' Special Rapporteur Mr. Felipe Gonzalez Morales* (Apr. 2020) (citing D.W. Brown et al., *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 Am. J. Prevent. Med. 389 (2009); M. Kelly-Irving et al., *Adverse Childhood Experiences and Premature All-Cause Mortality*, 28(9) Eur. J. Epidem. 721 (2013); M.H. Teicher, *Childhood Trauma and the Enduring Consequences of Forcibly Separating Children from Parents at the United States Border*, 16 BMC Med. (2018)).

[21] Heidemarie K. Laurent et al., *Child Anxiety Symptoms Related to Longitudinal Cortisol Trajectories and Acute Stress Responses: Evidence of Developmental Stress Sensitization*, 124 J. Abnorm. Psychol. 68 (2015).

Additionally, the forced separation of families can significantly exacerbate the injuries of traumatic stress and PTSD in children. Without having any expectation or knowledge of their parents' well-being or plans for reunification, children's distress will be continually heightened. Extended duration of trauma or related threats are known to increase the frequency and severity of trauma-related psychological injuries.[22] Traumatic stress is cumulative, and exposure to multiple or repeated traumatic events over a person's lifespan has been shown to increase the risk, severity, and complexity of trauma-related symptoms.[23] Therefore, the trauma of forced family separation is likely to significantly worsen psychological outcomes by compounding the prior traumas experienced by children seeking refuge in the United States (commonly including abuse, discrimination, traumatic loss, and exposure to violence). The Trump Administration's family separation policy has caused thousands of children whose families fled tragedy and trauma in their home countries to experience compounded trauma. A growing body of empirical research has indeed demonstrated that parent-child separation during immigration processes (as well as corresponding parental detention and threat of deportation) is associated with increased risk, rates, and severity of mental health problems for parents and their children.[24]

Traumatic stress, such as from being forcibly separated from one's parent during immigration, has measurable effects on neurobiological and physiological functioning. When

[22] Julian D. Ford et al., *Etiology of PTSD*, in *Posstraumatic Stress Disorder: Scientific and Professional Dimensions* 81-132 (2d ed. 2015).

[23] Marylene Cloitre et al., *A Developmental Approach to Complex PTSD*, 22 J. Traumatic Stress 399 (2009).

[24] Kalina Brabeck & Qingwen Xu, *The Impact of Detention and Deportation on Latino Immigrant Children and Families*, 32 Hispanic J. Behav. Sci. 341 (2010); Julie M. Linton et al., *Detention of Immigrant Children*, 139 Pediatrics e20170483 (2017); Dana Rusch & Karina Reyes, *Examining the Effects of Mexican Serial Migration and Family Separations on Acculturative Stress, Depression, and Family Functioning* 35 Hispanic J. Behav. Sci. 139 (2013); Carola Suárez-Orozco et al., *I Felt Like My Heart Was Staying Behind*, 26 J. Adolescent Rsch. 222 (2011).

humans experience a stressor, physiological and mental resources are diverted to respond.[25] This response involves engagement of emotion processing centers of the brain, release of stress hormones, and activation of the sympathetic nervous system, resulting in a "fight, flight, or freeze" reaction. Under these circumstances, the human brain focuses on surviving the immediate threat, and other areas of the brain essentially go on lockdown until the threat is resolved.[26]

Based on voluminous research confirming acute and lasting harms resulting from the trauma of family separation, the United Nations included in its Convention on the Rights of the Child the directive that children never should be separated from their parents unless it is in the child's best interest (such as in cases of parental abuse, which is not present here). Conv. on the Rights of the Child, art. 9 (Sept. 2, 1990). The UN stresses that all decisions regarding the treatment of migrating families arriving at a state's border should prioritize the best interests of children and that separation should be considered only after an individualized assessment of the family. *Id.* It is clear that the government did not make such an assessment prior to separating D.J.C.V. from his father for almost half a year. That was nearly one quarter of his young life spent under the stress, adversity, and insecurity of separation from his primary attachment figure during a critical stage of development. Instead, while the government notes G.C.'s criminal history, that is not the government's basis for separation; rather, it claims that it lacked adequate facilities to house a father with a criminal history with his son. Defs.' Mem. Supp. Mot. Dismiss 2, ECF No. 22.

