**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

D.J.C.V., a minor child, and G.C., his father

       *Plaintiffs*,

v.

United States of America

       *Defendants*.

Civil Action No. 1:20-CV-05747-PAE

**BRIEF FOR LAW PROFESSORS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS**

**COVINGTON & BURLING LLP**

Bert Wells
Christopher Y. L. Yeung
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
bwells@cov.com
cyeung@cov.com

*Counsel for Amici Peggy Cooper Davis,
Martha Minow, Dorothy Roberts, and Lea
VanderVelde.*

December 23, 2020

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE .................................................................................... 1

ARGUMENT ................................................................................................................ 4

I.    Repudiation of Slavery and the Embrace of Universal Freedom Were Motivated
      by Abhorrence of Slavery's Denial of Family Integrity. .................................... 5

      A.    Forced Family Separation Was a Central Tenet of Slavery in the United
            States. ......................................................................................................... 5

      B.    Securing the Right of Family Integrity Was an Explicit Objective of the
            Reconstruction Congress. ...................................................................... 10

II.   The Right to Family Independence and Integrity Has Been Recognized as a
      Fundamental Right and Has Been Afforded Procedural Protections to Prevent
      Separation of Families. .................................................................................... 13

      A.    The Right to Family Independence and Integrity Has Been Recognized as
            a Fundamental Right. .............................................................................. 13

      B.    The Right to Family Independence and Integrity Has Been Afforded
            Procedural Due Process Protections to Prevent Separation of Families. .............. 14

CONCLUSION ........................................................................................................... 15

**TABLE OF AUTHORITIES**

**Cases**

*Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977).......................................................... 13

*Gilleo v. Williams,* No. V-2798-03/04A, 2008 WL 8013230 (N.Y. Fam. Ct. Dec. 02, 2008) ..... 15

*In re Guardianship & Custody of Terrance G.*, 731 N.Y.S.2d 832, 836 (N.Y. Fam. Ct. 2001) .. 14

*Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 33-34 (1981) ...................................................... 14

*Loving v. Virginia*, 388 U.S. 1 (1967),.................................................................................... 13

*Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) ...................................................... 4, 13

*Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925) ............................................................ 13

*Santosky v. Krame*r, 455 U.S. 745, 769 (1982)...................................................................... 14

*Stanley v. Illinois*, 405 U.S. 645, 658 (1972) ......................................................................... 14

*Troxel v. Granville*, 530 U.S. 57, 65 (2000) .......................................................................... 13

*W.V. v. Dep't of Children and Families*, 840 So.2d 430, 431 (Fla. Dist. Ct. App. 2003)............. 15

*Wisconsin v. Yoder,* 406 U.S. 205, 234-35 (1972)...................................................................... 14

**Other Authorities**

Amanda Connolly, *'What's going on in the United States is wrong:' Trudeau adds voice to*

  *chorus condemning Trump*, Global News (June 20, 2018),

   https://globalnews.ca/news/4285443/justin-trudeau-donald-trump-child-detention-cages/ ..... 12

Angelina E. Grimké, *Letter II. Immediate Emancipation* (June 17, 1837), *in Letters to Catharine*

  *E. Beecher in Reply to an Essay on Slavery and Abolitionism* (2016) (ebook) ......................... 9

Anti-Slavery Record, *The Disruption of Family Ties*, March 1836, at 9....................................... 8

Cong. Globe, 38th Cong., 1st Sess. (1864).............................................................................. 11, 12

Cong. Globe, 38th Cong., 2d Sess. (1865)............................................................................... 11, 12

Cong. Globe, 39th Cong., 1st Sess. (1866).............................................................................. 10, 12

Eric Foner, *Gateway to Freedom: The Hidden History of the Underground Railroad* 200–05
    (2015) ................................................................................................................................ 7

Eric Foner, *Reconstruction: America's Unfinished Revolution 1863-1877* 87 (1988).......... 10, 11

