

April 6, 2021

Hon. Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Engelmayer:

      Plaintiffs respectfully submit this letter to address the Court's question about whether it may inquire into which of the two competing policy frameworks – the punitive Family Separation Policy or a "criminal history" policy – governed the decision to separate Plaintiffs in this case and whether the Court may order jurisdictional discovery to help resolve that question. In short, the answer is yes: under the jurisdictional inquiry posed by Defendant's motion, the court may so inquire.  And, particularly given the unreliability of the evidence Defendant now proffers in support, and Plaintiffs' plausible, substantiated allegations showing that criminal history was mere pretext subservient to the governing Family Separation policy, the Court should order ample jurisdictional discovery before resolving the 12(b)(1) motion. If material facts remain in dispute, the Court would then review under a summary judgment standard. Plaintiffs further contend that outright denial of the 12(b)(1) motion is appropriate, because even under Defendant's framework and even crediting Defendant's selective and unreliable evidence, Defendant's agents had no discretion to separate this family absent procedural due process, namely notice and an opportunity to contest the government's removal of custody of D.J.C.V. from Mr. C. absent a finding of parental unfitness and the child's best interests.

      **A. The Court Should Not Grant the 12(b)(1) Motion Without Affording Ample Jurisdictional Discovery to Permit Plaintiffs an Opportunity to Test Defendant's Conclusory and Unreliable Assertion Regarding the Reason for the Separation.**

      The prevailing view in the Second Circuit is that the defendant bears the ultimate burden of proving the discretionary function exception (DFE) applies. *See Anson v. United States*, 294 F. Supp. 3d 144, 158 (W.D.N.Y. 2018) (citing *Molchatsky v. United States*, 778 F.Supp.2d 421, 431 (S.D.N.Y. 2011), *aff'd*, 713 F.3d 159 (2d Cir. 2013) ("Although the discretionary function exception is jurisdictional on its face, it is analogous to an affirmative defense. Therefore, just as a plaintiff cannot be expected to disprove every affirmative defense that a defendant could potentially raise, so too should a plaintiff not be expected to disprove every exception to the FTCA.")  Under the *Molchatsky* framework, Plaintiffs bear a burden to "rebut the Government sufficiently to demonstrate there is a plausible case for non-discretionary or non-policy action in order to defeat dismissal." 778 F. Supp. 2d at 431. Because Plaintiffs have plausibly alleged and submit rebuttal evidence contesting the government's proffered "criminal history" rationale for separation, the documents submitted by Defendant on March 23, 2021 are insufficient to support dismissal at this stage. Accordingly, the Court should order discovery to test the Defendant's assertion of discretion and show it was in fact governed by an unconstitutional policy to separate families at the border without due process.

### 1. Plaintiffs Have Made Sufficient Allegations Demonstrating that the Defendant Was Acting Unconstitutionally and Rebut the Defendant's New Evidence.

Plaintiffs have plausibly alleged facts showing that Defendant implemented a wide-ranging Family Separation Policy during the precise period when it forcibly separated Mr. C. and D.J.C.V. Compl. ¶¶ 22-78 (citing public record evidence and statements by high-level government agents). They have further pled and attest here that the Defendant shifted rationales for continuing the separation for 166 days and that it promised to reunify the family if Mr. C. waived his and his son's rights to humanitarian protection, suggesting that all the rationales – including purported criminal history – were subservient to the broader Family Separation Policy. *See* Compl. ¶¶ 80-122. *See also* Mr. C. Decl., Ex. A. ¶¶ 9-12; Silane Decl., Ex. B. ¶¶ 4-5.

Although not invited by the Court to do so, Defendant has proffered a conclusory email exchange with the subject heading "FMU Separation Request" (Dkt. 84-3) and a form "I-213" (Dkt. 84-2) in support of its assertion that the separation "was predicated upon G.C.'s criminal history." Because these conclusory documents are unreliable and insufficient to demonstrate that the family was separated independently of the Family Separation Policy – let alone that this constitutes any semblance of due process – they cannot provide a basis to grant the Defendant's 12(b)(1) motion.

