UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

D.J.C.V., *a minor child*, and G.C., *his father*,

                                                  Plaintiffs,

                              -v-

UNITED STATES OF AMERICA,

                                                  Defendant.

---

20 Civ. 5747 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

This case arises from the separation of D.J.C.V., a minor child, from his father, G.C. (together, "plaintiffs"), at the hands of United States authorities, following the illegal entry of these noncitizens into the United States. That separation had two phases. The first began on May 2, 2018—when, a few days after plaintiffs had crossed the U.S./Mexico border, Department of Homeland Security agents took D.J.C.V. away from G.C. and detained G.C. in secure detention—and lasted until October 10, 2018. The second began on October 10, 2018—when G.C. was released from such detention—and lasted until October 15, 2018, when D.J.C.V. and G.C. were reunited, as a result of a successful habeas corpus petition filed by G.C.

Plaintiffs bring claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 1402, 2401, 2671 *et seq.*, and torture, persecution, and inhumane acts under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, against the United States (the "Government"). These claims are based on both periods of separation. Pending now is the Government's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure

to state a claim under Rule 12(b)(6).  It argues that this suit is barred by sovereign immunity and that plaintiffs' complaint fails to state a viable claim.

For the reasons that follow, the Court finds that, as to the first period of separation, jurisdictional discovery is necessary, to determine what policy formed the basis of the Government's decision to separate G.C. from D.J.C.V. on May 2, 2018.  That determines whether the Court has subject-matter jurisdiction over plaintiffs' FTCA claims—or whether these are barred by exceptions to the FTCA's waiver of sovereign immunity.  As to the second period of separation, the Court denies the Government's motions to dismiss plaintiffs' FTCA claims both for lack of subject matter jurisdiction, because the Government has not met its burden to show that any exception to the waiver of sovereign immunity applies, and for failure to state a claim.  Finally, the Court grants the Government's motion to dismiss plaintiffs' ATS claims for lack of subject matter jurisdiction.

## I.      Background[1]

### A.      The Statutory and Regulatory Framework

#### 1.      Removal of Noncitizens and Withholding of Removal

Any noncitizen present in the United States without having been admitted or paroled in is inadmissible and subject to removal.  8 U.S.C. § 1182(a)(6)(A)(i).  When a noncitizen has

---

[1] The facts related here are drawn largely from the Complaint, Dkt. 1 ("Compl.").  To the extent the Government moves under Rule 12(b)(1), the Court also has considered the declarations and exhibits submitted by the parties.  Those are: the declaration of Alexander J. Hogan, Esq., Dkt. 23 ("Hogan Decl."); the declaration of Darius Reeves, Dkt. 24 ("Reeves Decl."); the declaration of James de la Cruz, Dkt. 83 ("de la Cruz Decl."); the declaration of Gerardo Guerra, Dkt. 84-1 ("Guerra Decl."); and the declaration of Ghita Schwarz, Esq., Dkt. 87-1 ("Schwarz Decl.").  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").  For the purpose of resolving the 12(b)(6) motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

illegally reentered the country after having been removed, the earlier order of removal is "reinstated from its original date." *Id.* § 1231(a)(5). The reinstated order "is not subject to being reopened or reviewed"; the noncitizen thus "is not eligible and may not apply for any relief" under the immigration laws. *Id.* Noncitizens who enter the United States unlawfully may also be subject to criminal prosecution. *See, e.g.*, *id.* §§ 1325, 1326.

Noncitizens, however, may not be removed to a country where they would face persecution or torture. *Id.* § 1231(b)(3); 8 C.F.R. §§ 208.16–18. Therefore, notwithstanding § 1231(a)(5)'s otherwise categorical bar on relief, such persons may be eligible for "withholding of removal," through "withholding-only" proceedings, if they can establish a "reasonable fear" of persecution or torture. 8 C.F.R. §§ 208.31(a)–(b), (e), 241.8(e). A noncitizen who expresses such fear to immigration-enforcement officials is referred to U.S. Citizenship and Immigration Services ("USCIS") for an interview with an asylum officer, who determines whether the person, in fact, possesses a "reasonable fear" of persecution or torture. *Id.* If the officer finds that the noncitizen has established such fear, the officer must refer the case to an immigration judge ("IJ") to determine whether the person is entitled to withholding of removal. *See* 8 C.F.R. § 208.31(e).

### 2. Detention Pending Removal

Relevant here, two statutes authorize detention of noncitizens.

First, 8 U.S.C. § 1226(a) authorizes detention "pending a decision on whether the alien is to be removed from the United States." Under that section, the Government may detain a noncitizen, although it may instead release him subject to parole or a bond. If the noncitizen is detained under § 1226(a), he may request a bond hearing before an IJ. 8 C.F.R. § 1236.1(d)(1).

Under 8 U.S.C. § 1231(a)(1), by contrast, a noncitizen subject to a final order of removal *must* be detained for the 90-day period after the order of removal becomes final. Thereafter, a

person subject to a removal order who has not yet been removed may be released or further detained, depending on whether the Government determines that he is a "risk to the community or unlikely to comply with the order of removal." *Id.* § 1231(a)(6). Under § 1231(a)(6), bond hearings are authorized to review this determination if removal is not "reasonably foreseeable." *See Guerra v. Shanahan*, 831 F.3d 59, 62 (2d Cir. 2016).[2]

Under both provisions, the Government "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

### 3.    Detention and Release of Minor Children

Two statutes govern the custody and release of an unaccompanied alien child ("UAC").

Under the Homeland Security Act, the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services ("HHS") is responsible for "the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(A). A UAC is defined as any child who (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) either has no parent or legal guardian in the United States *or* has "no parent or legal guardian in the United States" who is "available to provide care and physical custody." *Id.* § 279(g)(2).

---

[2] Previously, in this Circuit, a noncitizen, like G.C., who was both subject to a reinstated removal order and in withholding-of-removal proceedings, was considered detained under § 1226(a), not § 1231, which meant he was entitled to a bond hearing. *See Guerra*, 831 F.3d at 64; *id.* at 62 (deciding "whether a reinstated removal order is 'administratively final' during the pendency of withholding-only proceedings"). In the course of such "withholding-only" proceedings, the immigration authorities "engage in the lengthy process of determining whether [a noncitizen] ha[s] the legal right (because of [his] fear of persecution or torture) to have [his] removal withheld." *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2293 (2021) (Breyer, J., dissenting). The Supreme Court recently held, however, that it is § 1231 that governs the detention of noncitizens subject to reinstated orders of removal in withholding-only proceedings—"meaning those aliens are *not* entitled to a bond hearing while they pursue withholding of removal." *Id.* at 2280 (majority opinion) (emphasis added). Here, however, as discussed below, G.C., once referred for withholding-only proceedings, was granted a bond hearing and, in fact, released on bond. *See infra.*

And under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).

Once the UAC is transferred to HHS, ORR must place the UAC "in the least restrictive setting that is in the best interest of the child"; it cannot place UACs in a secure facility unless it determines that the child "poses a danger to self or others or has been charged with having committed a criminal offense." *Id.* § 1232(c)(2)(A). ORR cannot release a UAC to a person's custody unless HHS first "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," including by verifying the proposed custodian's identity and making an "independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A).

In addition, the United States is subject to "a binding agreement incorporated into a judicial decree" governing the detention, release, and treatment of minors in immigration custody. *See Flores v. Sessions*, 862 F.3d 863, 866, 875 (9th Cir. 2017). The *Flores* Settlement Agreement, entered into in 1997, applies to both accompanied and unaccompanied minors. *See Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016). It requires that "[w]ithin five days of arrest," the Government "must transfer the minor to a non-secure, licensed facility[.]" *Id.* at 902. It is undisputed that D.J.C.V. is subject to that settlement agreement. *See* Compl. ¶ 76 n.75; Dkt. 22 ("Gov't Mem.") at 11.

### 4. The Trump Administration's Enforcement Directives and Responses

On January 25, 2017, then-President Trump issued Executive Order No. 13767 ("EO 13767"). It announced that "the policy of the executive branch" was to "detain individuals

apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations." *See* Exec. Order No. 13767, 82 Fed. Reg. 8793, 8793 (Jan. 30, 2017). EO 13767 instructed the Department of Homeland Security ("DHS") to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country as permitted by law." *Id.* at 8795.

In July 2017, "[i]n an effort to limit the number of individuals seeking asylum," the Trump Administration established a family-separation "pilot program" in Western Texas and New Mexico. Compl. ¶ 23. Plaintiffs allege that the program targeted parents who unlawfully crossed the southern border with their children, and involved removing the children from their parents' custody, designating the child a UAC, and referring the parent to the Department of Justice ("DOJ") for criminal prosecution. *Id.* ¶¶ 23–24. Between July and November 2017, "the Government separated at least 281 individuals in families" via this pilot program. *Id.* ¶ 25.

In December 2017, after the pilot program ended, the Administration circulated a memorandum titled, "Policy Options to Respond to Border Surge of Illegal Immigration." *Id.* ¶ 26. That memorandum included, as two "short term" options, (1) "Increased Prosecution of Family Unit Parents," which contemplated that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [UACs]"; and (2) "Separate Family Units," which contemplated placing parents in adult-detention centers and children in ORR custody. *Id.* ¶¶ 26–27. As a rationale for these proposals, the memorandum stated that the "increase in prosecutions would be reported by [the] media and it would have substantial deterrent effect." *Id.* ¶ 27.

On April 6, 2018, then-Attorney General Jeff Sessions announced a new "Zero Tolerance" policy. It mandated prosecution of all persons who crossed the United States border between ports of entry. *Id.* ¶ 29. Plaintiffs allege that this policy endorsed the pilot program and "triggered the family separation policies." *Id.* ¶¶ 29–30. Contemporaneous statements by high-ranking members of the Trump Administration suggested that the Administration intended to deter border crossings by taking forceful action against persons who did so. *See id.* ¶¶ 32 (quoting National Security Council official stating, "My mantra has persistently been presenting aliens with *multiple unsolvable dilemmas* to impact their calculus for choosing to make the arduous journey to begin with.") (emphasis in original), 37 (describing statements "confirming that family separation[s] . . . intended to terrorize and deter parents from seeking asylum"). The same day, the White House issued a Presidential Memorandum titled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement." Among other things, it instructed DHS to report on its progress in implementing EO 13767. *See* Gov't Mem. at 13 (citing 83 Fed. Reg. 16179 (Apr. 13, 2018)).

Under these policies, immigration officials separated hundreds of parents from their children near the United States-Mexico border. Compl. ¶ 39. Officials detained families in inhumane conditions, forcibly removed children as young as four months from their parents, and transferred parents to Immigration and Customs Enforcement ("ICE") detention. *Id.* ¶¶ 39–46. Often, the children were then flown hundreds or thousands of miles away, allegedly under the "pretense" that this separation was the necessary result of the parents' prosecution. *Id.* ¶ 49. In many cases, the Government failed to record which children had been separated from which parents. *Id.* ¶¶ 56–59. On June 20, 2018, after widespread condemnation and after more than

700 families had been separated, President Trump signed an executive order purporting—but, according to the Complaint, failing—to end family separations. *Id.* ¶¶ 63–66.

On June 26, 2018, a federal court in the Southern District of California, which had previously certified a class of migrant parents whose children had been taken by the Government, held that the family-separation policy likely violated parents' due process rights to family integrity. It issued a preliminary injunction enjoining the policy and requiring the Government to begin reuniting separated families. *See id.* ¶¶ 67–73; *Ms. L. v. U.S. Dep't of Homeland Sec.*, 310 F. Supp. 3d 1133, 1145 (S.D. Cal. 2018) ("*Ms. L. II*").[3] The court also prohibited the Government from separating families without a determination that the parent was unfit or a danger to their child. *Ms. L. II*, 310 F. Supp. 3d at 1149. The *Ms. L.* court, however, excluded from the class of migrant parents those with criminal history. *Id.* at 1139 n.5; *see* Hogan Decl., Ex. 2 ("*Ms. L.* Order"); Compl. ¶¶ 74–75. It did so because it found that the Government's interest in securely detaining "individuals who posed a flight risk or danger to the community or others in a family detention facility because of that person's criminal history" outweighed the parents' concern that the Government would "abuse [its] discretion and exclude parents with minor misdemeanors." *Ms. L.* Order at 2.

