UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

D.J.C.V., a minor child, and G.C., his father,

         *Plaintiffs*,

v.

UNITED STATES OF AMERICA,


         *Defendant*.

---

20 Civ. 5747 (PAE)

## PLAINTIFFS' MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Meena Roldan Oberdick
Rayza B. Goldsmith
Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Drive, Suite #1901
New York, New York 10031
+1 (212) 256-1910
rgoldsmith@latinojustice.org
moberdick@latinojustice.org

Zane Memeger (*Pro Hac Vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
+ (215) 963-5750
zane.memeger@morganlewis.com

Jonathan York (*Pro Hac Vice*)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
+ (202) 739-5394
jonathan.york@morganlewis.com

Baher Azmy
Jessica Vosburgh *Pro Hac Vice forthcoming*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
+1.212.614.6427
bazmy@ccrjustice.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. iii

PROCEDURAL BACKGROUND........................................................................................ 1

PRELIMINARY STATEMENT........................................................................................... 2

LEGAL STANDARD .......................................................................................................... 5

FACTUAL BACKGROUND .............................................................................................. 7

      A.    USBP had no policy in place authorizing the separation of plaintiffs based on criminal history alone. ........................................................................... 8

      B.    Long before the official announcement of the Zero Tolerance Policy, DHS and DOJ officials developed a policy to effect widespread family separation in order to deter migrants like Plaintiffs from seeking asylum in the United States. ................................................................................................. 11

      C.    DHS began using prosecution as a pretext to justify increasing family separations starting with, but not limited to, a pilot project in CBP's El Paso Sector. ............................................................................................................ 13

      D.    Continuation of Zero Tolerance separations across the Southern border............. 16

      E.    Official policy required reuniting families if the parent was not prosecuted or incarcerated............................................................................................................ 19

      F.    The public-facing justification for the Family Separation Policy was to apply "consequences to criminals." ......................................................................... 21

ARGUMENT ......................................................................................................................... 23

      A.    Under the first prong of *Berkovitz/Gaubert,* the DFE does not apply because USBP did not have discretionary authority to separate G.C. from his son. ....................................................................................................................... 24

            1.    USBP's decision to separate G.C. and D.J.C.V., after DOJ declined to prosecute G.C., was grounded in the Zero Tolerance Policy, and not because of his "criminal history." ......................................................... 26

            2.    RGV agents lacked discretion to violate mandatory USBP policy requiring them to make reasonable efforts to reunite families if prosecution was declined. ........................................................................ 31

            3.    RGV agents lacked discretion to designate and treat D.J.C.V. as a UAC because he did not meet the statutory definition of a "UAC" under the TVPRA. ........................................................................................ 33

      B.    Under the second prong of *Berkovitz/Gaubert,* the DFE does not apply because Plaintiffs' separation is unsupported by any policy justification. .......... 37

CONCLUSION...................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.F.P. v. United States*,
    No. 121CV00780DADEPG, 2022 WL 2704570 (E.D. Cal. July 12, 2022) ..........................30

*AIIL v. Sessions*,
    No. CV-19-00481-TUC-JCH, 2022 WL 992543 (D. Ariz. Mar. 31, 2022) ..........................30

*Alvarez v. Bause*,
    No. 922CV00186LEKATB, 2023 WL 1765415 (N.D.N.Y. Feb. 3, 2023) ...........................25

*Andrulonis v. United States*,
    952 F.2d 652 (2d Cir. 1991) ............................................................................ passim

*Anson v. United States*,
    294 F. Supp. 3d 144 (W.D.N.Y. 2018) ..................................................................5, 6

*Bagner v. United States*,
    428 F. Supp. 2d 101 (N.D.N.Y. 2006) .....................................................................31

*Berkovitz v. United States*,
    486 U.S. 531 (1988) ......................................................................................... passim

*Bunch v. United States*,
    880 F.3d 938 (7th Cir. 2018) .................................................................................5

*C.M. on behalf of D.V. v. United States*,
    No. 5:21-CV-0234-JKP-ESC, 2023 WL 3261612 (W.D. Tex. May 4, 2023)..................30, 34

*Carlyle v. United States, Dep't of Army*,
    674 F.2d 554 (6th Cir. 1982) .................................................................................5

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .............................................................................................25

*Coreas-Giron v. Holder*,
    422 F. App'x 602 (9th Cir. 2011) ..........................................................................36

*Coulthurst v. United States*,
    214 F.3d 106 (2d Cir. 2000) ...................................................................23, 37, 38, 39

*D.A. v. United States*,
    No. EP-22-CV-00295-FM, 2023 WL 2619167 (W.D. Tex. Mar. 23, 2023)...............25, 31, 35

*D.B. v. Cardall*,
    826 F.3d 721 (4th Cir. 2016) .................................................................................35

*E.C.B. v. United States,*
   No. CV-22-00915-PHX-CDB (D. Az. Nov. 8, 2022) ..........................................................30

*F.R. v. United States,*
   No. CV-21-00339-PHX-DLR, 2022 WL 2905040 (D. Ariz. July 22, 2022) ..........................30

*Hamm v. United States,*
   439 F. Supp. 2d 262 (W.D.N.Y. 2006),
   *aff'd,* 483 F.3d 135 (2d Cir. 2007) ....................................................................................6

*Hartman v. Holder,*
   No. 100-CV-6107-ENV-JMA, 2009 WL 792185 (E.D.N.Y. Mar. 23, 2009) ........................38

*Indian Towing Co. v. United States,*
   350 U.S. 61 (1955)..............................................................................................................32

*J.S.R. v. Sessions,*
   330 F. Supp. 3d 731 (D. Conn. 2018)................................................................................25

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't,*
   319 F. Supp. 3d 491 (D.D.C. 2018)....................................................................................35

*Keller v. United States,*
   771 F.3d 1021 (7th Cir. 2014) .............................................................................................6

*King v. United States,*
   491 F. Supp. 2d 286 (D. Conn. 2007).................................................................................5

*Loumiet v. United States,*
   828 F.3d 935 (D.C. Cir. 2016).....................................................................................24, 26

*Maldonado v. Lloyd,*
   No. 18 CIV. 3089 (JFK), 2018 WL 2089348 (S.D.N.Y. May 4, 2018) ................................35

*Mantena v. Johnson,*
   809 F.3d 721 (2d Cir. 2015)................................................................................................6

*Mendez Ramirez v. Decker,*
   612 F. Supp. 3d 200 (S.D.N.Y. 2020)................................................................................35

*Merando v. United States,*
   517 F.3d 160 (3d Cir.2008).................................................................................................5

*Meyers & Meyers, Inc. v. United States Postal Serv.,*
   527 F.2d 1252 (2d Cir. 1975)........................................................................................1, 24

*Ms. L. v. ICE,*
   302 F. Supp. 3d 1149 (S.D. Cal. 2018)...............................................................10, 11, 25, 30

iv

*Nicholson v. Williams*,
   203 F. Supp. 2d 153 (E.D.N.Y. 2002) ..................................................................25

*Parrott v. United States*,
   536 F.3d 629 (7th Cir. 2008) ..............................................................................5

*Prescott v. United States*,
   973 F.2d 696 (9th Cir. 1992) ..............................................................................5

*R.Y.M.R. et al v. United States*,
   No. CV-20-23598-KMW (S.D. Fla. Feb. 5, 2021) ....................................................30

*S.E.B.M. by & through Felipe v. United States*,
   No. 1:21-CV-00095-JHR-LF, 2023 WL 2383784 (D.N.M. Mar. 6, 2023) ............................35

*S.R.P. ex rel. Abunabba v. United States*,
   676 F.3d 329 (3d Cir. 2012)..........................................................................5, 6

*Saint-Guillen v. United States*,
   657 F. Supp. 2d 376 (E.D.N.Y. 2009) .....................................................................5

*Simone v. United States*,
   No. 09CV3904TCPAKT, 2010 WL 11632765 (E.D.N.Y. June 17, 2010) ..............................32

*Southerland v. City of New York*,
   680 F.3d 127 (2d Cir. 2012)..............................................................................25

*St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*,
   556 F.3d 307 (5th Cir. 2009) ..............................................................................5

*Stanley v. Illinois*,
   405 U.S. 645 (1972).......................................................................................31

*Terbush v. United States*,
   516 F.3d 1125 (9th Cir. 2008) ..............................................................................6

*Triestman v. Fed. Bureau of Prisons*,
   470 F.3d 471 (2d Cir. 2006)..............................................................................38

*United States v. Gaubert*,
   499 U.S. 315 (1991)............................................................................... passim

*United States v. Myers*,
   426 F.3d 117 (2d Cir. 2005)..............................................................................25

*Washington v. Glucksberg*,
   521 U.S. 702 (1997).......................................................................................25

*Wright v. United States*,
    162 F. Supp. 3d 118 (E.D.N.Y. 2016) ..................................................................38

*Wright v. United States*,
    866 F. Supp. 804 (S.D.N.Y. 1994)....................................................................32

*Zeranti v. United States*,
    358 F. Supp. 3d 244 (W.D.N.Y. 2019) ...............................................................6

**Statutes**

6 U.S.C. § 279(g)(2) .......................................................................................34, 35

6 U.S.C. § 279(g)(2)(C)(ii) ....................................................................................34

8 U.S.C. § 1232(b)(1) .............................................................................................34

8 U.S.C. § 1325................................................................................................ passim

8 U.S.C. § 1325(a) ..................................................................................................17

8 U.S.C. § 1326................................................................................................ passim

**Rules**

Fed. R. Civ. P. 30(b)(6)............................................................................................8

**Other Authorities**

14 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and
    Procedure § 3658.1 (3d ed. 1998) .......................................................................5

Dep't of Justice, Office of the Inspector General, *Review of the Department of Justice's
    Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with
    the Department of Homeland Security and Health and Human Services* at 14 (January
    14, 2021, revised April 13, 2022) .......................................................................14

DHS OIG, *DHS Lacked Technology Needed to Successfully Account for Separated
    Migrant Families* (OIG-20-06, November 25, 2019) ..........................................14

Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating
    Women, Children at Mexico Border,* Reuters (March 3, 2017)...............................11

*Kelly: Separating Families Under Consideration,* CNN (March 7, 2017)...................................12

Matthew Rozsa, *Homeland Security Secretary John Kelly Says He Is 'Considering'
    Separating Children from Their Parents,* Salon (March 7, 2017)...........................12

*USBP Interim Guidance on Preliminary Injunction in Ms. L. v. ICE, No. 18-482 (C.D. Cal. June 26, 2018)* (June 27, 2018)......................................................................................10

## PROCEDURAL BACKGROUND

Defendant United States filed a motion to dismiss Plaintiffs' claims under the Federal Tort Claims Act ("FTCA") in 2020, arguing, *inter alia*, that the government's decision to separate G.C. from his toddler son was protected by various exceptions to FTCA liability.[1] After oral argument and supplemental briefing, on June 3, 2022, this Court issued a ruling denying the government's motion to dismiss Plaintiffs' FTCA claims for the period of October 10–15, 2018, denying the applicability of the due care exception to the FTCA for any period and holding that private analogues existed for the government's tortious conduct.  ECF No. 127 at 35–42. Left open was a determination of whether the discretionary function exception ("DFE") applied to the government's decision to separate the family. *Id*. at 47-48.

