UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

D.J.C.V., a minor child, and G.C., his father,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

20 Civ. 5747 (PAE)

---

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-3274/2769
Email: mollie.kornreich@usdoj.gov
        carly.weinreb@usdoj.gov

CARLY WEINREB
MOLLIE KORNREICH
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................2

 I. Removal of Noncitizens and Detention Pending Removal.......................2

  A. The Relevant Framework for G.C.'s Immigration Detention ...................2

  B. Family Units and Minor Children in the Removal Process .......................4

  C. Processing in the Rio Grande Valley Sector before May 5, 2018 .............5

  D. Immigration Enforcement and the Southwest Border Under the Trump Administration ................................................................................8

  E. The Ms. L. Litigation .....................................................................12

 II. Plaintiffs' Immigration History...........................................................13

  A. G.C.'s history prior to 2018 ............................................................13

  B. The 2018 detention and separation .................................................14

 III. Procedural History and Jurisdictional Discovery In This Action .........18

  A. The Complaint and Motion to Dismiss Opinion...................................18

  B. Jurisdictional Discovery ................................................................19

LEGAL STANDARD.......................................................................................19

  A. Rule 12(b)(1)...............................................................................19

  B. The FTCA's Discretionary Function Exception ....................................21

  C. The FTCA's Due Care Exception......................................................24

ARGUMENT................................................................................................25

 I. Plaintiffs Were Separated because of G.C.'s Violent Criminal History and Not because of Zero Tolerance-Related Policies ................................25

  A. Plaintiffs Were Separated due to G.C.'s Criminal History .....................25

i

B.      Plaintiffs Were Not Separated Because of the Zero Tolerance Policy ......27

II.     All of the Government's Custody and Separation Decisions Relating to Plaintiffs
        During the First Period are Protected by the DFE and/or DCE ...........................28

A.      The DFE Applies to the Government's Decision to Refer G.C. for
        Prosecution ................................................................................................29

B.       The DCE Applies to the Government's Decision to Refer D.J.C.V.
         to ORR ......................................................................................................32

C.      The DFE Applies to G.C.'s Detention in Secure Facilities from May 3,
        2018, Through October 10, 2018 .............................................................34

III.    The Government's Detention and Separation of G.C. Based on his Criminal
        History Were not Pretextual...............................................................................39

CONCLUSION.........................................................................................................40

# TABLE OF AUTHORITIES

**CASES**                                                      **Page**

Agoro v. Dist. Dir. for Immigr. & Customs,
  Enf't, 403 F. App'x 536 (2d Cir. 2010) ................................................................. 37

APWU v. Potter,
  343 F.3d 619 (2d Cir. 2003) ................................................................................ 21

Arizona v. Biden,
  31 F.4th 469 (6th Cir. 2022) ............................................................................... 35

Arizona v. United States,
  567 U.S. 387 (2012) ............................................................................................ 35

Assocs. LLC v. Alba Servs. Inc.,
  No. 21 CIV 3490 (MKV), 2021 WL 2003126 (S.D.N.Y. May 19, 2021) .............. 20

Bailor v. Salvation Army,
  51 F.3d 678 (7th Cir. 1995) ................................................................................. 36

Berkovitz v. United States,
  486 U.S. 531 (1988) ............................................................................................ 22

Boelter v. Hearst Commc'ns, Inc.,
  269 F. Supp. 3d 172 (S.D.N.Y. 2017) .................................................................. 21

Caban v. United States,
  671 F.2d 1230 (2d Cir. 1982) ............................................................................... 22

Calla-Collado v. Att'y Gen. of U.S.,
  663 F.3d 680 (3d Cir. 2011) ................................................................................ 36

Callahan v. United States,
  329 F. Supp. 2d 404 (S.D.N.Y. 2004) .................................................................. 23

Cangemi v. United States,
  13 F.4th 115 (2d Cir. 2021) ............................................................................. 23-24

Carter v. HealthPort Techs., LLC,
  822 F.3d 47 (2d Cir. 2016) .................................................................................. 21

Chukwurah v. Stop & Shop Supermarket Co. LLC,
  354 F. App'x 492 (2d Cir. 2009) .......................................................................... 40

iii

Clark v. Suarez Martinez,
    543 U.S. 371 (2005)..............................................................................................3

Clayton v. United States,
    No. 18 Civ. 5867, 2019 WL 9283977 (E.D.N.Y. Aug. 1, 2019).........................25, 32

Committee Of Cent. Am. Refugees v. I.N.S.,
    795 F.2d 1434 (9th Cir. 1986) ..........................................................................36

Coulthurst v. United States,
    214 F.3d 106 (2d Cir. 2000).....................................................................22-23, 29-30

D.J.C.V. v. United States,
    605 F. Supp. 3d 571 (S.D.N.Y. 2022).................................................................3

Douglas v. United States,
    796 F. Supp. 2d 1354 (M.D. Fla. 2011)...............................................................35

Dupree v. United States,
    247 F.2d 819 (3d Cir. 1957)...............................................................................24

Fazi v. United States,
    935 F.2d 535 (2d Cir. 1991)..........................................................................22, 23

Felipe v. United States,
    No. 1:21-CV-00095-JHR-LF, 2023 WL 2383784 (D.N.M. Mar. 6, 2023) ............29

Flores v. Sessions,
    862 F.3d 863 (9th Cir. 2017) .............................................................................5

Flores v. Lynch,
    828 F.3d 898, 902-03 (9th Cir. 2016) ................................................................32

GEO Grp., Inc. v. Newsom,
    50 F.4th 745 (9th Cir. 2022) ............................................................................36

Giammatteo v. Newton,
    452 Fed. Appx. 24 (2d Cir. 2011) ......................................................................20

Gjidija v. United States,
    No. 18 CIV 0259 (LAK) (OTW), 2019 WL 2615438 (S.D.N.Y. June 26, 2019) ....25

Gringo Pass, Inc. v. United States,
    542 F. App'x 642 (9th Cir. 2013) .......................................................................31

Gualandi v. Adams,
    385 F.3d 236 (2d Cir. 2004)..................................................................................... 21

Guerra v. Shanahan,
    831 F.3d 59 (2d Cir. 2016)......................................................................................... 3

Harisiades v. Shaughnessy,
    342 U.S. 580 (1951)................................................................................................. 36

Herrera v. United States,
    No. 20-CV-10206 (PKC), 2022 WL 902090 (S.D.N.Y. Mar. 27, 2022)................................. 24

Huntress v. United States,
    No. 18 CIV 2974 (JPO), 2019 WL 1434572 (S.D.N.Y. Mar. 29, 2019) ........................... 29, 31

In re Joint Eastern and Southern Dists. Asbestos Litig.,
    891 F.2d 31 (2d Cir. 1989)....................................................................................... 22

In re World Trade Ctr. Disaster Site Litig.,
    521 F.3d 169 (2d Cir. 2008)..................................................................................... 22

Johnson v. Guzman Chavez,
    141 S. Ct. 2271 (2021)...................................................................................... 2, 3, 35, 37

Kamen v. American Tel. & Co.,
    791 F.2d 1006 (2d Cir. 1986)................................................................................. 20, 21

Lane v. Pena,
    518 U.S. 187 (1996)................................................................................................. 20

Long Island Radio Co. v. NLRB,
    841 F.2d 474 (2d Cir. 1988)..................................................................................... 20

Lway Mu v. Whitaker,
    No. 6:18-CV-06924-MAT, 2019 WL 2373883 (W.D.N.Y. June 4, 2019) ............................. 36

Makarova v. United States,
    201 F.3d 110, 113 (2d Cir. 2000)............................................................................... 20

Mansa v. United States,
    No. 3:16-CV-644 (VAB), 2019 WL 121681 (D. Conn. Jan. 7, 2019) ................................. 31

Molchatsky v. United States,
    713 F.3d 159 (2d Cir. 2013)........................................................................... 24, 31, 34

Morrison v. Nat'l Austl. Bank Ltd.,
    547 F.3d 167 (2d Cir. 2008)................................................................ 19, 20

Ms. L. v. ICE,
    310 F. Supp. 3d 1133 (S.D. Cal. 2018)............................................... 33, 38

Myers & Myers, Inc. v. U.S. Postal Serv.,
    527 F.2d 1252 (2d Cir. 1975)............................................................. 23, 24

Gjidija v. United States,
848 F. App'x 451 (2d Cir. 2021) ........................................................ 25, 35

Needham v. United States,
    No. 17 CIV 05944 (ER), 2018 WL 3611944 (S.D.N.Y. July 27, 2018).................................. 22

Nwozuzu v. U.S.,
    No. 14 CIV 8589 (LGS), 2015 WL 4865772 (S.D.N.Y. Aug. 12, 2015).............................. 33

Nwozuzu v. United States,
    712 Fed. App'x 31 (2d Cir. 2017)........................................................ 24

Pena Arita v. United States,
    470 F. Supp. 3d 663 (S.D. Tex. 2020) ................................................ 30

Reichhart v. United States,
    408 F. App'x 441 (2d Cir. 2011) ........................................................ 31

Hekmat v. United States Trans. Sec. Admin.,
    247 F. Supp. 3d 427 (S.D.N.Y. 2017).................................................. 23

Shahim v. United States,
    No. 221CV02401ODWAGR, 2022 WL 1644440 (C.D. Cal. May 24, 2022)........................ 31

Sw. Env't Ctr. v. Sessions,
    355 F. Supp. 3d 1121 (D.N.M. 2018) ................................................ 29, 30

Tandon v. Captain's Cove Marina of Bridgeport, Inc.,
    752 F.3d 239 (2d Cir. 2014)................................................................ 21

Timothy v. Our Lady of Mercy Med. Ctr.,
    233 F. App'x 17 (2d Cir. 2007) .......................................................... 40

Tun-Cos v. Perrotte,
    922 F.3d 514 (4th Cir. 2019) ............................................................ 35

United States v. Armstrong,
    517 U.S. 456 (1996) ................................................................................. 29

United States v. Batchelder,
    442 U.S. 114 (1979) ................................................................................. 30

United States v. Gaubert,
    499 U.S. 315 (1991) ........................................................................... passim

United States v. Sherwood,
    312 U.S. 584 (1941) ................................................................................. 20

Valdez v. United States,
    No. 08 CIV 4424 (RPP), 2009 WL 2365549 (S.D.N.Y. July 31, 2009) ................................ 31

W.S.R. v. Sessions,
    318 F. Supp. 3d 1116 (N.D. Ill. 2018) ............................................................ 33

Waldman v. Escobar,
    No. 08 CIV 6405 (FM), 2009 WL 861068 (S.D.N.Y. Mar. 27, 2009) .................................. 20

Watson v. United States,
    179 F. Supp. 3d 251 (E.D.N.Y. 2016) ............................................................. 33

Weiss Acquisition, LLC v. Patel,
    No. 12 CIV 1819 (CS), 2013 WL 45885 (S.D.N.Y. Jan. 3, 2013) ................................... 20

Welch v. United States,
    409 F.3d 646 (4th Cir. 2005) .............................................................. 24, 25, 32

Winters v. United States,
    No. 10 CIV 7571 (JMF), 2013 WL 1627950 (S.D.N.Y. Apr. 16, 2013) ............................... 23

Zadvydas v. Davis,
    533 U.S. 678 (2001) ............................................................................... 3-4

Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,
    215 F.3d 247 (2d Cir. 2000) ....................................................................... 21

