N765djcA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

N.J.C.V. and
G.C.,

                    Plaintiffs,              New York, N.Y.

          v.                                 20 CV 5747 (PAE)

UNITED STATES OF AMERICA,

                    Defendant.

------------------------------x

                                             July 6, 2023
                                             10:10 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                        U.S. District Judge


                         APPEARANCES


LATINOJUSTICE PRLDEF
     Attorneys for Plaintiffs
BY:  RAYZA GOLDSMITH
     MEENA OBERDICK
     GHITA SCHWARZ
        -and-
SETON HALL LAW SCHOOL CENTER FOR SOCIAL JUSTICE
BY:  BAHER AZMY


DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MOLLIE KORNREICH
     CARLY I. WEINREB
     JEFFREY S. OESTERICHER
     Assistant United States Attorneys

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

(Case called)

THE DEPUTY CLERK:  Counsel at the front table, please state your appearance for the record.

MS. OBERDICK:  Meena Oberdick for plaintiffs.

THE COURT:  Good morning.

MS. GOLDSMITH:  Good morning, your Honor.  Rayza Goldsmith on behalf of the plaintiffs.

THE COURT:  Good morning.

MS. SCHWARZ:  Good morning, your Honor.  Ghita Schwarz on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. AZMY:  Good morning.  Baher Azmy on behalf of plaintiffs.

THE COURT:  Good morning.  You may be seated.

MS. WEINREB:  Good morning, your Honor.  Carly Weinreb with the U.S. Attorney's office, on behalf of the government.

MS. KORNREICH:  Good morning, your Honor.  Mollie Kornreich for the United States.

THE COURT:  Good morning.

MR. OESTERICHER:  Good morning.  Jeff Oestericher, Assistant U.S. Attorney.

THE COURT:  You may be seated.  And good morning as well to the significant number of people in the gallery who are here to observe the argument in this important case.

Let me begin by complimenting counsel, as I think I

have before, on the excellence and thoroughness of the briefing in this case. The nature of litigation is that both sides can't win but the cause of justice is always advanced by having superb advocacy on both sides and I have been the consumer of that in this case and I want to thank you for it.

So, with that, we are here for oral argument on the open issue with respect to, quote unquote, the first period, and whether or not there is subject matter jurisdiction for it. I will be hearing from the plaintiffs first and then from the defendants. My understanding from my deputy is that Ms. Oberdick and Ms. Goldsmith will both be arguing, which is great. Do tell me, though, how you have allocated the argument, just so I have some expectation and can tailor questions accordingly.

MS. GOLDSMITH: Good morning, your Honor. Rayza Goldsmith. I will be arguing the facts as they relate to our client's separation and also the zero tolerance policy, and I will also be addressing the burden of proof. My colleague Ms. Oberdick will address the discretionary function exception as well as the government's new arguments with respect to the TVPRA and ICE, which includes the due care exception.

THE COURT: That's very helpful.

MS. GOLDSMITH: Yes.

THE COURT: I understand from the defense as well that both Ms. Weinreb and Ms. Kornreich will be arguing; is that

N765djcA

correct?

MS. WEINREB:  That is correct.

THE COURT:  How do you intend to divide the argument?

MS. WEINREB:  I am prepared to discuss the period of separation when they were in border patrol custody up until May 3, and my colleague is prepared to address, to the extent the Court has questions, the period after May 3 when they were in ICE custody, as well as the plaintiff's arguments regarding the best interests of the child and the legal standard.

THE COURT: OK.  Thank you.  That's very helpful.  The nature of your issue of dividing it along different lines and that's fine.  I think the nature of the questions is that there are any number that will straddle your categories so feel free, if I am addressing the question to the wrong person, to lateral to your colleague.

With that, I will hear from the plaintiffs.  Who will be going first?

MS. GOLDSMITH:  Your Honor, I will be going first.

THE COURT:  Ms. Goldsmith.

MS. GOLDSMITH:  Thank you, Judge.

Two years ago, the government asserted that G.C. was separated from his 19-month old son because of G.C.'s criminal history, citing to an e-mail request for separation that references G.C.'s misdemeanor conviction, but that e-mail wasn't enough and this Court ordered jurisdictional discovery

in order to probe at the question of why G.C. and D.J.C.V. were separated from one another on May 2, 2018.

Two years, 65,000 documents, and several depositions later, and the government still has no additional support for its contention that our clients were separated based on G.C.'s criminal history.  Instead, it is clear that our client's separation was based on the fact that G.C. was referred for prosecution even though he was never prosecuted.  Separation, based on prosecution referral alone, whether or not there was an actual prosecution, was the hallmark of the zero tolerance family separation policy.  Our client's separation was unconstitutional and this Court has jurisdiction.

So, your Honor, I will jump right in and talk a little bit about the evidence surrounding our client's separation. The government originally claimed our clients were separated based on G.C.'s criminal history but the evidence clearly establishes that the separation was based on G.C.'s referral for prosecution even though his prosecution was declined and even though his prosecution was declined as of May 1, 2018

THE COURT:  So just walking through the chronology, there is a referral that is based on the criminal history; correct?

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  And the timing gets very tight, if you will, during the window of time, essentially May 1 into May 2,

and as I understand it, and let me know if this is wrong, but essentially the sequence of events which plays out in rather short time is that there is a referral for prosecution, that there is thereafter an order directing the child, D.J.C.V., to an O&R placement.  The child is not immediately placed, the order is entered, and later on that same night, on May 1, the prosecution is declined, and early the next morning, at 10:53 a.m. the child D.J.C.V. is then booked out pursuant to the earlier order.  That much is undisputed, right, just as a matter of the chronology?

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  And it does not appear as if there is any record of anybody taking into account the intervening declination.

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  And putting aside later in action or later in attention to the circumstances of parent and child, one of the questions is how to think about that window of time where there isn't a documentary record and where it appears as if, for better or worse, everybody is asleep.  A, is that a fair way to frame the problem?  And B, if so, how do you analyze the silent record on that point as saying something?  How do you construe that as being attributable to the zero tolerance policy.

MS. GOLDSMITH:  Yes, your Honor.

N765djcA

So, first of all, I agree that that is an accurate way of describing what is going on.  Our contention is that the government, particularly U.S. Border Patrol, is asleep for that period of time.  I think your Honor has also used the word "autopilot" before and our contention is that the government was on autopilot during that 13-or-so-hour window after prosecution was declined.

THE COURT:  But just on that, was there a policy in place at the time -- put aside the zero tolerance policy, was there a policy in place that governed the fact pattern here of a referral that is turned away?  In other words, was there a policy that spoke to active reconsideration or was autopilot in practice, what happens when there isn't a policy?

MS. GOLDSMITH:  Yes, your Honor.  So, there was a policy in place that we are referring to as a reunification policy.  I'm not sure that it has an official name, however our contention is that that policy developed in lock-step with the zero tolerance policy.  That part of the project of separating families included an understanding from government actors involved in the crafting of this policy that once the pretext of prosecution expired, the pretext meaning the prosecution is the basis for the separation had expired, either because prosecution was declined or because someone was prosecuted very quickly, received a sentence of time-served and returned back to USBP custody before parent and child left U.S. Border Patrol

custody, that it was the government's understanding that it was required to reunify parent and child under those circumstances. And the plaintiffs point to some documentary evidence in the record that points to this policy. One sort of critical piece of evidence here, your Honor, is the fact, well, it is an e-mail that we cite to, I believe it is Exhibit 29 which is a March 1, 2018 e-mail that is a different separation request but in RGV, and it was March 1, 2018, and the agent on the border requests separation of parent and child based on parent's criminal history. In that case it was an immigration violation. Separation was approved. And then, approximately 14 hours later, which was the next day at that point, the agent apparently had received word that the prosecution was declined and this e-mail states that prosecutions were a no-go and asked what to do. And the deputy agent in charge responded and said if prosecutions are a no-go, reunite the family.

THE COURT:  So, in other words, there is a counter-example that, from your perspective, is on point, except for the intervening zero tolerance policy and therefore the zero tolerance policy, the inference follows, must explain the lack of even a reunification conversation here.

MS. GOLDSMITH:  Yes.  And I will just add that this is sort of one example but we also cite to additional evidence in our brief of e-mails and correspondence between higher level DHS officials who talk about the fact that they believe they

N765djcA

have no choice but to re-unify after prosecution is complete, given the fact that, again, prosecution is complete and so they have no choice.

THE COURT:  OK.  Suppose there had been no zero tolerance policy and you had this fact pattern.

MS. GOLDSMITH:  Yes.

THE COURT:  Presumably the natural inference would be the government simply dropped the ball; right?

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  And it is because the zero tolerance policy is percolating in this time period that you are asking that the inference be drawn that it wasn't really a matter of dropping the ball about thinking about reunification, but rather that the factors must have been informed by that background fact.

I just want to make sure I am understanding the reasoning process you are asking me to use.

MS. GOLDSMITH:  Yes.  So I think our understanding --

THE COURT:  I mean, there is no documentary evidence that points to the reunification policy as it relates to G.C. and D.J.C.V.

MS. GOLDSMITH:  Correct, your Honor.  There is no evidence that any government actor ever considered or decided not to reunify our clients after prosecution was declined.

THE COURT:  Right.  Right.  But, in other words,

N765djcA

ideally for you the record would have reflected some reference to the zero tolerance policy in or around this time period, or even later as a reason for the non-reunification.  You don't have that and therefore you are asking me to draw the inference that because it's the big picture context or atmosphere, that must, and because there had been contrary decisions before, that must have been the driver.

MS. GOLDSMITH:  Certainly I agree with that, your Honor, although I will just add that even if this Court doesn't believe that it is the zero tolerance that is informing our client's separation on May 2, 2018, it sort of goes without saying that if the reason that the two of them are being separated on May 1 and 2, 2018 is to refer G.C. for prosecution and their separation is necessary to facilitate his prosecution, if he no longer is going to be prosecuted and the government already knows that before both parent and child have left U.S. Border Patrol custody, you don't necessarily even need the zero tolerance policy to find that that reunification should have occurred.

THE COURT:  Sorry.  This lawsuit is about the zero tolerance policy.

MS. GOLDSMITH:  Yes.

THE COURT:  It hasn't been pled that there is some, that a lawsuit can be brought against the government for the misapplication of the policy that separates parent and child

N765djcA

where there is a criminal referral but you say not after a declination.  That is not what this case is about.

MS. GOLDSMITH:  Well --

THE COURT:  And it would raise an entirely different set of analyses which you have never asked me to undertake under, among others, that discretionary function and due care exceptions which would be suppose the government had a policy of separating people at the time of referral and a practice of reuniting them which it ignored in a particular case.  The question would then be, insofar as even negligent applications of a policy fall within the DFE -- the discretionary function exceptions -- by no clear means do you prevail on that but that's not what this case is about.

MS. GOLDSMITH:  Your Honor, I would respectfully disagree to the extent that we do make extensive arguments in our brief that regardless of what the Court finds with respect to the timeline of zero tolerance, that our clients were separated and our contention is that it was unconstitutional and that it was not lawful.  And so my colleague Ms. Oberdick will address the arguments with respect to the discretionary function exception but this case isn't simply about -- the reason we are here is because the Court wants to know the answer to the question of whether our clients were separated based on the zero tolerance policy or for some other policy to separate families based on criminal history.  Our argument is

that it is zero tolerance but in the alternative there is simply no evidence of a policy to separate based on criminal history.

THE COURT:  Put aside for a moment the zero tolerance and help me with your understanding of the framework, if you will beforehand, that governed the situation which there is an initial referral which would have driven separation, followed by a declination.  Is there a written policy somewhere that addresses reunification?

MS. GOLDSMITH:  So I guess just to make sure I understand your question correctly, when we talk about the framework that was in place, the question is really geared toward the reunification policy, not the overall policy of family separation at that time.

THE COURT:  Look.  There is clearly a policy, you would agree, to separate upon the referral for prosecution based on criminal history, right?

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  And suppose that had the prosecution been accepted it would follow then that the continued separation would have been pursuant to policy and exempt under the discretionary function exception.

