UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

D.J.C.V., *a minor child*, *and* G.C., *his father*,

                                        Plaintiffs,

                    -v-

UNITED STATES OF AMERICA,

                                        Defendant.

20 Civ. 5747 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case arises from the separation of D.J.C.V., a minor child, from his father, G.C. (together, "plaintiffs"), at the hands of United States authorities, following the unlawful entry of these noncitizens[1] into the United States. That separation had two phases. The first began on May 2, 2018—when, a few days after plaintiffs had crossed the U.S./Mexico border, Department of Homeland Security ("DHS") agents took D.J.C.V. away from G.C. and detained G.C. in secure detention—and lasted until October 10, 2018. The second began on October 10, 2018, when G.C. was released from such detention, and lasted until October 15, 2018, when D.J.C.V. and G.C. were reunited, as a result of a successful habeas corpus petition filed by G.C. This decision evaluates, with the benefit of jurisdictional discovery, whether there is factual basis on which the Court can exercise subject matter jurisdiction over plaintiffs' claims as to the first period of separation.

Plaintiffs brought claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the Federal Tort Claims Act ("FTCA"), 28

---

[1] This decision uses the term "noncitizen" as equivalent to the statutory term "alien." *See, e.g.*, *Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1110 n.1 (2023).

U.S.C. §§ 1346, 1402, 2401, 2671 *et seq.*, and torture, persecution, and inhumane acts under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, against the United States (the "Government"), based on both periods of separation.  The Government moved to dismiss plaintiffs' claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  It argued that this suit is barred by sovereign immunity and that plaintiffs' complaint fails to state a viable claim.  On June 3, 2022, after argument, the Court granted the motion to dismiss plaintiffs' ATS claims and denied the motion to dismiss plaintiffs' FTCA claims arising from the second period of separation.  *See D.J.C.V. v. United States*, 605 F. Supp. 3d 571 (S.D.N.Y. 2022) (the "June 2022 decision").  The Court's decision left unresolved the motions to dismiss plaintiffs' FTCA claims arising from the first period of separation.

As to these, the Court determined that the factual allegations were too inconclusive to assess whether plaintiffs' claims fell within an exception to the FTCA's sovereign immunity waiver, such that the Court had subject matter jurisdiction.  If the separation arose from the then-Trump Administration's "Zero Tolerance policy," the Court determined, it would have subject matter jurisdiction.  *See, e.g.*, *id.* at 587.  The Zero Tolerance policy, together with the referral policy that then-Secretary of Homeland Security Kirstjen Nielsen approved in furtherance of it (the "Mandatory Referral policy"), resulted in DHS referring all noncitizens who crossed into the United States along the southwest border for prosecution, which in turn triggered family separations.  *See id.* at 581–82, 590.  The Zero Tolerance policy was expressly designed to inflict maximum pain and trauma on noncitizens who crossed the southwest border, in order to deter others from doing so, and actions taken pursuant to it did not fall within any exception to the FTCA's waiver of sovereign immunity.  *See id.* at 590.  However, the Court reasoned, if G.C. and D.J.C.V.'s separation had been based on G.C.'s criminal history, which entailed a state-court

conviction for aggravated assault based on swinging a machete at his wife, the Court would not have jurisdiction, as either or both of the FTCA's "discretionary function" and "due care" exceptions to that waiver would apply. *Id.* at 590–605. Because, as pled, there was "factual support for either version of events," the Court directed the parties to undertake limited jurisdictional discovery to determine which policy formed the basis of the Government's decision to separate G.C. from D.J.C.V. on May 2, 2018. *Id.* at 590.

The parties have now done so. With the benefit of that extensive jurisdictional discovery, the Court now resolves the narrow factual question the June 2022 decision left unanswered: Was the basis for the separation of G.C. and D.J.C.V. the Zero Tolerance policy or G.C.'s criminal history? The Government argues that, even after significant discovery, there is no evidence that G.C. and D.J.C.V.'s separation was attributable to the Zero Tolerance policy. It argues that the evidence establishes, instead, that father and son were separated as a result of G.C.'s criminal history, such that this suit falls with the FTCA's discretionary function and due care exceptions, and is barred by sovereign immunity. Plaintiffs view the facts differently. They principally contend that, although the contemporaneous documentary record contains references to G.C.'s criminal history as driving the separation, these references were pretextual, and that G.C.'s criminal history alone would not have mandated his separation from D.J.C.V.

For the reasons that follow, the Court finds by a preponderance of the evidence, and after careful assessment, that G.C. and D.J.C.V. were separated as a result of G.C.'s criminal history, not the Zero Tolerance policy. The Court accordingly holds that it does not have subject matter jurisdiction over plaintiffs' FTCA claims arising from the first period of separation.

I.      **Background**[2]

The Court incorporates its June 2022 decision by reference, and recounts here only the

facts and procedural history necessary to situate the reader.  *See id.* at 579–86.

A.      **The Statutory and Regulatory Framework**

1.      **Removal of Noncitizens and Withholding of Removal**

Any noncitizen present in the United States without having been admitted or paroled in is

inadmissible and subject to removal.  8 U.S.C. § 1182(a)(6)(A)(i).  When a noncitizen has

illegally reentered the country after having been removed, the earlier order of removal is

"reinstated from its original date."  *Id.* § 1231(a)(5).  The reinstated order "is not subject to being

reopened or reviewed"; the noncitizen thus "is not eligible and may not apply for any relief"

under the immigration laws.  *Id.*  Noncitizens who enter the United States unlawfully may also

be subject to criminal prosecution.  *See, e.g.*, *id.* §§ 1325–26.

Noncitizens, however, may not be removed to a country where they would face

persecution or torture.  *Id.* § 1231(b)(3); 8 C.F.R. §§ 208.16–18.  Therefore, notwithstanding

§ 1231(a)(5)'s otherwise categorical bar on relief, such persons may be eligible for "withholding

of removal," through "withholding-only" proceedings, if they can establish a "reasonable fear"

of persecution or torture.  8 C.F.R. §§ 208.31(a)–(b), (e), 241.8(e).  A noncitizen who expresses

---

[2] In resolving the motion under Rule 12(b)(1), the Court draws the facts related here from the redacted joint statement of undisputed facts, which draws upon the jurisdictional discovery.  Dkt. 177 ("JSF").  The Court also has considered the declarations (and attached exhibits) submitted by the parties.  These include: the declarations of Alexander J. Hogan, Esq., Dkt. 23 ("Hogan Decl."); Darius Reeves, Dkt. 24; Gerardo Guerra, Dkt. 84-1 ("Guerra Decl."); Monique Grame, Dkt. 210 ("First Grame Decl."), Dkt. 211 ("Second Grame Decl."); Jonathan P. York, Dkt. 200 ("First York Decl."), Dkt. 223 ("Second York Decl."); Johnny Cavazos, Dkt. 213 ("Cavazos Decl."); Mollie Kornreich, Dkt. 214 ("Kornreich Decl."); Leonor Macal, Dkt. 215 ("Macal Decl."); Carly Weinreb, Dkt. 228; and Robert Guadian, Dkt. 234 ("Guadian Decl.").  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

such fear to immigration-enforcement officials is referred to U.S. Citizenship and Immigration

Services ("USCIS") for an interview with an asylum officer, who determines whether the person,

in fact, possesses a "reasonable fear" of persecution or torture. *Id.* If the officer finds that the

noncitizen has established such fear, the officer must refer the case to an immigration judge

("IJ") to determine whether the person is entitled to withholding of removal. *See* 8 C.F.R.

§ 208.31(e).

### 2. Detention Pending Removal

Relevant here, two statutes authorize detention of noncitizens.

First, 8 U.S.C. § 1226(a) authorizes detention "pending a decision on whether the alien is

to be removed from the United States." Under that section, the Government may detain a

noncitizen, although it may instead release him subject to parole or a bond. If the noncitizen is

detained under § 1226(a), he may request a bond hearing before an IJ. 8 C.F.R. § 1236.1(d)(1).

Under 8 U.S.C. § 1231(a)(1), by contrast, a noncitizen subject to a final order of removal

*must* be detained for the 90-day period after the order of removal becomes final. Thereafter, a

person subject to a removal order who has not yet been removed may be released or further

detained, depending on whether the Government determines that he is a "risk to the community

or unlikely to comply with the order of removal." *Id.* § 1231(a)(6).

Under both provisions, the Government "shall arrange for appropriate places of detention

for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1).

### 3. Detention and Release of Minor Children

Two statutes govern the custody and release of an unaccompanied alien child ("UAC").

Under the Homeland Security Act, the Office of Refugee Resettlement ("ORR") within

the Department of Health and Human Services ("HHS") is responsible for "the care and placement

of unaccompanied alien children who are in Federal custody by reason of their immigration

status."  6 U.S.C. § 279(b)(1)(A).  A UAC is defined as any child who (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) either has no parent or legal guardian in the United States *or* has "no parent or legal guardian in the United States" who is "available to provide care and physical custody."  *Id.* § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child."  8 U.S.C. § 1232(b)(3).

Once the UAC is transferred to HHS, ORR must place the UAC "in the least restrictive setting that is in the best interest of the child"; it cannot place UACs in a secure facility unless it determines that the child "poses a danger to self or others or has been charged with having committed a criminal offense."  *Id.* § 1232(c)(2)(A).  ORR cannot release a UAC to a person's custody unless HHS first "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," including by verifying the proposed custodian's identity and making an "independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  *Id.* § 1232(c)(3)(A).

In addition, the United States is subject to "a binding agreement incorporated into a judicial decree" governing the detention, release, and treatment of minors in immigration custody.  *See Flores v. Sessions*, 862 F.3d 863, 866, 875 (9th Cir. 2017).  The *Flores* Settlement Agreement, entered into in 1997, applies to both accompanied and unaccompanied minors.  *See Flores v. Lynch*, 828 F.3d 898, 901, 905 (9th Cir. 2016).  It requires that "[w]ithin five days of arrest," the Government "must transfer the minor to a non-secure, licensed facility[]."  *Id.* at 902.

It is undisputed that D.J.C.V. is subject to that settlement agreement, and that the *Flores* Settlement Agreement limited the length of time DHS can detain minors, including in family residential centers ("FRCs").  *See* JSF ¶ 36.