According to the Complaint, D.J.C.V. already has developed several short-term effects of his five-month separation from his father—sleeplessness, nightmares, aggression, anxiety, moodiness. Compl. ¶¶ 135-136. These symptoms, which are consistent with what we have

---

[25] Yvonne M. Ulrich-Lai & James P. Herman, *Neural Regulation of Endocrine and Autonomic Stress Responses*, 10 Nature Rev. Neuroscience 397 (2009).

[26] Stanford Medicine, *supra* note 16; Suárez-Orozco, *supra* note 24.

observed in children at other immigrant detention facilities, indicate disruptions in D.J.C.V.'s physical and psychological ability to process and respond adaptively to stress. The severity of the separation's impact on D.J.C.V. also is made clear by the fact that he did not recognize his father upon the family's reunion. Compl. ¶¶ 125-127. D.J.C.V.'s inability to recognize his father after months spent separated indicates the exact type of interference with a parent-child attachment that is associated with cognitive and physiological impairment in children.[27]

These short-term effects could well be a harbinger of long-term impacts that may follow D.J.C.V. throughout his life. D.J.C.V. is at risk of long-term psychiatric problems as he continues to grow and develop. D.J.C.V. was pre-verbal when he was taken from his father, and his traumatic separation likely has impaired his ability to fully express his thoughts and feelings since their reunification. In the context of chronic insecurity and adversity during this critical developmental stage for language, his communication and self-expression skills may be impacted, and the trauma of separation from his father likely will be encoded in non-linguistic forms (*e.g.*, affective, somatic, relational), which will make it more difficult for D.J.C.V. to verbally recall and process his experience in the future once his language skills are realized. Even though D.J.C.V. cannot verbalize his suffering, the clinician assigned to D.J.C.V. through the Office of Refugee Resettlement confirmed that D.J.C.V.'s sadness, anger, irritability, and tendency to be withdrawn likely are the result of his feeling abandoned by both his father and the numerous foster parents with whom he was placed. Compl. ¶¶ 123-125. It is apparent that D.J.C.V. endured severe suffering upon being taken from his father at the hands of the government. It will likely require substantial (*i.e.*, frequent and long-term) and specialized clinical care and multidisciplinary support

---

[27] *See supra* notes 4, 6-14; Ryan Matlow & Daryn Reicherter, *Reducing Protections for Noncitizen Children—Exacerbating Harm and Trauma*, New England J. Med. (Nov. 21, 2018).

to help D.J.C.V. heal and recover from the injuries of the traumatic separation he experienced.

D.J.C.V. is hardly a unique case. In fact, the government separated thousands of children from their asylum-seeking parents, hundreds of whom have yet to be reunited.[28] Based on our own research and the scientific consensus on the effects of trauma on childhood psychological and physical development, we conclude that the government's practice of intentionally and forcibly separating families seeking asylum inflicts severe suffering on the harmed children, meeting both international and U.S. standards of torture.[29]

### B. Separation Inflicts Severe Pain And Suffering In The Separated Parents.

Separation also inflicts severe pain and suffering in parents. Parent-child separation disrupts attachment, the scientifically-established life milestone explained above. As Professors Reicherter and Matlow detail in their research, the attachment relationship not only is important for child development, but also is critical for a parent's growth and well-being.[30] Separating a

---

[28] By June 2018, the Administration had no effective way to reunite separated families of more than 600 children, and many of these families remain separated today. *See* Jonathan Blitzer, *The Activist Effort to Find the Children the Government Took From Their Parents*, New Yorker (July 13, 2018), https://www.newyorker.com/news/news-desk/the-activist-effort-to-find-the-children-that-the-government-took-from-their-parents (explaining the role NGOs played in locating parents and children in the wake of the government's failure to properly track separated families). And, even more separations came to light as the government continued to review its tracking information, with the government identifying at least 2,737 children, though the actual number is likely much higher. Colleen Long & Ricardo Alonso-Zaldivar, *Watchdog: Thousands More Children May Have Been Separated*, Associated Press (Jan. 18, 2019), https://apnews.com/article/c648954057594364b01a38b8d16701ac; Jonathan Blitzer, *A New Report on Family Separations Shows the Depths of Trump's Negligence*, New Yorker (Dec. 6, 2019), https://www.newyorker.com/news/news-desk/a-new-report-on-family-separations-shows-the-depths-of-trumps-negligence (noting that the ACLU has suggested that more than 5,000 children have been separated since 2017).