Harriet Beecher Stowe, *A Key to Uncle Tom's Cabin; Presenting the Original Facts and
    Documents Upon Which the Story is Founded Together With Corroborative Statements
    Verifying The Truth Of The Work* 133 (John P. Jewett & Co. 1853 ...................................... 6, 7

Herbert G. Gutman, *The Black Family in Slavery and Freedom, 1750-1925* 329-30 (1976) ........ 5

James M. McPherson, *Battle Cry of Freedom: The Civil War Era* 37 (Oxford Univ. Press 1988) 6

James W.C. Pennington, *The Fugitive Blacksmith* 2, *reprinted in Five Slave Narratives* (William
    Loren Katz ed., 1968)................................................................................................................ 6

Moses Grandy, *Narrative of the Life of Moses Grandy, Late a Slave in the United States of
    America* 5-6 (1844), *reprinted in Five Slave Narratives* ......................................................... 9

Peggy Cooper Davis, *Neglected Stories*: *The Constitution and Family Values* 38-40, 112-17
    (1997) ..................................................................................................................................... 11

Petition to the Governor, the Counsel, and the House of Representatives of Massachusetts, May
    25, 1774, *reprinted in A Documentary History of the Negro People in the United States* vol. I,
    8-9 (Herbert Aptheker ed., 1951) ............................................................................................. 8

Ronald Walters, *The Antislavery Appeal: American Abolitionism After 1830* 58 (Johns Hopkins
    Univ. Press 1976) ..................................................................................................................... 8

Stanley Feldstein, *Once a Slave: The Slaves' View of Slavery* 59-60 (1971)................................ 9

*UN rights chief slams 'unconscionable' US border policy of separating migrant children from
    parents*, UN News (June 18, 2018), https://news.un.org/en/story/2018/06/1012382 ............... 12

*US child detention pictures disturbing - Theresa May*, BBC News (June 20, 2018),

    https://www.bbc.com/news/uk-politics-44545823.................................................................. 12

W. E. Burghardt Du Bois, *Black Reconstruction in America* 136 (Russell & Russell 1935)....... 10

William Goodell, *The American Slave Code in Theory and Practice: Its Distinctive Features*

    *Shown by its Statutes, Judicial Decisions, and Illustrative Facts* 3 (1853) .............................. 7

William W. Brown, *Narrative of William W. Brown, A Fugitive Slave* 2 (2d ed. 1848)................ 5

William Wells, *Family Government*, The Liberator, Dec. 1, 1837, at 194.................................... 7

## INTEREST OF AMICI CURIAE

*Amici curiae* are leading scholars and professors in the area of United States family law, whose work has been influential in the areas of child welfare and constitutional law, with a particular focus on family liberty. Together, *Amici* possess expertise in the constitutional principles, including the fundamental right to family integrity, which inform the practice and understanding of family law in the judicial system. Furthermore, the amici have expertise in the anti-slavery traditions and antebellum practice of forced separation of enslaved families that formed the foundation upon which the Thirteenth and Fourteenth Amendments were drafted and ratified. *Amici* have a strong interest in assuring that the enlightened heritage of emancipation and Reconstruction guides the judicial interpretation of our reconstructed Constitution, in line with the intent of the Reconstruction-era lawmakers who drafted it. *Amici* are intimately familiar with how the history of our Constitution is reflected in the protections afforded to families in our judicial system and believe that this history should guide the Court's consideration of the issues and arguments presented in this case.[1]

**Peggy Cooper Davis** is the John S. R. Shad Professor of Lawyering and Ethics at the New York University School of Law. She served for three years as a judge of the Family Court of the State of New York prior to joining the NYU Law faculty. She has published two books and more than 50 articles and book chapters, most notably in the premier journals of Harvard, Yale, NYU, and Michigan law schools. Her analyses of judicial reliance on the social and psychological sciences have been pivotal to thinking about child placement decision-making

---

[1] No counsel for a party to this litigation authored this brief, either in whole or in part. Similarly, no party or party's counsel made a monetary contribution intended to fund the preparation of this brief. The parties have consented to the filing of amici curiae briefs.