The May 1, 2018 "FMU Request to Separate" email exchange was written at the chaotic height of the Family Separation Policy's implementation. In addition to the error identifying Mr. C. as a "mother" – an error which suggests separation decisions were being done *en masse* rather than on an individualized level – the email included a directive to "make the necessary changes" in DHS' "e3" database. If anything, this tends to support Plaintiffs' theory. As the Office of the Inspector General has found, prior to April 2018, the "e3" database did not contain any ability to record any reason for separation. The capability to record "criminal history" as grounds for separation was added only just before Plaintiffs' separation and coincident with the roll-out of the Family Separation and Zero Tolerance policies – suggesting it was an additional pretextual mode of implementing the dominant Family Separation Policy that is operative in this case and that was applied to thousands of others without any criminal history.[1] To the extent that the I-213 form, with its boilerplate language, repeats this statement, it also is not probative of Defendant's theory.

It is also questionable whether a misdemeanor such as Mr. C's was the sort of "criminal history" that provided grounds for separation *before* Defendant implemented the Family Separation Policy. Advocates regularly working along the border attest that parents, including fathers, with

---

[1] *See* Office of the Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* DHS OIG 20-06, (November 25, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf) ("In April 2018, Border Patrol updated e3 to add 11 possible separation codes for agents to select as distinct reasons why family members were separated. **However, none of the 11 separation codes were specifically tied to the Zero Tolerance Policy. That is, agents did not have an option to select "Zero Tolerance" as a reason for separating families.** To compensate, Border Patrol agents used ad hoc workarounds to capture the reasons for family separations by simply selecting 'Criminal History' or 'Other Reasons.'") (emphasis added). Notably, the email indicated that Mr. C. was being referred for prosecution. If that prosecution had occurred, Plaintiffs would have separated pursuant to "Zero Tolerance," a category that could not have been recorded in the e3 database.

criminal convictions, were housed together in family detention centers. *See* Govindaiah Decl., Ex. C (declaring to the *Ms. L.* court in September 2018 that the Karnes family detention center did house families with fathers who had past criminal convictions). Plaintiffs must be able to inquire into past practices of housing parents with "criminal histories" together with their children or releasing such families without detaining them at all.

### 2. The Court Should Not Dismiss Plaintiffs' Plausibly Pled Complaint and Additional Evidence Under 12(b)(1) Without Providing for Jurisdictional Discovery.

In order to resolve open questions regarding the existence of jurisdiction, the Court has discretion to allow jurisdictional discovery. *See Togut v. Forever 21*, 285 F. Supp. 3d 643, 648 (S.D.N.Y. 2018). Courts have granted FTCA jurisdictional discovery where the existence of guidelines is relevant to the application of the DFE, but "such guidelines are unknown or unknowable without discovery." *Molchatsky*, 778 F. Supp. 2d at 438. And, to ensure fairness to a plaintiff, the district court "has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *Broidy Capital Management v. Benomar*, 944 F.3d 436, 446 (2d Cir. 2019) (internal citation omitted). Indeed, a plaintiff should have "*ample* opportunity to secure and present evidence relevant to the existence of jurisdiction," *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011) (emphasis added) (internal citation omitted), particularly when the jurisdictional facts "are peculiarly within the knowledge of the opposing party." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004). Put another way, a plaintiff should not be "deprived of his day in court by a 12(b)(1) order based on erroneous facts." *In re Alstom SA*, 406 F. Supp. 2d 346, 366 (S.D.N.Y. 2005), quoting *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 121 n. 1 (2d Cir.1998).[2]

### B. Because a Prior Criminal Conviction Does Not Confer Discretion to Violate Plaintiffs' Due Process Right to Family Integrity Absent Notice and Opportunity to be Heard, the Court Should Deny the 12(b)(1) Motion Outright and Proceed to the Merits.

As Plaintiffs previously detailed, Dkt. 35 at 13-16, both Mr. C. and D.J.C.V. are protected by the fundamental right to family integrity. *See Troxel v. Granville*, 530 U.S. 57, 66-67 (2000); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) (explaining centrality of "the right of the family to remain together without the coercive interference of the awesome power of the state."). Accordingly, that right is guarded by the adjudicatory requirements of procedural due process via notice and an opportunity to be heard. *See Stanley v. Illinois*, 405 U.S. 645, 658 (1972) (although it is "more convenient to presume than to prove" a parent's unfitness, "refusing a father a hearing when the issue at stake is the dismemberment of his family" violates due process). Such protections apply to immigrants seeking humanitarian protection at the border. *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116,

---

[2] Following the conclusion of jurisdictional discovery and because the question of jurisdiction will likely be intertwined with the merits (for example, whether willful interference with family relationship constitutes IIED), the Court would evaluate the 12(b)(1) motion on a summary judgment standard. *London v. Polishook*, 189 F.3d 196, 198 (2d Cir. 1999). If disputed issues of material facts going to both jurisdiction and the merits remain, the court would defer fact-finding until trial, as only the trier-of-fact may resolve facts going to the merits. *Id*. (in a "close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time.").