---

[3] The *Ms. L.* court had previously, on June 6, 2018, granted in part and denied in part a motion to dismiss the complaint. *Ms. L. v. U.S Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018) ("*Ms. L. I*").

**B.     Factual Background as to G.C. and D.J.C.V.**

**1.     Parties**

G.C. is an adult Honduran man and the father of D.J.C.V.  Compl. ¶ 15.[4]  D.J.C.V. was

19 months old on April 30, 2018, when he and G.C. entered the United States, and turned two

while he was separated from his father.  *Id.* ¶ 16.

The United States is sued here in its capacity as the employer of the federal officers of

DHS and HHS described in the Complaint.  *Id.* ¶ 18.  Plaintiffs allege that agents of DHS

(including its subsidiaries ICE and Customs and Border Protection ("CBP")) and HHS (including

ORR) unlawfully separated and detained G.C. and D.J.C.V.  *Id.* ¶¶ 18–21.

**2.     G.C.'s Immigration and Criminal History**

In 2010, after entering the United States at an unknown place and time, G.C. pled guilty

to one charge of aggravated assault in Louisiana for swinging a machete at his wife.  *See* Reeves

Decl. ¶¶ 4–5; de la Cruz Decl., Exs. 1 ("Arrest Report"), 2 ("Plea Minutes").  He was sentenced

to 48 days in jail, and then ordered removed; in January 2011, he was removed.  Reeves Decl.

¶¶ 6–8.  In October 2013, after G.C. again unlawfully reentered the country, the Government

reinstated G.C.'s removal and again removed him.  *Id.* ¶ 8.

**3.     G.C. and D.J.C.V.'s Entry, Detention, and Separation**

On April 30, 2018—soon after the announcement of the Zero Tolerance policy—G.C.

and D.J.C.V. entered the United States after fleeing Honduras.  They sought protection from

persecution, including threats to their lives.  *Id.* ¶¶ 15, 81.  The same day, G.C. and D.J.C.V.

encountered U.S. border patrol agents near Hidalgo, Texas, to whom G.C. expressed their fear of

---

[4] G.C. is not D.J.C.V.'s biological father, but he alleges that he has full parental rights over
D.J.C.V. and has cared for him "[f]rom the day D.J.C.V. was brought home from the hospital
after his birth."  Compl. ¶ 82.

returning to Honduras. *Id.* ¶ 83. G.C. also immediately provided the agents with D.J.C.V.'s birth certificate and a sworn statement from D.J.C.V.'s mother authorizing him to travel with G.C. *Id.*

The agents apprehended the two and detained them in a short-term detention center, known as an "icebox" due to its freezing temperatures. G.C. and D.J.C.V. remained there between April 30 and May 2, 2018. *See id.* ¶¶ 84–85.

On May 1, 2018, CBP officials conducted a record check for G.C. It revealed his 2010 misdemeanor conviction. Guerra Decl. ¶ 6. The same day, CBP completed a Form I-213.[5] It noted that G.C. had "pled guilty and was sentenced to 48 Days Jail" in 2010,[6] and that "[b]ased on the above criminal record information, as per Watch Commander Gerardo Guerra, [G.C.] and [D.J.C.V.] will be separated. [D.J.C.V.] will be processed accordingly as a UAC." Dkt. 84-2 ("Form I-213") at 4; *see also* Dkt. 84-3 ("Guerra Email") (approving request for separation of G.C. from D.J.C.V. because of "mother [sic] having prior criminal history"). On the same day, officials served G.C. with a notice that his prior removal order would be reinstated under 8 U.S.C. § 1231(a)(5), triggering his detention for the 90-day removal period under 8 U.S.C. § 1231(a)(2). Reeves Decl. ¶¶ 11–12. A warrant for G.C.'s removal issued the same day. *Id.* ¶ 11.

---

[5] Form I-213 is a "record of a deportable or inadmissible alien," which can support "adverse immigration actions." Guerra Decl. ¶ 4.

[6] The Form I-213 contains contradictory statements about G.C.'s criminal history but reflects both his arrest and conviction. *See* Dkt. 84-2 ("Form I-213") at 3 (citing a September 10, 2010 arrest but noting that "Subject has no criminal convictions"), 4 ("According to EARM/ICE narrative subject pled guilty and was sentenced to 48 Days Jail."); *see also* Dkt. 84-3 ("Guerra Email") ("[T]he arrest does come out on his criminal history check, but not the conviction. The conviction only comes out on EARM narrative.")

On May 2, 2018, immigration officials questioned G.C., including about his 2010 misdemeanor conviction in Louisiana. Compl. ¶ 88. After that questioning, an official told G.C. that the Government intended to deport him and take D.J.C.V. *Id.* ¶ 89. That day, other officials arrived at plaintiffs' cell; they told G.C. to say goodbye to his son, and, as G.C. cried, forcibly removed D.J.C.V. from G.C.'s arms, and took D.J.C.V. away. *Id.* ¶ 90.

### 4.    The Government's Continued Separation of G.C. and D.J.C.V.

G.C. was then transferred to a different detention center in Texas and housed with other parents whose children had been separated from them. *Id.* ¶ 93. The Complaint alleges that G.C. and the other parents experienced fear, trauma, and anxiety while detained and separated from their children, and that G.C. contemplated, and another parent attempted, suicide. *Id.* ¶¶ 93–96. While G.C. was at this facility, he alleges, immigration officials repeatedly threatened to deport him without his son, refused to reveal D.J.C.V.'s whereabouts to G.C., prohibited G.C. from communicating with D.J.C.V., and pressured him to waive his application for withholding of removal[7] by threatening that if he did so, they would block any chance of reunification with D.J.C.V. *Id.* ¶¶ 95–99, 101. At some point, officials told G.C. that D.J.C.V. was in New York, as was, for the latter part of this period, correct. *Id.* ¶ 98; *see id.* ¶¶ 14, 108 (D.J.C.V. was housed with Lutheran Social Services of New York in the Bronx, New York).

Several weeks later, the Government transferred G.C. to a detention facility in New Jersey. He remained there for another two months without seeing or speaking to D.J.C.V. *Id.* ¶ 99.

---

[7] The Complaint refers to G.C.'s claim as being for asylum. However, because he was subject to a reinstated removal order, he was not eligible for asylum, but was eligible for withholding or deferral of removal. *See* Gov't Mem. at 3 n.1 (citing 8 C.F.R. § 1208.16; 8 C.F.R. § 208.31(e)).

In July 2018, G.C. was transferred to Hudson County Correctional Center ("HCCC") to be reunited with D.J.C.V. *Id.* ¶ 103.  On July 17, 2018, after G.C. had engaged counsel, his counsel learned from G.C.'s deportation officer that G.C. would be interviewed by USCIS in connection with his claim for withholding of removal once ICE resolved certain questions it had about his relationship to D.J.C.V. *Id.* ¶ 105.  On July 19, 2018, after obtaining a DNA test showing that D.J.C.V.'s and G.C.'s DNA did not match, ORR briefly concluded that the two were not family. *Id.* ¶ 106.  On July 27, 2018, however, ORR reversed its position after receiving further evidence of G.C.'s parentage. *Id.* ¶ 107.  Nonetheless, DHS told G.C.'s counsel that, despite ORR's conclusion, it did not consider the two to be family, and so would not let them see each other or be reunified. *Id.* ¶¶ 108–09.

In August 2018, after G.C.'s counsel suggested that the June 26, 2018 *Ms. L.* ruling required G.C. and D.J.C.V.'s reunification, the Government, allegedly for the first time, cited G.C.'s 2010 misdemeanor conviction as the basis for the continued separation. *Id.* ¶¶ 110–13. Plaintiffs characterize the Government's reliance on G.C.'s criminal history as a basis for the continued separation as pretextual.  This rationale, they allege, conflicted with the Government's prior stated reasons for keeping G.C. and D.J.C.V. apart. *Id.* ¶¶ 100, 104, 116.  The true basis for the separation, they allege, was the Government's goal to use family separation to deter asylum-seekers from crossing the border.  In support, they cite an August 2018 offer by the Government to reunify G.C. and D.J.C.V., but solely for purposes of removal and only if they relinquished their rights to challenge their removal through asylum or withholding-only proceedings. *Id.* ¶ 116.

On September 19, 2018, the *Ms. L.* court approved the continued separation of noncitizen parents from their children where the separation was based on the parent's criminal history.  The

order specifically listed G.C. as fitting within that category. *See Ms. L.* Order at 3.  The court

held:

> Defendants' determination that Ms. Q. and [G.C.] have disqualifying criminal
> history that precludes reunification with their children and either release into the
> community or detention in a family residential center is entitled to deference. The
> record indicates Defendants have vetted these parents in good faith and made
> principled decisions in light of their criminal history and overarching concerns
> regarding safety of their children and the public.
>
> These determinations certainly can be debated, but the Court is persuaded that
> Defendants have exercised their statutorily prescribed discretion in a reasonable
> manner. The Court has consistently held that matters of detention and parole are
> peculiarly within the province of the executive branch, and for prudential and other
> reasons that exercise of discretion ought not to be disturbed under these
> circumstances.

*Id.*  As a result of this ruling, G.C. remained ineligible for relief under the injunction issued in

*Ms. L.*

### 5. G.C.'s Release from Custody

On August 21, 2018, G.C.'s counsel learned that G.C. would receive a reasonable-fear

interview with USCIS on August 23, 2018. Compl. ¶ 114.  That same day, without notice to his

counsel, G.C. was transferred to yet another facility, this time in upstate New York. *Id.*

On August 23, 2018, USCIS conducted G.C.'s reasonable-fear interview. *Id.* ¶ 115.  It

found that G.C. had a reasonable fear of persecution and torture should he return to Honduras.

*Id.*; *see* Reeves Decl. ¶ 14.  As a result, he was referred to an IJ for withholding-only

proceedings, and became eligible for a bond hearing. Reeves Decl. ¶¶ 15–16; *see supra* n.2.  On

October 10, 2018, G.C. was released from detention after an IJ granted his petition for bond.

Compl. ¶ 120.

### 6. G.C. and D.J.C.V.'s Reunification

On October 11, 2018, G.C., through counsel, arranged a 1.5-hour visit with D.J.C.V.,

who was then in foster care. *Id.* ¶¶ 119, 121, 126.  At first, D.J.C.V. did not recognize G.C., and

cried when G.C. tried to hold him. *Id.* ¶ 127. After the visit, G.C. requested that he and D.J.C.V. be reunified, given G.C.'s release from federal custody. *Id.* ¶¶ 128–29. But government officials denied that request, telling G.C. he "had to go through a lengthy vetting process in order to regain custody of his son." *Id.* ¶ 129; *see* Dkt. 77 ("Gov't Reply") at 11–12 (discussing statutory requirement that, before ORR releases an unaccompanied minor, it must make "a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," and that such process take no longer than two weeks). In response, G.C. petitioned for habeas corpus before this Court, and moved for a temporary restraining order ("TRO") requiring his reunification with D.J.C.V., arguing that, *inter alia*, the separation violated plaintiffs' substantive due process rights to family integrity. Compl. ¶ 130.

On October 15, 2018, Judge Hellerstein, to whom G.C.'s petition was assigned, granted the TRO. *Id.* ¶ 131; *see D.J.C.V. v. U.S. Immigr. & Customs Enf't*, No. 18 Civ. 9115 (AKH), 2018 WL 10436675, at *1 (S.D.N.Y. Oct. 15, 2018). He ruled that "the government does not allege that Petitioner Mr. C. is unwilling or unfit to care for Petitioner D.J.C.V., his child, or any other adequate reason why Petitioners should not be reunited." *D.J.C.V.*, 2018 WL 10436675, at *1. He further found that several recent court decisions, in this District and elsewhere, which had held that forced family separations violated immigrants' due process rights, established plaintiffs' likelihood of success on the merits. *Id.* He also held that G.C.'s "single misdemeanor conviction from eight years ago does not provide a sufficient basis to distinguish this case." *Id.* Accordingly, he ordered that G.C. and D.J.C.V. be reunited that day. Compl. ¶¶ 130–32.