Because Plaintiffs claimed that the separation was part of the government's Zero Tolerance Policy, and the government claimed that it was driven by G.C.'s misdemeanor conviction alone, the Court ordered jurisdictional discovery to test whether "the Zero Tolerance Policy played no part in the decision to separate G.C. and D.J.C.V." *Id.* at 48 n.20. Thus, if the facts elicited in jurisdictional discovery show that the separation of father and son at the border was based in part on the Zero Tolerance Policy, rather than solely on the fact of G.C.'s prior misdemeanor conviction, this Court has held that the government's conduct "*does not fall within the DFE.*" *Id.* at 35 (emphasis added). This is because the DFE cannot shield government officials from liability when they act outside the bounds of their constitutional authority. *Id.* at 23 ("there is no discretion for a federal official 'to behave unconstitutionally or outside the scope of his delegated authority'") (quoting *Meyers & Meyers, Inc. v. United States Postal Serv.,* 527 F.2d 1252, 1261 (2d Cir. 1975)).

---

[1]     The government also moved to dismiss Plaintiffs' claims under the Alien Tort Statute, which the Court granted on June 3, 2022.

## PRELIMINARY STATEMENT

On May 2, 2018, three weeks after the official announcement of a nationwide Zero Tolerance policy that had been rolling out for over a year, agents of the United States Border Patrol ("USBP") intentionally, cruelly, and unnecessarily separated then nineteen-month-old D.J.C.V. from his father G.C. as they sought humanitarian relief under U.S. immigration law.

The timing of the USBP's decision and the process they followed — or rather, did not follow — are central to the government's liability in this case. The government undertook its decision in the context of an official announcement of a nationwide Zero Tolerance policy designed to punish and deter asylum-seekers crossing the Southern border, and one day after the U.S. Department of Justice ("DOJ") *declined* to prosecute G.C. under potential charges for illegal entry. Contrary to its own policy requirements, USBP took no action to reunify father and son after prosecution was declined. Moreover, the United States took custody of a child from his parent — a separation that was to last more than five months — without any determination about the father's fitness or the best interest of the child; it was done in the absence of any demonstrable federal policy authorizing separation of a parent from a child absent a determination about the child's safety or an active prosecution.

Numerous courts, including this one, have found that separations driven by the Zero Tolerance policy, which earned national and international condemnation for its cruelty to migrating families, violated due process protections and could trigger liability for the United States under the Federal Tort Claims Act.  Here, the government has argued that USBP had the discretion to make the catastrophic decision to separate G.C. and D.J.C.V., and that the "discretionary function exception" protects it from liability under the FTCA.  But none of the of the government's shifting explanations for the separation are borne out by discovery.

First, shifting away from its original position to this Court that the separation was driven by G.C.'s prior "criminal history," the government has suggested it will argue that because USBP separated G.C. and D.J.C.V. on May 2, 2018, three days before "USBP was [] authorized to implement the Referral Policy," JSOF ¶ 65, Plaintiff's separation could not have been part of the Zero Tolerance policy.  But the record reveals that officials at the highest levels of the Trump Administration had been developing the Zero Tolerance policy — that would use federal prosecutions for unlawful entry/re-entry as a predicate for family separation — for more than a year prior to May 2018, and the policy was being implemented without official authorization across the Southern border for months before USBP separated G.C. and D.J.C.V.

Second, the government's initial position — that the separation in this case was not because of a contemporaneous policy to separate thousands of families, but because G.C. had a misdemeanor conviction from six years before his son was born — is likewise belied by the record. While the existence of criminal history could be a predicate for a prosecution referral, the government has produced no evidence of any official policy, written or otherwise, permitting border agents to separate families for so-called "criminal history" alone — that is, when, as here, the government was not planning to prosecute a parent or when a parent was not subject to an open warrant. Indeed, high-level officials consistently stated in response to the understandable public outrage about en masse family separations, that there was *no family separation policy*, and that any separations were merely a consequence of federal prosecution. Both line agents and high-level officials believed that official policy required reunification of a parent and child if a prosecution did not occur or if it resulted in a sentence of time served.  In May 2018, there was no "criminal history" policy that alone could have driven the separation of Plaintiffs.

Third, moving even farther afield from its original position in this case, the government and its witnesses have suggested that identifying a parent as "amenable" to prosecution under federal law — regardless of whether the parent was actually prosecuted or incarcerated — allowed agents to identify a minor as an "unaccompanied child" ("UAC"). But that explanation would violate the definitions set forth in the Trafficking Victims Protection Reauthorization Act ("TVPRA") (and elementary principles of due process), which requires that parents actually be unavailable to care for their children before those children are labeled "unaccompanied." USBP did not have the discretion to rewrite a statute in order to further a public narrative that the families they were separating were "criminal" and their rights to family integrity disposable.[2]

Finally, given the actual policies and practices in effect at the time of the Plaintiffs' separation — namely, (i) no general "criminal history" policy; (ii) a DOJ declination to prosecute G.C. prior to G.C. and D.J.C.V.'s separation; and (iii) USBP policy *requiring reunification* upon a declination to prosecute where parent and child remain in USBP custody — the best remaining argument the government is left with is their *negligence* in ignoring the declination over the course of many hours and going ahead with the separation anyway. But such a grievous act of neglect does not constitute a discretionary policy that can be shielded by DFE, and only supports the government's liability on the merits.

D.J.C.V. and his father were among thousands of asylum-seeking family units separated under the Zero Tolerance Policy of family separation. The government's contention that it had the

---

[2]     The factual record conclusively reveals that Plaintiffs were not actually separated due to G.C.'s "criminal history" and that Plaintiffs separation can only be explained by the Zero Tolerance policy then in effect. Nevertheless, Plaintiffs respectfully preserve their arguments set forth in their Opposition to the government's motion to dismiss and subsequent jurisdictional briefing that separation, even if based on criminal history would violate the Plaintiffs' due process rights, absent procedural safeguards not undertaken in this case.

discretion to separate this family on account of the father's 2010 misdemeanor conviction is wrong on both the facts and the law. The discretionary function exception to the FTCA does not apply in these circumstances, and the Court has jurisdiction to decide the merits of Plaintiffs' claims.

## LEGAL STANDARD

While plaintiffs bear the initial burden of stating claims that fall within the FTCA's waiver of sovereign immunity, federal circuit courts are split on the question of whether the plaintiff or government bears the burden of establishing the applicability of the DFE. *See, e.g.*, *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 n.3 (5th Cir. 2009) (listing cases); 14 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3658.1, at 639 (3d ed. 1998) ("[M]ost courts have concluded that the burden of proving the applicability of the discretionary-function exception falls upon the United States."). Though the Second Circuit has not decided the question, the apparent "prevailing view in this Circuit is that the government bears the burden of establishing the applicability of the discretionary function exception." *Anson v. United States*, 294 F. Supp. 3d 144, 158 (W.D.N.Y. 2018) (collecting cases); *see Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 n.5 (E.D.N.Y. 2009) ("Once a plaintiff satisfies this pleading requirement, the burden shifts to the government to prove that the exception applies"); *King v. United States*, 491 F. Supp. 2d 286, 296 (D. Conn. 2007) ("The United States has the burden of proving that both requirements [of the DFE] are met"). *See also* ECF Dkt No. 87 at 1. This analysis conforms with those of the Third, Sixth, Seventh, and Ninth Circuit Courts of Appeals. *See, e.g.*, *Merando v. United States*, 517 F.3d 160, 164 (3d Cir.2008); *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 (3d Cir. 2012); *Carlyle v. United States, Dep't of Army*, 674 F.2d 554, 556 (6th Cir. 1982); *Parrott v. United States*, 536 F.3d 629, 634–35 (7th Cir. 2008); *Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018); *Prescott v. United States*,

973 F.2d 696, 701 (9th Cir. 1992); *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).

Plaintiffs urge the Court to adopt the *Anson* analysis because "the Government will generally be

in the best position to prove facts relevant to the applicability of the discretionary function

exception," *S.R.P.*, 676 F.3d at 345 n.2.

　　To date, no court has decided what standard of proof the government must meet to carry

its burden of establishing the applicability of the DFE at the motion to dismiss stage. While

generally, courts apply the "preponderance of the evidence" standard for motions to dismiss, *see,

e.g.*, *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015), because the jurisdictional question is

closely intertwined with the merits, if material facts remain in dispute, the Court would then review

under a summary judgment standard. *See Zeranti v. United States*, 358 F. Supp. 3d 244, 254

(W.D.N.Y. 2019) ("where the issue of subject matter jurisdiction is so intertwined with the merits

that its resolution depends on the resolution of the merits, the court should use the standard

applicable to a motion for summary judgment and dismiss for lack of jurisdiction only where there

are no triable issues of fact") (collecting cases); *Hamm v. United States*, 439 F. Supp. 2d 262, 264

n.2 (W.D.N.Y. 2006), *aff'd*, 483 F.3d 135 (2d Cir. 2007) (the summary judgment standard is

applicable when "a clear conflict as to the central factual issues in the case" remain). Only the

Seventh Circuit has decided the question of what standard of proof the government must meet to

show that the DFE applies under a summary judgment standard. *Keller v. United States*, 771 F.3d

1021, 1023 (7th Cir. 2014) (at the summary judgment phase, noting that "the government must

offer evidence that shows *beyond reasonable dispute* that its conduct was shielded by the

exception") (emphasis added). Defendants cannot meet their burden under either the

"preponderance of the evidence" or the "beyond reasonable dispute" standard because they are

unable to show that the separation of D.J.C.V. and G.C. involved an element of choice that was based on considerations of public policy.