**STATUTES**
6 U.S.C. § 279 ............................................................................... 4, 5, 32
8 U.S.C. § 123l ............................................................................... passim
8 U.S.C. § 1232(b)(1) .................................................................. 4, 5, 32, 34
8 U.S.C. § 1325(a) ........................................................................... passim
8 U.S.C. §§ 1182(a)(2) ......................................................................... 2, 3
8 U.S.C. §§ 1227(a)(2) ........................................................................... 3

28 U.S.C. §2680(a) ............................................................................ 22, 24, 37
28 U.S.C. §§ 1346(b)(1) ................................................................................. 21
8 U.S.C. § 1226(a) ............................................................................ 3, 17, 35, 37
La. Stat. Ann. § 14:37 ................................................................................... 13

## RULES

Fed. R. Civ. P. 12(b)(1) ......................................................................... passim
Fed. R. Civ. P. 12(h)(3) ................................................................................ 20
Fed. R. Civ. P. 56 ........................................................................................ 21

## REGULATIONS

8 C.F.R. § 208.31 .......................................................................................... 2
8 C.F.R. § 241.5 ............................................................................................ 3
8 C.F.R. § 1208.16 ........................................................................................ 2
8 C.F.R. § 208.16-18 ..................................................................................... 2

## OTHER AUTHORITIES

Petitioners, United States of America, et al. v. State of Texas and State of Louisiana,
   No. 22-58, 2022 WL 4278395 (U.S.) ....................................................... 35

E.O. 13767, 82 Fed. Reg. 8793, 8793 (Jan. 25, 2017) .............................. 8-9

E.O. 13841, 83 Fed. Reg. 29435 (June 20, 2018) .............................. 12, 28

U.S. Department of Justice, News Release: Attorney General Announces Zero-Tolerance Policy
   for Criminal Illegal Entry, (Apr. 6, 2018), DOJ 18-417, 2018 WL 1666622 .......................... 9

Defendant the United States of America (the "Government") submits this memorandum of law in further support of its motion to dismiss the Complaint of D.J.C.V., a minor child, and his father, G.C. (collectively, "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 12(b)(1).

## PRELIMINARY STATEMENT

In early May 2018, U.S. Border Patrol ("USBP") exercised its discretion to refer plaintiff G.C. for criminal prosecution after learning that he had a prior criminal conviction for aggravated assault and two prior unlawful entries and removals. The extensive evidence elicited in discovery, including contemporaneous documents and deposition testimony, consistently supports that an individualized determination based on G.C.'s criminal history was the reason for his prosecution referral. Because G.C. was traveling with his minor son D.J.C.V., Plaintiffs had to be separated to facilitate G.C.'s prosecution. This separation was not due to the implementation of a "zero tolerance" prosecution referral policy, as Plaintiffs allege, but rather was the result of longstanding USBP practices designed to safeguard the community and appropriately enforce federal immigration law. While USBP did for a brief time have a policy of referring all adults, including those with minor children, for criminal prosecution to the extent practicable, that policy did not go into effect until after Plaintiffs had already been separated, and it was never fully implemented in the sector where the Plaintiffs were apprehended, detained, and separated.

As Plaintiffs' claims in this case relating to their separation from May 2, 2018, through October 10, 2018, are based upon acts of government employees performing discretionary functions or duties authorized by statute, those claims are precluded by the discretionary function and/or due care exceptions to the Federal Tort Claims Act and should be dismissed for lack of subject matter jurisdiction.

1

**BACKGROUND**

I.     **Removal of Noncitizens and Detention Pending Removal**

a.  **The relevant framework for G.C.'s immigration detention**

Under the Immigration and Nationality Act ("INA"), any noncitizen present in the United States without being admitted or paroled is inadmissible and subject to removal, see 8 U.S.C. § 1182(a)(6)(A)(i), and any noncitizen who illegally reenters the United States after having been previously removed is subject to removal again, see id. § 1231(a)(5). When the Department of Homeland Security ("DHS") finds that a noncitizen has illegally reentered the United States after having been removed, "the prior order of removal is reinstated from its original date." Id. The reinstated order "is not subject to being reopened or reviewed," and the individual "is not eligible and may not apply for any relief" from the order. Id.

A noncitizen cannot be repatriated to a country where he would face persecution or torture. 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16-18. Therefore, when a noncitizen subject to a reinstated removal order expresses a fear of return to his country of origin(i.e., the country to which he would ordinarily be removed), he is referred to U.S. Citizenship and Immigration Services ("USCIS") for an interview with an asylum officer to determine whether the noncitizen possesses a "reasonable fear" of persecution or torture. See 8 C.F.R. §§ 208.31(a), 241.8(e). If the asylum officer determines that the noncitizen has established a reasonable fear of persecution or torture, then the noncitizen is referred to an Immigration Judge to determine whether he can establish eligibility for withholding of removal.[1] 8 C.F.R. § 208.31(e); see also Johnson v. Guzman Chavez, 141 S. Ct. 2271, 2283 (2021).

---

[1] An individual with a reinstated order of removal remains ineligible for asylum. Withholding of removal may be based on 8 U.S.C. § 1231(b)(3) or the regulations implementing the Convention Against Torture. 8 C.F.R. § 1208.16; 8 C.F.R. § 208.31(e).

"[T]he Attorney General[2] shall detain the alien" for a "removal period" of 90 days beginning, as relevant here, when "the order of removal becomes administratively final." 8 U.S.C. § 1231(a)(1), (2). A noncitizen detained pursuant to Section 1231(a)(2) is generally not entitled to a bond hearing to determine whether he or she should be released during the 90-day period. See Johnson, 141 S. Ct. at 2280. ICE has discretion to release someone detained under this provision if that individual has not been found inadmissible under 8 U.S.C. §§ 1182(a)(2) or (a)(3)(B) or deportable under 8 U.S.C. §§ 1227(a)(2) or (a)(4)(B).[3] See 8 U.S.C. § 1231(a)(2). The Government also has express statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." See id. § 1231(g)(1).

After the 90-day removal period, a noncitizen who has not been removed may be released subject to supervision. Id. § 1231(a)(3); see also 8 C.F.R. § 241.5. At DHS's discretion, the noncitizen may also be detained beyond the 90-day removal period, subject to constitutional limitations on the length of detention without a bond hearing. See 8 U.S.C. § 1231(a)(6) (permitting continued detention when a noncitizen is a "risk to the community or unlikely to comply with the order of removal"); Johnson, 141 S. Ct. at 2281-82 (a noncitizen subject to both a reinstated removal order and in withholding-of-removal proceedings may be detained beyond the 90-day period under Section 1231(a)(6));[4] see also Zadvydas v. Davis, 533 U.S. 678, 701

---

[2] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary of Homeland Security. See Clark v. Suarez Martinez, 543 U.S. 371, 374 n.1 (2005).

[3] In this Court's opinion on the Government's motion to dismiss, the Court explained that "[u]nder 8 U.S.C. § 123l(a)(l) . . . a noncitizen subject to a final order of removal must be detained for the 90-day period after the order of removal becomes final." D.J.C.V. v. United States, 605 F. Supp. 3d 571, 579-80 (S.D.N.Y. 2022). The United States has taken the position in briefing submitted to the United States Supreme Court and elsewhere, however, that DHS retains law enforcement discretion in this context. (See infra, n.16.)

[4] Prior to the Supreme Court's 2021 decision in Johnson, courts took different views regarding whether Section 1231(a)(6) or 1226 governed the continued detention of noncitizens subject to reinstated orders of removal who were in withholding-only proceedings. The Second Circuit had held that a noncitizen in this situation was considered detained under Section 1226(a), and therefore entitled to a bond hearing. See Guerra v. Shanahan, 831 F.3d 59, 64 (2d Cir. 2016). The Supreme Court held in Johnson, however, that Section 1231(a)(6) applies to detention in this context. Johnson, 141 S. Ct. at 2280.

(2001) (providing that post-order detention is presumptively reasonable for six months and that continued detention beyond six months is not permissible if "there is no significant likelihood of removal in the reasonably foreseeable future").

In addition to immigration detention, noncitizens may be subject to criminal prosecution and detention. Unlawful entry into the United States by a noncitizen is a federal crime, see 8 U.S.C. § 1325(a), as is unlawful reentry after removal, see id. § 1326.[5] DHS may refer noncitizens to the Department of Justice ("DOJ") for criminal prosecution for these offenses. Due to resource constraints, DOJ cannot prosecute every noncitizen who has violated U.S. immigration law. (Declaration of Monique Grame ("Grame Decl.") ¶¶ 11, 40.) Accordingly, USBP generally must prioritize which noncitizens to refer to the United States Attorney's Offices for prosecution for unlawful entry. (Id. ¶¶ 12-15, 41, 44.) The noncitizen is typically taken into custody by the U.S. Marshals Service ("USMS") if DOJ accepts the prosecution referral. If the United States Attorney's Office declines the prosecution referral or the noncitizen is sentenced to time served, he may be returned to USBP custody. (Id. ¶ 29.)

**b.   Family units and minor children in the removal process**

The Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), not DHS, has responsibility for "the care and placement of unaccompanied alien children who are in [f]ederal custody by reason of their immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); see also 8 U.S.C. § 1232(b)(1). An unaccompanied alien child ("UAC") is defined by the Homeland Security Act ("HSA") as a person under 18 years old with "no lawful immigration status in the United States" and "with respect to whom (i) there is no parent or legal

---

[5] The first unlawful entry is punishable by fine or imprisonment of not more than six months, or both, see id. § 1325(a), and subsequent offenses are punishable by fine or imprisonment of up to two years, or both, id. § 1326.

guardian in the United States; or (ii) no parent or legal guardian in the United States is available

to provide care and physical custody." 6 U.S.C. § 279(g)(2).

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

("TVPRA") requires that a UAC be placed with ORR within 72 hours of a determination that the

child is a UAC, absent exceptional circumstances. 8 U.S.C. § 1232(b)(3); (ECF No. 177 (Joint

Statement of Undisputed Facts) ("SUF") ¶ 40).[6] Further, the United States has entered a consent

decree (the "Flores Agreement") that sets certain standards for the detention, housing, and

release of noncitizen minors detained by the Government. Flores v. Sessions, 862 F.3d 863, 866

(9th Cir. 2017). In addition, in 2015, U.S. Customs and Border Protection ("CBP") issued

guidance titled "National Standards on Transport, Escort, Detention and Search," known as the

"TEDS Policy," which provides that CBP should "maintain family unity to the greatest extent

operationally feasible, absent a legal requirement or an articulable safety or security concern that

requires separation." (SUF ¶¶ 37, 38; Grame Decl. ¶ 20, Exh. C (TEDS Policy).)

### c.  Processing in the Rio Grande Valley Sector before May 5, 2018

Plaintiffs in this case were processed and separated in the USBP's Rio Grande Valley

Sector Central Processing Center ("RGV CPC"). (SUF ¶¶ 6-7, 23.) From at least November 2014

through June 26, 2018, the intake process at RGV CPC for noncitizens apprehended between

ports of entry remained fundamentally unchanged. (Grame Decl. ¶¶ 6, 44; Declaration of Johnny

Cavazos ("Cavazos Decl.") ¶¶ 5-12, 20-21.) When a noncitizen was apprehended and transferred

to a USBP facility, a Border Patrol Agent ("BPA") ran a "records check" to identify whether the

noncitizen had any past encounters with law enforcement, and a BPA collected relevant

---

[6] Docket number 177 is a redacted version of the SUF. An unredacted version was filed under seal at docket number 176.  To the extent this brief cites to redacted portions of the publicly filed SUF, those citations should be deemed to also cite to identical portions of the unredacted SUF.

documentation for placement in the alien file ("A-file") and updated USBP's database. (Grame Decl. ¶¶ 7-8; Cavazos Decl. ¶¶ 5-9.) USBP then determined how to process the individual. (Grame Decl. ¶¶ 9-10; Cavazos Decl. ¶¶ 9-11.) Options included, but were not limited to, referring the noncitizen to ICE Enforcement and Removal Operations ("ERO") for detention pending administrative immigration processing, releasing the noncitizen into the community with a Notice to Appear and/or conditions of release, or referring the noncitizen to the local U.S. Attorney's Office for criminal prosecution of immigration or other criminal offenses. (Grame Decl. ¶¶ 9, 19, 25; Cavazos Decl. ¶¶ 9, 11, 20.)