MS. GOLDSMITH:  Only in -- well, I think there are two caveats to that.  Only insofar as both parent and child are not back in U.S. Border Patrol custody after prosecution is

N765djcA

complete is the first point; and then I think the second point is part of the plaintiffs' understanding of the zero tolerance policy and the family separations that were taking place between 2017 and 2018, is that they were unconstitutional not just because of the manner in which they were taking place but also because of discriminatory animus.  So there is also an argument that even if the prosecution, if we can show you that the prosecution is also sort of motivated by this discriminatory intent to criminalize Central American asylum seekers and separate them for the interim effect on them, then that is still another -- it sort of colors, I think, the picture of what happens after prosecution is complete.

THE COURT:  Well, all right.  Come back to the question I'm asking about.

MS. GOLDSMITH:  Yes.

THE COURT:  You would identify a counter-example in which a parent and child were reunified after a prosecutorial declination.  Did that follow from some written policy?  Was that the practice in fact but not pursuant to something in writing?  Where did that come from?

MS. GOLDSMITH:  Yes, your Honor.

So there isn't evidence of a written policy prior to May 1, 2018, which is the date of that e-mail, however there are sort of two pieces of evidence I want to direct the Court to.  The first is contained within the family separation

N765djcA

spreadsheet that was attached to the government's brief which is I believe ECF 89-1, and that includes a reunification spreadsheet with a whole list of families who were reunited based on the 48-hour rule.

THE COURT:  And G.C. is the second from the bottom -- tiny print -- the second from the bottom on the spreadsheet, right?

MS. GOLDSMITH:  On one of the pages of the spreadsheet; yes, your Honor.

THE COURT:  Yes.

MS. GOLDSMITH:  But then if the Court sort of flips beyond the family separation spreadsheet to the reunification section -- and again, this is what was attached to the government's filings -- there is reference, sort of repeated reference to reunifications based on the 48-hour rule.  So even though there were families who were referred to prosecution -- and again, this is after May 2, 2018 -- there is indication on the spreadsheet that families were being reunited based on the 48-hour rule.  Obviously this doesn't predate the March 1, 2018 e-mail I referred you to, but it is a suggestion of what the government felt its obligation was in the context of family separation.

THE COURT:  But it sounds as if you are deriving a, quote unquote, policy from the spreadsheet or you are backing it out of these decisions as opposed to pointing to even

N765djcA

informally some written directive.  I am trying to pin this down.  Does the reunification policy, is it written somewhere?

MS. GOLDSMITH:  Well, it is written in other e-mails I can also direct the Court to, including from high-level DHS officials, directing that we feel we have no choice but to reunite families.  There is not something that looks like a policy decision like a memorandum or something like that that conveys the policy I am referring to, but I will note that in Chief Hastings' interrogatory responses he indicates that policy could be conveyed in written form, in phone calls.  There was a lot of ways that policies were conveyed, even according to the government's witness, that would not necessarily come in written memorandum.

THE COURT:  Does the policy that dictates the separation upon the referral contain any termination provision? Does it say this is to last up until, for example, the point of a non-prosecution decision or is it essentially silent on that point?

MS. GOLDSMITH:  Your Honor, it's silent on that point. I will say that we are talking about the DHS referral policy that was issued on May 5, maybe be instituted May 7.  I don't believe there is any reference to a termination provision.  And when we are talking about the time frame between 2017 and May 5, 2018, which was the time frame in which our clients were separated, there was no written policy even confirming the

N765djcA

existence of a family separation policy even though we know that was happening.  So, no, there is no notation about termination.

THE COURT:  Let me come back then to the chronology.

So, there is this 13-hour window and then D.J.C.V. is sent east, in effect, notwithstanding the fact that his father's prosecution has been declined.  At what point does the record next affirmatively reflect some human being putting two and two together and contemplating whether the continued separation is justified?  When is there evidence of actual consideration?

MS. GOLDSMITH:  Your Honor, there is no evidence of actual consideration until September of 2018.

THE COURT:  OK.  So here is the challenge for you, and I want to ask you, you are the fact person so I want to put this to you straight on.  The dog that doesn't bark here is any reference to the zero tolerance policy.  This is a policy that was, for better or worse, being loudly trumpeted, so to speak, in Washington.  There is no reason why if that were a driver of some decision in connection with G.C. and D.J.C.V. you wouldn't expect it to appear even informally in some e-mail.  It is not like an antitrust price fixing conspiracy where nobody ever puts it in writing.  This was a directive from the president of the United States' attorney general.  And so, the question for you is why, throughout months of silence from May 1 through

N765djcA

September, where there is no reunification effort being undertaken, why is it right to infer from the lack of a reference to that, that that is actually what is driving things?  If some decision maker along the way thought that that was a reason to not reunify, why wouldn't they put it in writing?

MS. GOLDSMITH:  Yes.  So, I think that question goes to the heart of our argument here, which is what is the zero tolerance policy and how was it being implemented in the time frame heading up to May 5, 2018, or really April 6, 2018 and then again May 5 to 18.  It is very clear from what we know from the time, frankly, but also from the facts elicited in this case and Court decisions opining on the question of whether family separations from that time frame were driven by the zero tolerance policy that even though we are calling -- even though the zero tolerance policy memorandum was issued on April 6, 2018, and then the referral policy came on May 5, 2018, that now, in retrospect, we refer to that entire period from around July 2017 through June of 2018 as the zero tolerance policy because all of the government's efforts, from July 2017 through May 2018, were building up to an official policy announcement but it was instituting a policy of family separation that is identical to what it implemented later on.

THE COURT:  And does that mean that one should logically impute the policy as an impetus behind any family

separation during that period?

MS. GOLDSMITH:  Your Honor, I think under these facts, yes.  I believe there could be some hypothetical case in which the evidence is so clear that what was happening was different, but in our client's case what is happening was identical to what was happening to every other family that was being separated prior to the official announcement.

THE COURT:  Well, they all had fathers with assault criminal convictions?  I mean, no, that's just not true.  I mean, I appreciate what you are saying, which is that there were separations, but what distinguishes this case is that the father had a criminal conviction that put the prospect of prosecution in play enough that there was a referral.  To put it a little differently, supposing that the prosecutor referral had been granted, not declined, would you have an argument here that this case, in fact, was a product of the zero tolerance policy?

MS. GOLDSMITH:  Yes, your Honor.  And the reason for that is even though not everyone has an identical criminal conviction, what is clear is that the way in which the policy was being instituted from 2017 through May 5, 2018, was that the government was referencing criminal history and then making referrals based on reference to that criminal history, even if the criminal history wasn't an assault conviction.  And sometimes it is actually clear that when the government

references criminal history, it is actually referring to present conviction or present charges for immigration violations.

THE COURT:  OK, but in this case that's not G.C.'s lot.  He has got a normal, non-immigration background conviction.  How would a Court make the judgment, for example, within the universe of prosecutions that were accepted, which ones were influenced by the background zero tolerance policy and which ones were authentically driven by prosecutive motivations?

MS. GOLDSMITH:  So there are many family separation zero tolerance cases from across the country that have sort of probed at the question of what the zero tolerance policy looked like and it is clear that courts have found that even where there is a prosecution, that can still be considered part of the zero tolerance policy.  So, what distinguishes the zero tolerance family separation policy from some other hypothetical family separation policy is the fact that referral for prosecution was being used as the basis for separating families and it is clear that --

THE COURT:  That was referral for prosecution for the act of unlawful entry.  I'm asking you to focus on the subset where there is an underlying non-immigration offense that is the basis for the referral.  It would be, you know, illegal re-entry following -- I am asking you to focus on the subset

N765djcA

where there is a non-immigration crime in the background.

MS. GOLDSMITH: I understand, your Honor, and I am sorry, I will try to get to that point because I think I am providing some context but I think what was happening from October 2017 through, up until May 10, 2018, was that in every case the government was making a separation request and citing to some criminal history, and then in every case prosecution was being approved. There we actually deposed one watch commander who testified that he couldn't recall a single instance where he didn't approve a prosecution request.

THE COURT: You mean a prosecution referral.

MS. GOLDSMITH: Referral, request.

THE COURT: Giving the U.S. Attorney a call.

MS. GOLDSMITH: Right. Precisely, your Honor. And in fact, many people were prosecuted but also many people were not prosecuted. And a piece of really important documentary evidence here is the family separation spreadsheet. Again, the Court can refer to the government's submission or our Exhibit 18 which demonstrates that, first of all, the spreadsheet doesn't even begin tracking family separations until October 2017. So, the first time that the government ever tracked family separations as far as we could tell from all of the evidence put forth in this case, was October 2017, right at the height of the El Paso Family Separation Pilot Program. And in almost every case, the reason for separation is listed as

N765djcA

criminal history.  And so it's clear that in certain months there were more than a hundred families being separated based on criminal history, and when you look at G.C. and D.J.C.V.'s entry in the spreadsheet, it doesn't look any different than anyone else's entry in the spreadsheet.

THE COURT:  On May 1, the document, the first reference here in the record is the 9:31 a.m. separation request which says:  Request separation due to -- I don't know how this error had been made -- but mother having prior criminal history.  That's the first reference here.

MS. GOLDSMITH:  Yes.

THE COURT:  And your contention is essentially that if that's the original impetus that gets the separation started that is ultimately pretextual, that ultimately it is a product of the family separation policy -- of the zero tolerance policy.

MS. GOLDSMITH:  Yes, your Honor.  And to make that point we are relying on not just the spreadsheet, which demonstrates that their entry in the spreadsheet looks the same as everyone else who is being separated from that time period, but also all of the other examples that both plaintiffs and the government cite to in brief of other family separations taking place during that time.  The government cites to several examples of family separations that take place in the year leading up to the zero tolerance policy but no examples of

family separations based on referral for prosecution prior to 2017, and certainly no examples of any separation specifically for criminal history where there is no reference to prosecution whatsoever.

THE COURT:  OK.  Next there are e-mails later on from the watch commander and then the deputy agent in charge, Mr. Alvarado, and he basically says if the adult parent is -- he means to say amenable -- to prosecution due to criminal history, we would prosecute the adult and separate the family. I take it the premise there is that that, too, ought to be treated as either pretextual or as essentially an e-mail that would have been written but for the zero tolerance policy.

MS. GOLDSMITH:  Yes, your Honor.  There are two points to make about this particular line in the e-mail.  The first is that even in this e-mail referencing criminal history, there is still very explicit reference to prosecution.  And the second point that I would like to make is that we, referring to Chief Hastings' deposition transcript, every single time that he is asked to define "amenable to prosecution" it is clear that "amenable to prosecution" refers to every single person who crosses the border not as a port of entry.  It is not some term that is referring to prosecution priorities or some special category of immigration offenses --

THE COURT:  But the problem is the clause that is used by Alvarado who is the one who actually writes the e-mail

N765djcA

says -- I don't mean to change the word amicable to amenable --

MS. GOLDSMITH:  Yes.

THE COURT:  -- if the adult parent is amenable to prosecution due to criminal history.  I understand the scenario you are talking about but it wouldn't logically be described as capturing people due to criminal history as much as due to the border crossing.

MS. GOLDSMITH:  Yes, your Honor.  I mean, I think that the reference to criminal history, it kind of goes back to our pretext argument, it is a pretext, but it is clear that the government defined "amenable to prosecution" not based on whether someone had a prior criminal history or some other thing.  It is very clear from the deposition transcripts that "amenable to prosecution" means anyone who could be prosecuted for an immigration violation which includes anyone who doesn't have a prior criminal history, and in fact there is some evidence that there was a special focus on creating convictions for people who have no prior criminal history and that is part of the zero tolerance policy.

THE COURT:  Let me ask you one more question.  I then want to get to Ms. Oberdick on the important overlay -- I take it you are the law person, in effect, of how the law and exceptions fit here.

What does the record reflect about reunification and reassessment?  In other words, one of the challenging problems

N765djcA

in the case and one of the really troubling problems in the case is that nobody seems to be considering reunification, and I am really trying to get a sense of how G.C.'s and D.J.C.V.'s narrative compares and contrasts to others at the time including not just May 2 and May 3, but rolling all the way forward, basically through September.

MS. GOLDSMITH:  Yes.