### 4. Policies Prior to the Zero Tolerance Policy

In October 2015, United States Customs and Border Protection ("CBP") issued guidance titled "National Standards on Transport, Escort, Detention and Search," or the "TEDS policy." *Id.* ¶ 37.  The TEDS policy directed CBP to "maintain family unity to the great extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."  *Id.* ¶ 38.  It directed officers and agents to "follow legal requirements and their operational office's policies and procedures" "[w]hen it is necessary to separate juveniles from the parent(s) and/or legal guardian(s)."  *Id.*  All sectors were required to follow the TEDS policy, and the policy was consistent before and after the 2018 dates at issue here.  *Id.* ¶ 39.

### 5. 2017–2018: The Trump Administration's Enforcement Directives and Responses and Their Application in New Mexico

On January 25, 2017, then-President Trump issued Executive Order No. 13767 ("EO 13767").  *See* Exec. Order No. 13767, 82 Fed. Reg. 8793, 8793 (Jan. 30, 2017).  It announced that "the policy of the executive branch" was to "detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations."  *Id.* at 8793.  EO 13767 instructed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law."  *Id.* at 8795.

On April 11, 2017, then-Attorney General Jeff Sessions issued a memorandum directing all federal prosecutors to renew their commitment to criminal immigration enforcement and to "focus on criminal cases that will further reduce illegality."  JSF ¶ 45.

A few months later, in July 2017, the Acting United States Attorney for the District of New Mexico "removed all restrictions imposed" for the prosecutions within the El Paso sector of misdemeanor and felony immigration offenses (the "El Paso Prosecution Initiative"). *Id.* ¶ 46. In implementing the El Paso Prosecution Initiative, the Western District of Texas and District of New Mexico began prosecuting "*all* amenable adults who entered as part of a family unit," whereas, previously, family separations arising from the prosecution of a parent had been limited "due to the fact that parents were required to have prior criminal and/or immigration history before separation was approved." *Id.* ¶ 48 (emphasis added). In November 2017, United States Border Patrol ("USBP") was directed to "stand down" its implementation of the El Paso Prosecution Initiative "until USBP – HQ leadership has had an opportunity to review all aspects of this program and brief up the chain at the appropriate level." *Id.* ¶ 49. By November 18, 2017, the "El Paso Sector [was] [n]o longer executing prosecutions" as part of the El Paso Prosecution Initiative, nor were any other "USBP sectors . . . engaged in similar operations at [that] time." *Id.* ¶ 50 (emphasis and brackets omitted).

In February 2018, in response to a superior's request for information, the Associate Chief of CBP's HQ-Operations-West Division stated that it was "standard procedure" in the Rio Grande Valley ("RGV") sector "not to separate family units in order to prosecute the head of household," but that the sector "did separate family units for" certain reasons, including if the parent "has a criminal history and meets the established [p]rosecutorial guidelines." *Id.* ¶ 52 (brackets omitted); *see id.* ¶ 53. In March 2018, emails between Chad Wolf, then-Chief of Staff to the Secretary of Homeland Security, and three officials in Immigration and Customs Enforcement ("ICE"), discussed family separations by ICE. *Id.* ¶ 54. Wolf discussed the "few instances" where families were separated, and the chief of staff to ICE's Acting Director

responded that, in Fiscal Year 2017, ICE had separated only 10 families out of approximately

75,000 families referred from DHS to ICE.  *Id.*  Also in March 2018, USBP staff discussed

making modifications to the e3 software system, *id.* ¶ 56, which was "the official record for

CBP's detention and processing for all detainees in border patrol custody," *id.* ¶ 15 (brackets

omitted).

### 6.    2018: The Zero Tolerance Policy and its Aftermath

On April 6, 2018, Attorney General Sessions announced the Zero Tolerance policy that

plaintiffs assail here.  *Id.* ¶ 57.  He did so through a memorandum directing "each United States

Attorney's Office along the southwest border—to the extent practicable, and in consultation with

DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution

under section 1325(a)."  *Id.*  The memorandum was directed to the Department of Justice only.

*Id.*  USBP did not change its processes in response to the memorandum.  Second Grame Decl.,

Ex. A at 131.

The same day, President Trump issued a memorandum titled "Ending 'Catch and

Release' at the Border of the United States and Directing Other Enhancements to Immigration

Enforcement."  JSF ¶ 58.  It did not discuss the treatment of noncitizen families, but directed

DHS, in coordination with the Secretary of Defense, Attorney General, and Secretary of HHS, to

report on its progress in implementing EO 13767.  *Id.*

On April 19, 2018, CBP's e3 software system was updated to track family separations.

*Id.* ¶ 59.  In a memorandum dated April 23, 2018, the Commissioner of CBP, the Director of

ICE, and the Director of USCIS proposed three prosecution referral policy options to then-

Secretary of Homeland Security, Kirstjen Nielsen, in furtherance of the Zero Tolerance policy.

*Id.* ¶ 60.  One of these options was the Mandatory Referral policy—which, if approved, would

direct DHS to refer *all* amenable adults, including those who arrived with minor children, for prosecution of immigration violations. *See id.* ¶ 63.

On April 27, 2018, Associate CBP Chief Matthew Roggow, based in CBP headquarters in Washington, D.C., sent an e-mail to the southwest border chiefs and deputies instructing them to "[p]lease begin referring all single adults to your respective U.S. Attorney's Office for prosecution under section 1325(a) of Title 8." *Id.* ¶ 61 (alteration in original); *see also id.* ¶ 51. The email observed that the "action of referring all amenable cases is new." *Id.* ¶ 62; *see* First York Decl., Ex. 21 at 3.

On May 4, 2018, Secretary Nielsen approved the Mandatory Referral policy. JSF ¶ 63. Later that day, after the Mandatory Referral policy was approved, Chief of CBP's Law Enforcement Operations Directive, Brian Hastings, *id.* ¶ 39, emailed USBP field chiefs and deputy field chiefs directing them to "implement increased Southwest Border Prosecutions . . . **effective May 5, 2018**." *Id.* ¶ 64 (emphasis in original). USBP was not authorized to implement the Mandatory Referral policy before May 5, 2018. *Id.* ¶ 65. Hastings's email attached an approved concept of operations ("CONOP") "to develop a quickly scalable approach to achieve 100% immigration violation prosecution referrals for all amenable adults" and asked each of the nine southwest border sectors to create an individualized CONOP by May 7, 2018. *Id.* (emphasis omitted). The approved CONOP attached to Hastings's email, which was dated May 3, 2018, stated that the "southwest border sectors, under the direction of their Chief Patrol Agents . . . will implement phased prosecutorial priorities to achieve an end state of 100% prosecution of all amenable aliens on a phased timeline consistent with DOJ partners' capacity." *Id.* ¶ 66. It also directed that "all appropriate humanitarian considerations and policies remain in place," and that "[d]iscretion on appropriate referrals for sensitive cases, including but not

limited to adults who are traveling with tender age children, remains with the [Chief Patrol Agents] or their designees within their command staffs." *Id.* ¶ 67 (brackets omitted).

In the RGV sector, Watch Commander Gerardo Guerra orally communicated the Mandatory Referral policy to his supervisees, who included border patrol agents ("BPAs") responsible for processing migrants in USBP custody. *Id.* ¶ 68; *see id.* ¶ 12. On May 6 and 7, 2018, respectively, Assistant Chief Patrol Agent Monique Grame emailed initial and corrected versions of a CONOP for the RGV sector to implement the Mandatory Referral policy. *Id.* ¶ 70. Because a 100% prosecution referral rate was not feasible in the RGV sector "due to resource limitations," the sector's CONOP proposed a "phased approach" to increase the number of prosecution referrals over time beginning on May 7, 2018. *Id.* ¶ 72. The phased approach prioritized certain referrals over others, including based on the noncitizens' criminal histories. *Id.* ¶ 73 (sealed).

Also on May 7, 2018, USBP Acting Chief Carla Provost issued a memorandum to the Chief Patrol Agents and Directorate Chiefs regarding "modifications to the recording information process within the e3 system" to ensure "accurate reporting of reasons for a Family Unit (FMUA) Separation." *Id.* ¶ 71. Although noting that "USBP maintains family unity of detainees to the greatest extent operationally feasible," the memorandum stated that "there are several instances where temporary [family] separation (while in USBP custody) and complete dissolution must be documented within e3." *Id.* The memorandum attached a PowerPoint providing guidance on how to document family separations in the e3 system. *Id.*

On May 27, 2018, DHS's Executive Director of Policy and Planning, Meghann K. Peterlin, sent an email to other high-level officials stating that data on family separations only went as far back as 2017. *Id.* ¶ 74. In that email, Peterlin stated, "We didn't and don't have a

policy of separation," and that "[p]reviously, if we separated, it was specifically and only for safety and welfare of the child" or, potentially, a parent's criminal history. *Id.* (brackets omitted). A senior advisor to the CBP Commissioner responded that, previously, "we could also separate if the adult was a prior deport" or for "child danger; for medical reasons, etc." but that "none of this was captured in the system prior to April 19th 2018 when we started capturing family separation." *Id.* ¶ 75 (brackets omitted).

On June 20, 2018, President Trump signed an executive order titled "Affording Congress an Opportunity to Address Family Separation," ending the Zero Tolerance policy. *Id.* ¶ 77 (citing E.O. 13841.).

On June 26, 2018, a federal court in the Southern District of California, which had previously certified a class of migrant parents whose children had been taken by the Government, held that the Zero Tolerance policy likely violated parents' due process rights to family integrity. It issued a preliminary injunction enjoining the policy and requiring the Government to begin reuniting separated families. *See Ms. L. v. U.S. Dep't of Homeland Sec.*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018) ("*Ms. L. II*").[3] The court also prohibited the Government from separating families without a determination that the parent was unfit or a danger to their child. *Id.* The *Ms. L.* court, however, excluded from the class of migrant parents those with criminal history. *Id.* at 1139 n.5; JSF ¶ 82. It did so because it found that the Government's interest in securely detaining "individuals who posed a flight risk or danger to the community or others in a family detention facility because of that person's criminal history" outweighed the parents' concern that

_____

[3] The *Ms. L.* court had previously, on June 6, 2018, granted in part and denied in part a motion to dismiss the complaint. *Ms. L. v. U.S Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018) ("*Ms. L. I*").

the Government would "abuse [its] discretion and exclude parents with minor misdemeanors." Hogan Decl., Ex. 2 at 2; *see id.* at 2–3.

### B.      Factual Background as to G.C. and D.J.C.V.

#### 1.      Parties

G.C. is an adult Honduran man and the father of D.J.C.V.  JSF ¶ 6.[4]  D.J.C.V. was 19 months old on April 30, 2018, when he and G.C. entered the United States.  *Id.*

The United States is sued here in its capacity as the employer of the federal officers of DHS and HHS described in the Complaint.  Compl. ¶ 18.