[29] There is consensus on this within the field of pediatric health care. *See* Charles Oberg et al., *Treatment of Migrant Children on the US Southern Border is Torture*, Pediatrics (Oct. 27, 2020) https://pediatrics.aappublications.org/content/pediatrics/early/2020/10/23/peds.2020-012930.full.pdf.

[30] *See* Stanford Medicine, *supra* note 16; John Bowlby, *Maternal Care*, *supra* note 14.

parent from their child disrupts attachment and is associated with significant parental pain and suffering.[31] The forced separation inflicted by the government in the immigration context can cause even more harm because the parents do not know when they might be reunited, if at all, with their children. This uncertainty may cause parents to experience "ambiguous loss."[32] Because the loss of a child cannot be reconciled due to the uncertainty, the parent's grief process is frozen. Based on *amici*'s observations in detention facilities and interviews with separated parents, the impact of an ambiguous loss inhibits parents' cognitive functioning, which significantly impairs their coping and decision-making capabilities. The greater the degree and length of the separation, the more potential there is for irreversible damage for the parent and the child.[33]

From the parents' perspective, their child is under threat and in danger of experiencing physical violence, sexual violation, or even death.[34] As a result, many parents experience symptoms of PTSD following separation from their children.[35] Parents separated from their children suffer from many of the same psychological injuries as their children: depression, anxiety, suicidal thoughts, dissociation, mood instability, and psychosis.[36]

Additionally, the forced separation of parents from their children can significantly exacerbate the injuries from traumatic stress and PTSD. As discussed above,[37] the trauma of forced

---

[31] John Bowlby, *The Influence of Early Environment in the Development of Neurosis and Neurotic Character*, 21 Int'l J. Psycho-Analysis 1-25 (1940); Godfrey F. Glasgow & Janice Gouse-Sheese, *Theme of Rejection and Abandonment in Group Work with Caribbean Adolescents*, 17 Soc. Work with Grps. 3 (1995); Maite P. Mena et al., *Extended Parent-child Separations: Impact on Adolescent Functioning and Possible Gender Differences*, 13 J. Specialists in Pediatric Nursing 50 (2008); Suárez-Orozco, *supra* note 24.
[32] Pauline E. Boss, *Family stress management: A contextual approach* (2d ed. 2002).
[33] John Bowlby, *Attachment and Loss*, *supra* note 12.
[34] Stanford Medicine, *supra* note 16.
[35] Suárez-Orozco, *supra* note 24.
[36] Briere & Scott, *supra* note 17.
[37] *See supra*, pp. 8-9.

family separation compounds prior traumas. The same risks of compounded traumas exist with respect to parents as with children.[38] Parents suffering from traumatic stress and PTSD often also suffer from chronic physical pain and injuries that manifest from the continued states of heightened and compounded stress, such as cancer, arthritis, digestive disease, cardiovascular disease, and other physical ailments.[39]

G.C. suffered severe pain and suffering due to separation from his child, including frequent feelings of depression, thoughts of suicide, anxiety, severe chest and body pain, and heart palpitations. Compl. ¶¶ 93, 96, 99, 134. He also continues to suffer from episodes of severe chest pain and heart palpitations, as well as serious sleeplessness and nightmares. *Id.* ¶¶ 135-136. The severe pain and suffering alleged by G.C. is consistent with *amici*'s clinical observations of the pain and suffering of other asylum-seeking parents separated from their children. Based on the foregoing, one can easily see the severe pain and suffering that would attend the forced and indefinite separation from his son that G.C. suffered, compounded by extended periods of not knowing his son's whereabouts, much less whether he was being treated well.