*Amici* file this brief solely as individuals and not on behalf of any institution with which they are affiliated. Affiliations are provided for identification purposes only.

in both public law and matrimonial contexts.  Her book, *Neglected Stories: The Constitution and Family Values*, and her book-in-progress, *Enacting Freedom*, illuminate the importance of anti-slavery and civil rights traditions as guides to understanding the scope and meaning of Fourteenth Amendment liberty interests.

**Martha Minow** is the 300th Anniversary University Professor at Harvard University. She has taught at Harvard Law School since 1981, where her courses include constitutional law and family law.  An expert in human rights and advocacy for members of racial and religious minorities and for women, children, and persons with disabilities, she also writes and teaches about digital communications, democracy, privatization, military justice, and ethnic and religious conflict.  In addition to her many scholarly publications in journals of law, history, and philosophy, she has authored numerous books and casebooks on constitutional and family law, among other topics.  Professor Minow served as Dean of Harvard Law School between 2009 and 2017, as the inaugural Morgan and Helen Chu Dean and Professor.  She has been recognized as a scholar and teacher of family law and its history, constitutional law, the rights of children, and human rights with honorary degrees and awards.

**Dorothy Roberts**, an acclaimed scholar of race, gender and the law, joined the University of Pennsylvania as its 14th Penn Integrates Knowledge Professor with joint appointments in the Departments of Africana Studies and Sociology and the Law School where she holds the inaugural Raymond Pace and Sadie Tanner Mossell Alexander chair.  She is also founding director of the Penn Program on Race, Science & Society in the Center for Africana Studies.  Her pathbreaking work in law and public policy focuses on urgent contemporary issues in health, social justice, and bioethics, especially as they impact the lives of women, children and African-Americans.  She is the author of more than 100 scholarly articles and book chapters, co-

editor of six books on such topics as constitutional law and women and the law, and author of *Killing the Black Body: Race, Reproduction* and the *Meaning of Liberty and Shattered Bonds: The Color of Child Welfar*e.

**Lea VanderVelde** is the Josephine R. Witte Chair at the University of Iowa College of Law.  She is a specialist in the Reconstruction Amendments and the histories of slaves suing for freedom.  She is the director of the Reconstruction Amendment Optical Scanning project (RAOS) that has digitized the Congressional Globe for the entire period of Reconstruction.  The project uses digital research technologies to examine debates in the Reconstruction Congress as those debates amended the Constitution and enhanced American freedom.  She is the author two books, a biography, *Mrs. Dred Scott*, and *Redemption Songs*, an account of 12 enslaved families suing for freedom.  She is also the author of *The Labor Vision of the Thirteenth Amendment* as well as several other works of legal history.  In 2011, she was the Guggenheim fellow in Constitutional Studies, she was awarded the May Brodbeck Humanities Fellowship in 2019, and she just won the Brophy Award for best article published in legal history in the American Journal of Legal History in 2020.  Finally, she works with 2014 Nobel Peace Prize Laureate Kailash Satyarthi in his mission to eliminate child trafficking and child slavery on an international level.

**ARGUMENT**

In early May 2018, as then-19-month-old D.J.C.V. and his father, G.C., crossed into the United States from Mexico to seek asylum as a result of their fear of persecution in their home country of Honduras.  Upon entry, federal officers forcibly took D.J.C.V. from his father and separated the two, cruelly, for five and a half months pursuant to a systematic and illegal program implemented by high-level U.S. officials for the purpose of separating thousands of migrant children from their parents.  This malicious conduct implicates one of the most fundamental rights in the constitution—the right to family integrity.[2]

Forced, and usually permanent, separation of parents from their children was a hallmark of slavery in the United States.  American history is rife with examples.  It is precisely because of our horrifying history of separating families that Reconstruction lawmakers sought to make family integrity a fundamental right within our constitutional scheme.