1125 (N.D. Ill. 2018) (even in detention, due process protects a child's fundamental right to family integrity absent evidence and finding of "parental unfitness or danger to the child"); *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 741-42 (D. Conn. 2018) (DHS violated children's rights by failing to undertake case-specific evaluation, with notice and opportunity to be heard, regarding best interests of children before removing them from the custody of their parents). In the Second Circuit, the constitutionality of a government policy is not subject to the "shocks the conscience" standard advocated by Defendant, Dkt. 84-2 n.3, but to the more rigorous "strict scrutiny" standard, *Nicholson v. Williams*, 203 F. Supp. 2d 153, 243 (E.D.N.Y. 2002); *J.S.R.*, 330 F. Supp. 3d at 741-42 (DHS policy was not "narrowly tailored to achieve [a] compelling reason" for depriving children of family integrity.).

Ignoring these constitutional commitments, Defendant proceeds on the remarkable assumption that if a government official identifies a past criminal conviction, that fact alone authorizes the State to take an infant child away from his father for months at a time with no opportunity to challenge the State's potentially arbitrary action. Defendant cites *zero* authority for this terrifying and lawless proposition, nor could it. Even if the evidence Defendant proffers were reliable (which it is not, *see supra* at (A)), Defendant's denial of due process still precludes invocation of the DFE, because there is no discretion to violate the Constitution. Dkt. 35 at 10-13. The Defendant's focus in its prior briefing on the right to *detain* Mr. C. does not resolve the relevant constitutional question given that, as detailed *supra*, prior practice had been either to release families with a notice to appear in immigration proceedings or to detain adults with "criminal history" with their children in family detention centers.[3]

It is undisputed that the Defendant provided Mr. C. no opportunity to challenge the Defendant's reflex presumption that an eight-year-old misdemeanor conviction automatically renders a parent unfit to care for his child.  As Mr. C. pled and substantiates in his accompanying declaration, the State took custody of his son without an explanation of how any prior conviction required him to forfeit his parental rights, Mr. C. Decl. ¶¶ 6, 9, 11, let alone an adjudicatory process at that moment or thereafter to dispute the presumption that an isolated criminal conviction rendered a loving father unfit to care for his son. *Id*.  And, as Mr. C. pled and attests here, he was given numerous *alternative* rationales for the separation that had nothing to do with the pretextual criminal history rationale now relied upon by the U.S., including that he was not the biological father. Compl. ¶¶ 104-09; Mr. C. Decl. ¶¶ 10-11.  And, perhaps most damning – and consistently ignored by Defendant – officials of the United States government offered to reunify if Mr. C. forfeited his and his child's legal rights to pursue asylum – a rationale that makes clear that the separation was never about parental unfitness or child welfare, but rather about deterring asylum seekers from the southern border. Compl. ¶ 116; Mr. C. Decl. ¶ 9; Silane Decl. ¶¶ 4-5, (documenting DOJ's conditioning reunification on forfeiture of asylum rights).[4]

---

[3]   Implicitly conceding it has no authority justifying the legality of its actions in this case, the Defendant seeks to change the relevant inquiry by importing a qualified immunity defense pertinent to personal capacity liability into the FTCA's congressionally-established entity liability framework. *See* Dkt. 77 at 5-6, Dkt. 84 at 2 n.2 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Such attempted conflation of individual and entity liability has been roundly rejected. *See Castro v. United States*, 34 F.3d 106,111 (2d Cir. 1994) The government in an FTCA suit is liable "to the same extent as private individuals under like circumstances," and private individuals do not have access to qualified immunity. *Id. See also Rivera v. United States*, 928 F.2d 592, 609 (2d Cir. 1991); *Farag v. United States*, 587 F. Supp. 2d 436, 452 (E.D.N.Y. 2008).