## C.   Procedural History

On July 24, 2020, plaintiffs filed the Complaint. *See* Compl. On October 16, 2020, the Government moved to dismiss, Dkt. 21, and filed a memorandum of law in support, *see* Gov't Mem., as well as the declarations of Alexander J. Hogan, Darius Reeves, and James de la Cruz.

On December 8, 2020, plaintiffs filed an opposition, Dkt. 32, which they later re-filed to omit certain confidential information, Dkt. 35 ("Pl. Opp'n"). In late December 2020, many *amici curiae* appeared and, with leave, filed briefs supporting plaintiffs. *See* Dkts. 36–66, 68–73, 76. On February 12, 2021, the Government replied. *See* Gov't Reply. On March 5, 2021, the Court held extended argument. *See* Dkt. 85 ("Tr.").

After argument, the Court directed the parties to file supplemental letter briefs addressing the following question:

> Where an officer made a decision challenged under the FTCA, and the parties dispute—and the cognizable materials do not clearly resolve—which of two policy frameworks the officer made that decision under, may a court, in the course of determining whether it has subject-matter jurisdiction, inquire (and if necessary commission jurisdictional discovery) into which of the policies actually formed the basis of the decision?

Dkt. 78. On March 23, 2021, the Government filed its letter, Dkt. 84 ("Gov't Ltr."), and the declaration of Geraldo Guerra. On April 6, 2021, plaintiffs filed their letter, Dkt. 87 ("Pl. Ltr."), and the declaration of Ghita Schwarz. On April 9, 2021, given the parties' agreement that jurisdictional discovery was permissible and appropriate, the Court issued an order briefly stating its conclusion that such discovery was warranted, and directing the parties to submit a proposed discovery schedule. Dkt. 88 ("Order"). The Court noted that a full opinion on the issue would follow. *Id.* at 2.

This is that decision—though its issuance was delayed for a year by the representation of the parties that a settlement was at hand. On April 30, 2021, the parties requested an extension for their proposed discovery plan because the parties were discussing a stay of all proceedings in light of a possible settlement. Dkt. 91. The Court granted that request, Dkt. 92, and, on May 10, 2021, at the joint request of the parties, Dkt. 93, stayed the case, Dkt. 94. On February 23, 2022, after the Court had several times extended the stay at the parties' request, *see* Dkts. 96, 98, 100,

102, 104, the parties notified the Court that settlement negotiations had proven unsuccessful, as they had in other cases challenging the separation of non-resident parents and children at the border. Dkt. 107. On March 18, 2022, the parties submitted a discovery plan, Dkt. 115, which the Court approved, Dkt. 116.

## II. Applicable Legal Standards

### A. Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). In resolving a motion to dismiss under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff." *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (citation omitted). Nevertheless, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (citation omitted). Instead, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

### B. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly

dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.    Discussion

The Government seeks to dismiss plaintiffs' claims for lack of subject matter jurisdiction and for failure to state a claim. The Court first considers plaintiffs' claims under the FTCA, with distinct attention to the two phases of the separation. The Court then considers the claims under the ATS.

### A.    The Federal Tort Claims Act

The Court first reviews the legal principles applicable to plaintiffs' FTCA claims, including the "private analog" doctrine under which claims against the United States may be permitted. The Court then explains why, as to the initial period of more than five months in which G.C. and D.J.C.V. were separated, the Court would have subject matter jurisdiction if the separation was based on the Zero Tolerance policy, but not if it was based on G.C.'s criminal history. Jurisdictional discovery as to the basis for that separation is therefore necessary. The Court then explains why there is subject matter jurisdiction as to the second, five-day, period of separation, and why plaintiffs plead a plausible FTCA claim as to that period.

#### 1.    Applicable Legal Principles

In general, courts lack jurisdiction to entertain suits against the United States where it has not consented to suit and thereby waived its sovereign immunity. *Hamm v. United States*, 483

17

F.3d 135, 137 (2d Cir. 2007). The FTCA constitutes a limited waiver by the United States of its sovereign immunity. It thereby "allows for a tort suit against the United States under specified circumstances." *Id.* (citation omitted).

FTCA jurisdiction exists only if a plaintiff alleges "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see id.* § 2674 (FTCA allows for tort recovery against United States only "in the same manner and to the same extent as a private individual under like circumstances"). This "private analog" requirement that a claim address "like circumstances" does not mean "under the same circumstances." *Indian Towing Co. v. United States,* 350 U.S. 61, 64–65 (1955). Given the *sui generis* nature of governmental action, courts must look "further afield" to find analogous torts relating to the government activity at issue. *United States v. Olson,* 546 U.S. 43, 46 (2005); *see Liranzo v. United States,* 690 F.3d 78, 87 (2d Cir. 2012) (explaining that the "[Supreme] Court adopted a broader view of the private analogue requirement" in *Indian Towing*).

There are exceptions to the FTCA's waiver of sovereign immunity, *see* 28 U.S.C. § 2680, three of which the Government invokes here: the discretionary function exception ("DFE"), the due care exception ("DCE"), and the misrepresentation exception.

### a.    Discretionary function exception

The FTCA excludes from its waiver of sovereign immunity "[a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This "discretionary function exception" is "a form of retained sovereign immunity." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008).

Retention of that immunity is designed "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotation marks and citation omitted).

On a 12(b)(1) motion, a complaint may survive "if it alleges facts that could embrace a non-discretionary decision that caused the injury and the United States does not 'establish that the decision in question was grounded in questions of public policy.'" *Molchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011) (quoting *Coulthurst v. United States*, 214 F.3d 106, 110–11 (2d Cir. 2000)), *aff'd*, 713 F.3d 159 (2d Cir. 2013). And for the DFE to apply, "(1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst*, 214 F.3d at 109 (internal quotation marks omitted) (citing *Gaubert*, 499 U.S. at 322–23; *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)); *see also, e.g.*, *Molchatsky*, 713 F.3d at 162. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see In re Joint E. & S. Dists. Asbestos Litig.*, 891 F.2d 31, 37 (2d Cir. 1989) ("We believe that it is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision."). However, there is no discretion for a federal official "to behave unconstitutionally or outside the scope of his delegated authority." *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975). "In sum, the discretionary function exception

insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537.

### b. Due care exception

The FTCA also excludes from its waiver of sovereign immunity "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). It is aimed at ensuring that a statute or regulation's validity is not "tested through the medium of [a] damage suit for tort." *Myers & Myers*, 527 F.2d at 1261 (internal quotation marks omitted).

The Second Circuit has not yet set forth the standard for the DCE to apply, but many courts within the Circuit have used the formulation set forth in *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005). *See Nwozuzu v. United States*, No. 14 Civ. 8589 (LGS), 2015 WL 4865772, at *5 (S.D.N.Y. Aug. 12, 2015), *aff'd*, 712 F. App'x 31 (2d Cir. 2017) (summary order); *see also* Gov't Reply at 8 n.5 ("The Government acknowledges that district courts in this Circuit have applied the test in *Welch*."). Under *Welch*, a court first "determines whether the statute or regulation in question specifically prescribes a course of action for an officer to follow" and, second, if it finds in the affirmative, "inquires as to whether the officer exercised due care in following the dictates of that statute or regulation." *See Clayton v. United States*, No. 18 Civ. 5867, 2019 WL 9283977, at *12 (E.D.N.Y. Aug. 1, 2019) (cleaned up), *report and recommendation adopted*, No. 18 Civ. 5867, 2020 WL 1545542 (E.D.N.Y. Mar. 31, 2020). Due care "implies at least some minimal concern for the rights of others." *Gjidija v. United States*, 848 F. App'x 451, 454 (2d Cir. 2021) (summary order) (quoting *Myers & Myers*, 527 F.2d at 1262) (further quotation omitted). Unlike the DFE, then, the DCE "applies to situations where a statute or regulation *requires* an action to be taken." *Watson v. United States*, 179 F. Supp. 3d

251, 270 (E.D.N.Y. 2016) (emphasis in original), *aff'd in part, rev'd in part*, 865 F.3d 123 (2d Cir. 2017).

c.     *Misrepresentation exception*

The FTCA also bars "[a]ny claim arising out of . . . misrepresentation." 28 U.S.C. § 2680(h).  The exception "applies to claims arising out of negligent, as well as intentional, misrepresentation." *Block v. Neal*, 460 U.S. 289, 295 (1983).  "[A] misrepresentation may result from the failure to provide information, as well as from the provision of information that is wrong." *Blue Angel Realty, Inc. v. United States*, No. 20 Civ. 8220 (KPF), 2022 WL 94599, at *7 (S.D.N.Y. Jan. 8, 2022) (quoting *Esrey v. United States*, 707 App'x 749, 749 (2d Cir. 2018) (summary order)) (further quotation omitted).  Moreover, the exception bars both negligence in the misrepresentation itself and "in the conduct underlying" it.  *Dorking Genetics v. United States*, 76 F.3d 1261, 1264–65 (2d Cir. 1996) (citing *United States v. Neustadt*, 366 U.S. 696, 706–07 (1961)) (further citations omitted).  The Second Circuit has directed courts, in deciding whether the misrepresentation exception applies, to "look, not to the theory upon which the plaintiff elects to proceed, but rather to the substance of the claim which he asserts." *Id.* at 1265 (quoting *Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir.), *cert. denied*, 426 U.S. 921 (1976)).

**2.     The Separation Between May 2 and October 10, 2018**

On the materials cognizable on this motion, the Court finds that is not certain whether G.C. and D.J.C.V. were separated pursuant to the Zero Tolerance policy or as a result of G.C.'s criminal history.  There is factual support for either version of events.  Because the existence or not of subject matter jurisdiction turns on this question, jurisdictional discovery is necessary.

a.    *The Zero Tolerance policy*

On April 6, 2018, Attorney General Sessions announced the Zero Tolerance policy for the United States's Southwest border, which "in turn, triggered the family separation policies." Compl. ¶¶ 29–30.  On or about April 30, 2018, the Complaint alleges, G.C. and D.J.C.V. entered the United States, and "encountered U.S. border officials," who apprehended them.  *Id.* ¶¶ 16, 84.  A few days later—on or about May 2, 2018—the D.J.C.V. and G.C. were "forcibly separated" by DHS agents.  *Id.* ¶ 80.

Plaintiffs contend that, once the two were apprehended, their initial separation resulted from the Trump Administration's family-separation policy, which in turn derived from the Zero Tolerance policy and was designed and intended to inflict maximum pain and trauma on non-citizens who crossed the border, to deter others from doing so.  *See id.* ¶¶ 33, 139 ("Mr. C.'s forced separation from his young son was directed as part of a broader policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States.").  And, plaintiffs argue, that policy was unconstitutional, because it separated families without a pre-deprivation hearing.  On this theory, they argue, no FTCA exception applies, and their tort claims are cognizable under the FTCA.

In support, plaintiffs point to evidence that the policy was in place when G.C. and D.J.C.V. crossed the border; that the policy was designed to be maximally punitive and traumatic; and that they were separated shortly after the policy's onset.  And plaintiffs call the Government's competing theory—that the separation was based on G.C.'s criminal history—pretextual.  *See* Pl. Mem. at 16–18.  In support, plaintiffs note the Complaint's allegation that G.C. was repeatedly told that he was separated from D.J.C.V. for reasons other than his criminal history.  Compl. ¶¶ 104–09; *see* Dkt. 87-2 ("G.C. Decl.") ¶¶ 9, 10, 12, 16.  Further, plaintiffs note, officials allegedly offered to reunify G.C. and D.J.C.V. if G.C. forfeited their rights to

pursue asylum—an offer that they posit would not have been made had unification been precluded by G.C.'s criminal history. Compl. ¶ 116; G.C. Decl. ¶ 9; Dkt. 87-3 ("Silane Decl.") ¶¶ 4–5 (counsel for G.C. and D.J.C.V. attesting that in August 2018, DOJ official told her "DHS will reunify for the purposes of removal"). Plaintiffs assert too that a court should look beneath even contemporaneous invocations of G.C.'s criminal history as a basis for separation, as these could be pretextual cover. *See* Pl. Ltr. at 2–3.