## **FACTUAL BACKGROUND**

On May 2, 2018, in the Rio Grande Valley ("RGV") sector of U.S. Border Patrol ("USBP"), a component of Customs and Border Protection ("CBP"), government officials separated Plaintiff G.C., a Honduran father, from his son, D.J.C.V., then nineteen months old. The separation lasted until October 15, 2018, when the Southern District of New York ordered immediate reunification, finding that the separation was unlawful. *D.J.C.V. v. U.S. Immigration and Customs Enforcement*, 1:18-cv-09115-AKH, Summary Order, ECF No. 21 (Oct. 15, 2018). Plaintiffs incorporate by reference the facts set forth in the parties' Joint Statement of Facts ("JSOF"), ECF No. 176.

In relevant summary, those facts demonstrate that agents for USBP determined that G.C. was amenable to prosecution by the U.S. Attorney's Office for the Southern District of Texas for prosecution for the federal misdemeanor of illegal entry (8 U.S.C. 1325) (JSOF ¶ 13); that he was referred for prosecution because USBP prioritized those with past convictions for prosecution referrals under Sections 1325 and 1326 (JSOF ¶ 73); that he had a misdemeanor conviction for which he had served 48 days from 2010, six years before D.J.C.V. was born (JSOF ¶ 2); and that the U.S. Attorney's Office ("USAO") declined to prosecute him (JSOF ¶ 22). As set forth in the JSOF, USBP officials designated D.J.C.V. as a UAC, and more than thirteen hours after learning that G.C. would not be prosecuted, sent D.J.C.V. into the custody of the Office of Refugee Resettlement ("ORR"), where he was given a placement in New York, while G.C. remained in the custody of USBP in RGV. (JSOF ¶¶ 22–25).

In the course of limited jurisdictional discovery permitted by the court, Plaintiffs have elicited significant additional facts, as outlined below.

**A. USBP had no policy in place authorizing the separation of plaintiffs based on criminal history alone.**

The government's primary contention in this case — that G.C.'s 8-year-old misdemeanor conviction is what drove his separation from D.J.C.V. — has no evidentiary support. Not a single document produced by the government articulates a policy or directive to separate parents from their children based *solely* on the parent's "criminal history," that is, absent prosecution or a limited set of exceptions that were not present here. Nor has any government witness articulated such a policy or directive. Because no such "criminal history" policy existed, the government cannot in this litigation claim discretion to act pursuant to this imagined authority.

USBP records completed by RGV's Central Processing Center ("CPC") dated May 1, 2018, reflect that G.C. stated that he feared return to Honduras. York Declaration in Support of Plaintiff's Opposition to the Motion to Dismiss (hereinafter "York Decl.") Ex. 1 at USA057417. When USBP agents in RGV received documentation of G.C.'s 2010 misdemeanor conviction in Louisiana,[3] they determined, at 3:35 p.m. on May 1, to "approve" a separation because "parent is amicable [*sic*] to prosecutions due to criminal history" and to "prosecute the adult subject." JSOF ¶ 13–14.  On May 1, 2018, at approximately 8:42 PM, USBP received an ORR placement for D.J.C.V. with Lutheran Social Services of New York ("LSS New York").  JSOF ¶ 21.

But G.C. was never prosecuted. Less than one hour later, at 9:30 p.m., G.C.'s Record of Deportable Alien (Form I-213), reflects that the USAO for the Southern District of Texas *declined*

---

[3]      G.C.'s immigration file, as updated at an unknown later date, stated that G.C. had no aggravated felony convictions, and was not ████████████████ it classified G.C. as an ████████████████████████████ York Decl. Ex. 39 at USA057219-20 (printout from DHS's ████████████████████████████ System). The printout appears to be from after July 2018 because it contains a banner identifying G.C. as "a member of a Separated Family Unit." As ICE 30(b)(6) deponent Robert Guadian testified, this banner was not added to the ███ system until after July 2018. York Decl. Ex. 40 at 28:17–30–15; 46:5–8; 57:11–20. Mr. Guadian testified that before that time, ICE was not notified when USBP separated a family. *Id.* at 44:7–8.

to prosecute G.C. JSOF ¶ 22; York Decl. Ex. 1 at USA057418. G.C. thus remained in the custody

of the RGV CPC. No record exists of any step taken by anyone in USBP to halt D.J.C.V.'s planned

transfer to the custody of ORR or to consult about whether to continue to effect separation. Instead,

more than thirteen hours after DOJ declined to prosecute G.C., on May 2, 2018, at approximately

10:53 AM, D.J.C.V. was "booked out" of the RGV CPC to be placed with LSS New York. JSOF ¶

23-24. G.C. remained in the custody of RGV CPC until 2:36 a.m. on May 3, 2018, when he was

transferred to the South Texas Processing Center in the custody of United States Immigration &

Customs Enforcement ("ICE"). JSOF ¶ 25. As of 9:30 p.m. on May 1, 2018, any initial connection

between criminal prosecution and a need to separate D.J.C.V. and G.C. was vitiated.

Indeed, the evidence shows the separation was contrary to applicable government policy.

Numerous directives in effect on May 2, as well as the understanding of USBP agents, make clear

that outside a limited set of circumstances, families at the border were to be kept together absent

an affirmative decision to prosecute the parent. *See, e.g.*, York Decl. Ex. 3 at 202:13–204:2 (CBP

Associate Chief Matthew Roggow explaining the circumstances under which a parent and child

could be separated absent prosecution: if the parent had an open warrant, was physically or

mentally incapacitated, or if there were safety or welfare of the child concerns flagged on CBP

Form 93 (Unaccompanied Alien Child Screening Addendum)); *see also* York Decl. Ex. 2 (CBP

National Standards on Transport, Escort, Detention, and Search (hereinafter "TEDS")) at CD-US-

0029225, (█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████) (emphasis

added); *Id.* at CD-US-0029236 ("█████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████") (emphasis added). This

understanding was echoed by agents involved in the separation of G.C. and D.J.C.V.   USBP Watch

Commander Gerardo Guerra admitted that, as of May 1, 2018, agency policy was that ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. York

Decl. Ex. 4 at 103:12–17; 106:4–9.

Notably, the first time the government articulated any policy to separate based on criminal

history alone occurred as part of its litigation defense of the family separation policy and in

response to the plaintiff's motion for a preliminary injunction in *Ms. L. v. ICE*.  Faced with the

entirely untenable position that *en masse* separations of family members absent any determination

regarding parental fitness or child welfare, the government in part retreated into a position that

such separations would be permissible if a parent had a prior criminal history — a position the

court accepted. See *USBP Interim Guidance on Preliminary Injunction in Ms. L. v. ICE, No. 18-

482 (C.D. Cal. June 26, 2018)* (June 27, 2018), available at

https://www.cbp.gov/sites/default/files/assets/documents/2022-Jun/Interim%20Guidance%20on

%20Preliminary%20Injunction%20June%202018.pdf. But the defense of this newly articulated

policy occurred well after Plaintiffs separation in this case and no evidence exists that such a policy

existed on May 2, 2018.[4] In fact, after the *Ms. L.* ruling, "[t]he situation dramatically changed,"

with DHS separating "more than *900 children*—including numerous babies and toddlers—based

on criminal history" between June 28, 2018 and June 29, 2019, a dramatic 3000% increase

compared with the period under consideration in the *Ms. L* litigation. *Ms. L. v. ICE*, No. 3:18-cv-

00428-DMS-AHG, ECF No. 439-1 at 5 (S.D. Cal. July 30, 2019). Such a dramatic increase once

---

[4]     Strict scrutiny requires that for any interest to be credited as "compelling," it must have
been the *actual* reason for the government's liberty deprivation; post-hoc justifications cannot
satisfy strict scrutiny.

"criminal history" was formally adopted as a stand-alone reason for family separation further demonstrates that no such policy existed before that time — and at the time Plaintiffs were separated. For the relevant period here, the evidence shows that separations of children from parents who were and were not prosecuted had been occurring for months across the Southern border in order to punish and deter asylum seekers — and that this intentionally broad practice is what led to Plaintiffs' separation.

**B. Long before the official announcement of the Zero Tolerance Policy, DHS and DOJ officials developed a policy to effect widespread family separation in order to deter migrants like Plaintiffs from seeking asylum in the United States.**

Starting in early 2017, DHS, CBP and ICE began publicly and privately discussing separating immigrant children from their parents to deter immigration along the Southern Border, in what was to become the official "Zero Tolerance" policy.

On or about February 2, 2017, the asylum chief at U.S. Citizenship and Immigration Services ("USCIS"), briefed asylum officers on a proposal to separate families crossing the border.[5] On March 7, 2017, then-DHS Secretary John F. Kelly confirmed these reports when asked in an interview on CNN: "If you get some young kids who manage to sneak into the United States with their parents, are [DHS] personnel going to separate the children from their moms and dads?" Secretary Kelly replied: "Yes, I am considering, in order to deter more movement along this terribly dangerous network, I am considering exactly that." In the same interview, Secretary Kelly

---

[5]     Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border,* Reuters (March 3, 2017), available at https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES.

stated he "would do almost anything to deter the people from Central America" from coming to the United States."[6] York Decl. Ex. 7 at CD-US-00016642 (containing interview excerpts).