In determining the processing pathway for each apprehended noncitizen, the BPA exercises his or her discretion based on the particular circumstances. (Grame Decl. ¶¶ 9-10, 14, 17, 25-26; Cavazos ¶ 9.) A BPA may consider the noncitizen's individual circumstances, humanitarian considerations, any contemporaneous operational constraints or resource limitations, the volume of incoming noncitizens, and immigration enforcement priorities, among other factors. (Id.) Certain processing pathways, such as criminal prosecution referrals, require supervisory approval. (Cavazos Decl. ¶¶ 10-11.)

The RGV Sector is located within the Southern District of Texas. Due to resource constraints, the U.S. Attorney's Office for the Southern District of Texas ("SDTX") historically could accept only a limited number of individuals per day for prosecution of immigration offenses, such as illegal entry or reentry. (Grame Decl. ¶¶ 11, 40.) In determining which noncitizens to refer to SDTX for prosecution, the practice in the RGV CPC from at least November 2014 through June 20, 2018 has been to prioritize noncitizens with prior criminal history. (Grame Decl. ¶ 12-14, 41, 43-44; see also Cavazos Decl. ¶¶ 11, 17, 20-25.) The type of prior criminal history warranting prosecution referral was largely left to the discretion of BPAs

and their supervisors, but it generally included prior felonies, a history of violence or domestic violence, or any type of criminal history implicating safety concerns. (Grame Decl. ¶ 14.) This prioritization applied even if the noncitizen was apprehended as part of a family unit. (Grame Decl. ¶¶ 26, 41-42; Cavazos Decl. ¶ 11.) While it was "RGV's standard procedure not to separate family units in order to prosecute the head of household," RGV did separate family units if the "[s]ubject has criminal history and meets the established Prosecutorial guidelines." (SUF ¶ 52; see also Grame Decl. ¶¶ 23, 27, 44; Cavazos Decl. ¶ 11.)

From November 2014 through June 26, 2018, once a BPA decided to refer a noncitizen for prosecution and received supervisory approval to do so, the BPA would send the individual's file to the RGV CPC Prosecutions Unit, which was responsible for reviewing all prosecution referrals and making the final selection of cases to send to the SDTX. (Grame Decl. ¶ 15; Cavazos Decl. ¶ 9.) SDTX would then decide whether to accept or decline each referral. (SUF ¶ 44; Grame Decl. ¶ 16.) If SDTX declined to prosecute an individual, that person remained in USBP custody for further processing. (Grame Decl. ¶ 16.) If SDTX accepted a prosecution, the adult noncitizen would be transferred to USMS custody pending any criminal proceedings. (Grame Decl. ¶ 9.)

As minors cannot accompany their parent(s) through the criminal justice system or stay with their parent(s) in a secure adult detention facility (Grame Decl. ¶ 27), the prosecution of a single head of household means that any minor children in that family unit become UACs because their parent can no longer provide for their care and physical custody (Grame Decl. ¶ 27.). From November 2014 to June 26, 2018, to ensure compliance with the 72-hour transfer rule under the TVPRA, the practice in the RGV CPC was to request placement with ORR as soon as child was determined to be a UAC. (See Grame Decl. ¶¶ 21, 28.)

During this same time period, USBP in the RGV Sector could cancel an ORR transfer request under certain circumstances. For example, following a prosecution referral, if the parent was returned to the RGV CPC before his or her child had been transferred to ORR, it might be possible to reunite them in USBP custody.(Grame Decl. ¶ 29.) In that case, if USBP was aware that the returning adult was part of a family unit, and if there were no other reasons warranting continued separation such as safety concerns, USBP would make reasonable efforts to reunify that family and cancel the ORR referral, to the extent operationally feasible. (Id.) This remained a discretionary process; the UAC designation was not automatically canceled or reevaluated if a parent was not referred for prosecution. (Id. ¶ 30.)

From at least November 2014 through June 26, 2018, when a BPA decided to refer a noncitizen to ICE ERO—whether after initial processing, following a prosecution referral, or at any other point—the BPA typically contacted an ICE ERO staff member with the request. (SUF ¶ 42; Grame Decl. ¶¶ 17, 24.) In April and May of 2018, when a family unit was in custody in the RGV CPC, USBP could have referred the family unit together to an ICE family residential center ("FRC"). (Grame Decl. ¶ 24; Declaration of Robert Guadian ("Guadian Decl.") ¶ 16.) If there was no FRC space available due to lack of space or failure to meet the FRC admission criteria—ICE ERO could not house the family unit. (Grame Decl. ¶ 25; Guadian Decl. ¶¶ 16-17.) USBP could then exercise its discretion to release the family unit under several processing options, or it could separate the family unit and pursue separate dispositions for the parent(s) and child(ren). (Grame Decl. ¶¶ 25-26.)

### d. Immigration enforcement and the Southwest border under the Trump administration

On January 25, 2017, then President Donald Trump issued Executive Order No. 13767 stating that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on

suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" E.O. 13767, 82 Fed. Reg. 8793, 8793 (Jan. 25, 2017). E.O. 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law," id. at 8794, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole," id. at 8796.

On April 6, 2018, former Attorney General Jefferson Sessions issued a memorandum (the "Zero Tolerance Memorandum") directing "each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." (SUF ¶ 57; U.S. Department of Justice, *News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), DOJ 18-417, 2018 WL 1666622 (Zero Tolerance Memorandum).) The Zero Tolerance Memorandum was directed to the DOJ and not to DHS or any of its components. (See id.)

To facilitate the prosecution initiative outlined in the Zero Tolerance Memorandum, on April 23, 2018, the Commissioner of CBP, the Director of ICE, and the Director of USCIS authored a memorandum titled "Increasing Prosecutions of Immigration Violations," which proposed three DHS prosecution referral policy options to the Secretary of Homeland Security at that time, Kirstjen Nielsen. (SUF ¶ 60; Grame Decl. ¶ 36, Exh. E (memorandum).) This memorandum recommended that DHS adopt a policy to "Refer All Amenable Adults, including

those presenting as part of a FMUA"[7] for prosecution, which was presented as Option 3. (Id.)

On April 27, 2018, CBP Associate Chief Matthew Roggow sent an email to the Southwest border chiefs and deputies instructing them to "[p]lease begin referring all single adults to your respective U.S. Attorney's Office for prosecution under section 1325(a) of Title 8." (SUF ¶ 61; Grame Decl. ¶ 33, Exh. D (Roggow email dated Apr. 27, 2018).) Following this email, RGV Sector began referring an increased number of single adults to SDTX for prosecution. There was no change in how the Sector processed family units. (Grame Decl. ¶¶ 34-35, 44.)

On May 4, 2018, former DHS Secretary Nielsen approved Option 3 in the Increasing Prosecutions Memorandum, thereby adopting a policy of referring, to the extent practicable, all amenable adults for prosecution of immigration violations, including those presenting as part of a FMUA (the "DHS Referral Policy"). (SUF ¶ 63; Grame Decl. ¶ 36; Exh. E (DHS Referral Policy).) The DHS Referral Policy directed DHS to "[w]ork with DOJ, the Department of Health and Human Services, and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors." (Id..)

That same day, the USBP field chiefs and deputy field chiefs received an email directing them to "implement increased Southwest Border Prosecutions . . . **effective May 5, 2018**" pursuant to the DHS Referral Policy. (SUF ¶ 64; Grame Decl. ¶ 37, Exh. F (Hastings email dated May 4, 2018) (emphasis in original).) The email attached an approved concept of operations ("CONOP") "to develop a quickly scalable approach to achieve 100% immigration violation prosecution referrals for all amenable adults," including those presenting as part of a family unit.

---

[7] "FMUA" is USBP's acronym for "family unit." (Grame Decl. ¶ 22.)

(Id.; Grame Decl. ¶ 37, Exh. G (approved CONOP).) The CONOP stated that the southwest

border sectors would "implement phased prosecutorial priorities to achieve an end state of 100%

prosecution of all amenable aliens on a phased timeline consistent with DOJ partners' capacity."

(SUF ¶ 66; Grame Decl., Exh. G.) The CONOP further stated that, "[d]iscretion on appropriate

referrals for sensitive cases, including but not limited to adults who are traveling with tender age

children, remains with the CPAs or their designees within their command staffs." (SUF ¶ 67;

Grame Decl., Exh. G.) The CONOP did not prescribe a specific course of action to achieve the

DHS Referral Policy's objectives; instead, each Southwest border sector was asked to create an

individualized CONOP by May 7, 2018. (SUF ¶ 64; Grame Decl. ¶ 37, Exh. F.)

On May 6, 2018, RGV Sector Assistant Chief Patrol Agent Monique Grame sent a

CONOP for the RGV Sector to headquarters, with an updated version on May 7, 2018. (SUF ¶

70; Grame Decl. ¶ 39, Exhs. F (Grame emails dated May 6 and 7, 2018), H (RGV CONOP).)

The RGV Sector CONOP included an "execution timeline" proposing a "phased approach" to

increase the number of prosecution referrals over time, from approximately 75 per day as of May

7, 2018, to approximately 300 or more per day as of September 3, 2018. (SUF ¶ 72; Grame Decl.

¶ 40, Exh. H.) The RGV Sector CONOP established prosecution referral priorities in the

following order: ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ (SUF ¶ 73; Grame Decl. ¶ 41, Exh. H.) ████████████████

████████████████████████████████████████████████

████████████████████████████████ (Grame Decl. ¶ 42, Exh. H.)

RGV Sector implemented the DHS Referral Policy starting on May 7, 2018. (Grame Decl. ¶ 39, Exh. F.) This change is reflected in the spreadsheet that RGV Sector used to track family unit separations at that time. Through May 9, 2018, "Zero Tolerance" was not listed on the spreadsheet as a reason for the separation of a family unit; instead, common reasons included "parent's criminal history" or "father's criminal history."  Beginning on May 10, 2018, "Zero Tolerance" was listed as a reason for the separation of a family for the first time, and was frequently listed thereafter as a reason for separation through June 20, 2018. (Declaration of Leonor Macal ("Macal Decl.") ¶ 3, Exh. A (family separation and reunification spreadsheet).)

On June 20, 2018, the President signed an executive order titled "Affording Congress an Opportunity to Address Family Separation," ending the Zero Tolerance Policy. E.O. 13841, 83 Fed. Reg. 29435 (June 20, 2018); (SUF ¶ 77).That same day, or shortly after, USBP headquarters ordered the immediate suspension of Section 1325 prosecution referrals of adults in single parent FMUAs unless there were safety concerns or an outstanding criminal background or warrant for the parent beyond a simple Section 1325 violation. (Grame Decl. ¶ 43; Declaration of Monique Grame as USBP Custodian of Records ("Grame Custodian Decl.") ¶ 5, Exh. 2.)

### e. The Ms. L. litigation

On February 26, 2018, a plaintiff known as Ms. L. filed a habeas corpus petition and complaint in the Southern District of California against ICE and other agencies alleging that the government had separated her from her child while in immigration detention. (SUF ¶ 79.) On June 26, 2018, the Ms. L. court certified a class consisting of: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a

determination that the parent is unfit or presents a danger to the child." (SUF ¶ 82 (quoting Ms.