So, looking specifically to that period between May 2 and May 3, it is our contention that the failure to reunify is part of what the zero tolerance policy was doing.  There were plenty of people who were not being reunified after prosecution was complete.  I actually believe that is Ms. C in the *Ms. L* case, she was not reunified immediately after prosecution was complete.  But, on the flipside, there was understanding among government officials that they should have been reunifying.

So, it feels like even though there is not a lot of evidence in this record about what happened to every other person who was separated during this time frame who has a similar 13-hour window, it does seem, based on the evidence, that this was sort of part of the development of the zero tolerance policy.

THE COURT:  I mean, are there numbers that bear out, for example, that as the zero tolerance policy is being introduced and implemented, the incidence of reunification for people who had been separated based on prosecutive referrals

drops?  Is there something contextually that supports the inference you are drawing, which is that the reason for the non-reunification here can fairly be said to be the policy, the zero tolerance policy.

MS. GOLDSMITH:  So the fact of the non-reunification as part of the zero tolerance policy?

THE COURT:  Yes.  Is there some statistical backdrop?  Is there something that supports the inference?

MS. GOLDSMITH:  There is no statistical backdrop, however there is clear evidence that government officials viewed the reunification of families who had been separated to be "a fiasco" and to undermine their efforts.  We cited to an exhibit, I believe it is Exhibit 25 but I can confirm momentarily, in which government officials are talking about the reunification of families in RGV who had been separated, had actually been prosecuted, and then were returned to U.S. Border Patrol custody before their children had left.  And in this e-mail one government official describes this practice in RGV and says what a fiasco, and another official writes back --

THE COURT:  Referring to the --

MS. GOLDSMITH:  The reunification.

THE COURT:  That the lack of reunification and the consequent suffering is a fiasco or something different?

MS. GOLDSMITH:  No.  The fact of the reunification.

THE COURT:  That that's a fiasco but it is in conflict

N765djcA

with the desires of the policy.

MS. GOLDSMITH:  Yes, your Honor.  And again, that is actually one of the e-mails in which one government official responds and says we feel we have no choice but to reunify under these circumstances, even though it was the understanding of several officials in this e-mail chain that it was both a fiasco and undermines the entire effort to be reunifying families once prosecution was complete.

THE COURT:  OK.  Thank you very much.  Very helpful. I have peppered you with questions.  If there is anything factually -- I understand you are master of the facts here from the front table -- is there anything factually that you want to amplify on that you haven't had a chance to?

MS. GOLDSMITH:  Your Honor, I will.  If possible, I would like to take maybe some time for rebuttal.

THE COURT:  I am not sure there will be time for rebuttal but if there is something you meant to drive home, you have the chance to do it now.

MS. GOLDSMITH:  So, with respect to the facts, no, there is nothing more I would like to speak to now.  I will note to the Court that I did indicate that I would handle the burden of proof, so to the extent that the Court has questions about the burden of proof?

THE COURT:  Very good.  I do have a question about that.

MS. GOLDSMITH:  Oh sure.

THE COURT:  The case law seems to say that in this context where jurisdictional discovery has been commissioned, the framework is a preponderance analysis.  Now, putting aside who has got the burden to prove that, do you agree with that much?

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  In other words, the issue, we are not at a pleading stage a plausible allegation, we are now getting into the facts, and nor are we at a summary judgment standard where the issue is whether a reasonable jury could find for either side.  The issue is simply whether it has been established by a preponderance and it is for me to make that fact finding.

MS. GOLDSMITH:  Yes, your Honor.

THE COURT:  So, who has got the burden?

MS. GOLDSMITH:  Your Honor, there is sort of two points here.  The government, clearly, has the burden.  I mean, there are several cases that we cited to in brief from the Second Circuit that note that even though the Second Circuit hasn't opined on this question, that other courts in the Circuit have applied or sort of stated that the burden is on the government.

THE COURT:  Because you have established the existence of the Federal Tort Claims Act which would waive sovereign immunity subject to an exception, it is therefore the

government's burden to prove that the exception applies.

MS. GOLDSMITH:  Correct, your Honor.  Both parties, I believe, cite to *Molchatsky*, which sort of discusses the same framework that we agree with which is that it is on the plaintiffs to allege the burden, it is on the government to then present facts to rebut the allegations, and then it is on the plaintiffs to plausibly rebut.  So --

THE COURT:  But, at the end of the day, if it is a -- let's suppose the burden -- I agree with you that -- suppose I find I agree with you that the burden is on the government to prove by a preponderance.  If, hypothetically, I were to find 60/40 that the government's perspective is the more persuasive, at the end of the day even though there is an argument in the plaintiffs' side, under that view, taking as a given that assessment, just hypothetical, then the government would prevail.  And by the same token, if the government prevailed, if I found 51/49, same answer; 50/50, though, you win.

MS. GOLDSMITH:  I believe I followed your Honor and that I do agree but maybe I will say this about the burden, if I can.

THE COURT:  Yes.

MS. GOLDSMITH:  We believe that we prevail regardless.

THE COURT:  I know.  I know.  I know.

MS. GOLDSMITH:  Both because we have rebut the one piece of evidence that the government had at the time that this

N765djcA

Court ordered jurisdictional discovery, which was the very same separation e-mail that we are standing here today talking about that references both prosecution and our client's criminal history.

THE COURT:  It is not about rebutting a particular e-mail, it is about looking holistically at the evidence or lack of evidence throughout.  And so, I appreciate that that is one way to put a problem looking at a particular e-mail, but at the end of the day there has been fulsome discovery, as you said, at the outset.

MS. GOLDSMITH:  Yes.

THE COURT:  My job, and I think you agree, is putting aside who has got the burden, I have to determine, applying a preponderance standard, whether the facts show that the zero tolerance policy was a driver of the separation or not.

MS. GOLDSMITH:  Your Honor, we agree with that.  I think that these are maybe two different ways of saying the same thing.

THE COURT:  Very good.  Thank you.  I will hear now from Ms. Oberdick, and for everyone's benefit, we will take a comfort break in between the plaintiff's argument and the defense argument.

Ms. Oberdick, let me begin with one framing question and then I will let you get going on the thrust of the argument.

N765djcA

Imagine that there was no zero tolerance policy, and imagine then that the same facts played out, but all of this is playing out in a world in which there is no zero tolerance policy and so, for whatever reason, the government does not engage with the issue of reunifying and therefore, for months, father and child are separated.  Putting aside whether it's within the four corners of this case as pled, would that fact pattern be within either of the exceptions that have been offered here or would that be an instance where the government would face tort liability?

MS. OBERDICK:  Just to make sure I understand your question, your Honor.

THE COURT:  Strip away the zero tolerance policy.

MS. OBERDICK:  Assume that the zero tolerance policy never existed.

THE COURT:  This all occurs in 2016, let's say.

MS. OBERDICK:  Otherwise the facts of our case is the same; is that correct?

THE COURT:  Yes.  They don't re-unify even though there was a declination.

MS. OBERDICK:  Yes, we believe under that circumstance, neither the discretionary function exemption or the due care exemption, would apply.  If the parent is separated because of a referral for prosecution, as soon as that prosecution is complete, there needs to be some effort to

N765djcA

reunify the family or there needs to be a separate individualized determination that continued separation is warranted.  This is the same logic from *Ms. L*, it is not necessarily limited to the zero tolerance policy.

THE COURT:  But *Ms. L* is an injunctive case.  The issue here is a tort liability case and so what you have just said may well be absolutely right in terms of a Court being asked to award declaratory relief, say, but as it relates to tort liability, why wouldn't this fall squarely within the concept under the discretionary function exception that the bungling of a policy, if we are still in that, is something that the discretionary function exception covers?

MS. OBERDICK:  Yes, your Honor.

Our position is that a separation based solely on a referral for prosecution where that prosecution is wholly unconsummated and no other justification is given, would violate the Constitution regardless of whether driven by the zero tolerance policy or pursuant to some other policy under any name.  There needs to be, in order to meet basic principles of due process, some compelling government interest, of why the separation is necessitated.  That could be an individualized determination about the safety and welfare of the child, it could be an individualized determination later on by ICE about the safety of family detention custody, or it could be the temporary need to make a parent unavailable in order to put the

parent through the criminal prosecution system.  But once that purpose is complete, the government needs to come forward with another justification to justify the continued separation. Otherwise, the separation is without lawful basis and the DFE would not apply because the DFE does not apply to unconstitutional actions.

THE COURT:  OK.  In this case, although it has been suggested I think by the government that G.C.'s criminal history bespoke a dangerousness such that, prosecuted or not, he couldn't be in a place with other children or whatnot.  From your perspective, this is a place in which the silence of the record helps you?

MS. OBERDICK:  Absolutely.

THE COURT:  In the sense that the government would love to have somebody saying, in mid-May, even if he is not being prosecuted, this guy has an assault conviction under facts that make it unimaginable for him to be with little children, but nobody says that and so --

MS. OBERDICK:  Correct.

THE COURT:   -- one would have to infer that a person in those shoes would have drawn that conclusion but there is no evidence that it was drawn.

MS. OBERDICK:  That's correct.  And the discretionary function exception does not apply to hypothetical fact patterns of what federal employees should have done, what they could

have done, or what they would have done if they had acted differently.  The government, in order to meet its burden, must point to some basis in the record to support the argument it is putting forward.  It has not done that.  Post hoc justifications are not to be entertained by courts, courts are not supposed to decide whether the DFE applies based on mere conjecture.  The government needs to point to some decision that was made and here the only decision that was made was a decision to separate our clients because of anticipated prosecution.

THE COURT:  But if, essentially, in a world where there isn't a zero tolerance policy said to be the impetus, but if it is a line official who blundered by not noticing that there had been a declination and therefore reassessing, how do you analyze that in terms of constitutionality?  It looks like a terrible bungle but at the same time it isn't driven by some of the considerations that you saw in my analysis of why, if driven by the zero tolerance policy, it would be well pled that there was a constitutional violation.  If the line official isn't attempting to achieve maximum deterrence or do some of the things that the zero tolerance policy purported to be trying to achieve and simply dropped the ball -- was just too busy, distracted by all the other chores in front of him or her -- why is that unconstitutional as opposed to deplorable?

MS. OBERDICK:  So, the DFE is highly contingent on the

N765djcA

specific facts of the case, so focusing on your use of the word a "bungle" --

THE COURT:  Yes.

MS. OBERDICK:  -- I think that would necessarily, under that fact alone, make the separation unconstitutional. You would look to other reasons, for instance a racially animus motive.  But focusing on the bungle, the reason why the DFE would not apply to that is because it would not be susceptible to policy analysis.

THE COURT:  If there is a policy that says we are separating people at the point of the criminal referral, and if there is not a written policy that says we are going to reunite them after the declination -- although in practice that sounds like it often happened -- and then a line official drops the ball, just isn't paying attention -- and when one reviews the facts that is what happened here -- what makes that unconstitutional such that the DFE doesn't apply?  Why isn't the narrative that says this was a misapplication of a policy by essentially continuing the separation but it is not countenanced by some -- there isn't some written policy that forbids it, it is just autopilot, why is that unconstitutional if that's the basis for saying the DFE doesn't apply?

MS. OBERDICK:  Any policy or practice of separating based on a parent's amenability to prosecution referral alone would be unconstitutional and unlawful.

THE COURT:  But suppose it is not a policy.  In other words, suppose -- I mean your colleague, Ms. Goldsmith, has said that there are examples of people being reunified.  If it is not a policy, it is just the person in the arena dropping the ball, why isn't the right way to look at that as being exactly the sort of negligence that is within the scope of either the DFE or the due care exception?

MS. OBERDICK:  Understood, your Honor.

So, assuming that there is no unconstitutional policy or practice in place that the policy is to prosecute a certain class of individuals and thereby separate the families, the analysis would be if after prosecution is complete and there is a delay in the reunification because agents simply dropped the ball, the proper analysis under that fact pattern would be similar to *Andrulonis* and *Coulthurst* which recognize that actions, due to inattentiveness or carelessness, are not susceptible to policy analysis.  So, I would look to that line of cases.

THE COURT:  Then you wind up with the due care issue.

MS. OBERDICK:  And the reason for that is because it is not a decision.  There has to be some action or omission, and simply going on a smoke break or forgetting to do something isn't an action that can be susceptible to policy analysis under the DFE.