#### 2.      G.C.'s Immigration and Criminal History

On October 28, 2010, after entering the United States at an unknown place and time, G.C. pled guilty to one charge of aggravated assault in Louisiana for swinging a machete at his wife. *See* JSF ¶¶ 1–2; Guadian Decl., Ex. B ("Arrest Report"), 2 ("Plea Minutes").  He was sentenced to 48 days in jail and then ordered removed; in January 2011, he was removed.  JSF ¶¶ 2–3; Guadian Decl., Ex. D.

In October 2013, after G.C. unlawfully reentered the country, the Government reinstated G.C.'s removal and again removed him.  JSF ¶¶ 4–5; Guadian Decl., Ex. F.

#### 3.      April 30–May 3, 2018: G.C. and D.J.C.V.'s Entry, Detention, and Separation

On April 30, 2018—soon after the announcement of the Zero Tolerance policy, but before its official implementation date—G.C. and D.J.C.V. entered the United States between ports of entry after fleeing Honduras.  JSF ¶ 6.  At approximately 11:30 p.m. that day, G.C. and D.J.C.V. encountered USBP agents near Hidalgo, Texas.  *Id.*  The USBP agents arrested G.C.

---

[4] G.C. is not D.J.C.V.'s biological father, but he alleges, and for purposes of this decision it is undisputed, that he has full parental rights over D.J.C.V. and has cared for him "[f]rom the day D.J.C.V. was brought home from the hospital after his birth."  Dkt. 1 ("Compl.") ¶ 82.

and D.J.C.V. and took them to the Central Processing Center ("CPC") in McAllen, Texas, within the RGV sector of CBP.  *Id.*

Significant events occurred in the following hours.  On May 1, 2018, at approximately 4:30 a.m., G.C. and D.J.C.V. were processed into the RGV CPC.  *Id.* ¶ 7.  Agents conducted a record check for G.C, which revealed his 2010 misdemeanor conviction.  *Id.* ¶ 8.

A few hours later, at 9:31 a.m., BPA Johnny Cavazos emailed one of his supervisors, RGV Watch Commander Guerra, stating:  "Request separation . . . due to mother [sic] having prior criminal history."  *Id.* ¶ 9; Cavazos Decl. ¶ 17, Ex. C at 1–2.  The email described G.C.'s 2010 aggravated assault conviction and sentence.  JSF ¶ 9; Cavazos Decl. ¶ 17; First York Decl., Ex. 37 ("Guerra Email") at 2.

At 10:16 a.m., Guerra forwarded the email to the RGV sector's Deputy Patrol Agent-in-Charge asking for "guidance on family separation approvals."  First Grame Decl., Ex. 1.

At 3:28 p.m., the Deputy Patrol Agent-in-Charge responded to Guerra's email:

If the Adult parent is amicable [sic] to prosecutions due to criminal history or fraudulent documents then we would prosecute the adult and separate the family for the welfare of the child.  An FOJC [Field Office Juvenile Coordinator] notification would need to be done for the child.

JSF ¶ 13; Guerra Email at 2.  At 3:35 p.m., Guerra replied to Cavazos approving the separation and directing Cavazos to "make the necessary changes on e3," "have someone make the FOJC notification," and "[p]rosecute the adult subject."  JSF ¶ 14.

Also on May 1, 2018, at an unknown time thereafter, USBP referred G.C. to the United States Attorney's Office for the Southern District of Texas.  *Id.* ¶ 16.  CBP also completed a Form I-213 for G.C.[5]  Cavazos Decl., Ex. B ("Form I-213").  It stated that G.C. had "pled guilty

---

[5] Form I-213 is a "record of a deportable or inadmissible alien," which can support "adverse immigration actions."  Guerra Decl. ¶ 4.

and was sentenced to 48 Days Jail" in 2010,[6] and that "[b]ased on the above criminal record information, as per Watch Commander Gerardo Guerra, [G.C.] and [D.J.C.V.] will be separated. [D.J.C.V.] will be processed accordingly as a UAC." *Id.* at 4.  USBP issued a notice to G.C. that his prior removal order would be reinstated under 8 U.S.C. § 1231(a)(5).  JSF ¶ 17; Guadian Decl., Ex. H.

The same evening, at 8:27 p.m., an entry was made in D.J.C.V.'s USBP log stating: "Processing Complete."  First Grame Decl., Ex. 3 at 3.  A box in the log for "Possible Trafficking?" was also checked.  *Id.* at 1.  At 8:42 p.m., USBP received ORR placement for D.J.C.V. with Lutheran Social Services of New York.  *Id.* at 1, 3; JSF ¶ 21.

At 9:30 p.m., the United States Attorney's Office declined to prosecute G.C. "due to a full docket for the next presentation in Court," and because he would "not meet the 48-hour rule for the next day's docket."  JSF ¶ 22.

The next day, at 10:53 a.m., D.J.C.V. was transferred from USBP to ORR custody, to be placed with the Lutheran Social Services of New York, and separated from G.C.  *See* First Grame Decl., Ex. 3 at 4; JSF ¶¶ 23–24.  On May 3, 2018, at 2:36 a.m., G.C. was transferred to ICE custody.  JSF ¶ 25.

### 4.    May 3–October 10, 2018: The Government's Continued Separation of G.C. and D.J.C.V.

G.C. remained in ICE custody from May 3, 2018 until he was released on bond on October 10, 2018.  *Id.* ¶ 27.  During that period, he was transferred to several different facilities.

---

[6] The Form I-213 contains contradictory statements about G.C.'s criminal history but reflects both his arrest and conviction.  *See* Cavazos Decl., Ex. 2 at 3 (citing a September 10, 2010 arrest but noting that "Subject has no criminal convictions"), 4 ("According to EARM/ICE narrative subject pled guilty and was sentenced to 48 Days Jail."); *see also* Guerra Email at 3 ("[T]he arrest does come out on his criminal history check, but not the conviction.  The conviction only comes out on EARM narrative.")

D.J.C.V. remained in ORR custody from May 2 through October 15, 2018, and lived in three different foster homes during that period.  *Id.* ¶ 26.

The following are salient events during that period.

> ### i.    *G.C.'s Exclusion from the* Ms. L. *Class*

In August 2018, the Government determined that G.C. was not a member of the *Ms. L.* class due to his criminal history and that it would not release him as part of the *Ms. L.* reunification process.  JSF ¶ 86; *Ms. L.*, No. 18 Civ. 428, at Dkt. 222 at 6.

On September 13, 2018, plaintiffs in *Ms. L.* requested that the court in that case order the immediate reunification of G.C. with D.J.C.V.  JSF ¶ 87 (citing *Ms. L.*, No. 18 Civ. 428, at Dkt. 221).

On September 19, 2018, the court denied the request as to G.C. and another noncitizen.  JSF ¶ 88 (citing *Ms. L.*, No. 18 Civ. 428, at Dkt. 236); *see* Hogan Decl., Ex. 2.  The court held:

> Defendants' determination that Ms. Q. and [G.C.] have disqualifying criminal history that precludes reunification with their children and either release into the community or detention in a family residential center is entitled to deference.  The record indicates Defendants have vetted these parents in good faith and made principled decisions in light of their criminal history and overarching concerns regarding safety of their children and the public.
>
> These determinations certainly can be debated, but the Court is persuaded that Defendants have exercised their statutorily prescribed discretion in a reasonable manner.  The Court has consistently held that matters of detention and parole are peculiarly within the province of the executive branch, and for prudential and other reasons that exercise of discretion ought not to be disturbed under these circumstances.

Hogan Decl., Ex. 2 at 3.

> ### ii.   *G.C.'s Release and Reunification with D.J.C.V.*

On August 23, 2018, G.C. received a reasonable fear interview, at which USCIS determined that G.C. had a reasonable fear of returning to Honduras.  JSF ¶ 28.  Later the same day, G.C. was served with a Notice of Referral to an Immigration Judge and placed in

proceedings for withholding of removal.  *Id.* ¶ 29.  On September 10, 2018, DHS issued a Notice

of Custody Determination that DHS would continue to detain G.C. pending a final administrative

determination in his immigration case.  *Id.* ¶ 30.  On October 4, 2018, G.C. and D.J.C.V. filed a

habeas corpus petition in the federal district court for the Southern District of New York seeking

court-ordered reunification.  *Id.* ¶ 31 (citing *D.J.C.V. et al. v. ICE et al.*, No. 18 Civ. 9115 (AKH)

(S.D.N.Y. 2018), at Dkt. 1).

On October 5, 2018, G.C. received a bond hearing before an immigration judge, who

ordered that G.C. be released from detention on a $2,000 bond.  *Id.* ¶ 32.  On October 10, 2018,

G.C. posted bond and was released from ICE custody.  *Id.* ¶ 33.  On October 15, 2018, Judge

Alvin Hellerstein of this District ordered the immediate release of D.J.C.V. from ORR custody to

G.C.  *Id.* ¶ 34.  Father and son were reunited that evening.  *Id.* ¶ 35.

### C.    Procedural History of This Case

On July 24, 2020, plaintiffs filed the Complaint.  *See* Compl.  On October 16, 2020, the

Government moved to dismiss, Dkt. 21, and filed a memorandum of law, *see* Dkt. 22, and

declarations, Dkts. 23–25, in support.  On December 8, 2020, plaintiffs opposed the motion to

dismiss.  Dkt. 32; Dkt. 35 (refiled).  In late December 2020, many *amici curiae* appeared and,

with leave, filed briefs supporting plaintiffs.  *See* Dkts. 36–66, 68, 73, 76.  On February 12, 2021,

the Government replied.  Dkt. 77.  On March 5, 2021, the Court held argument.  Dkt. 85.

After argument, the Court directed the parties to file supplemental letter briefs addressing

the following question:

> Where an officer made a decision challenged under the FTCA, and the parties
> dispute—and the cognizable materials do not clearly resolve—which of two policy
> frameworks the officer made that decision under, may a court, in the course of
> determining whether it has subject-matter jurisdiction, inquire (and if necessary
> commission jurisdictional discovery) into which of the policies actually formed the
> basis of the decision?

Dkt. 78.  On March 23, 2021, the Government filed its letter, Dkt. 84, and the supporting

declaration of Geraldo Guerra.  On April 6, 2021, plaintiffs filed their letter, Dkt. 87, and a

supporting declaration.  Both parties agreed that jurisdictional discovery was permissible and

appropriate.