### C. Federal Courts Recognize That Family Separation Causes Severe Mental And Physical Harm To Both Child And Parent.

Consistent with the scientific research described above, federal courts have recognized that family separation causes severe mental and physical suffering for children and parents. *See Ms. L. v. U.S. ICE*, 310 F. Supp. 3d 1133, 1146-47 (S.D. Cal. 2018) (finding that separating children from asylum-seeking parents is "a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development" and that "the separations at issue have

---

[38] Cloitre et al., *supra* note 23.
[39] Chevelle Brudey et al., *Autonomic and Inflammatory Consequences of Posttraumatic Stress Disorder and the Link to Cardiovascular Disease*, 309 Am. J. Physiology Regul., Integrative & Comparative Physiology R315 (2015).

been agonizing for the parents who have endured them" (quotation marks omitted)); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121-22 (D.D.C. 2018) (summarizing mental and physical harms suffered by adult asylum seekers separated from their children); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (noting that the court previously held that separation from family members was an "important [irreparable harm] factor[]" for both parents and children (alterations in original) (quotation marks omitted)).

In *Ms. L.*, the district court recognized the harm experienced by children and parents. With respect to children, the court found that:

> [T]here is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development. Forced separation disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness. . . . And the psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after eventual reunification with a parent or other family. . . . Children are at risk of suffering great emotional harm when they are removed from their loved ones. And children who have traveled from afar and made their way to this country to seek asylum are especially at risk of suffering irreversible psychological harm when wrested from the custody of the parent or caregiver with whom they traveled to the United States.

*Ms. L*, 310 F. Supp. 3d at 1146-47 (quotation marks omitted). The court also recognized that:

> [S]eparating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development. That evidence reflects [that] [s]eparation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting. In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development. Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into adult years. Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.

*Id.* at 1147 (quotation marks omitted). The court's findings regarding the harm experienced by

children separated from their parents is consistent with harm suffered by D.J.C.V.

With respect to the parents, the *Ms. L* court noted similar irreparable harm articulated in the parents' statements. An asylum seeker from Kyrgyzstan stated that he "felt as though [he] was having a heart attack" when he was told he was going to be separated from his son. *Id.* at 1146 (quotation marks omitted). One asylum-seeking parent from El Salvador wrote:

> The separation from my sons has been incredibly hard, because I have never been away from them before. I do not want my children to think that I abandoned them. [My children] are so attached to me. [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room. . . . It hurts me to think how anxious and distressed they must be without me.

*Id.* (alterations in original) (quotation marks omitted). The court also took notice of a report that a father committed suicide in custody after being separated from his wife and three-year-old child. *Id.*

G.C. and his son, D.J.C.V., have suffered severe mental and physical harms similar to harms found by courts of other asylum-seeking parents and children who were separated.

## D. The Government Has Intentionally Separated Families For Impermissible Purposes.

The government's policy and practice of forcibly separating minor children from their parents meets the second, third, and fourth elements of the CAT's definition of torture—intentional infliction, for an impermissible purpose, by a government actor or agent, respectively.[40]

*Element 2 (Intentional Infliction).* High-ranking officials responsible for the development and enforcement of the Trump Administration's "zero tolerance" family separation policy have promoted the "technique" of family separation as explicitly and intentionally aimed at achieving

---

[40] CAT art. I (Dec. 10, 1984).

the Administration's policy goals—discussed below.[41] President Trump's Executive Order of June 20, 2018, confirmed that the policy was deliberate by asserting that "Congress's failure to act" had required the Administration to "separat[e] alien families to effectively enforce the law."[42]

*Element 3 (Impermissible Purpose).* The federal government's intentional infliction of severe pain and suffering is torture when done for an impermissible purpose.[43] Such purposes include, among others, "intimidati[on] or coerci[on]" of the victim or a third person, "punish[ment]" for an act committed by the victim or a third person, and "any reason based on discrimination of any kind."[44] The CAT's inclusion of third persons makes clear that severe pain and suffering need not be suffered by the intended target of the punishment, intimidation, or coercion to constitute torture. Thus, torture includes pain or suffering inflicted on one person to change the behavior of others.