*Amici* write to tell the story of how systematic separation of enslaved families informed efforts of the Reconstruction Congress to afford family integrity constitutional protections.  Through the Thirteenth and Fourteenth Amendments, Congress sought to ensure constitutional protection of family integrity and to prevent the state from replicating the once commonplace terror that slave owners inflicted on enslaved families—taking child from parent.  *Amici* submit that we should bear this history in mind when considering both the morality and legality of Defendant's modernization of an ancient cruelty—family separation.

In what follows, we demonstrate that the Reconstruction Amendments were designed and rightfully understood in the postbellum period to encompass rights of family recognition.  We

---

[2] *See, e.g.*, *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) (noting that the constitution "protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").

make that demonstration first with reference to popular understandings of what it meant to repudiate slavery and eliminate its defining constraints, then with reference to the statements of Reconstruction lawmakers. We conclude with a discussion of how courts have construed the Reconstruction Amendments to encompass the right to family integrity.

I. **Repudiation of Slavery and the Embrace of Universal Freedom Were Motivated by Abhorrence of Slavery's Denial of Family Integrity.**

    A. **Forced Family Separation Was a Central Tenet of Slavery in the United States.**

Family separation through force was a constant threat to enslaved people and, indeed, essential to maintenance of the institution of slavery in the United States. Slavery began, of course, with separating men, women, and children overseas—either through kidnapping or sale—and transporting them to the American continent. After the successful mutiny by the slave cargo of the ship *Amistad* in 1839, interviews with the surviving mutineers provided illustrative examples: Singgbe had been taken from a father, a wife, and three children; Gilabaru from a wife; Burna from a wife, child, father, three sisters, and a brother; Sessi from three brothers, two sisters, a wife, and three children; Ndamma from a mother, brother, and sister; Kinna from his parents, grandparents, four brothers, and a sister; Ngahoni from a wife and child; Fakinna from a father, wife, and two children; and Kagne from her parents, four brothers, and four sisters.[3]

Upon arrival on American shores, the cycle of separation continued. Often from the moment of birth, enslaved persons were denied access to their parents, and were deemed the property of the enslaver. The narrative of the life of William Brown opens with a description of that process: "I was born in Lexington, Ky. The man who stole me as soon as I was born,

---

[3] Herbert G. Gutman, *The Black Family in Slavery and Freedom, 1750-1925* 329-30 (1976).

recorded the births of all the infants which he claimed to be <u>born his property</u> . . . ."[4]  Indeed, no slave-holding state's laws gave any enslaved person—parent, child, and those yet born—rights or claims of birth, or legally enforceable family ties.  State slave codes also entrusted the slaveholders and their overseers with the entirety of the enslaved child's education (to the extent permitted), upbringing, and discipline.  And every slave-holding state allowed the separation, by sale or otherwise, of parent and child.

Eliminating family ties was essential to maintaining the social isolation needed to perpetuate the institution of slavery.  Breaking familial bonds reinforced the notion of the slave as a commodity, rather than as the child of parents, or a member of a community or a nation.  One formerly enslaved person's autobiographical narrative describes the situation from the child's perspective: "To estimate the sad state of a slave child, you must look at it as a helpless human being thrown upon the world without the benefit of its natural guardians."[5]  While parents labored from first light to darkness under tyrannical masters, the enslaved child was exposed to the emotional deprivation and persistent anxiety that isolation from consistent adult attention and prolonged absences of parent figures inevitably produce.

As a natural consequence, the anti-slavery movement focused on the importance of family independence and integrity and the devastating effects of slavery upon the African-American family.  Family separation was "the greatest perceived sin of American slavery."[6]  Righting this wrong was in the hearts and minds of most who fought to end the evils of

---

[4] William W. Brown, *Narrative of William W. Brown, A Fugitive Slave* 2 (2d ed. 1848) (emphasis added).
[5] James W.C. Pennington, *The Fugitive Blacksmith* 2, *reprinted in Five Slave Narratives* (William Loren Katz ed., 1968).
[6] James M. McPherson, *Battle Cry of Freedom: The Civil War Era* 37 (Oxford Univ. Press 1988).