[4]   The government's reliance on a prior misdemeanor conviction to authorize family separation absent procedural due process also does not withstand scrutiny under the balancing framework of *Mathews v. Eldridge*, 424 U.S. 319 (1976).  First, Plaintiffs' asserted liberty interest "is perhaps the oldest of the fundamental liberty

In addition, the proceedings in the *Ms. L.* case did not satisfy the relevant constitutional requirements. The *Ms. L.* court did not inquire at all as to Mr. C.'s fitness as a parent. Dkt. 23-2. The *Ms. L.* court dealt solely with the scope of a class of persons subject to the Family Separation Policy which could be certified under Rule 23, and whether claims by individuals with criminal convictions were common or typical of the broader class. Mr. C.'s notice and opportunity to be heard on *that* technical question – related to doctrinal and prudential standards under Rule 23 – was not relevant to the government's forfeiture of Mr. C's parental rights. Moreover, the *Ms. L.* court did not address the rights of separated children at all, as the class was composed solely of *parents* who had lost custody pursuant to the government's Family Separation Policy. Thus the *Ms. L.* court did not find that continued placement in state custody apart from his father was in D.J.C.V.'s best interests, even as it highlighted evidence showing that D.J.C.V. was "suffering tremendously." Dkt. 23-2 at 2.[5]

In any event, the *Ms. L.* holding would have been too little, too late. Due process must be provided "at a *meaningful time* and in a meaningful manner." *Goldberg v. Kelly,* 397 U.S. 254, 267 (1970) (emphasis added). Post-deprivation process may be sufficient if, because of exigent circumstances, it happens immediately after a deprivation; but process four months after cannot cure the continuing violation. *See Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009). Were it otherwise, the government could always delay process and undermine the requirement of advance notice. *See id*. at 173 ("providing a hearing after the investigation is completed cannot be squared with due process"); *Nnebe v. Daus*, 931 F.3d 66, 87 (2d Cir. 2019) (a "lengthy deprivation of property . . . without a judicial determination of probable cause and without a deeper inquiry into whether the deprivation is appropriate" is unconstitutional regardless of available post-deprivation process).

The Court must reject Defendants' invocation of the DFE. Regardless of which policy dictated the separation of Mr. C. and D.J.C.V., the United States has no discretion to remove a child from his parent's custody without a scintilla of pre-deprivation procedural due process and with plainly inadequate post-deprivation denials of reunification. This is so regardless of whether a "criminal history" policy in fact existed. To hold otherwise would be to find no remedy for a policy that requires parents with any "criminal history" to lose custody long after their sentences were served and allows children to be held apart from their parents indefinitely without any constitutionally adequate proceeding to determine whether such custody is lawful. The DFE does not shield such conduct.

---

interests recognized by th[e] Court." *Troxel*, 530 U.S. at 65. Second, the assumption that any conviction renders someone an unfit parent carries a shocking "risk of an erroneous deprivation" of Plaintiffs' familial rights, which is the very reason due process and lawful decision-making require notice and an opportunity to be heard. As family law expert Professor Martin Guggenheim attested to the *Ms. L.* court regarding Mr. C.'s, separation, "Hundreds of thousands of people with felony convictions in the United States have the constitutional right to the care and custody of their children once they have served their sentences and are released from custody. **To deny a father the same right for behavior that warranted a 48-day jail sentence would be manifestly unsupportable under the law governing this context**." Brief for Petitioner, *Ms. L. v. ICE*, No. 18-cv-428-DMS-MDD (S.D. Cal. Sept. 18, 2020) (Dkt. 221, Exhibit 65 at ¶ 9).

[5]     The first time an immigration judge considered the appropriateness of Mr. C.'s detention, it found that he was not a danger and ordered him released on bond. Silane Decl. ¶10. And the first time a court considered Mr. C.'s fitness to parent, Judge Hellerstein concluded "the government does not allege that Petitioner Mr. C. is unwilling or unfit to care for Petitioner D.J.C.V., his child, or any other adequate reason why petitioners should not be reunited." *D.J.C.V*, 2018 WL 10436675, at *1.

        Respectfully submitted,

        */s/ Ghita Schwarz*

        Baher Azmy
        Ghita Schwarz
        **CENTER FOR CONSTITUTIONAL RIGHTS**
        666 Broadway, 7th Floor
        New York, NY 10012
        +1.212.614.6464
        +1.212.614.6499
        bazmy@ccrjustice.org
        gschwarz@ccrjustice.org

        Kathryn Ball
        **MORGAN, LEWIS & BOCKIUS, LLP**
        101 Park Avenue
        New York, NY 10178-0060
        +1.212.309.6000
        +1.212.309.6001
        kathryn.ball@morganlewis.com

        Lily G. Becker (*Pro Hac Vice*)
        **MORGAN, LEWIS & BOCKIUS, LLP**
        1701 Market Street
        Philadelphia, PA 19103
        +1.215.963.5000
        +1.215.963.5001
        lily.becker@morganlewis.com