For the following reasons, the Court holds that, if the Zero Tolerance policy drove the separation of G.C. and D.J.C.V.—as plaintiffs contend—none of the FTCA exceptions would apply, at least based on the facts accessible at this stage. And, contrary to the Government's assertion, a private analog in tort law would exist for this conduct. Thus, the FTCA's waiver of sovereign immunity would apply.

i.   The discretionary function exception

Assuming that the Government separated G.C. and D.J.C.V. pursuant to the Zero Tolerance policy, this action would not fit within the DFE. That is because plaintiffs plausibly allege that their constitutional rights—to due process under the Fifth Amendment—were violated.[8]

As the Second Circuit has explained, "a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority." *Myers & Myers*, 527 F.2d at 1261; *see also, e.g.*, *Huntress v. United States*, No. 18 Civ. 2974 (JPO), 2019 WL 1434572, at *5 (S.D.N.Y. Mar. 29, 2019) (DFE "does not shield official conduct that [is] unconstitutional"),

---

[8] Even though plaintiffs did not have lawful immigration status, they are entitled to due process. "[T]he Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (citing *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

*aff'd*, 810 F. App'x 74 (2d Cir. 2020) (summary order), *cert. denied*, 141 S. Ct. 1056 (2021); *see*

Dkt. 36-3 at 15–16. Other circuits are in accord, holding that the DFE does not shield

unconstitutional conduct. *See Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016)

("We hold that the FTCA's discretionary-function exception does not provide a blanket

immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional

prescription."); *Limone v. United States*, 579 F.3d 79, 102 (1st Cir. 2009) (where "conduct was

unconstitutional," it was, "therefore, not within the sweep of the discretionary function

exception"); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (per curiam) (holding that

"the FBI's alleged surveillance activities fall outside the FTCA's discretionary-function

exception because Raz alleged they were conducted in violation of his First and Fourth

Amendment rights"); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("[F]ederal

officials do not possess discretion to violate constitutional rights or federal statutes.") (quoting

*U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)); *Nurse v. United*

*States*, 226 F.3d 996, 1002 (9th Cir. 2000) (denying motion to dismiss where complaint alleged

"that the policy-making defendants promulgated discriminatory, unconstitutional policies which

they had no discretion to create" because "governmental conduct cannot be discretionary if it

violates a legal mandate"); *U.S. Fid. & Guar. Co.*, 837 F.2d at 120 ("[C]onduct cannot be

discretionary if it violates the Constitution, a statute, or an applicable regulation."); *Sutton v.*

*United States*, 819 F.2d 1289, 1293 (5th Cir. 1987) (decision balancing policy concerns "does

not fall within the discretionary function of § 2680(a) when governmental agents exceed the

scope of their authority as designated by statute or the Constitution").

      Here, plaintiffs have plausibly pled that the family separations pursuant to the Zero

Tolerance policy violated their rights to both procedural and substantive due process.

As to procedural due process, a court examining such a claim under the Fifth or Fourteenth Amendment "first asks whether there exists a liberty or property interest which has been interfered with by the State; [and] second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)) (internal quotation marks omitted).[9]  The right to family integrity is unquestionably a fundamental liberty interest. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (observing "this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (noting protection for "integrity of the family unit" in due process and equal protection clauses of the Fourteenth Amendment); *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) ("The Fourteenth Amendment imposes a requirement that except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child from his or her parent's custody may be effected.").[10]

---

[9] Because the claims here are brought against the federal government, they are brought under the Fifth Amendment.  The Fifth Amendment due process analysis is parallel to that governing claims brought under the Fourteenth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."); *Lombardi v. Whitman*, 485 F.3d 73, 78 (2d Cir. 2007) (describing procedural and substantive components of Fifth Amendment due process); *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir.) (observing that "the due process analysis is basically the same under both the Fifth and Fourteenth Amendments"), *cert. denied*, 525 U.S. 948 (1998).

[10] *See also, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (collecting cases) ("We have recognized on numerous occasions that the relationship between parent and child is

Here, G.C. and D.J.C.V. allege that they were separated entirely for months, and not

given *any* process. They allege that they were not afforded any opportunity whatsoever to be

heard to challenge the separation, let alone a meaningful one. *See Mathews v. Eldridge*, 424 U.S.

319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at

a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545,

552 (1965)); Dkt. 73 at 14–15 (describing importance of process before family separation).

Although the ultimate determination of whether this conduct in fact was unconstitutional could

be made only after an assessment of the facts developed in discovery, the pleadings—which

allege the state's deliberate separation of parent and child for months with no opportunity to be

heard—at a minimum plausibly make out such a violation. *See, e.g.*, *Stanley*, 405 U.S. at 649

(holding, on due process and equal protection grounds, that father, after death of his children's

mother to whom he was not married, "was entitled to a hearing on his fitness as a parent before

his children were taken from him," on par with other parents). The Second Circuit's caselaw

---

constitutionally protected."); *id.* ("We have little doubt that the Due Process Clause would be
offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections
of the parents and their children, without some showing of unfitness and for the sole reason that
to do so was thought to be in the children's best interest.'") (quoting *Smith v. Org. of Foster
Families*, 431 U.S. 816, 862–63 (1977) (Stewart, J., concurring in judgment)); *Moore v. City of
E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977) ("Our decisions establish that the Constitution
protects the sanctity of the family precisely because the institution of the family is deeply rooted
in this Nation's history and tradition."); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It
is cardinal with us that the custody, care and nurture of the child reside first in the parents[.]");
*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925)
(describing "liberty of parents and guardians to direct the upbringing and education of children
under their control"); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) (describing right
of "the family to remain together without the coercive interference of the awesome power of the
state" as "the most essential and basic aspect of familial privacy" and noting, "[t]his right to the
preservation of family integrity encompasses the reciprocal rights of both parent and children. It
is the interest of the parent in the companionship, care, custody and management of his or her
children, and of the children in not being dislocated from the emotional attachments that derive
from the intimacy of daily association, with the parent.") (internal citation and quotation marks
omitted).

establishes that, save in defined emergency circumstances, parents are entitled to a hearing in advance of a separation from their child. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (describing "general rule" that, "before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them"); *id.* at 596 ("[W]here there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted."); *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991) ("In light of a parent's constitutionally protected 'liberty' interest in the custody of his or her children, officials may remove a child from the custody of the parent without consent or a prior court order only in 'emergency' circumstances.") (citing *Stanley*, 405 U.S. at 649–58). The Complaint alleges here that there was no such pre-separation hearing, no emergency warranting plaintiffs' immediate separation from one another, and no hearing thereafter.

As to substantive due process, courts have "long recognized that parents have a constitutionally protected liberty interest in the care, custody and management of their children, and that the deprivation of this interest is actionable on a substantive due process theory." *Southerland*, 680 F.3d at 152 (cleaned up). That liberty interest may be "counterbalanced by the compelling government interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Id.* (quoting *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999), *cert. denied*, 528 U.S. 1155 (2000)). To be viable, a substantive due process claim must "allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Conscience-shocking

conduct has "no calibrated yard stick," *Lewis*, 523 U.S. at 847, but the Second Circuit has stated

that "malicious and sadistic abuses of government power that are intended only to oppress or to

cause injury and serve no legitimate government purpose unquestionably shock the conscience"

because "[s]uch acts by their very nature offend our fundamental democratic notions of fair play,

ordered liberty and human decency." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246,

252 (2d Cir. 2001).

Again, the merits of plaintiffs' claim cannot be resolved without full discovery.  But on

the pleadings, plaintiffs assert a plausible claim of a violation of substantive due process.  They

allege a calculated decision to take a parent and a child who had crossed the border together and

separate them indefinitely, for no reason other than to send a maximally deterrent message to

others who might consider illegal entry.  In denying a motion to dismiss plaintiffs' substantive

due process claims, the *Ms. L.* court found that the class of plaintiffs challenging it stated such a

claim.  As that court put the point: "[T]he government actors responsible for the care and custody

of migrant children . . . bec[a]me their persecutors." *Ms. L. v. U.S. Immigr. & Customs Enf't*,

302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018) ("*Ms. L. I*") (internal quotation marks omitted).

Based on the pleadings, in which G.C.'s criminal record did not form a basis for the

separation decision, the facts alleged as to G.C. and D.J.C.V. are, if anything, more shocking

than in the baseline case described in *Ms. L.*  Their separation allegedly lasted more than five

months.  It was imposed despite U.S. authorities' awareness that the parent and child were

seeking protection from persecution they claimed to reasonably fear in their homeland, Compl.

¶¶ 83, 101, 102, 105, 116, claims which USCIS ultimately validated, *id.* ¶ 115.

Accordingly, G.C. and D.J.C.V. plausibly allege that their substantive due process rights,

too, were violated by their separation pursuant to the Zero Tolerance policy.

In finding well-pled procedural and substantive due process violations, the Court joins numerous other district courts that—either on motions to dismiss or on bids for injunctive relief—have upheld as viable constitutional challenges to the Zero Tolerance policy along these lines. *See, e.g.*, *A.I.I.L. v. Sessions*, No. 19 Civ. 481, 2022 WL 992543, at *4 (D. Ariz. Mar. 31, 2022) (holding, on motion to dismiss for lack of subject matter jurisdiction, that plaintiffs, some of whom had criminal histories, "plausibly alleged that the government's conduct violated their constitutional rights"); *Nunez Euceda v. United States*, No. 22 Civ. 10793, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021) (holding, similarly, on motion to dismiss for lack of subject matter jurisdiction, "[p]laintiff has plausibly alleged that the government's Policy violated his constitutional rights"); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) (holding, on motion to dismiss for lack of subject matter jurisdiction, that "[p]laintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights"); *C.M. v. United States*, No. 19 Civ. 5217, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) (holding that, on motion to dismiss for lack of subject matter jurisdiction, "[p]laintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights"), *motion to certify appeal denied*, No. Civ. 19-5217, 2020 WL 5232560 (D. Ariz. July 6, 2020); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 741–42 (D. Conn. 2018) (granting in part preliminary injunction because "when the Government separated children from their parents," a constitutional violation of their substantive due process and procedural due process rights occurred, as they were deprived of "their right to family integrity" and "were given no notice and no fair opportunity for a hearing before being separated"); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 118–21 (D.D.C. 2018) (granting preliminary injunction because "the Court easily concludes that Ms. E.F. is likely to succeed on her claim that her continued

separation from her minor son, absent a determination that she is either an unfit parent or

presents a danger to her son, violates her substantive due process rights under the Fifth

Amendment"); *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d

491, 499–500 (D.D.C. 2018) (on motion for preliminary injunction, "easily conclud[ing] that Ms.

Jacinto-Castanon and her sons" were "likely to succeed on . . . their substantive due process

claim that their continued separation, absent a determination that Ms. Jacinto-Castanon is either

an unfit parent or presents a danger to their sons, violates their right to family integrity," and

noting that "[t]he fact that Ms. Jacinto-Castanon is lawfully detained in immigration custody

does not eliminate her due process right to family integrity"); *W.S.R. v. Sessions*, 318 F. Supp. 3d

1116, 1124–25 (N.D. Ill. 2018) (granting partial preliminary injunctive relief, and finding

conscience-shocking boys' separation from their fathers where they had "right to reunify with

[their] parent in immigration custody, after the parent's criminal detention ends and absent

parental unfitness or danger to the child"); *Ms. L. II*, 310 F. Supp. 3d at 1144–46 (holding, on

motion for preliminary injunction, "[t]his practice of [separating parents at the border] from their

minor children, and failing to reunify class members with those children, without any showing

the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood

of success on their due process claim").