Well over one year before Plaintiffs were separated, the public discussion of a family separation policy to deter migration at the Southern border provoked widespread outcry among policy makers, elected officials, and advocates.  On March 3, 2017, DHS officials circulated a Reuters report on the proposed family separation policy internally. One official remarked "I would be truly grateful if you could tell me this isn't being seriously considered." In response, DHS Budget Director Allen Blume replied, "the Department of Homeland Security continually explores options that may discourage those from even beginning the journey" to the United States. York Decl. Ex. 8 at CD-US-00016982. On March 8, 2017, eighty members of Congress wrote to DHS Secretary John Kelly to express their "deep concerns and opposition to an immigration enforcement proposal . . . to separate families and put children into the U.S. foster care system." York Decl. Ex. 7.  On March 22, 2017, "184 organizations who serve or work on behalf of immigrants, refugees, asylum seekers, and children" also wrote to Secretary Kelly to "express [their] profound opposition to your recent proposal to separate migrant families arriving at our borders. In addition to this proposed policy being fundamentally un-American and cruel, it is also profoundly misguided." York Decl. Ex. 10 at CD-US-00016590. On April 20, 2017, DHS Counselor █████████ sought guidance from several senior DHS officials regarding ██████

---

[6]     *Kelly: Separating Families Under Consideration,* CNN (March 7, 2017), available at https://www.cnn.com/videos/politics/2017/03/06/trump-travel-ban-separate-parents-children-kelly-tsr-bts.cnn; *see also* Matthew Rozsa, *Homeland Security Secretary John Kelly Says He Is 'Considering' Separating Children from Their Parents,* Salon (March 7, 2017), available at https://www.salon.com/2017/03/07/homeland-security-secretary-john-kelly-says-he-is-considering-separating-children-from-their-parents/.

████████████████████████████████████████████████████████████████

████ York Decl. Ex. 11.

Despite ICE's own concerns about negative publicity surrounding the practice of separating families,[7] the policy development continued. In approximately November 2017, USBP developed an issue paper evaluating the treatment of family units. The issue paper stated, "████

████████████████████████████████████████████████████████████████

████████████████████████████████ York Decl. Ex. 13 at CD-US-0045745. The issue paper also considered whether the TEDS policy (discussed *supra*) — which dictates the preservation of family integrity absent circumstances requiring separation — would hurt or help a family separation policy. *Id*. at CD-US-0045746. The public relations backlash against separating children from parents caused officials to deflect away from the true punitive and deterrence goals of the policy by focusing on presumably more palatable language regarding "prosecutions." Talking points aside, the punitive Zero Tolerance prosecution policy *was* the method to carry out the underlying family separation policy goals; "prosecution" was effectively a euphemism for family separation.

**C. DHS began using prosecution as a pretext to justify increasing family separations starting with, but not limited to, a pilot project in CBP's El Paso Sector.**

---

[7]     Public relations concerns were clear to DHS officials. In early August 2017, responding to Acting Director of ICE Thomas Homan's "proposal for separation," DHS Immigration Counselor Gene Hamilton replied: "The comms strategy will make or break all of this." *See* York Decl. Ex 12 at CD-US-0190918A. Forwarding Homan's message to other ICE officers, ICE Chief of Staff Thomas Blank wrote: "Tom has been advocating that we need to separate family units and send the adults to adult detention and the children to HHS. If we announced that, how bad do you think it would get??" *Id*. at CD-US-0190917A. ICE Assistant Director of Public Affairs Liz Johnson wrote: "Regarding your Q about separation of family units, it would likely send a strong message south of the border, but there would definitely be a severe negative reaction domestically." *Id*.

As early as April 2017, in order to advance their deterrence goals, DHS and DOJ officials developed a strategy to classify asylum-seekers as criminals subject to prosecution and family separation by expanding prosecutions of adults in family units.  They did so first by experimenting with rolling out a prosecution program in the El Paso Sector of CBP.  Throughout, messaging was an explicit concern, causing officials to focus on the presumably more palatable "prosecution" element of the whole family separation program.

According to a 2021 DOJ inspector general report, "[i]n early March 2017,[8] the Border Patrol's El Paso Sector suspended what local Western District of Texas U.S. Attorney's Office and Border Patrol officials referred to as the sector's 'family unit policy,'" under which "the Border Patrol did not refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents."[9]

On April 11, 2017, then-Attorney General Jeff Sessions issued a memorandum that directed federal prosecutors to prioritize prosecution of certain types of immigration cases and directed USAOs on the Southwest border "to work with the U.S. Department of Homeland Security and any other appropriate agency" to develop prosecution guidelines with the "goal of deterring first-

---

[8]     While the 2021 DOJ IG Report cited March 2018 as the beginning of the El Paso Initiative, most other accounts cite July 2017 as the official start of the program. JSOF ¶ 46. In November 2019, the DHS Inspector General admitted "it could not determine the origin of the initiative." DHS OIG, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (OIG-20-06, November 25, 2019), available at https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

[9]     The Report described the "El Paso Initiative" as a period during which "the Border Patrol's El Paso Sector began referring family unit adults for criminal prosecution, and the WDTX USAO developed guidelines to prosecute family unit adults in certain circumstances even if this resulted in the separation of children from those prosecuted adults." Dep't of Justice, Office of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Department of Homeland Security and Health and Human Services* at 14 (January 14, 2021, revised April 13, 2022), available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

time improper entrants." York Decl. Ex. 14 at CD-US-00007058A-59A. On July 28, 2017, Assistant Chief Patrol Agent ███████████ emailed on behalf of the El Paso Sector "██████ ████████████████████████████ which overlaps with the El Paso Sector, ████████ ████████████████████████████████████████████ ███████████████████████ York Decl. Ex. 15 at CD-US-0017361A. Regarding the purpose of the policy, ███████ wrote: "█████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████ *Id.* In response, U.S. Attorney for New Mexico Terri Abernathy ██████████████████████████████████████████████

*Id.* at CD-US-0017361A. As Brian Hastings, then-Chief of CBP's Law Enforcement Operations Directive, testified, the El Paso Initiative "█████████████." York Decl. Ex. 6 at 222:11–23.

Other sectors began to follow suit. On July 14, 2017, the Yuma sector stated it was also looking to separate family units pursuant to a criminal prosecution initiative in which USBP and the local USAO agreed that USBP would present all adults "amenable to 1325, which meant separating accompanied children so the adults could be sent to court." York Decl. Ex. 16. On August 15, 2017, an ORR Lead Intake Specialist e-mailed then-ORR Director Jonathan White stating that a majority of family separation referrals were coming from El Paso and Phoenix. York Decl. Ex. 17. The intake specialist noted that the field was seeing additional separations not being reported by DHS. *Id.* Starting in approximately October 2017, RGV started █████████████ █████████████ in an Excel spreadsheet. *See, e.g.,* York Decl. Ex 18. USBP deponents were not

able to explain why RGV began ███████████████████████ in Excel beginning in October 2017. York Decl. Ex. 4 at 48:12–49:23; Ex. 3 at 121:5–7.

As set forth in a November 1, 2017 USBP Memorandum, "Border Patrol management" began working with the USAOs in the Western District of Texas and the District of New Mexico to ████████████████████████████████████. York Decl. Ex. 19 at CD-US-0024081A. The memo affirmed ██████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████ *Id.* at CD-US-0024087A. But on November 18, 2017, USBP Deputy Chief Gloria Chavez wrote to CBP personnel in an e-mail with the subject line: "FW: DHS Separating Families:" "Effective immediately, please stand down on the continuation of this EPT prosecutions program until USBP-HQ leadership has had an opportunity to review all aspects of this program." York Decl. Ex. 20 at CD-US-0024332. A November 29, 2017 memorandum issued by USBP stated that the El Paso Sector was no longer "executing prosecutions." JSOF ¶ 50.

**D. Continuation of Zero Tolerance separations across the Southern border.**

Despite official statements that El Paso Sector was no longer prosecuting family units, family separations continued across the Southwest border. In RGV, for example, the family separation report logged between 60 to 100 family separations each month from November 2017 through the official announcement of the Zero Tolerance Policy in April 2018. *See, e.g.*, York Decl. Ex. 18.  And despite the government's public claims that it did not have a family separation policy in place after the El Paso Initiative, service providers continued "documenting an alarming increase in cases of family separation" across the entire Southern border region between August and December 2017. *See, e.g.*, York Decl. Ex. 34 at CD-US-0042445-64 (collecting cases that

"demonstrate a disturbing, increasing trend of family separation at the hands of U.S. immigration officials at the U.S.-Mexico border despite former Secretary Kelly's assurances to the contrary"). As aforementioned, in August 2017, ORR had also noted spikes in family separation cases coming from not just El Paso, but also Phoenix (located in the Tucson Sector), and that the field was seeing separations that were not being reported by DHS. York Decl. Ex. 17. In December 2017, legal service providers also reported that separations were occurring without abuse or neglect allegations and without "prior criminal history or removal orders" not just in El Paso, but also in the San Diego, Yuma, and RGV sectors. York Decl. Ex. 34 at CD-US-0042450-62. They also reported separations of families that had lawfully presented at a port of entry. *Id.*

In April 2017, when Roggow sent an e-mail to the Southwest Border chiefs and deputies instructing them to "begin referring all single adults to your respective U.S. Attorney's Office for prosecution under section 1325(a) of Title 8," York Decl. Ex. 21 at CD-US-0048995, Yuma USBP agents responded: "[t]his is inline [sic] with what we have discussed in regards to pursuing all 1325 prosecutions." York Decl. Ex. 21 at CD-US-0048995. In the same e-mail chain, U.S. Attorney for Arizona Joe Koehler responded: "[t]his is what OBP is doing at this point." *Id.* On April 27, 2018, El Paso USBP agents also responded: "[w]e already do this." York Decl. Ex. 21 at CD-US-00016754 and CD-US-00016706.