L. v. ICE, et al., 18-cv-428 (DMS) (MDD) (S.D. Cal.) [hereinafter, "Ms. L."], ECF No. 82).) The

class excluded "parents with criminal history." (Id.); Ms. L., 310 F. Supp. 3d 1133, 1139 n.5

(S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019).

Also on June 26, 2018, the Ms. L. court preliminarily enjoined ICE from detaining class

members apart from their minor children "absent a determination that the parent is unfit or

presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily

declines to be reunited with the child in DHS custody." (SUF ¶ 83 (quoting Ms. L., 310 F. Supp.

3d at 1149).) The court ordered defendants to reunify class members (1) with minor children

under age 5 within 14 days of the order, and (2) with minor children age 5 and older within 30

days of the order. (Id. ¶ 84 (quoting Ms. L., 310 F. Supp. at 1149).)

To ensure compliance with the Ms. L. injunction, in July and August 2018, ICE released

detained parents who had children in ORR custody, including individuals with minor criminal

histories, unless ICE determined that the parent was unfit or posed a danger to the child. (SUF ¶

85; Guadian Decl. ¶ 18; Declaration of Alex Hogan, dated Oct. 16, 2020 (ECF No. 23) ("Hogan

Decl."), Exh. 2, at 3.)

## II.   Plaintiffs' Immigration History

### a.   G.C.'s history prior to 2018

At some time prior to November 2, 2010, G.C. entered the United States without

inspection or admission. (SUF ¶ 1; Guadian Decl. ¶ 5 & Exh. A.) On October 28, 2010, G.C.

pleaded guilty to one charge of Aggravated Assault, La. Stat. Ann. § 14:37, in LaFourche Parish,

Louisiana. (SUF ¶ 2; Guadian Decl. ¶ 6 & Exh. B.) According to the arrest report, he was

arrested for "swing[ing] a machete at [his wife] in [an] attempt to cut her." (Guadian Decl. ¶ 6 &

Exh. C.) G.C. was sentenced to and served 48 days in jail. (SUF ¶ 2; Guadian Decl. ¶ 6 & Exh.

B.) On December 9, 2010, an immigration judge ordered G.C. removed from the United States to

Honduras. (SUF ¶ 3; Guadian Decl. ¶ 7 & Exh. D.) On January 3, 2011, a Warrant of Removal

was issued for G.C., and on January 14, 2011, G.C. was removed from the United States. (SUF ¶

3; Guadian Decl. ¶ 7 & Exh. E&F.)

On October 2, 2013, G.C. re-entered the United States between ports of entry without

inspection or admission. (SUF ¶ 4; Guadian Decl. ¶ 8 & Exh. F.) G.C.'s order of removal was

reinstated on October 5, 2013, and G.C. was removed from the United States a second time.

(SUF ¶ 5; Guadian Decl. ¶ 8 & Exh. F&G.)

### b.  The 2018 detention and separation

On April 30, 2018, at approximately 11:30 PM, G.C., then 37 years old, and his son

D.J.C.V., then 19 months old, were encountered by a BPA near Hidalgo, Texas. (SUF ¶ 6;

Cavazos Decl. ¶ 15.) They had entered the United States between ports of entry without

admission, inspection, or parole. (SUF ¶ 6) They were arrested and taken to the RGV CPC for

processing. (Id.; Cavazos Decl. ¶ 15.)

*1. Plaintiffs' USBP Detention*

G.C. and D.J.C.V. were booked into the RGV CPC on May 1, 2018, at approximately

4:30 AM. (SUF ¶ 7; Cavazos Decl. ¶ 15.) Agents at the RGV CPC fingerprinted G.C. and

performed a search through their records system and law enforcement databases of G.C.'s

encounters with law enforcement. (SUF ¶ 8.) The records check revealed G.C.'s prior criminal

conviction and sentence for aggravated assault, as well as his prior orders of removal. (Id.; see

Cavazos Decl. ¶¶ 15-17, Exh. B (G.C.'s Form I-213, Record of Deportable/Inadmissible Alien).)

Because G.C. had been previously convicted of a violent crime, the BPA who reviewed

the records check requested permission to refer him for prosecution. (Cavazos Decl. ¶¶ 16-17.)

The BPA made that request on May 1, 2018, at approximately 9:31 AM, by email to his

supervising Watch Commander, with the subject line "FMU Separation Request." (SUF ¶ 9;

Cavazos Decl., Exh. C (Cavazos May 1, 2018, email).) The email stated: "Request separation of

███████████ due to mother [*sic*] having prior criminal history," and it referenced G.C.'s

2010 aggravated assault conviction and sentence. (Id.)

On May 1, 2018, at approximately 10:16 AM, the Watch Commander who received this

request forwarded it to the RGV Deputy Patrol Agent-in-Charge ("DPAIC") asking for

"guidance on family separation approvals." (SUF ¶ 12.)[8] The DPAIC replied at 3:28 PM that

same day, stating: "If the Adult parent is amicable [*sic*] to prosecutions due to criminal history or

fraudulent documents then we would prosecute the adult and separate the family for the welfare

of the child. An FOJC [Field Office Juvenile Coordinator] notification would need to be done for

the child." (SUF ¶ 13; Grame Custodian Decl. ¶ 4, Exh. 1 (DPAIC email).)

That afternoon, at approximately 3:35 PM, the Watch Commander responded to the

BPA's email approving the separation request. In the approval email, the Watch Commander

directed the BPA to "[p]rosecute the adult subject" and "have someone make the FOJC

notification." (SUF ¶ 14; Cavazos Decl. ¶ 18.) Accordingly, USBP referred G.C. to the RGV

CPC Prosecutions Unit, designated D.J.C.V. as a UAC, and notified the FOJC to refer D.J.C.V.

for transfer to ORR. (SUF ¶¶ 16, 18.) That afternoon, USBP also reinstated G.C.'s prior order of

removal under 8 U.S.C. § 1231(a)(5). (SUF ¶ 17; Guadian Decl. ¶ 9, Exh. H (reinstatement

order).)

That night, at approximately 8:42 PM, USBP received an ORR placement for D.J.C.V.

---

[8] At that time, the Watch Commander had been in his position for under a month. (Kornreich Decl., Exh. 4, 7:22-8:3.)

(SUF ¶ 21; Grame Custodian Decl. ¶ 6, Exh. 3.) Also on May 1, 2018, the RGV CPC

Prosecutions Unit referred G.C. to the SDTX for criminal prosecution. (SUF ¶ 16.) However, a

note in G.C.'s immigration records dated May 1, 2018, at 9:30 PM states: "Prosecutions [*sic*]

was declined on subject due to a full docket for the next presentation in court. Subject will not

meet the 48-hour rule for the next day's docket." (<u>Id.</u> ¶ 22; Cavazos Decl., Exh. B.) The next

morning, at approximately 10:53 AM, D.J.C.V. was "booked out" of the RGV CPC and taken

into ORR custody. (SUF ¶¶ 23, 24; Grame Custodian Decl. ¶ 6, Exh. 3.)

   *2. G.C.'s immigration detention*

   Following the prosecution declination, G.C. was referred to ICE custody for

administrative immigration processing. (SUF ¶ 27.) At that time, there were no FRCs that would

have accepted G.C. and D.J.C.V. as a family unit due to G.C.'s violent criminal history.

(Guadian Decl. ¶ 17.) For the same reason, USBP likely would not have released G.C. and

D.J.C.V. into the community as a family unit. (<u>Grame Decl.</u> ¶ 25.) On May 3, 2018, G.C. was

received into ICE custody at the South Texas ICE Processing Center and remained there until

June 28, 2018. G.C. was then detained at the Port Isabel Processing Center until June 30, 2018,

when he was moved back to the South Texas Processing Center until July 1, 2018. (Guadian

Decl. ¶ 10.) From July 1, 2018, to August 20, 2018, G.C. was detained at a correctional facility

in New Jersey; he was then detained at the New York City Hold Room from August 20, 2018, to

August 21, 2018; and, finally, at the Orange County Jail from August 21, 2018, until October 10,

2018, when he was released on bond. (SUF ¶ 27; Guadian Decl. ¶ 10.) From May 3, 2018,

through July 30, 2018 (90 days from the May 1, 2018, reinstatement of his removal order), ICE

detained G.C. pursuant to 8 U.S.C. § 1231(a)(2) for the 90-day statutory removal period. After

that time, his detention was pursuant to ICE's discretionary detention authority under either 8

U.S.C. § 1231(a)(6) or § 1226(a), depending on the jurisdiction(s) in which he was held at different times. See  ECF No. 127 at 43 ("MTD Opinion" or "MTD Op.") at 4 n.2; see also n.4, supra. On August 23, 2018, USCIS gave G.C. a reasonable fear interview and determined that G.C. had a reasonable fear of returning to Honduras. (SUF ¶ 28; Guadian Decl. ¶ 11 & Exh. J.) That same day, G.C. was served with a Notice of Referral to an Immigration Judge for a hearing on withholding of removal. (SUF ¶ 29; Guadian Decl. ¶ 11.) On September 10, 2018, after a review of G.C.'s immigration records and criminal history, DHS issued a Notice of Custody Determination determining that G.C. would remain detained by DHS pending a final administrative determination in his immigration case. (SUF ¶ 30; Guadian Decl. ¶ 12.)

Following the *Ms. L*. decision, in August 2018, the Government declined to release G.C. after he was found to be unsuitable for reunification. (SUF ¶ 86; Guadian Decl. ¶¶ 18-19.) On September 13, 2018, the Ms. L. plaintiffs filed a motion specifically requesting that the Ms. L. court order the immediate reunification of G.C. with D.J.C.V. (SUF ¶ 87; Hogan Decl. ¶ 2, Exh. 1 (ECF No. 23-1) (Ms. L. reunification motion).) On September 19, 2018, the court denied that request. (SUF ¶ 88; Hogan Decl. ¶ 3, Exh. 2 (ECF No. 23-2) (Ms. L. order denying reunification).) The court noted that G.C. was one of only 29 parents with minor children in ORR custody had not been reunified based on "significant" criminal history. (Hogan Decl., Exh. 2 at 2.) The Ms. L. Court observed that the class included over 2,600 parents and the defendants "ha[d] been over-inclusive in the [reunification] process, and . . . included for reunification parents with minor criminal history—even though such parents [were] not part of the class." (Id. at 3) The Ms. L. court found that ICE had "vetted [G.C.] in good faith and made principled decisions in light of [his] criminal history and overarching concerns regarding [the] safety of [D.J.C.V.] and the public." (Id.) Accordingly, the Court ruled that ICE's determination that G.C.

had a "disqualifying criminal history that preclude[d] reunification with [D.J.C.V.] and either release into the community or detention in a family residential center" was "entitled to deference." (Id.)

        *iii. G.C.'s release and Plaintiffs' reunification*

        G.C. received a bond hearing before an Immigration Judge on October 5, 2018. (SUF ¶ 32; Guadian Decl. ¶ 13.) On October 10, 2018, G.C. posted bond and was released from ICE custody. (SUF ¶ 33; Guadian Decl. ¶ 13.) ORR released D.J.C.V. into G.C.'s custody on October 15, 2018. (SUF ¶ 35.)