THE COURT:  OK.  But then you have -- again, pursuing

this hypothetical and then we will get back to the zero tolerance policy -- on this hypothetical, why wouldn't the due care exception then apply if one assumes that what happened here was somebody just forgot about G.C. and D.J.C.V?

MS. OBERDICK:  The due care exception would not apply to that example because still there would be no statute or regulation that authorizes the separation.  And particularly under the facts you provided where there is, just so you know, an operational failure to consider the reunification, they dropped the ball.  Simply, that also likely wouldn't pass the Welch step II which requires that agents take some minimal scintilla of care and I think it would be hard to find that agents exercise dude care if they merely dropped the ball and didn't give any consideration for what was supposed to happen.

THE COURT:  Thank you.  That's helpful.  Let me put a flag on that.  Government, when the time comes for your argument, front and center I would like you to address that point.

Go ahead.

MS. OBERDICK:  Your Honor, I would like to address three reasons why the discretionary function exception does not apply in this case.  The first is that any exercise of prosecutorial discretion was complete when DOJ declined to prosecute G.C. on May 1, prior to separation on May 2.  So the government cannot point to any exercise of prosecutorial

N765djcA

discretion as giving it authority in this case.

THE COURT:  The order to separate precedes the declination, it is the implementation of it that by some 13 hours, I guess, postdates it.

MS. OBERDICK:  Yes.  That's correct.  We are not contesting that the government had discretion, assuming that there was no unconstitutional policy describing this -- unconstitutional policy aside, we are not contesting that they generally would have discretion to make prosecution priorities or referral of people for prosecution.

THE COURT:  So suppose the facts were a little bit different, which is that D.J.C.V. was, quote, booked out of the Rio Grande Valley CPC before the declination, in other words these events are taking place in a tight time frame, suppose those steps two and three are flipped, step one is the referral for prosecution, step two is the authorization -- sorry.  There is the referral for prosecution, the authorization of the separation, the declination, and then the removal of D.J.C.V.

MS. OBERDICK:  Right.

THE COURT:  Suppose that steps three and four are flipped so D.J.C.V., in effect, is booked out and sent east a few hours before the declination.  Would that change your analysis?

MS. OBERDICK:  No, that would not change our analysis, your Honor.  If G.C. was booked out before the declination,

N765djcA

what happens next --

THE COURT:  D.J.C.V.

MS. OBERDICK:  Sorry.  D.J.C.V.

THE COURT:  If the child was actually removed before the declination.

MS. OBERDICK:  No, that does not change our analysis because G.C. would still be available throughout the next day and a half regardless, so D.J.C.V. would not properly be classified as unaccompanied in that circumstance.

THE COURT:  Does that mean he is available because we are still in border patrol as opposed to ICE custody?  Is that the basis on which you are saying day and a half?  Because for five months he is separated.  Your argument might be it doesn't matter how far away the child has gotten, you have to bring the child back.

MS. OBERDICK:  Right.  To be unavailable within the meaning of the TVPRA has consistently been interpreted by courts consistent within the plain meaning of the statute to require physical or mental incapacity, to be physically unavailable or mentally unavailable to care for the child.  No Court and no -- the government cites to no support for its argument that a child can be unavailable who enters the United States with their parents and is detained alongside their parent.  To be unavailable would require a physical removal of the parent to prosecution going through the U.S. Marshal's

N765djcA

custody or being incarcerated, for example, in a county jail on an open warrant or being placed in a hospital for a surgery where the child cannot go.  But if the parent and child are detained together, or even if the parent is not -- has not gone through the criminal proceedings or has finished criminal proceedings and is merely back in civil ICE custody, courts have consistently held the parent is no longer unavailable and the government has to reunite or make an individualized determination that separation is warranted for another reason.

THE COURT:  So even if D.J.C.V. had been sent back to New York and was in New York at the time of the declination, as long as G.C. was not facing prosecution and as long as he hadn't been found, by virtue of his criminal record, to be unavailable or unable to be in the presence of a child, he was available and therefore, in effect, regardless of the sequence of events, liability attaches.

MS. OBERDICK:  That's exactly correct, your Honor; yes.

The government's arguments rely wholly on conclusory assertions and hypothetical justifications for what border patrol or ICE could have theoretically maybe decided but that's not how discretionary function exception applies.  They need to point to support in the record and the only decision we have evidence of in the record is it the decision to separate based on an anticipated prosecution.  That decision was completed and

declined as of 9:30 p.m. on May 1.  So, the only question left then is whether the government can put forth some other reason that the agents considered before May 2, before the separation occurred, that gives a valid basis for that separation.

THE COURT:  The government says that, by statute, in effect G.C.'s being held in custody was authorized.  Indeed, I think the government says mandatory for 90 days which takes you essentially through the end of July, July 30th I think.

MS. OBERDICK:  So a few points in regards to that.

Firstly, there is no evidence in the record that ICE makes any custody decision.  And, ICE could not, because G.C. was referred to ICE as a single adult, classified as a single adult on May 3.  There is no evidence in the record that ICE was even aware of D.J.C.V.  ICE was not given an opportunity to make any decisions regarding D.J.C.V.

THE COURT:  No, no, no.  But I think what the government is saying is that G.C., given his criminal record, was properly held in custody and therefore unavailable for 90 days.  That, essentially, is an operation of the statute as applied to G.C. regardless of how many children he had, he was going to be in custody for 90 days, and so slicing the chronology into different units the government says, in effect, from May 2 through July 30th, that period can't be the basis of a viable lawsuit here because G.C.'s criminal record statutorily put him in 90 days of inevitable custody.

MS. OBERDICK:  If I understand the government's argument correctly, the government has not argued that G.C.'s criminal history is what made him subject to mandatory detention.  The government is arguing that because G.C. was subject to a reinstated order of removal that that carried a period of 90-day mandatory detention.

THE COURT:  Correct.  My bad.

MS. OBERDICK:  Our response to that:  Well, it wasn't clear that G.C. was subject to mandatory detention at that time.  There was a Circuit split at the time in the Third Circuit and the Fifth Circuit had not decided that question.  Courts disagreed about whether a reinstated order of removal was discretionary or mandatory.  It was also not decided in the Second Circuit.  And if I believe correctly -- I don't have the case in front of me -- I believe the Second Circuit at that time had held that a reinstated order of removal does not carry mandatory detention, it is purely discretionary, but that was abrogated later on.

THE COURT:  As of today what is the answer to that question?

MS. OBERDICK:  ICE interprets it as mandatory detention today and the Supreme Court has agreed but that was not in place at the time G.C. was going to detention.

THE COURT:  And why is the Second Circuit's law the relevant precedent for the custody of G.C. who, at the time,

N765djcA

was in the southwest for the entire period.

MS. OBERDICK:  Our understanding is that some at some point he was referred to a correctional facility in New York.  I don't have the exact time frame in front of me.

THE COURT:  If we are talking about May 2 through the end of July, he is in the southwest.

MS. OBERDICK:  Correct.

THE COURT:  I assume it is the Ninth Circuit.

MS. OBERDICK:  Yes.  It is undecided, the question at that time, and we think that's neither here nor there regardless because that is outside the jurisdictional question.  The jurisdictional question is what drove the initial decision and ICE did not make an affirmative decision.  The entire arrangement about mandatory detention is hypothetical.  It assumes that if G.C. and D.J.C.V. had been referred to ICE ERO as a family unit, that ICE would have somehow separated the family because G.C. was separated subject to a reinstated order of removal but there is no evidence that that policy existed.

THE COURT:  So, the point is really a distinction between on the one hand the 12(b)(1) subject matter jurisdiction issue before us and, in theory, an issue of whether a damages action could lie which would be an element of the cause of action; right?  In other words, hypothetically, suppose you clear subject matter jurisdiction.  The government then comes back and says, as a matter of law, based on the law

as we now understand it, G.C. would have had to be in mandatory custody through July 30th and so this unit of time, even if you prevail at the subject matter jurisdictional stage, is eliminated from the damages analysis.  If I may, just because it is sitting right out there as a problem in the case, help me with that.  I mean, you have essentially moved the obstacle from jurisdiction to the damages element of the cause of action but it is still out there as an obstacle, isn't it?

MS. OBERDICK:  No.  We disagree, your Honor, because nothing about mandatory detention or a parent being subject to reinstated order of removal authorizes or necessitates family separation.  A person could be mandatorily detained in a family residential center -- and frequently was.  Prior to 2017 that was the general practice.  It is during the height of the use and expansion of family detention during the Obama administration families were routinely held for more than 90 days.  So I have a hard time seeing the correlation between mandatory detention and why that would be a justification for either an authorization over a requirement for family separation.

THE COURT:  Thank you.

May I ask you, we may be beyond the 12(b)(1), but on this thread, was a ICE facility at the time that would have been able to take D.J.C.V. and G.C.?

MS. OBERDICK:  We don't know the answer to that

N765djcA

question.  There is no evidence in the record for that. Throughout the course of this litigation both parties reasonably understood the jurisdictional question to be what drove the initial family separation; who are the decision makers, what policies were they acting under, and were those policies constitutional.

THE COURT:  Right.  If you clear the jurisdictional hurdle, this would be among the issues that would be reserved for merits discovery.

MS. OBERDICK:  That's correct, your Honor; yes.  What happens in ICE and once G.C. is in ICE custody is a matter of reunification.  As my colleague explained, the only evidence we have of an actual ICE decision regarding our client is a form notice of custody determination on September 10th.  That form notice doesn't provide any information about what ICE is basing that decision on so we would want to -- well, firstly, that would go more to the question of reunification and the extent of damages rather than to the jurisdictional question what drove the initial separation; but secondly, we just don't have enough information to understand what ICE was operating under, what its policies were, what its practices were.

THE COURT:  OK.  So, if Ms. Goldsmith's argument carries the day that by a preponderance, whichever way the burden goes, is I find that the zero tolerance policy informed the continued separation from May 2 on, there are several break

points in the chronology thereafter which present distinct questions. One follows the period after *Ms. L* insofar as this very case is carved out of *Ms. L* with a Court crediting the government's representation that G.C.'s criminal history mandated the separation. Given that finding by a Court, from whatever may have transpired beforehand, how can the period from that point forward be found to be outside of the discretionary function exception? I mean, you have got a Court order that essentially adopts the government's reasoning and whether the Court was right or wrong to do that. How does whatever causal chain that might have existed before not be broken.

MS. OBERDICK: Sure, your Honor. A few responses.

Our position is that a finding that the DFE does not apply in this case and that we can proceed with this case would be completely consistent with *Ms. L*. That is for three reasons. One is the difference in the litigation posture of *Ms. L* versus this case. *Ms. L* was largely about continued separation once individuals are in ICE custody. That is, *Ms. L* did not opine on the legality of an initial separation by border patrol and it did not have that information in front of it at that time.

THE COURT: And I understand that and I am not suggesting that *Ms. L* speaks retrospectively to the period before the *Ms. L* ruling.

MS. OBERDICK:  Right.

THE COURT:  What I am suggesting is that a Court, with specific attention to this parent and child, has effectively approved the continued separation on a criminal history/safety theory.  You can disagree with it, but given that there is a court order out there, why doesn't that effectively terminate the period at which it can be said that the continued separation has anything to do with the zero tolerance policy?

MS. OBERDICK:  Sure, your Honor.

Firstly, the carving out of G.C. was a class certification decision, and in that class certification decision the *Ms. L* Court explicitly recognized that it had limited information before it and that it was possible that additional information could come to light that could change the boundaries of that class.  That's point one.

Point two is that *Ms. L* itself did not adopt a categorical approach to criminal history.  I would like to point your Honor to a quote on page 10 of *Ms. L*'s class certification order which is Kornreich Exhibit 3 or ECF 193. That quote says:  Criminal history comes in all gradations, from minor misdemeanors to violent felony offenses.  Sometimes a criminal history would clearly justify separate detention of the parent while other criminal history might not and the exercise of governmental discretion to separately detain that individual might be challenged.  Whether such detention of such

parents violates substantive due process could raise individualized determinations.

So, *Ms. L*, I think, is improperly read to say that it completely forecloses the question of whether G.C. was rightfully continued to be separated from his son after *Ms. L.* I think *Ms. L* leaves open the possibility that as more evidence comes to light, it is possible that that detention was not authorized and our position is that it had no basis.