On April 9, 2021, the Court issued an order stating that such discovery was warranted,

and directing the parties to submit a proposed discovery schedule.  Dkt. 88.  The Court noted that

a full opinion on the issue would follow.  *Id.* at 2.  On June 3, 2022, after a long delay due to the

parties' continuing representations that a settlement was at hand, the Court issued its decision,

granting the motion to dismiss plaintiffs' ATS claims, denying the motions to dismiss the claims

as to the second period of separation, and directing jurisdictional discovery as to the first period

of separation.  *See, e.g.*, *D.J.C.V.*, 605 F. Supp. 3d at 587–609.  Such discovery, the Court

explained, was necessary to determine whether the basis for G.C. and D.J.V.C.'s separation had

been the Zero Tolerance policy and/or the Mandatory Referral policy arising from it, in which

case no exception to the FTCA's waiver of sovereign immunity applied, or G.C.'s criminal

history, in which case one or both of the discretionary function and due care exceptions applied.

*See id*. at 591–605.  If G.C. and D.J.C.V. had been separated pursuant to the Zero Tolerance

and/or Mandatory Referral policies, the Court determined, that decision would have violated

their Fifth Amendment rights and would, therefore, fall outside the discretionary function

exception's scope.  *See id.* at 591–97; *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252,

1261 (2d Cir. 1975) ("[A] federal official cannot have discretion to behave

unconstitutionally[].").  The due care exception would also not apply, the Court found, because

decisions grounded in an executive order—such as the Zero Tolerance and Mandatory Referral

policies—are excluded from the FTCA's sovereign immunity waiver.  *See id.* at 597–98.

On July 15, 2022, the parties filed a proposed discovery plan, Dkt. 134, which the Court approved on July 18, 2022, Dkt. 135.  On March 27, 2023, after extensions, *see, e.g.*, Dkts. 145, 166, the Court set a briefing schedule, Dkt. 167.  On June 1, 2023, the Government filed sealed versions of its supplemental memorandum of law in support of its Rule 12(b)(1) motion to dismiss, Dkt. 192, 197, and declarations in support, Dkts. 187–91, 193.  On June 1, 2023, plaintiffs filed sealed versions of their supplemental memorandum of law in opposition to that, Dkt. 184, and a declaration, Dkt. 186.  On June 23, 2023, plaintiffs filed a sealed memorandum of law opposing the Government's motion, Dkt. 220, and a sealed version of the second York declaration, Dkt. 221, in support.  The same day, the Government filed a sealed version of its reply in support of its motion to dismiss, Dkt. 225, and a sealed declaration in support, Dkt. 226.[7]

On July 6, 2023, the Court heard argument.  *See* Dkt. 239 ("Tr.").  Later that day, the Government filed a letter, at the Court's request, identifying a record cite referenced at argument. Dkt. 236.  The next day, plaintiffs responded.  Dkt. 238.

## II.     Applicable Legal Standards

### A.      Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).  The party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it

---

[7] The Government filed public versions of its memorandum of law, Dkt. 216 ("Gov't Mem."), and supporting declarations, Dkts. 210–11, 213–15, 234, and the defense did likewise, *see* Dkts. 199 ("Pl. Mem."), 200, 220, 222 ("Pl. Opp.").  The Government also filed, on June 23, 2023, public versions of its reply in support of its motion to dismiss, Dkt. 227 ("Gov't Reply"), and declaration in support, Dkt. 228.  The Court cites to the public versions of the parties' submissions unless otherwise noted.

exists."[8] *DeMartino v. N.Y. State Dep't of Tax'n & Fin.*, No. 22-720, 2023 WL 2563967, at *2 (2d Cir. Mar. 20, 2023) (summary order); *see, e.g.*, *Makarova*, 201 F.3d at 113.  In resolving a motion to dismiss under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff."  *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (citation omitted).  Nevertheless, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (citation omitted).

---

[8] Plaintiffs argue that, because the FTCA embodies a statutory waiver of sovereign immunity to which the discretionary function and due care provisions are exceptions, the FTCA imposes a burden-shifting framework for establishing subject-matter jurisdiction under which the Government here bears the burden.  *See, e.g.*, Pl. Opp. at 3; Tr. at 27–28.  Plaintiffs contend that they bear only "the initial burden to *allege* a claim not barred" by an FTCA exception, after which the burden shifts to the [G]overnment to prove that the exception applies."  Pl. Opp. at 3 (internal citations omitted) (emphasis added and omitted).  If the Government does so, plaintiffs argue, they may rebut.  *Id.*  At argument, the Government did not take issue with the framework urged by plaintiffs.  Tr. at 83.

Beyond stating that plaintiffs bear the initial burden on this point, the Second Circuit has not spoken definitively on whether the burden of showing that FTCA exceptions apply ever shifts to the Government.  *See Cangemi v. United States*, 13 F.4th 115, 130 (2d Cir. 2021) ("Because plaintiffs bear the initial burden of showing that their claims against the United States fall within the FTCA's limited waiver of sovereign immunity, plaintiffs also bear the initial burden of showing that their claims are not barred by the discretionary function exception."); *see also* 14 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3658 (4th ed. 2023) (referring to whether plaintiff or Government bears burden of showing FTCA exception's applicability:  "[T]here is division on this issue.").  The Court need not address that point here.  As the Court's June 3, 2022 decision noted, the Complaint's allegations did not carry plaintiffs' initial burden of showing that their FTCA claims as to the first period of separation fell outside the two exceptions, and therefore the prerequisite for burden-shifting under the framework urged by plaintiffs does not exist.  *See Cangemi*, 13 F.4th at 130; *see Wang v. United States*, 61 F. App'x 757, 759 (2d Cir. 2003) (no jurisdiction where "[p]laintiffs failed to meet their initial burden of pleading facts which would support a finding that the conduct of the investigative agents fell outside the scope of the exception").  More important, even if the Government bore the burden here of establishing that an FTCA exception applies, the Court, for the reasons that follow, finds that it has done so, and that plaintiffs have not rebutted this showing.  *See, e.g.*, Tr. at 29.

The Court, applying a preponderance of the evidence standard, is obligated to make factual findings with reference to evidence outside the pleadings where jurisdictional facts are disputed.  *See, e.g.*, *DeMartino*, 2023 WL 2563967, at *2; *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) ("If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to [jurisdiction]."); *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("But where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (internal citations, brackets, and quotation marks omitted)); *APWU*, 343 F.3d at 627 ("Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." (brackets omitted)); *see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) (district court has "broad discretion when determining how to consider challenges to subject matter jurisdiction," but abuse of discretion to disregard evidence contradicting complaint's allegations); *APWU*, 343 F.3d at 627 (affirming factual findings as to jurisdictional facts and noting district court's responsibility to go beyond pleadings to resolve disputed issues of fact necessary to motion to dismiss ruling); *see also* Tr. at 23 (plaintiffs, agreeing that court is authorized to make factual findings), 83 (Government, same).

## III.   Discussion

The Court turns to the narrow factual question its June 2022 decision left unanswered: Was G.C. and D.J.C.V.'s initial period of separation based on the Zero Tolerance policy or G.C.'s criminal history?

Plaintiffs argue that the references to G.C.'s past conviction in USCIS's records were pretextual, *see, e.g.*, Pl. Opp. at 13; Tr. at 21, and that—even though the Mandatory Referral policy was not yet formally in effect in the RGV sector—the public announcement and private discussion of the Zero Tolerance and Mandatory Referral policies unavoidably influenced the decisions regarding G.C. and D.J.C.V. that led to their separation, *see, e.g.*, Pl. Mem. at 10–12; Tr. at 9–10.  The Government counters that there is no evidence tying G.C. and D.J.C.V.'s separation to the Zero Tolerance or Mandatory Referral policies.  On the contrary, it emphasizes, the record evidence regarding these decisions consistently identifies G.C.'s aggravated assault conviction as the basis for his detention and for his and D.J.C.V.'s separation.  *See, e.g.*, Gov't Reply at 6–23.  Upon careful review of the evidence and the reasonable inferences drawn therefrom, the Court, applying the preponderance standard, finds for the Government on this factual point, and that the exceptions to the FTCA's waiver of sovereign immunity therefore apply.

### A.    Applicable Legal Standards

In general, courts lack jurisdiction to entertain suits against the United States where it has not consented to suit and thereby waived its sovereign immunity.  *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007).  The FTCA constitutes a limited waiver by the United States of its sovereign immunity.  It thereby "allows for a tort suit against the United States under specified circumstances."  *Id.* (citation omitted).  Relevant here, however, the FTCA contains exceptions to its waiver of sovereign immunity, *see* 28 U.S.C. § 2680.  The Government invokes two here: the discretionary function exception ("DFE"), and the due care exception ("DCE").  The Court discusses the relevant standards for these exceptions in greater detail below.

### 1.        Discretionary Function Exception

The FTCA excludes from its waiver of sovereign immunity "[a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  This "discretionary function exception" is "a form of retained sovereign immunity." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008). Retention of that immunity is designed "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotation marks and citation omitted).

On a 12(b)(1) motion, a complaint may survive "if it alleges facts that could embrace a non-discretionary decision that caused the injury and the United States does not 'establish that the decision in question was grounded in questions of public policy.'" *Molchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011) (quoting *Coulthurst v. United States*, 214 F.3d 106, 110–11 (2d Cir. 2000)), *aff'd*, 713 F.3d 159 (2d Cir. 2013).  After jurisdictional discovery, a claim may survive if a court—applying the preponderance of the evidence standard—finds the decision in question was non-discretionary under this definition.  *Cf. DeMartino*, 2023 WL 2563967, at *2 (district court obligated to make factual findings by reference to evidence outside the pleadings where jurisdictional facts disputed); *Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela*, 556 F. Supp. 2d 272, 277 (S.D.N.Y. 2008) (same, evaluating whether allegations within scope of sovereign immunity waiver), *aff'd*, 341 F. App'x 722 (2d Cir. 2009); *see also supra* note 8 (discussing allocation of burden at this stage).  For the DFE to apply, "(1) the acts alleged to be negligent must be discretionary, in that they involve an 'element

of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst*, 214 F.3d at 109 (internal quotation marks omitted) (citing *Gaubert*, 499 U.S. at 322–23; and *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)); *see also, e.g.*, *Molchatsky*, 713 F.3d at 162. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see In re Joint E. & S. Dists. Asbestos Litig.*, 891 F.2d 31, 37 (2d Cir. 1989) ("We believe that it is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision."). However, there is no discretion for a federal official "to behave unconstitutionally or outside the scope of his delegated authority." *Myers & Myers*, 527 F.2d at 1261. "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537.