---

[41] *See Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2020, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr (quoting White House Chief of Staff John Kelly's characterization of family separation as "a technique" to deter migration through the U.S. border with Mexico) [hereinafter *John Kelly Interview*]; *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, U.S. Dep't of Justice (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions [hereinafter *Sessions Remarks*] (announcing "zero tolerance" family separation policy as applicable to the southern border, a "necessary" response to the "massive increases in illegal crossings in recent months," and designed to send the message that, "[i]f you are smuggling a child [across the border], then we will prosecute you and that child will be separated from you as required by law"); *User Clip: Separation of Families*, CSPAN (Jan. 18, 2018), https://www.c-span.org/video/?c4709347/user-clip-separation-families [hereinafter *Nielsen Testimony*] (depicting Secretary of Homeland Security Kirstjen Nielsen's testimony before the Senate Committee on the Judiciary on January 16, 2018, in which, at minute 2:05, Secretary Nielsen responded to a question regarding development of a family separation policy by stating that the government was considering various "ways to enforce our laws to discourage parents from bringing their children here illegally").
[42] Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 20, 2018).
[43] CAT art. I (Dec. 10, 1984).
[44] *Id.*

The Department of Justice ("DOJ") Office of Inspector General ("OIG") found that deterrence of migration through intimidation was the driving force behind top officials' "aggressive[]" promotion of the policy within the Justice Department.[45] Among the OIG's findings are that then-Attorney General Sessions "and other top law enforcement officials understood that 'zero tolerance' meant that migrant families would be separated and wanted that to happen because they believed it would deter future illegal immigration."[46] When the five U.S. attorneys of the districts bordering Mexico objected to prosecuting all undocumented immigrants and separating children from their parents in order to do so, the Attorney General responded, "We need to take away children."[47] According to a participant's notes, the Attorney General added: "If care [sic] about kids, don't bring them in. Won't give amnesty to people with kids."[48] After the policy was expanded to the entire border with Mexico,[49] then-Deputy Attorney General Rod Rosenstein told the OIG that, "[t]he [Attorney General]'s goal . . . was to create a more effective deterrent so that everybody would believe that they had a risk of being prosecuted."[50] The government designed the family separation policy to punish migrants by inflicting on them the kind of pain and suffering that would, in turn, intimidate would-be migrants at the southern border.

Top government officials have confirmed that purpose. In formally announcing the policy on May 7, 2018, Attorney General Sessions articulated what the expanded "zero tolerance" policy meant in practice: "If you cross this border unlawfully, then we will prosecute you. . . . If you are

---

[45] *See* Michael D. Shear et al., *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. Times (Oct. 6, 2020, updated Oct. 21, 2020), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *See Sessions Remarks*, *supra* note 41.

[50] Shear at al., *supra* note 45.

smuggling a child, then we will prosecute you and that child will be separated from you as required by law."[51] Three days later, then-Homeland Security Secretary Kirstjen Nielsen admitted that the purpose of separating asylum-seeking families was to serve as a "deterrent."[52] Officials made similar statements before and after the policy was enacted. In January 2018, in testimony to the Senate Judiciary Committee, Secretary Nielsen stated that family separation was a tool that would "discourage parents from bringing their children here illegally."[53] And in June 2018, in response to an interview question about whether the purpose of the policy was "trying to deter people from bringing children or minors" across the border, Attorney General Sessions stated unequivocally, "Yes, hopefully people will get the message and . . . not break across the border unlawfully."[54] President Trump himself echoed this all with a straightforward articulation of the separation policy's purpose in October 2018: "If they feel there will be separation, they don't come."[55]

In addition to admitting that the purpose of the policy is deterrence, members of the Trump Administration at the highest levels, up to the President himself, have laid bare the discriminatory