American slavery and, after its abolition, the legislators who sought to restore the freed child, mother, and father to their natural dignity.  Harriet Beecher Stowe wrote in 1853 that "[t]he worst abuse of the system of slavery is its outrage upon the family; and . . . it is one which is more notorious and undeniable than any other."[7]  An essay in *The Liberator* in 1837 declared: "the most appalling feature of our slave system is, the annihilation of the family institution."[8] The American and Foreign Anti-Slavery Society, in order to "test the moral character of American slaveholding," published William Goodell's treatise on slave law, which explained statutes governing American slavery and documented their effects.[9]  With respect to the laws governing the enslaved family, Goodell supplemented his legal treatise with anecdotal accounts of families separated by sale and distanced by the demands of servitude, and with a collection of advertisements from Southern newspapers offering rewards for the capture or killing of slaves reported to have run away attempting to rejoin their families.

Enslaved people fled to reunite with family members, and free anti-slavery advocates maintained an Underground Railroad in part to facilitate family reunifications.[10]  Moreover, both enslaved and free anti-slavery advocates consistently undergirded the demand for release from bondage by arguing that the right to family integrity and parental autonomy was related to a

---

[7] Harriet Beecher Stowe, *A Key to Uncle Tom's Cabin; Presenting the Original Facts and Documents Upon Which the Story is Founded Together With Corroborative Statements Verifying The Truth Of The Work* 133 (John P. Jewett & Co. 1853).  Stowe writes in response to charges that family separations depicted in Uncle Tom's Cabin were unrealistic or atypical.  Her evidence of the prevalence of slave family disruption includes eye-witness accounts of family separations resulting from slave auctions, *id.* at 137, and advertisements for the sale of slaves in South Carolina, *id.* at 134-36, 138-42.

[8] William Wells, *Family Government*, The Liberator, Dec. 1, 1837, at 194.

[9] William Goodell, *The American Slave Code in Theory and Practice: Its Distinctive Features Shown by its Statutes, Judicial Decisions, and Illustrative Facts* 3 (1853).

[10] Eric Foner, *Gateway to Freedom: The Hidden History of the Underground Railroad* 200–05 (2015).

theory of human entitlement and freedom. To be recognized as human was to be recognized as morally autonomous, and moral and religious autonomy required family autonomy. When an article in an 1836 issue of the *Anti-Slavery Record* denounced slavery as "nothing but a system of tearing asunder family ties," it said those ties were protected by "sacred law."[11] "The Family," wrote another abolitionist, "is the head, the heart, the fountain of society, and it has not a privilege that slavery does not nullify, a right that it does not counteract, nor a hope that it does not put out in darkness."[12] Anti-slavery advocates considered the rights, privileges, and hopes of forming and maintaining families inviolable as a matter of divine, natural, moral, and, even then, constitutional law.

As early as 1774, enslaved people claiming "a natural right to [their] freedoms" petitioned the Massachusetts legislature demanding liberty. They described enslavement as a theft of the self from family: "[W]e were unjustly dragged by the cruel hand of power from our dearest friends and sum of us stolen from the bosoms of our tender Parents . . . ."[13] "How," they asked, demanding the liberty to fulfill familial obligations, "can a slave perform the duties of a . . . parent to his child[?]"[14] From this belief that family integrity and autonomy were matters of moral and natural right, anti-slavery advocates made sweeping assertions that the Constitution already embodied such universal principles within its dedication to justice, general welfare, and the blessings of liberty, and accordingly forbade slavery. In 1837, prominent abolitionist

---

[11] Anti-Slavery Record, *The Disruption of Family Ties*, March 1836, at 9 (emphasis omitted).
[12] Ronald Walters, *The Antislavery Appeal: American Abolitionism After 1830* 58 (Johns Hopkins Univ. Press 1976).
[13] Petition to the Governor, the Counsel, and the House of Representatives of Massachusetts, May 25, 1774, *reprinted in A Documentary History of the Negro People in the United States* vol. I, 8-9 (Herbert Aptheker ed., 1951).
[14] *Id*.