   As such courts have further recognized in cases where FTCA claims were challenged, if

that policy is unconstitutional, it cannot fall within the DFE exception to the FTCA. *See, e.g.,*

*A.I.I.L.*, 2022 WL 992543, at *4 ("Because constitutional violations are not subject to discretion,

the discretionary function exception does not apply."); *Nunez Euceda*, 2021 WL 4895748, at *3

("Plaintiff's Complaint states a plausible constitutional violation under *Iqbal* and *Twombly*.

Accordingly, the discretionary function does not bar Plaintiff's claims.") (citation omitted);

*A.P.F.*, 492 F. Supp. 3d at 996 ("Because government officials lack discretion to violate the Constitution, the discretionary function exception cannot shield conduct related to the government's likely unconstitutional separation of plaintiffs."); *C.M.*, 2020 WL 1698191, at *4 (because of plausible allegations that "the government's separation of [plaintiffs'] families violated their constitutional rights," conduct is "not shielded by the discretionary function exception").

The Government makes several contrary arguments, *see* Gov't Reply at 2–7, but none carries the day.

First, it cites a single case turning away tort claims arising from the separation of families at the border.[11]  Gov't Reply at 3–4.  It is inapposite.  In *Peña Arita v. United States*, 470 F. Supp. 3d 663 (S.D. Tex. 2020)), the wife of a man who had died by suicide in custody, following his separation from his family, brought several claims on his behalf, including one for intentional infliction of emotional distress.  The court held that it was barred by the DFE.  *Id.* at 687.  But the court there did not consider the claim that the Zero Tolerance policy was unconstitutional. *See id.* at 686–87.  Cases upholding as constitutional family separations brought about by a parent's deportation are inapposite, too.  *See* Gov't Reply at 6 n.4.  That factual context is far afield from the separation of parents and children at the border while awaiting disposition of

---

[11] The Government argues that the Court should disregard the cases plaintiffs cite finding likely constitutional violations because, in those cases, the Government did not separate families based on a parent's criminal history. *See* Gov't Reply at 3–4 n.2, 5 n.3.  But that presupposes a fact in dispute.  Plaintiffs plausibly allege that they were separated pursuant to the border separation policy, not on account of G.C.'s criminal history.

Since the briefs were submitted, one court has found that distinction unavailing as a basis to dismiss the claims of a putative class challenging the family separation policy. *See A.I.I.L.*, 2022 WL 992543, at *4 ("Because *some* Plaintiff-Parents had a criminal history which the government could properly consider does not overcome the Fourth and Fifth Amendment violations alleged by *all* Plaintiffs.") (emphases in original).

their claims—commonly made on a family-wide basis—including in withholding-only proceedings or for asylum.  Those cases reflect the unremarkable principle that Congress has "'plenary . . . power to make policies and rules for exclusion of aliens' . . . based on a 'facially legitimate and *bona fide* reason.'" *Gordon v. Mule*, 153 F. App'x 39, 42 (2d Cir. 2005) (summary order) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770–71 (1972)).  That the removal of a noncitizen convicted of serious crimes is constitutional even if his family remains in the United States, *id.*, does not speak to the constitutionality of a policy to separate families at the border for the *in terrorem* effect it may have on others. *Ms. L. I*, 302 F. Supp. 3d at 1162–63 (distinguishing allegations based on family separation from cases, including *Gordon*, where "immigration detainees and convicts [were] separated from their families without constitutional implication" because, under Zero Tolerance policy, separation was not "necessary incident of detention" or deportation and instead was "the result of an *unnecessary* governmental action intended to separate family units who were arrested *together*") (emphasis in original) (citation omitted).

Second, the Government argues that even if the officials who made the decision to separate G.C. and D.J.C.V. did not act on the basis of G.C.'s criminal record, the separation may be upheld after the fact because that record would have justified separation.  Gov't Reply at 3; Gov't Ltr. at 3–4 n.4; Tr. at 25–31 (colloquy with Court).  The Government points to caselaw in the Fourth Amendment context, which holds that an officer's subjective intent in making a stop or seizure is "irrelevant to the existence of probable cause," provided the facts known to the officers objectively justified that action. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also Whren v. United States*, 517 U.S. 806, 813 (1996).  But the Government has not pointed to comparable case authority under the Due Process Clause, in which official action based on

invidious grounds can be upheld as lawful based on information that did not form the basis of the official action. To the contrary, *Whren* itself noted that although a traffic stop could be upheld under the Fourth Amendment where an infraction known to the officers supplied objective justification for a stop, the same stop could form the basis of a viable Equal Protection claim under the Fourteenth Amendment if racial discrimination had motivated the decision to stop. *See* 517 U.S. at 813 (traffic stop based on objective probable cause may still be challenged on the basis of "intentionally discriminatory application of laws" under the Equal Protection Clause).[12]

Finally, the Government argues that any right G.C. and D.J.C.V. may have had to family integrity while in immigration detention was not clearly established at the time. On this basis, it argues, the officials' conduct violating that right should be viewed as "discretionary." Gov't Reply at 5–7 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); Gov't Ltr. at 2 n.2. This argument, however, draws on a different body of law—that of qualified immunity. It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

---

[12] In the context of procedural due process, a plaintiff may bring a malicious prosecution claim under 42 U.S.C. § 1983 where she shows, *inter alia*, that there was no probable cause for the later proceeding and that it was instituted with malice. *See Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009), *as amended* (Oct. 7, 2009) (per curiam). Accordingly, even where a plaintiff is arrested based on objective probable cause, she may bring a malicious prosecution claim if she shows "that facts emerged following the arrest to vitiate probable cause." *Carthew v. Cnty of Suffolk*, 709 F. Supp. 2d 188, 202 (E.D.N.Y. 2010). In the child custody context, the Second Circuit has observed that "a plaintiff may have a viable claim for violation of procedural due process even where emergency circumstances existed at the time of removal"—that is, even where there was objective cause to separate the parent and child—"if the plaintiff does not receive a timely and adequate post-deprivation hearing." *Southerland*, 680 F.3d at 151 n.22 (citing *Kia P. v. McIntyre*, 235 F.3d 749, 760–61 (2d Cir. 2000)).

Plaintiffs' lawsuit here, however, is not brought against individuals. G.C. and D.J.C.V. sue the Government, which "is not entitled to defend on the basis of any official immunity that its executive employees individually might possess," such as qualified immunity. *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994) (citing *Rivera v. United States*, 928 F.2d 592, 608–09 (2d Cir. 1991)). As the Second Circuit has noted, "qualified immunity will not immunize the United States from liability." *Id.*; *see also, e.g., Farag v. United States*, 587 F. Supp. 2d 436, 452 (E.D.N.Y. 2008) (although individual officers performing discretionary functions were shielded "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known . . . [t]he United States, by contrast, may not assert qualified immunity as a defense to plaintiffs' FTCA claim") (cleaned up). On the contrary, as the *Castro* court recognized, the FTCA itself explicitly provides for the United States' liability "to the same extent as a *private individual*[.]" 28 U.S.C. § 2674 (emphasis added); *see also Olson*, 546 U.S. at 45–46 (the FTCA "says that it waives sovereign immunity 'under circumstances where the United States, if a *private person*,' . . . would be liable. Our cases have consistently adhered to this 'private person' standard.") (quoting 28 U.S.C. § 1346(b)(1)) (citation omitted) (emphasis in *Olson*). The Government thus may not here invoke the immunity defenses to which any of its employees are subject. *See Rayonier Inc. v. United States*, 352 U.S. 315, 319–20 (1957) (describing the "very purpose of the [FTCA]" as "to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability" and refusing "to read exemptions into the Act beyond those provided by Congress").[13]

---

[13] In so holding, the Court has no occasion to engage with the Government's argument that the right to family integrity in immigration detention was not clearly established, *see* Gov't Reply at 6.

On the facts pled, therefore, the separation of G.C. and D.J.C.V. at the border, if based on the Zero Tolerance policy, does not fall within the DFE.

ii.      Due care exception

The Government next argues that, even if the DFE does not cover a separation pursuant to the Zero Tolerance policy, "actions taken pursuant to the dictates of an Executive Order are shielded by the due care exception." Gov't Reply at 10 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 577 (D.D.C.), *aff'd*, 343 U.S. 579 (1952)). But the DCE covers only actions taken pursuant to a "statute or regulation." 28 U.S.C. § 2680(a). Although *Youngstown*, decades ago, construed an Executive Order as a "regulation," *see* 103 F. Supp. at 577, the Court, like others, does not construe the policy here as such. Accordingly, the suit is not barred by this exception. *See, e.g., A.I.I.L.*, 2022 WL 992543, at *5 ("Because none of the statutory provisions cited by the government expressly mandate enforcement of a family separation policy, the due care exception does not apply."); *Nunez Euceda*, 2020 WL 4895748, at *3–4 ("Defendant fails to cite any statute or regulation that required Plaintiff and his children to be separated upon their arrival to the United States . . . such actions [pursuant to executive policy] are not shielded by the due care exception."); *A.P.F.*, 492 F. Supp. 3d at 995–96 ("The United States cites no statute or regulation [condoning family separation pursuant to prosecution] or any statute more generally requiring the separation of Plaintiffs upon their entry into the country. Nor could it: the family separations were conducted pursuant to executive policy . . . [and] are not shielded by the due care exception."); *C.M.*, 2020 WL 1698191, at *3 ("family separation was established by executive policy—not by a statute or regulation—which is not covered by the due care exception").

### iii.    Misrepresentation exception

The Government next argues that, to the extent G.C.'s IIED and NIED claims are based

on the Government's "attempt[] to coerce Mr. C. to abandon his rightful claims under asylum

law and the Convention Against Torture by conditioning any reunification with his son upon his

agreement for both to be removed to Honduras," *see* Compl. ¶ 101, they are barred by the

misrepresentation exception. Gov't Mem. at 27–28; Gov't Reply at 16–17 n.13. The heart of

plaintiffs' FTCA claims, however, is not the officials' alleged coercion, but their separation. The

misrepresentation allegations cited by the Government instead are made to support plaintiffs'

claim that the Government's assertion that they were separated on account of G.C.'s criminal

history was false and pretextual.

Accordingly, focusing on "the substance of the claim," as the Second Circuit commands,

*Lambertson*, 528 F.2d at 442, the Court finds that they are not based on the Government's

alleged misrepresentation. The misrepresentation exception is thus not grounds to dismiss

plaintiffs' FTCA claims for lack of subject matter jurisdiction. *See A.I.I.L.*, 2022 WL 992543, at

*5 (because "the misstatements allegedly made by government officials are not essential to the

claims asserted," the misrepresentation exception did not bar plaintiffs' claims); *A.P.F.*, 492 F.

Supp. 3d at 997 (where plaintiffs made IIED and negligence claims following family separation,

and alleged that Government attempted to compel them to abandon claims for asylum, those

allegations "do not affect the Court's jurisdiction over Plaintiffs' . . . causes of action" because

"two factual allegations, standing alone, are insufficient to prove that the misrepresentation

exception applies").

### iv.    Private analog requirement

Finally, the Government argues that plaintiffs' suit is barred because there is no private

analog for it, as the FTCA requires. As noted, the Government is liable "in the same manner and

to the same extent as a private individual in like circumstances." 28 U.S.C. § 2674. However, the "like circumstances" requirement does not oblige an FTCA plaintiff to point to a claim brought against a private individual in the *same* circumstances. *See Indian Towing*, 350 U.S. at 64; *Olson*, 546 U.S. at 46. Rather, "a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (cleaned up); *see Hollis Care Grp., Inc. v. Small Bus. Admin.*, No. 19 Civ. 5695 (JMF), 2020 WL 2521321, at *2 (S.D.N.Y. May 18, 2020), *aff'd*, 848 F. App'x 483 (2d Cir. 2021) (summary order).

The Government and plaintiffs cast differently the conduct at issue for purposes of considering the existence of the required private analog.[14] The Government depicts the FTCA claims as challenging G.C.'s detention in an immigration facility. It points to *McGowan v. United States*, 825 F.3d 118 (2d Cir. 2016), in which the plaintiff sued under the FTCA for false imprisonment and negligence, arising from his solitary confinement while in criminal detention. The Circuit held, however, that McGowan's FTCA claims were barred because "[p]rivate persons cannot establish facilities to detain other persons—only the government can, either on its own or through a governmental contractor." *Id.* at 127. Accordingly, the claims lacked a private analog because "there is no circumstance in state tort law that is analogous to the situation here." *Id.* But G.C. and D.J.C.V. note that they are not challenging their detention *qua* detention.