The continued separations differed from those in El Paso in a crucial respect: actual prosecution no longer factored into the separation decision. The El Paso Initiative initially focused on separating families where the parent's prosecution was actually approved. For example, in July 28, 2017, ███████████ USBP Assistant Chief Patrol Agent in El Paso, stated, ███████████ ████████████████████████████████████████████████████████████ ███████████ York Decl. Ex. 22 at CD-US-00017119. Soon, however, high-level officials in DHS

17

began to express frustration at this limitation. In December 2017, a month after the El Paso

Initiative officially ended, senior officials at DOJ and DHS exchanged a memorandum titled

████████████████████████████████████████ York Decl. Ex. 23 at CD-

US-00012651A. Two of the policies outlined in the memo were ███████████████████

████████████████████████████████ The memorandum acknowledged that ████████████

████████████████████████████████████████ *Id.* It also posited

that ██████████████████████████████████████████████████████████

████████████████ *Id.*

   According to an e-mail written by USBP Division Chief Lloyd Easterling, ████████████

██████████████████████████████████████████ York Decl. Ex. 24 at CD-US-

0128368-69 (emphasis added). As Hastings attested, "████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ " York Decl. Ex. 6 at 135:21–25. Hastings confirmed that "████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████. *Id.* at 136:7-17; 158:2–6; 165:21–166:4; 172:10–

173:2; 180:2–9. According to Hastings, ████████████████████████████████████████

██████████████████." *Id.* at 162:7–16. Thus, although DHS publicly maintained that separations

were occurring as the necessary result of prosecutions, USBP's *de facto* policy was for agents to

separate families and refer children to ORR before parents' cases were referred for potential

prosecution, before parents were sent to criminal custody, before the USAO made a decision about

whether to accept a parent's prosecution referral, and—in some cases—even when the agents had

no expectation that the parent would ever be prosecuted.

18

Hastings and others repeatedly referred to the TVPRA as the source of the requirement to designate a child a UAC because the parents were "amenable to prosecution." *See, e.g.*, *Id.* at 45:4–14; 47:11–16; 138:13–23; 220:24–221:24; 239:11–15; *see also* York Decl. Ex. 4 at 36:11–15 ("any adult that was being prosecuted that was travelling with a minor child would be separated from that child at the time the court proceedings were sought, and that child would be treated as an unaccompanied minor"). This understanding was in contravention of the statutory language of the TVPRA and a USBP memorandum explaining that the TVPRA defines UAC as a child under the age of 18 whose parent was "unavailable" to care for the child. *See* York Decl. Ex. 38 at CD-US-0045350 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████") (emphasis added).

### E. Official policy required reuniting families if the parent was not prosecuted or incarcerated.

Even where cases were accepted for prosecution, it was not uncommon for parents to quickly receive time-served sentences and be returned to their children.  DHS officials expressed frustration with this settled practice. As Hastings testified, "████████████████████████████████████████████████████████████████████████████." York Decl. Ex. 6 at 208:23–25. On May 25, 2018, Tae Johnson, ICE Acting Director of Enforcement, Removal Operations, sent an e-mail with the subject line "CBP is Reuniting adults with kids" to Nathalie Asher and Matthew Albence. York Decl. Ex. 25. In the e-mail Johnson wrote: "CBP is Reuniting adults with kids after prosecution in McAllen. My guess is there is no place to house the adult, so they are bringing them back to the station and since the child is still there, they are joining them …**What a fiasco**." *Id.* at CD-US-0030039. That day, Albence forwarded Johnson's May 25, 2018 e-mail to then-Acting Secretary of Homeland Security Kevin McAleenan, ICE Acting Director Homan, and

others, writing, "It sounds like ORR is refusing to take the children as UAC if the parent arrives back that [sic] the processing site and the child is still there. This is happening at the CPC as indicated below and have also heard in AZ. **This obviously undermines the entire effort** and the Dept is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a FRC and out the door." *Id.* CBP official Sandi Goldhamer responded to this e-mail exchange, confirming the reunification practice existed, even as she sought to change it: "I recommend we cease the reunification process when a family member is given time served and sent back to the CPC." *Id.* at CD-US-0030038.

But official policy remained clear: "The goal is to prosecute, not separate families. The separation is a byproduct of the prosecution, not the end state." York Decl. Ex. 35 at CD-US-0032498; *see also* York Decl. Ex. 26 at CD-US-0139163 (On May 29-30, 2018, USBP 30(b)(6) deponent Monique Grame emailed the RGV sector stating "As a reminder, the separation is not itself a consequence/punishment. The separation is occurring as a consequence of the prosecution" and warning that "[a]nyone in our organization saying such things causes unnecessary scrutiny from the courts, media, NGO's etc."); York Decl. Ex. 24 at CD-US-0128368 (June 3, 2018 e-mail from Easterling, "████████████████████████████████ ████████████████████████████").

The policy required reunification after a parent was returned to CBP custody after prosecution or when DOJ declined prosecution unless reunification was logistically impossible. *See, e.g.*, York Decl. Ex. 35 at CD-US-0032498 (Hastings email stating, "[w]e don't believe that we have another option, but to reunite the families if the kids are still in our custody after the adult gets back (before HHS has placed the UAC from time served."); York Decl. Ex. 29 at USA003372 (March 2, 2018 e-mail from RGV Acting Deputy Patrol Agent in Charge ████████ to all RGV

CPC Border Patrol supervisory officials directing: "If there is no way [the parent] will make prosecutions, reunite them and update the files/notifications"); York Decl. Ex. 30 at CD-US-0025131 (May 24, 2018 Richard Hudson e-mail to all USBP field deputies and chiefs directing where a family unit parent is not transferred to U.S. Marshal's custody after a referral for prosecution, "we must make every effort to reunify the family prior to transferring them to ERO as a family unit" and affirming expectation that "Chief Patrol Agents with ensure compliance").

### F. The public-facing justification for the Family Separation Policy was to apply "consequences to criminals."

DHS officials acknowledged early on that "separating families" would spark public opposition and urged the use of alternative language. In a handwritten note dated August 14, 2017, a DHS official wrote ████████████████ and lower down on the document wrote: ██ ████████████████████████████████ York Decl. Ex. 31. On December 13, 2017, Hastings wrote in an e-mail to Executive Director Meghann Peterlin, "to Chief Huffman's point, we need to get away from verbiage of separation of family units and focus on applying proper consequences to criminals." The [El Paso] Pilot was stopped for re-evaluation by BP HQ on 11-20-2017. We have now re-evaluated the initiative and find (Add Stats) . . . push/pull statistics to support continuation." York Decl. Ex. 32. On February 22, 2018, then-Associate Chief Matthew Roggow wrote to the Southern border sectors: "We continue to remain in a holding pattern for implementing a Family Unit Prosecution Initiative . . . To the greatest extent, give us the data to support the narrative that criminals are not shielded because they cross as a family unit." York Decl. Ex. 33 at CD-US-0033102.

In or around December 2017, a ████████████████ was added to RGV's family separation excel spreadsheet. The ████████████████████████████████

███████████████ York Decl. Ex. 18. USBP deponents could not explain why the ████████

███ was added at this time. York Decl. Ex. 4 at 51:5–18; York Decl. Ex. 3 at 124:22–125:6.

Internal processes demonstrate that a policy of Zero Tolerance was driving family separations, even if that motive was not reflected in official documentation. As OIG wrote: "In April 2018, Border Patrol updated e3[10] to add 11 possible separation codes for agents to select as distinct reasons why family members were separated. *However, none of the 11 separation codes were specifically tied to the Zero Tolerance Policy. That is, agents did not have an option to select 'Zero Tolerance' as a reason for separating families.* To compensate, Border Patrol agents used ad hoc workarounds to capture the reasons for family separations by simply selecting 'Criminal History' or 'Other Reasons'") (emphasis added). *See* 2019 OIG Report, *supra* n. 7 at 10.

Criminal history was relevant to the Zero Tolerance family separation program only to the extent that it was a factor for determining whether a particular adult was a *priority* for referral to DOJ for prosecution of illegal entry or reentry. *See, e.g.*, York Decl. Ex. 14 at CD-US-00007058A; York Decl. Ex. 36 at USA004117 (stating that RGV standard procedure as of February 2018 was not to separate families in order to prosecute the parent unless "[s]ubject has criminal history *and meets the established Prosecutorial guidelines*") (emphasis added); JSOF ¶ 13 and York Decl. Ex. 37 at USA002504 (May 1, 2018 email guidance to separate G.C. from D.J.C.V. "[i]f the Adult parent is amicable [sic] to prosecutions due to criminal history or fraudulent documents"). It was not, absent an actual decision by DOJ to prosecute the adult, a stand-alone reason to separate a family. *See* Section E *supra*.

\* \* \*

---

[10]     A USBP records system to document arrestees. *See, e.g.*, York Decl. Ex. 6 at 83:11–14.

The evidence elicited in discovery demonstrates that CBP had no "criminal history" policy to separate families prior to the development of the Zero Tolerance family separation policy, and that USBP's decision to separate G.C. from D.J.C.V. in May 2018 was consistent with its year-long project to effect separations of families in order to deter migration at the Southern border. The evidence also demonstrates that both USBP policy and the Constitution mandated reunification of father and son following DOJ's decision to decline to prosecute G.C. for unlawful entry. Instead, for no reason other than the cruelty inherent in the government's family separation policy, G.C. and D.J.C.V. were separated while in USBP custody, after G.C.'s prosecution was declined.

## ARGUMENT

The test for application of the DFE derives from *Gaubert* and *Berkovitz*, and it contains two prongs. To prevail, the government must establish both elements: that (1) the challenged "activity is not mandated by statute and involves some element of judgment or choice" and (2) the "decision in question was grounded in considerations of public policy." *Coulthurst v. United States*, 214 F.3d 106, 110 (2d Cir. 2000) (citing *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) and *Berkovitz*, 486 U.S. at 536–37). Government conduct is not discretionary if it is subject to a constitutional duty, mandatory federal statute, regulation, or policy that requires a specific course of action. *Gaubert*, 499 U.S. at 322. The exception only protects discretionary judgments based on valid policy considerations, not careless actions, negligent omissions, or failures to engage in any decision-making whatsoever. *Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991); *see also Coulthurst*, 214 F.3d at 110–11 (DFE does not apply in cases involving careless inattention, laziness, absentmindedness, or negligence).