## III.    Procedural History and Jurisdictional Discovery in This Action

### a.    The Complaint and Motion to Dismiss Opinion

        Plaintiffs instituted this action on July 24, 2020. (ECF No. 1.) On October 16, 2020, the Government moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. (ECF No. 21.) Following oral argument and supplemental briefing, the Court issued an order on April 9, 2021, explaining that there were "at least two distinct periods of separation" at issue: one from May 2, 2018, through October 10, 2018, during which G.C. and D.J.C.V. were detained separately (the "First Period"); and a second period from October 10, 2018, through October 15, 2018, during which G.C. was released but D.J.C.V. remained in ORR custody (the "Second Period"). (ECF No. 88 at 1.) For the First Period, the Court directed the parties to conduct discovery on the question of "which policy actually formed the basis of the Government's decision to initially separate G.C. from D.J.C.V." (Id. at 1-2.) The Court advised that "if G.C.'s criminal history of domestic violence—to the exclusion of the 'Zero Tolerance' policy announced by the Attorney General on April 6, 2018—drove the initial decision to separate the G.C. and D.J.C.V., the Government would be immune from suit under the FTCA."

18

(Id. at 2.) "In that circumstance, the Court would not have subject-matter jurisdiction over Plaintiffs' claim as to the first period of separation." (Id.) However, with respect to the Second Period, the Court found that Plaintiffs had plausibly alleged that they could have been, but were not, reunited and that the Government had not met its burden to show that any exceptions to the waiver of sovereign immunity under the FTCA applied. Accordingly, the Court denied the Government's motion to dismiss claims relating to the Second Period. (Id. at 1, 3.)

On June 3, 2022, the Court issued a full opinion on the Government's motion to dismiss, further explaining that if the decision to separate Plaintiffs was "driven by policies triggered by G.C.'s misdemeanor conviction in 2010 . . . the Court would not have subject matter jurisdiction over Plaintiffs' claims." MTD Op. at 43.

**b. Jurisdictional discovery**

Pursuant to the MTD Opinion, the parties conducted jurisdictional discovery relating to the First Period. The Government produced over 65,000 documents. Plaintiffs deposed the BPA who made the request to separate Plaintiffs, the Watch Commander who approved that request, and CBP Chief Matthew Roggow. Plaintiffs also took Rule 30(b)(6) depositions of ICE and USBP. The Government also produced the deposition transcript of Chief Brian Hastings from a different litigation involving similar allegations and provided written answers from Chief Hastings in response to 14 additional written questions posed by Plaintiffs.

**LEGAL STANDARD**

**A. Rule 12(b)(1)**

"[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." MTD Op. at 16 (citing Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008)). "The

United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941). "Any waiver of the government's sovereign immunity is to be strictly construed in favor of the government," Long Island Radio Co. v. NLRB, 841 F.2d 474, 477 (2d Cir. 1988), and Congress can only waive the United States' sovereign immunity through clear and unequivocal statutory language, see Lane v. Pena, 518 U.S. 187, 192 (1996). "Under Rule 12(b)(1), a complaint must be dismissed if there is no subject matter jurisdiction over the claim." Waldman v. Escobar, No. 08 CIV 6405 (FM), 2009 WL 861068, at *2 (S.D.N.Y. Mar. 27, 2009); see also Fed. R. Civ. P. 12(h)(3) (the court "must dismiss" the action "at any time" it determines that it lacks subject matter jurisdiction).

"Determining the existence of subject matter jurisdiction is a threshold inquiry." MTD Op. at 16 (citing Morrison, 547 F.3d at 170). The Court has a duty to "review a plaintiff's complaint at the earliest opportunity to determine whether [there is in fact] subject matter jurisdiction." N47 Assocs. LLC v. Alba Servs. Inc., No. 1:21 CIV 3490 (MKV), 2021 WL 2003126, at *1 (S.D.N.Y. May 19, 2021) (quoting Weiss Acquisition, LLC v. Patel, No. 3:12 CIV 1819 (CS), 2013 WL 45885, at *1 (S.D.N.Y. Jan. 3, 2013)).

The plaintiff "has the burden of proving by a preponderance of the evidence that jurisdiction exists." Giammatteo v. Newton, 452 Fed. Appx. 24, 27 (2d Cir. 2011); MTD Op. at 16. On a Rule 12(b)(1) motion, a district court "may refer to evidence outside the pleadings" presented by affidavit or otherwise. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)). "Where jurisdictional facts are placed in dispute [on a Rule 12(b)(1) motion], the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings," and may hold

an evidentiary hearing "if necessary." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752

F.3d 239, 243 (2d Cir. 2014) (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003));

Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000)

(court did not abuse its discretion by not holding evidentiary hearing following two years of

discovery on a jurisdictional question). The court should make "findings of fact" to resolve

"material and controverted extrinsic evidence." Carter v. HealthPort Techs., LLC, 822 F.3d 47,

57 (2d Cir. 2016); see also Boelter v. Hearst Commc'ns, Inc., 269 F. Supp. 3d 172, 183

(S.D.N.Y. 2017).

While "a 12(b)(1) motion cannot be converted into a Rule 56 motion," Rule 56 "offers

guidelines in considering evidence submitted outside the pleadings," such as the requirement that

evidence submitted in support of a Rule 12(b)(1) motion must be "competent." Kamen, 791 F.2d

at 1011; see also Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004).[9]

## B.  The FTCA's Discretionary Function Exception

The FTCA constitutes a limited waiver by the United States of its sovereign immunity.

See MTD Op. at 17-18. It allows a tort suit against the United States where a plaintiff alleges

"circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred." Id. (quoting 28 U.S.C.

§§ 1346(b)(1), 2674). There are, however, exceptions to this waiver of sovereign immunity. One

such exception is the discretionary function exception ("DFE"), which retains the Government's

sovereign immunity, and therefore precludes, suit for "[a]ny claim based upon an act or omission

---

[9] Because the parties have conducted jurisdictional discovery in the context of a Rule 12(b)(1) motion, and not a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the Government does not believe that a statement pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern District of New York is required. If the Court's preference is for the Government to submit a Rule 56.1 statement, however, the Government respectfully requests the opportunity to do so.

of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. (quoting 28 U.S.C. §2680(a)); see also In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir. 2008) (the DFE is "a form of retained sovereign immunity"). The DFE is designed to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 19 (quoting United States v. Gaubert, 499 U.S. 315, 323 (1991)). As the Second Circuit has explained, "[t]he wellspring of the discretionary function exception is the doctrine of separation of powers. Simply stated, principles of separation of powers mandate that the judiciary refrain from deciding questions consigned to the concurrent branches of the government." In re Joint Eastern and Southern Dists. Asbestos Litig., 891 F.2d 31, 35 (2d Cir. 1989) (citing Caban v. United States, 671 F.2d 1230, 1233 (2d Cir. 1982)).

The Supreme Court has articulated a two-prong test for determining whether a claim is barred by the DFE. First, "the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and ·are not compelled by statute or regulation." MTD Op. at 19 (quoting Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000) (citing Gaubert, 499 U.S. at 322-23)); see also Berkovitz v. United States, 486 U.S. 531, 536 (1988) ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.") The DFE "bars claims based on day-to-day management decisions if those decisions require judgment as to which of a range of permissible courses is wisest." Needham v. United States, No. 17 CIV 05944 (ER), 2018 WL 3611944, at *3 (S.D.N.Y. July 27, 2018) (quoting Fazi v. United States, 935

F.2d 535, 538 (2d Cir. 1991)).

Second, "the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." MTD Op. at 19 (quoting Coulthurst, 214 F.3d at 109 (citing Gaubert, 499 U.S. at 322-23)). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. (quoting Gaubert, 499 U.S. at 325); see In re Joint E. & S. Dists. Asbestos Litig., 891 F.2d at 37 ("We believe that it is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision."). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324.

The DFE applies even if the Government's conduct was negligent or an abuse of discretion. See id. at 322-23; Hekmat v. United States Trans. Sec. Admin., 247 F. Supp. 3d 427, 437 (S.D.N.Y. 2017); Callahan v. United States, 329 F. Supp. 2d 404, 409 (S.D.N.Y. 2004) ("An abuse of discretion is expressly covered by the FTCA's discretionary function example."). "However, there is no discretion for a federal official 'to behave unconstitutionally or outside the scope of his delegated authority.'" MTD Op. at 19 (quoting Myers & Myers, Inc. v. U.S. Postal Serv., 527 F.2d 1252, 1261 (2d Cir. 1975)).

"Where the DFE applies, it follows that a court lacks subject matter jurisdiction to hear the claim." Winters v. United States, No. 10 CIV 7571 (JMF), 2013 WL 1627950, at *4 (S.D.N.Y. Apr. 16, 2013) (citing Fazi, 935 F.2d at 537); Fed. R. Civ. P. 12(b)(1). Plaintiffs "bear the initial burden of showing that their claims are not barred by the discretionary function

exception" by a preponderance of the evidence. <u>Cangemi v. United States</u>, 13 F.4th 115, 130 (2d

Cir. 2021) (citing <u>Molchatsky v. United States</u>, 713 F.3d 159, 162 (2d Cir. 2013)); <u>Herrera v.</u>

<u>United States</u>, No. 20-CV-10206 (PKC), 2022 WL 902090, at *5, 9 (S.D.N.Y. Mar. 27, 2022).

### c.  The FTCA's Due Care Exception

"The FTCA also excludes from its waiver of sovereign immunity '[a]ny claim based

upon an act or omission of an employee of the Government, exercising due care, in the execution

of a statute or regulation, whether or not such statute or regulation be valid.'" MTD Op. at 20

(quoting 28 U.S.C. § 2680(a)). The due care exception ("DCE") is aimed at ensuring that a

statute or regulation's validity is "not tested through the medium of [a] damage suit for tort." <u>Id.</u>

(quoting <u>Myers & Myers, Inc.</u>, 527 F.2d at 1261) (internal quotation omitted). "Where

government employees act pursuant to and in furtherance of regulations, resulting harm is not

compensable under the act[.]" <u>Dupree v. United States</u>, 247 F.2d 819, 824 (3d Cir. 1957)

(citations omitted); <u>see also</u> <u>Nwozuzu v. United States</u>, 712 Fed. App'x 31, 33 (2d Cir. 2017)

(summary order) (due care applies to government's interpretation of a statute where there is legal

uncertainty on the issue and no controlling legal authority clearly precludes that particular

interpretation).

In the Motion to Dismiss Opinion, the Court applied the test for this exception set forth in

<u>Welch v. United States</u>, 409 F.3d 646 (4th Cir. 2005). MTD Op. at 20.[10] "Under *Welch,* a court

first 'determines whether the statute or regulation in question specifically prescribes a course of

action for an officer to follow' and, second, if it finds in the affirmative, 'inquires as to whether

the officer exercised due care in following the dictates of that statute or regulation.'" MTD Op. at

---

[10] As the Government explained in its Memorandum in Support of its Motion to Dismiss, if it is "authorized by statute or regulation to take the course of action that caused the harm, then it is not amenable to suit under the FTCA [due care exception]." (ECF No. 22 at 23.)

20 (quoting <u>Clayton v. United States</u>, No. 18 Civ. 5867 (MKB) (LB), 2019 WL 9283977, at *12

(E.D.N.Y. Aug. 1, 2019), <u>report and recommendation adopted</u>, No. 18 Civ. 5867, 2020 WL

1545542 (E.D.N.Y. Mar. 31, 2020) (quoting <u>Welch</u>, 409 F.3d at 652)). "If due care was

exercised, sovereign immunity has not been waived." <u>Gjidija v. United States</u>, No. 18 CIV 0259

(LAK) (OTW), 2019 WL 2615438, at *5 (S.D.N.Y. June 26, 2019), <u>report and recommendation</u>

<u>adopted,</u> 2019 WL 3889854 (S.D.N.Y. Aug. 19, 2019), <u>aff'd</u>, 848 F. App'x 451 (2d Cir. 2021)

(internal quotation omitted).