THE COURT:  In other words, *Ms. L* is not so much affirmatively blessing the separation of D.J.C.V. and G.C. so much as making a determination that drawing the parameters of the class to pick up G.C. with his criminal history would defeat, in effect, the predominance requirement for class certification.  It would inject individualized inquiries driven by the unique factual circumstances of its criminal history.

MS. OBERDICK:  That's correct, your Honor.  And I would add that I think *Ms. L* is helpful only to the merits question because the question was whether G.C. could be part of a reunification class and our position is that reunification and the steps that the government took or didn't take towards reunification, any delays that happened, any justifications that happened, that goes to merits, not the initial jurisdictional discovery question we have before us right now.

THE COURT:  Very helpful.  Let me come back to reunification because you have raised it and I want to pursue

with you, for just a moment, something I pursued with your colleague but I want to make sure I understand the plaintiffs' perspective.

What was it, from your perspective, independent of the zero tolerance policy that, mandated reunification upon a declination of prosecution?  Where did that come from?

MS. OBERDICK:  That comes from an understanding that there has to be a government justification for a separation. Prosecution happened to be the pretext that the government landed on.  They found that they would have the most supported legal basis if they could put people through the criminal processing system.  In absence of that, they knew they needed some other justification.  So if they can't find another justification based on an individualized determination of safety and welfare of the child or some other, a public safety concern, the only proper recourse they have is to reunify the family as soon as prosecution is complete.  Courts have consistently held that the parent is no longer unavailable, the government no longer has a justification to continue the separation, and the family must be reunified in the absence of some countervailing individualized determination.  We cite numerous cases in our response brief at pages 19 and 20 holding just that, and the government has purported no cases to support its position that a separation could continue indefinitely so long as there is a prosecution set into action.

THE COURT:  Got it.

I know that you had on your plate the TVPRA.  I wanted to give you a few minutes to turn to that before we take a break and turn to the government.

MS. OBERDICK:  Sure, your Honor.  I think we already touched on part of it but what I would add is -- I think we touched on part of it.  What I would add is that our argument is that there is no discretion to redefine an immigration law concept clearly put forth by Congress.  The government, in its brief says that, asserts that it has authority to designate and de-designate children as unaccompanied.  Courts have rejected that interpretation across the board and other family separation courts nationwide have found that the government has not put forth any justification how the TVPRA would authorize it to separate families or adopt a practice of separating families based solely on a prosecution referral alone.

THE COURT:  Very good.

MS. OBERDICK:  And if I can --

THE COURT:  Let me give you a minute or two to wrap up and then we need to take a break.

MS. OBERDICK:  Absolutely.

None of the justifications the government has given justify the decision to separate D.J.C.V. and G.C. on May 2.  They point to generalized prosecutorial discretion and ignore the fact that that prosecutorial discretion was complete as of

N765djcA

May 1.

THE COURT:  Which is why the first period, from your perspective, begins when it does.

MS. OBERDICK:  Correct.  That's correct, your Honor.

THE COURT:  In other words, had they been separated while the prosecutorial referral was pending, you wouldn't be making the same argument.  Your argument really depends on the discretion having -- the referral having been declined.

MS. OBERDICK:  We think that is dispositive in this case but we also would point the Court to other decisions where families were separated pursuant to zero tolerance and were prosecuted and that was still found unconstitutional because the separation was for unlawful reasons.  I think we cite to *AFP* in our case, that is an RGV case where a family was separated in January 2018 and the Court found it neither here nor there that the father was prosecuted in that case because the prosecution was pursuant to zero tolerance.

THE COURT:  Very good.

MS. OBERDICK:  And I would just like to point out that, based on the government's reasoning, that U.S. Border Patrol setting in motion a prosecution referral could somehow justify a later separation, it is inconsistent with the DFE and would have very illogical absurd consequences.  Under that logic, for instance, the U.S. Border Patrol could subject someone to a referral to prosecution, put the individual in a

van anticipating that they're going to be physically transported over to DOJ, and then, if an agent simply forgets about that person and leaves them handcuffed in a van for two days, under the government's logic, because that flows from a prosecution referral, that would be defended by the discretionary function exemption. That, clearly, can't be the case. There has to be an individualized assessment by the Court that the separation itself leads both prongs of *Berkovitz* and *Gaubert* and our position is the government has not provided that evidence at all.

THE COURT: Very good. We will take a 10-minute comfort break before I hear from the government. Thank you.

(Recess)

THE COURT: I will hear now from the government. Ms. Weinreb, I take it you will be taking the lead?

MS. WEINREB: Yes, your Honor.

THE COURT: People in the audience, please, no speaking during argument.

MS. WEINREB: The Court has asked the parties to answer one question during this period of jurisdictional discovery. The question is did plaintiffs' separation result from zero tolerance related policies or from the father's criminal history. If the separation resulted from zero tolerance policies, the Court has ruled in its prior motion to dismiss that the exceptions to the FTCA do not apply and the

N765djcA

Court has jurisdiction.  If, on the other hand, the separation resulted from G.C.'s criminal history, one or more of those exceptions apply and the Court does not have jurisdiction.

THE COURT:  Right, but the nuance arose in preparation for and certainly during the argument this morning, and the nuance really is as follows, which is:  Suppose the criminal history, to the exclusion of the zero tolerance policy, drove the prosecutorial referral, and suppose that after the declination the father and son were separated not because of the zero tolerance policy but because nobody paid any attention to the situation.  It raises a question of whether or not any of these exceptions would apply and I am interested in the government's perspective on that.

MS. WEINREB:  Yes, your Honor.

THE COURT:  I appreciate that it is different from the dichotomy that I set out in the prior decision that became clear to me based on the briefing which, contrary to what I had assumed, did not reflect continued attention to the criminal history in the period after the declination but appears to reflect radio silence.

MS. WEINREB:  Your Honor, we disagree with the characterization of what occurred here as autopilot or radio silence.  We do think that the evidence makes clear that the plaintiffs were separated because of the father's criminal history regardless of the prosecution and I will go through the

evidence that shows that.

THE COURT:  That would be very helpful but, in other words, just to be clear, what is on my mind as to that point, I certainly appreciate that the fountainhead decision of the original separation was based on the criminal referral.  There is documentary evidence that reflects that.  I understand plaintiffs argue that that, in turn, was infused by the zero tolerance policy, but the documentary record refers to the criminal history.  The issue is, post-declination, what does the record tell me about whether anybody was focused on the continued separation or what the drivers of it were.

MS. WEINREB:  Your Honor is correct that we do not have documentation specifically related to G.C., but what we do have, for example, is this family separation spreadsheet that plaintiffs' counsel discussed earlier.  That is a spreadsheet that was maintained by border patrol to track family separations that occurred in the RGV station, and the reason for that and the plaintiffs here relied on that and it clearly reflects the reason for the separation was the father's criminal history.  That was a spreadsheet that was not merely limited to prosecution referrals, there are many examples of families that were separated listed on that spreadsheet where the parent was not in fact prosecuted and yet a separation resulted.  And so, that could be consistent with RGV practices set forth in the Monique Grame declaration which is that

criminal history was both a reason to refer a person for prosecution and a reason to refer them for ICE secured detention, both of which require a separation if there is a child because children, by law, cannot be detained with parents in secure facilities, whether that is criminal or civil detention.

THE COURT:  So tell me.  I have got the spreadsheet and I take it it is document docket 189-1?  It is the one with the optician-level print and G.C. is the second to last entry, and at the end it indeed says, on the far right:  Father's criminal history.

MS. WEINREB:  That sounds right.

THE COURT:  What does the record reflect about the circumstances and timing under which this document was created?  How did the lines tend to get populated based on what type of data?  What information caused that to be noted, the column in which it is noted is called Additional Notes, for what it is worth.

MS. WEINREB:  The plaintiffs deposed watch commander Guerra as part of discovery and he testified that this spreadsheet was used to track family separations generally, and that reason column was manually entered by a border patrol agent, by supervisor, whoever was working on that particular case, that particular non-citizen at the time, and they would reflect, contemporaneously, the reason necessitating any family

separation and it could have been any number of things; it could have been criminal history, it could have been a fraudulent claim to family status, there could have been an imposter situation.  There are a lot of reasons why a family might have been separated.

THE COURT:  Right.  I mean there is -- I guess the reason column, which says parent's criminal history, and additional notes break it out as father's criminal history, does anything tell us whether or not that reflected an input after the declination or would that entry have been equally made upon the referral for criminal prosecution before the declination?

MS. WEINREB:  I don't believe the record indicates when that entry was input into the spreadsheet, whether it was before or after the declination.  We do know, though, that after the declination, a decision was made with respect to G.C., it wasn't simply autopilot.  Somebody, at some point, between May 1 at 9:30 p.m. and May 3 at 2:30 a.m., had to have looked at his file and made a decision of how to reprocess him given the prosecution declination.  That could have happened before or after D.J.C.V. left the facility.  Unfortunately, we don't have evidence in the record of when exactly that decision occurred but we know it did happen.

THE COURT:  Why?  How do we know that?

MS. WEINREB:  Because a decision was made, it was not

N765djcA

an automated process.

THE COURT:  Decision was made to do what?

MS. WEINREB:  To refer G.C. to ICE secure detention.

THE COURT:  And why does that say that a decision was made as to the separation of G.C. and D.J.C.V.?  In other words, I think plaintiffs' counsel says not everybody who is in ICE detention, for example, was separated from their child.  There were some facilities that permitted that.  Why does the decision to refer G.C. to ICE, why does that speak to the relevant decision here?

MS. WEINREB:  There were no facilities at that time that would have accepted G.C. and D.J.C.V. as a family given G.C.'s violent criminal history and there is, if you look at the Guadian declaration, paragraph 17, he explains at the time there was strict entry criteria at the detention centers and none of them would have accepted a family where the parent had a violent criminal history so that wasn't an option.

THE COURT:  OK.  So, let me make sure I am understanding the thrust of the argument here.  I think what you are saying to me is it is, in some sense, lost to history what the specific subjective thinking was of the actors here.  We have a spreadsheet that reflects father's criminal history and the facts on the ground say there wasn't a facility in ICE that would have accepted the two of them together.  Putting that together, the argument, is it is reasonable to infer that

a decision was made to send G.C. to ICE on account of his criminal history and therefore it naturally followed the separation was inevitable?  Am I accurately capturing the argument?

MS. WEINREB:  Yes, and I would only add to that that this separation referral, the way it occurred, was consistent with RGV's practices.  Chief Grame testified at her deposition and in the declaration that it was RGV sector's practice to refer people with criminal history to both prosecution and to ICE secure detention depending on the circumstances.

THE COURT:  In other words, does the record reflect that anyone who was referred for criminal prosecution was thereafter referred to ICE even if prosecution was declined?

MS. WEINREB:  It seems very likely in most cases. Chief Grame also testified that people, non-citizens with criminal history, were rarely released into the community absent extraordinary circumstances and that to do so, headquarters approval was required.  The record doesn't reflect that headquarters approval was sought in this case so the options for any non-citizen who had criminal history were either prosecution or referral to ICE detention and, in extraordinary circumstances release, which were not present here.

THE COURT:  Is there anything that reconstructs when this decision would have been or was made?  In other words, the

spreadsheet doesn't -- it reflects the date as being May 1 but that seems to be the date on which the intake occurred, not the -- I don't know.  You tell me.  I am trying to, understanding that there is a process of reconstruction here because there doesn't appear to be a percipient witness who remembers making the decision as to G.C., I am trying to figure out what rational inferences can be drawn.

MS. WEINREB:  We don't have specific documentation of when exactly the decision was made post-declination to refer G.C. to ICE detention, however we can deduce that it must have occurred sometime between May 1 at 9:30 p.m. and May 3 at 2:30 a.m.  Moreover, there is some indication in the record that it occurred on the evening of May 1.  After the declination there is an activity log that indicates processing complete of as, I believe, 9:50p.m.  We were not able to confirm what exactly that entry meant and so we have not affirmatively entered that as evidence, but there is some indication that it was considered around that time.