### 2.      Due Care Exception

The FTCA also excludes from its waiver of sovereign immunity "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). It is aimed at ensuring that a statute or regulation's validity is not "tested through the medium of a damage suit for tort." *Myers & Myers*, 527 F.2d at 1261 (internal quotation marks omitted).

The Second Circuit has not yet set forth the standard for the DCE to apply, but many courts within the Circuit have used the formulation set forth in *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005). *See Nwozuzu v. United States*, No. 14 Civ. 8589 (LGS), 2015 WL 4865772, at *5 (S.D.N.Y. Aug. 12, 2015), *aff'd*, 712 F. App'x 31 (2d Cir. 2017) (summary order); *see also*

*D.J.C.V.*, 605 F. Supp. 3d at 589 (applying *Welch*).   Under *Welch*, a court first "determines whether the statute or regulation in question specifically prescribes a course of action for an officer to follow" and, second, if it finds in the affirmative, "inquires as to whether the officer exercised due care in following the dictates of that statute or regulation."   *See Clayton v. United States*, No. 18 Civ. 5867 (MKB) (LB), 2019 WL 9283977, at *12 (Aug. 1, 2019) (brackets omitted), *report and recommendation adopted*, 2020 WL 1545542 (E.D.N.Y. Mar. 31, 2020). Due care "implies at least some minimal concern for the rights of others." *Gjidija v. United States*, 848 F. App'x 451, 454 (2d Cir. 2021) (summary order) (quoting *Myers & Myers*, 527 F.2d at 1262) (further quotation omitted)).   Unlike the DFE, then, the DCE "applies to situations where a statute or regulation *requires* an action to be taken." *Watson v. United States*, 179 F. Supp. 3d 251, 270 (E.D.N.Y. 2016) (emphasis in original), *aff'd in part, rev'd in part*, 865 F.3d 123 (2d Cir. 2017).

### B.   Was G.C. and D.J.C.V.'s Separation Based on the Zero Tolerance Policy?

The Court now turns to the factual basis for G.C. and D.J.C.V.'s separation, which plaintiffs contend was the Zero Tolerance policy and the Mandatory Referral policy that derived from it, and which the Government contends was G.C.'s criminal history.   As pled, "[t]here [was] factual support for either version of events." *D.J.C.V.*, 605 F. Supp. 3d at 590.   Now, however, with the benefit of significant jurisdictional discovery, the Court finds a clear answer to the question:   G.C.'s criminal history, and not the Zero Tolerance policy, drove the separation in this case.   Specifically, two decisions as to G.C. dictated the course of events that resulted in his separation from his son.   These were: (1) USBP's decision to refer G.C. for prosecution; and (2) ICE's decision to detain G.C. in a secure facility, in which D.J.C.V. could not join him.   In

the analysis that follows, the Court evaluates the evidence as to these decisions, before

addressing plaintiffs' alternative arguments.

At the outset, however, the Court notes two overarching features of the factual record that

inform its analysis.

The first is that the documentary record is devoid of any reference to the Zero Tolerance

or Mandatory Referral policies in connection with G.C. and D.J.C.V., preceding or during their

five-month separation.  To be sure, the documentary record is not pellucid as to the thought

processes of the officials who made the decisions that resulted in G.C. and D.J.C.V.'s separation.

But among the entirety of the documents produced in jurisdictional discovery that are particular

to the plaintiffs, the parties cannot identify, and the Court cannot find, any reference to either of

the policies on which plaintiffs' liability theory—and theory of why this case falls outside both

FTCA exemptions—turns.[9]  Plaintiffs instead rely on communications not involving plaintiffs,

---

[9] At argument, plaintiffs conceded this point multiple times.  Two exchanges are representative.

From page 10 of the transcript:

> COURT:  [I]deally for you the record would have reflected some reference to the
> Zero Tolerance policy in or around this time period, or even later as a reason for
> the non-reunification.  You don't have that and therefore you are asking me to draw
> the inference that because it's the big picture context or atmosphere, that must, and
> because there had been contrary decisions before, that must have been the driver.

> PLAINTIFFS' COUNSEL:  Certainly I agree with that, your Honor, . . .

And from pages 16–17:

> THE COURT:  The dog that doesn't bark here is any reference to the Zero
> Tolerance policy.  This is a policy that was, for better or worse, being loudly
> trumpeted, so to speak, in Washington.  There is no reason why if that were a driver
> of some decision in connection with G.C. and D.J.C.V. you wouldn't expect it to
> appear even informally in some e-mail.  It is not like an antitrust price fixing
> conspiracy where nobody ever puts it in writing.  This was a directive from the

that discuss the policies' upcoming implementation.  From these, plaintiffs urge the Court to infer that discussions of these policies must have so infected the atmosphere at USBP and ICE that these policies, although not yet operative in the RGV sector, should be treated as causing the decision to separate G.C. and D.J.C.V.

The absence of any reference to the Zero Tolerance or Mandatory Referral policies in the records regarding G.C. and D.J.C.V. is striking given the openness with which the same officials discussed these policies in records that attributed the separation of parents and children in *other* families to them.  These records reflect overt references to these policies in connection with family separations after May 5, 2018, the effective date of the Mandatory Referral policy.  The RGV sector family separation tracker ("separation tracker")—a spreadsheet which agents used to track RGV sector family separations between October 2017 and August 2018, Macal Decl. ¶ 3—includes hundreds of entries listing "Zero Tolerance" or "Zero T" as the reason for noncitizens' separations; the first of these appears on May 10, 2018; Macal Decl., Ex A; *see also* Dkt. 189-1 (sealed).  There are other entries in the separation tracker, both before and after May 5, 2018, Macal Decl., Ex. A; Dkt. 189-1 at 6–13, that attribute the separation to the parent's criminal history, as did the tracker's May 1, 2018 entries with respect with G.C and D.J.C.V., Dkt. 189-1

---

president of the United States' attorney general. . . . [W]hy is it right to infer from the lack of reference that [the Zero Tolerance policy] is actually what's driving things?

PLAINTIFFS' COUNSEL:  Yes.  So, I think that question goes to the heart of our argument here, which is what is the Zero Tolerance policy and how was it being implemented in the time frame leading up to May 5, 2018 . . . . [I]n retrospect, we refer to that entire period from around July 2017 through June of 2018 as the Zero Tolerance policy because all of the government's efforts, from July 2017 through May 2018, were building up to an official policy announcement but it was instituting a policy of family separation that is identical to what it implemented later on.

at 8.  Had the impending Mandatory Referral policy been the basis for the separation of G.C. and

D.J.C.V., it is reasonable to expect the spreadsheet—if not other internal records—to have

reflected this.  That it does not undermines plaintiffs' theory that the Court should read

references to G.C.'s criminal history as pretextual cover-ups for USBP's reliance on these

policies.[10]

The second notable feature of the documentary record is the consistency of its statements

bearing on the basis for G.C. and D.J.C.V.'s separation.  These uniformly point to G.C.'s

criminal history as the basis.  Cavazos's initial email requesting approval to separate G.C. and

D.J.C.V. describes G.C.'s criminal history and cites it, in bolded font, as the only basis for

---

[10] In other internal communications, not keyed to specific noncitizens, the officials, both before
and after the effective date, discussed the Zero Tolerance and Mandatory Referral policies and
family separation openly, without any hint of wariness.  Such explicit references suggest that,
had these policies and not G.C.'s criminal history driven the separation in this case, the officials
would not have been hesitant to say so in writing.  For example, in April and early May 2018,
before the policy's effective date, DHS officials exchanged emails discussing its implementation
in the southwest border sectors, *see, e.g.*, JSF ¶¶ 61 (Roggow email of April 27, 2018 to border
chiefs and deputies to "begin referring all single adults to your respective U.S. Attorney's Office
for prosecution"), 64 (Hastings email of May 4, 2018 directing field and deputy chiefs to
"implement increased Southwest Border Prosecutions . . . **effective May 5, 2018**" (emphasis in
original)), and in the RGV sector, specifically, *id.* ¶¶ 66–71 (CONOP implementation emails).
After the effective date, DHS officials continued openly to discuss it and the Zero Tolerance
policy—in some cases with apparent pride.  For example, in emails exchanged over May 25 and
26, 2018, DHS officials criticized the reunification of families after a parent's completed
prosecution as a "fiasco" that "undermin[ed] the entire effort . . . of prosecuting [adults]" under
the Zero Tolerance policy.  First York Decl., Ex. 25 at 4.  USBP officials also—in response to
U.S. senators' requests for access to the RGV CPC facility to see the policy's effect—arranged a
tour, answered questions, allowed the senators to interact with families, and facilitated a press
availability, after which the officials congratulated one another on showing "[t]he Senator . . .
that what is said in press isn't really happening," *id.*, Ex. 24 at 2, 5, 8, 10 (May 30 to June 3,
2018 emails).  The officials explicitly discussed these policies even while recognizing the
public's negative views about them.  *See, e.g.*, *id.*, Ex. 32 at 2 (email of December 13, 2017)
("[W]e need to get away from the verbiage [of] separation of family units and focus on applying
proper consequences to criminals."); *id.*, Ex. 26 at 3–4 (emails from May 30, 2018, anticipating
hostile questions from public defenders who were "tired of hearing questions from their clients
about where the[ir] children may be").

separation.  *See* Guerro Email at 2 ("Request separation . . . due to mother [sic] having prior **criminal history**." (emphasis in original)); *see also* Cavazos Decl., Ex. C at 1.  G.C.'s Form I-213 likewise references G.C.'s conviction, Form I-213 at 4 ("Assault/Aggravated"), before stating: "Based on the above criminal record information, . . . the subject and his juvenile son will be separated," Cavazos Decl., Ex. B. at 3–4.  And the RGV sector's separation tracker—whose entries were made contemporaneously with the events, Macal Dec. ¶ 3—likewise lists "Parent's criminal history" in the "Reason" column and "Father's Criminal History" in the "Additional Notes" column for G.C. and D.J.C.V.'s entries, *see* Macal Decl., Ex A; *see also* Dkt. 189-1 at 8 (sealed).[11]  In the *Ms. L.* litigation—which preceded this lawsuit—the Government

---

[11] Plaintiffs appear to challenge the reliability of the separation tracker, based on a 2019 report from DHS's Inspector General ("OIG Report").  *See* Pl. Mem. at 22 (citing DHS Office of Inspector General, "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families," Nov. 25, 2019, *available at* https://www.oig.dhs.gov/sites/default/files/assets/ 2019-11/OIG-20-06-Nov19.pdf).  The report details DHS's failure to put in place adequate systems to track—and ultimately reunite—families separated under the Zero Tolerance policy.  It describes how, in April 2018, USBP "updated e3 to add 11 possible separation codes for agents to select as distinct reasons why family members were separated," but that "none of the 11 separation codes were specifically tied to the *Zero Tolerance Policy*," so BPAs "used *ad hoc* workarounds . . . by simply selecting 'Criminal History' or 'Other Reasons.'"  OIG Report at 10.  Plaintiffs argue G.C.'s "criminal history" entry was one such "workaround."  Pl. Mem. at 22.  The documentary evidence here, however, suggests otherwise.  For example, as noted, the USBP separation tracker used in the RGV sector had a Zero Tolerance policy feature—and indeed contains hundreds of entries that cite the policy as the reason for a separation.  *See* Macal Decl., Ex. A; Dkt. 189-1 (sealed).