---

[51] *Sessions Remarks*, *supra* note 41.
[52] *Transcript: Homeland Security Secretary Kirstjen Nielsen's Full Interview with NPR*, NPR (May 10, 2018), https://www.npr.org/2018/05/10/610113364/transcript-homeland-security-secretary-kirstjen-nielsens-full-interview-with-npr.
[53] *Nielsen Testimony*, *supra* note 41.
[54] *Sessions Admits Policy Is a Deterrent*, CNN (June 19, 2018), https://edition.cnn.com/videos/politics/2018/06/19/sessions-defends-controversial-immigration-policy-deterrent-sot.cnn/video/playlists/top-news-videos/ (at approximately 0:43).
[55] *Remarks by President Trump Before Marine One Departure*, White House (Oct. 13, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-16/; *see also* Sara Robinson, *Submission to the United Nations Special Rapporteur on the Human Rights of Migrants: U.S. Immigration Detention of Children and Their Families in the Time of Coronavirus and Family Separation, Global Justice Clinic*, N.Y.U. School of Law 19-20 (May 15, 2020), https://chrgj.org/wp-content/uploads/2020/05/Submission-to-SR-on-Migrants_NYU-Global-Justice-Clinic_May-2020_Final.pdf [hereinafter *UN Submission*] (compiling "statements by high-level Trump Administration officials asserting that the purpose of family separation is to prevent migration").

motivations for the family separation policy. They have described the policy as aimed at deterring asylum seekers from Central America and Mexico in particular, and they have achieved that goal: Nearly all separations involved families from those regions crossing our southern border, as opposed to families at other border crossings. Attorney General Sessions announced the policy as aimed only at the "Southwest Border,"[56] and, according to a Government Accountability Office report, 98% of the children separated arrived from one of three Central American countries (Guatemala, Honduras, and El Salvador) or from Mexico.[57] President Trump repeatedly has expressed animus toward migrants from those regions—beginning by calling them "rapists" in his presidential-bid announcement in 2015.[58] Once in the White House, he doubled-down on the sentiment, claiming in May 2018 that: "You wouldn't believe how bad these people are. These aren't people. These are animals."[59] In May 2018, then-White House Chief of Staff John Kelly explained the policy by characterizing the migrants to be affected: "[T]hey're . . . not people that would easily assimilate into the United States into our modern society. They're overwhelmingly rural . . . . They don't speak English. They don't integrate well, they don't have skills."[60] Similarly, Secretary Nielsen told reporters that "[t]he only people that benefit from the [asylum] system" at

---

[56] *Sessions Remarks*, *supra* note 41.
[57] U.S. Gov't Accountability Office, GAO-20-245, *Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS*, at 93 tbl. 19 (Feb. 2020), https://www.gao.gov/assets/710/704683.pdf.
[58] *Full Text: Donald Trump Announces a Presidential Bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?arc404=true.
[59] *UN Submission*, *supra* note 55, at 13 n.72 (citing *Remarks by President Trump at a California Sanctuary State Roundtable*, White House (May 16, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-california-sanctuary-state-roundtable/).
[60] *John Kelly Interview*, *supra* note 41.

the southern border are "smugglers," "traffickers," those "peddling drugs," and "terrorists."[61]

Finally, evidence suggests that the Trump Administration has carried out the family separation policy to impermissibly punish asylum seekers and coerce them to forfeit their rights. A Department of Homeland Security ("DHS") factsheet on separated families offers information only on "[c]are for children," "[f]amily communication processes," and "[t]he removal process"; it refers to reunification only to say that the government "can take steps to facilitate family reunification *for purposes of removal*"[62]—in other words, to ensure that "family units can be returned to their home countries together," rather than press their asylum claims.[63]

Experts and observers have further documented instances of this dynamic at work. For example, the U.S. Commission on Civil Rights warned Attorney General Sessions and Secretary Nielsen in June 2018 that family separation "can coerce parents into withdrawing what may be valid asylum applications or otherwise impairing their immigration proceedings, for fear of what