Angelina Grimké wrote that the nation must, therefore, "let parents have their own children, for they are the gift of the Lord to them and no one else has any right to them."[15]

The pain caused by sudden family separation is long-lasting and forever impacts the relationship between a parent and their child. Moses Grandy wrote in 1844 that his mother was "frantic with grief" as she endeavored to protect her children from the slave market, often hiding them in the woods.[16] Likewise, Henry Brown wrote of the loss of his child to a slave coffle and the immeasurable horror of seeing children torn from their homes, tightly packed in wagons, and then sold to complete strangers for a life of enslavement.[17]

Such scenes of mothers and fathers threatened with separation or being separated from their children, to be traded like commodities, too uncomfortably parallel the thousands of separations at the United States-Mexico border. Both enslaved and asylum-seeking parents were subjected to the pervasive threat of sudden family separation, and to constant worry about whether reunification would ever be possible following separation. Like the families forcibly torn apart at historical slave markets,[18] Mr. C. and his son D.J.C.V. live each day with the emotional trauma of their family relationship, their life- and spirit-sustaining bond, broken by an authority with no regard for their natural rights, freedoms or affections, nor their profound mutual dependence.

---

[15] Angelina E. Grimké, *Letter II. Immediate Emancipation* (June 17, 1837), *in Letters to Catharine E. Beecher in Reply to an Essay on Slavery and Abolitionism* (2016) (ebook) (emphasis and internal quotations omitted).
[16] Moses Grandy, *Narrative of the Life of Moses Grandy, Late a Slave in the United States of America* 5-6 (1844), *reprinted in Five Slave Narratives*.
[17] Stanley Feldstein, *Once a Slave: The Slaves' View of Slavery* 59-60 (1971).
[18] *Id.*

### B. Securing the Right of Family Integrity Was an Explicit Objective of the Reconstruction Congress.

When the Civil War ended, and terms of national reconstruction were needed, federal lawmakers insisted that the freedom of emancipation, with its guarantee of "life, liberty and the pursuit of happiness," legally embody the rights of family affiliation that slavery had trampled. These lawmakers, who sought to secure broad rights of national citizenship by drafting and ratifying the Thirteenth and Fourteenth Amendments, had lived through a passionate national debate over slavery and a prolonged and bloody civil war to bring about its end. They knew how slavery had denied formal family ties and disregarded extra-legal kinship. They also understood that rights associated with family relationships remained fragile in the former Confederacy absent federal protection. Carl Schurz, a writer commissioned to report to Congress on the conditions in the South following the Civil War, indicated that Southern whites still had "an ingrained feeling that the blacks at large belong[ed] to the whites at large."[19] By ratifying the Thirteenth Amendment and eliminating the remnants of the authoritarian slave system, the Reconstruction Congress intended to create national rights of citizenship, and categorically end the physical "dominion of one man over the souls and bodies of his fellow men."[20] When objections to the power of Congress to enact sweeping civil rights protections under the Thirteenth Amendment led to concerns about the constitutional stability of those protections, the Reconstruction Congress confirmed beyond doubt—via the Fourteenth Amendment—the authority of the federal government to ensure due process, equal protection, and all the privileges and immunities of citizenship to all persons.

---

[19] W. E. Burghardt Du Bois, *Black Reconstruction in America* 136 (Russell & Russell 1935) (quoting 39th Cong., 1st Sess., Senate Executive Document No. 2, Report of Carl Schurz).
[20] Cong. Globe, 39th Cong., 1st Sess. 146 (1866) (statement of Sen. Wilson); *see also* Eric Foner, *Reconstruction: America's Unfinished Revolution 1863-1877* 87 (1988).

Along with black men and women across the country, Reconstruction lawmakers thus "shared a passionate commitment to the stability of family life as a badge of freedom."[21]  With the notorious and ongoing trauma of forced family separations marked on their and the nation's conscience, the Reconstruction Congress repeatedly acknowledged during debates over the Civil Rights Act of 1866 and the anti-slavery Reconstruction Amendments that freedom under the Constitution required restoration of family rights.