---

[14] The parties are also non-aligned as to which jurisdiction's caselaw governs. The Government cites mainly to Second Circuit caselaw, whereas plaintiffs point to the tort law of border states. The Court here assumes *arguendo* that New York applies, even though the plaintiffs were originally separated in Texas, because large periods of the separation took place in New York, and neither party appears to object to application of that law. In any case, the torts alleged here are common law and generic. They are not specific to New York.

Rather, they note, their tort claims focus on the Government's forced separation of them from each other, with the intent of inflicting torment sufficient to deter future illegal entrants. *See* Pl. Mem. at 26–27. Plaintiffs cite cases that have permitted IIED claims based on the tortious separation of immediate family to go forward.[15]

Plaintiffs' characterization is more apt. And such claims, the Court holds, have a private analog, because emotional distress and negligence claims based on such conduct each could lie against private individuals.

At the outset, the Government is correct that only the federal sovereign could separate G.C. and D.J.C.V. in the precise manner alleged here. But that does not control. "To say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analogue exists." *Liranzo v. United States*, 690 F.3d 78, 94 (2d Cir. 2012); *C.M.*, 2020 WL 1698191, at *2 (Government's argument that federal government alone has the authority to enforce immigration laws did not establish lack of private analog). And as briefly illustrated below, the allegations here fall easily within New York law's definition of the causes of action of these torts, such that these could be pursued against a private party in like circumstances. This case is thus distinct from ones where the Government's unique role

---

[15] *See, e.g.*, *Martinez v. United States*, No. 13 Civ. 955, 2018 WL 3359562, at *11 (D. Ariz. July 10, 2018) (plaintiffs stated claim under the FTCA for emotional distress where defendant officers caused such distress by "separating the family, questioning and threatening incarceration, verbal abuse, offering to release the children if Mr. Martinez confessed [ . . .], threaten[ing] to separate his family [. . .], ensur[ing] that Mr. Martinez watched the agents transport his family to another location; and isolat[ing] him in a windowless cell"); *Carranza v. United States*, No. 12 Civ. 2255, 2013 WL 3333104, at *8 (D. Ore. July 1, 2013) (government intended to inflict severe emotional distress threatening to send plaintiff to Mexico and place her daughters in a foster home where they would not know who their family was and where she would not see them again); *M.D.C.G. v. United States*, No. 15 Civ. 552, 2016 WL 6638845, at *11–12 (S. D. Tex. Sept. 13, 2016) (allowing an IIED claim to proceed where plaintiffs alleged their trauma continued as plaintiff and her minor daughter were separated for three days and the minor was not permitted to be with her family for a month).

lacked a private tort law analog—for example, where the challenged Government function was "quasi-adjudicative," such as withdrawing citizenship, *Akutowicz v. United States*, 859 F.2d 1122, 1125–26 (2d Cir. 1988); *see also Watson v. United States*, 865 F.3d 123, 134–35 (2d Cir. 2017).

*IIED and NIED*:  Under New York law, IIED requires "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). To constitute IIED, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko v. Am. Broad. Co. Inc.*, 49 N.E.3d 1171, 1178 (N.Y. 2016) (internal quotations omitted).  As to NIED, a plaintiff "must show (1) 'extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress.'" *Truman v. Brown*, 434 F. Supp. 3d 100, 122 (S.D.N.Y. 2020) (quoting *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297 (S.D.N.Y. 2015)).  To state an NIED claim in New York, a plaintiff must allege facts that fall under one of three theories: (1) the "bystander theory," in which a plaintiff (i) "was threatened with physical harm as a result of defendant's negligence; and (ii) consequently she suffered emotional injury from witnessing the death or serious bodily injury of her immediate family," *id.* at 123 (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)) (cleaned up); (2) the "direct duty" theory, in which a plaintiff "suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety," *Mortise*, 102 F.3d at 696; or (3) the "special circumstances" theory, where there is "an especial likelihood of genuine and serious mental

distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious," *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. State*, 334 N.E.2d 590 (N.Y. 1975)).

The Complaint alleges, in detail, that the Government inflicted severe mental and physical trauma on G.C. and D.J.C.V. by separating them, with the intent to cause maximum harm and an *in terrorem* effect. The Zero Tolerance policy was an effort to "systemically terrorize and punish . . . vulnerable migrants and thereby deter future migration to the United States." Compl. ¶ 1; *see id.* ¶¶ 3, 24, 29–31, 49–59. As intended, it "caus[ed] extraordinary and profound trauma to thousands of families," including the plaintiffs here. *Id.* ¶ 1; *see id.* ¶¶ 33 ("With knowledge that the policy of forcibly separating children from their families would cause severe harm . . . and specifically intending to cause such harm[,] Administration officials at the highest levels created a legally sanctioned procedure to incite fear, trauma and pain."), 34 (this was "despite, and indeed in part because of, repeated warnings about the catastrophic, traumatic injuries forced and prolonged separation of families would produce"), 35. The Government's failures to give parents information about where their children were or facilitate communication with them, which compounded the harm. *Id.* ¶ 5. In this case, D.J.C.V., then aged 19 months, was "forcibly pulled" from G.C.'s arms as G.C. cried. *Id.* ¶ 90. G.C. thereafter was given only "limited information" about D.J.C.V.'s "whereabouts and well-being," and "no opportunity to directly communicate with his son." *Id.* ¶ 8. This separation "caused [G.C.] unbearable anguish and grief as well as fear for his son's mental, emotional, and physical well-being, which continues today." *Id.* ¶ 9. He considered suicide; fretted constantly about D.J.C.V.; and was anguished by their separation. *Id.* ¶¶ 93–94. Meanwhile, D.J.C.V. was shuttled between foster homes, and became sad, angry, irritable, and withdrawn. *Id.* ¶ 123. His health suffered from the

separation, and, when he was finally reunited with his father, "it was not clear that he recognized him." *Id.* ¶ 125. As of the Complaint, both plaintiffs continue to struggle to sleep and experience nightmares; G.C. has "episodes of severe chest pain and heart palpitations," depression, and anxiety; and D.J.C.V. "has experienced episodes of aggression, anxiety, and moodiness." *Id.* ¶¶ 134–36.

These allegations easily clear the bars set by the IIED and NIED torts, as they would state a claim against a private party who engaged in like conduct. The Complaint alleges extreme and outrageous conduct intended, and succeeding, to cause severe emotional distress, "beyond all possible bounds of decency" that is intolerable in a civilized society. *See Chanko*, 49 N.E.3d at 1178. And they plausibly plead facts within NIED's "special circumstances" category. As pled, the Government's conduct towards G.C. and D.J.C.V. certainly carried an "especial likelihood of genuine and serious mental distress." *See Howard v. Lecher*, 366 N.E.2d 64, 65 (N.Y. 1977) ("[W]e have held that there may be recovery for the emotional harm, even in the absence of fear of potential physical injury, to one subjected directly to the negligence of another as long as the psychic injury was genuine, substantial, and proximately caused by the defendant's conduct."). Accordingly, because a private individual could be held liable for separating a parent from a child, barring the two from communicating, and doing so in a way calculated to cause maximum distress, the Government's motion to dismiss based on the lack of a private analog is denied as to IIED and NIED. *See, e.g.*, *Nunez Euceda*, 2021 WL 4895748, at *4; *A.P.F.*, 492 F. Supp. 3d at 994–95 (in family separation case, finding IIED and negligence claims to have private analog); *see also, e.g.*, *Negron v. United States*, 19 Civ. 5442 (PMH), 2020 WL 5634304, at *5 (S.D.N.Y. Sept. 21, 2020) (FTCA claims have private analog if the cause of action is at least comparable to a cause of action against a private citizen and satisfies the elements of that cause of action).

*Negligence*: To state a negligence claim under New York law, a plaintiff need plead less

than for an IIED or an NIED claim—merely a "duty owed to the plaintiff by the defendant"; a

"breach of that duty"; and an injury "substantially caused by that breach." *Lombard v. Booz-

Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino v. N.Y.C. Transit Auth.*,

639 N.Y.S.2d 784 (1st Dep't 1996)). For reasons similar to those enabling plaintiffs' IIED and

NIED claims to stand, there is a private analog to their negligence claims against the United

States. They have alleged that Government agents violated their duty to act with ordinary care

towards them by separating parent and child and preventing them from communicating. *See

Watson v. United States*, 133 F. Supp. 3d 502, 526 (E.D.N.Y. 2015) ("If the USCIS were

a private entity and had knowledge of a condition which it could eliminate and which would

foreseeably cause harm to a specific individual, then its failure to avoid the harm by reasonable

means would be actionable negligence[.]"). And that plaintiffs were in immigration detention

does not preclude finding a private analog. *See Liranzo*, 690 F.3d at 97. The Court therefore

holds that there is a private analog for plaintiffs' negligence claim. *See, e.g., A.I.I.L*, 2022 WL

992543, at *6; *A.P.F.*, 492 F. Supp. 3d at 994; *Nunez Euceda*, 2021 WL 4895748, at *4; *C.M.*,

2020 WL 1698191 at *2.

Accordingly, if jurisdictional discovery shows or permits the finding that the Zero

Tolerance policy was the basis for the separation of G.C. and D.J.C.V. between May 2 and

October 10, 2018, no exception to the FTCA's waiver of sovereign would apply, and plaintiffs

have also met the private analog requirement for their FTCA claims to proceed.[16]

---

[16] Because the Court finds that jurisdictional discovery necessary as to this first separation, it
does not reach the motion to dismiss the claims for this period under Rule 12(b)(6) motion. That
analysis, however, would substantially overlap with the private analog analysis above. *See
Chen*, 854 F.2d at 626.

> b.   *Criminal history*

As noted, the Government portrays the decision to separate the plaintiffs as unrelated to the Zero Tolerance policy and as driven by policies triggered by G.C.'s misdemeanor conviction in 2010 for attacking his wife with a machete.  If discovery bears out that claim, the Court would not have subject matter jurisdiction over plaintiffs' claims, because one or more exceptions to the FTCA's waiver of sovereign immunity would apply to the sequential but interwoven decisions (1) to detain G.C., (2) to house him in a secure facility, and (3) to separate him from D.J.C.V.

> i.   G.C.'s detention

On April 30, 2018, G.C. and D.J.C.V. arrived in the United States.  As noted, G.C. had been previously removed.  Under 8 U.S.C. § 1231(a)(5), a noncitizen like G.C. who has illegally reentered the country after having been removed is inadmissible and subject to removal. Pending a decision on whether the noncitizen will be removed, the Government may detain him. *Id.* § 1226(a).  On May 1, 2018, G.C. was served with a notice that his prior removal order had been reinstated.  Reeves Decl. ¶ 11.  At that point, he was subject to 90 days of mandatory detention under 8 U.S.C. § 1231(a)(2).  *Id.* ¶ 12.  And following that 90-day removal period, the statute authorizes continued detention if immigration authorities determine that the noncitizen is "a risk to the community or unlikely to comply with the order of removal" under 8 U.S.C. § 1231(a)(6).  G.C. was ultimately given a bond hearing and released on bond.  Compl. ¶ 120.

Assuming the Zero Tolerance policy did not drive the Government's decisions, the detention of G.C. both pending a decision on whether he would have be removed—between April 30 and May 1—and following his 90-day removal period—which began on May 1, 2018 and ended 90 days later—met both prongs of the DFE.  Those decisions were not compelled by statute. *See* 8 U.S.C. § 1226(a) ("the Attorney General—(1) *may* continue to detain the arrested

alien; and (2) *may* release the alien[.]") (emphases added) [17]; *see Arizona v. United States*, 567

U.S. 387, 407 (2012) ("[T]he Attorney General can exercise discretion to issue a warrant for an

alien's arrest and detention 'pending a decision on whether the alien is to be removed from the

United States.'") (quoting 8 U.S.C. § 1226(a)); 8 U.S.C. § 1231(a)(6) (noncitizen "*may* be

detained beyond the removal period" if determined to be a risk to the community or unlikely to

comply with the order of removal) (emphasis added); *Zadvydas v. Davis*, 533 U.S. 678, 697, 699

(2001) (noting that "'may' suggests discretion," but that it is limited insofar as "once removal is

no longer foreseeable, continued detention is no longer authorized by statute").  And detention

decisions made on this basis are susceptible to policy analysis.  *See* Gov't Mem. at 20–21.