The government's immunity claim fails under both prongs of the *Gaubert/Berkovitz* analysis. The government cannot satisfy the first step of this analysis for three reasons. First,

because the unconstitutional Zero Tolerance family separation policy drove the separation of G.C. and D.J.C.V., the government's conduct cannot be deemed to have involved an element of judgment or choice as government agents do not have discretion to violate the Constitution. Second, the separation violated mandatory USBP policy that required agents to reunite separated families where the parent's prosecution was either declined or resulted in a time served sentence, and both parent and child were still being held at a USBP detention facility. Third, RGV agents lacked discretion to designate and treat D.J.C.V. as a UAC because he did not meet the statutory definition of "UAC" under the TVPRA. In addition, even if this Court were to determine that the government enjoyed some discretion to proceed with separating D.J.C.V. from G.C. after DOJ declined prosecution, the government cannot satisfy the second step of the *Gaubert/Berkovitz* analysis because its actions were not grounded in considerations of public policy. Contravening its own policies, USBP failed to take *any* steps or engage in any decision-making *at all* regarding the plans to separate D.J.C.V. after becoming aware by the evening of May 1 that DOJ would not prosecute G.C. For these reasons, the DFE is inapplicable, and this Court has jurisdiction.

### A. Under the first prong of *Berkovitz/Gaubert,* the DFE does not apply because USBP did not have discretionary authority to separate G.C. from his son.

The DFE cannot shield government officials from FTCA liability when they act outside the bounds of their constitutional authority or in violation of a mandatory statute or policy. ECF No. 127 at 23 ("a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority") (quoting *Meyers & Meyers,* 527 F.2d at 1261). The DFE "does not shield decisions that exceed constitutional bounds, even if such decisions are imbued with policy considerations." *Loumiet v. United States*, 828 F.3d 935, 944 (D.C. Cir. 2016).

Plaintiffs have a fundamental right to family integrity, which cannot be breached by the government without some individualized assessment based on the interests of the child. In the

Second Circuit, strict scrutiny applies to government actions interfering with the fundamental right to family integrity. *United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005) ("If the liberty interest at stake is fundamental, a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest.") (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *Alvarez v. Bause*, No. 922CV00186LEKATB, 2023 WL 1765415, at *4 (N.D.N.Y. Feb. 3, 2023) ("Strict scrutiny applies to statutes and regulations, as well as *actions* by individual governmental defendants that infringe on close familial relationships.") (collecting cases); *Nicholson v. Williams*, 203 F. Supp. 2d 153, 242–44 (E.D.N.Y. 2002) (applying strict scrutiny to city administration for children services' removal of children from mothers' custody solely on grounds that mothers were victims of abuse); *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 741–42 (D. Conn. 2018) (DHS policy was not "narrowly tailored to achieve [a] compelling reason" for depriving children of family integrity).[11]

To the extent that D.J.C.V. and G.C.'s claims are analyzed under the "shock the conscience" standard set forth in *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), defendants' actions also fail under that standard. ECF No. 127 at 28 (noting that "on the pleadings… the facts alleged as to G.C. and D.J.C.V. are, if anything, more shocking than in the baseline case described in *Ms. L.*"); *see also D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *9 (W.D. Tex. Mar. 23, 2023) (Zero Tolerance "was made conscience shocking, moreover, by virtue

---

[11]     Some courts will afford atypical deference in cases involving a short deprivation of family integrity in order to investigate a reasonable allegation of child abuse. *See, e.g.*, *Southerland v. City of New York*, 680 F.3d 127, 152–55 (2d Cir. 2012) (applying "shock the conscience" standard to caseworker's temporary removal of child from parent's home based on reasonable belief child was being abused and neglected). Such deference is inapplicable where the Government did not assert any allegation of abuse or neglect. Moreover, the separation of D.J.C.V. and G.C. was protracted, whereas this line of cases applies to short-term separations tailored to give the government just time to investigate the underlying claim of abuse or neglect. This did not occur here.

of the sheer completeness of the separation and the cruel, heartless way it was effectuated and maintained.") Because their separation was driven by the Zero Tolerance policy — and not any consideration of interest of the child — the government's actions cannot be shielded by the DFE. *Loumiet*, 828 F.3d at 944 (holding that the DFE "does not shield decisions that exceed constitutional bounds, even if such decisions are imbued with policy considerations").

In addition, where there exists a mandatory federal statute, regulation, or policy that "specifically prescribes a course of action for an employee to follow," the first prong of the test requiring an element of judgment or choice is not met because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. The DFE is also inapplicable in this case because USBP violated its own mandatory policy and a non-discretionary statute, the TVPRA.

### 1.   USBP's decision to separate G.C. and D.J.C.V., after DOJ declined to prosecute G.C., was grounded in the Zero Tolerance Policy, and not because of his "criminal history."

As the facts elicited in discovery show, USBP did not separate G.C. and D.J.C.V. incident to a detention in U.S. Marshal's custody or prosecution by DOJ, since the DOJ specifically declined to prosecute G.C. one day after G.C.'s apprehension. Nor was the separation driven or sustained because of G.C.'s eight-year-old misdemeanor conviction, as there was no policy in place authorizing family separations based on "criminal history" alone. Instead, the Zero Tolerance family separation policy drove USBP's separation of G.C. and D.J.C.V. on May 2, 2018.

While the formal "Zero Tolerance" memorandum issued by AG Sessions in April 2018 was directed to USAOs and ordered maximum prosecution for migrants regardless of family status, DHS's Zero Tolerance Policy of family separation began far earlier. *See, supra* Factual Background Sections C-D; *see, e.g.*, York Decl. Ex. 14–19, 21, 34. The government spent more than a year workshopping its family separation program, beginning in El Paso and extending

throughout field offices at the border. *See, supra* Factual Background Section B, C, and E; *see, e.g.*, York Decl. Ex. 7, 8, 12, 14, 15, 18, 23, 31, and 32. After workshopping numerous potential routes for increasing separations, the government finally landed on the justification that increased family separations could be achieved by increasing prosecutions of adults in family units under 8 U.S.C. §1325 (unlawful entry) and §1326 (unlawful re-entry). *See, supra,* Factual Background Section C. The government appears to have believed that prosecuting parents would help justify designating separated children as UACs, which they understood was required for them to separate parents from children. *See, supra,* Factual Background Section D; *see also* York Decl. Ex. 23.

However, due to prosecutorial resource limitations, DHS was unable to separate as many families as it wished under these limited circumstances where DOJ was declining to accept prosecution, and many high-level officials within DHS complained that separations were not occurring in as widespread or significant a way as desired for effective deterrence of migration. *See, supra* Factual Background Section D–E; *see, e.g.*, York Decl. Ex. 6 at 208:23–25, Ex. 23 and Ex. 25. Faced with the limitations of their official prosecution-driven policy, USBP developed an unofficial policy of designating as many parents as possible as "amenable to prosecution" and separating family units based on "amenability" alone.  *See, supra* Factual Background Section D; *see, e.g.*, York Decl. Ex. 24, Ex. 6.  Though the government continued to publicly maintain that it was separating families as a necessary result of *actual prosecutions* of the family unit adults, unofficially and in practice, USBP was separating as many family units as possible where the adult was simply "amenable to prosecution," meaning they met the elements of § 1325 (unlawful entry) and § 1326 (unlawful re-entry). This more expansive and unprecedented concept was unique to the Zero Tolerance Policy and was used to give the government a purported rationale to separate every family unit it apprehended, rather than just those parents it had the capacity to prosecute.

Criminal history was relevant to this program only to the extent that it was a factor for determining whether to refer an individual for prosecution under 8 U.S.C. § 1325 and § 1326. *See* Factual Background Section F; *see also* York Decl. Ex. 14, 36, 37. In other words, it was employed as one mechanism for determining who was a priority for federal prosecution, not for identifying who was eligible for prosecution. Contrary to the government's central contention in this case, criminal history was never a stand-alone basis for the separation of parents from their children.

This move from separating family units as a result of an actual prosecution to separating family units where the parent was merely "amenable to prosecution" triggered a dramatic expansion of families to be separated. CBP identified children in family units whose parents were merely "amenable" to prosecution, not actually prosecuted, as UACs. This move was in direct contravention of USBP's own mandatory policy to reunite families if prosecution was declined or the parent was sentenced to time served while the child was still in USBP custody as well as TVPRA, which defines a UAC as a child whose parent is "unavailable" to care for them.

In addition, the government cannot, consistent with the Constitution, separate a family based on an asserted "amenability" to some potential prosecution as the theoretical prospect of prosecution is in no way tethered to a determination of dangerousness or unfitness. It thus fails strict scrutiny on either prong: (i) there is no compelling interest in separating children based on a remote — and ultimately unfulfilled — prospect of prosecution; (ii) if the interest of a child broadly conceived is a compelling one, separation based on mere amenability to prosecution is in no way narrowly tailored to achieve that interest in child safety.[12] This policy is likewise conscience

---

[12]     By design, DHS's Zero Tolerance family separation policy was *not* narrowly tailored to achieve a legitimate government purpose — it was designed to be as broad as possible to send a message of deterrence to asylum-seeking families. *See, supra*, Factual Background Sections B–E.

shocking because its intended purpose was nothing other than to effect as many family separations as possible for the purpose of sending a cruel message of deterrence.

The government has contended throughout this litigation that the separation of G.C. and D.J.C.V. was not based on any generalized family separation policy, and indeed has stated that no such policy existed in DHS.  Instead, they have argued — though not demonstrated with any written or other evidence — that a policy of separating parents from their children because of generalized "criminal history" gave agents discretion to separate G.C. from his son based on a misdemeanor conviction from 2010.  The facts do not support this theory. After months of jurisdictional discovery, the government has failed to produce a single written guideline or policy to agents and officers of USBP articulating a "criminal history" policy that permits separation of a parent in the absence of prosecution or an evaluation that the child is in danger.  No such writing appears to exist.  Nor do agents themselves seem to have any awareness that such a policy existed in April or May of 2018. The government cannot meet its burden to show that such a policy existed or that the separation occurred because of legitimate policy considerations that comport with the constitution and other binding law.