## ARGUMENT

Following jurisdictional discovery, it is clear that the Zero Tolerance Policy was not the

basis of Plaintiffs' separation during the First Period. As explained below, the evidence shows

that on May 1, 2018, USBP made a discretionary determination to refer G.C. for prosecution

based on his prior criminal conviction for a violent offense, and that resulted in Plaintiffs'

separation. This decision was consistent with USBP's longstanding practice in RGV Sector and

was not based on a Zero Tolerance prosecution referral policy. Indeed, Plaintiffs' separation

occurred *before* any Zero Tolerance-related policies were implemented in the RGV Sector.

Moreover, the decision to refer G.C. for prosecution, as well as the Government's subsequent

custody decisions relating to Plaintiffs, were discretionary, grounded in policy considerations,

and authorized by statute, and therefore protected by the DFE and/or DCE. There is no evidence

that any of those decisions were pretextual. Accordingly, the Court lacks subject matter

jurisdiction over Plaintiffs' claims arising from the First Period.

## I. Plaintiffs Were Separated Because of G.C.'s Violent Criminal History and Not Because of Zero Tolerance-Related Policies

### a. Plaintiffs Were Separated Due to G.C.'s Criminal History

Contemporaneous evidence makes clear that Plaintiffs were initially separated because of

G.C.'s criminal history. It is undisputed that USBP ran a records check the day Plaintiffs were booked into the RGV CPC and was aware of G.C.'s prior criminal conviction for aggravated assault. (SUF ¶ 8.) It is also undisputed that this criminal assault was the stated reason why the BPA who reviewed the records check sought permission to refer G.C. for prosecution and separate Plaintiffs. (Id. ¶ 9; Cavazos Decl., Exh. C ("Request separation of ▮▮▮▮▮▮▮▮▮ due to mother [*sic*] having prior **criminal history**.") (emphasis in original).)[11] Indeed, the email requesting separation included specific information about G.C.'s prior criminal history, including the date of his arrest, the arresting authority, the nature of the charge and conviction (aggravated assault), and the criminal sentence (48 days of jail time). (Cavazos Decl. ¶ 17, Exh. C.) Due to resource limitations, RGV Sector's longstanding practice since has been to prioritize for prosecution noncitizens with prior criminal history, particularly violent criminal history. (Id. ¶¶ 11, 17, 20-25; Grame Decl. ¶¶ 11-14, 40-41, 43-44.)

Thus, when, in response to the BPA's request, the Watch Commander asked the DPAIC for "guidance on family separation approvals," the DPAIC responded, consistent with RGV Sector's practices, that parents in family units with "criminal history" should be prosecuted and the family unit separated "for the welfare of the child." Because G.C. had a prior criminal conviction for a violent offense, the Watch Commander approved the prosecution and separation request. (SUF ¶ 14; Cavazos Decl. ¶ 18, Exh. C.) G.C. was then referred to the Prosecutions Unit and, ultimately, the SDTX for prosecution[12] (SUF ¶ 16), while D.J.C.V. was taken into ORR custody, (SUF ¶¶ 18, 21, 23-24).

The USBP spreadsheet that was used in 2018 to track family separations similarly

---

[11] BPA Cavazos' reference to G.C. as the "mother" was a typo; later in the email, he identifies G.C. as the father. (Cavazos Decl. ¶ 17, Exh. C.) ▮▮▮▮▮▮▮▮ was USBP's identification number for Plaintiffs' family unit. (Id.)

[12] G.C. was not ultimately prosecuted because SDTX was not able to present him for arraignment within 48 hours of arrest. (Cavazos Decl., Exh. B (I-213)).

identifies "parents [*sic*] criminal history" as the "reason" for Plaintiffs' separation. (Macal Decl., ¶ 3, Exh. A.) The "additional notes" column of this spreadsheet specifies that Plaintiffs were separated because of the "father's criminal history." Id.  There is no evidence in the record indicating that Plaintiffs were separated for any other reason.

### b.   Plaintiffs Were Not Separated Because of the Zero Tolerance Policy

Although the contemporaneous record demonstrates that G.C.'s criminal history was the reason for his referral for prosecution and separation from D.J.C.V., Plaintiffs allege that they were separated in early May 2018 pursuant to the "zero tolerance policy." (Cplt. ¶¶ 1, 8.) That claim is inconsistent with the factual record. Moreover, it is undisputed that the Zero Tolerance Memorandum, which was issued on April 6, 2018, was a DOJ prosecution policy and effected no changes within USBP in the RGV Sector on its own, although it led to the DHS Referral Policy. (SUF ¶ 57 (the "Zero Tolerance Memorandum was directed to the Department of Justice and not DHS or any of its component agencies").) USBP confirmed in its Rule 30(b)(6) testimony that "[t]he Department of Justice [zero tolerance] memoranda and instruction to their prosecutors had no bearing on U.S Border Patrol. We did not change our processes as a result or based on the DOJ memoranda." (Grame Decl., Exh. A ("Grame Dep. Tr.") 131:10-14.)

Further, while DHS later adopted a separate prosecution referral policy to "support the zero tolerance effort" (Id. 122:21-124:9), it is undisputed that this referral policy was not signed until May 4, 2018, and that "USBP was not authorized to implement the Referral Policy until May 5, 2018"—days *after* Plaintiffs had already been separated (see SUF ¶¶ 63-65; Grame Decl. ¶ 37, Exhs. E, F ("Border Patrol is authorized to implement increased Southwest Border Prosecutions, as outlined in the [DHS Referral Policy] . . . effective **May 5, 2018**.") (emphasis in original).) As Chief Roggow testified at his deposition, the DHS Referral Policy was not

27

effective any earlier than May 5, 2018, "based on the fact that it was transmitted the afternoon of May 4th [and] all of the appearances in the court system would have already occurred for that day for individuals." (Kornreich Decl., Exh. 2 (Roggow Dep. Tr.) 194:8-19; Grame Decl. ¶ 38 (USBP implemented the DHS Referral Policy starting on May 5, 2018).)

In the RGV Sector, the DHS Referral Policy in fact was implemented even later than May 5, 2018. On May 5, 2018, Chief Hastings instructed the Southwest border sectors to operationalize the DHS Referral Policy by developing Sector-specific CONOPs, using an approved template as a model, by "Monday, May 7." (SUF ¶ 64; Grame Decl. ¶ 39, Exh. F.) The RGV Sector submitted to headquarters its finalized CONOP on May 6, 2018, and a slightly updated version on May 7, 2018. (SUF ¶ 70; Grame Decl. ¶ 39, Exh. F (email attaching RGV CONOP).) Accordingly, the RGV Sector did not operationalize the DHS Referral Policy until May 7, 2018—six days after G.C. was referred for prosecution and separated from D.J.C.V., and after both Plaintiffs had already left USBP custody. (SUF ¶¶ 16, 23, 25, 70, 72; Grame Decl. ¶¶ 39, 46, Exh. F.) Because the DHS Referral Policy was not in effect in RGV Sector at the time the BPA made the decision to separate Plaintiffs, it did not play any role in that decision. (See id.)

Likewise, the Zero Tolerance Policy could not have played any role in Plaintiffs' treatment after it was rescinded. On June 20, 2018, former President Trump signed an executive order ending the Zero Tolerance Policy, and later that day, Chief Hastings sent an email to all Southwest border chiefs and deputies suspending the DHS Referral Policy. (SUF ¶ 77; E.O. 13841; Grame Decl. ¶ 43; Grame Custodian Decl., Exh. 2 (Hastings email).) The DHS Referral Policy simply did not play any role in the Government's separation of Plaintiffs.

## II.    All of the Government's Custody and Separation Decisions Relating to Plaintiffs During the First Period Are Protected by the DFE and/or DCE

Pursuant to the DFE, the Court lacks subject matter jurisdiction over claims challenging

discretionary decisions of the executive branch that are susceptible to policy analysis. Because the Government's custody and separation decisions relating to Plaintiffs during the First Period fall within the DFE, Plaintiffs' claims relating to that period should be dismissed. Additionally, because governing law required Plaintiffs' separation after G.C. was referred for prosecution, that decision is additionally protected by the DCE.

### a. The DFE Applies to the Government's Decision to Refer G.C. for Prosecution

The May 1, 2018, decision to refer G.C. for prosecution due to his criminal history plainly falls within the DFE because it was discretionary, susceptible to policy analysis, and not related to allegedly unconstitutional zero tolerance policies.

The first prong of the DFE requires the Government to show that the subject decision was "discretionary," meaning that it was not compelled by statue or regulation and involved an "element of judgment or choice." Coulthurst, 214 F.3d at 109 (citing Gaubert, 499 U.S. at 322-23)). The BPA's decision on May 1, 2018, to refer G.C. for prosecution meets this standard. Criminal "immigration statutes give DHS discretion to refer individuals to DOJ for prosecution based on the particularized facts and circumstances of each individual case." Sw. Env't Ctr. v. Sessions, 355 F. Supp. 3d 1121, 1126 (D.N.M. 2018); Huntress v. United States, No. 18 CIV 2974 (JPO), 2019 WL 1434572, at *4 (S.D.N.Y. Mar. 29, 2019), aff'd, 810 F. App'x 74 (2d Cir. 2020) (agent's decision to refer Plaintiffs for "further criminal investigation" was "quintessentially discretionary" because it "reflect[ed] the decision-maker's judgment of how best to enforce compliance and to deter misconduct in others"); S.E.B.M. by & through Felipe v. United States, No. 1:21-CV-00095-JHR-LF, 2023 WL 2383784, at *8 (D.N.M. Mar. 6, 2023) (citing United States v. Armstrong, 517 U.S. 456, 464 (1996)) ("The federal government generally has discretion to prosecute any person in the United States whom it has probable cause

to believe has violated federal criminal law.").

The prosecution referral process in the RGV CPC on May 1, 2018, reflected both USBP's judgment regarding prioritization of noncitizen prosecutions in general and the exercise of judgment in each case. (See Grame Decl. ¶¶ 12-14, 41, 43-44; Cavazos Decl. ¶ 9 (same); Kornreich Decl., Exh. 1 (Hastings Written Responses to Plaintiffs' Questions) Response No. 3 ("[F]rom October 2017 through May 5, 2018 . . . Border Patrol Agents could prioritize individuals for prosecution differently based upon their discretion.").) Indeed, from November 2014 through June 26, 2018, SDTX asked RGV CPC BPAs to exercise their discretion to prioritize prosecution referrals in light of resource limitations. (SUF ¶ 69; Grame Decl. ¶¶ 11, 40-41.)[13]

In addition, the second prong of the DFE test is satisfied because the Government's decision to refer G.C. for prosecution is "susceptible to policy analysis." See Coulthurst, 214 F.3d at 109 (citing Gaubert, 499 U.S. at 322-23). Prosecution referrals are grounded in policy considerations such as immigration enforcement priorities, safety concerns, border security, and resource allocation. USBP's Rule 30(b)(6) witness testified that in developing its prosecution policies, both before and after the DHS Referral Policy, RGV Sector sought to strike a balance between the enforcement of immigration law and resource allocation/limitations. (Grame Dep. Tr. 30:5-10 (in 2016, RGV Sector prioritized noncitizens with criminal history for prosecution "based on agent discretion, . . . location, . . . . operating procedures, [and] tempo"), 69:2-13 (the RGV Sector CONOP, including its prosecution priorities, was developed in light of RGV

---

[13] "Whether a person is prosecuted for such crime after a referral by DHS is a decision made by DOJ, and is subject to DOJ's prosecutorial discretion." Sw. Env't Ctr., 355 F. Supp. 3d at 1126 (citing United States v. Batchelder, 442 U.S. 114, 124 (1979)); Pena Arita v. United States, 470 F. Supp. 3d 663, 686-87 (S.D. Tex. 2020) ("[P]rosecutorial judgment is a matter of choice . . . grounded in considerations of public policy . . . that is intended to be shielded by the discretionary function exception."); see also SUF ¶ 44.