THE COURT:  And what is it about the father's criminal history that would have sent him to -- that would have required him being sent to ICE?  In other words, it is a misdemeanor, I appreciate it sounds like a more serious misdemeanor than misdemeanor, but it is a misdemeanor.  Was it written somewhere?  Was there some policy that delineated what types of criminal history led the adult to be referred to ICE or

transferred to ICE custody?

MS. WEINREB:  So this goes to the heart of our argument, that this was a discretionary determination by border patrol, taking into account a number of policy considerations such as public safety, which would be implicated by releasing a person with a violent criminal history into the community; safety of other detainees, which relates to the FRC criteria not accepting families with a parent with prior violent criminal history; and also enforcement and the prioritization of immigration law.  This was also a person who had two prior unlawful entries, this was his third, and prior orders of removal.

THE COURT:  Look, I appreciate your martialing the argument yourself but the problem I guess is that it is not known whether somebody actually went through this exercise, is it.

MS. WEINREB:  Well, somebody had to have gone through this exercise during that time period because it is not an automatic process.  After a prosecution is declined, somebody has to go into the file and make a new decision as to what to do with G.C.  So, someone did it.  Unfortunately, we don't have documentation of who does it or when or the reasoning that went into it, but we would submit that is not relevant for the Court's inquiry because, under the discretionary function exception, you don't look behind the curtain.  The question is

the nature of the action, is it susceptible to policy analysis, you don't review the discretion actually exercised.

THE COURT:  Are there examples of the discretionary decision coming out the other way for a parent with a criminal history, i.e., not being referred to ICE and being reunified?

MS. WEINREB:  I'm not recalling an example where, at the moment, where the parent had a criminal history but I do know that plaintiff's counsel mentioned some other examples.  I don't know if those examples were people who only had Section 1325 violations or also additional prior criminal history.  They brought up examples of situations where prosecution either was declined or time-served and then came back to the border patrol station and were reunified and that is also consistent with border patrol policy.

THE COURT:  Those were people without a criminal history.

MS. WEINREB:  They may have been, I don't know.

THE COURT:  But in the universe of people who were referred for prosecution, the plaintiffs' positive scenario under which, essentially, ones referred for criminal prosecution, there was not any actual examination after the declination of whether the parent and child needed to be separated.  Your chart reflects a number of people who, based on "criminal history" were, in fact, separated.  What is not reflected here -- it logically wouldn't be on this chart but it

might be elsewhere -- is the counter-example of somebody with a criminal history where prosecution was declined where the people were reunited.  The reason that may matter is because if there isn't a counter-example, the scenario arises in which nobody is exercising discretion but, rather, as a matter of autopilot, somebody is automatically saying criminal history, send to ICE to separate.

MS. WEINREB:  Plaintiffs are inviting the Court to look behind the curtain and to evaluate the particular reasoning and the particular factors that were considered into any individual separation decision which, we submit, is not appropriate.

THE COURT:  Suppose there is nobody behind the curtain, it is the Wizard of Oz, there is nobody behind the curtain, it is automatic that somebody writes "criminal history" where there has been a referral.

MS. WEINREB:  According to the statute, the DOP applies even if discretion is abused or even in the failure to exercise discretion.  According to the *Coulthurst* decision by the Second Circuit, the only circumstances that don't follow within the DFE or where there is evidence of laziness or carelessness and inattentiveness, and there is no evidence of that here.  I think your Honor gave the example of someone going on a smoke break, or something, that had no policy justification whatsoever.  There is no evidence in the record

N765djcA

that anything like that happened here.  In fact, all decisions were made with respect to these plaintiffs within less than a 48-hour period of their apprehension.

THE COURT:  In other words, the decision is demonstrably made.  The inputs and whether there was realistically any possibility of any other answer emerging are opaque.  But you are saying at least we know that a decision was taken because an action followed from it.

MS. WEINREB:  Yes.

THE COURT:  And there is the May 1 notation.  You are covering just up through May 3, right?

MS. WEINREB:  Correct.

THE COURT:  I don't know whether it is proper to ask you then or Ms. Kornreich the question, but what about the 90-day period, if you will?  In other words, I understood the government to be making the argument that there was something inevitable about the separation of the two for 90 days that simply flowed from G.C.'s criminal history.  Can you unpack that and why it is, in fact, inevitable?

MS. WEINREB:  I can answer that question and my colleague is also prepared to answer that question, but being as I am currently speaking --

THE COURT:  That period straddles the two time periods that you each are prepared to address.

MS. WEINREB:  Yes.  So there is, by statute, a 90-day

removal period upon the reinstatement of an order of removal. The government's position -- the statute clearly uses the "shall" language which is a mandatory-type language.  The government's position is, nevertheless, DHS retained law enforcement discretion whether to exercise that authority that is granted to them by statute.  We still believe that the DCE looks at the language of the statute which, here, is mandatory in terms of how it is written but the government's position is that we do retain prosecutorial or law enforcement discretion to release given individual circumstances.

THE COURT:  Sorry, but the status, the policy itself, read literally, would have required G.C., you are saying, to have been what?

MS. WEINREB:  I'm sorry.  Which policy?

THE COURT:  Explain to me, there is a 90-day period under which I understood the government to be saying, in effect, G.C. had to be detained under circumstances away from D.J.C.V.  I understood you to be saying that as somebody whose order of removal was renewed, if that's the right word, that was required.  Can you unpack why you say that is so?

MS. WEINREB:  Yes.

So that stems from the *Flores* agreement which requires minors to be housed in licensed, non-secure facilities.  ICE detention is a secure facility so they're not eligible to be detained there absent certain circumstances which aren't

present here such as violent history of a child.  That's clearly not the case here.

THE COURT:  I see.  And so, supposing that the statute was mandatory and ICE did not have the discretion to make exceptions, reading the word literally as "shall" and assuming that ICE would be abusing its discretion to do anything else, your argument is that ICE comported with its statutory obligation here because it sent G.C. to a secure ICE facility; correct?

MS. WEINREB:  Yes.  To the extent that G.C. was in secure detention, D.J.C.V. couldn't be with him there.

THE COURT:  So why is it important to your argument to convince me that ICE had the discretion to not do that?

MS. WEINREB:  ICE had the discretion not to detain G.C. for that 90-day period if they determined that the circumstances warranted.  I just wanted to make that clear for Court given the question earlier.

THE COURT:  Look, I appreciate your clarifying it but as it relates to the legal analysis applicable here, if there was a mandatory statute that from your perspective required that G.C. be in an ICE facility for the 90 days that more or less span May 2 through July 30, which exception is triggered then by that?  Is it due care?  Is it discretionary function if it is in fact mandatory language?  Or is it?

MS. WEINREB:  If the detention of G.C. during the 90

N765djcA

days is in fact mandatory?

THE COURT:  Yes.

MS. WEINREB:  Then that would be the due care exception.

THE COURT:  That's what I thought you would say.  I had thought by telling me that, in point of fact, contrary to the statutory language, ICE views itself as having the ability to disregard the statute.  I thought there was some way you were trying to bring to bear the discretionary function exception.  Is that what you were trying to do or merely clarifying that, for better or worse, ICE reads "shall" as "may".

MS. WEINREB:  Yes, your Honor.  To the extent that the statute is not interpreted as mandatory or isn't executed as mandatory practice to the extent that the Court determines that DFE is not applicable, in the alternative we would submit that the DFE is still applicable because ICE would have exercised its discretion to detain him in that period.

THE COURT:  Whether read literally or ready as you say as ICE reads it, you say it leads it one of the exceptions.

MS. WEINREB:  Yes.

THE COURT:  What about plaintiff's argument that in practice there were ways in which aliens with a criminal record, nevertheless, were able to be housed with their children?

N765djcA

MS. WEINREB:  So there is no evidence for that.  I believe that plaintiffs cited to a declaration from the *Ms. L* case in support of that and that declaration only cites two examples of families where the father had either a charge or a conviction for drunk driving, so it didn't even assert that there was a conviction for either of those families and drunk driving is much different than a violent aggravated assault conviction.

THE COURT:  Anything else you want to say about what the record reflects about motivations or policies being implemented, the drivers of the decision up through May 3?

MS. WEINREB:  Yes.  Briefly, your Honor.

I think we have gone through the evidence showing that the separation was due to criminal history and I would also like to briefly point out that there is no evidence showing that it was pursuant to zero tolerance policies, which that relates to the Jeff Sessions memo of April 6 of 2018, or the subsequent DHS referral policy which was issued on May 4 of 2018 and didn't go into effect in RGV sector until May 7.

THE COURT:  Notwithstanding the policy going into effect the plaintiffs are right, are they not, that the policy, as rolled out by the attorney general, was a matter of knowledge long beforehand?

MS. WEINREB:  The plaintiffs are correct that various policy actions were under consideration but there is no

evidence that there was any implementation of a policy like that in RGV sector.  Prior to May 7 they point to other sectors and other initiatives, there is no nexus to our sector here or to plaintiffs.

THE COURT:  When does the family separation worksheet begin to be kept?

MS. WEINREB:  If I recall correctly, October 2017.

THE COURT:  Why did it start then?

MS. WEINREB:  I do not know.  The witnesses also could not recall.

THE COURT:  Is it an inference that the timing of that, the beginning of tracking, that is a reflection of, if you will, rollout of the policy?  Look, we are talking about circumstantial inferences but if it is the case that the family separation worksheet didn't exist beforehand, before October of 2017, isn't it a fair inference that it's because the whole issue of family separations was front burner as a result of the policy in a way that it hadn't been before?

MS. WEINREB:  I don't think, your Honor, that the decision to begin keeping data on family separations necessarily indicates anything about the implementation of a zero tolerance policy at that time and if you look, over time on the spreadsheet, you will see that the number of separations after May 10, 2018 significantly increases showing that there was in fact a change in RGV sector after the DHS referral

N765djcA

policy was implemented.  So, if it had been previously implemented, you would expect to see not much change but there is a very distinct difference.

THE COURT:  Beginning on May 10 there are many references under reason for zero tolerance.

MS. WEINREB:  Yes.

THE COURT:  What would be the typical fact pattern that would be implicated by an alien as to whom the reason says zero tolerance?

MS. WEINREB:  Well, the zero tolerance policy -- so, the DOJ zero tolerance policy directed U.S. Attorneys' offices to prosecute non-citizens for illegal entry under Section 1325 regardless of any prior criminal history and regardless of family status.  The subsequent DHS referral policy was exactly that, a referral policy that DHS would refer individuals that qualified for prosecution under the zero tolerance policy to the U.S. Attorney's office who would then make the decision whether or not to go forward or not.

THE COURT:  So, there are several different striations of zero tolerance on the chart.  Some simply say zero tolerance, some say father zero tolerance, and some say criminal hist/zero tolerance, or reversed, zero tolerance/criminal history.  Can you explain what those separately denote?

MS. WEINREB:  I suspect it reflects the different

N765djcA

agents who were inputting the information because it was a manual spreadsheet.

THE COURT:  But why would you write down "criminal history/zero tolerance" in some situations and "zero tolerance" alone in others?  Is it because where there is a criminal history and zero tolerance those were joint, whereas zero tolerance reflected only the policy and not an alien with a criminal history?

MS. WEINREB:  It is likely because in RGV vector, due to human resource limitations, the zero tolerance and DHS referral policies were never fully implemented so the goal under those policies or the stated goal was to achieve a hundred percent prosecution referrals for unlawful entries. That simply wasn't possible due to resource limitations and due to limits set by the U.S. Attorney's office and how many prosecutions they could accept per day.  So until a hundred percent could be achieved, RGV had to prioritize who to refer for prosecution notwithstanding the DHS referral policy and criminal history continued to be one of those factors to prioritize those non-citizen for criminal prosecution.

THE COURT:  Can any inference be drawn in your favor from the fact that the words "zero tolerance" begins to pop up on this form around May 10, either alone or in conjunction with criminal history and not before?

MS. WEINREB:  Yes.  It shows that that policy was not

N765djcA

in effect prior to that date and plaintiffs had already been separated and left border patrol custody a week prior.

THE COURT:  Thank you.

Anything else you wanted to add as to the period you are focusing on?

MS. WEINREB:  I don't believe so, your Honor.  Thank you.

THE COURT:  Thank you.

So I will hear now from Ms. Kornreich.  You have got the period from May 3 on.