The OIG Report is separately relevant here—and supports the Government's narrative—insofar as it confirms that the Zero Tolerance policy first went into effect May 5, 2018, after the separation at issue here, and that communications before that date reflected only planning for its implementation.  *See, e.g.*, OIG Report at 2, 18 n.23.  The following chart, drawn from page 18 of the OIG Report, chronicles the dates relevant to that policy:

again identified G.C.'s criminal history as the basis for separating him from D.J.C.V., when called upon to explain that separation.  JSF ¶ 86 (citing *Ms. L.*, No. 18 Civ. 428, at Dkt. 222 at 6).[12]

As a final threshold point, the Court is unpersuaded by plaintiffs' reliance on cases holding that the DFE "cannot shield the government from liability for family separations that were occurring across the Southern border sectors between November 2017 and May 2018."  Pl. Mem. at 30 (collecting cases); *see* Pl. Opp. at 14.  Unlike those cases, this case entailed extensive jurisdictional discovery, and involves a plaintiff parent with a criminal history predating his unlawful entry that, discovery has demonstrated, was chronicled in contemporaneous records as the basis for the separation.  *See, e.g.*, *C.M. ex rel. D.V. v. United States*, No. 21 Civ. 0234 (JKP) (ESC), 2023 WL 3261612, at *12 (W.D. Tex. May 4, 2023); *F.R. v. United States*, No. 21 Civ. 00339 (PHX) (DLR), 2022 WL 2905040, at *1 (D. Ariz. July 22, 2022); *A.P.F. v. United States*,



Figure 6: Major Zero Tolerance Policy Milestones

*Source: OIG-Generated based on data provided by DHS*

[12] Although the decision by the *Ms. L.* court is of limited relevance here—as it resolved this question without the benefit of adversarial discovery and, instead, solely on evidence proffered by the Government—the *Ms. L.* court credited that showing in excluding G.C. and D.J.C.V. from the plaintiff class.

492 F. Supp. 3d 989, 993 (D. Ariz. 2020); *C.M. v. United States*, No. 19 Civ. 05217 (PHX) (SRB), 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020); *cf. A.I.I.L. v. Sessions*, No. 19 Civ. 00481 (TUC) (JCH), 2022 WL 992543, at *4 (D. Ariz. Mar. 31, 2022) (subject matter jurisdiction asserted over claimed constitutional violations based on class members who did not have criminal histories); *Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980, 992 (S.D. Cal. 2020) ("[P]arents may be excluded from the class based on any criminal history, not just criminal history that bears on a parent's fitness or danger."). In those cases, the Government did not have a factual basis to dispute that the referrals had been based on the Mandatory Referral policy, which fell outside the DFE. Here, however, for the reasons that follow, the record supports that G.C.'s criminal history of domestic violence, to the exclusion of the Mandatory Referral policy, drove the decisions that resulted in his separation from G.C.

### 1.    USBP's Referral of G.C. for Prosecution

The Court begins with USBP's decision to refer G.C. for prosecution. The Government argues that USBP referred G.C. because of his criminal history and that the decision therefore was a product of the discretionary referral framework in place before the Mandatory Referral policy was implemented on May 5, 2018. *See* Gov't Mem. at 25–32. Plaintiffs disagree. They argue that the Mandatory Referral policy informally permeated immigration law enforcement prior to its effective date, such that G.C.'s referral can be inferred to have resulted from the policy. Pl. Mem. at 11–16, 23–26. For reasons tracking those discussed above, the Court finds with the Government.

The record reflects that, at the time of G.C.'s referral, the Mandatory Referral policy— the separate DHS policy designed "to support the zero tolerance effort," Second Grame Decl., Ex. A at 123—was not yet effective in DHS, let alone in the RGV sector. *Compare* JSF ¶¶ 16–

24 (G.C. May 1, 2018 referral), *with id.* ¶ 64 (May 4, 2018 email to USBP field chiefs stating Mandatory Referral policy effective May 5, 2018); Dkt. 193-8 at 1 (RGV CONOP stating mandatory referrals to begin May 7, 2018) (sealed); *see also* Second Grame Decl., Ex. A. at 131 (USBP "did not change [its referral] processes as a result or based on the DOJ [Zero Tolerance] memoranda").  Plaintiffs emphasize Associate CBP Chief Roggow's April 27, 2018 email directing southwest border chiefs and deputies to "begin referring all single adults" for prosecution and to track those referrals on a daily basis, and observing that the "action of referring *all* amenable cases is new."  First York Decl., Ex. 21 (emphasis added).  But Roggow's email does not specify that referrals should begin immediately as opposed to on the policy's effective date.  And the record reflects that BPAs, at the time, lacked authority to do so.  JSF ¶ 65 (USBP "not authorized" to implement mandatory referral policy before May 5, 2018).

Roggow's email is too thin a reed to find that the RGV sector, *sub silentio*, implemented the Mandatory Referral policy before its authorized date, or that G.C.'s referral on May 1 was made under the Mandatory Referral or Zero Tolerance policy frameworks.  *Cf. United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *DeMartino*, 2023 WL 2563967, at *2 ("A presumption of regularity attaches to the actions of Government agencies, and [plaintiff] offers no evidence to overcome the presumption that [defendant] acted in compliance with the statute in effect at the time." (internal quotation marks and citations omitted)).  The email is properly read in context: alongside facts including that then-Secretary Nielsen did not approve the Mandatory Referral policy until days later, on May 4, JSF ¶ 63; that Chief Hastings directed local USBP chiefs to implement the Mandatory Referral policy beginning on May 5, *id.* ¶ 64; and that the

RGV sector, as of May 7, was still planning how to implement the policy, *see, e.g.*, *id.* ¶ 70; Second Grame Decl. ¶ 46 (policy not implemented in RGV sector until May 7); Dkt. 193-8 (sealed).  In this context, Roggow's email is best read to address preparatory steps for the policy's implementation.  *See, e.g.*, JSF ¶ 59 (updating e3 to track family separations).  The assembled evidence as to implementation of the Zero Tolerance and Mandatory Referral policies in the RGV sector does not support that either policy drove G.C.'s referral, or that the documented reason for his referral (and other referrals between April 28 and May 5, 2018) was pretextual.

The documentary evidence addressing G.C. specifically—namely, Cavazos's separation request email, Guerro Email at 2 ("Request separation . . . *due to* mother [sic] having prior **criminal history**." (first emphasis added) (second emphasis in original )); G.C.'s Form I-213, Form I-213 at 4 (stating referral was "[b]ased on the above criminal record information"); and the RGV sector's separation tracker, Macal Decl. ¶ 3—instead reflects that G.C. was referred based on his criminal history, consistent with the discretionary prosecution referral framework that existed before the Zero Tolerance and Mandatory Referral policies.  Before May 5, 2018, the practice in the USBP, and RGV sector specifically, was for BPAs to exercise their discretion in choosing whom to refer for prosecution, while prioritizing noncitizens with criminal histories. *Compare* Kornreich Decl., Ex. 1 at 5 (Chief Hastings:  "[F]rom October 2017 through May 5, 2018, and again after the zero tolerance policy ended in late June through July 2018, Border Patrol Agents could prioritize individuals for prosecution differently based upon their discretion."); Dkt. 190-1 at 5 (sealed) (BPAs generally prioritized referring noncitizens with prior criminal history and considered severity of criminal history), *with* Cavazos Decl. ¶ 9 (stating that, as an RGV sector records check agent, he made "initial processing pathway

recommendation[s] for the processing agent regarding referral to ICE, ORR, or the Prosecutions Unit," and that, in doing so, "[he] followed local guidance and exercised [his] judgment to the best of [his] ability"); Second Grame Decl. ¶¶ 12 ("From November 2014 through June 26, 2018, the local general practice was to prioritize noncitizens with prior criminal history for referral to SDTX for prosecution of immigration violations," such that "all other factors being equal, those noncitizens with prior criminal history would be referred for prosecution ahead of those without prior criminal history."), 14 (prior criminal history warranting prosecution referral was not strictly defined and was largely left to the discretion of BPAs).

Accordingly, the Court finds, the Government has established, by a preponderance of the evidence, that USBP referred G.C. for prosecution because of his criminal history—and under the discretionary framework that predated the Zero Tolerance policy. Plaintiffs have not rebutted that showing. *See Molchatsky*, 778 F. Supp. 2d at 431. And plaintiffs do not—and cannot—dispute that the DFE applies to prosecution referrals made under the discretionary referral framework. *See* Pl. Opp. at 14 ("Plaintiffs do not challenge the government's authority to *prosecute* illegal entry offenses nor the manner in which the government carries out prosecutions." (emphasis in original)); Tr. at 37 (acknowledging that, "the [G]overnment had discretion, assuming there was no unconstitutional policy" at work, "to make prosecution priorities" and to "refer[] people for prosecution"). Under the discretionary referral framework, G.C.'s prosecution referral satisfies the first prong of *Berkovitz-Gaubert* because "the decision to refer [for prosecution] . . . is quintessentially discretionary." *Huntress v. United States*, No. 18 Civ. 2974 (JPO), 2019 WL 1434572, at *4 (S.D.N.Y. Mar. 29, 2019), *aff'd*, 810 F. App'x 74 (2d Cir. 2020). It also satisfies the second prong because, under the same framework, USBP delegated decisions as to prosecutorial priorities to local sector leadership and BPAs who were

"in the best position" to weigh "the needs and priorities of each" sector, and to "take[] into account the noncitizen's individual circumstances, humanitarian considerations, any contemporaneous operational constraints or resource limitations, the volume of incoming noncitizens, deterrent effects, and immigration enforcement priorities then in effect."  Second Grame Decl. ¶ 10.  Individual BPAs like Cavazos were tasked "to exercise[] [their] judgment to the best of [their] ability," Cavazos Decl. ¶ 9, in weighing those priorities.  Prosecution referrals under the discretionary framework, then, required making an "administrative decision[] grounded, economic, and political policy" of the sort to which the discretionary function exception applies, and are not amenable to suit.  *See, e.g.*, *Huntress*, 2019 WL 1434572, at *4 (DFE applied to prosecution referral for Clean Water Act violations because it required weighing the need to maximize compliance with the efficient allocation of agency resources); *cf. Molchatsky*, 713 F. Supp. at 162 ("Congress's intent to shield regulatory agencies' discretionary use of specific investigative powers via the DFE is fatal to Plaintiffs' claims.").