---

[61] *Kirstjen Nielsen Addresses Family Separation at Border: Full Transcript*, N.Y. Times (June 18, 2018), https://www.nytimes.com/2018/06/18/us/politics/dhs-kirstjen-nielsen-families-separated-border-transcript.html; *see also* Letter from U.S. Commission on Civil Rights to Jeff Sessions and Kirstjen Nielsen 1-2 (June 15, 2018), https://www.usccr.gov/press/2018/06-15-18-letter.pdf [hereinafter U.S. Commission on Civil Rights] ("The Commission's concerns [regarding family separation] are exacerbated by the apparent animus directed at Mexican and Central American immigrants by the Administration, giving rise to questions of unwarranted discrimination on the basis of national origin." (footnote omitted)); *USA: "You Don't Have Any Rights Here,"* Amnesty Int'l, 4 (2018), https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF [hereinafter Amnesty Report] (describing the family separation policy as "fuel[ed]" with "discriminatory and demonizing rhetoric").

[62] *Fact Sheet: Zero Tolerance Immigration Prosecutions – Families*, U.S. Dep't of Homeland Security (last updated June 15, 2018), https://www.dhs.gov/news/2018/06/15/fact-sheet-zero-tolerance-immigration-prosecutions-families (emphasis added); *see also Fact Sheet: Zero Tolerance Prosecution and Family Reunification*, Dep't of Homeland Security (last updated Nov. 19, 2020), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (more-recently updated version referring to a DHS and HHS process "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal*" (emphasis added)).

[63] *Fact Sheet: Zero Tolerance* (last updated Nov. 19, 2020), *supra* note 62.

may be happening to their children."[64] The American Immigration Council and the American Immigration Lawyers Association sounded a similar alarm in August 2018 in a joint complaint to DHS.[65] Based on research conducted through interviews of separated family members, they argued that cases of family separation paired with detention "demonstrate how the trauma of separation and detention creates an environment that is by its very nature coercive and makes it extremely difficult for parents to participate in legal proceedings affecting their rights."[66] The organizations detailed numerous instances of ICE agents' coercing parents to sign away their rights either to reunification or to seek asylum without informing parents that they were entitled *both* to pursue their claims *and* be reunited with their children.[67] Indeed, they found four families that ICE separated "*a second time* upon [the parents'] refusal to sign" pre-completed forms distributed by ICE agents, with "Option 1, I want to be deported with my children" already checked.[68]

*Element 4 (Role of Government).* Government documents show that the family separation policy was developed by government officials and has been enforced by government agents.

---

[64] U.S. Commission on Civil Rights, *supra* note 61, at 1; *see also* Jay Root & Shannon Najmabadi, *Kids in Exchange for Deportation: Detained Migrants Say They Were Told They Could Get Kids Back on Way Out of U.S.*, Tex. Trib. (June 24, 2018, 10:00 AM), https://www.texastrib une.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/ (reporting on several instances of detained migrants being told that they could be reunited with their children in exchange for signing a voluntary deportation order); Amnesty Report, *supra* note 61, at 31 (detailing immigration hearing in which migrant was given the choice of giving up her asylum claim to be reunited and deported with her grandson).

[65] Letter from Am. Immigration Counsel & Am. Immigration Lawyers Ass'n to Cameron Quinn, Officer of Civil Rights and Civil Liberties, Dep't of Homeland Security, and John V. Kelly, Acting Inspector General, Dep't of Homeland Security (Aug. 23, 2018), https://www.american immigrationcouncil.org/sites/default/files/general_litigation/the_use_of_coercion_by_u.s._depart ment_of_homeland_security_officials_against_parents_who_were_forcibly_separated_from_thei r_children_public_fin_0.pdf.

[66] *Id.* at 2.

[67] *Id.* at 5-6.

[68] *Id.* at 7.