Their remarks echoed the rhetoric of the anti-slavery movement and were based upon their personal experiences in the slavery era.  For example,[22] Congressional representatives decried the perversity of an institution that "allow[ed] the children to be taken from the mother; ah!"[23]  They condemned "tearing from the mother's arms the sucking child, and selling them to different and distant owners."[24]  The separation and sale of husband and wife, and parent and child, were denounced by many as "unnatural."[25]  To the legislators, the violence inflicted on the enslaved family's integrity was the denial of an essential freedom, specifically the family freedom.  They remarked that the enslaved "had no rights, nor nothing which he could call his own," because they "had not the right to become a husband or a father in the eye of the law, he had no child, he was not at liberty to indulge the natural affections of the human heart for

---

[21] Foner, *Reconstruction*, at 88.

[22] For a more comprehensive account, see Peggy Cooper Davis, *Neglected Stories*: *The Constitution and Family Values* 38-40, 112-17 (1997).

[23] Cong. Globe, 38th Cong., 2d Sess. 221 (1865).

[24] Cong. Globe, 38th Cong., 1st Sess. 2948 (1864).

[25] Cong. Globe, 38th Cong., 1st Sess. 2984 (1864).

children, for wife, or even for friend."[26]  Many agreed that parental rights are inalienable, fundamental, and "hallowed."[27]

The policy that led to the separation of G.C. and D.J.C.V. is exactly what the framers of the Fourteenth Amendment sought to end.  Back in 1864, Senator Sumner speculated that extraterrestrials would be astonished by the insensibility and abject cruelty of one person's making another live "despoiled of all rights, even the . . . sacred right of family; so that the relation of husband and wife was impossible and no parent could claim his own child."[28]  In the present day, people from other nations have indeed been shocked to observe the United States' inhumane and unconstitutional practice of separating asylum-seekers from their children at the border without any legitimate justification.[29]

---

[26] Cong. Globe, 39th Cong., 1st Sess. 504 (1866).

[27] *See* Cong. Globe, 38th Cong., 1st Sess. 1324 (1864); Cong. Globe, 38th Cong., 2d Sess. 193, 200 (1865).

[28] Cong. Globe, 38th Cong., 1st Sess. 1479 (1864).

[29] *See, e.g.*, *UN rights chief slams 'unconscionable' US border policy of separating migrant children from parents*, UN News (June 18, 2018), https://news.un.org/en/story/2018/06/1012382 (UN High Commissioner for Human Rights Zeid Ra'ad Al Hussein referred to the policy as "unconscionable" and said that "[c]hildren must not be traumatized by being separated from their parents.  Family unity must be preserved"); *US child detention pictures disturbing - Theresa May*, BBC News (June 20, 2018), https://www.bbc.com/news/uk-politics-44545823 (U.K. Prime Minister Theresa May condemned the forced separation of migrant children from parents); Amanda Connolly, *'What's going on in the United States is wrong:' Trudeau adds voice to chorus condemning Trump*, Global News (June 20, 2018), https://globalnews.ca/news/4285443/justin-trudeau-donald-trump-child-detention-cages/ (Canada Prime Minister Justin Trudeau condemned President Trump's policy of separating children from migrant families).

II.     **The Right to Family Independence and Integrity Has Been Recognized as a Fundamental Right and Has Been Afforded Procedural Protections to Prevent Separation of Families.**

A.      **The Right to Family Independence and Integrity Has Been Recognized as a Fundamental Right.**

The Supreme Court has emphasized that, consistent with its Reconstruction roots, the Fourteenth Amendment protects families' rights to independence and integrity in nearly all spheres of life. Indeed, ten years after holding in *Loving v. Virginia*, 388 U.S. 1 (1967), that the right to marry is a fundamental right protected by the Due Process Clause, the Supreme Court made clear that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore*, 431 U.S. at 503 (striking down a zoning ordinance that prohibited a grandmother from living with her grandchild as violating the 14th Amendment). The Second Circuit also has noted that "the right of the family to remain together without the coercive interference of the awesome power of the state . . . encompasses the reciprocal rights of both parent and child" and that children have the constitutional right to avoid "dislocat[ion] from the emotional attachments that derive from the intimacy of daily association" with the parent. *See Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977).