Whether to release a particular noncitizen may turn on considerations of immigration policy,

prosecutorial discretion, or even foreign policy.  *See Tun-Cos v. Perrotte*, 922 F.3d 514, 526 (4th

Cir. 2019) (noting that immigration enforcement may "affect diplomacy, foreign policy, and the

security of the nation") (internal quotation marks omitted); *Douglas v. United States*, 796 F.

Supp. 2d 1354, 1369 (M.D. Fla. 2011) ("Operating with limited resources, ICE must weigh

various policy considerations in deciding which suspected aliens to detain[.]").  And the

Government need not show that, in the particular case, it "actually balanced" such

considerations, *see Asbestos Litig.*, 891 F.2d at 37, but that it could.[18]

---

[17] The Secretary of Homeland Security has been delegated authority by Congress to enforce the
Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, "though the Attorney General retains
the authority" originally given to him under the act "to administer removal proceedings and
decide relevant questions of law." *Nielsen v. Preap*, 139 S. Ct. 954, 960 n.2 (2019) (citing 6
U.S.C. §§ 202(3), 251, 271(b), 542 note, 557; 8 U.S.C. §§ 1103(a)(1) and (g), 1551 note).

[18] *See also, e.g., Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2012) ("Because the
decision to detain an alien pending resolution of immigration proceedings is explicitly committed
to the discretion of the Attorney General and implicates issues of foreign policy, and because the
Mirmehdis do not allege that this decision itself violated the Constitution, it falls within [the

G.C.'s mandatory 90-day detention period—beginning on May 1, 2018—is covered by the due care exception. The statutory framework governing noncitizens subject to reinstated removal orders requires detention during that period. *See* 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien."). The Government would therefore have been exercising due care in executing the statute by detaining G.C. for 90 days following his reinstated order of removal. *See Gjidija*, 848 F. App'x at 454 (holding that the DCE barred suit where "Gjidija's detention was mandated by statute," including 8 U.S.C. § 1231(a)(2)). Accordingly, suit is barred as to G.C.'s detention for each period, based on the discretionary function and due care exceptions.

ii.     The location of G.C.'s detention

As to where G.C. was to be detained, federal law provides that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). The Government submits that the decision to detain G.C. "in a secure detention facility (rather than a family residential center or releasing him into the public)" was a discretionary one within the scope of the DFE, driven largely by G.C's criminal history. *See* Gov't Reply at 2. And as the *Ms. L.* court, on the limited factual presentation available, so held as to G.C., the Government "vetted [him] in good faith and made principled decisions in light of [his] criminal history and overarching concerns regarding safety of their children and the public." *Ms. L.* Order at 3 (although those decisions "can be debated . . .

DFE]."); *Appolon v. United States*, No. 16 Civ. 2275, 2017 WL 3994925, at *17 (E.D.N.Y. Sept. 6, 2017) ("ICE agents' decisions regarding whether and how to investigate his claims of United States citizenship . . . fall squarely within the discretionary function exception[.]"), *report and recommendation adopted*, No. 16 Civ. 2275, 2018 WL 461241 (E.D.N.Y. Jan. 18, 2018); *cf. Watson*, 179 F. Supp. 3d at 272 ("ICE officials were not acting within their discretionary authority by arresting and detaining plaintiff because plaintiff was a citizen, not an alien, [and] the statutes upon which the government relies pertain only to the arrest and detention of aliens, not citizens.").

the Court is persuaded that Defendants have exercised their statutorily prescribed discretion in a reasonable manner.") Accordingly, on the Government's version of events, the decision of where to detain G.C. was within the DFE. *See id.*

### iii.    D.J.C.V.'s detention

Finally, and most crucially, the Government had to determine where D.J.C.V. would be detained—and whether he could be detained with G.C. The Complaint alleges that the Government told G.C. that he could not be "reunified with D.J.C.V. in custody because he is not permitted to be held in a family detention facility due to his criminal history." Compl. ¶ 113. Although plaintiffs dispute that this was the driver of the separation, were this version true, this final decision, to house D.J.C.V. apart from G.C., would be covered by the DCE.

As reviewed above, a minor like D.J.C.V. is considered "unaccompanied" if he or she lacks lawful immigration status and either has no parent or legal guardian in the United States *or* has no such parent or legal guardian in the United States who is available to provide care and physical custody. 6 U.S.C. § 279(g)(2). The child then becomes the responsibility of ORR, which must put the child in the "least restrictive setting that is in the best interest of the child," but cannot place such child in a "secure facility" unless ORR determines that the child poses a danger to herself or others or has been charged with a criminal offense. 8 U.S.C. §§ 1232(b)(3), (c)(2)(A). Similarly, under the *Flores* settlement, DHS must transfer any minor in its custody to a "non-secure, licensed facility." *Flores*, 828 F.3d at 902–03. It "does not contemplate releasing a child to a parent who remains in custody." *Id.* at 906. Were G.C. detained in a secure facility on account of his criminal history, he would not have been available to provide care or physical custody, and D.J.C.V., as a matter of law, could not have been permissibly housed in the secure facility. Accordingly, on the Government's version of events, the FTCA's due care exception applied, as the Government officials were exercising obligatory due care in housing D.J.C.V. in a

non-secure facility away from where his father was required to be held. *See Clayton*, 2019 WL 9283977, at *12; *see also W.S.R.*, 318 F. Supp. 3d at 1125 ("The fathers' criminal detentions necessitated the separation of W.S.R. and C.D.A.").

Plaintiffs argue that, even assuming that G.C.'s conviction was the basis for separating G.C. and D.J.C.V., their claims are nevertheless not barred by sovereign immunity because G.C.'s conviction did not subjectively justify putting him in a secure facility where he would be away from his son. G.C., they urge, was entitled to an individualized assessment of his fitness as a parent. Tr. at 47, 50. That is wrong. The statute and regulations authorizing the placement of a convicted criminal in a secure facility did not oblige authorities to undertake an individualized assessment of G.C.'s fitness as a parent. Assuming that G.C.'s conviction drove the decision to put him a secure facility, that decision was discretionary and within the DFE.[19]

Therefore, if G.C.'s criminal history of domestic violence—and not the Zero Tolerance policy—drove the decision to detain and then securely house and thus separate him from D.J.C.V., plaintiffs' FTCA claims would be barred, because each sequential decision fell within either the DFE or the DCE.

     *c.*    *Conclusion*

Because the basis for the separation of G.C. and D.J.C.V. between May and October 2017 is factually disputed, and because the different versions of events yield opposite outcomes as to whether sovereign immunity has been waived, jurisdictional discovery is warranted here to

---

[19] The Government argues that even if individualized process were required, the *Ms. L.* court's review of G.C.'s separation from D.J.C.V. sufficed. But in determining that G.C. was to be excluded from the class of parents reunified with their children, *Ms. L.* relied on a submission from the Government attesting that G.C.'s criminal history was the basis of the separation. *Ms. L.* Order at 3. Plaintiffs claim that that factual contention was untrue. Jurisdictional discovery will test it.

determine whether there is subject matter jurisdiction. *See Gualandi v. Adams*, 385 F.3d 236,

244 (2d Cir. 2004) (where plaintiffs "resist[] a motion to dismiss under Rule 12(b)(1) . . . courts

generally require that plaintiffs be given an opportunity to conduct discovery on these

jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within

the knowledge of the opposing party"). The parties agree that the Court has the authority to

commission targeted discovery on this threshold jurisdictional question. *See* Gov't Ltr. at 1; Pl.

Ltr. at 1.[20]

Accordingly, the Court will permit plaintiffs to pursue limited jurisdictional discovery to

test the truth of these facts and discern the reason for G.C.'s initial separation from D.J.C.V. *See*

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011) ("[A] court should

take care to give the plaintiff ample opportunity to secure and present evidence relevant to the

existence of jurisdiction.") (quoting *APWU*, 343 F.3d at 627); *All. of Am. Insurers v. Cuomo*, 854

F.2d 591, 597 (2d Cir. 1988) ("Before dismissing a case for want of jurisdiction, a court should

permit the party seeking the court's intervention to engage in discovery of facts supporting

jurisdiction.") (citing cases). On March 21, 2022, the Court approved the parties' proposed

discovery plan as to this period of separation. Dkt. 116.

---

[20] It is no answer to note, as the Government does, that the complaint at points references
statements by officials to G.C. about his criminal record. *See, e.g.*, Compl. ¶¶ 88 (on third day of
plaintiffs' detention, "immigration officials questioned Mr. C. and accused him of being a
criminal due to an eight-year-old misdemeanor conviction"), 110 (in August 2018, federal
officials argued that an injunction requiring reunification "did not cover Mr. C. because of his
'criminal history'"). These statements, although tending to support the Government's version of
events, do not establish that the Zero Tolerance policy played no part in the decision to separate
G.C. and D.J.C.V.

### 3.    The Separation Between October 10 and 15, 2018

As to the second period of separation—after G.C. was released from immigration

detention following a bond hearing—plaintiffs' FTCA claims cannot be dismissed on the

pleadings.

The Government's stated justification for keeping G.C. apart from D.J.C.V. during this

period is that, once a child is in the custody of the ORR, the TVPRA requires the ORR, before

releasing the child to a custodian, to determine that the custodian is capable of providing for the

child's physical and mental well-being.  Gov't Mem. at 24–25; 8 U.S.C. § 1232(c)(3)(A).  The

Government represents, factually, that, prior to the point when Judge Hellerstein ordered that

G.C. and D.J.C.V. be reunited, it had not completed that assessment.  Gov't Reply at 11.  On this

factual premise, the Government argues that its failure to reunite the plaintiffs during this period

was covered by the DFE and DCE, such that the Court lacks subject matter jurisdiction.  *See id.*

at 10–11.  It alternatively argues that the Complaint does not state an FTCA claim as to this

period.  The Court denies both motions to dismiss.

### a.    *12(b)(1) motion to dismiss*

The Government first argues that plaintiffs' FTCA claims as to the second period of

separation fit within the DCE and DFE.  That argument fails.

Because G.C. was out of custody and available to care for D.J.C.V., D.J.C.V. no longer

qualified as a UAC, which had been the statutory basis on which the immigration authorities had

earlier acted to separate the two.  A UAC is defined as a noncitizen child who does not have a

parent or legal guardian in the United States "available to provide care and physical custody" or

does not have a parent or legal guardian in the United States.  6 U.S.C. § 279(g)(2)(C)(ii).  And

"[w]hen an alien previously determined to have been a UAC" has "a parent or legal guardian in

49

the United States . . . available to provide care and physical custody . . . the alien is no longer a

UAC." 8 C.F.R. § 236.3(d)(2).

Here, as pled, as found in the companion habeas litigation, upon his release pursuant to

the bond hearing—and as is not disputed on this motion—G.C. was available to provide such

care and custody, actively and vigorously pursued the opportunity to do so, and was so qualified.

*See D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) ("[T]o be 'available to provide care' for a

child, a parent must be available to provide what is necessary for the child's health, welfare,

maintenance, and protection.") (quoting 6 U.S.C. 279(g)(2)(C)(ii)).  After his release on bond,

G.C. was "[d]esperate for the opportunity to see his son" and arranged to see D.J.C.V. the next

day.  Compl. ¶ 121.  After that visit, he asked again to see D.J.C.V. as soon as possible; his

request was denied.  *Id.* ¶ 128.  After being told he would face "a lengthy vetting process," he

filed a habeas corpus petition and moved for a TRO, which was granted by Judge Hellerstein.