To the contrary, as explained in more detail below at Section A(2), there is significant evidence that CBP had an official policy of *not* separating parents absent prosecution unless certain delineated circumstances were present. Those circumstances included: a parent with an open warrant, a fraudulent or unsubstantiated family relationship, documented concerns for the welfare of the child, or parental incapacity (e.g., due to hospitalization). *See, e.g.*, York Decl. Ex. 3 at 181:10–182:22; 186:6–16; 202:13–204:2. None of those circumstances applied in G.C. and D.J.C.V.'s case, and agents certainly did not reference any of those circumstances to justify their decision to separate them after DOJ declined to prosecute.

To the extent the government attempts to argue that the Zero Tolerance Policy was not implemented until after the separation of D.J.C.V. and G.C. on May 2, 2018, such a view is also unsupported by jurisdictional discovery. As the foregoing factual record details and as numerous courts have recognized, the implementation of the Zero Tolerance family separation policy stretched over time, beginning long before the "official" implementation of the policy by DOJ and DHS between April 7, 2018, JSOF ¶ 57 (AG Sessions Zero Tolerance Prosecution Memorandum), and May 5, 2018, JSOF ¶ 65 (official authorization for USBP to implement the Zero Tolerance prosecution referral policy). Nationwide, courts have repeatedly held that the DFE cannot shield the government from liability for family separations that were occurring across the Southern border sectors between November 2017 and May 2018. *See, e.g.*, *Ms. L. v. ICE*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018) (family separated after presenting at a port of entry in San Diego Sector in November 2017); *AIIL v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543 (D. Ariz. Mar. 31, 2022) (two families separated after apprehension in Arizona in December 2017); *R.Y.M.R. et al v. United States*, No. CV-20-23598-KMW, ECF No. 23 (S.D. Fla. Feb. 5, 2021) (family separated in San Diego sector in November 2017); *F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040 (D. Ariz. July 22, 2022) (family separated at U.S.-Arizona border in March 2018); *C.M. on behalf of D.V. v. United States*, No. 5:21-CV-0234-JKP-ESC, 2023 WL 3261612 (W.D. Tex. May 4, 2023) (family separated in Del Rio sector in March 2018); *A.F.P. v. United States*, No. 121CV00780DADEPG, 2022 WL 2704570 (E.D. Cal. July 12, 2022) (family separated in RGV sector in January 2018); *E.C.B. v. United States*, No. CV-22-00915-PHX-CDB, ECF No. 24 (D. Az. Nov. 8, 2022) (family separated in Yuma sector on May 1, 2018).

It was in this context that G.C. and D.J.C.V. were separated, absent any prosecution or evaluation of G.C.'s fitness as a parent,[13] on May 2, 2018, more than one year into the rollout of the government's family separation policy, and mere days before Secretary Nielson confirmed the government's commitment to prosecuting, and therefore separating, family unit parents and children. Only the existence of the prevailing Zero Tolerance policy of family separation can explain the decision to separate D.J.C.V. and G.C. Because the Fifth Amendment of the U.S. Constitution deprived the government of discretion to implement this purposefully broad and conscience shocking policy, the government's conduct cannot be deemed to have involved an element of judgment or choice. The DFE is inapplicable and this Court has jurisdiction.

### 2. RGV agents lacked discretion to violate mandatory USBP policy requiring reasonable efforts to reunite families if prosecution was declined.

The government also cannot satisfy the first step of the *Gaubert/Berkovitz* analysis because USBP agents did not have discretion to violate its own mandatory policy that required agents to reunite separated families where the parent's prosecution was either declined or resulted in a time served sentence, and both parent and child were still in USBP custody.

---

[13]     As previously argued, ECF No. 35 at 26 (citing *Stanley v. Illinois*, 405 U.S. 645, 648 (1972)), the separation violated G.C.'s and D.J.C.V.'s procedural due process rights. In addition, as the Complaint alleges, the family separation policy was driven by discriminatory animus toward Central American immigrants in violation of the Equal Protection Clause. The policy did not direct law enforcement to increase prosecutions for all 8 U.S.C. §§1325 and 1326 offenses, such as those occurring on the northern border of the United States, but selectively directed law enforcement to enforce prosecutions "along the Southwest Border." JSOF ¶ 57. "To that end, practically all the illegal border crossings along the southwestern border are by Latino, Spanish-speaking migrants, but the same cannot be said for the northern border." *D.A.*, 2023 WL 2619167, at *7–8 (concluding that "Defendant's Zero Tolerance Policy plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants. As a possible violation of Plaintiffs' equal protection rights, Defendant's incarceration… and separation from her children under the Zero Tolerance Policy is not protected by the discretionary function exception.").

Where the law requires specific conduct, the government may have discretion to determine how to achieve that conduct, but not whether to engage in the conduct in the first instance. *See, e.g.*, *Bagner v. United States*, 428 F. Supp. 2d 101, 110 (N.D.N.Y. 2006) (while government had some discretion regarding the type of signage and its placement, it did not have discretion to refrain from placing any signage at all where the agency's manual "specifically and unequivocally state[d]" the area must be delineated by signage). Thus, while the law does not permit courts to "second guess" or "micro-manage" reasonable steps within the government's discretion, where a mandatory agency policy requires employees to take some action, "[f]ailure to take any such steps where feasible is negligent and not within the discretionary function exemption, even though the particular nature of the appropriate steps is discretionary." *Wright v. United States*, 866 F. Supp. 804, 806 (S.D.N.Y. 1994) (citing *Andrulonis*, 952 F.2d 652 and *Indian Towing Co. v. United States*, 350 U.S. 61 (1955)). *See also Simone v. United States*, No. 09CV3904TCPAKT, 2010 WL 11632765, at *3 (E.D.N.Y. June 17, 2010).

In addition to violating non-discretionary Constitutional mandates, Plaintiffs' separation also violated mandatory USBP policies. Because family separation is not a legitimate or lawful stand-alone consequence for unauthorized border crossing,[14] it was USBP policy to reunite separated families where the parent's prosecution was either declined or resulted in a time-served sentence and both parent and child were still held at a CBP detention facility. *See, supra,* Factual Background Section E; *see, e.g.*, York Decl. Ex. 25, 29, and 30. USBP agents themselves viewed

---

[14]     *See* Factual Background Section E, citing York Decl. Ex. 35 ("The goal is to prosecute, not separate families"), Ex. 26 ("separation is not itself a consequence/punishment"), and Ex. 24 ("we made the separation as a result of the prosecution and that it wasn't a consequence"). *See also* York Decl. Ex. 28 at USA057885 (RGV's Fiscal Year 2018 Consequence Delivery System Guide in which "family separation" is not listed as an independent consequence).

this policy as mandatory, rather than discretionary. *See* York Decl. Ex. 30 ("we *must* make every effort to reunify" and "HB USBP is providing this overarching direction and expectation with the *understanding Chief Patrol Agents will ensure compliance* with the above direction to the fullest of our capabilities") and Ex. 25 at CD-US-0030038 ("We don't believe we have another option"); *see also* March 27, 2023 Status Conference Transcript at 23–24 ("generally, where possible, once prosecution was declined, the families were reunified."). Indeed, this policy triggered frustration in high-level officials who were not satisfied with the limited number of border separations leading up to the release of the Sessions memoranda. *See* Factual Background Section E.

The policy requiring USBP agents to make "every effort" to reunify families in instances where the original reason for the separation no longer necessitated separation gives agents the discretion to determine what specific steps to take to reunify but does not grant agents the discretion not to take any steps at all.  The government took no steps at all to reunify G.C. and D.J.C.V., even though such reunification posed no logistical problem, as both remained in the same facility overnight between May 1 and May 2, and even though USBP had more than thirteen hours between becoming aware that prosecution had been declined and transferring D.J.C.V. to ORR.

Because the government lacked the discretion to refrain from making *any* assessment of the feasibility of reunification, the decision — or lack of decision — that kept G.C. and D.J.C.V. separated once G.C.'s prosecution was declined is not covered by the DFE. The DFE cannot shield the government from liability for its failure to even consider whether separation was still warranted after the original reason for it was rendered moot. This Court has jurisdiction.

### 3.   RGV agents lacked discretion to designate D.J.C.V. as a UAC because he did not meet the statutory definition of a "UAC" under the TVPRA.

To the extent the government wishes to shift justifications further and argue that separation was justified because D.J.C.V. was an "unaccompanied alien child" (UAC), this too would not

support a DFE exception to this Court's jurisdiction.   Any such designation would have violated the terms of the TVPRA. Under the first step of the *Gaubert/Berkovitz* analysis, the government does not have discretion to violate a federal statute. The designation of a non-citizen child as a UAC by USBP agents is not subject to discretion.

Children may be designated and treated as UAC if and only if they meet the statutory definition set forth in 6 U.S.C. § 279(g)(2), which the TVPRA incorporates by reference. 8 U.S.C. § 1232(b)(1). Congress has set forth that a minor meets the definition of a UAC if the child "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom – (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is *available* to provide care and physical custody." 6 U.S.C. § 279(g)(2) (emphasis added); *see also* York Decl. Ex. 2 (CBP's TEDS Policy citing language of 6 U.S.C. § 279(g)(2)); York Decl. Ex. 38 at CD-US-0045350 (CBP Memorandum on *Implementation of the TVPRA* (Nov. 12, 2010)) ("█████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████").

Federal courts construing 6 U.S.C. § 279(g)(2) are explicit that "actual incarceration" is what renders a parent "unavailable" under 6 U.S.C. § 279(g)(2)(C)(ii). *See, e.g., C.M. v. United States*, No. 5:21-CV-0234-JKP-ESC, 2023 WL 3261612, at *22 (W.D. Tex. May 4, 2023) (stating that "[a]ctual incarceration of an accompanying parent indeed makes the parent unavailable to provide care to the child" and that "C.M. became unavailable to provide care of D.V. once [the government] commenced criminal charges against C.M. *and placed the father 'in secure immigration detention separate from D.V.'*") (emphasis added); *See also D.A.*, 2023 WL 2619167,

at *11 (Plaintiffs were "barred from challenging Defendant's discrete decision to transfer D.A. and A.A. to ORR custody once Padilla-Gonzales *was incarcerated*") (emphasis added); *See S.E.B.M. by & through Felipe v. United States*, No. 1:21-CV-00095-JHR-LF, 2023 WL 2383784, at *14 (D.N.M. Mar. 6, 2023) ("The act of charging, prosecuting, *and jailing* S.E.B.M.'s father made S.E.B.M. a UAC which in turn required her to be cared for elsewhere." (emphasis added); *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 495 n. 2 (D.D.C. 2018) (finding children were not "true unaccompanied minors within the meaning of the statute" where their mother was being held in *civil* immigration detention and the children had been "rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants").