Sector's "unique . . . operating requirement[s], resources and limitations, and capabilities"), 79:2-10 (RGV Sector sought to achieve a "scalable approach" to implement the DHS Referral Policy in light of resource limitations)); see also Grame Decl. ¶¶ 13, 41, Exhs. H (RGV CONOP) (ranking prosecution priorities in light of resource limitations and enforcement priorities), B (RGV Consequence Delivery System Guide) (ranking deterrent effects of prosecution versus other processing pathways for noncitizens).) USBP also prioritized the prosecution of noncitizens with a history of violent conduct to promote the safety of its employees and detainee population, particularly minors within its custody. (See Grame Dep. Tr. 30:19-31:9 (RGV Sector prioritized prosecution referral of noncitizens with "violent" criminal history or "domestic violence" "for the safety and security of the child"), 80:16-81:4 (USBP "weigh[ed]" a noncitizens criminal history, "even a violent misdemeanor charge or conviction" in making prosecution referral decisions); Kornreich Decl., Exh. 2 (Roggow Dep. Tr.) 68:11-17 ("[O]ther considerations that may warrant separation [of a family unit] would be the welfare and safety of the juvenile"); see also Grame Decl. ¶¶ 14, 44.)

These quintessentially policy-based considerations have been recognized by courts as satisfying the second prong of the DFE test. See, e.g., Molchatsky v. United States, 713 F.3d 159, 162 (2d Cir. 2013) (resource allocation); Reichhart v. United States, 408 F. App'x 441, 443 (2d Cir. 2011) (same); Valdez v. United States, No. 08 CIV 4424 (RPP), 2009 WL 2365549, at *6 (S.D.N.Y. July 31, 2009) (same); Mansa v. United States, No. 3:16-CV-644 (VAB), 2019 WL 121681, at *12 (D. Conn. Jan. 7, 2019) (deterrence and public safety); MTD Op. at 8 (citing Hogan Decl., Exh. 2 (Ms. L. Order at 3) (public safety); Shahim v. United States, No. 2:21-CV-02401-ODW (AGR), 2022 WL 1644440, at *5 (C.D. Cal. May 24, 2022) (employee and public safety); Gringo Pass, Inc. v. United States, 542 F. App'x 642, 643 (9th Cir. 2013) (border

security); <u>Huntress</u>, 2019 WL 1434572, at *4, <u>aff'd</u>, 810 F. App'x 74 (law enforcement).

Accordingly, because the decision to refer G.C. for prosecution was discretionary and susceptible to policy analysis, the DFE applies and Plaintiffs' claims based on that decision are precluded.[14]

### b.  The DCE Applies to the Government's Decision to Refer D.J.C.V. to ORR

As a consequence of the Government's decision to refer G.C. for prosecution, D.J.C.V. was designated a UAC and referred to ORR. This referral was compelled by statute and accordingly falls within the DCE, removing it from this Court's jurisdiction.

Under the <u>Welch</u> test, the Court must "determine whether the statute or regulation in question specifically prescribes a course of action for an officer to follow," and whether the officer exercised due care in following the dictates of that statute or regulation. <u>Clayton</u>, 2019 WL 9283977, at *12 (quoting <u>Welch</u>, 409 F.3d at 652)). Here, the TVPRA and HSA required USBP to refer D.J.C.V. to ORR once the determination had been made to refer G.C. for prosecution. Pursuant to those statutes, once G.C. was no longer available to provide care and physical custody of D.J.C.V., D.J.C.V. became a UAC and USBP had only 72 hours to transfer him to ORR. <u>See</u> 6 U.S.C. § 279(g)(2); 8 U.S.C. §§ 1232(b)(3), (c)(2)(A); <u>see also</u> <u>Flores v. Lynch</u>, 828 F.3d 898, 902-03 (9th Cir. 2016); MTD Op. at 46 (minors cannot be housed in secure adult detention facilities); (Grame Decl. ¶ 27). Accordingly, USBP exercised due care in complying with these requirements by designating D.J.C.V. a UAC once it determined to refer G.C. for prosecution to ensure that the 72-hour deadline was met.

---

[14] In the alternative, even if the DHS Referral Policy played some role in USBP's decision to refer G.C. for prosecution—which it did not—the referral decision would still be protected by the DFE. (SUF ¶¶ 72, 77.) Even after the DHS Referral Policy became effective in RGV Sector, the Sector never achieved 100% prosecution referrals due to resource limitations, and BPAs continued to exercise their discretion to select noncitizens for prosecution referrals due to resource constraints and consistent with the policy considerations discussed above. (Grame Decl. ¶¶ 46-47, 52, 73, Exh. H.)

This is a natural result of a criminal arrest or prosecution. "When a parent is charged with a criminal offense, the law ordinarily requires separation of the family." Ms. L. v. ICE, 310 F. Supp. 3d 1133, 1139 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019); see also, e.g., W.S.R. v. Sessions, 318 F. Supp. 3d 1116, 1125 (N.D. Ill. 2018) (noncitizen parents' criminal detentions "necessitated the separation of" those families). Accordingly, because Plaintiffs were separated because of G.C.'s criminal history and subsequent prosecution referral, the "final decision, to house D.J.C.V. apart from G.C., would be covered by the DCE." MTD Op. at 46.

The fact that G.C. was not ultimately prosecuted does not change this analysis. Because USBP had referred G.C. for prosecution and D.J.C.V. could not remain with his father during the anticipated criminal proceedings, and in light of the strict timing requirements for referral to ORR under the TVPRA and the large volume of migrants in USBP custody during the first half of 2018, USBP exercised due care in taking reasonable steps to ensure compliance with its statutory obligations.[15] (See Grame Decl. ¶ 21 (noting 72-hour requirement); Cavazos Decl. ¶¶ 18, 23-25 (USBP designated FMUA minors as UACs upon recommending the parent for prosecution referral); see also Watson v. United States, 179 F. Supp. 3d 251, 270-71 (E.D.N.Y. 2016), aff'd in part, rev'd in part on other grounds, 865 F.3d 123 (2d Cir. 2017) (citing Nwozuzu v. U.S., No. 14 CIV 8589 (LGS), 2015 WL 4865772, at *5 (S.D.N.Y. Aug. 12, 2015)) ("[W]here the government official acts in a reasonable way, i.e., not negligently, in carrying out the requirements of a statute or regulation, sovereign immunity lies.").

At the very least, USBP's decision to designate D.J.C.V. as a UAC around when it referred G.C. for prosecution, rather than waiting until SDTX accepted the referral for prosecution, was a discretionary decision reflecting USBP's reasonable interpretation of the law,

---

[15] It is unclear from the record whether G.C. was transferred to the USMS prior to the prosecution declination.

which is susceptible to policy analysis. Given the large volume of migrants in USBP custody at

the time Plaintiffs were apprehended (Grame Decl. ¶ 32), the agency's limited resources and

personnel (id. ¶¶ 35, 40), efforts to promote the welfare of minors in its custody (id. ¶ 43), and its

overall goal to maximize the effectiveness and efficiency of its processes (id. ¶ 13), USBP

reasonably exercised its discretion to ensure compliance with its statutory obligations and

facilitate D.J.C.V.'s transfer to ORR as soon as possible, see 8 U.S.C. §§ 1232(b)(3), (c)(2)(A);

see also supra at 31-32 (identifying policy considerations satisfying second prong of DFE);

Molchatsky, 713 F.3d at 162 (defendant's "choices regarding allocation of agency time and

resources [were] sufficiently grounded in economic, social, and policy considerations").

Accordingly, D.J.C.V.'s referral to ORR is protected by the DCE and/or DFE and cannot be

challenged under the FTCA.

> ### c.   The DFE Applies to G.C.'s Detention in Secure Facilities From May 3, 2018, Through October 10, 2018

USBP reinstated G.C.'s prior order of removal on May 1, 2018. (SUF ¶ 17; Guadian

Decl., Exh. H (I-871).) Thus, after SDTX declined G.C.'s prosecution "due to a full docket"

(SUF ¶ 22; Cavazos Decl., Exh. B (Form I-213)), USBP referred G.C. to ICE ERO to be held in

secure immigration detention pending further administrative proceedings. (SUF ¶ 25.) ICE

accepted the referral and detained G.C. pursuant to its authority under 8 U.S.C. § 1231(a)(2)

from May 3, 2018, through July 30, 2018, the end of the 90-day removal period. (See id. ¶¶ 25,

27; 8 U.S.C. §§ 1231(a)(2), (a)(5).) Thereafter, ICE continued to detain G.C. through October

10, 2018 (see SUF ¶ 27; Guadian Decl. ¶¶ 10, 13), and this was pursuant to its discretionary

authority. Thus, the Government's decisions to hold G.C. in secure detention from May 3, 2018,

through October 10, 2018, are protected by the DFE.

It is well-settled that DHS has the discretion to detain a noncitizen pending a decision on

whether he or she will be removed. See MTD Op. at 43 (citing Arizona v. United States, 567

U.S. 387, 407 (2012) ("[T]he Attorney General can exercise discretion to issue a warrant for an

alien's arrest and detention 'pending a decision on whether the alien is to be removed from the

United States.'") (quoting 8 U.S.C. § 1226(a)). Further, DHS is authorized to reinstate a prior

order of removal and subsequently detain the noncitizen during the 90-day removal period. See 8

U.S.C. § 1231(a)(5), (a)(2) ("During the removal period, the Attorney General shall detain the

alien."). "[D]etention decisions made on this basis are susceptible to policy analysis" because

they "turn on consideration of immigration policy, prosecutorial discretion, or even foreign

policy." MTD Op. at 44 (citing cases). The Government "must weigh various policy

considerations in deciding which suspected aliens to detain," Douglas v. United States, 796 F.

Supp. 2d 1354, 1369 (M.D. Fla. 2011), including "diplomacy, foreign policy, and the security of

the nation," Tun-Cos v. Perrotte, 922 F.3d 514, 526 (4th Cir. 2019). "[T]he Government need not

show that, in the particular case, it 'actually balanced' such considerations, but that it could."

MTD Op. at 44 (quoting In re Joint E. & S. Districts Asbestos Litig., 891 F.2d 31, 37 (2d Cir.

1989)).[16]

---

[16] In the MTD Opinion, the Court held that "G.C.'s mandatory 90-day detention period—beginning on May 1, 2018—is covered by the due care exception. The statutory framework governing noncitizens subject to reinstated removal orders requires detention during that period." MTD Op. at 45. The Second Circuit, similarly, has held that the FTCA due care exception applies to detention pursuant to 8 U.S.C. 1231(a)(2), see Gjidija, 848 F. App'x at 454 ("The due care exception precluded the district court from exercising subject-matter jurisdiction over Gjidija's FTCA claims . . . . Gjidija's detention was mandated by statute . . . because he was subject to an order of removal, see 8 U.S.C. § 1231(a)(2) . . . . On appeal, Gjidija does not challenge the district court's determination that the detention of an alien is mandatory under these statutes."), and the Supreme Court has stated that "during the removal period, detention is mandatory," Johnson, 141 S. Ct. at 2281. But while the statutory language in 8 U.S.C. § 1231(a)(2) provides that the Secretary "shall" detain a noncitizen with a reinstated order of removal for the 90-day removal period, and a noncitizen detained pursuant to that provision is not entitled to a bond hearing, see Johnson, 141 S. Ct. at 2280, DHS retains law enforcement discretion to detain or release noncitizens during the removal period who have not been found inadmissible or deportable on specified grounds. See Brief for Petitioners, United States of America, et al. v. State of Texas and State of Louisiana, No. 22-58, 2022 WL 4278395 (U.S.); Arizona v. Biden, 31 F.4th 469, 479 (6th Cir. 2022) (holding that although Section 1231(a) has "mandatory language," it is "unlikely" that it "displaces the Department's longstanding discretion in enforcing the many moving parts of the nation's immigration laws"). To the extent the Court holds that G.C.'s detention was statutorily required, which would render the DFE inapplicable, the DCE would apply, for the reasons stated in the MTD Opinion.