MS. KORNREICH:  Yes, your Honor.

THE COURT:  Let me just begin with this.  When is the next documentation that refers to G.C. and D.J.C.V. after May 3?

MS. KORNREICH:  Well, if your Honor means with respect to an analysis of whether G.C. should continue to be detained or whether they should be reunified, the next -- there are two things that happened around the same time.  One is on September 6, 2018, in the *Ms. L* case, the plaintiffs in that case informed the Court that they intended to request that that court order the reunification of G.C. and D.J.C.V. and that issue, with respect to these particular plaintiffs, was then briefed and the Court's decision, as your Honor is aware in 2018.

THE COURT:  But prior to *Ms. L*, fair to say that from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N765djcA

May 3, or let's say May 4 on, just for clarity, through the first time that this father and child are referenced in *Ms. L*, there is really no paperwork, there is no record of anybody engaging with this issue?

MS. KORNREICH:  With the particular issue of reunification, no.  With respect to particularly addressing the reunification of plaintiffs, no.  With respect to other aspects of G.C.'s immigration processing, there was a reasonable fear interview, I believe it was on August 23, and then after that he was referred for withholding only proceedings, and then of course ultimately received a bond hearing.

THE COURT:  So from May 2 through July 30, the government's position is that G.C. had to be detained in ICE, and the ICE facilities in which he had to be held would not have been amenable to an infant.

MS. KORNREICH:  Right.  So, as my colleague Ms. Weinreb said, the agency's position is that they had the discretion to release him if there had been reason to do so but he was held under that --

THE COURT:  They had the discussion because they read the statutory word "shall" as "may".

MS. KORNREICH:  Correct. And just for the Court's reference, this is addressed in footnote 16 of our initial brief in this case and that lays out the agency's position on this.

THE COURT:  OK.  Be that as it may, after July 30, the statute is no longer compelling the detention.  What happened?  Walk me through what the facts reflect as to his detention and the continued separation.  Is somebody requesting a bond hearing?  Is a bond hearing supposed to be provided as a matter of course after the 90 days?  What is going on with that?

MS. KORNREICH:  So at that time he was being held depending on -- well, so under the statute, under 8 U.S.C. 1231 after the expiration of the 90 days, the agency has discretion to continue his detention.  The first documentation we see with respect to any analysis for continuing that detention is a September 10 determination on his continued custody.  My understanding is that that's just standard procedure.  So what also happened, though, simultaneously, is because he was being held in the Second Circuit at the time he had his reasonable fear interview -- and I believe this is what Ms. Oberdick was referencing earlier -- the law in the Second Circuit at that time was that once, following the reasonable fear interview, someone entered withholding only proceedings, they were no longer being held under 8 U.S.C. 1231 under which they're not entitled to to receive a bond hearing but they would have then been held under --

THE COURT:  1226.

MS. KORNREICH:  -- 1226, correct; which requires a bond hearing and that is why he ultimately received a bond

N765djcA

hearing in early October.  Again, my understanding, from the agency that -- this is not in the record, I don't think, before the Court -- is that that's not atypical.

THE COURT:  Did the bond hearing, did D.J.C.V.'s existence play any role in the bond hearing?

MS. KORNREICH:  Not to my knowledge.  It is not reflected in the record.  The considerations that I believe are generally considered by the agency are at 8 C.F.R. Section 241.4(e) and (f), and they go to matters such as the criminal conduct and nature and severity of prior convictions, of public safety, prior immigration history, and I believe though it doesn't go into that level of detail the Guadian declaration talks about, at high level, about how the immigration records and criminal history would have been considered in G.C.'s ongoing detention.

THE COURT:  So stepping back, is there any change in the pattern of separations that we see in the period you are talking about from May 4 on, relative to the period before the policy, the zero tolerance policy had been rolled out?  I mean, the plaintiffs' argument is essentially a circumstantial one but an understandable one which is the 800-pound guerilla at the time is the zero tolerance policy which is widely known of by all the players in the area.  Is there any difference in the pattern of separations of people, who present like G.C., from their children?

N765djcA

MS. KORNREICH:  So, with respect to what occurs after May 3, I believe it is clear and I believe it is actually in the joint statement of fact so I don't have it in front of me, that the zero tolerance policy and then the subsequent DHS referral policy, the zero tolerance policy was directed to the Department of Justice, and then the DHS referral policy reflected border patrol's practices.  That is the prosecution referral policy that everyone keeps referring to and any practice of separating around that prosecution referral so that was all happening at border patrol during the zero tolerance time and neither impacted ICE except to the extent ICE had to make accommodations for additional bed space, that type of thing until, and of course this is a very important caveat, you get to *Ms. L* which happens pretty quickly after the DHS referral policy.  So, by late June you have the *Ms. L* injunction, which has directed a number of agencies to, including ICE, to reunify.

THE COURT:  What does *Ms. L* do with respect to people, parents with a criminal history?  I know that G.C. and D.J.C.V. get excluded specifically but where is the line drawn within the parent who has a criminal history?

MS. KORNREICH:  So *Ms. L* is very clear about this in a number of decisions.  So, as an initial matter, I think we talk about it in our briefs, non-citizens' criminal history are excluded from the *Ms. L* class and that is something that

N765djcA

plaintiffs in that case tried to challenge in different ways over time.  And I would suggest, actually, that the Court look at the *Ms. L* decision not from June of 2018, although that is also I think useful in this context, but from January of 2020, which addressed, in broad strokes, how -- and again this is from 2020, this is significantly after the period we are talking about -- how the agencies are constitutionally required to address folks with criminal history.  And *Ms. L*, of course, had ordered the reunification back in 2018 under certain circumstances, said a number of interesting things.  The issue addressed in that opinion was -- I am paraphrasing -- it says defendants have continued to separate parents and children crossing the border, and then it lists certain circumstances in which that continued to happen, one of which was where a parent has a criminal history and that was something plaintiffs were challenging there.  And the Court noted that unlike a situation where a child is removed from a home by social services, this is a situation where there are national security concerns, immigration and criminal law enforcement concerns, concerns about detaining or paroling into the community families and children without lawful status in the U.S. and the headline is that the Court -- and I will read now from the opinion -- the Court says:  The Court again agrees with defendants that parents may be excluded from the class based on any criminal history and not just criminal history that bears on a parent's

fitness or danger.  Now, of course, G.C. actually did have a criminal history that beared on dangers.  And the Court explains the defendants need to be able to be able to use criminal history as an objective metric not only to assess the parent's fitness and danger to the child, but also risk of flight, danger to others, and suitability for release in the community or placement in an FRC with other families.  And, of course, all of that comes into play in this case where we are actually talking about a specific plaintiff who had a domestic violence conviction?

THE COURT:  Look, I appreciate that if you were making the argument to a decider in terms of an actual hearing in the individual case you would be emphasizing that, but is there any record evidence at any stage that anyone actually considered the details of G.C.'s criminal record in making any determination about him?

MS. KORNREICH:  I think there are a number of places in the record where his criminal history drove the decision either explicitly or we know just from the standards of what would have been considered.  So, for example, I mean going back to the border patrol, we know initially the e-mail requesting separation says it is based on his criminal history.

THE COURT:  Was based on the referral which was based on the criminal history.

MS. KORNREICH:  Yes.  That's right.  But the referral

N765djcA

was based on his criminal history, that is explicitly the reason --

THE COURT:  Right, but you just made an argument that this guy was dangerous, that he has got a domestic violence offense, and I am trying to figure out how much of this is your making an argument that might have been made back in the day but we don't know if it was and how much of it is actually reflected as having driven an argument or a decision in real-time.

MS. KORNREICH:  So the reality is that the border patrol agents making these decisions, and subsequently folks at ICE, are not courts, they're not writing, in some instances, for each decision, long explanations but we know a couple things.  We know that as a matter of practice they considered records in which his criminal history was reflected and we note that it was their standard practice to consider that history in making these determinations.  So, unfortunately, there is -- I think there is clear evidence that they again referred on the basis of his criminal history, they said we are aware of this, this is why we are referring for prosecution.  There is evidence, subsequently, that the agent's practice would have been to consider that criminal history in determining his continued detention after the 90-day period and there is certainly evidence in all the submissions to *Ms. L* in September of 2018 that there was a close look given and the standard that

N765djcA

the *Ms. L* Court was using at that time was whether a parent was unfit or presented a danger to the child so the briefing was really around that standard.

So, even if the other documents I mentioned previously aren't in-depth enough considerations, you know, really analyzing whether he presented a danger, certainly the briefing in the *Ms. L* case would have.

THE COURT:  Couple of more questions from the period you are focused on, one involves *Ms. L*.  Plaintiff's counsel says that *Ms. L* is properly read really as a class cert decision as opposed to a decision based on a close factual review in this case that affirmatively justified the separation.  Isn't that right?

MS. KORNREICH:  The *Ms. L* case has a lot of opinions and certainly was a class action.  There was a class cert opinion, there was also an opinion on the preliminary injunction, there is also an opinion on the motion to dismiss. And what all of these have in common is some effort to determine the degree to which what happened here was unconstitutional or within the scope of the DFE, and around that question the *Ms. L* Court I think consistently was very clear that on facts like the one in this case, plaintiffs would not have been alleging an unconstitutional scenario such that the DFE would not apply.

THE COURT:  Was the decision -- G.C. is not within the

scope of the preliminary injunction; right?

MS. KORNREICH:  Correct.

THE COURT:  Was that because he was not within the scope of the certified class?  Or something else?

MS. KORNREICH:  So, he was not within the scope of the certified class but that was inseparable from the question of why the class was defined the way it was.

THE COURT:  But it wasn't that the *Ms. L* Court was saying, of necessity, anybody who has got any form of a criminal history can be separated from a child.  The *Ms. L* class was saying there is an individualized determination including into the criminal history that would make a class, including such a person, unsustainable.  And so, the issue is whether you can get any affirmative mileage out of *Ms. L* or more that *Ms. L* does no damage to you.

MS. KORNREICH:  So at a bare minimum it does no damage but I think the *Ms. L* Court is, first of all, clear in the decision addressing specifically the plaintiffs' in that case desire to have reunification of these particular plaintiffs ordered by that Court.  And it was not a question of whether -- at least it wasn't framed as a question of whether they joined the class, it was framed as a request to have the Court order the reunification of these people.

THE COURT:  The Court wasn't saying G.C. ought to be maintained separately as an original matter of analysis.  The

Court was saying I'm not going there, I'm not going to evaluate the specifics of G.C.'s circumstances, I am really dealing with a lawsuit that I am defining to not be about people with criminal history.

MS. KORNREICH:  Right.  What the Court said was that this was properly within the agency's discretion and, again, in context, that's in a case where the whole question is:  Is what border patrol and ICE doing unconstitutional?  And in that context the plaintiffs in that case said what is going on here with G.C. and D.J.C.V. is unconstitutional and the Court said I'm not going to make that determination.  And again, I have a quote here from that decision that the Court said the record indicates that defendants have vetted these parents in good faith and made the principal decision in light of their criminal history and overarching concerns regarding safety of their children and the public.

THE COURT:  That, in turn, is based on a declaration from the government as opposed to an adversarial evidentiary process, right?  All of which is by way of the Court ruled on what was before it, I have something more before me and I am not bound by that characterization by the Court of the facts.

MS. KORNREICH:  I don't know that this Court is bound by it but I do think -- and I don't believe that the Court in *Ms. L* making that decision heard testimony.  There was, in the submissions, a number of declarations and both sides submitted

N765djcA

briefs.  I believe G.C.'s counsel, for example, submitted a brief -- excuse me -- a declaration to the Court so there were facts before the Court.

THE COURT:  OK.

MS. KORNREICH:  But I don't believe that the Court held a formal hearing.

THE COURT:  The next question is I am trying to unpack what creates the eventual reunification of G.C. and D.J.C.V. As I understand it, it ultimately flows from the bond hearing at which G.C. succeeds, and once G.C. succeeds at the bond hearing it becomes a matter of time before he can be reunited with D.J.C.V.; correct?

MS. KORNREICH:  Yes.  That's right.

THE COURT:  Is there any evidence that bears on any internal agency deliberations or anything involving when the bond hearing was given?  If the bond hearing is ultimately what unlocks the door, does the record say anything about the timing of the bond hearing?