### 2.    G.C.'s Placement in ICE Custody

The Court turns next to ICE's decision to detain G.C. and to house him in secure facilities beginning on May 3, 2018.  *See* JSF ¶ 25.  Those decisions, the Government argues, were based on G.C.'s criminal history.  And, it argues, that history required his separation from D.J.C.V. after May 3 for an obvious reason:  At the time, no secure ICE facility suitable to house a person with G.C.'s violent history would accept a young child.  *See* Gov't Mem. at 34–37; *id.* at 37 n.17 (explaining that it would have been inconsistent with ICE's policy at the time to release noncitizen with violent criminal history into community).  Plaintiffs urge that ICE's decision regarding how and where to detain G.C. should be viewed as distinct from the question of why

USBP separated D.J.C.V. and G.C. on May 2, 2018.  Pl. Opp. at 21–22.[13]  In any event, plaintiffs

argue, the sparse record does not supply direct evidence why ICE decided to house G.C. in a

secure facility as a single adult.  Nor, they note, does it demonstrate that the agency considered

alternatives to housing G.C. in a secure facility unfit for children, such as housing D.J.C.V. and

G.C. together in a family residential center ("FRC") or releasing them subject to conditions.  *Id.*

at 22–23.  The Court finds that, although the evidence as to the basis for ICE's decision to detain

G.C. in a secure facility is solely circumstantial, it supports the Government's theory that G.C.'s

placement in a secure facility unsuitable for a young child stemmed from his known and violent

criminal record.

At the threshold, it is notable that—as with USBP's decision to refer G.C. for

prosecution—the record is devoid of evidence that the Zero Tolerance policy influenced either

USBP's decision to refer G.C. to ICE ERO[14] or, critically here, ICE ERO's immediately ensuing

decision to detain G.C. in a secure facility.  The circumstantial evidence reflects that the latter

---

[13] Plaintiffs complain that they lacked sufficient opportunity for discovery on "post-separation coordination between relevant agencies, including ICE's reunification process."  Pl. Opp. at 23. Plaintiffs did, however, depose Robert Guadian, the Deputy Assistant Director for Field Operations within ICE ERO, Guadian Decl. ¶ 1, as a Federal Rule of Civil Procedure 30(b)(6) witness, *id.* ¶ 4.  *See, e.g.*, First York Decl. ¶ 3 & Ex. 40 (deposition excerpts).  In any event, for the reasons discussed *infra*, ICE's process for reunifying families is beyond the scope of the jurisdictional inquiry here, which, on this point, sought direct and circumstantial evidence as to ICE's reasons for detaining G.C., and not D.J.C.V., in a secure facility on May 3, 2018.

[14] The parties dispute whether USBP's referral of G.C. to ICE ERO on May 2 or 3, 2018 was mandatory under 8 U.S.C. § 1231(a), which states the noncitizens "shall" be detained for a 90-day removal period, *see* Gov't Mem. at 35 n.16 (citing 8 U.S.C. § 1231(a)(2)); *D.J.C.V.*, 605 F. Supp. 3d at 603, or discretionary under 8 U.S.C. § 1231(a)(6), which states that noncitizens "may" be detained after the 90-day period has expired, Pl. Opp. at 23 n.9.  That distinction is of no moment to the jurisdictional inquiry.  Plaintiffs do not dispute that USBP's referral of G.C. to ICE ERO was protected by either the due care exception (if mandatory) or the discretionary function exception (if discretionary).  Their argument is that, factually, a separate decision based on the Mandatory Referral policy caused the separation of father and child on May 2, 2018.  *See* Pl. Opp. at 21–25.

decision was made at some time in the period between May 1, 2018 at 9:30 p.m. (when the U.S.

Attorney declined the prosecution referral) and May 3, 2018 at 2:36 a.m. (when G.C. was booked

out of USBP's custody). *See* Tr. at 58–59. That lapse of time is not suggestive of irregularity.

Administrative processing was necessary upon the U.S. Attorney's declination of prosecution.[15]

*See* Second Grame Decl. ¶ 16. And thereafter, once USBP referred a noncitizen to ICE ERO,

ICE ERO had to "decide[] whether to accept that noncitizen" and where to place him—a choice

over which USBP does not have authority. *Id.* ¶ 17. As the Government explained at argument,

"[a]fter a prosecution is declined . . . somebody had to have gone through th[e] exercise" of

"go[ing] into the file and mak[ing] a new decision as to what to do with G.C." Tr. at 59.

Jurisdictional discovery did not yield documentation of the basis of the specific decision to place

G.C. in a secure facility. But ICE ERO's ordinary practices as to noncitizens whose criminal

records implicate security are circumstantial evidence that logically accounts for G.C.'s

designation to a secure ICE facility, as opposed to in an FRC. *See* JSF ¶¶ 25, 27. As Robert

Guadian, Deputy Assistant Director for Field Operations within ICE-ERO, Guadian Decl. ¶ 1,

attested without contradiction: "In April and May of 2018, FRCs were the only option for

housing noncitizen families," but, because of G.C.'s domestic violence conviction, "none of the

FRCs would have been able to accept" him with D.J.C.V, *see id.* ¶ 17; *cf.* Dkt. 193 ¶ 25 (sealed).

Plaintiffs' arguments to the contrary are unpersuasive. They urge first that Guadian's

declaration be put aside as purportedly conclusory. Dkt. 238. It is not. Guadian's account of

ICE's facility policies and practices in April and May 2018 does not conclusorily assert the

resolution of the jurisdictional fact in dispute. *Contra Zappia Middle E. Const. Co. v. Emirate of*

---

[15] The USBP activity log for G.C. contains an entry for "Processing Complete" at 9:53 p.m. on
May 1, 2018—approximately 23 minutes after the U.S. Attorney declined to prosecute G.C.
Second York Decl., Ex. 41 at 4 (sealed).

*Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (conclusory allegation that factual dispute existed, offered in affidavit prior to jurisdictional discovery, did not require an evidentiary hearing on 12(b)(1) motion). It reflects instead a clear, if generally put, articulation of policy and procedure in an agency at a particular point in time. This is the sort of fact to which an agency's Rule 30(b)(6) witnesses routinely—and properly—attest. And Guadian had a factual basis for this statement. He personally reviewed G.C.'s records and was personally familiar with ICE's policies and facilities at the time. On that basis, he attested that, as a result of G.C.'s "aggravated assault conviction," "G.C. and D.J.C.V. would not have been able to be housed together in an FRC." Guadian Decl. ¶ 17. Plaintiffs' hypothesis that, but for USBP's earlier separation of G.C. and D.J.C.V. pursuant to what plaintiffs claim was the Zero Tolerance policy, ICE ERO might have detained G.C. with D.J.C.V., *see* Pl. Opp. at 24, thus not only lacks record support—it also is contradicted by an ICE official with percipient knowledge of the agency's practices at the time.

Plaintiffs next cite an attorney declaration from the *Ms. L.* litigation, which attests that, in or around September 2018, two fathers with drunk driving records were held in a secure ICE facility with their minor children. Dkt. 87-4 ¶¶ 5–6. That aspect of the declaration does not impeach ICE's account as to the reasons for G.C.'s custody. Drunk driving charges, without more, are not crimes "involving violence." *Cf.* Guadian Decl. ¶ 17. The *Ms. L.* declaration further represents that "[a] background check showed [that one of the two fathers also] ha[d] an outstanding warrant for an armed robbery from Honduras," Dkt. 87-4 ¶ 5. Although that pending charge would certainly appear to qualify as a crime of violence, the absence of context regarding the detention of the unidentified noncitizen with his child in September 2018 is problematic. It

does not speak to whether, four months earlier, a secure ICE facility was available in which a person with G.C.'s criminal record could be securely housed alongside an infant child.

Accordingly, the Court finds, by a preponderance, that ICE detained G.C. in a secure facility that did not permit children because of his criminal history—not because of the Zero Tolerance policy.  Given that factual basis, ICE's decision as to where and how to detain G.C. falls within the DFE.  *See D.J.C.V.*, 605 F. Supp. 3d at 604 (if "the decision of where to detain G.C." was based on his criminal history, rather than Zero Tolerance policy, it "was within the DFE"); *see, e.g.*, *Lway Mu v. Whitaker*, No. 18 Civ. 06924 (MAT), 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019) (DHS has authority to determine where noncitizens are detained pending removal); *Farley v. United States*, No. 11 Civ. 198 (WMS), 2017 WL 3503727, at *6 (W.D.N.Y. Aug. 16, 2017) ("Decisions regarding [ICE's] housing of prisoners or detainees, as well as their handling and placement, necessarily implicate safety and security and are therefore the sort of decisions that generally fall under the discretionary-function exception."); *Tsolmon v. United States*, No.13 Civ. 3434 (NFA), 2015 WL 5093412, at *11 (S.D. Tex. Aug. 28, 2015) ("Operating with limited resources, [ICE] must weigh various policy considerations in deciding which suspected aliens to detain, how to detain them, and how to investigate claims of citizenship by detained aliens."), *aff'd*, 841 F.3d 378 (5th Cir. 2016); *Douglas v. United States*, 796 F. Supp. 2d 1354, 1369 (M.D. Fla. 2011) (same); *cf. Appolon v. United States*, No. 16 Civ. 2275 (SJS) (MG), 2017 WL 3994925, at *17 (Sept. 6, 2017) (same; ICE's failure to investigate plaintiff's immigration status within DFE), *report and recommendation adopted*, 2018 WL 461241 (E.D.N.Y. Jan. 18, 2018).