According to the House Committee on the Judiciary Majority Staff's recent report, documents obtained from DOJ, DHS, and the Department Health and Human Services ("HHS") demonstrate that "the Administration began formulating its plan to separate parents from their children as early as February 2017," "DHS and DOJ began to implement that plan through a family separation pilot program in the El Paso Border Patrol Sector" in July 2017, and the Administration expanded the program in early 2018.[69] HHS emails disclose the extent of the policy's enforcement in early 2018, indicating that the government separated nearly 1,500 children from their parents by April 23, 2018.[70] On a call with reporters on June 15, 2018, a DHS spokesperson stated that nearly 2,000 children were separated from their parents under the policy between April 19 and May 31, 2018.[71] The forced separation to which 19-month-old D.J.C.V. and his father G.C. fell victim cannot be cast aside as one-off, or the result of rogue or poorly monitored enforcement activity. Rather, it was part of a broad, purposeful policy initiative conceived at literally the highest level of government, and carried out exactly as intended.

G.C. and D.J.C.V. are victims of a government-mandated, intentional family separation program designed to cause severe pain and suffering. Moreover, their case exemplifies the family separation policy's aims of targeting migrants from Central America, as G.C. and D.J.C.V. arrived from Honduras, and of punishing asylum seekers and coercing them to abandon their rights. As described in the Complaint, a DOJ lawyer relayed to G.C.'s lawyer that "DHS was 'willing to

---

[69] Maj. Staff of H. Comm. On the Judiciary, 116th Cong., *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos* 2-3 (Oct. 2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519.

[70] *Id.* at 4.

[71] Tal Kopan, *DHS: 2,000 Children Separated from Parents at Border*, CNN (June 16, 2018, 2:44 AM), https://www.cnn.com/2018/06/15/politics/dhs-family-separation-numbers/index.html.

reunify and remove,' on the condition that G.C. waive his asylum and CAT rights."[72] And less than a week later, DOJ stated in writing that "DHS will reunify [G.C. and his son] for the purposes of [their] removal" from the United States.[73]

### E. Torture Must Be Assessed Based On Cumulative Effect.

One does not examine torture and harm in isolation; it is the cluster and context of aggregated harms—and their subjective physical or mental impact on the victims—that make up torture.[74] Likewise, subjective criteria, such as the victim's age, state of health or circumstances should be considered in determining whether a particular set of conduct constitutes torture.[75] U.S. courts assessing claims of torture follow this guidance. *See, e.g.*, *Abebe-Jira v. Negewo*, 72 F.3d 844, 845 (11th Cir. 1996) (finding a variety of acts to inflict the requisite physical and/or mental harm to constitute torture); *Al-Saher v. INS*, 268 F.3d 1143, 1145-47 (9th Cir. 2001) (same). Considering the subjective vulnerabilities of D.J.C.V. and G.C. and the mental and physical injuries they endured—injuries that were compounded by the traumatic stress of being separated— the Court should find that the separation of D.J.C.V. from G.C. was nothing less than torture.

### CONCLUSION

The United States's practice of family separation violates its obligations to refrain from committing torture and violates asylum seekers' rights to be free from torture, as guaranteed under the CAT and U.S. law. For these reasons, *amici* support Plaintiffs' Opposition to Defendant's Motion to Dismiss the Complaint and respectfully request the Court deny the Defendant's Motion.

[Signature block on next page]

---

[72] *See* Compl. ¶ 116.
[73] *Id.*
[74] Cordula Droege, *In Truth the Leitmotiv: The Prohibition of Torture and Other Forms of Ill-Treatment in International Humanitarian Law*, 867 Int'l Rev. of the Red Cross 515, 529 (2007).
[75] *See* Report of the Special Rapporteur, *supra* note 3, at ¶ 14 n.12.

Dated: December 23, 2020

Respectfully Submitted,

_/s/ Brian J. Fischer_

Brian J. Fischer
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-39008
(212) 891-1600 (phone)
(212) 891-1699 (fax)
bfischer@jenner.com

Debbie L. Berman (*pro hac vice*)
Andrew W. Vail (*pro hac vice*)
Brandon J. Polcik (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350 (phone)
(312) 527-0484 (fax)
dberman@jenner.com
avail@jenner.com
bpolcik@jenner.com

Corinne M. Smith (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000 (phone)
(202) 639-6066 (fax)
csmith@jenner.com

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing and all documents attached hereto were served on December 23, 2020 upon all counsel of record via CM/ECF.

*/s/ Brian J. Fischer*

Brian J. Fischer