No relationship is more sacred within our constitutional system than that between a parent and their child. In *Pierce v. Society of Sisters*, the Supreme Court held that both the Fifth and Fourteenth Amendments protect the "liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534 (1925). In *Troxel v. Granville*, the Supreme Court stated that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." 530 U.S. 57, 65 (2000).

Values of family integrity and parental liberty were also imbedded within our constitutional system by the framers themselves. In *Wisconsin v. Yoder*, the Supreme Court struck down a state law providing for compulsory education of children up to age 16 when applied over the objections of Amish parents. 406 U.S. 205, 234-35 (1972). In doing so, the *Yoder* Court reasoned that the law violated the Free Exercise Clause, which had been incorporated against the states by the Fourteenth Amendment. *See id*. Again, the Court stressed that the "values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society." *Id.* at 213-14.

B.       **The Right to Family Independence and Integrity Has Been Afforded Procedural Due Process Protections to Prevent Separation of Families.**

The Supreme Court affords family independence and integrity robust procedural due process protections. For example, in *Stanley v. Illinois*, the Court held that parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody. 405 U.S. 645, 658 (1972). The Court also has held that when seeking to terminate parental rights, a state must afford the affected parent a fundamentally fair procedure that may include the appointment of counsel. *See Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 33-34 (1981). In fact, the Court has gone so far as to hold that the Constitution requires that the clear and convincing evidence standard be applied in such termination proceedings. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). These strong protections are called for because "the determination to terminate [a] parental right in the civil area is the jurisprudential equivalent of capital punishment in the criminal area—the declaration in legal terms of the death of the

biologic child to the biologic parent, and the death of the biologic parent to the biologic child."

*In re Guardianship & Custody of Terrance G.*, 731 N.Y.S.2d 832, 836 (N.Y. Fam. Ct. 2001).

Despite well-settled precedent requiring that a hearing be held before the state may separate a parent from their child, Defendant refused to provide Mr. C. even a single opportunity to be heard prior to forcibly separating him from his 19-month-old son for five and a half months. Cases in which parents have had custody over their children revoked, after the full hearing that Mr. C. was denied, typically involve parental conduct of a type not at all present here. *See, e.g.*, *Gilleo v. Williams,* No. V-2798-03/04A, 2008 WL 8013230 (N.Y. Fam. Ct. Dec. 02, 2008) (recounting the conduct that led to revocation of a father's custody of his child, which included throwing his ten month old daughter out of an apartment window); *W.V. v. Dep't of Children and Families*, 840 So.2d 430, 431 (Fla. Dist. Ct. App. 2003) (revoking a father's custody over his child after, among other things, the father admitted to hitting the child's sister, mother, grandmother, and possibly others). Accordingly, the Defendant's actions fly in the face of the Fourteenth Amendment and the values which served as the basis for its ratification.

## CONCLUSION

More than a century ago, Henry Brown wrote of the loss of his child in slavery and the immeasurable horror of children pressed together in carts while being torn from home and family. As Mr. C. can attest, Defendant's decision to reintroduce family separation policies into the United States has caused immeasurable suffering. It is precisely these horrors that the Reconstruction Congress sought to eradicate when drafting the Thirteenth and Fourteenth Amendments. The right to family integrity is both deeply rooted in our nation's history and necessary to our constitution's scheme of ordered liberty. In separating Mr. C. from his infant child, Defendant violated this profound and sacred right.

Dated:  December 23, 2020
       New York, New York

**COVINGTON & BURLING LLP**

S/ *Christopher Y. L. Yeung*
    Christopher Y. L. Yeung, Esq.

Bert Wells
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
cyeung@cov.com
bwells@cov.com

*Counsel for Amici Peggy Cooper Davis, Martha Minow, Dorothy Roberts, and Lea VanderVelde.*