*Id.* ¶¶ 129–32.  D.J.C.V.'s guardian *ad litem* also supported their reunification.  The guardian

noted that it was "essential" for D.J.C.V. "to have contact and be reunited with his father." *Id.* ¶

119.  The guardian further stated that D.J.C.V. "needs his father's daily attention, care, and

love," and as long as they were separated and D.J.C.V. was prevented "from living and

developing under his father's care," his "health, safety, and well-being will continue to suffer

and will likely worsen." *Id.* ¶ 124; *see D.J.C.V. v. U.S. Immigr. & Customs Enf't*, No. 18 Civ.

9115 (AKH), Dkt. 25 ("Habeas Tr.") at 16 (court describing G.C. as "ready, willing, and able to

take care of his child").

In these circumstances, the Government thus cannot claim to have been exercising due

care in implementing the statutes at issue, or to have been exercising discretion committed to it

by statute, because, upon G.C.'s release from immigration detention, those statutes, which had

been triggered by D.J.C.V.'s UAC status, no longer applied. *See Maldonado v. Lloyd*, No. 18

Civ. 3089 (JFK), 2018 WL 2089348, at *5 (S.D.N.Y. May 4, 2018) ("[A] child is not

'unaccompanied'—and therefore, neither a UAC nor properly within ORR's regulatory ambit—

if a parent is physically present in the United States and, as a practical matter, is available to

provide care and physical custody."). Other courts that have confronted challenges to

separations between a minor and a non-detained parent have similarly found, including that ORR

did not have a statutory charter to review the parent's suitability as custodian under 8 U.S.C. §

1232(c)(3)(A). In *Maldonado*, Judge Keenan explained that "the record belies the proposition

that [the child there was] 'unaccompanied' in a statutorily relevant sense." 2018 WL 2089348,

at *5. The child there had been taken into custody while living with his mother; she was not

unavailable; and she "unambiguously communicated her desire to reunite with" her child. *Id.*

Accordingly, defendants' position that there needed to be "final determinations on dangerousness

and suitability" was unavailing, because that "refrain presupposes that [the child] is a UAC." *Id.*

at *6 (ordering minor's release to his mother); *see also Mendez Ramirez v. Decker*, 19 Civ.

11012 (GHW), --- F. Supp. 3d. ----, 2020 WL 1674011, at *6 (S.D.N.Y. Apr. 3, 2020) ("[W]hen

ORR determined that Mr. Mendez Ramirez's mother was available to provide for his care and

physical custody, he no longer satisfied the statutory definition and ceased to be properly

classified as a UAC."); Habeas Tr. at 16 ("What you want to do is take time to do an

investigation, which is not authorized.").[21] Accordingly, neither the DCE nor the DFE apply.

---

[21] *See also, e.g.*, *D.B.*, 826 F.3d at 744 (Floyd, J., dissenting) (arguing that the ORR "is only
authorized to detain alien children whose parents are not available in the United States"); *id.* at
749 n.3 (noting that ORR concedes that "its authority ends once an individual ceases to be [a
UAC]," including when the child turns 18 or gains lawful immigration status, and that "[t]he text
of the UAC definition provides no indication that custodial authority does not also end when [the
child] is no longer 'unaccompanied'"); *Souza v. Sessions*, No. 18 Civ. 4412, 2018 WL 10436697,

*Myers & Myers*, 527 F.2d at 1261 ("[A] federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority."); *Nwozuzu*, 2015 WL 4865772, at *5 (statute must "specifically prescribe[] a course of action for an employee to follow") (citation omitted).

In any event, even if ORR had charter to undertake some review of G.C. before reuniting him with D.J.C.V., as pled, the Government's actions in failing to reunite him with G.C. for five days—until Judge Hellerstein ordered such reunification—do not fit within the DFE or the DCE. There is no basis to view the authorities' failure to so act in this period as following from either a statutory command or the process of exercising statutorily conferred discretion. Consequential delays in processing petitions for reunification have been held to implicate due process. *See, e.g., Santos v. Smith*, 260 F. Supp. 3d 598, 613–14 (W.D. Va. 2017); *Beltran v. Cardall*, 222 F. Supp. 3d 476, 486 (E.D. Va. 2016). Here, in fact, Judge Hellerstein found that plaintiffs were likely to succeed on their bid for habeas relief, which was based on claims of substantive and procedural due process violations, and violations of the *Flores* settlement. *See D.J.C.V.*, No. 18 Civ. 9115 (AKH), Dkt. 18; *id.*, 2018 WL 10436675, at *1. Supporting this, plaintiffs' Complaint pleads that the Government's delay was unjustified, particularly inasmuch as D.J.C.V.'s guardian *ad litem* had opined that he needed to be reunited with his father urgently and was immensely suffering without his father. Compl. ¶¶ 119, 124. As the Complaint further pleads, there was no

---

at *1 (N.D. Ill. June 28, 2018) (noting that where a parent is "present and available," it is likely that minor "no longer qualifies as [a UAC]" and ORR "has no statutory basis to keep [minor] in custody if he is not [a UAC]"); *but see Lopez v. Sessions*, No. 18 Civ. 4189 (RWS), 2018 WL 2932726, at *10 (S.D.N.Y. June 12, 2018) (not considering whether the petitioner no longer qualified as a UAC after he turned 18 or once ORR determined that his mother was available to provide care or physical custody).

suggestion, and the Government does not claim, that G.C. was an unfit parent. *Id.* ¶¶ 76 n.75, 88; *see also id.* ¶ 132.

Accordingly, neither the DFE or the DCE applies here, so as to overcome the statutory waiver of sovereign immunity. *See Santos*, 260 F. Supp. 3d at 613 ("when a parent is requesting reunification, the burden should be on ORR to show why its continued custody of a UAC is appropriate, rather than placing that burden on the parent"); *D.J.C.V.*, 2018 WL 10436675, at *1 ("[T]he government does not allege that Petitioner Mr. C. is unwilling or unfit to care for [D.J.C.V.], or any other adequate reason why petitioners should not be reunited."). The Court denies the motion to dismiss under Rule 12(b)(1).

### b.    *12(b)(6) motion to dismiss*

The Government, finally, moves to dismiss the FTCA claims based on the second period of separation for failure to state a claim. That motion is easily put aside.

As noted above, IIED and NIED both require extreme and outrageous conduct; a causal connection between the conduct and the injury; and severe emotional distress. *See Bender*, 78 F.3d at 790; *Truman*, 434 F. Supp. 3d at 122. IIED additionally requires intent to cause severe emotional distress. *Bender*, 78 F.3d at 790. Negligence requires a duty owed, a breach of that duty, and injury caused by that breach. *Lombard*, 280 F.3d at 215.

The Complaint states a claim for all three causes of action with respect to G.C.'s continued separation from D.J.C.V. as to the five-day period in October 2018. It alleges that— having been kept apart for more than five months—G.C. and D.J.C.V. were blocked by the Government from speaking directly to one another; that G.C. desperately sought a visit with his son; that during their brief, supervised visit, D.J.C.V. cried when G.C. tried to hold him, and G.C. "worried that since D.J.C.V. had struggled to recognize him during their visit," he would never be reunited with his son. Compl. ¶¶ 119, 121, 128. As alleged, the Government then

denied G.C.'s request to see D.J.C.V. again after this short visit, and "refused" to reunify them permanently, instead stating that they "had to go through a lengthy vetting process" before G.C. could be reunified with D.J.C.V. *Id.* ¶¶ 128–29. Even though D.J.C.V.'s guardian *ad litem* had recommended reunification, Government officials "defied this common sense recommendation." *Id.* ¶ 119. Such allegations make out the elements of these causes of action, particularly inasmuch as the Complaint repeatedly alleges that the Government's actions in keeping G.C. and D.J.C.V. apart during this period compounded their harm. *See id.* ¶¶ 127 (G.C. "worried that since D.J.C.V. had struggled to recognize him during their visit, immigration officials would never reunify him with his son"), 129 (immigration officials refused to permanently reunite G.C. and D.J.C.V.); Habeas Tr. at 16 ("[T]hat's the most cruel thing you can imagine, separating a child from a parent who is ready, willing, and able to take care of his child."), 24 ("t's the most cruel of all cruelties to separate a father from the child when there is no basis in the detention aspect of the father to do that."); *D.J.C.V.*, 2018 WL 10436675, at *1 ("Except in the most dreadful circumstances, a court should not countenance the cruelty of the separation of a parent and child by the government.").

The Court therefore denies the motion to dismiss the claims based on the five-day period of separation between October 10 and 15, 2018.

### B.    Alien Tort Statute

Finally, the Government moves to dismiss the Complaint's claims of torture and crimes against humanity, brought under the ATS. That motion is granted, for lack of subject matter jurisdiction.

Congress must unambiguously waive sovereign immunity to expose the United States to a suit for damages. *See, e.g., FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("[A] waiver of sovereign immunity must be 'unequivocally expressed' in statutory text[.]") (quoting *Lane v.*

*Peña*, 518 U.S. 187, 192 (1996)); *see also, e.g.*, *United States v. Mitchell*, 445 U.S. 535, 538 (1980) ("A waiver of sovereign immunity cannot be implied but must be unequivocally expressed.") (internal quotation marks and citation omitted); *Binder & Binder, P.C. v. Colvin*, 818 F.3d 66, 70 (2d Cir. 2016). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

Here, the ATS provides a grant of jurisdiction and a cause of action, but it does not contain an express waiver of sovereign immunity. Therefore, as almost every court to consider the question has held, the United States is immune from suit under the ATS, even for alleged violations of *jus cogens* norms, as the Complaint here articulates. *See Quintero Perez v. United States*, 8 F.4th 1095, 1100–01 (9th Cir. 2021) (affirming dismissal of *jus cogens* claim against United States under ATS due to sovereign immunity); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) ("[T]he [ATS] has been interpreted as a jurisdictional statute only—it has not been held to imply any waiver of statutory immunity.") (citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985); *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980)); *Sanchez-Espinoza*, 770 F.2d at 207 ("The Alien Tort Statute itself is not a waiver of sovereign immunity.") (citing *Canadian Transp. Co.*, 663 F.2d at 1092). The Second Circuit has also stated that the ATS does not waive sovereign immunity. *Arar v. Ashcroft*, 532 F.3d 157, 175 n.12 (2d Cir. 2008) (agreeing with "[s]everal Courts of Appeals [that] have held that neither the [Torture Victim Protection Act ("TVPA")] nor the [ATS] establishes the United States's consent to be sued under the cause of action created by the TVPA") (citations omitted), *vacated and superseded on other grounds on reh'g en banc*, 585 F.3d 559 (2d Cir. 2009); *see also* Gov't Reply at 19–20 (collecting cases).

Plaintiffs and their *amici* ask the Court to make new law, and find that the ATS waives sovereign immunity such that plaintiffs may pursue ATS claims against the Government. Tr. at 75; Pl. Mem. at 41 (citing *Al Shimari v. CACI Premier Tech, Inc.*, 368 F. Supp. 3d 935 (E.D. Va. 2019)); Dkt. 40-1 at 14 (urging Court not to accept Government's assertion of sovereign immunity in this case); Dkt. 41-1 at 4–5, 16 ("sovereign immunity should not override . . . a clear congressional mandate" to address international law violations); *see also* Dkt. 46-1 (arguing that family separation to deter immigration violates international law). The Court declines this invitation. Bedrock principles of sovereign immunity require an express waiver. There is none in the ATS. Plaintiffs' recourse on this point is to the elected branches.

## CONCLUSION

For the reasons stated above, the Court (1) directs the parties to conduct jurisdictional discovery as to the basis or bases for G.C. and D.J.C.V.'s initial period of separation; (2) denies the motions to dismiss plaintiffs' claims as to the second period of separation, and (3) grants the motion to dismiss plaintiffs' claims under the ATS for lack of subject matter jurisdiction.

Discovery as to that first period is now ongoing. *See* Dkts. 115, 116. The Court directs the parties to submit, within two weeks of this decision, a proposed discovery plan for merits discovery as to the second period of separation.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: June 3, 2022
New York, New York