DHS does not have legal authority or discretion to adopt an alternative definition to an immigration law concept put forth and clearly defined by Congress. This Court has held the same specifically in the context of 6 U.S.C. § 279(g)(2). *Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200, 216 (S.D.N.Y. 2020) ("This 'once a UAC, always a UAC' argument is not supported by any citation to legal authority. It is also inconsistent with the statutory text … [A] UAC ceases to be a UAC when she no longer meets the statutory definition"); *see also Maldonado v. Lloyd*, No. 18 CIV. 3089 (JFK), 2018 WL 2089348, at *5 (S.D.N.Y. May 4, 2018) ("[A] child is not 'unaccompanied' – and, therefore, neither a UAC nor properly within ORR's regulatory ambit – if a parent is physically present in the United States and . . . is available to provide care and physical custody."). Other courts outside the Second Circuit have agreed. *See*, *e.g.*, *D.B. v. Cardall*, 826 F.3d 721, 728 n.4 (4th Cir. 2016) (if an "individual does not satisfy the definition, the government has no nebulous discretionary authority to treat the individual as a UAC."); *Coreas-Giron v. Holder*, 422 F. App'x 602, 603 (9th Cir. 2011) ("Since he lives with his mother in the United States, Coreas-Giron fails to meet the requirement for an unaccompanied alien child").

It is undisputed that in 2017 and 2018, USBP agents designated non-citizen children in family units as UACs based merely on the parent's "amenability" to referral to the DOJ for prosecution. Without authority, DHS officials asserted that a parent was unavailable from the moment they were labeled "amenable to prosecution," regardless of whether they were ever actually prosecuted, and even if the government expected that the parent would not in fact be prosecuted. *See, e.g.*, York Decl. Ex. 6 at 47:11–16; York Decl. Ex. 4 at 36:11–15 ("any adult that was being prosecuted that was travelling with a minor child would be separated from that child at the time the court proceedings were sought, and that child would be treated as an unaccompanied minor").

In the present case, D.J.C.V. was designated as a UAC on May 1, 2018, shortly after Guerra approved the family's separation in order to "[p]rosecute the adult subject." JSOF ¶ 13–14. Late that evening around 9:30 P.M., USBP became aware that the "[p]rosecutions [sic] was declined" for G.C. JSOF ¶ 22; York Decl. Ex. 1 at USA057418. The next morning, at approximately 10:53 A.M., D.J.C.V. was taken from his father's arms and transferred to the custody of ORR. JSOF ¶ 23. In those intervening hours, the government failed to take any steps to keep G.C. and D.J.C.V. together. D.J.C.V. never met the statutory definition of a UAC, because G.C. was only deemed "unavailable" because he was amenable to prosecution. At the time of the separation, D.J.C.V. certainly did not meet the statutory definition of a UAC because the original, unlawful reason for his father's "unavailability" — G.C.'s potential transfer to U.S. Marshal's custody for prosecution pursuant to the Zero Tolerance Policy — no longer applied. Because the government is subject to a mandatory statute that plainly and unequivocally defines when a child is a UAC, its decision to designate and treat D.J.C.V. as a UAC, when he in fact did not meet the statutory definition, was not subject to discretion. Treating D.J.C.V. as a UAC is not protected by the DFE.

**B. Under the second prong of *Berkovitz/Gaubert,* the DFE does not apply because Plaintiffs' separation is unsupported by any policy justification.**

The government's immunity claim also fails under the second prong of the *Gaubert/Berkovitz* analysis. Even if this Court were to determine that the government enjoyed some discretion to proceed with separating D.J.C.V. from G.C. after DOJ declined prosecution, those actions were not "grounded in 'considerations of public policy,'" and thus are not covered by the DFE. *Coulthurst*, 214 F.3d at 109 (citing *Gaubert*, 499 U.S. at 322–23 and *Berkovitz,* 486 U.S. at 536–37). The exception protects discretionary judgments based on valid policy considerations, not careless actions, negligent omissions, or failures to engage in any decision-making whatsoever.

In spite of a DOJ declination to prosecute and agency policy that mandated reunification in that circumstance, the government proceeded to separate father and infant son without engaging in *any* policy analysis following that critical development. In the approximately 65,000 documents of discovery produced by defendants there is not a single shred of evidence to show that government agents engaged in any decision-making *at all* — let alone a valid "social, economic, [or] political policy" objective, *Gaubert*, 499 U.S. at 323 — regarding the plans to separate D.J.C.V. after becoming aware by the evening of May 1 that DOJ would not prosecute G.C. This complete lack of reasoned decision-making is the sort of "negligent omission" that the DFE does not shield. *Andrulonis*, 952 F.2d at 655; *see also Coulthurst*, 214 F.3d at 110–11 (DFE does not apply in cases involving careless inattention, laziness, absentmindedness, or negligence).

As in *Coulthurst*, this case involves negligent acts or omissions "unrelated to any plausible policy objectives." 214 F.3d at 111. In that case, the Second Circuit held that the DFE did not apply to a prison official's alleged failure to perform a diligent inspection of prison gym equipment, which malfunctioned and injured the plaintiff's shoulder. *Id*. The Court explained that, while the

exception encompassed such policy-based judgment calls as how to conduct inspections and how frequently to do so, it did not immunize the United States from liability "if the inspector failed to perform a diligent inspection out of laziness or was carelessly inattentive." *Id*. at 110. Nor would the exception apply to an "absent-minded or lazy failure to notify the appropriate authorities upon noticing" a dangerous condition. *Id*. at 111. The Second Circuit and district courts therein have repeatedly reaffirmed the principle that careless and negligent execution of discretionary duties is not covered by the DFE. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006) (holding that correctional officer's negligent failure to patrol or respond diligently to the situation leading to plaintiff's injuries was not covered by DFE); *Wright v. United States*, 162 F. Supp. 3d 118, 130 (E.D.N.Y. 2016) (holding that DFE did not apply to probation officer's negligent placement of ankle monitor); *Hartman v. Holder*, No. 100-CV-6107-ENV-JMA, 2009 WL 792185, at *9 (E.D.N.Y. Mar. 23, 2009) (citing cases). *See Andrulonis*, 952 F.2d at 655 (rejecting government's "attempt to sweep all of [a CDC doctor's] acts and omissions under the rug of broad CDC policy" as such a move would "effectively insulate virtually all actions by a government agent from liability," noting that "*Gaubert* . . . does not cut so broadly").

In *Andrulonis*, the Second Circuit held that the agency's "general policy of wanting to eradicate rabies and granting officials some discretion to achieve those ends is far too broad and indefinite to insulate" the specific "negligent conduct" at issue in that case — namely, a CDC official's a failure to warn of dangerous conditions in a laboratory where the plaintiff contracted rabies from an improperly contained vaccine. *Id*.

Here, USBP agents — to the extent they had discretion — were expected to engage in a process of policy-grounded decision-making before taking 19-month-old D.J.C.V. away from G.C., his sole parent and guardian available to care for him in the U.S., and sending him into the

federal detention system for unaccompanied minors. The USBP agents were on notice that DOJ had declined to prosecute G.C., and that D.J.C.V. did not meet the statutory definition of a UAC. Their lack of attentiveness and utter failure to diligently perform those responsibilities — similar to the failure to perform a diligent inspection in *Coulthurst* — is not insulated by the DFE. Under *Coulhurst* and *Andrulonis*, a general policy of enforcing U.S. immigration laws cannot excuse negligence and carelessness under the particular circumstances of this case, where the result of USBP's failure violated father and son's right to family integrity.

Once DOJ declined to prosecute, the purported reason for the initial separation decision evaporated. USBP agents at the processing center where G.C. and D.J.C.V. were being held were aware of that fact by the evening of May 1. JSOF ¶ 22; York Decl. Ex. 1 at USA057418. There is no evidence of communication among the agents involved in the separation of D.J.C.V. and G.C. regarding the fact that DOJ had declined prosecution or discussing whether to carry out the separation despite the fact that father and son remained together in USBP custody.

In fact, as discussed *supra*, officials at various levels of CBP's command structure appear to have been operating according to policy that *required* them to keep family units together, in RGV as well as in other sectors, when prosecution was declined or completed and the family remained together in CBP custody—provided that none of the special circumstances noted above were present. *See, supra* Factual Background Section E; *see, e.g.*, York Decl. Ex. 25, 29, and 30. Even if this Court finds that those policies and practices did not constitute mandatory directives, it is clear that agents perceived them as such, suggesting that the agents' actions at odds with that guidance lacked the requisite care and consideration that would shield them under the DFE.

This was not a situation where agents failed to make the best decision or the right decision—they made no decision at all. These sorts of operational failures, carelessness, and inattention with no plausible basis in policy fall squarely outside the scope of the DFE.

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that the Court deny the government's Motion to Dismiss.

Dated: June 1, 2023                               Respectfully submitted,

/s/ *Meena Roldan Oberdick*

Meena Roldan Oberdick
Rayza B. Goldsmith
Ghita Schwarz
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite #1901
New York, New York 10031
+1 (212) 256-1910
moberdick@latinojustice.org

Zane Memeger
**Morgan, Lewis & Bockius LLP**
1701 Market Street
Philadelphia, PA 19103-2921
+ (215) 963-5750
zane.memeger@morganlewis.com

Jonathan York
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
+ (202) 739-5394
jonathan.york@morganlewis.com

Baher Azmy
Jessica Vosburgh (PHV forthcoming)
**Center for Constitutional Rights**
666 Broadway
New York, NY 10012
bazmy@ccrjustice.org