Further, federal law provides that the Secretary "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). The Government's decisions as to the location and type of confinement for a noncitizen pending removal are "vitally and intricately interwoven with contemporaneous policies [and] so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Cmtte. Of Cent. Am. Refugees v. I.N.S., 795 F.2d 1434, 1440 (9th Cir. 1986) (quoting Harisiades v. Shaughnessy, 342 U.S. 580 (1951)); see also Bailor v. Salvation Army, 51 F.3d 678, 685 (7th Cir. 1995) (decisions regarding whether to detain or release are policy-based decisions protected by the DFE); Lway Mu v. Whitaker, No. 6:18-CV-06924-MAT, 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019) (denying immigration detainee's request to enjoin DHS from changing his place of confinement because "[t]he Court . . . does not have the authority to dictate to DHS where Petitioner should be housed"); Calla-Collado v. Att'y Gen. of U.S., 663 F.3d 680, 685 (3d Cir. 2011) ("ICE necessarily has the authority to determine the location of detention of an alien in deportation proceedings") (internal quotation omitted); GEO Grp., Inc. v. Newsom, 50 F.4th 745 (9th Cir. 2022) ("Congress unambiguously granted the DHS Secretary broad discretion over immigrant detention.").

The Government's decision to reinstate G.C.'s prior order of removal and detain him in a secure facility for the full 90-day period, rather than in an FRC or releasing him into the public, was discretionary and implicated policy considerations around enforcement of immigration laws and public safety in light of G.C.'s criminal history. (Guadian Decl. ¶ 17 (FRCs at that time would not accept FMUA if father had violent criminal history); Grame Decl. ¶ 20, Exh. C (TEDS Policy requires family separation if safety of juvenile is at risk); Hogan Decl., Exh. 2 at 3 (ICE "vetted [G.C.] in good faith and made principled decisions in light of [his] criminal history

and overarching concerns regarding [the] safety of [D.J.C.V.] and the public.".); Grame Dep. Tr. 31:8-9 ("[W]e [] separate [family units] for the safety and security of the child")); see also 8 U.S.C. § 1231(a)(1); Johnson, 141 S. Ct. at 2281; supra at 31-32 (citing cases). There is no evidence that G.C.'s detention in a secure facility over this period was the result of zero tolerance policies or the DHS Referral Policy. Accordingly, the decision to detain him is protected by the DFE.[17]

G.C.'s continued detention following the removal period is also protected by the DFE because ICE is authorized to continue to detain noncitizens on a discretionary basis if the noncitizen is "a risk to the community or unlikely to comply with the order of removal." MTD Op. at 44 (quoting 8 U.S.C. §1231(a)(6)); Agoro v. Dist. Dir. for Immigr. & Customs Enf't, 403 F. App'x 536, 537 (2d Cir. 2010) (describing 8 U.S.C. §1231(a)(6) as authorizing "discretionary detention").[18] This determination is inherently susceptible to policy analysis. See Johnson, 141 S. Ct. at 2281; (see also Guadian Decl. ¶ 12 (ICE exercised its discretion to continue detaining G.C.

---

[17] Between the May 1, 2018, 9:30 PM, addendum to G.C.'s Form I-213 noting that his prosecution was declined and D.J.C.V.'s transfer out of USBP custody on May 2, 2018, at approximately 10:53 AM (SUF ¶ 23), there was an approximately 13 hour window overnight during which USBP could have de-designated D.J.C.V.'s UAC status, but did not. De-designating D.J.C.V. would not have changed the outcome here, however, because at that time, there were no FRCs that would have accepted G.C. and D.J.C.V. as a family unit due to G.C.'s violent criminal history. (Guadian Decl. ¶ 17.) It would have been inconsistent with local practices at the time to release G.C. and D.J.C.V. into the community as a family unit because G.C.'s criminal history implicated community safety concerns. (Grame Decl. ¶ 25) (release of noncitizen into community with violent criminal history required headquarters' approval).) As such, USBP would likely have referred G.C. to secure ICE ERO custody and referred D.J.C.V. to ORR. (See generally Grame Decl.) Although the record does not indicate whether USBP conducted this analysis for Plaintiffs specifically or whether USBP specifically determined not to alter D.J.C.V.'s UAC status, the DFE applies regardless. See MTD Op. at 44; In re Joint E. & S. Districts Asbestos Litig., 891 F.2d at 37 ("[I]t is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision" because "the relevant question" is "whether the decision is *susceptible* to policy analysis") (emphasis added); Gaubert, 499 U.S. at 322 ("When an established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that decision."); see also 28 U.S.C. § 2680(a) (DFE exempts the exercise or performance of a discretionary function, as well as the "failure to exercise or perform a discretionary function"). To the extent Plaintiffs characterize this outcome as an abuse of discretion, that does not avoid application of the DFE. MTD Op. at 18 (citing 28 U.S.C. §2680(a)) (DFE applies "whether or not the discretion involved be abused").

[18] In the Second Circuit's jurisdiction at that time, G.C.'s detention while he was detained in New York was considered pursuant to ICE's detention authority under 8 U.S.C. § 1226(a), which is also discretionary.

after the 90-day removal period after reviewing his file).)

Further, the Government's decision to detain G.C. until October 10, 2018, was reviewed and endorsed by the <u>Ms. L.</u> Court. Although noncitizens like G.C. with criminal history were excluded from the <u>Ms. L.</u> class, in response to that court's June 26, 2018, preliminary injunction and order, ICE nevertheless reviewed the relevant history of each adult parent in its custody who had a minor child in ORR custody to determine if they could be reunited. (SUF ¶¶ 83, 84 (quoting <u>Ms. L.</u>, 310 F. Supp. at 1149).) As a result of that effort, in July and August 2018, ICE released hundreds of detained noncitizens and coordinated reunification with their minor children, even those with minor criminal history, unless ICE determined that the parent was unfit or presented a danger to the child. (SUF ¶ 85; Guadian Decl. ¶ 18; Hogan Decl. Exh. 2, at 3.) G.C. was deemed unsuitable for reunification under this standard. (SUF ¶ 86; Guadian Decl. ¶ 19.)

On September 13, 2018, the plaintiffs in <u>Ms. L.</u> challenged this decision by filing a motion requesting the immediate reunification of G.C. with D.J.C.V. (SUF ¶ 87.) On September 19, 2018, the court denied that request, finding that ICE had "vetted [G.C.] in good faith and made principled decisions in light of [his] criminal history and overarching concerns regarding [the] safety of [D.J.C.V.] and the public." (SUF ¶ 88; Hogan Decl., Exh. 2 at 2.) Accordingly, the court ruled that:

> Defendants' determination that . . . [G.C.] ha[s] disqualifying criminal history that precludes reunification with [his] child[] and either release into the community or detention in a family residential center is entitled to deference . . . The Court is persuaded that Defendants have exercised their statutorily prescribed discretion in a reasonable manner. The Court has consistently held that matters of detention and parole are peculiarly within the province of the executive branch, and for prudential and other reasons that exercise of discretion ought not to be disturbed under these circumstances.

(Hogan Decl., Exh. 2 at 3.)

The Government has consistently represented, in this Court and others, that its detention decisions concerning G.C. were motivated by his criminal history and the attendant safety concerns. There is no evidence that the zero tolerance policy played any role in the Government's decision to detain G.C. in a secure facility, and when that policy ended the Government exercised its discretion to continue to detain G.C. because of his criminal history. The Ms. L. Court endorsed this exercise of discretion. Accordingly, the Court should dismiss all of Plaintiffs' claims relating to the First Period the Court lacks subject matter jurisdiction.

## III.   The Government's Detention and Separation of G.C. Based on His Criminal History Were Not Pretextual

Plaintiffs allege that the Government's proffered reason for G.C.'s detention and consequent separation from D.J.C.V.—his violent criminal history—is pretextual. (Cplt. ¶ 100) However, there is no evidence of pretext. On the contrary, the evidence demonstrates that G.C.'s treatment was consistent with longstanding DHS practices that predated the Zero Tolerance Memorandum and DHS Referral Policy.

Since at least November 2014, RGV Sector's practice has been to prioritize for prosecution noncitizens with prior criminal history, including single heads of households, even if that necessitated a family separation. (Grame Decl. ¶¶ 12-14, 41, 43-44.) This practice was designed to safeguard the welfare of the minors in USBP custody, protect public safety, and promote enforcement of criminal and immigration laws. (See supra at 6-7, 30.) Consistent with this practice, a number of family units were separated in the RGV CPC in the year prior to the issuance of the Zero Tolerance Memorandum and/or DHS Referral Policy to facilitate the prosecution of a single head of household with prior criminal history.  (See, e.g., Grame Custodian Decl. ¶¶ 7-9, Exhs. 4 (April 20, 2017), 5 (March 6, 2018), 6 (March 29, 2018); Macal Decl. ¶ 4, Exh. B (February 3, 2018); Cavazos Decl. ¶ 23-25, Exhs. D (November 21, 2017), E

(November 21, 2017), F (February 26, 2018).).

These examples—all of which pre-date both the Zero Tolerance Memorandum and implementation of the DHS Referral Policy in the RGV Sector—are consistent with Plaintiffs' treatment and rebut any assertion that G.C.'s criminal history was merely a pretext for the application of zero tolerance-related family separation policies. Cf. Chukwurah v. Stop & Shop Supermarket Co. LLC, 354 F. App'x 492, 495 (2d Cir. 2009) (employer's justification for challenged termination decision was not pretextual because employee had consistently received years of negative performance reviews).

Further, throughout G.C.'s detention—both before, during, and after the zero tolerance policy—the Government has consistently cited G.C.'s criminal history as the reason for his secure detention and separation from D.J.C.V. Indeed, the Ms. L. Court endorsed this justification and ruled that it was "entitled to deference." (Hogan Decl., Exh. 2 at 3.) G.C.'s continued detention in July and August 2018, when ICE was releasing and reunifying hundreds of families in response to the Ms. L. preliminary injunction, including those with minor criminal histories, further rebuts any suggestion that the criminal history justification was pretextual. See Timothy v. Our Lady of Mercy Med. Ctr., 233 F. App'x 17, 20 (2d Cir. 2007) (consistent explanations rebut inference of pretext).

## CONCLUSION

For the reasons discussed herein, Plaintiffs' claims relating to the first period of separation should be dismissed for lack of subject matter jurisdiction.

Dated:      June 1, 2023
            New York, New York

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney for the
                                    Southern District of New York
                                    *Attorney for Defendant*

                        By:     /s/ *Carly Weinreb*
                                    CARLY WEINREB
                                    MOLLIE KORNREICH
                                    Assistant United States Attorneys
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Tel: (212) 637-2769/3274
                                    E-mail: carly.weinreb@usdoj.gov
                                        mollie.kornreich@usdoj.gov