MS. KORNREICH:  No, except as I mentioned because I'm not sure that this is explicit anywhere in the record, but because of Second Circuit law at the time, my understanding is it was triggered by G.C. being put in withholding only proceedings and then it just took a number of weeks to actually have the bond hearing occur.

THE COURT:  In your discovery, have you found

N765djcA

anything, any circumstantial evidence that supports that the existence of the zero tolerance policy infused the decision making of any decision-maker at any stage in the period you are covering with respect to D.J.C.V. and G.C.?

MS. KORNREICH:  Not that I am aware of except that I actually think they received more consideration than they might have otherwise in the normal course because of the *Ms. L* --

THE COURT:  Because of the *Ms. L.*

MS. KORNREICH:  -- because of the *Ms. L* request.  So, my understanding is that in the normal course, if someone is in immigration detention and they received appropriate process and they are, as a result of that, in secure adult ICRO detention, there aren't points of determination beyond what we have already discussed where someone would consider a potential reunification with their family but in this case there was an extra one because of the *Ms. L* question.

THE COURT:  OK.  All right.  Thank you.  Anything further?

MS. KORNREICH:  No, your Honor.  I can address the standard review if the Court has questions about that.

THE COURT:  Well, since I took that up with plaintiff's counsel, let's engage on that.

First of all, are you in agreement, regardless for a moment as to who has the burden, that this is an inquiry that calls for a fact finding by a preponderance by the Court as

N765djcA

opposed to the summary judgment standard applying.

MS. KORNREICH:  Right.  We think in 12(b)(1) context the Court can find facts, if necessary, and make a determination on preponderance; that's right.

THE COURT:  OK.  And the plaintiffs' argument is that because, ultimately, the decisive question is whether an exception to the Federal Tort Claims Act waiver of sovereign immunity applies, the burden belongs on the government by a preponderance.  Who knows whether that is going to be determinative, but why is that wrong?  Or is it wrong?

MS. KORNREICH:  I actually don't think the parties really dispute the standard here.  I think the cases that are cited, for example, the *Molchatsky* case, I think plaintiffs cite makes clear that there is a burden-shifting.  So, in the first instance, the plaintiff has to have alleged that the claims are not barred by the DFE.  We contest that they met that initial threshold but appreciate the Court might disagree, then the burden would shift to the government and at that point the government needs to show, by a preponderance, that in fact the burden shifts to the government to show that the action is shielded by the DFE.  We believe we have met that burden and then under the case law plaintiffs may attempt to rebut that showing and we don't believe that they have done that here.

THE COURT:  And the move in the middle there, the one that says that you have met the burden, is essentially the

demonstration that Ms. Weinreb gave earlier centered on the chart under which, although there isn't anybody with a specific memory as to how the G.C. decision was made, inferentially a decision along those lines was made reflecting the exercise of discretion.  I mean, that's essentially the move at which you say we have satisfied our burden.

MS. KORNREICH:  That's right.  I also, I think it -- well, it is more in the chart, also in the e-mails.  I think also, critically, the e-mails that we have that very clearly show the date on which the DHS referral policy was implemented in RGV sector and after G.C. and D.J.C.V. were there, but even more than that the question -- we talk about the government's burden, which it is, but the question that we are addressing is whether this was unconstitutional such that it should not fall within the DFE.  And so -- it is hard to show a negative -- but in addition to all of this evidence that is in the record, the plaintiffs also haven't pointed to anything that would suggest that this was pursuant to the DHS referral policy, or some kind of dry run of that, or some other separation policy that would be unconstitutional and shock the conscience.

THE COURT:  What policy existed with respect to the reunification of adults referred for prosecution where the referral was declined effective May 1 of 2018?

MS. KORNREICH:  So, I'm not sure that there was a policy that was so narrow on that point but there was a general

N765djcA

policy to keep families together and it is sometimes referred to as the TEDS policy.  So again, it is not that narrow, but there was a general policy at the agency of maintaining family unity to the greatest extent operationally feasible which might have come into play in that scenario.

THE COURT:  And if somebody in the field was applying that policy, what standards, if any, existed?  I mean, it essentially says a tie goes to reunification but it doesn't really say anything more, does it?

MS. KORNREICH:  Well, it permits the exercise of discretion by the agency which is, of course, within the DFE, and also it is particularly important in this context.  This is a law enforcement context at the border where border patrol is detaining and processing a large number of people, they have a very short period of time to determine how to process them.  So, it certainly contemplates the exercise of discretion but it is precisely the type of discretion that is shielded by the DFE.

THE COURT:  I mean it sounds, if I may, as if there is nothing that really is out there that in any particular useful way speaks to how, in the field, people were to make the decision whether to continue to separate parent and child following the declination.  It sounded to me as if in fact what happened here, there is really no policy speaking to that and really the separation that occurs here, from the government's

N765djcA

perspective, is more that a decision was made about the father, regardless of any offspring, that his criminal history required him to be in a place where a child could not be.  In other words, there is really nothing about reunification at all, the focus is unilaterally on apparently the father's criminal history, and Ms. Weinreb offers that the fair inference that it must be that that was the basis for sending him to a place that a child could not accompany him.

MS. KORNREICH:  Well, again, so a couple things --

THE COURT:  That may not be a bad fact for the government, it might be a good one.

MS. KORNREICH:  Right.

THE COURT:  But isn't that what the government is saying what happened here?

MS. KORNREICH:  So if I am understanding your question, and I want to make sure that I am, I don't believe that there is a policy that narrowly directs what needs to happen when someone is either given to the U.S. Marshals and then they return to border patrol or the prosecution is declined, as it was in this case, but there is overarching guidance that, where feasible, families would be kept together.

THE COURT:  Right, but which trumps, so to speak, between that policy and the notion that somebody with a form of a criminal history that requires them to be sent to ICE needs to be sent to ICE.  I would assume from what you are saying is

N765djcA

that, in the first instance, the decision is made as to whether the parent needs to be sent somewhere and if kids aren't allowed, kids aren't allowed.  And if that doesn't happen, then this very broadly put policy of trying to encourage reunification takes place.

MS. KORNREICH:  Yes.  No, I think that is correct. Another way of thinking about it is there are detention decisions made with respect to the adult non-citizen, and just as in other contexts, they may have impacts on his ability to be with his family.  In some cases, even where someone was detained for the 90-day period or detained pursuant to agency discretion otherwise, there was the ability to keep the family together and that's where we get to the family residential centerpiece.

THE COURT:  At the end of the day the government's argument for invoking DFE here involves the decision to send G.C. to ICE custody and what followed from that, rather than a discretionary decision that really focused on the separateness or togetherness of the father and child.  I am trying to distill what I have heard.  I think that is what you are saying.

MS. KORNREICH:  I think there were discretionary decisions at a number of points.  Certainly the big one was the decision to send G.C. to ICE secure detention but there were earlier decisions as well, some of which did involve how

D.J.C.V. would be treated.  So, for example there is the initial request to separate so that G.C. could be referred for prosecution.

THE COURT:  Sorry, but that's pre May 2.  The period of time here is May 2, and at that point there has been a declaration of prosecution and I think what you are saying to me is if G.C. hadn't been sent to ICE, the operative policy would have been this very high level one that encourages families to be together, but because of what the government is saying was a discretionary decision to send G.C. to ICE, the separation had to follow.  I mean, you tell me but I am trying to understand what decision the DFE applies to.

MS. KORNREICH:  Right.

So, the DFE, with respect to May 3rd and forward, and at that point D.J.C.V. is already no longer in ICE or border patrol custody or any other DHS agency custody, so from that point forward there is the decision to refer G.C. to ICE as a single adult, and then there was the subsequent determination later that summer that he didn't meet the *Ms. L* criteria for reunification and then there was subsequently, of course, the bond hearing.

THE COURT:  OK.  All right.  Thank you.  Thank you very much.

I have a guilty plea proceeding in a few moments and I need to give our court reporter a break.  We have adjourned the

proceeding during this.  Nonetheless, I would welcome a minute from the government focusing on the specific point that I took away from Ms. Weinreb's argument, specifically the -- I am asking plaintiff's counsel to comment on it.  The government's argument is that the evidence permits the inference that the co-decision here was to send G.C. to ICE custody and that that, in turn, necessitated the separation of parent and child.  This is a factual matter, not a legal question, and I'm asking you, is there anything wrong with the government's, from your perspective, from the government's reconstruction of the evidence, that a decision to refer G.C. to ICE on or about May 2 or 3 was made?

MS. OBERDICK:  Can I clarify, your Honor, are you asking from a purely factual perspective what our factual rebuttal is to that?

THE COURT:  Yes, because the government is essentially saying we don't have a human being who remembers this happening but we have got, stepping back, declarations about broader practices, and we have got a chart and so forth and they're re-constructing events that way.  I am giving you an opportunity factually, not legally, to rebut.

MS. GOLDSMITH:  Thank you, your Honor.  I think three main points in response to that.  The first is that by the time we get to the decision or lack of decision that the government is referring to, G.C. is already a single adult so this

N765djcA

non-decision is informed by the fact that G.C. and D.J.C.V. have already been separated.  D.J.C.V. has been designated an unaccompanied minor and G.C. --

THE COURT:  So you infer that G.C. might not have been sent to an ICE facility if he hadn't previously been separated from his son around the time of the referral for prosecution?

MS. GOLDSMITH:  So I think that question is maybe answered by the second point, which is that the government assumes in sort of crafting this argument that G.C. and D.J.C.V. would have been separated in ICE custody and that you refer to secure facilities because G.C. needed to be sent to a secure facility.  However, it is not factually correct that family residential centers are not secured facilities.  FRCs are secured facilities.  And so, the government's sort of assumption that a decision was made here to separate our clients because G.C. had to be sent to a secure facility assumes facts not in evidence and is based on a hypothetical, not facts before the Court, and so our position is that the government cannot meet its burden based on that argument.

THE COURT:  OK.  Thank you.

Let me just come back to you then for a final word, Ms. Weinreb.  The representation made just now by Ms. Goldsmith is that FRCs are secure facilities, i.e. there was a way in which G.C. could have been sent to ICE and kept with his child.

MS. WEINREB:  So I'm not sure I can comment on whether

N765djcA

FRCs are correctly described as secure or unsecure facilities. What I can say is that we know it is undisputed that families can be housed together in FRCs and that they cannot be housed together in ICE ERO -- Enforcement Removal Operations.  That is where G.C. went as a single adult.

THE COURT:  What is the record basis for what you just said about them being unable to be kept together in ERO or ICE detention?  Where does that come from in the record?

MS. WEINREB:  I am trying to think if it is in one of our declarations.  I didn't think that that was contested.  I am actually surprised to hear questioning about that.

THE COURT:  Well, it is because there was a statement by plaintiff's counsel that suggested that sending G.C. to ICE didn't require the separation and then you had indicated that sending G.C. to ICE did.  I am ultimately -- this flows from an argument you made.

MS. WEINREB:  I apologize.  I can't recall off the top of my head where in the record this might be.  I do know that it is true and we have made all of our arguments premised on that fact.

THE COURT:  You have just gotten a post-it which may answer the question.

(Counsel conferring)

MS. WEINREB:  Yes.  So my colleague was just reinforcing the distinction between the ICE family residential

centers and ICE ERO.  They are both ICE custody, they are different kinds of detention facilities.

THE COURT:  Look, I took away from your argument that you are saying that essentially what drove the separation here was a decision as to G.C. having to be sent somewhere in ICE that precluded him from being with D.J.C.V., I took you rather clearly to be saying that.

MS. WEINREB:  Yes.

THE COURT:  Can you back that up?

MS. WEINREB:  I can.  I can't think of where in the record right now to tell you but I would be happy to submit --

THE COURT:  Without arguing the point, because I really want to close the curtain on argument, I will welcome a letter today that simply directs me to the record that you say supports that.

Very good.  Look, let me end where I began which is just to compliment all counsel.  This has been a very vigorous, very excellent argument on all sides.  You gave me a lot to think about consistent with the high quality of advocacy all along.  I am in your debt.

We stand adjourned.  Have a good summer, everybody. Thank you.

oOo