### C.      Plaintiffs' Alternative Arguments

The Court, finally, considers, but rejects as a basis for relief, three alternative arguments plaintiffs advanced following jurisdictional discovery to avoid the application of the DFE and due care exceptions.

### 1.      USBP's Decision to Designate D.J.C.V. as a UAC

Plaintiffs argue that USBP's practice of designating children as UACs—and, as a result, separating families—based on a parent's *referral* for prosecution violated their due process rights and, therefore, is outside the DCE or DFE's scope.  *See* Pl. Opp. at 14; Tr. at 5 ("Separation, based on prosecution referral alone, whether or not there was an actual prosecution, was the hallmark of the Zero Tolerance family separation policy.").

To the extent that plaintiffs contend, factually, that the practice of designating a child as a UAC after a parent's referral for prosecution was part of the Zero Tolerance or Mandatory Referral policies at issue in this lawsuit, the record undermines that assertion.  *See, e.g.*, Compl. ¶¶ 49–50.  It reflects multiple examples predating the April 20, 2018 Zero Tolerance policy memorandum in which RGV sector officials designated children as UACs after a parent had been referred for prosecution, but before a determination as to that prosecution had been made.  *See* First Grame Decl., Exs. 4 (April 20, 2017), 5 (March 6, 2018), 6 (March 29, 2018); Macal Decl. ¶ 4, Ex. B (February 3, 2018); Cavazos Decl. ¶¶ 23–25, Exs. D (November 21, 2017), E (November 21, 2017), F (February 26, 2018); *see also* Gov't Mem. at 39 ("Since at least November 2014, RGV Sector's practice has been to prioritize for prosecution noncitizens with prior criminal history, including single heads of household, even if that necessitated a family separation.").  Law enforcement declarations reinforce that, before the Zero Tolerance policy,

prosecution referrals triggered family separations.[16]  For example, BPA Cavazos stated that, "from 2015 to 2018, [he] requested supervisory approval to refer for prosecution adult family members of a[] [family] with prior criminal or violent history in the RGV Sector," and that, if he did so, "[he] also had to request permission to separate the family unit."  Cavazos Decl. ¶ 11. Although USBP's practice of immediately designating children as UACs after a prosecution referral facilitated the Zero Tolerance policy, it was not, based on the record established in jurisdictional discovery, introduced as part of that policy, which, as reviewed above, mandated referrals of all amenable adults.  *Cf.* JSF ¶ 62 (the "action of referring all amenable cases is new"; not stating designation of child as a UAC, after referral, was new); *see also* Dkt. 193-4 at 2 (sealed).

To the extent that plaintiffs appear to claim that USBP's policy of designating children as UACs after a parent's referral for prosecution was unconstitutional on its own terms—that is, independent of the Zero Tolerance policy—that theory is outside the scope of the claims brought in this lawsuit.  G.C. and D.J.C.V.'s Complaint attacks the separation of families pursuant to the Zero Tolerance and Mandatory Referral policies, under which USBP referred for prosecution parents whom they previously would not have referred as a pretext to achieve family separation. *See, e.g.*, Compl. ¶¶ 49–50.  And G.C. and D.J.C.V. did not mount a broad such claim in their

---

[16] For example, in discussing the agency's practices with respect to family detention and reunification, Monique Grame, USBP's Division Chief of the RGV Sector, attested that "[d]uring 2016, 2017, and 2018, when USBP took a[] [family] into custody, *so long as there were no circumstances meriting a prosecution referral* . . . such as prior criminal history or safety concerns, USBP would attempt to refer the [family] to ICE ERO for placement in a family residential center."  Second Grame Decl. ¶ 24 (emphasis added)); *see also id.* ¶ 30 (stating that, between "November 2014 through June 26, 2018, there was no automatic mechanism . . . to reevaluate family status" and reunite families "when a parent's prosecution is declined by SDTX," the implication being that, during that period, children were designated as UACs upon such a referral); *see also id.* ¶¶ 26–28.

opposition to the Government's motion to dismiss, which, like the Complaint, focused on the

Zero Tolerance and Mandatory Referral policies.  *See* Dkt. 32 at 11 (sealed) (arguing that policy

of separating families based on a parent being amenable to prosecution was a post-hoc

rationalization and not the reason for the initial or continued separation of D.J.C.V. and G.C.); *id.*

at 17 (USBP separated D.J.C.V. from G.C. for reasons independent of "amenability to

prosecution"—that is, in furtherance of Zero Tolerance policy); *see also* Dkt. 85 (prior oral

argument transcript).  The Court declines—at this late stage and after extensive discovery and

briefing premised on a theory of liability keyed to the Zero Tolerance policy—to consider this

expanded theory.

### 2.     USBP's Failure to Reevaluate D.J.C.V.'s Status as a UAC

Following jurisdictional discovery, plaintiffs now argue that USBP's failure to reevaluate

D.J.C.V.'s status as a UAC after the U.S. Attorney declined G.C.'s prosecution was a decision

outside the scope of the DFE.  Pl. Mem. at 31–33; Tr. at 10–11.[17]

The Court declines to entertain that argument.  Plaintiffs do not cite any record evidence

that the absence of a reevaluation of D.J.C.V.'s status during the 13-hour overnight period

between the decision not to prosecute G.C. and D.J.C.V.'s being booked out of USBP custody

derived from the Zero Tolerance policy.  The evidence reflects, instead, that USBP's policy for

reevaluating a child's UAC status was consistent before and after the Zero Tolerance

---

[17] To the extent that plaintiffs challenge ICE's failure to reunify G.C. and D.J.C.V. after that
point, the decision to detain G.C. in a secure facility—which the available evidence establishes
was based on his criminal history and not connected to the Zero Tolerance policy—precluded
detention with the child.  *See supra* Section III.B.2; Second Grame Decl. ¶ 27 ("Minors cannot
accompany their parent(s) through the criminal justice system and cannot stay with a parent in a
secure adult detention facility or prison.  As a result, referral of a single parent for prosecution
results in the separation of the [family].  The child(ren) then become UACs or are referred to
ORR custody."); *see also* Gov't Mem. at 37 n.17 ("De-designating D.J.C.V. would not have
changed the outcome here, however, because at that time, there were no FRCs that would have
accepted G.C. and D.J.C.V. as a family unit due to G.C.'s violent criminal history.").

memorandum. *See, e.g.*, Kornreich Decl., Ex. A at 7 (Chief Hastings: "To the best of my knowledge, the zero tolerance policy did not change these processes, which had been in place before and remained in place during zero tolerance."); Second Grame Decl. ¶ 30 (describing lack of automatic process for canceling ORR placement after parent's prosecution was declined during November 2014 through June 26, 2018).

Also problematic for this argument, in arguing a breach of preexisting agency policy here, plaintiffs contend that USBP's TEDS policy "required [USBP] agents to reunite separated families where the parent's prosecution was . . . declined" when "both parent and child were still in USBP custody." Pl. Mem. at 31; *see id.* at 31–33; Tr. at 10–11. That characterization of an across-the-board obligation misstates the TEDS policy, which was not categorical. It instead directed USBP officials to "maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." Second Grame Decl., Ex. C at 4 § 1.9. The policy does not define "operationally feasible" or impose a timeline for reunification where required, and includes an exception for safety and security concerns. *See* Gov't Reply at 13–14; *cf. K.O. by & through E.O. v. United States*, No. 20 Civ. 12015 (TSH), 2023 WL 131411, at *8 (D. Mass. Jan. 9, 2023) (TEDs policy "fails to specify a course of action such that it is not discretionary"). Evidence adduced reflects that, consistent with the TEDS policy's articulation above, USBP practices for reevaluating a child's UAC status were sector-dependent and did not automatically require unification upon declination of a prosecution. *See* Kornreich Decl., Ex. A at 7 (Chief Hastings: "[I]n the U.S. Border Patrol, the steps taken to stop separation varied from sector to sector, and it was left to the discretion of the field based on operational and logistical considerations whether to reprocess individuals as a family."); Second Grame Decl. ¶ 30 ("[F]rom November 2014 through June 26, 2018, there was

no automatic mechanism within e3 or other automatic process to reevaluate family status or immigration dispositions when a parent's prosecution is declined by SDTX[].").  And to the extent that plaintiffs now attack either the adequacy of the TEDS policy or its implementation by the USBP in general or by RGV sector agents, that theory of liability, too, exceeds the Complaint and the liability theory plaintiffs heretofore have pursued.  *Cf.* Kornreich Decl., Ex. A at 7 (Hastings, explaining that "timing issues arose" as to reunification because of interaction between TVPRA's 72-hour placement requirement and variable "timeliness" of U.S. Attorneys' prosecution decisions).

### 3.    USBP's Failure to Reevaluate D.J.C.V.'s Status as a UAC

Plaintiffs, finally, argue that even if G.C. and D.J.C.V.'s separation were found to have been based on G.C.'s criminal history, rather than the Zero Tolerance policy, it still violated their due process rights and, therefore, falls outside the DFE and DCE.  *See* Pl. Mem. at 4 n.2; Tr. at 10–11.  The Court declines to reach this alternative argument, too.  Like the arguments immediately above, this formulation of plaintiffs' claim was first articulated after discovery.

### CONCLUSION

For the foregoing reasons, the Court grants the Government's motion to dismiss plaintiffs' FTCA claims arising from the first period of separation, because these claims fall within the discretionary function and/or due care exceptions to the FTCA's waiver of sovereign immunity.  The Court respectfully directs the Clerk of Court to terminate all pending motions.

This case will proceed to discovery on plaintiffs' FTCA claims as to the second period of separation.  The Court schedules an in-person case management conference on September 5, 2023 at 3 p.m. in Courtroom 1305 at the Thurgood Marshall U.S. Courthouse, 40 Centre Street, New York, New York 10007.  All pretrial conferences must be attended by the attorney who will serve as principal trial counsel.

The Court directs the parties to file by August 28, 2023 a joint letter outlining a proposed agenda for the conference and attaching a joint proposed case management plan.  The Court also directs the parties to email to EngelmayerNYSDChambers@nysd.uscourts.gov, no later than 24 hours before the conference, the names of any counsel who wish to enter an appearance at the conference, with the names of lead counsel designated with an asterisk.

SO ORDERED.

_Paul A. Engelmayer_

PAUL A. ENGELMAYER
United States District Judge

Dated: August 18, 2023
New York, New York